NANVCOS1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          22 Cr. 281 (JPO)

5   JOHN COSTANZO, JR.,
    MANUEL RECIO,
6
               Defendants.               Trial
7   ------------------------------x

8
                                         New York, N.Y.
9                                        October 23, 2023
                                         9:40 a.m.
10

11  Before:

12                    HON. J. PAUL OETKEN,

13                                        District Judge
                                           -and a Jury-
14
                          APPEARANCES
15

16  DAMIAN WILLIAMS,
         United States Attorney for the
17       Southern District of New York
    SEBASTIAN A. SWETT
18  EMILY S. DEININGER
    MATHEW ANDREWS
19       Assistant United States Attorneys

20  MUKASEY FRENCHMAN LLP
         Attorneys for Defendant Costanzo
21  MARC L. MUKASEY
    MICHAEL F. WESTFAL
22  STEPHANIE GUABA
    TORREY K. YOUNG
23
    GAINOR & DONNER
24       Attorneys for Defendant Recio
    RONALD GAINOR
25  AMBER E. DONNER

NANVCOS1

1                        APPEARANCES (continued)

2

Also Present:  Dean Iannuzzelli, Paralegal Specialist (USAO)
3              Nerlande Pierre, Paralegal Specialist (USAO)
               Marie-Lou Serna, Paralegal (Gainor & Donner)
4              Sal Chan, Paralegal (Mukasey Frenchman)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NANVCOS1

```
 1              (Case called)

 2              THE DEPUTY CLERK:  Starting with the government,

 3    counsel, please state your name for the record.

 4              MR. SWETT:  Good morning, your Honor.

 5              Sheb Swett, Emily Deininger, and Mathew Andrews, for

 6    the United States.  And then just so you know who will be at

 7    counsel table throughout the course of the trial, we have

 8    Nerlande Pierre and Dean Iannuzzelli, paralegals in our office;

 9    Special Agent Lonnie Davis with the Department of Justice,

10    Office of Inspector General.

11              THE COURT:  Good morning.

12              MR. MUKASEY:  Good morning, your Honor.

13              Marc Mukasey for the defendant, John Costanzo, who's

14    seated to my left.  Next to me is Torrey Young.  Down at the

15    end of the table is Stephanie Guaba.  They are going to be

16    assisting me during the trial.  Behind me is Mike Westfal, who

17    you may hear from on legal argument.  And operating our

18    audio/video is Sal Chan.

19              THE COURT:  Good morning, everybody.

20              MR. GAINOR:  Good morning, your Honor.

21              Ron Gainor on behalf of Manny Recio, who's seated to

22    my left.  To his left is my partner Amber Donner.  And to her

23    left is our paralegal Marie Serna.

24              THE COURT:  Good morning.

25              All right.  We're here for the jury trial in this
```

NANVCOS1

1    case.  And we're handing out the peremptory challenge chart and

2    also the questionnaire that I'll be handing out to the

3    potential jurors.  This is just for them to follow along.  They

4    won't be turning it in.  I'm just running through my questions

5    for jurors and make sure I have all the names I need.

6             Okay.  For Mr. Recio's counsel, for the introductions,

7    I just have Mr. Gainor and Ms. Donner.  But I should probably

8    add your paralegal.

9             MR. GAINOR:  That's correct, your Honor.

10            THE COURT:  Could you say her name again.

11            MR. GAINOR:  It's Maria -- Marie Serna.

12            THE COURT:  Marie?

13            MR. GAINOR:  Marie.

14            THE COURT:  Serna?  And how do you spell that?

15            MS. SERNA:  S-E-R-N-A.

16            THE COURT:  S-E-R-N-A.

17            Okay.  And you're a paralegal right?

18            Okay.  I'll add that.

19            And I want to make sure I get pronunciations right.

20   I'm not going to get all of them right probably, but Mathew

21   Andrews, that's easy.  Emily Deininger or Deininger?

22            MS. DEININGER:  Deininger.

23            THE COURT:  I know I asked you this already.

24   Deininger.

25            Sheb Swett.

NANVCOS1

1          MR. SWETT:  Yes, your Honor.

2          THE COURT:  Delise Jeffrey, Lonnie Davis, John

3    Hubbard, Nerlande Pierre, Dean — give me a chance —

4    Iannuzzelli.  Is it Iannuzzelli?  Okay.  Thanks.

5          I think I can handle the other ones.

6          So the potential jurors are not ready.  We're supposed

7    to call them at about 10 o'clock and see what their status is.

8    Normally, it will probably be about 10:15 or maybe even 10:30

9    by the time we get to them, but we can address in the interim

10   the various legal issues.  There are some letters from last

11   week that I need to address, supplemental motions *in limine*,

12   and follow-up from the final pretrial conference.

13         I think I'll start with Mr. Mukasey's letter that was

14   filed on Friday, October 20th, regarding the deactivation memo

15   and Mr. Hernandez.

16         Mr. Swett, do you want to address that?

17         MR. SWETT:  Sure, your Honor.

18         So at the final pretrial conference, we discussed the

19   fact that the government had gone to the DEA, reviewed the

20   file, and identified materials for production as 3500.  The DEA

21   did not produce the entire deactivation memo; rather, they

22   provided a letter, and that letter included a summary of

23   impeachment material and it listed the reasons for the

24   deactivation in that letter.

25         THE COURT:  Did the DEA explain why it's not providing

NANVCOS1

1   the letter?

2           MR. SWETT:  It did not explain to us.  After defense

3   counsel asked for it, we went back to the DEA and said defense

4   counsel would like the memo in full; and they said that they

5   would consider it, but they did not explain the reason why they

6   did not provide it in full.

7           THE COURT:  I know you filed a 17(c) subpoena, but I

8   think it was only in the last few weeks.  Have they written

9   back an objection or have they responded to it?

10          MR. MUKASEY:  Judge, to be honest with you, I'm going

11  to lateral the ball to Mr. Gainor because I think he's really

12  taken the point on this issue, if that's okay.

13          THE COURT:  Ms. Donner.

14          MS. DONNER:  Yes, okay.  Thank you.

15          We did prepare and serve a *Touhy* letter and a request

16  for the DEA for a significant amount -- or specific materials

17  regarding Mr. Hernandez.  We did not get any response from

18  them, although we have gotten materials through the government.

19          THE COURT:  Did you serve a 17(c) subpoena or not?

20          MS. DONNER:  It was a trial subpoena, so yes.

21          THE COURT:  Okay.

22          MS. DONNER:  17(c) trial subpoena.  And we have

23  received certain materials in response to that through the

24  government, the prosecutors; but we have not received the

25  blackball memo that we know they've been aware of for many

NANVCOS1

1    years.  In fact, this was the subject of contention during the

2    motion to suppress hearings.

3                THE COURT:  Did the DEA ever explain why it was not

4    producing that memo pursuant to the subpoena?

5                MS. DONNER:  No.

6                THE COURT:  Did you have oral conversations with them

7    or only written?

8                MS. DONNER:  We have not communicated directly with

9    them.  We issued the subpoena and the *Touhy* letter, so that was

10   a direct communication.  But since that time we have been

11   communicating with the prosecutors.

12               THE COURT:  Okay.

13               MR. SWETT:  Your Honor, can I add a little more

14   context of what has happened since then?

15               THE COURT:  Sure.

16               MR. SWETT:  So at some point in the last week or so we

17   received from Mr. Hernandez an email that he got from his

18   handler at the time of his deactivation.  It's a Spanish

19   language email.  We didn't have it formally translated, but

20   it's an email that his handler sent from a personal email

21   account.  And it sort of describes the contentious

22   relationship, but says more or less that you have also been

23   blacklisted by the FBI and Customs.

24               And having received this, we had the FBI go and do

25   another sweep to see if there was any further information about

NANVCOS1

1    Mr. Hernandez.  And as it turns out, there's a system that's

2    not -- that handles older informants that I understand is not,

3    sort of, the one they currently use.  But he was in there and

4    we were able to retrieve a memo from October of 2008, in which

5    the FBI described essentially the facts that are summarized in

6    the DEA deactivation letter.

7            The fact that --

8            THE COURT:  You've produced that to the defense?

9            MR. SWETT:  We produced that to the defense.

10           The fact that Hernandez had gone on a Colombian radio

11   station and suggested that he was a source, a conversation

12   about whether Hernandez had outed a confidential source, so

13   we've produced that.

14           I don't want to represent that this is identical to

15   what the DEA has, but we've given them additional information

16   about what are the same facts.  It's the same time; it's when

17   Hernandez was working as a source for a strike force called

18   Panama Express, which as I understand included DEA and FBI.  So

19   we obviously -- we all know that this incident happened; we

20   know there are some factual disputes about what actually

21   happened, but we're trying to give them as much information as

22   we can.  We're trying to collect as much information.

23           Our view is that this is not really part of the

24   prosecution team; this is something that happened ten years

25   before Hernandez had anything to do with the FBI in this case

NANVCOS1

1     and 15 years before this trial.

2               THE COURT:  So how does he get -- just for my own

3     information, how does he get to work on this case when he'd

4     been deactivated by both the DEA and the FBI as a confidential

5     source?

6               MR. SWETT:  Well, your Honor, I haven't had a chance

7     to speak with the agents who initially signed him up, but my

8     understanding is that when they ran their checks in the

9     confidential source system that the FBI has now, he would not

10    have come up because it was from such a long time ago.

11              THE COURT:  The FBI's systems are what they are.

12              MR. SWETT:  They took one system offline and another

13    one on.

14              The reality is, your Honor, the reason he was able to

15    work as a source in this case is because he made recordings

16    that backed up what he was saying.

17              THE COURT:  That's my other question, is how much of

18    his testimony is just recordings, in which case *Giglio* is kind

19    of technical?

20              MR. SWETT:  Your Honor, honestly --

21              THE COURT:  How much of it is his actual testimony

22    about things he remembers that say defendants said?

23              MR. SWETT:  I would say --

24              THE COURT:  There's both, right.

25              MR. SWETT:  There's both, there's both, your Honor.

1          And look, there's going to be a little bit of direct

2     about his story because we expect there will be a lot of cross

3     about his story.  But at the end of the day -- we understand

4     that the defendants -- that the defendants want to go through

5     issues that he's had in the past.  And frankly, we expect that.

6     And we think that there's some that should stay out, but we

7     understand why the defense wants to attack his credibility any

8     way they can.  We don't think it's necessary to hold him off

9     the stand until the DEA has produced everything that they have.

10    We think the defense has ample ammunition to work with here

11    about what happened in 2008.  They have now from the FBI and

12    the DEA information about his deactivation.  They have this

13    email which they only could have gotten from Mr. Hernandez

14    because it was sent from an agent's personal account.

15          THE COURT:  When did the government get the email?

16          MR. SWETT:  Like I said, I think within the last week

17    or so.  I can't remember the day we produced it, but we -- the

18    day we produced is the day we received it.

19          THE COURT:  And was that -- when did the government

20    learn that the FBI had also deactivated him?

21          MR. SWETT:  So this email alleges that Mr. Hernandez

22    had been deactivated or that he was on the blacklist for the

23    DEA and the FBI and Customs.  And so from there we did a check

24    to see if there was any information about him.  Again, the

25    initial check was in the active source system.  And the

NANVCOS1

1    response was the only time he's ever been a source is on this

2    case.

3              THE COURT:  My question was specific:  When did the

4    prosecution team learn that the FBI had also deactivated him?

5              MR. SWETT:  We first learned it was a possibility when

6    we received this email.

7              THE COURT:  So in the last week.

8              MR. SWETT:  In the last week.

9              THE COURT:  Okay.

10             MR. SWETT:  And then we received this memo from the

11   FBI and that confirmed it.

12             THE COURT:  Okay.  The other thing that I think I'm

13   going to need -- and I'll let you speak, Mr. Mukasey.  I'm

14   letting them respond because I've read your letter but haven't

15   gotten the response.

16             There's an awkwardness to the fact that *Brady* and

17   *Giglio* relates to information, not documents in the case law.

18   And because the DEA is not part of the prosecution team, as

19   I've ruled, this wouldn't be a problem if you'd never seen the

20   blackball memo or deactivation memo.  But you've seen it and,

21   therefore, the prosecution team does have information.  I think

22   I need to get on the record what you remember at least about

23   Category 1 from the memo that you went and looked at.

24             MR. SWETT:  I'm happy to do that.

25             Would you want to do that now, your Honor, or -- so my

NANVCOS1

1    memory of the memo is more -- is consistent with what is in

2    this FBI memorandum.  In particular, the allegation that

3    Mr. Hernandez went on Colombian television or Colombian radio

4    to talk about his status as a source was discussed in that DEA

5    memo.  And the fact that he was alleged to have outed a source

6    was also discussed there.

7            Here, the memo talks about a particular meeting where

8    the agents confronted Hernandez about that.  I don't recall if

9    that was specifically in the DEA memo, but the basic allegation

10   that Mr. Hernandez had outed a source and had admitted as much

11   to the agents was in the deactivation memo.

12           As to the lies and the failure to obey instructions, I

13   do not remember a lot of details about that, your Honor.  I

14   looked through the file, I looked at every single quarterly

15   update about the source to see if there was any *Giglio* that

16   might shed light on whether he had violated a policy or whether

17   there had been an issue.  There was nothing like that.  And I

18   think the DEA actually produced those anyway.  So the

19   allegations about failure to follow instructions and lack of

20   candor towards the handler was, I would say, briefly described

21   in the DEA deactivation memo to the best of my recollection.

22           THE COURT:  Okay.  Do you remember any specific

23   instance of his not being truthful to his handlers or his

24   investigators?

25           MR. SWETT:  I do not.  And I think if those were --

NANVCOS1

1    again, as I recall, the only time in which his source file

2    raised issues with his performance and his behavior was in the

3    deactivation memo which, as I recall, was about two to three

4    pages; and again, similar, sort of, in detail in content to

5    what the FBI prepared at the same time.

6            THE COURT:  All right.  Mr. Mukasey?  I'll give you a

7    chance.  I've read your letter obviously very carefully.  I

8    know what you're asking for.  I think I understand the issue.

9    I want you to make whatever record you think you need to make.

10           MR. MUKASEY:  I think you drilled into the proper

11   issues and pressed the proper buttons.

12           One other issue that I would add though is I think I'm

13   a little confused now as to the knowledge of the FBI in this

14   case when they went and swore out the Title III affidavit as to

15   whether or not they knew he had been deactivated by the FBI.

16   I'm confused about that.

17           I don't want to go backwards; the suppression hearing,

18   you know, is in the rearview mirror.  But to me, that's an

19   important question for preservation of the record.  Did the

20   agent who swore out the Title III affidavit, at least the

21   initial one, Delzotto, the FBI agent, what was his knowledge as

22   to the deactivation?  And I think that picks up on your Honor's

23   question:  How do you become activated again?  And did Delzotto

24   have to reactivate him?

25           THE COURT:  Well, I'll let Mr. Swett respond however

NANVCOS1

1    you -- I think what he said was he got deactivated because they

2    didn't know about the old -- he got activated because they

3    didn't know about the old deactivation because it was some old

4    database, but I'll let you respond.

5           MR. SWETT:  I haven't had a chance to speak to Special

6    Agent Delzotto, who did sign up the source.  This was in

7    conversation with the case agents on this team about where the

8    information about Hernandez was in the FBI systems and whether

9    special agents have routine access to those databases.

10          And what my understanding is, that the information

11   about Hernandez was in a database to which agents do not have

12   routine access.  I don't know what databases Special Agent

13   Delzotto looked at, but I will know on the issue of the Title

14   III that his deactivation, whether it was FBI or DEA, was part

15   of not only the affidavit and the application, it was noted

16   there, because Special Agent Delzotto had spoken with a DEA

17   agent who told him about that episode --

18          THE COURT:  So that was in the affidavit.

19          MR. SWETT:  I believe it was in the affidavit.

20          In any event, it was certainly before the Court when

21   that motion was litigated.  Because the Court was well aware

22   that Delzotto had spoken with this agent, and the agent had

23   said yeah, he was deactivated, but really it was an interagency

24   dispute.  That was his impression of it.  At this point I don't

25   think there's any indication that Delzotto would have known

NANVCOS1

1    otherwise from anything he looked at.  But I think the Court's

2    ultimate decision was it doesn't matter because it would not

3    have changed the analysis on the probable cause.

4         THE COURT:  Okay.  So we have a Rule 17(c) subpoena,

5    which is very interesting, because the *Nixon* standard, of

6    course, applies to the Rule 17(c) subpoenas.  Whether that

7    makes sense or not, there's been some things written about

8    that.

9         But it surprises me that the government doesn't know

10   why the DEA isn't producing this memo.  It just seems to me

11   you're just -- why don't you shake the trees and get this memo

12   produced so you don't have all this post-trial briefing about

13   this significant memo that undermines the cooperator.

14        MR. SWETT:  Your Honor, I'm happy to.  We're happy to

15   confer with the DEA and provide the Court a better

16   understanding of the DEA's position on this or whether there's

17   a possibility to produce the memo either in a redacted form or

18   with certain protections in place.  Like I said, these facts

19   are out there and we have been providing what we have about

20   these facts.  And the Court will decide in short order how much

21   of this comes in on cross-examination.

22        But we understand the Court's questions.  We are happy

23   to confer with the DEA.  Mr. Hernandez is not testifying today

24   and likely will not testify tomorrow; so we will do whatever we

25   can to provide the Court and defense counsel more information

NANVCOS1

1      on this so that the Court can make a decision.

2                  THE COURT:  I should say, I said what I said about a

3      Rule 17(c) subpoena, but that's obviously for a third party.

4      And for these purposes, I think the DEA is a third party, so

5      maybe I shouldn't be so tough on you.  But the DEA is obviously

6      perhaps more likely to respond to the Justice Department than

7      to defense counsel.  So just as a practical matter, it seems

8      like this could avoid some issues.

9                  I'm not saying that it's material or that it's even

10     that it's *Giglio* or whatever, but I understand the defense's

11     frustration, you know, especially given that they just learned

12     that the FBI also deactivated them.  But it is what it is.

13                 Anything else you want to add, Mr. Mukasey?

14                 MR. MUKASEY:  No, your Honor.

15                 THE COURT:  Any other issues other than the ones that

16     have been teed up in the letters that anyone wanted to raise,

17     housekeeping, preliminary, or otherwise?

18                 MR. SWETT:  Just a couple of things, your Honor.

19                 One of the things that we wrote a letter on I think

20     has been mooted, which is the issue of how the cell phone

21     extractions come in.  We've reached an agreement and so there

22     shouldn't be any need to have someone testify about which

23     extractions come from which chat threads.  So those letters

24     have been mooted, I think, by agreement.

25                 THE COURT:  Is that the rule of completeness issue?

NANVCOS1

1          MR. SWETT:  Correct, your Honor.

2          THE COURT:  Okay.

3          MR. SWETT:  And then there is, I think, an issue that

4   is not before the Court right now, but we want to bring to the

5   Court's attention, which is that the defense has subpoenaed a

6   number of agents, DEA agents, and I think former DEA agents.

7   They went through the *Touhy* process; the request was denied for

8   lack of specificity.

9          The subpoena gave a very brief and summary explanation

10  of why these agents' testimonies were needed.  So we wanted to

11  bring that to the Court's attention.  I'm not sure if there's

12  going to be any further briefing on that, but it's an issue

13  that has not been resolved.

14         MR. MUKASEY:  Judge, if I may just jump backwards for

15  one second.  I apologize.

16         THE COURT:  Can you pull the mic a little closer.

17         MR. MUKASEY:  Sure.  Just jumping backwards, Mr. Swett

18  is right that we reached stipulated agreement with regard to

19  the authenticity of the chat threads.  The 106 issue, the rule

20  of completeness issue, at least in our view, is still on the

21  table.  And the issue is I think, as I set forth in my last

22  letter to the Court and, I think, on behalf of both sides or at

23  least both defendants — apologize for the paper flurry of the

24  past week — but the issue with respect to 106 is still out

25  there.  And that is that we believe there are incompletions,

NANVCOS1

1    more chats that need to be completed to provide proper context

2    or that could provide impeachment material.  And discussing

3    them with the government is really giving away how we're going

4    to attack the witnesses and how we're going to attack their

5    case.

6              THE COURT:  I don't understand how the rule of

7    completeness issue reveals defense strategy.  Rule of

8    completeness is just the stuff they want to use for it not to

9    be confusing or for it to be placed in proper context.  You do

10   include these other parts that seems like a pretty robust

11   notion of the rule of completeness that you're going to be

12   revealing defense strategy.

13             MR. MUKASEY:  So think of it this way:  If a chat is

14   spliced together, leaving out three or four exchanges, right,

15   so if there's ten back-and-forths and their exhibit skips from

16   number one to number ten, I think it's fair game for us to

17   cross-examine about the rest of the chat.

18             Look, I mean, I think we'd have to make a relevance

19   argument obviously.  But the way they present their case is

20   something that -- and the way we attack it is certainly

21   something that is part of a defense strategy.  I don't

22   necessarily want to tell them where I think they have misled

23   the jury; I want to show the jury where they've misled the

24   jury.

25             THE COURT:  This comes up a lot and I haven't in the

NANVCOS1

1    past required -- I know it's hard for the government because

2    you might have prepared slides and things.  And the defense is

3    then going to say, Well, you also need to include these two

4    snippets in the middle.  I usually deal with it as it comes up.

5               MR. MUKASEY:  I think Ms. Deininger --

6               THE COURT:  Deininger.

7               MR. MUKASEY:  Deininger, my apologies.  People just

8    destroy my name, so I sympathize.

9               THE COURT:  Am I saying it right, by the way?  Is it

10   Mukasey?

11              MR. MUKASEY:  Like "museum," Mukasey.

12              THE COURT:  Right.

13              MR. MUKASEY:  I think Ms. Deininger pointed out in her

14   letter that nobody wants to delay and come up to the sidebar

15   and say, Judge, this is the part that we want to put in and

16   we're going to use this on cross.  So I'd like to figure out a

17   way where we can bring forward in front of the jury what has

18   been left out, what has been spliced together, what is

19   incomplete.  And hopefully we can try to find a way to do that.

20              THE COURT:  Oh, you want to do it -- you want to make

21   a dramatic moment in cross where you add the part that's been

22   left out rather than have it all come in?

23              MR. MUKASEY:  I would say impactful rather than

24   dramatic, although I'm not above drama here and there.  But I

25   do think it's a -- if the government is presenting a chat as,

NANVCOS1

1   you know, reflective of the evidence in the case, I think we're

2   permitted to attack that as not reflective of the proof in the

3   case.

4           MR. SWETT:  Just one small point on that, which

5   doesn't completely respond to what Mr. Mukasey is saying.  But

6   we did confer on the idea of chats and recordings where we took

7   out chunks in the middle and kind of mushed two together.  And

8   we have.  And if we haven't, we intend to indicate in our

9   exhibits where that happens so that the jury will know if they

10  are listening to a recording or if they are looking at chats

11  that there are parts that had been kept out, sort of, in the

12  flow of the chart.

13          THE COURT:  But this doesn't resolve his issue at all.

14          MR. SWETT:  Well, it doesn't resolve the rule of

15  completeness.  But I think to the extent the Court was left

16  with the impression from Mr. Mukasey that there are

17  Frankenstein chats that look like one thing, but were actually

18  cobbled together, the jury will see from how we present it.

19  It's not as though we're going to argue that these are

20  uninterrupted chat threads.  They will understand where things

21  have been taken out.

22          THE COURT:  Ms. Deininger?

23          MS. DEININGER:  I think that the issue that's mooted

24  is we no longer need to have an extended conference this

25  afternoon because we no longer have to have a custodian to

NANVCOS1

1      stipulate to the authenticity of our excerpts.

2                 THE COURT:  I see.

3                 MS. DEININGER:  I think we are prepared to identify

4      for defense counsel the exhibits that we anticipate using the

5      following day the evening before, to give them a chance to

6      hopefully address in advance if there are some specific

7      exhibits they have rule of completeness arguments to.  Again,

8      they have not identified for us any specific exhibits where

9      they think there's an issue or there are chats that should be

10     included.  So we have not had an opportunity to fix any issues

11     or add in text messages that might be misleading.

12                THE COURT:  Fair enough.

13                I do think it's fair to require defense counsel to

14     propose any additional sections a day before of what the

15     government intends to use because without it, it would be

16     confusing or misleading or out of context.  And look, the rule

17     of completeness does what it does, but I'm not going to allow

18     defense counsel to get around the hearsay rules, which is what

19     sometimes people try to do under the guise of the rule of

20     completeness.

21                So I'm not saying that -- you know, I'm not going to

22     let you try, but if you haven't suggested to the government in

23     advance that this section needs -- in fairness, needs to be

24     considered with what they are proposing, I'll consider it.

25     But, you know, it will have to be pretty clearly out of context

NANVCOS1

 1    what they're doing for you to justify that the *Perry Mason*

 2    moment in cross.

 3            MR. MUKASEY:  Honestly, I'm not looking for a *Perry*

 4    *Mason* moment.  I'm really thinking, you know, do I want to give

 5    the government my attack, that's all.  It's not necessarily for

 6    the dramatic flare.  These are important chats.  This whole

 7    case is chats and phone calls.

 8            THE COURT:  If what they are proposing you think is

 9    confusing, it's not unreasonable for you to tell them the day

10    before that if you add this, we think it's less confusing.  I

11    don't think that reveals much.

12            MR. MUKASEY:  One of the reasons we haven't been able

13    to do that yet is we just don't know which witnesses are going

14    with which exhibits.  As of now, we know one witness in the

15    case.  I think we just heard that the cooperating witness is

16    not going tomorrow in all likelihood.  But the faster we know

17    who's coming and what exhibits, the faster we can address the

18    completeness issue.  And I would never try to raise a

19    completeness issue and skirt the hearsay rule.  We are prepared

20    to give you the hearsay exceptions.

21            THE COURT:  All right.  Great.

22            Who's the first witness?

23            MR. SWETT:  It's Assistant Special Agent in Charge

24    Daniel Escobar.

25            THE COURT:  Update from the jury:  We'll have our

NANVCOS1

1    potential jurors in 10 to 15 minutes.  They are always delayed,

2    of course, because they watch a film and they get situated and

3    they check in and all that.  So 10 to 15 minutes.

4          Any other preliminary issues anyone wanted to address

5    before I go through the outstanding evidentiary issues?

6          MR. GAINOR:  Yes, your Honor.

7          The Court had mentioned the last time we were all

8    together about the possibility of having half of Friday off or

9    the full day Friday off.  We just wanted to, on behalf of

10   Mr. Recio, make the request after we've talked as a team that

11   if the Court was inclined, based on efficiency, to give the

12   entire Friday off, we would be asking for that.

13         THE COURT:  The entire Friday off.

14         MR. GAINOR:  The entire Friday off.  Because I

15   believe -- I don't know if I mischaracterized what the Court

16   had said, but the Court may, we thought, have suggested that

17   depending on how things go, it would consider a half day Friday

18   or a full day Friday.  If the Court is still thinking that,

19   we'd be asking for the additional time.

20         THE COURT:  Okay.  Would counsel like to address that?

21         MR. SWETT:  Your Honor, I think we have the same

22   position we had at the final pretrial conference, which is we'd

23   like to see where our case is.  We obviously want to move

24   through this quickly, but if we feel we are on or ahead of

25   schedule, we wouldn't be opposed to shortening or eliminating

NANVCOS1

1    Friday.

2              THE COURT:  Mr. Mukasey?

3              MR. MUKASEY:  I agree with everybody.  I'm agnostic.

4    Either way is fine.  I wouldn't mind the day off on Friday.

5              THE COURT:  I don't care about your religious views.

6              I'm just kidding.

7              So should we -- I mean, I think what I'm going to

8    propose doing is present it to the jurors in jury selection as

9    if half a day Friday is a possibility.  But then we'll revisit,

10   see how we're doing in terms of progress as of Thursday, and

11   then consider possibly not sitting Friday, and then that will

12   be happy news.

13             MR. GAINOR:  Yes, your Honor.

14             THE COURT:  Okay.  Anything else?

15             MS. DONNER:  Your Honor, thank you.

16             Just in terms of stipulations, we've -- I think all

17   the parties have made a very good-faith effort to stipulate to

18   as much as possible.  But at the present state, the government

19   has obtained most of their stipulations; and we are going to be

20   requesting of the government to agree to additional

21   stipulations, and I just didn't want there to be a

22   misimpression that all of that has been resolved.  There's

23   still outstanding matters and we're hopeful that we can resolve

24   them with the parties.

25             MS. DEININGER:  We're obviously going to consider in

NANVCOS1

1     good faith any requests that are presented to us.  I can't

2     speak yet to requests that have not been made.

3              MS. DONNER:  We have made certain requests that have

4     been rejected by the government.  And in order to allow for not

5     to have the witness this morning, we agreed to a stipulation

6     that did not include a significant amount of requests that we

7     had.

8              MS. DEININGER:  I think on that point, counsel is

9     referring to yesterday afternoon they requested that the

10    government stipulate to dozens of exhibits that had never been

11    included in a stipulation before.  We made a good-faith effort

12    to review all of those and did stipulate to all of the ones we

13    were able to confirm the authenticity of.

14             As we informed counsel, some of those are materials

15    that were never passed over to the filter team to us as the

16    prosecution team, and so we have submitted them to our filter

17    team to review so we can make authenticity determinations.  But

18    again, we are going to work in good faith to stipulate,

19    especially as to authenticity of records so that there -- to

20    streamline the trial as much as possible.

21             THE COURT:  You're going to get back to them on that

22    set.

23             MS. DEININGER:  Yes.

24             MS. DONNER:  And the documents subject of the

25    stipulations were exhibits that we had provided on our list

NANVCOS1

1  earlier.

2            THE COURT:  Okay.  Anything else?

3            All right.  Do you guys want to take a break before we

4  get to the charge or do you want me to give you my rulings on

5  some of the issues that have been raised in the letters?

6            MR. SWETT:  Your Honor, we're happy to hear the

7  Court's rulings.

8            MR. MUKASEY:  Agreed.

9            THE COURT:  All right.

10           Mr. Costanzo has renewed his objection to the

11  admissibility of his tax returns.  I've reviewed the parties'

12  additional letters on the issue.  I adhere to my ruling that

13  the tax returns are admissible.  I find, at least

14  provisionally, that the tax reasons are probative, and that

15  their probative value is not substantially outweighed by the

16  danger of unfair prejudice, confusion of the issues, or

17  otherwise under Rule 403.

18           The government has filed supplemental motions *in*

19  *limine* on October 17th, and I have reviewed the parties'

20  letters on those.

21           First, the government seeks to preclude

22  cross-examination of Mr. Hernandez on certain allegations.  And

23  we discussed the three categories summarized in the DEA memo.

24           The first is that he failed to obey instructions from

25  controlling investigators and, at times, lied to investigators

NANVCOS1

1    when confronted about his activities.  The government

2    acknowledges that cross-examination on those issues should be

3    allowed, and it will be allowed.

4          Second, that he compromised his status due to

5    communications with foreign entities.

6          And third, that he admitted to the purposeful

7    disclosure and identification of another CS.  The second and

8    third categories, I agree with the government that those should

9    be precluded, at least that's my provisional ruling.

10         Second, the government seeks to produce testimony

11   about specific acts of Mr. Hernandez under Rule 608(b).  This

12   motion is also granted for the reasons stated by the

13   government, subject to particular proposed testimony that the

14   government -- that the defense may proffer, and I'll consider

15   that on a case-by-case basis.

16         Third, the government seeks the admission of the

17   $20,000 payment by Mr. Pagan by Costanzo's girlfriend.  The

18   government argues that this is evidence of the bribery scheme

19   and evidence of concealment.  To avoid prejudice, the

20   government notes it can redact the fact that the source is a

21   lawyer or, I guess, where the money went is a lawyer.

22         The defense argues that this is irrelevant and

23   prejudicial and contends that the redaction would make it even

24   more prejudicial.  In my original provisional ruling I had

25   assumed that this was after the indictment, which was in large

NANVCOS1

1   part the reason for my initial provisional ruling.  Upon

2   consideration, I do find that the pattern of this payment makes

3   it probative for the reasons that the government explains.  I'm

4   inclined to admit this and will consider whether the defendants

5   prefer that it be redacted or not.

6          MR. MUKASEY:  Judge, can I just jump in for one

7   second?

8          THE COURT:  Yes.

9          MR. MUKASEY:  It was before the indictment.

10  Mr. Costanzo did hire this lawyer before the indictment.

11         THE COURT:  Yes.

12         MR. MUKASEY:  But it was after the FBI had executed a

13  search warrant at his house.

14         THE COURT:  I understand.

15         MR. MUKASEY:  He knew he was under investigation and

16  he hired a lawyer.  What if the fact that it was

17  pre-indictment -- I'm just not understanding the fact that it

18  came pre-indictment, how does that play into it?

19         THE COURT:  Well, I think that makes a significant

20  difference.  The fact that it's post indictment I think makes

21  it much more prejudicial, because it's connected to -- sorry.

22  The fact that it would have been post indictment makes it very

23  different.  The fact that it was after a search, I think, is --

24  it's just not nearly as prejudicial to the defense.

25         MR. MUKASEY:  I just want to make sure we're tracking

NANVCOS1

1   each other.  The FBI comes to his house on November 18th, 2019,

2   with a search warrant and says, Give me your phone.  I need to

3   look for this phone.  I'm searching your house and I need to

4   take a statement from you, essentially saying, You're under

5   criminal investigation.

6          Couple weeks later he hires a lawyer.  He doesn't get

7   indicted for weeks and months.  The fact that he reached out to

8   get a lawyer because the FBI was rummaging around his house and

9   he was under investigation, whether indictment ever came seems

10  to me to be irrelevant.  The idea that he's now -- the jury is

11  going to be allowed to draw a conclusion that he did something

12  wrong, he concealed to me, because he hired a lawyer?

13         THE COURT:  Well, I'm going to give you the chance --

14  I'm going to take the government up on the offer to redact the

15  fact that it's a lawyer.  I mean, look, the reason it's

16  relevant has nothing to do with the fact that it went to a

17  lawyer.  The reason it's relevant is because the money went

18  from Pagan to the girlfriend, and that that is the same pattern

19  of concealing money from Pagan that goes to Costanzo's benefit.

20  That's the relevance.

21         The question is -- I mean, I think it's quite

22  probative and relevant; that's a pattern according to the

23  government.  And the question is, is it substantially

24  outweighed by unfair prejudice.  And I think if it's post

25  indictment, it's sort of too tied up in this trial.  But

NANVCOS1

1    pre-indictment, I think it's not unfairly prejudicial in the

2    same degree.  So I think the defense should consider whether

3    they want it redacted or not.

4            MR. MUKASEY:  Judge, there is one more issue, I'm

5    sorry to belabor.

6            With respect to the tax returns, we understand your

7    Honor's ruling with respect to Mr. Costanzo's tax returns.  I

8    think — and my colleague Mr. Westfal may be able to address

9    this better, but since we were here for the final pretrial

10   conference, the tax return issue has sort of gone nuclear.  And

11   there are more tax returns that the government now seeks to

12   offer:  Costanzo's father's tax returns, certain corporate tax

13   returns.  And I'll be frank, this is going to be a trial about

14   who filed what tax returns for what reason on behalf of what

15   company.  I'll let, if your Honor wants to hear more about it,

16   Mr. Westfal address it.

17           THE COURT:  I've read all the letters.  There have

18   been multiple letters.  I've read it.  I understand it.  I'm

19   not going to let hours of testimony about tax returns.  I

20   understand that if it is a gift, he didn't have to report it.

21   Everyone understands that.  That's a strawman.

22           The point is that if he was actually receiving income

23   and he was hiding the income, the government wants to show that

24   he didn't report it on his taxes.  You can cross-examine on

25   that.

NANVCOS1

1            MR. MUKASEY:  I'm with you --

2            THE COURT:  You just want to keep arguing about this.

3            MR. MUKASEY:  No, no, I'm not arguing about his tax

4    returns.  I'm talking about the other tax returns that the

5    government wants to offer.  The government now wants to offer

6    the father's tax returns.

7            THE COURT:  Right.  If you say, Well, that could have

8    been a gift, then they can say it wasn't a gift from his

9    father.  I mean, that's totally fair.  Because the father would

10   have had to report it as a gift.  I mean, that takes two

11   minutes.

12           MR. MUKASEY:  All right.  We'll raise it when it comes

13   up.

14           THE COURT:  All right.

15           Fourth, and this one we should do because this is the

16   first witness.  The government seeks to offer testimony from

17   Agent Escobar that he learned that Recio met with a criminal

18   defendant in jail who had been investigated when Recio was ASAC

19   as DEA.  The government no longer intends to elicit Escobar's

20   decision to report Recio to the DEA and the U.S. Attorney's

21   Office or his views regarding the propriety of Recio meeting

22   with a criminal defendant to avoid 404(b) concerns.  The

23   government argues that this is relevant to Escobar's subsequent

24   acts approaching Costanzo and asking him about Recio's post DEA

25   employment.  I think it's hearsay.  Tell me why it's not

NANVCOS1

1    hearsay.

2            MR. SWETT:  Because it's not being offered for the

3    truth of Mr. Recio working as a private investigator; it's

4    offered to explain why ASAC Escobar decided to ask Special

5    Agent Costanzo what's going on with Manny.  Because otherwise

6    the jurors are going to hear him say:  My understanding was he

7    was working at a bank.  And then he'll say, But then I went and

8    talked with Costanzo and said, What's going on with Manny?

9            THE COURT:  This is a new theory.  When the government

10    initially wrote about it, they said, We want to show that he

11    was meeting with people who are investigating, and that's

12    sketchy.  Now you're arguing a completely different nontruth

13    purpose; so it raises a red flag about what why you're really

14    trying to use it.

15            MR. SWETT:  Your Honor, I actually want to push back

16    on that a little bit because we never briefed this.  This was

17    brought up sort of off-the-cuff at the final pretrial

18    conference, and we gave 404(b) notice about what Mr. Escobar

19    might say.  We don't think Mr. Escobar -- we don't think

20    Special Agent Escobar has to testify at all about how Recio was

21    visiting someone he supervised.  What we think has to come in

22    is that Special Agent Escobar learned at some point that

23    Mr. Recio -- that he heard that Mr. Recio was working as a

24    private investigator.  It was different from what he understood

25    initially, and that prompted him to speak to Special Agent

NANVCOS1

1    Costanzo.  And that conversation is entirely relevant.  It's

2    quite important because Special Agent Costanzo, rather than

3    saying, Oh, yeah, he's working as a PI, he and I talk five

4    times a day about it, and I look up stuff for him.  And by the

5    way, he's getting me a burner phone --

6              THE COURT:  If that's all you need, then the stuff

7    about the jail and visiting someone in jail --

8              MR. SWETT:  I don't think that's coming in, period.  I

9    think he's just going to say, At some point I learned he was --

10   I heard -- he's not going to say I learned.  He's going to say,

11   I heard he was working as a PI, and I went and talked with

12   Costanzo about it.

13             THE COURT:  Oh, well, that seems fine.  That's

14   different from what I had assumed you were planning to use him

15   for.

16             MS. DONNER:  It's also hearsay.  So it's classic

17   hearsay.  What he heard about what Mr. Recio was doing is

18   hearsay.

19             THE COURT:  It's not controversial, but it's also not

20   for the truth; it's simply being used for why he then went and

21   talked to someone else about it.  And as to that, I think it

22   seems not truly not for the truth.  I mean, where you're

23   actually talking about visiting someone in jail, I think that's

24   problematic because the jury would take that for the truth, I

25   think.  But if it's really, I heard he was working as a private

NANVCOS1

1    investigator, that seems fine.

2              Are they here?  All right.  The jurors are here.

3              I'll continue on our break.

4              We might need to move some people around.

5              MR. MUKASEY:  Judge, I just have one question with

6    regard to the last ruling, which I don't take issue with, but

7    there are exhibits marked for Escobar that do refer to the jail

8    communication.  Am I understanding that that's out now?

9              THE COURT:  No reference to jail, right?

10             MR. SWETT:  Mr. Escobar is not going to reference

11   jail.  His understanding that he had visited a jail, that email

12   is not related to this episode that Mr.  --

13             THE COURT:  We'll address this later.  The jurors are

14   here.  Bring them in.

15             (Jury selection commenced and concluded)

16             THE COURT:  Ladies and gentlemen, you will be the jury

17   for the trial in this case.  And it's almost 5 o'clock, so

18   obviously we will not be starting today.  I'll give you some

19   preliminary instructions, and actually I'll give you more

20   detailed instructions in the morning, and then we'll have

21   opening statements of counsel and I'll explain that process of

22   how the trial is going to go forward.

23             At this time you need to be sworn in as the jury for

24   this case, and I'm going to ask Mr. Hampton to please swear you

25   in.

NANVCOS1

1          (A jury of 12 and two alternates was impaneled and

2     sworn)

3          THE COURT:  All right.  I'm going to let you go for

4     the evening.  Again, I'll explain in the morning a little bit

5     more about the process and stages of the jury trial.

6          I just want to remind you of the things I reminded you

7     at lunchtime for tonight; and then Mr. Hampton is going to give

8     you some information about how you come and go.

9          You'll be going back to the jury room when you report

10    in the morning for the trial.  And then when we're ready, we'll

11    bring you out, Mr. Hampton will bring you out.  And he needs to

12    show you, it's a little confusing back there, there's lots of

13    doors and alleyways and things.  He'll show you where the jury

14    room is and where exactly you should go to arrive in the

15    courthouse tomorrow morning.

16         As I said earlier, we'll be doing the jury trial from

17    9:30 to about 4:30 or 4:45, resuming tomorrow morning at 9:30.

18    We will have coffee for you in the morning around 9 or 9:15, so

19    please try to be here, if you can, around 9:15.  Shoot for

20    9:15, relax, have a cup of coffee, and I think we'll have

21    muffins or bagels.  And then we'll try to begin the trial as

22    soon as possible at 9:30 in the morning.  So please shoot for

23    arriving around 9:15 so we can start promptly at 9:30.  We

24    can't start until everybody is here.

25         And I just want to remind you of a couple of things.

NANVCOS1

1          First, as I said at lunchtime, you should not

2    discuss -- you may not discuss or communicate about this case

3    with anyone, including even your fellow jurors, until you're

4    deliberating at the end of the trial.  You should not be

5    talking about the case, about what a witness said or didn't

6    say.  You could talk about anything else.  Talk about the

7    weather, talk about your families, talk about your pets, but

8    just don't talk about the trial.  Also, don't tell other people

9    anything about the trial other than to say you're on a trial in

10   federal court before Judge Oetken, that's fine.  But other than

11   that, please don't talk about the case.

12         Don't read or listen to anything about the case.

13   Don't do any research about the case in any way.  And that's

14   really important.  It might be tempting to think about looking

15   into things, checking the internet.  Please don't do that

16   because it's really out of fairness to the parties.  They have

17   a right to have this case be decided based on the evidence in

18   this trial and not extraneous stuff which might be completely

19   wrong.  It's not reliable.  So don't even look into anything.

20   That's very, very important.  I'm instructing you to not do

21   that.  So please make sure that you don't.

22         And again, don't talk to anyone.  If you do run into

23   any of the lawyers or anybody, I've told them they should not

24   talk to you.  So please make sure that if you do run into one

25   of the lawyers or one of the parties or witnesses, they are not

NANVCOS1

1  being rude, they are just following my instruction not to speak

2  with you, and don't speak to them.

3          So now we'll resume, as I said, at 9:30 in the

4  morning.  Mr. Hampton will take you back and show you where to

5  go to enter and exit the courthouse, and we'll resume tomorrow

6  morning.

7          Have a good night, everybody.

8          I will see you in the morning.

9          (Jury not present)

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Nan2Cos2

```
 1              (Jury not present)

 2              THE COURT:  You may be seated.

 3              So openings for the government will be Mr. Andrews?

 4              MR. ANDREWS:  Yes, your Honor.

 5              THE COURT:  And?

 6              MR. MUKASEY:  Ms. Young.

 7              THE COURT:  Ms. Young, and?

 8              MR. GAINOR:  Mr. Gainor.

 9              THE COURT:  And you said yours is going to be 15

10   minutes?

11              MR. ANDREWS:  Yes, your Honor.

12              THE COURT:  Are yours going to be comparable?

13              MR. MUKASEY:  Yes.

14              MR. GAINOR:  Yes.

15              And first witness is Agent Escobar?

16              MR. SWETT:  Yes, your Honor.

17              THE COURT:  Any other issues people wanted to address?

18              MR. MUKASEY:  Thank you.

19              I understand the government is about to give us their

20   other witnesses for tomorrow.  I would just ask, and we

21   mentioned this to the government as well, that a 24-hour heads

22   up I think is fair.  There are a lot of documents in this case,

23   there are a lot of documents that are going to go with

24   witnesses that are not necessarily naturally associated with

25   those documents.  So if we could get tomorrow morning or
```

Nan2Cos2

1    tomorrow, let's say, by lunch who the witnesses will be for

2    Wednesday, it will save us a lot of scramble time.

3              MR. SWETT:  By lunch is fine, your Honor.

4              THE COURT:  Okay, great.

5              MR. GAINOR:  And if I may add, do we have the witness

6    lineup for tomorrow?

7              THE COURT:  Right.  So have you gotten that yet?

8              MR. SWETT:  Yes.  So we were about to hand it over,

9    but it will be Escobar; followed by Special Agent Stephen

10   Miller from the DEA; followed by Susanna Maj, who is an analyst

11   at the U.S. Attorney's office; and then we think -- we probably

12   won't get to him, but we think our fourth witness would be

13   Mr. Hernandez, the cooperator.

14             THE COURT:  Okay.  Good enough.  All right.  We will

15   see you all at 9:15.

16             MR. GAINOR:  Your Honor, will there also be a

17   disclosure of exhibits for each one of the witnesses?

18             MR. SWETT:  Yes.  We are going to send them the

19   exhibits we are putting in through our witnesses tonight.

20             THE COURT:  Okay.

21             MR. SWETT:  Your Honor, I think the two supplemental

22   motions *in limine* that the Court did not reach when it was

23   going through its rulings were the 2015 messages between John

24   Costanzo and David Macey and then whether Special Agent Delise

25   Jeffrey can sit at counsel table.  She is not available this

Nan2Cos2

1    week, but she could sit at counsel table or sit in the

2    courtroom next week.  And also a question about the scope of

3    cross-examination for her testimony.

4            THE COURT:  Right.  So, yes, on her sitting at counsel

5    table, I believe there is no objection.  That is granted

6    without objection.

7            With respect to the scope of cross-examination, the

8    arguments are kind of two ships passing in the night.  I think

9    that cross-examination will necessarily be limited to the scope

10   of direct.  You know, the fact that she has knowledge about

11   other aspects of the investigation does not allow defense to

12   question about those other aspects if they are not within the

13   scope of the direct.

14           MR. SWETT:  And then the 2015 messages we --

15           THE COURT:  Right.  This was briefed as well.

16           MR. SWETT:  Yes, your Honor.

17           THE COURT:  I guess I didn't get to that before.  I

18   had provisionally ruled to exclude the 2015 messages with

19   Macey.  After reviewing the 3500 material and taking a closer

20   look at the case law, I find that the messages are properly

21   admitted for permissible purposes under Rule 404(b) to show

22   motive, intent, preparation, plan, and knowledge, as long as a

23   limiting instruction is given at the time that the evidence is

24   admitted making clear that these communications are not part of

25   the charged conspiracy and may not be used for propensity.

Nan2Cos2

```
1              I also find, given the nature of the evidence, that

2       its probative value is not substantially outweighed by the

3       danger of unfair prejudice under Rule 403, particularly with

4       the limiting instruction.

5              And if you all would propose a limiting instruction,

6       if you could agree on one, that's fine, or you could just give

7       me alternative versions and I will use those.

8              MR. SWETT:  Thank you, your Honor.

9              THE COURT:  All right.  We will see you all tomorrow

10      morning.  I don't know if we will have any preliminary issues,

11      so 9:30 is probably okay tomorrow.

12             MR. MUKASEY:  Thank you, your Honor.

13             MR. SWETT:  Thank you, your Honor, yes.

14             THE COURT:  Okay, thanks.  Have a good night.

15             (Adjourned to Tuesday, October 24, 2023, at 9:30 a.m.)

16

17

18

19

20

21

22

23

24

25
```