NARVCOS1

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x

 3  UNITED STATES OF AMERICA,

 4            v.                          22 Cr. 281 (JPO)

 5  JOHN COSTANZO, JR.,
    MANUEL RECIO,
 6
              Defendants.                 Trial
 7
    ------------------------------x
 8
                                          New York, N.Y.
 9                                        October 27, 2023
                                          9:25 a.m.
10
11  Before:

12                    HON. J. PAUL OETKEN,

13                                        District Judge
                                            -and a Jury-
14
                            APPEARANCES
15
16  DAMIAN WILLIAMS,
          United States Attorney for the
17        Southern District of New York
    SEBASTIAN A. SWETT
18  EMILY S. DEININGER
    MATHEW ANDREWS
19        Assistant United States Attorneys

20  MUKASEY FRENCHMAN LLP
          Attorneys for Defendant Costanzo
21  MARC L. MUKASEY
    MICHAEL F. WESTFAL
22  STEPHANIE GUABA
    TORREY K. YOUNG
23
    GAINOR & DONNER
24        Attorneys for Defendant Recio
    RONALD GAINOR
25  AMBER E. DONNER
```

NARVCOS1

1                          APPEARANCES (continued)

2

Also Present:   Dean Iannuzzelli, Paralegal Specialist (USAO)
3                 Nerlande Pierre, Paralegal Specialist (USAO)
                  Delise Jeffrey, FBI
4                 Marie-Lou Serna, Paralegal (Gainor & Donner)
                  Sal Chan, Paralegal (Mukasey Frenchman)
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NARVCOS1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning.  Please be seated.

3          Sorry.  I said 9:15.  I'm a few minutes late.  That's

4    my fault.  I was going through the various things last night

5    and printing out the letters from last night and this morning.

6          So I think we wanted to address the idea of an

7    instruction relating to DEA policies and standards of conduct.

8          MS. DEININGER:  I think we did reach an agreement on

9    proposed language.

10          THE COURT:  Okay.  Great.  If you could hand it to

11    Mr. Hampton.

12          MR. MUKASEY:  Absolutely.

13          THE COURT:  Great.  Thank you.

14          So if it's all right with everyone, I'll read that as

15    soon as the jurors come out.

16          MS. DEININGER:  That's fine.  Or we still have a

17    little bit of the standards of conduct to cover with Inspector

18    Miller, so I don't know if you prefer -- and I can just let you

19    know when we're done with that section of the Q&A and you can

20    read at the end of that section, whatever you prefer.

21          MR. MUKASEY:  That's cool with us.

22          THE COURT:  Okay.  We'll do that.

23          Anything else you wanted to address?  I know there are

24    issues relating to the cooperating witness.  I received

25    Mr. Swett's email.  I've read the documents.  I also sent an

NARVCOS1

1    email to the DEA counsel directing her to send me the

2    unredacted document and the -- what's it called again?

3           MR. SWETT:  Form 512f or Form 512d.

4           THE COURT:  The 512d, to send to me as soon as

5    possible directly to my email.  I don't know if she'll be able

6    or willing to do that, but I'm hopeful that she will.

7           And then I know there are letters from last night

8    relating to, I believe, the next witness, right?

9           MR. SWETT:  Correct.

10          THE COURT:  All right.

11          Anything else you wanted to address?

12          MS. DEININGER:  We don't have anything to address that

13   relates to Inspector Miller, but some of the letters last night

14   did relate to Special Agent Jaycox, who's our next witness.  So

15   I don't know if your Honor wanted to address those now.

16          THE COURT:  I really haven't had a chance to fully

17   read all the letters and the attachments.  But if you want, you

18   can take a minute and just highlight the issues.

19          MR. SWETT:  Your Honor, I think this largely boils

20   down to whether Government Exhibit 210 is confusing and

21   requires contextualization under Rule 106.  And the Court made

22   it very clear at the outset of this trial that Rule 106 serves

23   a specific purpose, which is to clarify statements or documents

24   that are otherwise confusing or misleading.  And we think

25   Government Exhibit 210 speaks for itself.  There's nothing in

NARVCOS1

1  there about the language that isn't clear.  There's nothing in

2  there that has been cut out or spliced together.  This is a

3  conversation about the timing of an arrest and Costanzo warning

4  Recio to stay away from the person who's about to be arrested.

5       And what the defense wants to do under 106 is not

6  clarify this document, but rather introduce a defense theory

7  through other documents.  And we think that that goes well

8  beyond what Rule 106 permits.

9       THE COURT:  The defense wants to show that the

10  information wasn't actually harmful in terms of causing him to

11  flee?

12       MR. SWETT:  Well, I think what they want to show is

13  that Recio was aware that Peralta's arrest was imminent prior

14  to this conversation.  But that's in 210 already.  Right after

15  Costanzo says this arrest is happening in a matter of weeks,

16  Recio recounts a conversation he had with Dave Macey.  And he

17  says -- and Macey asked him how quick the arrest would happen;

18  and he says, I don't know.  It could be two weeks, it could be

19  a week, it could be tomorrow, it could be a month.  And then

20  Costanzo cuts him off and says, No, no, just wait for it to

21  happen.  Don't go.  Don't go down.

22       So there's nothing misleading about this exhibit and,

23  in fact, they have enough in here to argue that Recio was

24  generally aware of the imminent arrest.

25       THE COURT:  Okay.  Mr. Mukasey?

NARVCOS1

1          MR. MUKASEY:  Judge, I don't know why you didn't read

2     the letter that we served last night at 2:15 in the morning.  I

3     would encourage you to read the letter rather than arguing it

4     sort of off-the-cuff here.  We sent a letter that addresses why

5     the single exhibit that we want to offer is admissible under

6     the rule of completeness and does not violate any hearsay

7     rules.  And we cite a very interesting case that I had not read

8     before, notwithstanding my constant reliance on 106, which is

9     called *United States v. Williams*, 930 F.3d 44, a Second Circuit

10    case.  And I think it speaks to exactly why the exhibits we

11    want to put in are necessary.

12          THE COURT:  Okay.  I'll look through the letters.  And

13    you know, it will probably be on a break or something like

14    that.

15          I'm informed by Mr. Hampton that all the jurors are

16    here.  So I suggest that we get started to get them in the

17    practice of being here at 9:30.

18          MR. GAINOR:  Your Honor, I'm sorry.

19          I know that Mr. Mukasey has put something on the

20    record, but if I can just have a minute, because this may guide

21    the Court when you're looking through the letters.  And I

22    apologize because at 11:55, I went to bed.

23          THE COURT:  I was in bed before that.

24          MR. GAINOR:  I woke up to it.

25          So the government's contention with regard to 210 is

NARVCOS1

1    that -- and in the indictment, is that it's Costanzo that gave

2    the information to Recio on Peralta, who in turn either gave it

3    to Macey or gave it to Peralta directly and, as a result,

4    Peralta fled.  That's their contention.  And it's a significant

5    part of the indictment.

6            However, from our perspective and why we wanted to put

7    in all the MR exhibits, under the rule of completeness, we

8    believe — and it's going to be fairly clear, we think, after

9    all the exhibits are reviewed by the Court — that the

10   information was not given by John Costanzo, it was given by

11   another DEA agent, Lee Lucas, that Manny Recio was talking to

12   in advance of the arrest of Peralta.

13           And why that's significant is that in the indictment

14   it's the Costanzo/Recio exchange that's so key.  And in

15   reality, it was a Lee Lucas/Recio exchange.  So that goes

16   directly to the allegations in the indictment.  The Court will

17   read the order; we'll be prepared to make further argument.

18           THE COURT:  Okay.  Thank you.

19           All right.  Please get the jury and get the witness.

20           (Jury present)

21           THE COURT:  Please be seated.

22           Good morning, members of the jury.

23           THE JURY:  Good morning.

24           THE COURT:  Welcome back.

25           Did we have coffee for you in the back?  Good.

1          All right.  Thank you very much for being here on

2     time.  I do appreciate it and the parties appreciate it.

3          We'll be continuing with the direct examination of the

4     witness who is still under oath from yesterday.

5          Ms. Deininger, you may proceed.

6     STEVEN MILLER,

7          called as a witness by the Government,

8          having been previously duly sworn, testified as follows:

9     DIRECT EXAMINATION (continued)

10    BY MS. DEININGER:

11    Q.  Good morning, Inspector Miller.

12    A.  Good morning.

13         MS. DEININGER:  Ms. Pierre, if you can pull up just

14    for the witness and counsel what is marked as Government

15    Exhibit 704A-2.

16    Q.  Inspector Miller, yesterday you testified for a while about

17    Government Exhibit 704A, which was labeled "Summary Chart of

18    John Costanzo, Jr. NADDIS Searches."  Do you remember that?

19    A.  Yes.

20    Q.  After you testified yesterday, did you become aware of any

21    errors in that chart in Government Exhibit 704A?

22    A.  Yeah, there are two errors.

23    Q.  And what is 704A-2 that we're looking at now?

24    A.  It's the summary chart of John Costanzo's NADDIS searches.

25    Q.  And has this changed in any way from Government Exhibit

NARVCOS1                    Miller - Direct

1    704A that we looked at yesterday?

2    A.  Yes.

3    Q.  And how has it changed?

4    A.  The section request date and time, two entries have

5    changed.

6    Q.  Based on your re-review of the records, is Government

7    Exhibit 704A-2 the most accurate representation of the

8    underlying records that are referenced here?

9    A.  Yes.

10        MS. DEININGER:  The government offers Government

11   Exhibit 704A-2 into evidence.

12        THE COURT:  It's admitted.

13        (Government's Exhibit 704A-2 received in evidence)

14   Q.  Inspector Miller, I wanted to return to one other thing

15   that we talked about yesterday.  We looked yesterday at

16   Government Exhibits 117, 118, and 119, which were images of

17   pages from the intranet, the DEA's intranet relating to NADDIS.

18   Do you remember that?

19   A.  Yes.

20   Q.  And you testified that those images were, to your

21   knowledge, substantially similar from the way those same

22   screens would have appeared in 2018 and 2019?

23   A.  Correct.

24   Q.  I want to draw your attention in particular to Government

25   Exhibit 118, was an image of a screen that had the header

NARVCOS1                         Miller - Direct

1    "NADDIS Security and Warning Notice," and it listed ways that

2    you could and could not use the NADDIS system.

3               Do you remember that?

4    A.   Yes.

5    Q.   When you said that that screen was substantially similar to

6    the way it appeared in 2018 and 2019, what did you mean?

7    A.   So just to clarify, the screen prior to that, the

8    government's exhibit, I think 117, is more of what I was

9    alluding to.

10              So on that screen there are a list of applications and

11   versions of those applications.  That's generally the same.  I

12   can't speak to the fact that, for instance, there might be a

13   new version or there might be a new reference material that's

14   been added since 2018.  That screen is substantially the same

15   as it appears; and then the following exhibit, Government's

16   Exhibit 118, is the same.  That warning screen will come up

17   once you access search 2.0.

18   Q.   To your knowledge, is there anything that has changed in

19   Government Exhibit 118 from the way that this screen would have

20   appeared in 2018 or 2019?

21   A.   No.

22   Q.   Is it possible that a word or two might have changed?

23   A.   A word or two might have changed; but again, this is the

24   screen that pops up after you choose the link to search 2.0.

25   Q.   Thank you very much.

1          MS. DEININGER:  Ms. Pierre, we can now return to

2     Government Exhibit 113A.

3     Q.  Inspector Miller, this is the standards of conduct from the

4     personnel manual that we were discussing yesterday.

5          MS. DEININGER:  And Ms. Pierre, we can turn to page

6     14.

7     Q.  Inspector Miller, does the DEA standards of conduct include

8     policies and outside employment?

9     A.  Yes.

10    Q.  And what generally do those provide?

11    A.  Basically says that any outside employment — meaning

12    something that you would do in lieu of being DEA agent or

13    conjunction with — has to be approved by your chain of command.

14    Q.  And how common is it for DEA special agents to get

15    authorization for outside employment?

16    A.  In my 16 years, I have not seen an approval.  I haven't

17    heard of any agent who I've come into contact with has gotten

18    an approval to do outside employment other than volunteer work

19    or teaching.

20    Q.  Have you ever heard of a DEA special agent being able to

21    get authorization to work for a defense attorney while still

22    employed by DEA?

23         MR. MUKASEY:  Objection.

24         Calls for hearsay.  "Have you ever heard."

25         THE COURT:  Sustained.

NARVCOS1                    Miller - Direct

1   Q.  Are you aware of any DEA special agents who have been able

2   to get authorization to work for a defense attorney while still

3   employed by the DEA?

4           MR. MUKASEY:  Objection.  Calls for hearsay.

5           THE COURT:  Overruled.

6   A.  I have not.

7   Q.  Are you aware of any DEA special agents who have been able

8   to get authorization to work for a private investigator while

9   still employed by the DEA?

10  A.  I have not.

11          MS. DEININGER:  Ms. Pierre, we can now turn to page

12  21.

13  Q.  Okay.  Inspector Miller, do you see where there's a header

14  2735.18 labeled "Misuse of Official Position"?

15  A.  Yes.

16  Q.  Can you just read what it says in section A and 1 here.

17  A.  Misuse of office and coercion.  DEA personnel will not:

18  Use his or her official position for private gain.

19          MS. DEININGER:  If we scroll down a little bit.

20  Q.  Can you read what it says for me in paragraph 10.

21  A.  Glean or garner information not available to the general

22  public and use that information for nonofficial purposes.  This

23  includes conducting a search in a database that an employee has

24  access to due to his or her employment with DEA.

25  Q.  And this paragraph 10 here references databases.  Would

1    that include NADDIS?

2    A.  Yes.

3    Q.  It also says that you cannot glean or garner information

4    for nonofficial purposes.  What are nonofficial purposes?

5    A.  Again, what I alluded to in yesterday's testimony.  For

6    instance, if you just wanted to run a search on your neighbor

7    to see if they had been arrested or been involved in a DEA

8    investigation, that would be a nonofficial purpose.

9    Q.  Would giving information from NADDIS to a defense private

10   investigator be a nonofficial purpose?

11              MR. MUKASEY:  Objection.

12              THE COURT:  Overruled.

13   A.  Yes.

14   Q.  I'll ask that question again.

15              Would giving information to a defense -- from NADDIS

16   to a defense private investigator be a nonofficial purpose?

17   A.  Yes.

18              MS. DEININGER:  If we can scroll down to paragraph 13

19   on the next page.  Went too far.  There.

20   Q.  And if I can just have you read that one, Inspector Miller.

21   A.  Distribute or disclose information not available to the

22   general public for nonofficial purposes.

23   Q.  And again, this references information not available to the

24   general public.  Would that include information from the NADDIS

25   database?

1    A.  Yes.

2    Q.  What are some examples of other types of information not

3    available to the general public that should not be disclosed?

4    A.  Would be anything that would -- that you would disclose in

5    reference to any sort of DEA investigation that's not public.

6            So for instance, if you had a -- you had just sworn

7    out a complaint and that person hadn't been arrested, to reveal

8    the fact that there is a complaint existing for that individual

9    to certain members of the public, that wouldn't be authorized.

10   You're jeopardizing the safety of the DEA personnel involved

11   and possibly any confidential sources who may be involved in

12   order -- or that you use to in order to obtain that complaint.

13   Q.  Do standards of conduct also include sections regarding

14   conflicts of interest?

15   A.  Yes.

16   Q.  And generally, what do those say?

17   A.  Basically, you're not allowed to use your position as a DEA

18   agent to gain anything favorable as a result of that.

19           For instance, you can't say, Hey, I'm a DEA agent.

20   Can I have this or can you give me a discount on that.

21           You can't work or provide information to someone whose

22   sort of occupation or mission is contrary to the DEA mission.

23           So for instance, giving information to a defense

24   counsel, if you were to give them information about an

25   investigation that shouldn't be disclosed or would not be

NARVCOS1                    Miller - Direct

1   disclosed, that's a possible conflict of interest because they

2   could use that to their advantage to undermine the

3   investigation.

4   Q.  Why does the DEA have this as a standard of conduct?

5   A.  Again, because it's -- it's a policy that we keep in place.

6   For you to disseminate or jeopardize investigations, it

7   undermines public confidence in DEA.  It will also -- on a

8   larger scope and more serious scope, what it can do is it

9   jeopardizes the investigation and it can also put DEA personnel

10  and others in harm's way.

11  Q.  What training, if any, do agents receive regarding the

12  standards of conduct?

13  A.  So initially we're given a block of training at the

14  academy, ethics training.  And we go through that block of

15  training, finish the academy.  We have the standards of conduct

16  which are reviewed every year by each DEA personnel.

17          As a member of OPR, sometimes the special agent in

18  charge of each field division will invite members of OPR to

19  give a presentation about policy violations that they're seeing

20  and misconduct, kind of give them a heads-up in saying, Hey,

21  this is what we're seeing at the Office of Professional

22  Responsibility; you might want to look out for that in your

23  divisions.

24          As part of a -- becoming a group supervisor or

25  supervisory special agent, you attend roughly a two-week course

NARVCOS1                    Miller - Direct

1   where they do go over some ethical issues that you may see in

2   the people you're supervising.

3   Q.  You covered a lot there.  Thank you.

4        You said there's a block of training on ethics at the

5   academy that would include the standards of conduct?

6   A.  Yes.

7   Q.  And then I think you said that agents are required to read

8   the standards of conduct on an annual basis, right?  We talked

9   about that earlier.

10  A.  That's correct.

11  Q.  I know they're required to certify that they have reviewed

12  the standards of conduct on an annual basis.

13  A.  Yes.  When everything is done online, but after you

14  complete it and read it, there's a certification button which

15  you select, shows that I've read and certified those standards

16  of conduct.

17  Q.  And I think you were describing that supervisory special

18  agents also receive additional training on these subjects; is

19  that right?

20  A.  That's correct.

21        MS. DEININGER:  Ms. Pierre, we can publish what's in

22  evidence as Government Exhibit 107.

23  Q.  Inspector Miller, what is this?

24  A.  That is the nondisclosure agreement that every basic agent

25  trainee goes through the academy signs.

1    Q.  And so every special agent signs a nondisclosure agreement

2    like this?

3    A.  Yes.

4    Q.  And can you read the name of the DEA employee that signed

5    this one at the bottom?

6    A.  I'm sorry.  John Costanzo.

7    Q.  Can you read what date it was signed?

8    A.  July 12, 2004.

9           MS. DEININGER:  Can we just scroll up a little bit.

10   Q.  Can you read what it says in paragraph 3.

11   A.  I understand that unauthorized disclosure of information in

12   files of the DEA or information I may acquire as an employee of

13   the DEA could result in the impairment of national security,

14   place human life in jeopardy, or result in the denial of due

15   process to a person or persons who are targets of investigation

16   or prevent the DEA from effectively discharging its

17   responsibilities.

18   Q.  Looking at paragraph 2, can you just read the first

19   sentence.

20   A.  I understand that it is my responsibility to report any

21   information requested of me in other than an official capacity

22   immediately to my supervisor, whether it is information

23   described as sensitive or classified.

24   Q.  Thank you.

25           MS. DEININGER:  Ms. Pierre, we can now publish what is

1   in evidence as Government Exhibit 110.

2   Q.   Inspector Miller, what is this?

3   A.   That's the hard copy form of the standard -- standards of

4   conduct.  So again, we'd moved to the standards of conduct

5   being placed in our digital format and placed on the computer

6   in our intranet.  But prior to that, everyone got the standards

7   of conduct in a hard copy form and had to circle answers and

8   sign it at the end.

9   Q.   Was this part of -- is this the actual standards of conduct

10  or was this part of the annual certification process?

11  A.   This is the standards of conduct questions; it's part of

12  the standards of conduct and it's the certification.

13  Q.   And so if we go to the bottom of page 1, to Section 4,

14  where it says:  Misuse of office and coercion.  It says:  Are

15  you aware that you as a DEA employee may not use your official

16  position for private gain or coerce or give the appearance of

17  coercion to provide financial benefit to yourself or to another

18  person?

19          And what answer is checked off next to that?

20  A.   "Yes" is indicated.

21          MS. DEININGER:  Now we can go to page 2, paragraph 6C.

22  Keep scrolling down.

23  Q.   6C says:  Are you aware that you as a DEA employee may not

24  use information which comes to you by reason of your employment

25  with DEA for personal financial gain or for the financial gain

NARVCOS1                    Miller - Direct

1    of another?

2              What answer is checked next to that?

3    A.  "Yes."

4              MS. DEININGER:  We can go to page 5.

5    Q.  Inspector Miller, can you see who signed this form?

6    A.  Yes.

7    Q.  What employee signed this form?

8    A.  John Costanzo.

9    Q.  What's the date on which it was signed?

10   A.  October 1st, 2015.

11             MS. DEININGER:  Ms. Pierre, can we scroll to page 6.

12   If we can see the whole thing.

13   Q.  Inspector Miller, what is this?

14   A.  That's the standard of conduct certification form.

15   Q.  And who is the DEA employee that signed this certification

16   form?

17   A.  John Costanzo.

18   Q.  Does it indicate his title?

19   A.  Yes.

20   Q.  What was it?

21   A.  GS, which stands for group supervisor.

22   Q.  When did he sign this?

23   A.  October 11, 2016.

24   Q.  And who signed it as his supervisor?

25   A.  Manuel Recio.

1   Q.  Did it indicate Manuel Recio's title?

2   A.  Yes.

3   Q.  What is that?

4   A.  ASAC, which stands for Assistant Special Agent in Charge.

5   Q.  And was that also signed by Manuel Recio in October 2016?

6   A.  Yes.

7           MS. DEININGER:  Ms. Pierre, I'd like to publish just

8   for the witness and counsel Government Exhibit 105.

9   Q.  Inspector Miller, what is Government Exhibit 105?

10  A.  That is the standards of conduct certification.  Basically,

11  once you complete your standards of conduct review and

12  acknowledge that you've read and understood those standards of

13  conduct and hit the button, you will receive this

14  certification.

15  Q.  Is this a record that is maintained by the DEA?

16  A.  Yes.

17          MR. MUKASEY:  We have no objection.  Put it in.

18          MS. DEININGER:  The government offers Exhibit 105 into

19  evidence.

20          THE COURT:  105 is admitted.

21          (Government's Exhibit 105 received in evidence)

22          MS. DEININGER:  Ms. Pierre, if you can publish for the

23  jury.

24  Q.  And so Inspector Miller, tell us again what Government

25  Exhibit 105 is.

NARVCOS1                        Miller - Direct

1    A.  So it's the same effect as that certification that is

2    signed on the hard copy form.  When you complete the standards

3    of conduct on the computer, you receive that certification

4    back.

5    Q.  What date is this for?

6    A.  August 14, 2018.

7    Q.  And for what DEA employee?

8    A.  John Costanzo.

9         MS. DEININGER:  If you can just flip to page 2 of this

10   document.

11   Q.  What is this?

12   A.  That is the same standards of conduct certification.

13   Q.  For -- also again for John Costanzo?

14   A.  Correct.

15   Q.  And for what date?

16   A.  August 26, 2019.

17        MS. DEININGER:  And Ms. Pierre, if you can just

18   publish what's in evidence as Government Exhibit 111.

19   Q.  Okay.  Inspector Miller, what is this?

20   A.  That is the certification for the standards of conduct, the

21   hard copy form.

22   Q.  And the employee that signed this one, is this --

23        MS. DEININGER:  If we can scroll to the bottom.

24   Q.  Is that Manuel A. Recio?

25   A.  Correct.

1  Q.  And what date did he sign this certification of having

2  reviewed the standards of conduct?

3  A.  October 3rd, 2016.

4  Q.  What does it indicate is his title?

5  A.  Assistant Special Agent in Charge.

6        MS. DEININGER:  We can take that down.

7        Your Honor, I was going to move on to the next

8  subject, if you would -- I understand you wanted to read that

9  limiting instruction.

10        THE COURT:  Yes.

11        Members of the jury, you heard testimony yesterday and

12  today regarding DEA policies and standards of conduct.  I

13  instruct you that violating DEA policies or standards of

14  conduct is not by itself a federal crime.  I will instruct you

15  on the elements of the charged crimes at the end of the trial.

16        You may proceed.

17        MS. DEININGER:  Ms. Pierre, if we can publish what is

18  in evidence as Government Exhibit 1034.

19  Q.  Inspector Miller, can you read what it says at the top of

20  this exhibit, the top five lines?

21  A.  WhatsApp chat thread.

22        Lui Guerra, 17862711852@s.whatsapp.net (gray).

23        JC, 17862712480@s.whatsapp.net (green).

24        Manny Recio, 13057967463@s.whatsapp.net.  System

25  message (blue).

1    Q.  And so looking at the first messages in this WhatsApp chat

2    thread, what date did this chat thread begin?

3    A.  June 8, 2019.

4    Q.  And can you read the second message that's in blue, the

5    system message?

6    A.  The second one:  JC created the group "Work."

7          MS. DEININGER:  Can we scroll down.

8    Q.  There are several attachments; one on this page, one on the

9    next page, one on the next page.  Who is sending those

10   attachments?  Who's sending the green messages?

11         MR. MUKASEY:  Objection to the form.  There is no

12   personal knowledge here, Judge.

13         THE COURT:  Sustained as to that.

14         MS. DEININGER:  I'll rephrase.

15   Q.  According to this exhibit, Government Exhibit 1034, who is

16   sending the green messages?

17         MR. MUKASEY:  Objection.  He can read it.

18         THE COURT:  I think it's innocuous.  According to the

19   exhibit, it says what it says.  So I guess to that extent the

20   objection is overruled.  According to the exhibit.

21   BY MS. DEININGER:

22   Q.  According to the exhibit, what is the -- how is the person

23   that is sending the green messages identified?

24   A.   Identified as JC with the phone number and a WhatsApp

25   identifier.

NARVCOS1                         Miller - Direct

1    Q.  Okay.  Thank you.

2              MS. DEININGER:  I want to pull up one of those

3    attachments.

4              Ms. Pierre, we can go backwards one page on Government

5    Exhibit 1034 and pull up Government Exhibit 1034B side-by-side.

6    Q.  Inspector Miller, looking at Government Exhibit 1034B, what

7    does that -- what is this?

8    A.  So that's a Colombian ID from the country of Colombia or

9    Cedula, C-E-D-U-L-A.

10             MR. MUKASEY:  Objection.

11             May we approach on this, Judge?

12             THE COURT:  All right.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

NARVCOS1                        Miller - Direct

1          (At sidebar)

2          MR. MUKASEY:  I'm sorry for interrupting, but this

3     witness has zero personal knowledge of anything related to

4     this.  These are materials he was shown by the U.S. Attorney's

5     Office.  I don't know if he did research on it or whatever he

6     did, but he can't testify as to what these things are.  He can

7     testify to what's in front of him and what was presented.

8          But he said one of them is a Cedula, which is a

9     Colombian identification card.  It doesn't say that anywhere.

10    He has no personal knowledge.  He wasn't involved in the

11    investigation.  These are materials presented to him for the

12    purpose of having him read them in court with zero personal

13    knowledge.

14         THE COURT:  Might have personal knowledge of what

15    "Cedula" means.

16         MR. MUKASEY:  Well, she can lay that foundation.  I'm

17    telling you that in the 3500 material, it is very clear that

18    this stuff was presented to him for the purposes of him being a

19    narrator, not an interpreter of what's going on.

20         THE COURT:  Is there any question about admissibility

21    of this document?

22         MS. DEININGER:  It's already in.

23         THE COURT:  It's already in.

24         MS. DEININGER:  It's already in.

25         I think beyond the question I just asked, which I

NARVCOS1                         Miller - Direct

1    think he does have personal experience as a DEA agent with

2    Cedulas, we are planning having him read from it.

3                THE COURT:  That's fine.

4                MR. MUKASEY:  As long as he doesn't give

5    interpretation about it.

6                THE COURT:  That's fair.

7                MR. MUKASEY:  That's fine.

8                MR. ANDREWS:  One more matter.

9                This whole thing about JC and text messages, the

10   stipulation which the defense agreed to agreed that JC is John

11   Costanzo.  So if we need to keep flipping back and forth

12   between the stipulation, the defense agreed to it.  Just to

13   make this point, it's going to be very time-consuming.  They

14   are not disputing this.

15               MR. MUKASEY:  I didn't object to anything about the

16   phone numbers.

17               MR. ANDREWS:  But it's the JC.

18               THE COURT:  Right.  Okay.

19               (Continued on next page)

20

21

22

23

24

25

NARVCOS1                          Miller - Direct

1                   (In open court)

2     BY MS. DEININGER:

3     Q.  Inspector Miller, do you see the -- where there is a name

4     in Government Exhibit 1034B?

5     A.  Yes.

6     Q.  What is that name?

7     A.  Freddy De Jesus Castaño Velez.

8                   MS. DEININGER:  Ms. Pierre, can we now publish

9     Government Exhibit 1034A side-by-side with Government Exhibit

10    1034, page 2.

11    Q.  Inspector Miller, looking at Government Exhibit 1034A, is

12    there a name written at the bottom of that image?

13    A.  Yes.

14    Q.  What is it?

15    A.  Freddy Castaño.

16    Q.  And is that the same name that we just looked at in

17    Government Exhibit 1034B?

18    A.  Yes.

19    Q.  And is there also a reference in these notes to Federico

20    Alvarez?

21    A.  Yes.

22    Q.  Do you know anyone by the name of Federico Alvarez?

23    A.  I do.

24    Q.  And who is that?

25    A.  Federico Alvarez was a former DEA agent.

1   Q.  And did you come to review the DEA files for whether there

2   was -- had ever been an investigation into a Freddy Castaño?

3   A.  Yes.

4   Q.  And what did you find?

5               MR. MUKASEY:  Objection.  Hearsay.

6               THE COURT:  Sustained.

7   Q.  From your review of DEA records, had there ever been an

8   investigation into Freddy Castaño?

9               MR. MUKASEY:  Same objection.

10              THE COURT:  Sustained.

11              MS. DEININGER:  Let's go back just to Government

12  Exhibit 1034 and go to page 2 where it shows the attachment we

13  were just looking at.

14  Q.  What's the phone number that is sending -- associated with

15  the WhatsApp account that is sending this attachment?

16  A.  That's in green, so it's 1-786-271-2480.

17  Q.  Okay.

18              MS. DEININGER:  And Ms. Pierre, we can pull up quickly

19  Government Exhibit S8 and focus on paragraph 1.

20              This says that government exhibits 320 through 325A,

21  397, 1030 to 1032, are authentic copies of notes, call logs,

22  and communications extracted from the cell phone assigned call

23  number 786-271-2480 used by John Costanzo.

24              If we can take this down and, Ms. Pierre, we can go

25  back to Government Exhibit 1034.

1    Q.  Inspector Miller, I just want to look at this conversation

2    after those attachments were sent, so we can scroll to page 5.

3              Can you read the messages in green from John Costanzo.

4    A.  Yes.

5              Lui, check this out the call me.  I will explain.  K

6    Lui, he is waiting.  Thanks.

7              MS. DEININGER:  Ms. Pierre, we can now publish what's

8    in evidence as Government Exhibit 101.

9    Q.  Inspector Miller, what is this?

10   A.  That is a SF-50 form, Standard Form 50.

11   Q.  And what is a Standard Form 50?

12   A.  It's a form that tracks our personnel action.  So if you

13   are retiring or if you're transferring your duty stations, it's

14   noted on this form.

15   Q.  And what is this particular one for?

16   A.  This one is for retirement.

17   Q.  Of who?

18   A.  Manuel Recio.

19   Q.  And when does it show that he retired?

20   A.  The effective date is November 10th, 2018.

21   Q.  And on the left in boxes 7 and 14, does it show what his

22   title had been when he retired?

23   A.  Yes.

24   Q.  What was that?

25   A.  Was supervisory criminal investigator of -- and the name

NARVCOS1                        Miller - Direct

1    and location of the position was Miami field division, office

2    of the ASAC, No. 3, Miami HIDTA.

3    Q.  And did you review other files from Manny Recio's -- did

4    you also review Government Exhibit 120, which is in evidence,

5    another file from Manny Recio's -- sorry.  Did you also review

6    Government Exhibit 120, which is in evidence?

7    A.  Yes.

8    Q.  And did you -- you said a minute ago that Manny Recio

9    retired on November 10, 2018.  Was there anything notable to

10   you about that date of his retirement?

11   A.  It's just in conjunction with his date of birth.  So he has

12   a date of birth in November.  So what it appears to be is that

13   Manny Recio retired when he had enough time in as far as his

14   government service and arrived at being 50 years old, which is

15   a prerequisite for retirement and receiving your pension and

16   other benefits.

17   Q.  And so is it -- so he retired within a week or days of

18   being eligible to retire and receive those benefits?

19             MR. GAINOR:  Objection.  Asked and answered.

20             THE COURT:  Sustained.

21             MS. DEININGER:  We'll move on.

22             All right.  Ms. Pierre, if we can pull up Government

23   Exhibit 106A, which is in evidence.

24   Q.  All right.  Inspector Miller, what is this?

25   A.  That's an SF-50 for John Costanzo.

NARVCOS1                    Miller - Direct

1    Q.  And what does this SF-50 show was the personnel action with

2    regard to John Costanzo at this time?

3    A.  Reassignment or transfer.

4    Q.  And when was this?

5    A.  This was -- the effective date is June 23rd, 2019.

6    Q.  And looking at the left-hand side of the page, boxes 7 and

7    14, what position was he leaving?

8    A.  He was leaving supervisory criminal investigator position

9    in the Miami field division under the office of the ASAC 3

10   enforcement, Group 10.

11   Q.  And what -- looking on the right-hand side to boxes 15 and

12   22, what position was he reassigned to?

13   A.  So he was -- this was his headquarters rotation, so he was

14   assigned to the operations division, office of domestic ops,

15   financial investigations.

16   Q.  What is the office of financial investigations?

17   A.  So that's a department in headquarters, and it will oversee

18   DEA financial investigations throughout worldwide DEA.

19          So for instance, if you're conducting a money

20   laundering investigation or money pickups, then you would more

21   often than not contact financial investigations, they would

22   assign you what we call an FO number or financial operations

23   number to proceed with your investigation and provide any

24   assistance that they are capable of to the field in their

25   position as a, I guess, staff coordinator with financial --

NARVCOS1                          Miller - Direct

1    with the FO office.

2    Q.   And you said that this was a headquarters rotation.  What

3    does that mean?

4    A.   So every supervisory special agent after a certain period

5    of time, usually it's around five years, has to do a

6    headquarters rotation, gets assigned to a position in

7    headquarters.

8    Q.   And while you're at headquarters, are you considered

9    headquarters personnel?

10   A.   Yes.

11         MS. DEININGER:  Ms. Pierre, we can now publish what is

12   in evidence as Government Exhibit 104.

13   Q.   Inspector Miller, what is Government Exhibit 104?

14   A.   That's Standard Form 86.

15   Q.   And what is a Standard Form 86?

16   A.   So this is the form that you fill out every five years to

17   do an updated background investigation in order to maintain

18   your security clearances.

19   Q.   Do all DEA special agents have to complete an FS-86 every

20   five years?

21   A.   If you want to maintain your clearance, yes.

22         MS. DEININGER:  We can go to page 6 of this document.

23   Page 7, sorry.  Okay.

24   Q.   Under sections -- first under Statement of Understanding,

25   can you read the paragraph that starts "I have read the

1    instructions"?

2    A.  I have read the instructions and I understand that if I

3    withhold, misrepresent, or falsify information on this form, I

4    am subject to the penalties for inaccurate or false statement

5    per U.S. Criminal Code Title 18, Section 1001, denial or

6    revocation of a security clearance and/or removal and debarment

7    from federal service.

8    Q.  And what answer is marked underneath that?

9    A.  "Yes."

10   Q.  And under the section immediately below that labeled

11   "Identifying Information," what DEA employee does it say that

12   this form is for?

13   A.  John Costanzo.

14   Q.  Is that John Anthony Costanzo, Jr.?

15   A.  Correct.

16   Q.  And if we scroll down to the next page, this starts Section

17   7, your contact information.  If we scroll looking at the top

18   of this page, what is indicated as John Costanzo's work

19   telephone number?

20   A.  305-796-7679.

21   Q.  Are there any other telephone numbers listed here?

22   A.  Other than that one, no.

23        MS. DEININGER:  Let's go to page 12 now.

24   Q.  All right.  At the bottom of Section 13A is labeled

25   "Employment Activities."  Can you just read the first two

1    sentences of that instruction.

2    A.  List all of your employment activities, including

3    unemployment and self-employment, beginning with the present

4    and working back ten years.  The entire period must be

5    accounted for without breaks.

6           MS. DEININGER:  And now we just scroll down to the

7    next page.  I want to take a look at what employment is listed

8    here.

9    Q.  Inspector Miller, can you tell me what employment was

10   listed by John Costanzo?

11   A.  Special agent.

12   Q.  With what agency?

13   A.  Department of Justice, DEA.

14   Q.  And for what period of time?

15   A.  Was July 2004 to the present.

16   Q.  Is there any other employment listed in this SF-86?

17   A.  No.

18          MS. DEININGER:  If we can go down to page 14.

19   Q.  At the bottom here it says there's Section 16, people that

20   know you well.  And I'll just read it.  The first sentence

21   says:  Provide three people who know you well and preferably

22   live in the U.S.

23          I'd like to now turn to the next page.

24          And Inspector Miller, who is the individual that's

25   identified in Section 2?

1   A.   Edwin Pagan III.

2   Q.   And what does it state for the dates they've known each

3   other?

4   A.   July 7th, 1997 to the present.

5   Q.   And how does it indicate that they -- sorry.

6           MS. DEININGER:   And now we can turn to -- strike that.

7   If we can go to page 15.   Keep scrolling.   Sorry.   We can go on

8   to page 16.

9   Q.   All right.   Under section 18 here at the bottom where it

10  says "relatives," do you see that?

11  A.   Yes.

12          MS. DEININGER:   Ms. Pierre, we can just flip to the

13  next page.

14  Q.   And Inspector Miller, I'd like you to read the name of the

15  person that's identified as John Costanzo's father at the

16  bottom?

17  A.   John A. Costanzo.

18  Q.   Inspector Miller, in preparing to testify here today, did

19  you review John Costanzo's DEA personnel file?

20  A.   Yes.

21  Q.   Is there any record in there indicating that he had ever

22  received authorization from the DEA to engage in outside

23  employment?

24  A.   No.

25  Q.   Is there anything in John Costanzo's file indicating that

1    he had ever asked for authorization to engage in outside

2    employment?

3    A.  Not in the file.

4            MS. DEININGER:  Ms. Pierre, we can now publish what's

5    in evidence as Government Exhibit 113B.

6    Q.  And Inspector Miller, what is this?

7    A.  That's a page from the agent's manual.

8    Q.  Is this -- does this appear to be the entirety of the

9    agent's manual or just an excerpt?

10   A.  An excerpt.

11   Q.  And generally, what does the agent's manual contain?

12   A.  The agent's manual is sort of the guidelines that we use to

13   do our jobs.  So it's a guidebook on how to conduct ourselves

14   as DEA agents and how to do our -- our duties or our -- or to

15   perform as agents such as processing evidence, how to do

16   certain operations, etc.

17   Q.  Is the agent's manual made available to DEA special agents?

18   A.  Yes.

19   Q.  How?

20   A.  So initially it was a binder filled with pages that

21   comprise the agents manual.  Now it is on the DEA intranet,

22   what I spoke about yesterday.  You can access the agents manual

23   in the manual section through our DEA intranet; it lists all

24   the manuals that cover DEA employees.

25           MS. DEININGER:  Now, I just want to turn to page 7.

1  Q.  Okay.  At the top here the header says that this section

2  relates to requests for investigative information by members of

3  the public.  So first, would a private investigator be a member

4  of the public?

5  A.  Yes.

6  Q.  How about a defense attorney?

7  A.  Yes.

8  Q.  All right.  If you go to paragraph A, can you read that

9  first line starting with "Requests from members of the public."

10 A.  Requests from members of the public received in DEA field

11 offices will be processed as follows.

12 Q.  Now, I want to read the first full paragraph under

13 subsection B that starts with "Under no circumstances."

14 A.  Under no circumstances should a field or headquarters --

15 I'm sorry.

16 Q.  Sorry.  Inspector Miller, you can start again.

17          Under no circumstances.

18 A.  Under no circumstances should a field or headquarters

19 office acknowledge the existence or nonexistence of any of the

20 requested data in DEA files to a requestor.  A written response

21 will be forwarded to the requestor by the administrator

22 regarding the discloseability of the requested data.

23 Q.  Inspector Miller, what's your understanding of why a field

24 or headquarters office should not acknowledge the existence or

25 nonexistence of requested data and DEA files?

NARVCOS1                        Miller - Direct

A.   Again, what I alluded to earlier is you could compromise an

ongoing DEA investigation and thereby compromise the safety of

individual DEA personnel and any individual involved in the

investigation.

         And on top of that, if the target of that

investigation doesn't know they're being investigated by the

DEA, again, they could thwart that investigation.  If there is

an arrest warrant that hasn't been unsealed and that person

doesn't know that they are the subject of that arrest warrant,

they can flee the jurisdiction.  There's a myriad of problems

that can arise if you disclose that information.

Q.   Would it be a violation of this policy to confirm that a

specific DEA investigation exists?

A.   Yes.  To a member of the public, yes.

         MS. DEININGER:  Ms. Pierre, we can take this down.

Q.   Inspector Miller, we obviously talked for a while yesterday

about NADDIS.  During your time at the DEA, have you ever

conducted searches in NADDIS on behalf of defense counsel?

A.   No.

         MR. MUKASEY:  Objection.

         THE COURT:  Overruled.

A.   No.

Q.   And have you during your time at the DEA ever conducted

searches in NADDIS on behalf of a private investigator?

A.   No.

NARVCOS1                        Miller - Direct

1   Q.  Why not?

2   A.  It's a violation of policy.

3            MR. MUKASEY:  Objection.  Move to strike.

4            THE COURT:  Overruled.

5   Q.  Would there also be potentially other concerns with

6   disclosing that information?

7   A.  Again, what I just spoke about:  Safety concerns, you're

8   jeopardizing your investigation.

9   Q.  And during your time at the DEA, have you ever told a

10  defense counsel about the content of a particular NADDIS file?

11  A.  No.

12  Q.  Have you ever told a private investigator about the content

13  of a particular NADDIS file?

14  A.  No.

15  Q.  Have you ever told a defense counsel whether -- when the

16  DEA planned to arrest a particular individual?

17  A.  I have not.

18  Q.  Have you ever told a private investigator when the DEA

19  planned to arrest a particular individual?

20  A.  No.

21  Q.  Have you ever told a defense lawyer when the government

22  planned to get an indictment against a particular individual?

23  A.  No.

24  Q.  Have you ever told a private investigator when the

25  government planned to get an indictment against an individual?

1    A.  No.

2    Q.  Why not?

3    A.  Again, you're jeopardizing the investigation.  And again,

4    it could be a compromise of somebody's health and safety.

5    Q.  In your time at the DEA, have you ever revealed a

6    confidential source's identity to a private investigator

7    working with defense counsel?

8    A.  No.

9    Q.  Why not?

10   A.  Because again, you're revealing information that is

11   sensitive, could be classified.  It's violation of policy as

12   well as --

13              MR. MUKASEY:  Move to strike.

14              THE COURT:  Overruled.

15   A.  As well as you're disclosing the identity of a confidential

16   source who might be a party to that investigation.  And then

17   the subject of that investigation, again, might cause harm to

18   that individual based upon learning their identity.

19              (Counsel conferred)

20              MS. DEININGER:  Your Honor, if we can ask your

21   indulgence for a quick sidebar.

22              THE COURT:  Sure.

23              (Continued on next page)

24

25

NARVCOS1                          Miller - Direct

```
 1              (At sidebar)
 2              MS. DEININGER:  I asked questions earlier about
 3    whether he'd been able to determine from his review of DEA
 4    records that there was an investigation into a particular
 5    person named Freddy Alvarez.  There was an objection that was
 6    sustained on hearsay.
 7              I think we would like to go back and ask if he was
 8    able to determine just whether there were DEA files with that
 9    name.  We don't believe that that would be hearsay.
10              MS. DONNER:  What would be the relevance?
11              MS. DEININGER:  That they contained files about Freddy
12    Alvarez and John Costanzo and Manny Recio texting about --
13              MR. MUKASEY:  It's the same objection.  It's hearsay.
14    He learned it from outside files outside the courtroom.
15              THE COURT:  It's not a statement, it's --
16              MR. MUKASEY:  I'll listen to the question, but I don't
17    see any difference, if you learn facts from reading them in
18    files.
19              MS. DEININGER:  All we're seeking to elicit is that
20    there are DEA files regarding Freddy regarding this individual.
21              MR. MUKASEY:  I'll listen to the question.  I don't
22    think that's a problem.  That's not the question you asked
23    earlier, but --
24              THE COURT:  Okay.
25              MR. MUKASEY:  Judge, I actually have an application.
```

NARVCOS1                          Miller – Direct

1              The reason I moved to strike his testimony about

2     violation of policy is we specifically briefed this and we said

3     that conclusions of law or conclusions of violations of policy

4     would be a jury question.  The government, in a filing on

5     docket 126 on October 4th, said — and I'm looking at it — The

6     government does not anticipate that Miller will testify

7     regarding what responsibilities constituted Special Agent

8     Costanzo's official duties, whether any conduct of Costanzo's

9     violated DEA policies or any legal conclusions.

10             THE COURT:  He didn't testify to whether any conduct

11    of Mr. Costanzo violated a policy.

12             MR. MUKASEY:  He testified to conduct that would

13    violate the policy.

14             THE COURT:  Exactly.  I never excluded that.

15             MR. MUKASEY:  Well, that's our application.

16             THE COURT:  Okay.

17             (Continued on next page)

18

19

20

21

22

23

24

25

NARVCOS1                        Miller - Direct

1           (In open court)

2           MS. DEININGER:  Ms. Pierre, if you can pull back up

3    Government Exhibit 1034, and next to it Government Exhibit

4    1034A, both of which are in evidence.

5    BY MS. DEININGER:

6    Q.  Inspector Miller, this is a WhatsApp chat thread that we

7    discussed earlier.

8    A.  Correct.

9    Q.  The name at the bottom of Government Exhibit 1034A is

10   Freddy Castaño?

11   A.  Yes.

12   Q.  Are you aware whether the DEA has any files regarding

13   Freddy Castaño?

14   A.  Yes.

15   Q.  Are you aware whether the DEA ever opened an investigation

16   regarding Freddy Castaño?

17   A.  Yes.

18           MR. MUKASEY:  Objection.

19           THE COURT:  Overruled.

20   Q.  Are you aware when that investigation was opened?

21   A.  Approximately October of 2016.

22   Q.  And approximately when was that investigation closed?

23   A.  Approximately February of 2019.

24           MS. DEININGER:  No further questions.  Thank you.

25           THE COURT:  Cross-examination, Mr. Mukasey.

1          MR. MUKASEY:  Thank you, Judge.

2     CROSS-EXAMINATION

3     BY MR. MUKASEY:

4     Q.  Good morning, Inspector Miller.

5     A.  Good morning.

6     Q.  You were asked some questions by Ms. Deininger about the

7     SF-86 just a couple minutes ago, specifically with regard to

8     policies regarding outside employment.  Right?

9     A.  Correct.

10    Q.  If you don't have any outside employment, you don't need to

11    check the box regarding outside employment, right?

12    A.  Yes.

13    Q.  And if you don't have outside employment, you don't need

14    permission for outside employment, right?

15    A.  That would follow, yes.

16    Q.  Can you tell me what materials were provided to you to

17    prepare for your testimony today and yesterday?

18    A.  I was provided those charts that we spoke about yesterday,

19    the text messages.  All the documents that were put in evidence

20    before me, I was provided those documents as well.

21    Q.  So the policies that you talked about, the standards of

22    conduct, did you pick those out or were those given to you by

23    the U.S. Attorney's Office?

24    A.  Those were provided by the U.S. Attorney's Office.

25    Q.  Are you familiar with the Attorney General's guidelines

1   regarding the use of confidential informants?

2   A.  Not verbatim, but yes, I know it's out there.

3   Q.  Were you asked to review them?

4   A.  No.

5   Q.  Are you familiar with the Department of Justice guidelines

6   regarding the use of confidential informants?

7   A.  Familiar, but again, I was not asked to review those.

8   Q.  Are you familiar with the DEA's policies concerning

9   deactivation of confidential informants?

10              MS. DEININGER:  Objection.

11  A.  Yes.

12              THE COURT:  Overruled.

13  A.  Yes.

14  Q.  Were you asked to review those policies about deactivation

15  of confidential informants?

16  A.  No.

17  Q.  Were you asked to review by any chance the FBI's policy on

18  confidential informants?

19  A.  No.

20  Q.  Now, you were asked, if I understand correctly, whether

21  there was a written DEA policy on conflicts of interest, right?

22  A.  Yes.

23  Q.  And you did not know that policy off the top of your head;

24  correct?

25  A.  No, I would refer -- if I wanted to refer to that, I would

1     look at the personnel manual or the agents manual.

2     Q.  So when you were asked whether there was a written policy

3     on conflict of interest, you had to go check that, right?

4     A.  No, I know there's a policy against conflict of interest,

5     yes.

6     Q.  You had to go check the policy?

7     A.  I had to go review it, yes.

8     Q.  In other words, you didn't know it off the top of your

9     head?

10    A.  No, I don't know a lot of policies off the top of my head,

11    I have to review them.

12    Q.  Okay.  And would you agree that following standards of

13    conduct is largely a question of common sense?

14    A.  Most of the policies, yes, are common sense.

15    Q.  Would common sense tell you not to use a deactivated

16    informant in an investigation?

17            MS. DEININGER:  Objection.

18            THE COURT:  Sustained.

19    Q.  Speaking of the policies, I think you said yesterday that

20    there are a bunch of manuals, aside from the ones you've talked

21    about during your testimony, right?

22    A.  That's correct.

23    Q.  We touched on this a bit yesterday, but you talked about

24    chapter 27 with Ms. Deininger of the personnel manual; is that

25    right?

NARVCOS1                    Miller - Cross

1    A.   2735, right.

2    Q.   That means there's 26 other chapters that come before that?

3    A.   It's possible, yeah.  Yeah.

4    Q.   And are there chapters that come after that?

5    A.   Yes.

6    Q.   And those would all pertain to DEA personnel policies and

7    standards?

8    A.   Roughly, yes.  In the personnel manual, yes.

9    Q.   Suffice to say it's a big manual?

10   A.   Yes.

11   Q.   And you just testified about a little part of it?

12   A.   Yes.

13   Q.   And with regard to the agents manual, which is, I think,

14   Government Exhibit 113B, the part that you read was section

15   6322.  Are there 62 other chapters of that?

16   A.   Yeah, there's a bunch of other chapters before and after,

17   yes.

18   Q.   Okay.  So that's another massive book?

19   A.   It's voluminous, yes.

20   Q.   And all those voluminous policies and materials cover your

21   conduct as a DEA agent, right?

22   A.   Roughly.  But again, they are boiled down to the standards

23   of conduct for a more condensed and readable version.

24   Q.   But all those other chapters bear on your conduct as an

25   agent obviously?

1  A.  No.  Again, what I alluded to in the agents manual, it will

2  not so much regulate your conduct, but will tell how to conduct

3  certain investigations, such as this is how you process

4  evidence, things of that nature.  So it's not just standards of

5  conduct in the agents manual.

6  Q.  Understood.

7       But all different aspects of your conduct as a DEA

8  agent, whether it's processing evidence or ethics or what to

9  wear to work, it's all contained in that volume?

10 A.  That's a fair characterization, yes.

11 Q.  Okay.  And I think you mentioned yesterday there's also a

12 diversion investigator's manual?

13 A.  Yeah, there's a diversion investigator's manual, there

14 would be a laboratory manual, there's a manual for AGEOs.  So

15 again, there's a series of manuals.

16 Q.  Okay.  There's a money laundering investigative manual,

17 yes?

18 A.  Yeah, there's money laundering and I alluded to the AGEO.

19 Q.  Okay.  Now, speaking of AGEOs, you mentioned during your

20 direct examination money pickups?

21      MS. DEININGER:  Objection.  I don't remember that.

22      THE COURT:  Did you?

23      THE WITNESS:  I did.

24      THE COURT:  You did.  Okay.

25      MS. DEININGER:  Withdrawn.

NARVCOS1                          Miller - Cross

Q.  Can you tell the ladies and gentlemen of the jury what a

money pickup is?

A.  Sure.  A money pickup is when an individual will contact

most likely a confidential source or an undercover and seek to

launder that money.  And so because most drug transactions take

place with bulk cash, they have to launder that money

obviously.

          So they have a large amount of bulk cash on hand.

They will drop that bulk cash to an undercover or a

confidential source who is acting as a money launderer.  And

then they will launder that money for the target.  The target

will then drop off that money to the undercover or the

confidential source, and that confidential source will then

launder those funds through various bank accounts.

Q.  And what you just explained is sort of shorthand referred

to as a money pickup?

A.  Shorthand, yes.

Q.  And that's an effective technique in targeting drug

trafficking organizations very often, right?

          MS. DEININGER:  Objection.  Outside the scope.

          THE COURT:  Overruled.

A.  Yeah, it's a technique that's used to target drug

trafficking and money laundering organizations, yes.

Q.  And you also mentioned just a moment ago and I think

yesterday, AGEOs.  And I think you said they were attorney

NARVCOS1                    Miller - Cross

1    generals exempted operations?

2    A.  I mentioned AGEOs today.

3    Q.  Okay.  In the course of reviewing Special Agent Costanzo's

4    file, did you come to learn that he was involved in AGEOs?

5    A.  Not through his files, no.  Not from a review of his

6    personnel file, no.

7    Q.  And notification of personnel action that Ms. Deininger

8    showed you where he moved from Miami to Washington, do you

9    understand that was to work in financial operations?

10   A.  Yes, that's what's indicated in that box, yes.

11   Q.  And they do AGEOs; correct?

12   A.  I assume they have some oversight or some -- I don't know.

13   Q.  So you're not familiar with the kind of work he was doing

14   in Washington?

15   A.  I don't know specifically what he did, no.

16   Q.  Have you ever done AGEO work?

17   A.  Yes.

18   Q.  Have you ever supervised an AGEO?

19   A.  No.  I supervised the closure of one when I promoted the

20   group that I was running in Newark was closing their AGEO

21   investigation, so --

22   Q.  And have you ever been a case agent on an AGEO?

23   A.  No.

24   Q.  Are you familiar at all with something called Operation

25   Money Badger?

NARVCOS1                          Miller - Cross

```
 1              MS. DEININGER:  Objection.
 2   A.  No.
 3   Q.  Are you familiar with something -- I'll tell you the reason
 4   I'm asking this is in terms of policies that you were talking
 5   about, including the money laundering policy manual, are you
 6   familiar with something called The High Wire Program?
 7   A.  Yes.
 8              MS. DEININGER:  Objection.
 9   Q.  And the --
10              MS. DEININGER:  Objection.
11              THE COURT:  Sustained.
12   Q.  With respect to AGEOs, those are large financial
13   investigations of drug trafficking organizations, is that a
14   layperson's fair characterization?
15   A.  Large and sometimes complex, yes, involving multiple
16   jurisdictions and multiple offices possibly, yes.
17   Q.  And multiple targets potentially?
18   A.  Of course.
19   Q.  Now, you spoke a bit about NADDIS yesterday.  How does a
20   target of an investigation get assigned a NADDIS number?
21   A.  So when we do a DEA-6 or report of our investigation and a
22   target could be observed on surveillance or anything as a
23   result of our investigation, there's a section where -- it's
24   called indexing.  And that subject's information is placed into
25   that indexing section.  Once that's placed into the indexing
```

1   section and they report and the investigation is approved, sent

2   through the appropriate channels, then that person's

3   information is then placed into the NADDIS database.

4   Q.  Now, a special agent of the DEA doesn't need permission

5   from a supervisor to run a NADDIS search; is that correct?

6   A.  That's correct.

7   Q.  In order to further an investigation for an official

8   purpose?

9   A.  Correct.

10  Q.  And a supervisor at DEA, like a group supervisor, doesn't

11  need permission from his supervisor to run a NADDIS search,

12  yes?

13  A.  Correct.

14  Q.  Now, if you run a search on a name like some of the

15  searches you were talking about yesterday, you may find

16  nothing; correct?

17  A.  Correct.

18  Q.  And you may find information about the name or the address

19  or the car that you ran, right?

20  A.  That's correct.

21  Q.  Now, on the various screens, and it looks like icons or

22  menus that you showed us yesterday, there's no icon or menu or

23  someplace to click on NADDIS, like a section called "Sealed

24  Indictments"?

25  A.  No.  But it's possible that if you place that information

NARVCOS1                      Miller - Cross

1   in the indexing section or place it in a DEA-6 that this person

2   is the subject of a sealed indictment, it would show up in

3   their narrative or detailed section under NADDIS.

4   Q.  But there's no tab you click on to find all the sealed

5   indictments?

6   A.  That's not accurate.  Again, you could click on details,

7   but there isn't a specific, to add to your point, labeled

8   "Sealed Indictments," no.

9   Q.  Thank you.

10          In your review of the NADDIS searches, you did not

11  find any NADDIS search in which Special Agent Costanzo ran the

12  name Cesar Peralta; correct?

13  A.  That's only what you've seen provided by the U.S.

14  Attorney's Office, is only an excerpt of that -- that audit.  I

15  would have to review that audit to see if it did show up.

16  Q.  Okay.  Is that Government Exhibit 102 or 103?  The

17  larger -- the larger one you're talking about?

18  A.  It would be -- so when I ran the audit, there were a bunch

19  of names and searches that popped up.  That was then condensed

20  by the U.S. Attorney's Office in the document with the 23

21  searches on it.  So again, I can't -- without looking at that

22  large Excel spreadsheet, I wouldn't be able to tell you if that

23  name was on there or not.

24  Q.  And the 23 that you ran, which I think is Government

25  Exhibit 704 --

```
 1              MR. MUKASEY:  Can we give that to the witness?  Can we
 2    show that to the witness, 704?  704.  Can we get it?  A-2 is
 3    the corrected one.
 4    Q.  And again, just to move it along, I'm going to ask you to
 5    see if the name Cesar Peralta is in the third column from the
 6    right.
 7    A.  Not in this list, no.
 8              MR. MUKASEY:  Now, if we could put Government Exhibit
 9    117 on the screen.
10    Q.  You talked a bit yesterday about the top, on the green bar
11    that says "DEA sensitive but unclassified."  Do you see that?
12    A.  Yes.
13    Q.  What's the difference between classified and unclassified?
14    A.  Classified is information that you need to have a certain
15    clearance to view.
16    Q.  And classified is in something called the Merlin system; is
17    that right?
18    A.  Yes, you need clearance to view the information generated
19    from the Merlin system.
20    Q.  So classified would be in a different system than we're
21    looking at right now?
22    A.  Yes.
23    Q.  Classified information is not stored in NADDIS, right?
24    A.  No.
25    Q.  It comes off the Merlin system?
```

NARVCOS1                    Miller - Cross

1   A.  Some of it will -- it depends.  It depends.  There's not an

2   absolute, where you could say this does or does not happen.

3   Q.  Now, these screenshots that you took, I think it's 117,

4   118, and 119 --

5          MR. MUKASEY:  Sal, can you just zoom out.

6   Q.  You just, what, take your phone and took a picture of this?

7   A.  Yeah, these are photos that I took; correct.

8   Q.  In the upper right-hand corner it says Steven J. Miller.

9   That's you obviously, right?

10  A.  That's right.

11  Q.  After you took a screenshot, what did you, text this to the

12  U.S. Attorney's Office or email it to them?

13  A.  I did.

14  Q.  Now, if I understood you correctly yesterday, these

15  screenshots that you took of your own screen, this is not a

16  picture of the screen in 2018 or 2019, right?

17  A.  No, this is -- this is the screenshot from --

18  Q.  2023?

19  A.  Correct.

20  Q.  And this is not a picture of exactly what an agent would

21  have seen in 2018 or 2019 with respect to 117?

22  A.  Again, in that -- in that picture you're showing me, I

23  can't say whether or not it's exactly as it would appear in

24  2018, because of the upgrades and the reference materials that

25  might be added or the links that might be added.  But again, to

NARVCOS1                    Miller - Cross

1   my earlier testimony, it's substantially the same screen that
2   you would see when you access NADDIS.
3   Q.  They're not exactly the same.
4   A.  Split hairs, yes.
5   Q.  Or you just can't say?
6   A.  No, I can say.  I can tell you that it's the same; but
7   exactly, I can't say whether or not it's exactly.
8   Q.  Okay.  With respect to your discussion yesterday about the
9   audit logs and the different names that Special Agent Costanzo
10  ran in NADDIS, you can't tell us based on anything you've been
11  shown what he saw when he ran those searches, right, the actual
12  information?  You can see the tabs he clicked into, but you
13  can't see what came up?
14  A.  No, I can't see his screen from 2018, no.
15  Q.  Okay.  Just to put it in other words, you saw what he asked
16  for, but not what he got?
17  A.  Yeah, I saw what he searched for, what he clicked on, but
18  not the information that was recovered or that -- let me be
19  specific.  The specific information that was garnered from it.
20  So for instance, in one of the searches, if he searched on
21  identifying numbers, I can't say whether or not he received the
22  date of birth, Social Security number, alien ID number.
23  Q.  Or anything at all?
24  A.  Right.  I can just say that he clicked on identifying
25  numbers, that's it.

NARVCOS1                        Miller - Cross

1   Q.  Right.  And you couldn't say what came back and what he

2   saw?

3   A.  Specifically, no.

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. MUKASEY:

2    Q.  With respect to the FS86, which is Government Exhibit

3    104 -- Sal, can we put that on the screen?  Can you go to the

4    bottom of page 9.

5             Do you see the name in the middle of the page there,

6    Inspector Miller, under "person who knew you"?

7    A.  Yes.

8    Q.  The name Guillermo Aleman?

9    A.  Yes.

10   Q.  Do you know who he is?

11   A.  I don't.

12   Q.  Can you go to, Sal, the bottom of 15?

13            And, again, you see Guillermo Aleman.  Yes?

14   A.  Yes.

15   Q.  Sal, if we could put up Government Exhibit 113A.  These are

16   the standards of conduct.  Specifically page 9.

17            Do you see Section 2735.15, Inspector Miller?

18   A.  Yes.

19   Q.  Under Section A, it says, "An employee shall not accept a

20   gift from a prohibited source."  Right?  Got that?

21   A.  Yes.

22   Q.  And a prohibited source is defined on the next page under

23   subsection (b).  Sorry this is so tedious.  And then there is

24   (b) Roman Numeral i, ii, iii, iv, v, right?

25   A.  Right.

Q.  The first Roman is "prohibited source is someone seeking

official action by the employee's agency."

        Would an example of that be sort of like a pharmacist

or pharmaceutical company seeking official action by DEA?

A.  Yeah, so if you are -- yeah, that's a good example of that,

yes.

Q.  So under (b)(ii) prohibited source means "someone who does

business or seeks to do business with the employee's agency."

        Someone who does business with DEA would be like

somebody who wants to sell them a xerox machine or, I don't

know, a food supply?

A.  Could be, yes.

Q.  Okay.  No. (iii), prohibited source means "somebody who

conducts activities regulated by the employee's agency."

Someone the DEA regulates, I don't know, like, again, a

pharmacy maybe?

A.  Yeah, to your earlier point, yes.

Q.  And (iv) "prohibited source means anyone who has interest

that may be substantially affected by the performance or

nonperformance of an employee's duties."

        So that interest, again, consistent with the rest of

this section, is financial interest, right, that may be

substantially affected, someone who has a financial interest in

dealing with DEA?

A.  Among other things.  Could be, could be any sort of

Nar2Cos2                    Miller - Cross

1   interest.

2   Q.  Okay.  And if you move down from that section to large B,

3   as in "boy," 2, could you read (B)(2) for us, please, starting

4   with the word "an employee"?

5   A.  "An employee may accept a gift given under circumstances

6   which make it clear that the gift is motivated by a family

7   relationship or personal friendship rather than the position of

8   the employee.  Relevant factors in making such a determination

9   include the history of the relationship and whether the friend

10  personally pays for the gift."

11  Q.  Sal, you can take that down.

12          I want to go to 113B now, please, and I couldn't tell

13  you what page it is.  Do you know where I want to go?  I think

14  it is my third page.  It is the section that starts at 6322.2.

15          You got that in front of you, Inspector?

16  A.  Yes.

17  Q.  Okay.  Under (b), if you slide down past 1, 2, 3, 4, 5,

18  keep going to the next page, no. 9, and this talks about

19  disclosures, obviously, and no. 9 is disclosures to individuals

20  and organizations in the course of investigations to elicit

21  information, right?

22  A.  Yes.

23  Q.  Now, you read a bunch of NADDIS search information

24  yesterday on, I think, yesterday it was 734B.  Yesterday was

25  734B-2.  Is that right?  Sorry 704A.  Now it's 704A-2 but we

Nar2Cos2                    Miller - Cross

1    are talking about the same chart.  With respect to those

2    searches and names, you don't know why any of those names were

3    run, correct?

4    A.  Based upon this chart, no.

5    Q.  And you don't know the context in which any of the searches

6    were run, right?

7    A.  I don't understand your question.

8    Q.  You don't know the reason anybody asked for a search or ran

9    a search, correct?

10   A.  Correct.

11   Q.  Okay.  And you don't know anything about the relationship,

12   if there is any, between the requester and the name that was

13   run.

14   A.  Other than supervisor and subordinate, no.  Past

15   supervisor, past subordinate.

16   Q.  Well, no, let me clarify my question.  The requester in the

17   second column and the name that was run in the third column.

18   A.  Ah, okay.

19   Q.  You don't know the relationship between those two columns?

20   A.  No.

21   Q.  So you don't have any idea why the searches may have been

22   run.

23   A.  I don't.  It would be speculating on my part.

24   Q.  Okay.  And with respect to the text chains that you read

25   this morning with Ms. Deininger, kind of the same questions,

1  you don't know the context in which any of those texts were

2  sent, right?

3  A.  In terms of their relationship or --

4  Q.  In terms of what was happening at the time, what was

5  happening before, or the reasons for any of the --

6  A.  No, like the background or anything, no.

7          MR. MUKASEY:  Thank you, Inspector Miller.

8          THE COURT:  Mr. Gainor.

9          MR. GAINOR:  No questions.

10          THE COURT:  Ms. Deininger, any redirect?

11          MS. DEININGER:  Yes, your Honor.

12  REDIRECT EXAMINATION

13  BY MS. DEININGER:

14  Q.  Ms. Pierre, if we can return to Government Exhibit 704A-2.

15  Inspector Miller, on cross, as you said, you were just asked

16  whether you know anything about the context of the searches run

17  in this chart, right?

18  A.  Correct.

19  Q.  Now, you do know that John Costanzo ran searches in NADDIS

20  for these names, correct?

21  A.  Based upon my audit, that is correct.

22  Q.  And you do know based on your review of the materials that

23  were used to prepare these charts that he ran those searches

24  after receiving text messages from Manuel Recio or in one case

25  David Macey, is that correct?

1  A.  That's correct, based upon my review of the text messages

2  and this chart and my audit.

3  Q.  I meant each of those text messages asked for Costanzo to

4  provide information about the individuals that are named in the

5  third column, "name run in NADDIS"?

6  A.  That's correct.

7  Q.  Inspector Miller, you were asked on cross-examination about

8  a number of different DEA policies.  Do you remember that?

9  A.  Yes.

10  Q.  About how there are a lot of policies?

11  A.  (Nodding head).

12  Q.  And I think you were -- and you said you had to go back to

13  review certain specific date policies?

14  A.  (Nodding head).

15          (Court reporter confers)

16  A.  Yes.

17  Q.  You don't know all of the DEA policies word by word, do

18  you?

19  A.  No.  My memory is not that good.

20  Q.  Do you know generally what the DEA standards of conduct

21  prohibit and allow?

22  A.  As defense counsel said, a lot of it is common sense.

23  Q.  And you, as a DEA employee, have to review those every

24  year, correct?

25  A.  Review and certify that you read those, yes.

Nar2Cos2                    Miller – Redirect

1    Q.  And every employee, DEA employee has to review and certify

2    that they have read those every year, is that correct?

3    A.  That's correct.

4    Q.  And John Costanzo certified, as we saw, in 2015, 2016,

5    2018, 2019, and 2020 that he had read and reviewed the

6    standards of conduct, is that correct?

7    A.  Based upon my review, yes.

8    Q.  You were asked in that NADDIS summary table that was up a

9    moment ago whether the name César Peralta was in there, do you

10   remember that?

11   A.  Yes.

12   Q.  And it is not.  Do you remember that?

13   A.  Yes.

14   Q.  And are DEA agents able to gather information from sources

15   other than NADDIS?

16   A.  Yes.

17   Q.  What are some other sources of information that a DEA agent

18   might have access to?

19   A.  Obviously confidential sources, other methods of human

20   intel, such as talking to other law enforcement partners and

21   they can garner information that way.  But what you have to

22   understand about NADDIS is, unless that information is placed

23   into the database or placed on a report, it won't make it to

24   NADDIS.  So you could have information that you have and that

25   you know of that wouldn't get documented into NADDIS unless you

1    put it in there.

2    Q.  And these other sources of information, can those also be

3    considered law enforcement sensitive?

4    A.  If they are confidential sources and sources of

5    information, yes, you would want to protect them, protect their

6    identities, yes.

7    Q.  Are there also other sources of information that the DEA

8    uses that can also sometimes be considered sensitive or law

9    enforcement sensitive?

10   A.  Yes.

11   Q.  Ms. Pierre, if we can pull up Government Exhibit 113A.

12   This is the last thing I want to touch on.  If we can go to

13   page 10.

14            You were asked on cross-examination about some aspects

15   of the standard of conduct's policies on gifts.  Do you recall

16   that?

17   A.  Yes.

18   Q.  And how DEA agents aren't allowed to take gifts from

19   prohibited sources?

20   A.  That's correct.

21   Q.  In subsection 4 here it says that "a prohibited source is

22   any person who has interests that may be substantially affected

23   by the performance or nonperformance of the employee's official

24   duties."  Is that correct?

25   A.  That's correct.

1    Q.  And you said that that would include a financial interest?

2    A.  Yes, it can.

3    Q.  Would that include the financial interest of anyone that

4    the employee was working with?

5    A.  Yes.

6    Q.  Including working with in any form of outside employment?

7    A.  Yes.

8    Q.  And if we look at section B, defense counsel had you read

9    paragraph 2, which talks about how an employee may accept a

10   gift under circumstances that make it clear that the gift is

11   motivated by a family relationship or personnel friendship.  We

12   can look at paragraph C below that.  It says, "Even if an

13   exception identified in paragraph B above, an employee shall

14   not accept a gift if it is given in return for being influenced

15   in the performance of an official act or," looking at paragraph

16   3, "the employee accepts gifts from any source on a basis so

17   frequently that a reasonable person would be led to believe the

18   employee is using his or her public office for private gain."

19         So in these circumstances, would a DEA employee be

20   prohibited from accepting a gift even from a family member or

21   personal friend?

22   A.  Yes.

23         MS. DEININGER:  No further questions.

24         THE COURT:  Thank you.

25         Mr. Mukasey.

Nar2Cos2

1   RECROSS EXAMINATION

2   BY MR. MUKASEY:

3   Q.  Could we put up 704A-2 for the jury, for everybody.

4        Ms. Deininger asked you and you testified just a

5   minute ago that this list is a list of NADDIS searches that

6   John Costanzo ran after receiving text messages from Manny

7   Recio, is that right?

8   A.  Yes.

9   Q.  Take a look at the seventh entry down.  What time was the

10  request there?

11  A.  10:40 a.m.

12  Q.  What time was the search run?

13  A.  10:39 a.m.

14        MR. MUKASEY:  No further questions.

15        THE COURT:  Anything further?

16        MS. DEININGER:  Nothing further.

17        THE COURT:  All right.  Thank you, sir.  You may step

18  down.

19        (Witness excused)

20        THE COURT:  Would this be a good time for our morning

21  break?

22        MR. SWETT:  Yes, your Honor.

23        MR. MUKASEY:  Yes.

24        THE COURT:  Members of the jury, I'm going to give you

25  a 15-minute break.

Nar2Cos2

1            Remember, you are not yet deliberating.  Please leave

2       your notepads on your chairs, and we will resume in about 15

3       minutes.

4            (Continued on next page)

Nar2Cos2

1          (Jury not present)

2          MR. GAINOR:  Judge, can we take a fast bathroom break

3    or does the Court want us to do it after?

4          THE COURT:  I mean, I do want to take a few minutes

5    because I want to go back and look at the letters.  So I just

6    wanted to be clear on who the next witness is.  It's not going

7    to be Ms. Maj?

8          MR. SWETT:  It's going to be F.B.I. Special Agent

9    Brandon Jaycox.

10          THE COURT:  And you expect to get to these matters

11    pretty quickly?

12          MR. SWETT:  Yeah.  I mean, the government's direct

13    will probably take about 45 minutes, but I think it would be

14    helpful to know if messages and communications that the

15    government was not intending to introduce would be coming in on

16    the defense case.

17          THE COURT:  Okay.  We will take 15 minutes.

18          (Recess)

19          (Jury not present)

20          THE COURT:  Everybody here?

21          MR. SWETT:  Yes, your Honor.

22          THE COURT:  One quick thing.  Juror No. 9, Claudia

23    Binaghi, B-I-N-A-G-H-I, who is in Manhattan, had mentioned

24    something about an appointment on November 14, and she had

25    written down the specific information just so we would all have

Nar2Cos2

1    it and handed this to Mr. Hampton.  I don't think it is an

2    official jury note, but I just, since she handed this to him, I

3    wanted to put it on the record.  It just said, "Claudia Binaghi

4    unavailable November 14 from 12:15 to 2:30 time of appointment.

5    I need extra time to travel to midtown and back."  And since

6    she said 12:15 to 2:30, I think she just wanted us to know that

7    that was the sort of extra time that she needed.  So I just

8    wanted to put that on the record in case it's relevant.

9              I have looked at the exhibits and read the letters

10   about the rule of completeness, Rule 106 issue.  I do find that

11   JC 1009A properly comes in under the rule of completeness and

12   Rule 106 because I think it provides relevant context.  I

13   understand the government's argument, but I do think it is fair

14   game under the rule of completeness.

15             With respect to the MR exhibits, I find that they are

16   not closely connected enough and are not really properly

17   providing context under Rule 106.

18             Are we ready?

19             MR. SWETT:  Yes, your Honor.  We have a couple of

20   stipulations to read.  So we can bring the jury in, I can read

21   them, and then we can bring the witness up.

22             THE COURT:  Okay.

23             MR. GAINOR:  Your Honor, is there any way I can

24   just -- I have a couple of things to supplement with regard to

25   the Court's ruling.

Nar2Cos2

1    THE COURT:  Okay.  Go ahead and have a seat and speak

2    into the mic.

3    MR. GAINOR:  So as we had put on the record with

4    regard to this allegation and the indictment about Mr. Costanzo

5    being the person responsible for giving the information --

6    Special Agent Costanzo giving the information to Mr. Recio or

7    either Mr. Macey and the information getting to Mr. Peralta,

8    these other MR exhibits are fairly clear when read in

9    chronology that the information came from Lee Lucas and not

10   from Special Agent Costanzo.  So it presents an alternative

11   explanation that is documented by way of the exhibits.

12   Additionally, when the government intends to introduce

13   210T into evidence, which is the operative call "gone in two

14   weeks," there is Government Exhibit 212A-T, which is part and

15   parcel of the Government's Exhibit 703, which cites to 212 that

16   also talks about a conversation between -- that has occurred

17   between Special Agent Lee Lucas and Manny Recio about

18   surveillance that was set up on Peralta that occurred the night

19   before or some time before the attempted arrest on August 20.

20   THE COURT:  Did you say 212A-T?

21   MR. GAINOR:  This is Government Exhibit 212A-T.

22   THE COURT:  Right.

23   MR. GAINOR:  And that occurs on August 20.  And that

24   exhibit discusses the fact that there was surveillance that was

25   set up on Mr. Peralta the night before the attempt for the

Nar2Cos2

1    arrest.  And that particular conversation is not hearsay.  It

2    is not offered for the truth of the matter asserted.  And it

3    also explains that there is contact with another agent, Special

4    Agent Lee Lucas, that is the person that is giving information

5    to Manny Recio.  Again, and it also backs up and confirms that

6    the information that is coming to Recio is not coming from

7    Special Agent Costanzo.  So we intend to get into that

8    conversation if the government seeks to admit 210T into

9    evidence, which is their key operative phone call.

10               THE COURT:  Would you like to address that?

11               MR. SWETT:  Sure.  We are introducing 212T, as well.

12   So they are free to cross the witness about it.  The witness

13   knew nothing about conversations between Recio and Lucas which,

14   as the Court will hear in testimony, this agent should have

15   known about them, but that's neither here nor there.

16               As far as this notion that Lee Lucas disclosed the

17   arrest date, there is no evidence of that.  There are

18   recordings, intercepted wiretaps involving Lee Lucas.  There

19   are intercepted wiretaps in which Manuel Recio describes his

20   conversations with Lee Lucas and none of them come close to the

21   specificity of the timing of the arrest as Government Exhibit

22   210T.

23               So the notion that we are -- we are withholding

24   evidence that Manuel Recio learned about this from Lee Lucas is

25   false.  And in fact, as they know, we have interviewed Lee

Nar2Cos2

1   Lucas, who denied that he shared the timing of the arrest date

2   with Manuel Recio.  He is on the witness list, so if they want

3   to put him on the stand, they can.  But simply putting

4   conversations in the record in which Manuel Recio suggests that

5   he is trying to cooperate Peralta and Lucas is open to that is

6   classic propensity evidence.  It is irrelevant to the

7   conversations Costanzo was having with Recio because Costanzo,

8   as the Court will hear shortly, had absolutely nothing to do

9   with the Peralta case.  And so it is meant -- it will confuse

10  the jury, it will not shed any light on the relationship

11  between Costanzo and Recio and it, frankly, doesn't say what

12  Mr. Gainor claims it says.

13          THE COURT:  Do you agree that it is not hearsay, the

14  210 -- sorry, 212A-T.

15          MR. SWETT:  We are offering it, your Honor, so --

16          THE COURT:  Oh, oh, sorry.

17          MR. SWETT:  -- that's coming in.

18          THE COURT:  So 212A-T is coming in.

19          MR. SWETT:  Yes.

20          THE COURT:  Okay.  Can we bring out the jury?

21          MR. SWETT:  Yes.  Manny Recio, Manuel Recio.

22          (Continued on next page)

23

24

25

Nar2Cos2

1          (Jury present)

2          THE COURT:  Please be seated.

3          Mr. Swett.

4          MR. SWETT:  Your Honor, regrettably, I do have to read

5    another stipulation at this time.  This is Government Exhibit

6    S6, which I would ask be published to the jury as well.

7          THE COURT:  Yes, you may.

8          MR. SWETT:  Okay.  I will start reading at paragraph

9    1.

10         "From July 2, 2019, through October 2, 2019, the

11   Federal Bureau of Investigation ('F.B.I.') conducted a

12   court-authorized wiretap of cell phone number 305-796-7463,

13   used by Manuel A. Recio (the 'Recio Phone').

14         "Government Exhibits 201 through 220 are audio files

15   containing true and accurate excerpts of recordings of selected

16   phone calls intercepted pursuant to the wires of the Recio

17   Phone.

18         "Government Exhibits 201T through 220T are true and

19   accurate transcripts of the corresponding audio files, that is,

20   Government Exhibits 201 through 220.  The dates, times, phone

21   numbers, and voice attributions reflected on these transcripts

22   are accurate."

23         I'm going to read a portion of paragraph 4.  "Defense

24   Exhibit JC 1008, an audio file containing true and accurate

25   recordings of selected phone calls intercepted pursuant to the

Nar2Cos2

1   wiretaps of the Recio Phone."

2           And then a portion of paragraph 5.  "Defense Exhibit

3   JC 1009 is a true and accurate transcript of the corresponding

4   audio file exhibits.  The dates times, phone numbers, and voice

5   attributions reflected on the transcripts are accurate."

6           Paragraph 6.  "The content of each intercepted

7   communication was recorded at the time of the communication,

8   along with certain data relating to the communication,

9   including the date and time of the communication, the duration

10  of the communication, the phone numbers participating in the

11  communication, and whether the communication was incoming or

12  outgoing.  The recorded communications, along with the data

13  relating to the communications, were transferred to a computer

14  system under the custody and control of the F.B.I.

15          "It is further stipulated and agreed that this

16  stipulation may be admitted in evidence at trial."

17          And at this time I would offer Government Exhibit S6

18  into evidence.

19          THE COURT:  It is admitted.

20          (Government's Exhibit S6 received in evidence)

21          MR. SWETT:  I would also move Government Exhibits 201,

22  201T, 205, 205T, 210, 210T, and 212 and 212T into evidence.

23          THE COURT:  They are admitted.

24          (Government's Exhibits 201, 201T, 205, 205T, 210,

25  210T, 212, 212T received in evidence)

Nar2Cos2                          Jaycox – Direct

1              MR. SWETT:  I would also move Defense Exhibit JC 1008A

2    and JC 1009A into evidence.

3              THE COURT:  Admitted.

4              (Defendant's Exhibits JC 1008A and JC 1009A received

5    in evidence)

6              MR. GAINOR:  Your Honor, I didn't hear if 212A-T was

7    admitted into evidence as --

8              MR. SWETT:  Your Honor, Government Exhibit 212 has

9    been broken down into two separate portions.  So I am admitting

10   both portions, but that includes 212A.

11             THE COURT:  So 212A is a subset of 212.

12             MR. SWETT:  Correct, your Honor.

13             THE COURT:  Okay, so that's covered.  Yes, they are

14   admitted.

15             MR. SWETT:  At this time the government calls Special

16   Agent Brandon Jaycox.

17    BRANDON CURTIS JAYCOX,

18         called as a witness by the government,

19         having been duly sworn, testified as follows:

20             THE COURT:  Mr. Swett.

21             MR. SWETT:  Thank you, your Honor.

22   DIRECT EXAMINATION

23   BY MR. SWETT:

24   Q.  Special Agent Jaycox, I hope you don't mind if I remind you

25   to speak directly into the microphone because this is a very

Nar2Cos2                          Jaycox - Direct

1   cavernous room and the acoustics are bad.  Is that okay?

2   A.  That's fine.

3   Q.  Okay.  Good morning, Special Agent Jaycox.

4   A.  Good morning.

5   Q.  Where do you work?

6   A.  I work for Federal Bureau of Investigation, the F.B.I.

7   Q.  How long have you worked for the F.B.I.?

8   A.  Since 2016.

9   Q.  Where are you currently serving?

10  A.  Currently serving in San Juan, Puerto Rico.

11  Q.  What is your role?

12  A.  Currently the supervisory special agent for

13  counterintelligence squad.

14  Q.  Special Agent Jaycox, did you investigate an individual

15  named César Peralta?

16  A.  I did.

17  Q.  We are going to go back to that in a moment.

18          When you joined the F.B.I. in 2016, what was your

19  first role?

20  A.  Initially I was assigned to a small city in the south of

21  Puerto Rico, Poncé.  I worked drug crimes and violent gangs.

22          THE COURT:  What did you say the name of the city

23  was?

24          THE WITNESS:  P-O-N-C-E, Poncé.

25          THE COURT:  Thank you.

Nar2Cos2                        Jaycox - Direct

1   BY MR. SWETT:

2   Q.  How long had you work in the Poncé office?

3   A.  A couple of years, and then I was transferred -- maybe a

4   year and a half or so, and then I was transferred to

5   headquarter city, San Juan, where I began working on

6   transnational organized crime.

7   Q.  What kind of investigations are involved in transnational

8   organized crime?

9   A.  That squad we worked on, you know, organized crime that

10  basically crossed international borders, particularly in the

11  Caribbean, and these organizations were focused in drug

12  trafficking, money laundering, human trafficking, labor

13  trafficking, etc.

14  Q.  How long did you work with that squad?

15  A.  About another two years or so.

16  Q.  Where were you next transferred?

17  A.  Next I was division counsel for the office.

18  Q.  How long were you division counsel?

19  A.  Approximately another year and a half, two years.

20  Q.  Where did you go after that?

21  A.  After that I took my current role in counterintelligence

22  squad.

23  Q.  Ms. Pierre, could we please show the witness and counsel

24  what has been marked Government Exhibit 7.

25          Special Agent Jaycox, what's on the screen in front of

Nar2Cos2                     Jaycox - Direct

1    you?

2    A.  That's a picture of César Peralta.

3    Q.  Do you know César Peralta?

4    A.  I do.

5    Q.  How do you know César Peralta?

6    A.  He -- I was the case agent on the case involving his

7    organization that trafficked narcotics in the Caribbean during

8    the time I was on the transactional organized crime squad.

9          MR. SWETT:  The government offers Government Exhibit 7

10   into evidence.

11         THE COURT:  Government 7 admitted.

12         (Government's Exhibit 7 received in evidence)

13         MR. SWETT:  Can we please publish it to the jury.

14   BY MR. SWETT:

15   Q.  Okay, Special Agent Jaycox, so, again, can you explain

16   again who César Peralta is?

17   A.  Yes.  He was a prolific drug trafficker from the early

18   2000s until he was apprehended in 2019.  He was considered

19   consolidated priority target by DOJ it's knowns a CPOT.

20   Q.  Can you explain what a CPOT designation means?

21   A.  Yes.  It's kind of like the F.B.I. most wanted, but for all

22   of the Department of Justice.  He was deemed one of the most

23   prolific drug traffickers in the Caribbean at the time.

24   Q.  When did you first become aware of Mr. Peralta?

25   A.  In approximately 2017, 2018, when I joined the

Nar2Cos2                    Jaycox - Direct

1    transactional organized crime squad.

2    Q.  How did you learn about Mr. Peralta when you joined that

3    squad?

4    A.  I was the -- became the lead case agent in the

5    investigation against him.

6    Q.  Can you explain what a case agent does?

7    A.  So I was tasked with deciding what investigative methods we

8    would use to dismantle his organization, how we would gather

9    evidence.  My job was to set investigative priorities, conduct

10   interviews, etc., all with the intent to arrest.

11   Q.  Was the F.B.I. partnering with other law enforcement

12   agencies on this case?

13   A.  Yes.  This was part of an OCDETF.

14           (Court reporter confers)

15           THE COURT:  Are the screens working in the jury box?

16           JURORS:  Yes.

17           THE COURT:  Just wanted to check because I saw the one

18   in the gallery is not working.  Thank you.

19   BY MR. SWETT:

20   Q.  Why don't you talk a little bit more about the partners on

21   this case?

22   A.  Yes, so under the OCDETF investigation we worked with DEA,

23   F.B.I., HSI, Treasury Department, all with the intent to

24   formulate a whole government approach to be able to neutralize

25   and dismantle the organization.

1   Q.  Generally speaking, how would you describe César Peralta's

2   organization in terms of drug trafficking in the Caribbean?

3   A.  Well, he had routes that would go both from Dominican

4   Republic to Puerto Rico and points north into the U.S.  He also

5   had routes from Venezuela and Colombia into the Dominican

6   Republic.  And so he, you know, trafficked -- from

7   D.R.—Dominican Republic—to Puerto Rico alone, he trafficked,

8   you know, tens of thousands of kilos of cocaine.

9   Q.  Now, you said your investigation or your involvement in the

10  investigation began in approximately 2017 or 2018?

11  A.  Correct.

12  Q.  Was this investigation public?

13  A.  No, it was not.

14  Q.  Why not?

15  A.  Well, under the enterprise theory of investigation, you

16  begin with a covert phase, so, you know, our investigative

17  methods initially were covert, meaning they weren't public, in

18  order to make sure that the subjects, the members of the

19  organization, wouldn't change their methods and make it harder

20  for us to.

21  Q.  What steps did you take to keep the investigation covert?

22  A.  Well, we used things like wires, sealed search warrants,

23  things that wouldn't be made public.

24  Q.  Special Agent Jaycox, did there come a time when you

25  brought charges related to your investigation?

Nar2Cos2                          Jaycox - Direct

1   A.  Yes, there was.

2   Q.  At this time I would like to pull up Government Exhibit S7,

3   which is already in evidence, and I would like to focus on the

4   bottom of page 2, paragraph 2.  Actually let's just go to page

5   3, subparagraph (a).

6          Special Agent Jaycox, can you read that paragraph?

7   A.  Yes.  "On November 28, 2008, a grand jury" --

8          THE COURT:  Hold on.  2018, right?

9          THE WITNESS:  2018, excuse me.

10  A.  "2018, a grand jury sitting in the United States District

11  Court for the District of Puerto Rico issued an indictment in

12  United States v. César Emilio Peralta Adamez, 18 Cr. 746,

13  charging Peralta with conspiracy to import narcotics and

14  manufacturing and distribution of narcotics for the purpose of

15  unlawful importation."

16  Q.  I will stop you there, but let's keep that up.

17          So the indictment described in this paragraph, was

18  that your case?

19  A.  It was.

20  Q.  So when were charges brought against César Peralta?

21  A.  It would have been November of 2018.

22  Q.  What were the charges contained in that indictment?

23  A.  Conspiracy to distribute unlawful importation of narcotics.

24  Q.  Now when César Peralta was charged, was the indictment

25  initially sealed?

Nar2Cos2                          Jaycox - Direct

1   A.   It was.

2   Q.   What does it mean when an indictment is sealed?

3   A.   That means that it is kept -- the facts are kept from the

4   public, public view.

5   Q.   Okay.  And after you obtained this indictment against César

6   Peralta, were you able to go and arrest him immediately?

7   A.   No.  Peralta was located in Dominican Republic, so we had

8   to seek an extradition.

9   Q.   What's extradition?

10  A.   Extradition, we don't have jurisdiction or law enforcement

11  powers outside of the U.S., and so we have to work with law

12  enforcement in the given country to be able to execute a lawful

13  arrest on a subject.  And so part of that is getting it

14  approved through Department of Justice, the actual arrest, and

15  then, after that, we have to work with local law enforcement in

16  the country so that they ratify the arrest warrant.  And then

17  once that happens, we work with local law enforcement to

18  actually execute the arrest.

19  Q.   In your experience, how long can that process take?

20  A.   It can take years.  I mean, I think the shortest I have

21  ever seen it happen is maybe six months or so.

22  Q.   So Special Agent Jaycox, was the case against César Peralta

23  ultimately unsealed?

24  A.   It was.

25  Q.   And if you look at this paragraph that's on the screen, can

1  you tell us when it was unsealed?

2  A.  It says the indictment was sealed until November 12, 2019.

3  Q.  So is that approximately -- is that consistent with your

4  recollection of when it was unsealed?

5  A.  Yes, that's correct.

6  Q.  All right.  We can take that down.

7        Special Agent Jaycox, during your investigation of

8  César Peralta, did you become aware of other agencies that were

9  also investigating him?

10  A.  I did.

11  Q.  What did you learn?

12  A.  After we submitted the extradition package in early 2019,

13  we found that there was another indictment out of Florida.

14  Q.  Okay.  And what was your reaction when you found out there

15  was a case out of Florida as well?

16  A.  We were surprised because we had tried to deconflict prior

17  to that, prior to our indictment.  We had learned that there

18  was another indictment in fact out of New York, so when I found

19  out about the one out of Florida, we knew that that had

20  happened recently.

21  Q.  Okay.  So I just want to unpack that a little bit.

22        You talked about deconflict.  What does it mean to

23  deconflict?

24  A.  Deconflict is just to make sure that your efforts are

25  coordinated with other law enforcement agencies that might be

Nar2Cos2                        Jaycox - Direct

investigating, you know, either that organization or other

organizations affiliated with it.  So you talk about what your

efforts, your investigative methods are, and make sure that

there is no duplication of efforts.

Q.  Are there other reasons why it is important to deconflict

investigations?

A.  Well, you know, you don't want what we call blue on blue

action, right?  You don't want to be doing a law enforcement

action and then have another agency also performing, you know,

a law enforcement action at the same time that could put people

in danger.

Q.  So I think you mentioned that you learned about an

investigation out of New York, is that right?

A.  Correct.

Q.  Can you talk a little bit about what you learned about that

investigation?

A.  Yes.  I don't know a whole lot about the details, but I do

recall that they had an indictment.  It was an old indictment,

historic case.  We found out about that.  We were informed they

were interested at the time in moving forward on that

specifically.

Q.  I'm sorry.  Could you repeat that last part again?  I

didn't quite catch it.

A.  Yes.  They weren't interested in moving forward with that

indictment at the time.

1   Q.  So your understanding was that the New York case was not

2   active.

3   A.  Correct.  It was a pending inactive case.

4   Q.  And then you found out about this Miami case as well?

5   A.  Sometime later, exactly, after we submitted the extradition

6   package, we found out about the Miami case.

7   Q.  Okay.  Why don't we pull up GX S7 again.  This is the Court

8   stipulation.  And we can go to page 2.  I'm going to read

9   paragraph (e).  "On February 7, 2019, a grand jury sitting in

10  the United States District Court for the Southern District of

11  Florida issued an indictment in United States v. César Emilio

12  Peralta, 17 Cr. 20412, charging Peralta with conspiracy to

13  distribute a controlled substance, knowing or having reasonable

14  cause to believe that the controlled substance would be

15  unlawfully imported."

16         So is this the indictment that you learned about when

17  you were seeking to extradite Mr. Peralta?

18  A.  That's correct.

19  Q.  Okay.  And did this indictment come out before or after the

20  one in Puerto Rico?

21  A.  After.

22  Q.  So when you learned about the existence of this second

23  indictment, what steps did you take?

24  A.  Well, we reached out to local U.S. Attorney's office in

25  Puerto Rico, excuse me, again to attempt to deconflict.

Nar2Cos2                     Jaycox - Direct

1    Q.   And what happened throughout that deconfliction process?

2    A.   There was a process in which the evidence on both cases was

3    evaluated.  We presented our case in Puerto Rico and the Miami

4    case was also presented, and then eventually there was decided

5    that César Peralta would be tried -- would be extradited and

6    tried in Puerto Rico under the Puerto Rico case.

7    Q.   Okay.  So just to clarify that, when you say you presented

8    the case, who were you presenting the case to?

9    A.   It was officials in Main Justice in Washington, D.C.

10   Q.   What is Main Justice?

11   A.   It's, you know, the head of the Department of Justice.  It

12   was attorneys who work, you know, OCDETF matters at these kinds

13   of transaction organized crime matters to decide where the case

14   should go and which case had the most evidence.

15   Q.   So what kind of information were you presenting to these

16   officials at Main Justice?

17   A.   Information regarding César Peralta's drug trafficking

18   organization, his importation of both cocaine and heroin into

19   Puerto Rico, consensual monitorings, basically the basis of our

20   indictment.

21   Q.   And I think you mentioned this already, but was there

22   ultimately a decision about where César Peralta would be

23   extradited?

24   A.   Yes.

25   Q.   What was that decision?

1    A.   That he would be extradited to Puerto Rico.

2    Q.   So which case was going to be taking precedence between the

3    Miami case and the Puerto Rico case?

4    A.   The Puerto Rico case.

5    Q.   When was that decision made?

6    A.   In -- it would have been June of 2019.

7    Q.   What happened after that decision?

8    A.   Following that decision, there were meetings regarding how

9    we were going to apprehend César Peralta.

10   Q.   Who was involved in those meetings?

11   A.   All of the, you know, F.B.I., DEA, HSI, U.S. Marshals, all

12   of -- at that point we had, you know, gotten the extradition

13   package over at the Dominican Republic, so also local law

14   enforcement, both the Dominican national police as well as

15   Dominican drug police were all involved in --

16        MR. GAINOR:  I'm sorry.  I didn't hear the last after

17   Dominican national.

18   A.   Dominican drug police.  Dominican national police and

19   Dominican drug police were all coordinated in those efforts to

20   arrest him.

21   Q.   Now, you said that DEA was part of those efforts?

22   A.   Yes.

23   Q.   Did that include the DEA agents you were partnering with in

24   Puerto Rico?

25   A.   Yes.

Nar2Cos2                          Jaycox - Direct

1    Q.   Did it also include DEA in Miami?

2    A.   Yes, indirectly, but yes.

3    Q.   Okay.  Special Agent Jaycox, what does it mean when law

4    enforcement approaches a target of their investigation?

5    A.   Typically that would mean that the law enforcement would be

6    looking to talk to a subject in order to gain some kind of

7    cooperation.

8    Q.   Is that also called flipping someone or cooperating them?

9    A.   It is.

10   Q.   Would that typically happen before or after a person is

11   arrested?

12   A.   It could happen -- it would typically happen before they

13   were arrested.

14   Q.   Why would law enforcement approach an individual they are

15   investigating?

16   A.   Several reasons.  It might be done because they are looking

17   for testimony that that person might be able to give on other

18   persons that are higher in the organization, they might be able

19   to conduct consensual recordings, any number of reasons.

20   Q.   Did you ever consider approaching César Peralta in this

21   investigation?

22   A.   No.

23   Q.   Why not?

24   A.   Peralta -- first of all, he was the head of the

25   organization, and so again under the investigative theory, you

Nar2Cos2                        Jaycox - Direct

1    know, our intent was to extradite him and bring him to justice

2    in the U.S.  Also, we knew that Peralta, he was very concerned

3    about his public image, and so he was unlikely to be -- want to

4    be known to be cooperating with U.S. law enforcement.

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NARVCOS3                        Jaycox - Direct

1    BY MR. SWETT:

2    Q.  Did you ever discuss with anyone from the DEA the

3    possibility of cooperating Peralta?

4    A.  No.

5    Q.  During your investigation of Peralta, were you ever aware

6    of U.S.-based lawyers meeting with Peralta?

7    A.  No, I was not.

8    Q.  Were you ever aware of U.S.-based private investigators

9    meeting with Peralta?

10   A.  No, I was not.

11   Q.  And I'll just ask that you let me finish my question,

12   otherwise the court reporters will justifiably get upset with

13   me.

14          Were you ever aware of efforts made by U.S.-based

15   lawyers to get Peralta to surrender?

16   A.  No, I was not.

17   Q.  Were you ever aware of efforts by U.S.-based private

18   investigators to get Peralta to surrender?

19   A.  No, I was not.

20   Q.  Did anyone from the DEA ever tell you about any kinds of

21   efforts along those lines?

22   A.  No.

23   Q.  Could you please speak into the microphone?

24   A.  No.

25   Q.  Thank you.

NARVCOS3                        Jaycox – Direct

1          THE COURT:  You can pull it closer to you just a

2    little bit.  You can pull the whole thing closer.  Thanks.

3    Q.  Special Agent Jaycox, have you ever met an individual named

4    Manuel Recio?

5    A.  No, I have not.

6    Q.  Couldn't pick him out on the street?

7    A.  No.

8    Q.  Have you ever met an individual named John Costanzo?

9    A.  No.

10   Q.  Same, couldn't identify him on the street?

11   A.  Would not be able to identify him on the street.

12   Q.  Have you ever met an individual named David Macey?

13   A.  No.

14   Q.  To the best of your knowledge, was John Costanzo involved

15   in any way in the Cesar Peralta investigation?

16   A.  No.

17   Q.  Don't recall that name coming up at all?

18   A.  No, I do not.

19   Q.  That includes while you were deconflicting with Miami?

20   A.  That's correct.

21   Q.  To the best of your knowledge, was Manuel Recio involved in

22   any way in the Peralta investigation?

23   A.  No.

24   Q.  To the best of your recollection, was David Macey involved

25   in any way in the Peralta investigation?

NARVCOS3                        Jaycox - Direct

1    A.  No.

2    Q.  All right.  I'd like to look at some documents with you.

3             MR. SWETT:  Could we pull up -- one moment.

4             Can we pull up Government Exhibit S9 and show it to

5    the jury as well.

6             And let's go to paragraph 8:  Government Exhibit 510

7    through 510G are records from American Airlines.

8             And then paragraph 10:  Government Exhibit 526

9    contains records from the law firm Macey Law P.A.

10            Paragraph 21:  The exhibits listed above consist of

11   records that were kept and maintained in the course and regular

12   practice of the regularly conducted business activity of the

13   entities described above, and were made at or near the time of

14   the matters set forth in the records by a person or from

15   information transmitted by a person with knowledge of the

16   matters set forth therein.

17            And then on the last page it says:  It is further

18   stipulated and agreed that this stipulation may be received

19   into evidence at trial.

20            The government offers Government Exhibit S9, as well

21   as Government Exhibits 510 through 5G, and 526.

22            THE COURT:  510 through what?

23            MR. SWETT:  510 through 510G and 526.

24            THE COURT:  They are admitted.  And S9 as well.

25            (Government's Exhibits S9, 510 through 510G, 526

1   received in evidence)

2           MR. SWETT:  Thank you, your Honor.

3           All right.  Could we pull up what has been admitted as

4   government Exhibit 510D.

5   BY MR. SWETT:

6   Q.  Special Agent Jaycox, what does this appear to show?

7   A.  Appears to be some flight records from American Airlines.

8   Q.  And at the top do you see where it says "Passenger

9   Information"?

10  A.  Yes.

11  Q.  What's the name of the person there?

12  A.  David Macey.

13  Q.  And under "Flight Information," what are the dates of

14  travel for this particular record?

15  A.  Appears to be June 13, 2019.

16  Q.  June 13th, 2019.

17          And then what's the return leg?

18  A.  June 14th, 2019.

19  Q.  Okay.  Under "Flight Information," do you see the column

20  marked "dep" or departure?

21  A.  Yes.

22  Q.  Okay.  For the first leg, what's the departure?

23  A.  Miami.

24  Q.  How do you know that's Miami?

25  A.  Airport code, I'm familiar with it.

1    Q.   Okay.  And then the next column is "ARV," arrival.  Are you

2    familiar with the airport code listed there?

3    A.   Santo Domingo in the Dominican Republic.

4    Q.   Okay.  And then there's a return flight the next day?

5    A.   Correct.

6    Q.   Where was Cesar Peralta living in June of 2019?

7    A.   He was in Dominican Republic, and he had residences in

8    Santo Domingo specifically.

9              MR. SWETT:  Your Honor, at this point I would offer

10   Government Exhibit 380 into evidence, which is -- which is a

11   text message involving the defendants and was subject to a

12   stipulation that was read yesterday.

13             THE COURT:  380 is admitted.

14             (Government's Exhibit 380 received in evidence)

15             MR. SWETT:  I'm going to offer them all right now.

16             380, 381, 388, and 329.

17             THE COURT:  380, 381, 388 and 329?

18             MR. SWETT:  Yes.

19             THE COURT:  They are admitted.

20             (Government's Exhibits 329, 381, 388 received in

21   evidence)

22             MR. SWETT:  All right.

23             Can we pull up Government Exhibit 380.

24   Q.   Okay.  Special Agent Jaycox, if you look at the top of this

25   document, who are the participants on this native chat thread?

NARVCOS3                         Jaycox - Direct

1   A.   It says David Macey and Manuel Recio.

2   Q.   What color are the David Macey messages?

3   A.   The David Macey messages are in green.

4   Q.   What color are the Manuel Recio messages?

5   A.   Manuel Recio messages are in gray.

6   Q.   Okay.  And what is the date of the first message in this

7   text chain?

8   A.   It says June 24th, 2019.

9   Q.   All right.  I'd like to read these together.  I'll read the

10  green messages, and then if you could read the gray.  Does that

11  work?

12  A.   Yes.

13  Q.   Okay.

14        This week I would focus on getting something

15  impressive on the Peralta case.  Doesn't look like a good

16  resolution or at least one he will like.  So I would focus on

17  the evidence of the two cases.  We can show him we are

18  connected, informed, and capable of leading him through the

19  mess.  Don't want to blast him with the bad news.  Now I want

20  to blast him about the bad facts of the case and let him decide

21  the road after we present the different paths.

22  A.   Okay.

23  Q.   Let's stop there for a moment.

24        In June of 2019, had you charged Caesar Peralta as

25  part of your investigation?

NARVCOS3                        Jaycox - Direct

1   A.  Yes.

2   Q.  Was that public or was that sealed?

3   A.  That was sealed.

4   Q.  What steps were you taking in the investigation at that

5   point?

6   A.  We were seeking his extradition.

7   Q.  Now, what, if anything, did you know about an individual

8   named David Macey and an individual named Manuel Recio sharing

9   the bad facts of the case with Cesar Peralta?

10  A.  I was unaware of this.

11  Q.  Okay.  Didn't know anything about this.

12          All right.  Let's keep reading.

13          Do you see the green message that starts on June 27,

14  2019?

15  A.  I do.

16  Q.  All right.  Why don't we start reading there.

17          If you have time today, reach out to Cesar and arrange

18  for the second payment.  He was going to make it before

19  Tuesday.

20  A.  Okay.  NP, which I know is "no problem."

21  Q.  What, if anything, did you know about Cesar Peralta paying

22  U.S.-based individuals at this point in your investigation?

23  A.  I was unaware of this.

24  Q.  Had you authorized anyone to disclose information to

25  Peralta about your investigation?

1   A.  No.

2   Q.  Why not?

3   A.  Again, we were in a covert phase of investigation.  We also

4   had assessed that he would likely flee law enforcement if he

5   were to find out that there was an incoming extradition.

6   Q.  And again, this is late June 2019.  Can you remind the

7   jury, had the Department of Justice decided which case would

8   take priority at this point?

9   A.  Yes.

10  Q.  So whose case was going to be the lead in Cesar Peralta at

11  this point?

12  A.  It would have been my squad's case in Puerto Rico.

13  Q.  The FBI's case in Puerto Rico?

14  A.  Correct.

15  Q.  Not the DEA case in Miami?

16  A.  Correct.

17  Q.  Did anyone from DEA Miami tell you about sharing facts of

18  the case with any private attorneys or investigators?

19          MR. GAINOR:  Objection, your Honor, as to the witness

20  discussing content of the texts.

21          THE COURT:  Did anyone from DEA Miami tell you about

22  sharing facts of the case with any private attorneys or

23  investigators?

24          THE WITNESS:  No.

25          THE COURT:  Okay.  The objection is overruled because

1    I don't think it asks about the texts.

2              MR. SWETT:  Thank you, your Honor.

3              Can we pull up Government Exhibit 526, please.

4    BY MR. SWETT:

5    Q.  Special Agent Jaycox, what does it say at the top of this

6    document?

7    A.  It says "Macey Law."

8    Q.  What is the date of this document?

9    A.  June 28th, 2019.

10   Q.  Special Agent Jaycox, you speak Spanish; correct?

11   A.  That's correct.

12   Q.  And can you understand that there are -- there are Spanish

13   and English in this document?

14   A.  Yes.

15   Q.  What's your basic understanding of the Spanish and English

16   sections?

17   A.  Of this document?

18   Q.  Yes.

19   A.  It seems to be addressed to Cesar Peralta.

20   Q.  Okay.  Why don't we read the English section that starts

21   "Client Cesar Peralta."

22   A.  Sure.

23   Q.  Could you read that please?

24   A.  Any and all matters currently under investigation by any

25   law enforcement agency and/or any U.S. Attorney's Office in the

1    United States of America.

2    Q.  And let's scroll down to the next English language

3    paragraph.  Can you read where it starts "We are pleased"?

4    A.  We are pleased hereinafter client wish to engage our

5    firm -- hereinafter firm to perform legal services for you.

6    This letter is intended to set forth our understanding as to

7    the nature and scope of the legal services we have agreed to,

8    the amount of our fees for these services, the manner in which

9    our fees for these services shall be determined, and the terms

10   upon which you will make payment of these fees.

11   Q.  Let's go to page 6 of this document.  Okay.  That's fine.

12          Can you read the English language paragraph beginning

13   "We appreciate"?

14   A.  We appreciate your confidence in our firm and we assure you

15   that we shall make every effort to perform our services in a

16   prompt and efficient manner.

17   Q.  Who is listed in the signature blocks?

18   A.  Cesar Peralta and David W. Macey, Esq.

19   Q.  Who signed the document?

20   A.  Appears to be David W. Macey.

21          MR. SWETT:  Can we pull up government Exhibit 388,

22   please.

23   Q.  Who are the participants on this chat thread?

24   A.  Manuel Recio and Johnny Costanzo.

25   Q.  What are the dates of these chats?

NARVCOS3                         Jaycox - Direct

1   A.   This was July 1st, 2019.

2   Q.   And again, what were you doing with respect to the Peralta

3   investigation in July of 2019?

4   A.   At this point we were drafting an operations plan to arrest

5   him in Dominican Republic.

6   Q.   Who sent the gray messages on this chain?

7   A.   According to the chat, Manuel Recio.

8   Q.   Could you read those messages?

9   A.   Can you call Eric McGuire and ask him about Cesar Peralta?

10           Next message says:  They have a case in PR, which I

11   know to be "PR" referring to Puerto Rico.

12   Q.   Do you know who Eric McGuire is?

13   A.   No, I do not.

14   Q.   What, if anything, did you know about an individual named

15   John Costanzo contacting people for information about the

16   Peralta case?

17   A.   I was unaware of this.

18   Q.   Did you authorize anyone to share information about your

19   case --

20   A.   No.

21   Q.   -- with private investigators?

22   A.   No, I did not.

23           MR. SWETT:  All right.  Let's show the witness and the

24   jury what has been admitted into evidence as Government Exhibit

25   510E.

1  Q.  Special Agent Jaycox, what does this look like?

2  A.  These are also flight records.

3  Q.  Okay.  And who is the passenger listed on this flight

4  record?

5  A.  Appears to be David Macey.

6  Q.  And under the flight information, when was David Macey

7  traveling?

8  A.  This would have been July 2nd, 2019, from Miami.

9  Q.  And when was the return?

10 A.  July 3rd, 2019.

11 Q.  And the return trip left from PUJ.  Do you know what that

12 is?

13 A.  That's the airport code for Punta Cana in -- also in

14 Dominican Republic.

15 Q.  If you can just take a look, what are the flight numbers

16 associated with these two flights?

17 A.  Appears to be AA1502.

18 Q.  Thank you.

19       MR. SWETT:  Let's pull up Government Exhibit 510G,

20 show it to the jury.

21 Q.  What does this show?

22 A.  This again is another flight record for Manuel Recio.

23 Q.  Okay.  And if you look at the flight information, both the

24 flight number and the travel dates, how does this appear to

25 relate to the document we just looked at?

NARVCOS3                          Jaycox - Direct

1    A.  It appears to be the same flights.  It's the same flight

2    number, same date of -- date and location of departure and

3    arrival.

4    Q.  Okay.  And that was July 2nd to July 3rd?

5    A.  Correct.

6    Q.  All right.

7         MR. SWETT:  At this point I'd like to pull up Defense

8    Exhibit MR -- actually, I need to -- before I do that, your

9    Honor, I have to read another stipulation, I'm sorry to say.

10        Let's pull up Government Exhibit S8 and let's go to

11   paragraph 3F on page 5.

12        Defendant Manuel Recio Exhibits 141, 141T, 143, and

13   143T are excerpts of visual depictions of messages and

14   voicemails and sent via WhatsApp between the Recio phone and

15   the cell phone assigned call No. 809-789-3268, the Peralta

16   phone.

17        And the government will offer Defense Exhibits MR 141,

18   141T, 143, and 143T into evidence.

19        They are admitted?

20        THE COURT:  They are admitted, to be clear.

21        (Defendant's Exhibits MR 141, 141T, 143, 143T received

22   in evidence)

23        MR. SWETT:  I'd like to pull up Government Exhibit S5,

24   and I'd like to look at page 2.

25        It says:  The following Manuel Recio exhibits are true

NARVCOS3                        Jaycox - Direct

1    and accurate Spanish-to-English translations.  And then it's

2    141T.  And if you look at the next page, it includes 143T.

3            And then on the final page it says:  It is further

4    stipulated and agreed that this stipulation may be admitted in

5    evidence at trial.

6            The government offers Government Exhibit S5 into

7    evidence.

8            THE COURT:  Admitted.

9            (Government's Exhibit S5 received in evidence)

10           MR. SWETT:  Okay.  Can we pull up Defense Exhibit MR

11   141T.

12   BY MR. SWETT:

13   Q.  Okay.  Special Agent Jaycox, does this appear to show text

14   message conversations?

15   A.  It does.

16   Q.  What is the original language of these conversations?

17   A.  Spanish.

18   Q.  And do you see that there are boxes containing translations

19   of those messages?

20   A.  I can see that, yes.

21   Q.  Okay.  And what is the name associated with the messages in

22   white?

23   A.  Cesar Peralta.

24   Q.  And what is the name associated with the green messages?

25   A.  Manny.

1   Q.  And if you look at the messages here, when do they begin?

2   A.  They begin on July 2nd, 2019.

3   Q.  And again, do you remember the dates of travel that we just

4   looked at?

5   A.  Yes.

6   Q.  What were those dates?

7   A.  Also July 2nd, 2019.

8   Q.  Okay.  Why don't we read these messages together.  And I'd

9   ask you to read the Peralta messages, and I will read the Manny

10  messages.

11  A.  They're at La Romana.  It might be good to have dinner

12  together at 9.  Let me know if you/he are/is at La Romana.

13  Q.  We are.

14  A.  Then we'll have dinner together at 9.

15  Q.  So you want to do at SPG?

16  A.  Yes, at SBG.

17  Q.  All right.

18          MR. SWETT:  Now let's scroll down a little further.

19          Okay.  We can stop right there.

20  Q.  Special Agent Jaycox, do you see the message at the bottom?

21  A.  Yes.

22  Q.  What is Cesar Peralta sending in that message?

23  A.  He seems to be asking about our operation to extradite him.

24  Q.  Right.  But the message itself, what does that image show

25  in the message?

1    A.  What does it show?

2    Q.  Yeah.

3    A.  It shows that he has knowledge of the operation.

4    Q.  Special Agent Jaycox, is that -- is he sending an image of

5    a different text message conversation?

6    A.  I'm sorry.  Yes, it appears that he's sending, I guess, an

7    image --

8             MR. GAINOR:  Objection.

9             THE COURT:  Overruled.

10   Q.  All right.  Why don't we just -- why don't we read what's

11   contained in that image.  Can you stop at the top and I'll read

12   the next one?

13   A.  In the green?  Should I start in the green?

14   Q.  You can start where it says, "Of course, that's how it is."

15   A.  Of course, that's how it is.

16   Q.  And then the other person says:  What operation?  Might be

17   the one from the three letters and the FBI.

18            MR. GAINOR:  We have a continuing objection to this,

19   your Honor.

20            MR. SWETT:  Your Honor, I'm happy to give an

21   explanation or we can sidebar, but it's very straightforward.

22            THE COURT:  Overruled.  Noted and overruled.

23   Q.  Okay.  What operation might be the one from the three

24   letters and the FBI?  If the FBI comes, it's for someone.

25   Could be for an American citizen or someone wanted for

NARVCOS3                        Jaycox - Direct

1    extradition.  Sometimes it's for the agreement with Interpol.

2    Whatever is in dollars.

3            MR. SWETT:  Can we scroll down.

4    Q.  Is this more of the screenshotted conversation?

5    A.  Yes.

6    Q.  Okay.  I'll continue reading these green messages that have

7    been translated.

8            Depending on the different nationalities is sought by

9    the DEA, but when the FBI gets involved --

10           MR. GAINOR:  Your Honor, can we come to sidebar on

11   this please?

12           THE COURT:  Okay.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1            (At sidebar)

2            MR. GAINOR:  Your Honor, our objection is twofold.  We

3     don't know who is talking.  We have an objection to the

4     interpretation by the agent during the direct examination of

5     these texts.

6            MR. SWETT:  With respect to the agent's

7     interpretation, if the Court wishes to strike that, that's

8     fine.  He's not a party to this conversation and that was not

9     what I was looking to elicit.  I mean, the conversation itself

10    is not being offered for its truth.  It's sent to Recio, and

11    Recio is aware of conversations Peralta is having about inside

12    information about these cases, so that's why it's being

13    offered.

14           MR. GAINOR:  But we don't know who sent it, first of

15    all.  I think it was -- was it Peralta that was forwarding

16    these texts?

17           MR. SWETT:  Correct.  That's why it's admissible, to

18    show what Recio was aware of as far as Peralta and Peralta's

19    inside knowledge.

20           THE COURT:  It's not for the truth.

21           MR. SWETT:  Not for the truth.

22           THE COURT:  Okay.  But to be clear, this is --

23    screenshots are from Peralta.

24           MR. SWETT:  Correct.

25           THE COURT:  To Recio.

NARVCOS3                         Jaycox – Direct

1              MR. SWETT:  Correct.

2              THE COURT:  Okay.  I'll just clarify that, that it's

3    not for the truth; and that the witness is not interpreting

4    them, it's just explaining what they are.

5              MR. GAINOR:  But we don't know who Peralta is getting

6    the information from, that's what the concern is.

7              THE COURT:  Right.

8              MR. SWETT:  Your Honor, these are defense exhibits.

9    We're putting their exhibits in.  We hadn't seen this before

10   because these actually never made it over to the filter wall,

11   but they are relevant.

12             MS. DEININGER:  Who Peralta is receiving the

13   information from is beside the point.  The point here is to

14   show that Recio is being informed that Peralta has inside

15   information.

16             MS. DONNER:  By Peralta.

17             THE COURT:  By Peralta, right.  Right.  Fair enough.

18             I think that's all correct.  And I think it's

19   admissible, but not for a nonhearsay purpose.

20             (Continued on next page)

21

22

23

24

25

NARVCOS3                         Jaycox - Direct

1              (In open court)

2              THE COURT:  Just to be clear, you were not involved in

3     this conversation; you're just looking at and explaining what

4     you see in the conversation.

5              THE WITNESS:  No, I was not involved in this

6     conversation.

7              THE COURT:  Just to be clear, I'm admitting it and

8     overruling the objection, except to clarify that this is not

9     being admitted for the truth of what's said, but just insofar

10    as it may go to the intent of the recipient of the messages,

11    knowledge and intent.

12             MR. SWETT:  Correct.

13             Okay.  Why don't I just start reading again.

14             Depending on the different nationalities is audit by

15    the DEA.  But when the FBI gets involved, it is because they're

16    coming from someone.  I'm telling you from my own experience,

17    when the FBI gets involved, it is to bring up an American or

18    someone wanted.  But it's a commission operation from yesterday

19    until Friday.  It's for looking into something.  We pay 5,000D

20    to a DEA contact and he tells us who is and who isn't wanted or

21    for extradition purposes.  Wanted is when a country has a

22    signed agreement, and with purposes is previous investigation,

23    but they need to bring him up there to show him and then

24    negotiate there.

25             Can we scroll down a little further.  Let's scroll

1    down.

2              Special Agent Jaycox, do you see --

3              Let's scroll down.

4    BY MR. SWETT:

5    Q.  Special Agent Jaycox, can you read the message from Peralta

6    from 4:27 p.m. on the 3rd.

7    A.  Yes.  It says:  See what my friend says.

8    Q.  See what a friend says?

9    A.  Excuse me.  See what a friend says.

10   Q.  All right.  And I'll read the messages that Recio sent.

11             I can't see what you sent me, but I'm on a plane.

12   Could you send it again?  Cesar, it's important that you don't

13   talk about this with anyone.  We're going in ten days and let's

14   make a plan.

15             In those messages that you just saw, these messages

16   that Recio sent, anything about Cesar surrendering to the

17   authorities?

18   A.  No.

19   Q.  Anything about Cesar cooperating with the authorities?

20   A.  No.  Sorry.  No.

21             MR. SWETT:  Okay.  Now I'd like to play -- I'd like to

22   play Government Exhibit 201, which is in evidence.  And I'd

23   like to pull up Government Exhibit 201T, which is a transcript

24   in aid of Government Exhibit 201.

25             Before we start playing it, we'll just look at the

NARVCOS3                     Jaycox – Direct

1   cover page of 201T.

2   Q.  Okay.  Special Agent Jaycox, what is the date of this

3   intercepted communication?

4   A.  It says July 3rd, 2019.

5   Q.  And again, what were you doing with respect to the Peralta

6   investigation on July 3rd, 2019?

7   A.  We were planning for his arrest and extradition.

8   Q.  Who were the participants on this call?

9   A.  It says John Costanzo and Manny Recio.

10              MR. SWETT:  Okay.  Let's go to page 2 where the

11  transcript begins, and let's start playing Government Exhibit

12  201.

13              (Audio played)

14              MR. SWETT:  We're having a little bit of difficulty.

15              (Audio played)

16              MR. SWETT:  Okay.  Let's see if we can get this to

17  work.

18              (Audio played)

19              MR. SWETT:  Can we go to the next page.

20              (Audio played)

21  BY MR. SWETT:

22  Q.  Okay.  Special Agent Jaycox, what, if anything, did you

23  know about this conversation?

24  A.  I was unaware of this conversation.

25  Q.  What, if anything, did you know about an individual named

1   John Costanzo getting involved in this case?

2   A.  Nothing.

3   Q.  Now, you saw the transcript and you heard a reference to an

4   AGEO.  Do you know what that is?

5   A.  Yes, it's a -- it's a case funding mechanism that DEA uses

6   to basically use the money from drug proceeds or money

7   laundering in their investigations.

8   Q.  Did your investigation into Cesar Peralta have anything to

9   do with an AGEO?

10  A.  No, it did not.

11  Q.  All right.

12          MR. SWETT:  At this time could we pull up Defense

13  Exhibit MR 143T.

14  Q.  All right.  Special Agent Jaycox, are you looking at what

15  appear to be text messages?

16  A.  Yes.

17  Q.  And the messages that are white, who are they from?

18  A.  Appear to be from Cesar Peralta.

19  Q.  And the messages in green?

20  A.  Says Manny.

21  Q.  All right.  And as before, does this appear to be a

22  translation of the original text messages?

23  A.  Yes, the transition is off to the side.

24  Q.  Why don't we start reading these, starting with the 7/16

25  message.  Could you read the Manny messages and I'll read the

1   Peralta messages?

2   A.   Starting with 7/16?

3   Q.   July 16, that's right.

4   A.   Good morning, my friend.  Dave told me we were standing.

5   Where we're standing.  I understand your frustration and want

6   to -- want you to know that we have your best interest in mind.

7   And because so many things happen, it will be important to keep

8   communicating.  I believe that regardless of your choice at

9   this moment, I believe that we must use any time we have

10  wisely.  We have some ideas about those things that we could

11  do.  Let's meet and discuss.  Let's meet soon and discuss.

12  Q.   Now, again, July 16, 2019, what were you doing as far as

13  the Peralta investigation?

14  A.   We're preparing for the -- his arrest, Peralta's arrest and

15  extradition.

16  Q.   Did you know anything about these kinds of conversations?

17  A.   No, I did not.

18  Q.   And in the message you just read, any reference to having

19  Peralta surrender?

20  A.   No.

21  Q.   Any reference to having Peralta cooperate?

22  A.   No.

23  Q.   Okay.  Now I'll read the Peralta messages.

24        I'll be back from vacation in 12 days, then we can

25  talk.  But I need proof to believe in that.  I never worked

1   there in that direction.  I'll go on with my life until I know

2   what it is.

3        MR. SWETT:  Keep scrolling.

4   Q.  Don't forget that there's an extradition process that takes

5   a year or more in which they must tell me what it is.  And I

6   assure you that I never did anything there in that direction.

7        In order to believe that, I need to know who's in

8   jail, if there are drugs seized or money, or if there are

9   conversations, with whom did I talk, because I can't believe

10  only in words, I need proof.  I need proof to know what case it

11  is.  Not knowing what case it is, we can't do anything.  It's

12  absurd to take measures without a case.  I am a businessman

13  with a family.  I will not run from justice.  I will be leading

14  a normal life if they arrest me.  They must tell you/him the

15  case.  I am sure that I have nothing.

16       Any reference there to Peralta cooperating?

17  A.  No.

18  Q.  Okay.

19       MR. GAINOR:  Objection to any commentary by the

20  witness, your Honor.  The texts speak for themselves.

21       THE COURT:  I think the jury should understand the

22  answer as simply not interpreting what anyone was thinking, but

23  simply whether there was a reference literally in the text to

24  cooperating.

25  Q.  Could you read the Manny message?

NARVCOS3                       Jaycox - Direct

A.  I understood perfectly and we're working on that.  It's

complicated.  And during this time to get something that would

convince you is really difficult for several reasons, but let's

continue.  I want you to know that we're here to help you in

this situation so you don't ruin your freedom and your

family's.  Let me know when you're back so we can meet one

another and discuss several options.

Q.  Excellent, bro.

         MR. SWETT:  Keep scrolling down.

Q.  I'll pay the rest of the money when I see proof.

A.  Perfect.  Enjoy your vacations.

         MR. SWETT:  You could stop there.

         Your Honor, I think at this time it might make sense

to break for lunch.  I think this is a good natural break point

in the Q&A.

         THE COURT:  That's fine.  Why don't we break for lunch

and we'll resume in an hour at -- it's 12:50, so we'll resume

at 1:50.

         Ladies and gentlemen of the jury, please leave your

notepads on your chairs.  Have a good lunch and we'll see you

at 1:50.

         (Jury not present)

         THE COURT:  Anything anybody wanted to address before

we break.

         MR. SWETT:  No, your Honor.

NARVCOS3                          Jaycox – Direct

1              MR. GAINOR:  No, your Honor.

2              THE COURT:  Okay.  Have a good lunch.

3              (Luncheon recess)

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Nar2Cos4                        Jaycox - Direct

1                        A F T E R N O O N   S E S S I O N

2                                1:55 p.m.

3            (Jury not present)

4            THE COURT:  Good afternoon.  You may be seated.  The

5   jurors have all arrived now.  Everybody ready?

6            MR. SWETT:  Yes, your Honor.

7            MR. MUKASEY:  Yes.

8            THE COURT:  Bring out the jury and bring in the

9   witness.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Nar2Cos4                          Jaycox – Direct

1              (Jury present)

2              THE COURT:  Please be seated.

3              Good afternoon, members of the jury.

4              JURORS:  Good afternoon.

5              THE COURT:  Mr. Swett, you may proceed.

6              MR. SWETT:  Thank you, your Honor.

7    BY MR. SWETT:

8    Q.  Special Agent Jaycox, before lunch we finished looking at

9    some text messages between Manuel Recio and César Peralta,

10   correct?

11   A.  Correct.

12   Q.  From approximately mid July 2019?

13   A.  Correct.

14   Q.  At this time I would like to pull up Government Exhibit

15   205-T which is a transcript.  This is in evidence.  We can show

16   it to the jury.

17              Okay.  Special Agent Jaycox, what is the date of this

18   transcript?

19   A.  It would be July 11, 2019.

20   Q.  And if you scroll down, who are the participants in this

21   call?

22   A.  This is David Macey and Manny Recio.

23   Q.  Great.  At this point we can go to the next page and I

24   would like to play Government Exhibit 205 as well hopefully

25   with the transcript still up.

1          (Audio played)

2          MR. SWETT:  Let's keep up 205-T.  Just because the

3    acoustics are kind of bad here, could you read what it says in

4    the last box for Manny Recio.

5    A.   Yes.  It says, "All right.  Um, so here's where we stand

6    with César.  He's kind of like, now he's fucking turning this

7    shit like . . . he's like, I'm not paying right now until I

8    know specifics -- whose on the indictment and what they want me

9    for [sic] why I never had anything to do with, um, I had

10   nothing ever to do with, um, with um, Miami blah, blah, blah."

11   Q.   I think that's okay.  All right.

12          And Special Agent Jaycox, what, if anything, did you

13   know about individuals sharing specifics of these indictments

14   with César Peralta?

15   A.   Nothing.

16   Q.   And were these -- let's start with the Puerto Rico

17   indictment.  Was the indictment out of Puerto Rico sealed or

18   unsealed at this time?

19   A.   At this time it was sealed.

20   Q.   Can you just remind the jury what that means?

21   A.   It means it is not for the public, again, because we were

22   in the covert phase and planning for his arrest.

23   Q.   We looked at a stipulation relating to the Miami

24   indictment.  Do you recall whether that one was sealed or

25   unsealed?

Nar2Cos4                          Jaycox - Direct

1    A.  I don't recall.

2    Q.  Okay.  Special Agent Jaycox, did there come a time when you

3    and your team selected a date for Peralta's arrest in Dominican

4    Republic?

5    A.  Yes.

6    Q.  What date did you pick for his arrest?

7    A.  August 20, 2019.

8    Q.  When did you select that date?

9    A.  It was in July of -- at a coordination in July when that

10   specific date was selected.

11   Q.  Who knew about that arrest date?

12   A.  The -- you know, the partner agencies, persons that we were

13   working with in Puerto Rico and, again, it was -- it wasn't

14   public, but it was something that investigators——myself, my

15   case squad, and others we were working with——knew.

16   Q.  When you say your partner agencies, can you just remind the

17   jury who you were partnering with?

18   A.  Yes we were working with DEA, we were working with HSI, we

19   were working with the U.S. marshals, as well.

20   Q.  Now, just because you were working with those agencies,

21   would you have expected everyone in those agencies to know

22   about this arrest date?

23   A.  No.  Again, that was something that was kept between, you

24   know, those who were actually participants in the operation,

25   the arrest operation.

Nar2Cos4                      Jaycox - Direct

Q.  Was there any reason for an individual named Manuel Recio

to know about the arrest date?

A.  No.

Q.  Was there any reason for an individual named John

Costanzo to know about that arrest date?

A.  No.

Q.  All right.  Why don't we pull up Defense Exhibit JC 1009-A,

and it is in evidence so we can show it to the jury.

            Okay.  What is the date of this message or what is the

date of this recording?

A.  July 29, 2019.

Q.  And who are the participants on this call?

A.  It is Manuel Recio and John Costanzo.

Q.  Okay.  Let's scroll down to the transcript portion.  I

don't know if we can play the defense exhibit, so I will just

read this one.  "He asked me what I thought about Sessa César?

I'm like, you know what, Dave, I think we fucked up.  I think

you should have told him from day one it was gonna be a million

dollars and we should have told him that he needed to fucking

turning himself in right away.  He goes, do you think a million

dollars and asking a guy for a million dollars and turning

himself in right away is the way to go?  I'm like, yeah, I

think that was the way to go.  But I mean now we are playing

this fucking game with the guy.  We go down next time, we gotta

fucking hit him hard and convince him that this is the way to

1    go.  I'm like, you have to be on board with it, Dave.  I don't

2    think Dave is on board with that, but, I'm like, Dave,

3    regardless, the guy is gonna hire us, and he's gonna get

4    arrested within the next few weeks.  They are doing this whole

5    OFAC thing on the guy.  As soon as they finish all that,

6    they're going to fucking do the thing and arrest him.  And

7    either he'll go easy and he controls it or they're gonna

8    control him.  So whichever way he chooses is gonna be the way

9    it goes.  That's how it is."

10              So just a couple of questions about this.

11              Do you see a reference to OFAC?

12   A.  Yes.

13   Q.  Do you understand what OFAC refers to?

14   A.  Yes.  So, I think I mentioned previously that we were

15   working with the Treasury Department as well.  OFAC is a

16   treasury designation.  Peralta was designated a kingpin.  And

17   under that designation it was going to make anyone who was

18   doing business with Peralta could be subject to fines under the

19   Treasury Department and also would freeze his assets.  Peralta,

20   not only was he trafficking drugs, but he was a prolific money

21   launderer as well, laundering his drug proceeds through

22   different means in Dominican Republic, including clubs he

23   owned.  So those assets would have been frozen and then any

24   businesses that were doing business with him also would have

25   been subject to sanctions.

Nar2Cos4                          Jaycox - Direct

1   Q.  Based on your involvement in the Peralta investigation, was

2   there any reason for Manuel Recio to know that OFAC was

3   involved in this?

4   A.  No.

5   Q.  Was there any reason for John Costanzo to know this?

6   A.  No.

7   Q.  This excerpt references arrest dates.  What, if anything,

8   does it say about the specific timing of arrests?

9   A.  In this particular transcript?

10  Q.  Yeah.

11  A.  It doesn't say the specific date.

12  Q.  Okay.  And again, were you aware of any of these kinds of

13  conversations?

14  A.  No, I was not.

15  Q.  All right.  Now let's pull up Government Exhibit 210-T,

16  which is a transcript?

17          THE COURT:  Also already in evidence, right?

18          MR. SWETT:  Yes, your Honor.

19  Q.  Okay.  Do you see that on your screen, Special

20  Agent Jaycox?

21  A.  I do.

22  Q.  What is the date of this intercepted recording?

23  A.  It is July 31, 2019.

24  Q.  And what were you doing with respect to the Peralta

25  investigation on or around July 31, 2019?

1   A.  At this point planning for his arrest and extradition from

2   Dominican Republic.  We were probably a little more than two

3   weeks out from executing the arrest plan.

4   Q.  Who are the participants on this call?

5   A.  This is John Costanzo and Manny Recio.

6   Q.  Can we scroll down to the first page.  All right.  And the

7   transcript is up and now I would like to play the recording.

8          (Audio played)

9   BY MR. SWETT:

10  Q.  Could we go to page 1 of Government Exhibit 210T.  Excuse

11  me, page 2, the first page of the transcript.  Okay.

12          You see how Costanzo says "that guy in the DR gone in

13  two weeks"?

14  A.  Yeah.

15  Q.  What, if anything, did you know about John Costanzo sharing

16  the timing of César Peralta's arrest?

17  A.  I was unaware of this.

18  Q.  Did you authorize John Costanzo to share that information?

19          MR. MUKASEY:  Objection.

20          THE COURT:  Share what information?

21          MR. SWETT:  The timing of Peralta's arrest.

22          MR. MUKASEY:  The transcript says nothing about

23  Peralta's arrest.  It's an interpretation, just reading.

24          THE COURT:  Right.  He asked:  What, if anything, did

25  you know about John Costanzo sharing the timing of César

Nar2Cos4                          Jaycox - Direct

1   Peralta's arrest?

2            I was unaware of that.

3            And then he asked:  Did you authorize John Costanzo to

4   share that information, *i.e.*, the timing of Peralta's arrest.

5            You can answer.

6   A.  Absolutely not.

7   Q.  Why not?

8   A.  Well, again, we had assessed that Peralta would likely

9   attempt to flee if he found out and also, you know, Peralta was

10  under investigation in the Dominican Republic, you know, for

11  quite some time before this.  And, I mean, the things that he

12  would do to persons that he thought were cooperating with law

13  enforcement or with law enforcement, you know, he would kidnap,

14  he would have people killed, and so it was critically important

15  at this point that it not get out that U.S.-based law

16  enforcement was going to be there and that he was going to be

17  extradited.  There was a risk to life at this point.

18  Q.  Did anyone from the DEA tell you that they were having

19  conversations with private investigators about the timing of

20  Peralta's arrest?

21  A.  No.

22  Q.  How about defense attorneys?

23  A.  No.

24  Q.  Can we pull up Government Exhibit 329, please, which is in

25  evidence.

1          Special Agent Jaycox, who are the participants in

2   these text messages.

3   A.   It says David Macey and Gio Costanzo.

4   Q.   What are the dates?

5   A.   It says August 2, 2019.

6   Q.   Now, the recording we just listened to, that was July 31,

7   correct?

8   A.   Correct.

9   Q.   So this is before or after that date?

10  A.   It would be after that date.

11  Q.   Why don't we read these messages.  I can read -- before we

12  read them, what color are the Macey messages?

13  A.   Macey messages are in gray.

14  Q.   What color of the Costanzo messages?

15  A.   Costanzo messages are in green.

16  Q.   So why don't we read these.  I will read the Macey messages

17  and you can read the Costanzo messages.  Okay?

18  A.   All right.

19  Q.   "Trying hard to guess César.  Need that?"

20  A.   "I would wait till he is arrested.  He will call you."

21  Q.   "He will.  But he will also be attacked by everyone else,

22  too.  Dozens of my attorney is the best proposals.  Want to get

23  him more committed to withstand the lies."

24  A.   "Okay."

25  Q.   Taking a shot."

Nar2Cos4                    Jaycox – Direct

1              Did anyone from the DEA tell you about conversations

2     with defense attorneys two weeks before you went to arrest

3     Peralta?

4     A.   No.

5     Q.   No one from the DEA ever shared that information with you?

6     A.   No.

7     Q.   Now can we pull up Defense Exhibit MR 143-T again and go to

8     the last page.  Just to remind the jury, the white messages on

9     this -- in this exhibit, who are they?

10    A.   Those are from César Peralta.

11    Q.   And the green messages, what does it say on this document?

12    A.   Manny, according to the document.

13    Q.   What is the date of the last messages in this text chain?

14    A.   It is August 5, 2019.

15    Q.   Is that before or after the call we just listened to?

16    A.   It's afterwards.

17    Q.   Okay.  And this is a message from Manny?

18    A.   Correct.

19    Q.   Can you read what it says?

20    A.   "César call me."

21    Q.   Okay.  We can take that down.

22              Special Agent Jaycox, when did you attempt to arrest

23    César Peralta?

24    A.   August -- the early morning hours of August 20, 2019.

25    Q.   Where was that?

Nar2Cos4                          Jaycox - Direct

1   A.   Just outside of Santo Domingo --

2   Q.   Can you describe --

3   A.   -- Dominican Republic.

4            THE COURT:  Santo Domingo?

5            THE WITNESS:   In the Dominican Republic.

6   Q.   Can you describe the work that went into that arrest

7   operation?

8   A.   So it was a multiagency effort and we had headquarters --

9   F.B.I. had headquarters resources there.  We worked with the

10  Dominican national police as well as the Dominican drug police

11  in Dominican Republic.  It took coordination from our CIRG unit

12  as well, strategic -- it's strategic air wings, controls all of

13  our air wings and --

14           THE COURT:  How do you spell it?

15           THE WITNESS:  It's C-I-R-G.

16           THE COURT:  Thanks.

17  A.   And, you know, it was -- we had an interactional operations

18  plan approved by headquarters, and my squad was over there as

19  well.  We worked with different access to have surveillance on

20  Peralta in the days before the actual arrest.  It was a very

21  time-intensive and detailed plan that we executed.

22  Q.   Was the arrest date public?

23  A.   No, it was not.

24  Q.   Why not?

25  A.   Again, we wanted to make sure that the risk to law

1    enforcement was minimal.  We also assessed that he would take

2    flight if he found out the date.

3    Q.  Special Agent Jaycox, what happened when law enforcement

4    went to arrest Peralta?

5    A.  We had tracked him to a house and knew he was there

6    overnight, and in the morning when we hit that house, he was

7    not there.

8    Q.  At this time, I would like to pull up Government Exhibit

9    212A-T which is a transcript that is in evidence.

10            Special Agent Jaycox, what is the date of this

11   intercepted recording?

12   A.  August 20, 2019.

13   Q.  Is that the date you attempted to arrest César Peralta?

14   A.  That's correct.

15   Q.  Who are the participants on this call?

16   A.  Johnny Costanzo and Manuel Recio.

17   Q.  If we can scroll down to the next page and play Government

18   Exhibit 212A.

19            (Audio played)

20   Q.  Special Agent Jaycox, after this arrest attempt, were there

21   other attempts to locate César Peralta?

22   A.  Yes, there were.

23   Q.  Were you involved in those?

24   A.  I was.

25   Q.  At any point did anyone refer you to John Costanzo as

1    someone who might have information about his location?

2    A.  No.

3    Q.  What about Manuel Recio?

4    A.  No.

5    Q.  What about Dave Macey?

6    A.  No.

7    Q.  In fact, what, if anything, did you know about contact

8    between Manuel Recio and César Peralta?

9    A.  I didn't know there was any contact at all.

10   Q.  What, if anything, did you know about David Macey and César

11   Peralta?

12   A.  None.

13   Q.  No one ever brought that to your attention?

14   A.  No.

15   Q.  John Costanzo never told you that?

16   A.  No.

17   Q.  Okay.  At this time, I would like to show the witness and

18   counsel what has been marked Government Exhibit 703.

19           Special Agent Jaycox, have you seen that document

20   before?

21   A.  Yes, I have.

22   Q.  Generally speaking, what does it show?

23   A.  It's a timeline of the events we have talked about today.

24   Q.  Have you had an opportunity to review the underlying

25   documents to make sure they correspond to what's on this

Nar2Cos4                    Jaycox – Direct

1   timeline?

2   A.  I have.

3   Q.  Would this document assist you in your testimony today?

4   A.  It would.

5          MR. SWETT:  The government offers Government Exhibit

6   703 into evidence.

7          MR. GAINOR:  Objection, your Honor, for the reasons

8   cited before.

9          THE COURT:  Okay.  Objection noted.  I'm going to

10  admit it.  Overruled and admitted.  GX 703 is received.

11         (Government's Exhibit 703 received in evidence)

12  Q.  Can we publish that to the jury, please.

13         All right.  So Special Agent Jaycox, does this

14  timeline cover every document that we have looked at today?

15  A.  It does.

16  Q.  Does it cover -- does it cover all of them or is this just

17  an excerpt of different things we looked at?

18  A.  Oh, I mean, it's for -- the times point to some of the

19  documents we looked at, but it's just -- I guess there is

20  little summaries of what the many documents actually say.

21         MR. GAINOR:  Judge, objection 106, your Honor, so my

22  objection is clear.

23         THE COURT:  Yes, noted.

24  BY MR. SWETT:

25  Q.  All right.  Let's start with the first entry on this

Nar2Cos4                         Jaycox - Direct

1   timeline.  So can you just remind the jury what happened on

2   June 14, 2019?

3   A.  Yes.  June 14, 2019, Macey traveled to the Dominican

4   Republic.

5   Q.  Okay.  And I don't think we need to -- well, I understand

6   the jurors have smaller screens, so maybe it's helpful to

7   expand this for them.

8        And then on June 27, we looked at a text message

9   around that date, correct?

10  A.  That's correct.

11  Q.  Can you read what it says on Government Exhibit 703?

12  A.  Yes.  "June 27, 2019, Macey asked Recio about Peralta's

13  second payment."

14  Q.  And what about the June 28 entry?

15  A.  "June 28 entry, Peralta retainer agreement not signed by

16  Peralta."

17  Q.  Was that the Macey Law document that we looked at together?

18  A.  That would have been the Macey with the -- at the top it

19  says Macey Law.

20  Q.  Okay.  And how about July 3, 2019?  What happened then?

21  A.  July 3, 2019, Recio and Macey traveled to the Dominican

22  Republic.

23  Q.  All right.  And let's zoom back out again.  What happened

24  on July 11, 2019?

25  A.  "July 11, 2019, Macey told Recio Peralta isn't paying until

Nar2Cos4                        Jaycox – Direct

1   he knows 'specifics.'"

2   Q.  That was a recording we listened to, right?

3   A.  Correct.

4   Q.  And why don't we pull that one up just so we can clarify

5   it.  Can we pull up the transcript for 205-T, please.

6         Okay.  And can we go to page 2.  All right.  You see

7   the bottom portion that you read?

8   A.  Yes, I do.

9   Q.  Was that David Macey who said that or was that Manuel Recio

10  who said?

11  A.  That, Manuel Recio.

12  Q.  Okay.  So if we go back to Government Exhibit 703, so for

13  July 11 should it say Macey told Recio or Recio told Macey who

14  is the person who said that Peralta wasn't paying until he knew

15  specifics?

16  A.  Oh, Manuel Recio.

17  Q.  Okay.  All right.  What happened on July 31, 2019?

18  A.  Costanzo told Recio that the guy in DR is getting arrested

19  in two weeks.

20  Q.  And August 2, 2019?

21  A.  Macey told Costanzo he is taking a shot to get César.

22  Q.  August 20, 2019?

23  A.  F.B.I. and DEA attempt arrest -- attempt to arrest Peralta.

24  Q.  Okay.  We can take that down.

25        Special Agent Jaycox, what, if anything, did you know

1    about conversations between John Costanzo and Manuel Recio

2    regarding the Peralta case?

3    A.   I did not know about those conversations at all.

4    Q.   What role, if any, did John Costanzo have in the Peralta

5    investigation?

6    A.   None.

7    Q.   What authorization, if any, did John Costanzo have to share

8    information about the Peralta case?

9    A.   Absolutely none.

10   Q.   Did that include the timing of the arrest?

11   A.   It especially included the timing of the arrest.

12           MR. SWETT:  No further questions.

13           THE COURT:  All right.  Mr. Mukasey, cross?

14           MR. MUKASEY:  I'm actually going to have Ms. Guaba

15   examine.

16           THE COURT:  Okay, Ms. Guaba.

17   CROSS-EXAMINATION

18   BY MS. GUABA:

19   Q.   Good morning, Special Agent Jaycox.

20           You testified on direct that the day of an arrest --

21   disclosing the day of an arrest puts the lives of agents at

22   risk, right?

23   A.   Correct.

24   Q.   And the F.B.I.-DEA attempted to arrest Peralta on August

25   20, 2019, right?

1    A.  That's correct.

2    Q.  And you were joined by the Dominican police?

3    A.  That's correct.

4    Q.  I think you mentioned on direct the Dominican national

5    police?

6    A.  That's correct.

7    Q.  Right?

8            And the Dominican drug police?

9    A.  Yes.

10   Q.  There was probably a third that you had mentioned?  Was

11   there a third agency in the Dominican Republic that you worked

12   with?

13   A.  Not that I recall.

14   Q.  But at least two police agencies in the Dominican Republic,

15   right?

16   A.  That's correct.

17   Q.  The government played a call for us between Mr. Recio and

18   John on July 31, 2019.

19           Sal, if you could please pull up previously admitted

20   GX 210-T, please.

21           And the first page, and I'm not going to replay the

22   call again, but I just want to draw your attention to page 2.

23   And, Special Agent Jaycox, now I just want to read through the

24   first three lines of this transcript, and I'll read the lines

25   identified as John Costanzo and you read the lines identified

1    as Manny Recio.

2              So, "Dude, that guy in the DR?"

3    A.  "Um-hmm."

4    Q.  "Gone in two weeks."

5              Now, as a reminder, that call took place on July 31,

6    2019, right?

7    A.  I believe so.

8    Q.  And two weeks from that day of this phone call would have

9    been August 14, 2019, right?

10   A.  Approximately, yes.

11   Q.  Not the 20th, right?

12   A.  Correct.

13   Q.  So not the actual arrest date, right?

14   A.  It appears that way.

15   Q.  And Sal, if you could please display for the Court and the

16   jury previously admitted JC 1009-A, and can you please play for

17   the Court previously admitted JC 1008-A with the transcript.

18             (Audio played)

19   Q.  Now, Special Agent Jaycox, you have met and conferred with

20   the prosecutors in this case a couple of times in preparation

21   for your testimony today, is that right?

22   A.  Yes, I have.

23   Q.  And you were only shown this call for the first time this

24   morning, correct?

25   A.  This call here, I believe so.

1    Q.  And in this call -- Sal, if you could please just put back

2    up the transcript.

3              Now, in this call --

4    A.  I apologize.  This call, I have seen this call.

5    Q.  Okay.  But in this call, it is Mr. Recio who is telling

6    John that he is going to get arrested within the next few

7    weeks?

8    A.  That's correct.

9    Q.  And it is Mr. Recio telling John that they are doing this

10   whole OFAC thing.

11   A.  That's correct.

12   Q.  Now, Special Agent Jaycox, the government showed a

13   timeline, I believe, just to help get the days straight, except

14   this timeline did not include this call, is that right?

15   A.  I would have to go back and look at the timeline.  I'm not

16   sure.

17   Q.  Okay.  Sal, can you please display for the witness and the

18   parties JC 9703.

19              Without describing the blue box on the type line, is

20   this the timeline that you were shown on direct except for the

21   blue box?

22   A.  Yes.

23              MS. GUABA:  Okay.  The defense moves to move -- moves

24   in JC 9703?

25              THE COURT:  It is admitted.

Nar2Cos4                     Jaycox – Cross

1          (Defendant's Exhibit JC 9703 received in evidence)

2    BY MS. GUABA:

3    Q.  Can you display the timeline for the jury and the Court?

4          So this timeline shows that, on July 29, 2019, Manny

5    told John that they are doing this whole OFAC thing on the guy

6    and that they're gonna do the fucking thing and arrest him,

7    right?

8    A.  Correct.

9    Q.  And then it shows that on July 31, 2019 John told Recio

10   that the guy in the DR is gone in two weeks, right?

11   A.  Yes.

12   Q.  And this timeline is a little bit different from the

13   timeline you were shown before, right, which said that Costanzo

14   told Recio that the guy would be arrested in two weeks, right?

15   A.  The blue box is new on the timeline.  Is that what you are

16   asking me?

17   Q.  Yes.

18   A.  Yes, that's correct.

19   Q.  Okay.  So the government played another call for you,

20   Special Agent Jaycox.

21          And Sal, can you please pull up the transcripts for

22   GX 212-T.

23          And again, Special Agent Jaycox, if you can go to the

24   first page, please, and the next page, my apologies, again,

25   Special Agent Jaycox, I would like for you to read through —- I

1    believe it was 202-A-T?

2              MR. SWETT:  Is this being displayed to the jury?

3              MR. MUKASEY:  Take it down.

4              MS. GUABA:  If you can go to the second page.

5              MS. DEININGER:  Objection.

6              MR. SWETT:  This is not in evidence yet, your Honor.

7              MR. MUKASEY:  All right.

8              MS. GUABA:  We don't have to show it.

9              (Counsel confer)

10             MS. GUABA:  Yeah, the second page.  No.  We could

11   circle back to that.

12   Q.  Sal, if you can please go to GX 329.

13             Special Agent Jaycox, the government also had you read

14   some exhibits during your testimony, one of which was GX 329,

15   right?

16   A.  That's correct.

17   Q.  And this is a text message between Mr. Macey and John?

18   A.  Yes.

19   Q.  Now, you don't know who John Costanzo is, right?

20   A.  No.

21   Q.  You have never spoken to him?

22   A.  No.

23   Q.  And you have never worked with him?

24   A.  No.

25   Q.  And you don't know who Mr. Macey is.

1   A.  No.

2   Q.  And I would like to read through the first three lines of

3   this text message, and if you could just please read the lines

4   in gray for Mr. Macey and I will read the line in green for

5   Mr. Costanzo.

6   A.  "Trying hard to guess César.  Need that."

7   Q.  "I would wait till he is arrested.  He will call you."

8           Now, this text message exchange where John is telling

9   Mr. Macey to wait till he is arrested occurs on August 2, 2019,

10  right?

11  A.  Well, it says Gio Costanzo at the top, but your question

12  was again?

13  Q.  This text message where Gio Costanzo is telling Macey to

14  wait till he is arrested happens on August 2, 2019, correct

15  right?

16  A.  Correct.

17  Q.  Now -- you can take that down, Sal.  Thank you.

18          Special Agent Jaycox, you were the F.B.I. case agent

19  on the Peralta case, right?

20  A.  That's correct.

21  Q.  So you were the agent responsible for the case, right?

22  A.  Correct.

23  Q.  And are you still the case agent on that case?

24  A.  Like I said, now I work in a different -- on a different

25  squad.

Nar2Cos4                    Jaycox – Cross

1   Q.  But you are still in Puerto Rico?

2   A.  Correct.

3   Q.  And you were tasked with deciding investigative methods on

4   the Peralta case when you were on it?

5   A.  That's correct.

6   Q.  And DEA financial operations was not involved in that

7   operation, right?

8   A.  No.

9   Q.  And to your knowledge, DEA headquarters was not involved in

10  that operation.

11  A.  No.

12  Q.  And I believe you mentioned on direct that this wasn't an

13  AGEO, right?

14  A.  No.

15  Q.  This was an F.B.I. operation.

16  A.  Well, it was a -- it was an OCDETF operation, so it was the

17  partner agencies that were working with us as well, but we were

18  the primary on the --

19  Q.  The F.B.I.?

20  A.  Correct.

21  Q.  And César Peralta was a high-level drug trafficker in the

22  Dominican Republic?

23  A.  Correct.

24  Q.  And you put together the operation for the arrest, right?

25  A.  That's correct.

1  Q.  Now, I believe you testified on direct that the DEA cannot

2  operate on its own in a foreign country, right?

3  A.  U.S. law enforcement in general cannot operate on its own

4  outside the U.S.

5  Q.  Right.  So you were not able to operate on your own in the

6  Dominican Republic, right?

7  A.  That's correct.

8  Q.  You had to work with the authorities in the Dominican

9  Republic, right?

10 A.  That's correct.

11 Q.  To coordinate the arrest?

12 A.  Yes.

13 Q.  And you had to give them a copy of the provisional arrest

14 warrant?

15 A.  Yes.

16 Q.  And if you could please remind the jury what a provisional

17 arrest warrant is?

18 A.  It's basically the information on the basis, the

19 justification for us wanting to arrest Mr. Peralta.

20 Q.  So you had to give one of those to the Dominican

21 authorities, right?

22 A.  Yes, that's correct.

23 Q.  So the Dominican police had a copy of the American arrest

24 warrant?

25 A.  Yes, they did.

1  Q.  And they knew that charges were filed?

2  A.  Yes.

3  Q.  And they knew that an arrest was going to happen?

4  A.  That's correct.

5  Q.  And you were afraid of leaks getting out about the arrest.

6  A.  Of course.

7  Q.  Because law enforcement in the Dominican Republic is not

8  terribly trustworthy.

9  A.  I wouldn't say that.

10  Q.  And Peralta had contacts in the government in the Dominican

11  Republic?

12  A.  He did.

13  Q.  So he knew people in law enforcement and in the government

14  in the Dominican Republic, right?

15  A.  I don't know if he knew people in law enforcement.

16  Q.  But he had contacts.

17  A.  I don't know if he had contacts.

18  Q.  Now, Special Agent Jaycox, you mentioned that the F.B.I. in

19  San Juan was not the only office investigating Peralta, right?

20  A.  That's correct.

21  Q.  Multiple agencies were involved?

22  A.  Yes.

23  Q.  DEA Puerto Rico?

24  A.  Yes.

25  Q.  DEA Miami?

1    A.  Yes.

2    Q.  DEA in the Dominican Republic?

3    A.  Yes.

4    Q.  And it became clear to you at some point that they all had

5    like their own interests in the case.

6    A.  I don't know if they had their own interests, but they had,

7    you know, investigations.  Some of them had investigations into

8    Peralta.

9    Q.  And they were all different.

10   A.  I don't know that they were all different.  They all had

11   drug trafficking investigations into Peralta.

12   Q.  Special Agent Jaycox, do you recall meeting with the

13   prosecutors on this case in preparation for your testimony

14   today?

15   A.  Yes.

16   Q.  And I believe you met with Mr. Swett to prepare?

17   A.  Yes.

18   Q.  And during those meetings, prosecutors and agents will

19   often take detailed notes?

20   A.  Yes.

21   Q.  Sal, if we could please display just for the witness

22   3555-0001?

23            MR. SWETT:  Objection, your Honor.  There is no basis

24   to refresh recollection at this point.

25            MS. GUABA:  Judge, I'm impeaching the witness.

1          MR. SWETT:  We don't think that this is proper

2     material to impeach the witness.

3          THE COURT:  You can ask your question.

4     BY MS. GUABA:

5     Q.  Special Agent Jaycox, if you could just look -- didn't you

6     tell the prosecutors that while you were working with all of

7     these agencies, they all had their own interests in the case?

8     A.  That's just not the wording I used, but, yes, like I said,

9     there were all different investigations into Peralta.

10    Q.  Okay.  So the wording wasn't correct from your interview.

11         MR. SWETT:  Objection.

12         THE COURT:  Sustained.

13    Q.  Special Agent Jaycox, the government played a number of

14    calls throughout your testimony and, as you heard from the

15    stipulation from Mr. Swett, those calls were intercepted

16    pursuant to a wiretap, right?

17    A.  I don't know.  I wasn't part of that.  But as I understand,

18    yes, it was part of a Title III.

19    Q.  Right.  Mr. Swett read in a stipulation during your

20    testimony where he said that those calls were intercepted

21    pursuant to a wiretap?

22    A.  Okay.

23    Q.  And that was an F.B.I. wiretap, right?

24    A.  I believe --

25         MR. SWETT:  Objection.  Lacks foundation.

Nar2Cos4                          Jaycox - Cross

1          THE COURT:  Sustained.

2     Q.  So Special Agent Jaycox you weren't actually on any of the

3     calls that were played?

4     A.  No, I was not.

5     Q.  And you first became aware of these calls in connection

6     with this case, right?

7     A.  That's correct.

8     Q.  In other words, you did not know about these calls at the

9     time that they were happening.

10    A.  No, I did not.

11    Q.  And some of these calls -- I believe GX 201-T took place as

12    early as July 3, 2019, right?

13    A.  That's correct.

14    Q.  And so as early as July 3, 2019, the F.B.I. in this case

15    was listening to discussions about Peralta.

16          MR. SWETT:  Objection, your Honor.

17          THE COURT:  Overruled.

18    A.  I don't -- I was not part of this case, so I don't know at

19    what point law enforcement was aware.

20          MR. SWETT:  Your Honor, can we sidebar on this?

21          THE COURT:  Okay.

22          (Continued on next page)

23

24

25

Nar2Cos4                          Jaycox – Cross

1          (At the sidebar)

2          MR. SWETT:  Your Honor, I just don't see the relevance

3    of this line of cross.  I think they are trying to establish

4    that the F.B.I. somehow had wind of this and could have averted

5    Peralta fleeing.  But there are a number of reasons why that is

6    just not anything that this witness is capable of talking

7    about.  He doesn't know the fact that there was an entire

8    filter process over the line sheets.  He was not reviewing

9    these line sheets.  So just to inquire blithely about the fact

10   that the F.B.I. had these intercepted calls at certain dates

11   and then using that to suggest that they should have done

12   something about this I think is improper.  It puts the F.B.I.

13   on trial, and that's not what this case is about.

14         MR. MUKASEY:  No one is putting the F.B.I. on trial.

15   What's good for the goose is good for the gander.  They put

16   somebody up there who has no knowledge, and they just get asked

17   the questions to say I don't know, I don't know, I don't know.

18   We are doing the same thing, exactly the same thing.

19         MR. SWETT:  The difference, your Honor, is that our

20   questions are Manuel Recio and Jonathan Costanzo.

21         MR. MUKASEY:  And ours are about the investigation of

22   César Peralta which you raised.

23         THE COURT:  I just think what's the relevance?  It's

24   getting at other possible sources of leak.

25         MR. MUKASEY:  And the knowledge of what was going on

Nar2Cos4                    Jaycox - Cross

1   with César Peralta.  The F.B.I. knew.

2            MS. GUABA:  And didn't tell --

3            MR. ANDREWS:  Just the F.B.I. is not a monolith.

4   There is a very specific investigation that was going on here

5   involving the filter team.  That's the entire reason why there

6   is a filter team and why they are cabined off.  The idea that

7   because there was an F.B.I. agent listening to wiretaps in this

8   particular case does not mean that there was an F.B.I. agent

9   sitting in the Dominican Republic or a DEA agent who would know

10  about any of these wiretaps.  If they want to set a foundation

11  that this wiretap was about listening to somebody improperly

12  halfway across the world, they are welcome to try to, but they

13  cannot make this type of argument without a proper foundation.

14           MR. MUKASEY:  The reason they are upset is because

15  they put someone on the witness stand who doesn't know about

16  the case so he would answer questions like, I didn't know that,

17  I didn't know that, I wasn't aware of that, I wasn't aware

18  about Costanzo.  Now we are doing the same thing.  You weren't

19  aware of the following facts about the Peralta arrest.  That's

20  exactly the same thing.

21           THE COURT:  I mean, they are saying it is misleading

22  to suggest, given the tight control of this particular wiretap

23  situation.

24           MS. GUABA:  I think they are arguing the same thing

25  about this investigation into Peralta.

1          MR. SWETT:  Your Honor, we are simply playing the

2    communications between these two defendants and asking the case

3    agent if he was aware that he was involved.  What they are

4    asking is whether a reference to a César in a wiretap in

5    New York would somehow trigger knowledge that there was -- that

6    this agent was leaking information about a sealed case which,

7    your Honor, candidly speaking, this is not the kind of thing

8    that you just put together immediately and immediately

9    disseminate throughout the F.B.I.

10         THE COURT:  Right.

11         MS. GUABA:  You are implying it is disseminated

12   throughout the DEA and that's how Costanzo knew about it.

13         THE COURT:  At the end of the day, you are just asking

14   about a document that's in evidence of a witness.

15         MS. GUABA:  Right.

16         THE COURT:  Of a witness who doesn't have any personal

17   knowledge of it, so I think it's fair game.

18         MR. MUKASEY:  Thank you.

19         THE COURT:  There is a point where it gets --

20         MR. MUKASEY:  We are not going to beat it to death.

21         MS. GUABA:  No.

22         (Continued on next page)

23

24

25

1           (In open court)

2    BY MS. GUABA:

3    Q.  So Special Agent Jaycox, you were not actually on any of

4    the calls that were played.

5    A.  No, I was not.

6    Q.  And you became aware of these calls in connection with this

7    case.

8    A.  Correct.

9    Q.  And some of these calls, I believe GX 21-T occurred as

10   early as July 3, 2019.

11   A.  That's correct.

12   Q.  And no one in the F.B.I. ever made you aware of these calls

13   at the time.

14   A.  No.

15   Q.  And as you were planning the operation into Peralta, nobody

16   at the F.B.I. told you about the call in GX 205.

17   A.  No.

18   Q.  Or the call in GX 210.

19   A.  No.

20   Q.  Special Agent Jaycox, so you mentioned that you are still

21   with the F.B.I. in Puerto Rico?

22   A.  That's correct.

23   Q.  And you are a supervisor on the counterintelligence squad.

24   A.  That's correct.

25   Q.  And as a part of your work, have you become familiar with

Nar2Cos4                          Jaycox - Cross

1    the handling of confidential informants?

2              MR. SWETT:  Objection.  Outside the scope of his

3    testimony.

4              THE COURT:  Sustained.

5    BY MS. GUABA:

6    Q.  Special Agent Jaycox, you testified on direct a number of

7    times that Peralta was never going to cooperate?

8    A.  That's correct.  We assessed that.

9    Q.  And to your knowledge, is Mr. Peralta currently

10   cooperating?

11             MR. SWETT:  Objection.  Relevance.

12             THE COURT:  Sustained.

13             MS. GUABA:  Judge, can we have a sidebar to make an

14   application as to the relevance?

15             THE COURT:  Okay.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MS. GUABA:  So the question is relevant because to

3     impeach the witness.  He claims that Mr. Peralta would never

4     cooperate.  We know that Mr. Peralta is in fact cooperating

5     now, and it just impeaches the witness he claims.

6          MS. DEININGER:  He did --

7          MR. MUKASEY:  Not only that, it goes to the state of

8     mind of the defendants.  Our defense is obviously that Recio

9     was trying to meet with Peralta to get him to cooperate.  In

10    fact, he is cooperating despite the fact that the agent witness

11    said he would never cooperate.  Obviously our defense is that

12    efforts were made, not in bad faith here, to help Peralta flee

13    but because we thought he would cooperate.

14         MR. SWETT:  Your Honor, there is a world of difference

15    between the idea of someone cooperating once they have been

16    arrested after they fled from the Dominican Republic, took a

17    fast boat to Colombia, were captured and extradited from

18    Colombia.  That's very different from saying someone could have

19    been approached and someone would have voluntarily surrendered.

20    It is not relevant and, frankly, I'm surprised they are asking

21    it because they represented to us that they weren't going to

22    ask about his current cooperation.

23         MS. GUABA:  Well --

24         MS. DEININGER:  There is nothing about the fact that

25    he testified on direct that they assessed that he would not

Nar2Cos4                          Jaycox - Cross

cooperate, that he would flee, and did in fact flee just on the

fact that he later, after being arrested, is cooperating.

There is nothing impeaching about what he testified to on

direct.

          MS. GUABA:  The witness testified that he would never

cooperate.  That was their assessment.  It was just not a

possibility.

          MR. MUKASEY:  They opened that door.

          MR. SWETT:  Your Honor, the witness was asked on

direct if they had ever considered approaching Peralta and he

said no because if he was assessed, he wouldn't cooperate.  The

way Ms. Guaba asked the question I think might have been

confusing.  But it certainly didn't impeach what he said on

direct.  And if she wants to inquire if he meant he wouldn't

cooperate prearrest, she is free to do that and see what he

says.  But bringing out someone's postarrest cooperation is

irrelevant in this context.

          THE COURT:  I'm going to sustain the objection.

          (Continued on next page)

Nar2Cos4                          Jaycox - Cross

1                (In open court)

2                MS. GUABA:  No further questions, your Honor.

3                THE COURT:  Thank you.  Redirect.  I'm sorry,

4     Mr. Gainor.

5     CROSS-EXAMINATION

6     BY MR. GAINOR:

7     Q.  Agent Jaycox, good afternoon.

8     A.  Good afternoon, sir.

9     Q.  If I understand your testimony correctly, you were the lead

10    agent for the F.B.I. on the César Peralta Puerto Rico aspect of

11    this case, correct?  The Puerto Rico indictment, correct?

12    A.  That's correct.

13    Q.  And you testified early on in your direct examination that

14    you were actually surprised to learn that there were other

15    indictments for Mr. Peralta that were either pending or on

16    their way to being indicted, correct?

17    A.  That's correct.

18    Q.  So it's obvious, then, that the agencies were not

19    necessarily all talking with one another, is that fair?

20    A.  Well, we were communicating with DEA at the time.  But

21    obviously it was a surprise to us that next indictment, the

22    indictment out of Miami.

23    Q.  But didn't you know that there were other DEA agents

24    specifically involved in the case to arrest Mr. Peralta on

25    August 20?  For instance, Lee Lucas?

1    A.  No, I did not.

2    Q.  But it later came to your attention, correct?

3    A.  Yes, as a result of this, yes.

4    Q.  And we actually saw that in that conversation that occurred

5    on May 20 that we all listened to, correct?  You have a

6    recollection of that?

7    A.  The conversation on -- which conversation?

8    Q.  Where Manuel Recio is talking about talking to Special

9    Agent Lee Lucas about surveillance on Mr. Peralta the night

10   before the planned arrest.  Do you remember that conversation?

11   A.  I was unaware of that conversation.

12   Q.  But you have heard the conversation in court today?

13   A.  Yes.

14   Q.  And you heard it before today?

15   A.  Yes.

16   Q.  And that surprised you, too, that Lee Lucas from the DEA

17   was communicating with Manuel Recio prior to the arrest?

18   A.  That would surprise me, yes.

19   Q.  So it wouldn't also surprise you that there might have been

20   other communications between DEA Agent Lee Lucas and Manuel

21   Recio before that call?

22            MR. SWETT:  Objection.

23            THE COURT:  Sustained.

24   BY MR. GAINOR:

25   Q.  You were not privy to conversations between DEA Agent Lee

1    Lucas and other people on the case, not Manuel Recio, but other

2    people?

3              MR. SWETT:  Objection.

4              THE COURT:  Sustained.

5    BY MR. GAINOR:

6    Q.  Were you later made aware of conversations between Lee

7    Lucas and Peralta's defense attorneys?

8              MR. SWETT:  Objection.

9              THE COURT:  Sustained.

10   Q.  You are not used to, necessarily, defense attorneys sharing

11   information on their clients with you directly?

12   A.  No.

13   Q.  But you are also aware that it's known to happen in law

14   enforcement, correct?

15             MR. SWETT:  Objection.

16             MR. GAINOR:  If he is aware, your Honor.

17             THE COURT:  Sustained.

18   Q.  You were played a conversation MR 141-T, if we can get that

19   up, Ms. Serna, page 1.

20             Agent Jaycox, you remember answering some questions

21   with regard to this exhibit?

22   A.  Yes.

23   Q.  And a meeting that occurred between César Peralta and

24   Manuel Recio at La Roma?

25             MR. SWETT:  Objection.  Misstates testimony.

1    THE COURT:  Sustained.

2    Q.  You are not aware of the content of the conversation

3    between the two on that day?

4    A.  No.

5    Q.  And if we can go to page 2 of that exhibit.  And the bottom

6    of that exhibit -- I'm sorry, if it can be published for

7    everyone, your Honor.  I thought it was.  I apologize.

8    Q.  Did your investigation ever, as the lead case agent in this

9    case, indicate to you who that friend of César Peralta was that

10   was giving him information on the F.B.I.?

11   MR. SWETT:  Objection.

12   THE COURT:  Sustained.

13   BY MR. GAINOR:

14   Q.  Are you aware of an informant or a series of informants

15   that worked with César Peralta prior to his arrest?

16   MR. SWETT:  Objection.  Vague.

17   THE COURT:  Overruled.  You can answer if you

18   understand the question.

19   A.  Can you repeat the question?

20   Q.  Are you aware that César Peralta had a series of informants

21   that were giving him information prior to the arrest?

22   A.  No.

23   Q.  Or prior to the attempted arrest?

24   A.  No, no specific informants, no.

25   Q.  Were you ever aware of the name Drago as a specific

Nar2Cos4                        Jaycox - Cross

1    informant?

2    A.  No.

3    Q.  So if we can go to page 3 of this exhibit, I'm sorry, page

4    4 of the exhibit.

5            Based on your involvement as lead agent in this case,

6    did you ever ascertain who that friend was that was

7    communicating with César Peralta?

8            MR. SWETT:  Objection.

9            THE COURT:  Sustained.

10   BY MR. GAINOR:

11   Q.  Would you agree, based on your time in this investigation,

12   that there is some measure of corruption within the Dominican

13   Republic?

14   A.  In what sense?

15   Q.  With regard to, you know, political corruption within that

16   country?

17   A.  Yes.

18   Q.  Of the exhibits that you were shown today, you weren't

19   shown anything that -- where Mr. Recio told Mr. Peralta to

20   flee, correct?

21   A.  No, not that I saw today.

22   Q.  In fact, you were asked some questions with regard to

23   MR 143-T, if we can replace that exhibit and put that on,

24   please.  If we can go to page 2.

25           Do you remember reading that with Mr. Swett into the

1    record?

2    A.  Yes.

3    Q.  That exhibit?

4    A.  Yes.

5    Q.  Where Mr. Peralta was discussing going about his business

6    and not having a problem?

7    A.  Yes.

8    Q.  That was on July 16?

9    A.  That's correct.

10   Q.  You were aware that Mr. Peralta one particular time went to

11   the embassy in Dominican Republic?

12            MR. SWETT:  Objection.

13            THE COURT:  Overruled.  You can answer if you know.

14   A.  I believe he did go to the embassy at one point.

15   Q.  And this was in around this time frame, around July, August

16   of 2019?

17   A.  I don't recall.

18   Q.  If you go to the last page of that exhibit, 143-T, what is

19   the date of the last entry of -- where Manuel Recio is asking

20   "César call me."  Is that 8/5/2019?

21   A.  That's correct.

22   Q.  That's 15 days before the arrest or the attempted arrest?

23   A.  Correct.

24   Q.  Were you shown any other exhibits that show any contact

25   with Manuel Recio after -- and César Peralta after 8/5/2019?

Nar2Cos4                         Jaycox - Cross

1   A.  Not that I recall, no.

2   Q.  I believe you testified that it was -- the arrest was

3   planned for mid -- well, actually, August 20, 2019, that's

4   correct?

5   A.  Correct, around those dates, exactly.

6   Q.  And sometime before you got together, it was multiple

7   agencies that got together to discuss and coordinate that

8   arrest, that's correct?

9   A.  That's correct.

10  Q.  And that would have been several weeks before?

11  A.  Yes, sometime in July.

12  Q.  So F.B.I. was involved, the U.S. Marshal Service was

13  involved, correct?

14  A.  Yeah, DEA, HSI.

15  Q.  HSI is what for the ladies and gentlemen of the jury?

16  A.  Homeland Security Investigations.

17  Q.  And there were at least two different elements of the

18  Dominican Republic law enforcement.  It was the Dominican

19  Republic drug police, correct?

20  A.  Correct.

21  Q.  And the Dominican Republic, what, national police?

22  A.  Correct.

23  Q.  And prior to any operation of this size -- and this was one

24  of the larger operations, I'm sure you would agree?

25  A.  Yes.

Nar2Cos4                    Jaycox - Cross

Q.  There would have been -- it would have been standard to
have some measure of surveillance in place to track Mr. Peralta
and his movements on the island, correct?

A.  Yes, that's correct.

Q.  In fact, you spoke of the fact that he was tracked the
night before.  That would have been August 19, 2019?

A.  That's correct.

Q.  And he was tracked to a woman's house?

A.  Yes, a girlfriend's house.

Q.  So that would be consistent with that last message that was
played where DEA Agent Lee Lucas was -- apparently had related
that to Manuel Recio?

           MR. SWETT:  Objection to the form.

           THE COURT:  Sustained as to form.

BY MR. GAINOR:

Q.  It's consistent with that message, then, of surveillance on
August 19, 2019?

A.  Yes, we did have surveillance on Peralta the night before.

Q.  So you had surveillance on the 19th.  Let's work our way
back.  You had it on the 18th, as well?

A.  We had some surveillance on Peralta, yes, at least 48 hours
before.

Q.  You would have been the lead case agent on that day, as
well, coordinating resources amongst the different entities
involved?

1    A.  That's correct.

2    Q.  And surveillance would have occurred also on the 17th of

3    August, correct?

4    A.  I don't recall the specific days in which, before that, we

5    had surveillance on him.

6    Q.  But it would be standard operating procedure to have

7    surveillance in place several days or weeks before the arrest,

8    wouldn't that be correct, Agent Jaycox?

9    A.  What I can say is that it would be correct to have a

10   pattern of life on the subject.

11   Q.  I'm sorry?

12   A.  It would be correct to have a pattern of life on the

13   subject, not necessarily surveillance, but pattern of life.

14   Q.  But there was clear surveillance the day -- the evening

15   before the arrest, correct?

16   A.  Yes.

17   Q.  So Peralta had not fled on that day, that evening, correct?

18   A.  No.

19   Q.  And how many law enforcement officers from United States

20   Marshal Service, F.B.I., DEA, HSI, and local authorities were

21   part of this task force?  More than 10?

22   A.  Yes, more than 10.

23   Q.  More than 20?

24   A.  What is your question?  There during the operation or . . .

25   Q.  How many would have been involved in the surveillance of

1    Mr. Peralta on the evening of the 19th?

2    A.  Oh, maybe one or two.

3    Q.  And there was no evidence that Manuel Recio was in contact

4    with Mr. Peralta on the 19th, correct?

5    A.  Can I ask you to repeat the question?

6    Q.  Your last understanding of Manuel Recio trying to reach out

7    to César Peralta was August 5 according to the message?

8            MR. SWETT:  Objection.  I don't think he has any

9    understanding of Manuel Recio's contact.

10           THE COURT:  You can just ask him about the message.

11   BY MR. GAINOR:

12   Q.  The message of August 5, was that your last understanding

13   of Manuel Recio reaching out to César Peralta?

14           MR. SWETT:  Same objection to the form.

15           THE COURT:  Sustained as to his separate understanding

16   other than the message.

17   Q.  According to the government's timeline, that is Government

18   Exhibit 703, can we put that up, please?  And based on your

19   review of the text messages, when was your understanding that

20   Manuel Recio had his last contact with César Peralta?

21   A.  August 5, 2019.

22   Q.  Wasn't August 5 the date that he said "call me"?

23   A.  Yes.

24   Q.  Do you know from your investigation whether César Peralta

25   ever called?

1           MR. SWETT:  Objection.

2           MR. GAINOR:  If you know.

3           THE COURT:  You can answer.

4    A.   I don't know.  I don't know Manuel Recio or -- or David

5    Macey.  I don't know them.  I've never met them.

6    Q.   But on August 19, 2019, law enforcement, without a doubt,

7    had tracked César Peralta to a girl's house, correct?

8    A.   Yes.

9    Q.   And then law enforcement tries to arrest him that next

10   morning?

11   A.   Correct, on the 20th.

12           MR. GAINOR:  If I could have a moment, your Honor.

13           THE COURT:  Sure.

14           (Counsel confer)

15           MR. GAINOR:  No further questions, your Honor.

16           THE COURT:  All right.  Thank you.  Redirect.

17           MR. SWETT:  Very briefly, your Honor.

18   REDIRECT EXAMINATION

19   BY MR. SWETT:

20   Q.   Can we pull up MR 143-T, please.

21           Special Agent Jaycox, you were asked on

22   cross-examination about César Peralta's contacts with Dominican

23   law enforcement, do you recall that?

24   A.   Yes.

25   Q.   Based on the exhibits that you reviewed today, including

1   MR 143-T, which should be up on the screen in a moment, was

2   César Peralta in contact with Manny Recio?

3   A.  Yes, he was.

4   Q.  And now if we can just pull up Government Exhibit 210-T.

5           Based on your review of intercepted recordings in this

6   case, was Manny Recio in contact with John Costanzo?

7   A.  Yes, they were in contact.

8   Q.  Actually, let's not pull that up.  Let's just go right on

9   to pulling up Defense Exhibit JC 1009-A, which is the

10  transcript, and we can publish that to the jury.  And we can go

11  to page 2.

12          Now, on cross-examination you were asked a little bit

13  about this document.  You were asked about -- you were asked

14  about the reference to OFAC, right?

15  A.  That's correct, yes.

16  Q.  And in fact this intercept has Manuel Recio saying they are

17  doing this whole OFAC thing on this guy, right?

18  A.  Yes.

19  Q.  Was OFAC's action against César Peralta public?

20  A.  No, it was not public at the time, again, because the

21  implementation of the OFAC tool, law enforcement tool is

22  supposed to be a surprise.  If someone knows about it before,

23  they can hide assets, do a number of things that would blunt

24  the effectiveness of the kingpin designation.

25  Q.  And I think you were asked on cross-examination whether

Nar2Cos4                        Jaycox – Redirect

1   Manuel Recio was the person who was aware of OFAC as of this

2   conversation, right?

3   A.  Can you ask that again?

4   Q.  I believe on cross-examination you were asked whether Manny

5   Recio was the one sharing OFAC information on this call?

6   A.  Yes.

7   Q.  Okay.  And, again, sitting here today, what, if anything,

8   did you know about who Manny Recio is or what he does?

9   A.  I knew nothing about Manny Recio.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. SWETT:

2    Q.   Okay.  So do you know at the time of this call whether he

3    was a member of law enforcement or a private citizen?

4              MR. GAINOR:  Objection.

5              Outside the scope, your Honor.

6              THE COURT:  Overruled.

7              You can answer, or you can finish.

8    Q.   So this message or this call, which was July 29th, 2019, do

9    you know whether Manuel Recio was in law enforcement or a

10   private citizen at this time?

11   A.   I don't know.

12   Q.   If a private citizen was aware of OFAC's pending action, is

13   that something you would have wanted to have known?

14             MR. GAINOR:  Objection, your Honor.

15             THE COURT:  Overruled.

16   A.   Absolutely.  That would mean that there was a leak.

17   Q.   And if anyone in law enforcement knew that a private

18   citizen had this information, would you expect them to share

19   that with you?

20   A.   Absolutely.

21   Q.   There are also questions on cross-examination about this

22   exhibit and Recio discussing the arrest; is that right?

23   A.   That's correct.

24             MR. SWETT:  Why don't we pull up Government Exhibit

25   210T, and let's go to page 2.

1    Q.  All right.  You read with Ms. Guaba the first three lines

2    about that guy in the DR gone in two weeks, right?

3    A.  Yes.

4    Q.  Why don't you and I read down at the bottom where it starts

5    "It's gonna happen."  So if you could read the JC, and then I

6    will read the MR.

7    A.  It's gonna happen.  This is done.  It's -- it's a big noise

8    up here.

9    Q.  Oh, I know.  Listen, I was trying... Dave, Dave is like

10   Manny, but the thing is I was having a conversation with him.

11   I'm like, when are we going down to see Cesar?  And I'm like,

12   listen, you know, I'm getting word that we're gonna have to do

13   this quick, unless we're not going to be able to control it

14   after that.

15          And he's like, well, how quick is quick?  I'm like,

16   Dave, I don't know.  It could be two weeks, it could be a week,

17   it could be tomorrow, it could be a month, it could be -- and

18   then if we go to the next page, the "OV" stands for

19   overlapping.  What did John Costanzo then say over Manuel

20   Recio?

21   A.  No, no, just wait for it to happen.  Don't go.  Don't go

22   down.

23   Q.  And then down at the middle of the page, can you read what

24   Costanzo said about OFAC?  What did he say there?

25   A.  OFAC was telling me about it today.

1    Q.  Okay.  And Special Agent Jaycox, you were asked a lot of

2    questions about the arrest operation in the Dominican Republic;

3    is that right?

4    A.  Yes.

5            MR. SWETT:  Can we pull up Government Exhibit 212T,

6    please.  I'm sorry, 212A-T.  There we go.

7            Can we go to the second page.

8    Q.  I believe Mr. Gainor asked you about this conversation.  Do

9    you remember that?

10   A.  Yes.

11   Q.  And on the third, line Manuel Recio says they are out there

12   trying to arrest Cesar in the DR.  You see that, right?

13   A.  Yes.

14           MR. SWETT:  Can we zoom out.

15   Q.  Can you read -- let's read the last line on the large

16   portion of Manuel Recio.  Why don't I read that and then you

17   read the last John Costanzo message?

18   A.  Okay.

19   Q.  All right.  I'll start with the Manuel Recio portion.

20           What a fuck up Dave Macey did with this shit.

21           MR. GAINOR:  Your Honor, I'd object to the whole

22   conversation not being read to the jury in that box.  It's just

23   taking it out of context.

24           THE COURT:  You can do it in recross, if you'd like.

25           MR. SWETT:  May I read it again, your Honor?

1              THE COURT:  Yes.

2    Q.  What a fuck up Dave Macey did with this shit.

3    A.  Yeah, he knows now.  He knows.

4              MR. SWETT:  No further questions.

5              THE COURT:  Ms. Guaba?

6              MS. GUABA:  If you can please pull up JC 009A, which

7    was previously admitted, and 210T on page 3, which was

8    previously admitted.

9    RECROSS EXAMINATION

10   BY MS. GUABA:

11   Q.  So Special Agent Jaycox, just to be clear, the call on July

12   29th, 2019, is Mr. Recio telling John Costanzo about the OFAC

13   thing, right?  Page 2.

14   A.  Repeat your question again.

15   Q.  So the call on the left side of your screen, which took

16   place on July 29, 2019, that is Mr. Recio telling Costanzo

17   about the OFAC thing, right?

18             MR. SWETT:  Objection.

19             Mischaracterizes the intercept.

20             THE COURT:  Well, it says what it says.  You can

21   rephrase the question.

22   BY MS. GUABA:

23   Q.  Special Agent Jaycox, on the left side, the call that takes

24   place on July 29, 2019, Mr. Recio states they are doing this

25   whole OFAC thing on the guy, right?

1   A.  That's correct.

2   Q.  And on the call on the right on page 3, which takes place

3   on July 31st, 2019 --

4            MS. GUABA:  Sal, if you could just --

5   Q.  It is John Costanzo tells Mr. Recio OFAC was telling me

6   about it today.  Right?

7   A.  That's correct.

8   Q.  "Today" meaning July 31st, 2019, right?

9   A.  Yes.

10            MS. GUABA:  No further questions.

11            THE COURT:  Okay.  Mr. Gainor.

12            MR. GAINOR:  Yes, your Honor.

13            Put up Government Exhibit 212A-T.  Page 2, please.

14   And if we can blow up that last section.  That's it.

15   RECROSS EXAMINATION

16   BY MR. GAINOR:

17   Q.  Agent WilCox, was your team -- your team was responsible

18   for also surrounding the house, Peralta's house that night?

19   A.  Yes.

20   Q.  Along with DEA Agent Lee Lucas and his team?

21   A.  Well, let me just say, it says, "The house was surrounded."

22   That's a little exaggerated.

23   Q.  But you had elements and you had law enforcement agents in

24   that area near the house?

25   A.  Yes, that's correct.

NARVCOS5

1  Q.  And it's not an exaggeration to say that Cesar Peralta was

2  observed going into that house --

3  A.  That's correct.

4  Q.  -- by FBI agents?

5  A.  Yes.

6  Q.  And DEA agents as well?

7  A.  I don't know precisely who saw him go into the house.

8  Q.  But it was multiple agents that saw him; correct?

9  A.  That night it was a very small element that was doing

10  surveillance, so --

11  Q.  And with everything that we've talked about today, on

12  August 19th, 2019, Cesar Peralta, when he went into the house,

13  had not fled the Dominican Republic on that day at that time;

14  correct?

15  A.  He fled on August 20th, 2019.

16  Q.  But on August 19th, 2019, he had not fled the Dominican

17  Republic; correct?

18  A.  No, no.

19  Q.  Thank you.

20          THE COURT:  Anything further?

21          MR. SWETT:  No, your Honor.

22          THE COURT:  All right.  Thank you, sir.  You may step

23  down.

24          (Witness excused)

25          THE COURT:  And this is probably a good time for an

NARVCOS5

1    afternoon break.  We'll take ten minutes.

2          Ladies and gentlemen, please leave your notes on your

3    chairs and we'll be in recess for ten minutes.

4          (Jury not present)

5          THE COURT:  Who's the government's next witness?

6          MS. DEININGER:  It's Susanna Maj.  And I do think

7    there was a rule of completeness issue raised a couple of days

8    that the defendants had made us aware of relating to Government

9    Exhibit 209, and then there were also some summary charts that

10   Maj is going to testify to that were raised by -- the objection

11   was raised by defense counsel last night.

12         Do you want me to address those or --

13         THE COURT:  So the rule of completeness issue was --

14         MS. DEININGER:  The rule of completeness was -- we are

15   intending -- Government Exhibit 209 is a portion of a call.

16   And defense is seeking to admit, I believe, basically the

17   remainder of that call afterwards.

18         The portion that we are seeking to admit — sorry, I

19   don't have it in front of me — relates to discussion of --

20   between Costanzo and Recio of trying to recruit certain

21   clients.  Then that discussion moves on, and Recio begins

22   recounting a discussion that he had with the husband of a

23   different client, Shirley Herrera Colorado.  We don't believe

24   that is related to the portion of the excerpt that we are

25   seeking to admit, and it's certainly not necessary to clarify

NARVCOS5

1    or prevent from being misleading anything in the excerpt that

2    we are seeking to admit.

3           MS. YOUNG:  Your Honor, as it stands, there's a line

4    in this call that says, I've got something big to talk to you

5    about tonight.  And by cutting it off, it leaves the

6    misimpression that what is stated here is the something big

7    rather than other information.

8           MS. DEININGER:  It's not at all clear what they want

9    to admit is the something big either; I'm not sure how it adds

10    any clarity to that line.

11           MS. YOUNG:  I think that's for the jury to decide.

12           THE COURT:  Okay.

13           On the break I'll take a look at those two issues.

14           (Recess)

15           THE COURT:  On the rule of completeness issue, I'm

16    going to grant the defendants' request for the additional

17    section of -- I forget the number, of that language, and I'm

18    going -- I rule for the government on the summary exhibits GX

19    704B and GX 708, which I think are proper summary charts.

20           Can we bring in the jury.

21           MR. ANDREWS:  Give us one moment, your Honor, if

22    that's okay.

23           THE COURT:  You just need a moment?

24           MR. ANDREWS:  Yes.

25           THE COURT:  Okay.

NARVCOS5                         Maj - Direct

1          MR. ANDREWS:  I think we're ready to get started.

2          THE COURT:  Okay.

3          (Jury present)

4          THE COURT:  Please be seated.

5          Ms. Deininger, you may call your next witness.

6          MS. DEININGER:  The government calls Susanna Maj.

7          THE COURT:  Please come up to the jury box here -- I

8   mean witness stand, sorry.  And go ahead and have a seat.  And

9   pull your chair up so you're pretty close to the mic.

10         And Mr. Hampton will swear you in.

11    SUSANNA MAJ,

12        called as a witness by the Government,

13        having been duly sworn, testified as follows:

14         THE COURT:  Would you just pull the mic a little over.

15   That's good.

16         Ms. Deininger.

17   DIRECT EXAMINATION

18   BY MS. DEININGER:

19   Q.  Good afternoon, Ms. Maj.

20   A.  Good afternoon.

21   Q.  Where do you work?

22   A.  The U.S. Attorney's Office, Southern District of New York.

23   Q.  And how long have you worked for the U.S. Attorney's Office

24   in the Southern District of New York?

25   A.  Around 11 months.

1    Q.  What's your current title?

2    A.  I am currently an investigative analyst.

3    Q.  And what are your general roles and responsibilities as an

4    investigative analyst?

5    A.  Broadly speaking, I analyze all technical and digital data

6    that our office obtains.  This could be anything from cell

7    phone extractions to call detail records.

8    Q.  Do you have any specialized training in those fields?

9    A.  We receive rigorous monthly trainings from different law

10   enforcement agencies and nonprofit organizations.

11   Q.  You've been with the U.S. Attorney's Office for 11 months.

12   Where were you before joining the U.S. Attorney's Office?

13   A.  Prior to the U.S. Attorney's Office, I was at the Manhattan

14   District Attorney's Office.  I was also an investigative

15   analyst.

16   Q.  And how long were you at the Manhattan District Attorney's

17   Office?

18   A.  Around three years.

19   Q.  What were your general roles and responsibilities there?

20   A.  The same roles here, which is basically obtaining all

21   digital data and analyzing all forms of evidence.

22   Q.  At some point were you asked to review and analyze records

23   in preparation for this trial?

24   A.  Yes.

25   Q.  And approximately when was that?

1    A.  Around two months ago.

2    Q.  What types of records were you asked to review?

3    A.  Various records, such as call detail records, contents of a

4    cell phone, messages and calls and DEA records.

5    Q.  Apart from analyzing those records, did you have any other

6    involvement in this case?

7    A.  No.

8    Q.  Were you involved in the investigation of this case before

9    it was charged in any way?

10   A.  No.

11           MS. DEININGER:  I'd like to now take a minute just to

12   address some exhibits.

13           The government would offer into evidence Government

14   Exhibit 116 that was addressed in the DEA record stip S4 read

15   yesterday.

16           MR. MUKASEY:  No objection.

17           THE COURT:  116?

18           MS. DEININGER:  116.

19           THE COURT:  Admitted.

20           (Government's Exhibit 116 received in evidence)

21           MS. DEININGER:  The government would also offer in

22   evidence Government Exhibits 208, 208T, 209, and 209T pursuant

23   to the wiretap stipulation S6 that was read yesterday.

24           THE COURT:  Admitted.

25           (Government's Exhibits 208, 208T, 209, 209T received

1    in evidence)

2           MS. DEININGER:  The government also would offer into

3    evidence Government Exhibits 318, its attachments, 318A through

4    318F, 320, 324A, 337, 343, and 360 pursuant to the cell phone

5    extraction stipulation that was S8 that was previously read.

6           THE COURT:  320, 324A.

7           MS. DEININGER:  337, 343, and 360.  And before that it

8    was 318 and 318A through 318F.

9           THE COURT:  Any objection to those?

10          MS. YOUNG:  No objection.

11          THE COURT:  Admitted.

12          (Government's Exhibits 318, 318A through 318F, 320,

13   324A, 337, 343, 360  received in evidence)

14          MS. DEININGER:  And then if we can pull up S9,

15   Government Exhibit S9.  The stipulation is already in evidence,

16   so I can just read the relevant paragraphs.

17          From paragraph 2:  Government Exhibits 410 through

18   414, 420 through 423, and 470 through 481 are bank records from

19   Wells Fargo.  The government would offer into evidence

20   Government Exhibit 421.

21          THE COURT:  Admitted.

22          (Government's Exhibit 421 received in evidence)

23          MS. DEININGER:  And paragraph 11:  Government Exhibits

24   901 through 904 are records from Verizon.  The government

25   offers into evidence at this time Government Exhibit 901 and

NARVCOS5                         Maj - Direct

1    904.

2            THE COURT:  Admitted.

3            (Government's Exhibits 901, 904 received in evidence)

4            MS. DEININGER:   And Government Exhibit -- paragraph

5    12:  Government Exhibits 927 through 921 are records from AT&T.

6    The government offers Government Exhibit 927 and 928 at this

7    time.

8            THE COURT:  Admitted.

9            (Government's Exhibits 927, 928 received in evidence)

10   BY MS. DEININGER:

11   Q.  Ms. Maj, in preparing to testify today, did you prepare

12   charts summarizing some of the information you had reviewed?

13   A.  Yes.

14            MS. DEININGER:  And if we can pull up for the witness

15   — just for witness and counsel — what's been marked as

16   Government Exhibit 708.

17   Q.  Let me know when you can see that on your screen.

18   A.  I got it.

19   Q.  Do you recognize this?

20   A.  Yes.

21   Q.  What is it?

22   A.  This is a Power Point I created with summary charts after

23   analyzing records such as call detail records and cell phone

24   contents like messages and calls.

25   Q.  You said you helped to prepare Government Exhibit 708; is

1   that correct?

2   A.  Correct.

3   Q.  And did you review Government Exhibit 708 before coming to

4   testify today?

5   A.  Yes.

6   Q.  Did you rely on any record to make the charts contained

7   within Government Exhibit 708?

8   A.  Yes.

9   Q.  What types of records?

10  A.  Call detail records and contents of a cell phone such as

11  messages and calls and various cell phone attribution sources.

12  Q.  Who provided with you those records?

13  A.  The prosecutors.

14  Q.  Does the information in Government Exhibit 708 fairly and

15  accurately reflect the information in those underlying records?

16  A.  Yes.

17          MS. DEININGER:  The government moves Government

18  Exhibit 708 into evidence.

19          MS. YOUNG:  Objection for the record.

20          THE COURT:  Objection noted.

21          And the Exhibit 708 is admitted.

22          (Government's Exhibit 708 received in evidence)

23          MS. DEININGER:  If we can publish for everyone.

24          Thank you.

25  Q.  So we're on slide 2 of Government Exhibit 708 now.

NARVCOS5                          Maj - Direct

1                Can you tell us what this is?

2      A.  This is an attribution table.  To the left on the phone

3      number column you'll see ten different phone numbers.  On the

4      right side you'll see sources and how those phone numbers were

5      attributed to the phone user, which is the middle column.

6      Q.  What do you mean a phone number was attributed to a

7      specific user?

8      A.  When looking at the sources, you see that the phone number

9      is linked or used by that person; so you identify a phone user.

10     Q.  How many phone numbers here did you identify as being used

11     by John Costanzo, Jr.?

12     A.  Two.

13     Q.  And was one of those phone numbers 786-271-2480?

14     A.  Yes.

15     Q.  I'm going to refer to that as the first Costanzo phone.

16                How did you determine that the first Costanzo phone

17     was used by John Costanzo, Jr. generally?

18     A.  Generally, first was through a federal employment

19     application for a Edwin Pagan, where John Costanzo was listed

20     under people that may know you well.  That name and phone

21     number were listed.  And additionally, AT&T subscriber

22     information for that specific phone number led back to John

23     Costanzo.

24     Q.  What do you mean by "AT&T subscriber information"?

25     A.  Subscriber information is basic information such as a name

1   or address, anything that a company will use to link the phone

2   number to a user.

3   Q.  It says here that the phone number 305-796-7463 is used by

4   Manuel Recio.  I'm going to refer to that as the Recio phone.

5            How did you determine that the Recio phone was used by

6   Manuel Recio?

7   A.  To determine that, I received a call log.  And under that

8   call log, the phone number ending in 7463 had a contact name of

9   Manny Recio.  And additionally, we received Verizon billing and

10  subscriber information for that phone number that came back to

11  a Manuel Recio.

12  Q.  According to Verizon records, the Recio phone was

13  subscribed to Manuel Recio?

14  A.  Yes.

15  Q.  It says here that the phone number 786-556-0085 was a

16  second phone number used by John Costanzo, Jr.  I'm going to

17  refer to that as the second Costanzo phone.

18            Was that phone number subscribed to John Costanzo,

19  Jr.?

20  A.  No.

21  Q.  Who was that phone number subscribed to?

22  A.  Manuel Recio.

23  Q.  How generally did you determine that the second Costanzo

24  phone was used by John Costanzo, Jr.?

25  A.  Generally, through a WhatsApp thread where the 0085 was a

NARVCOS5                        Maj – Direct

1   participant, and additionally recorded calls.

2   Q.  I want to look at some of those recorded calls.

3        MS. DEININGER:  So if we can publish Government

4   Exhibit 208T and Government Exhibit 209T side by side.  They

5   are both in evidence.

6   Q.  Okay.  Do you see those both now?

7   A.  Yes.

8   Q.  All right.  So looking at the one on the left-hand side,

9   Government Exhibit 208T, what date is this call?

10  A.  July 31st, 2019.

11  Q.  What time does it begin?

12  A.  Begins at 15:37:41.

13  Q.  And what phone numbers are involved in this call?

14  A.  The phone number ending in 7463 and the phone number ending

15  in 2480.

16  Q.  And the phone number ending in 7463, that's the one we've

17  been referring to as the Recio phone?

18  A.  Correct.

19  Q.  And the one ending in 2480, I've been referring to that as

20  the first Costanzo phone?

21  A.  Correct.

22  Q.  Okay.  And who does it say the participants in this call

23  are?

24  A.  The participants are John Costanzo and Manuel Recio.

25  Q.  Now, if we can look at Government Exhibit 209T.

1        What date was that call?

2   A.  July 31st, 2019.

3   Q.  That's the same date as Government Exhibit 208T?

4   A.  The same date.

5   Q.  And looking back -- and who does it say that the -- what

6   phone numbers are involved in this call?

7   A.  The phone numbers involved are the one ending in 7463, and

8   another one ending in 0085.

9   Q.  And again, the phone number ending in 7463, that's the

10  phone number we've been referring to as the Recio phone;

11  correct?

12  A.  Correct.

13  Q.  And the 0085, that's the one I've been referring to as the

14  second Costanzo phone; is that correct?

15  A.  Correct.

16  Q.  And who does it say the participants in this call are?

17  A.  John Costanzo and Manuel Recio.

18  Q.  If we look back at 208T really quickly.

19          What time does it say that that call ended?

20  A.  15:38:52.

21  Q.  And if we look at 209T, when did that call begin in

22  comparison?

23  A.  Approximately three seconds later, at 15:38:55.

24          MS. DEININGER:  I'd like to now play Government

25  Exhibit 208 with that transcript up, if we can.  We can go to

1    the second page of the transcript and then start playing the

2    recording.  Thank you.

3              (Audio played)

4              MS. DEININGER:  Now let's listen to Government Exhibit

5    209.  Put that transcript up.

6              (Audio played)

7    Q.  Okay.  When you reviewed these calls, did you notice

8    whether Recio referred to the person that he was talking to by

9    name?

10   A.  Yes.

11   Q.  And what name did he use in the first call, Government

12   Exhibit 208?

13   A.  One was "Johnny," and another was "John" in the first call.

14   Q.  He referred to the person as both "Johnny" and "John"

15   during that conversation?  You have to --

16   A.  Oh, yes.  Sorry.

17   Q.  And what about in the next column, Government Exhibit 209,

18   how did he refer -- how did Recio refer to the person he was

19   talking to?

20   A.  John.

21   Q.  So he referred to the person in both calls as John?

22   A.  Correct.

23   Q.  Did you review records that showed who received billing

24   statements for the second Costanzo phone between May 2019 and

25   October 2020?

NARVCOS5                        Maj - Direct

1    A.  For the phone number ending in 0085, it was subscribed to

2    Manuel Recio.

3    Q.  And who was receiving those billing records?

4    A.  Manuel Recio.

5    Q.  Going back to Government Exhibit 708, slide 2.  This is

6    what you referred to earlier as the slide table, the cell phone

7    numbers and users.

8         We talked about a few of these numbers.  Can you just

9    tell me what are the names of the other people whose phone

10   numbers are included in this table?

11   A.  There's John Costanzo, Sr., Luis Guerra, David Macey, Edwin

12   or Eddie Pagan, and that's three other times.

13   Q.  Let's turn to page 3 of Government Exhibit 708.

14        All right.  This slide is labeled "Communication

15   Analysis for John Costanzo, Jr. and Manuel Recio, October 1st,

16   2018 to November 30th, 2019."

17        What does this show?

18   A.  This shows the amount of calls or texts that, for example,

19   John Costanzo, with the 2480 number, how many times they

20   communicated with all the phone numbers to the left.

21   Additionally also shows how many calls Recio and these phone

22   numbers had.

23   Q.  And it shows how many calls or calls and texts they had in

24   that specific period, right, October 1st, 2018 to November

25   30th, 2019?

NARVCOS5                        Maj - Direct

1   A.  Correct.

2   Q.  And I see at the top under John Costanzo, Jr.'s name, where

3   the first Costanzo phone is listed, it says "calls and texts."

4   But under Manuel Recio's name, where the Recio phone is listed,

5   it just says "calls."  Can you explain that?

6   A.  Yes.  For the phone number ending in 2480, I was provided

7   raw AT&T call detail records.  Those records show voice usage,

8   data sessions or SMS activity.

9          In regards to the phone number ending in 7463, we

10  received only billing statements for that phone number which

11  only shows voice activity.

12  Q.  Okay.  So let me break that down a little bit.

13         You said for the first Costanzo phone, the 2480

14  number, you received records that include, I think you said,

15  call detail activity; is that correct?  And data usage; is that

16  correct?  And also SMS activity?

17  A.  Correct.

18  Q.  And what is SMS activity?

19  A.  Text messages that go through the network.

20  Q.  What is data usage?

21  A.  Data usage.  Any time your phone pops up, it's usually

22  mainly used for cell sites; you won't see those in actual call

23  detail records.

24  Q.  So you were able to review those records and determine a

25  number of calls and texts that were made involving the first

1    Costanzo phone; is that correct?

2    A.  Yes.

3    Q.  And then you said for Verizon you just received billing

4    records, and that that only showed call usage; is that correct?

5    A.  Correct.

6    Q.  Okay.  So the column, that does not reflect any text

7    messages that might have been exchanged with the Recio phone?

8    A.  Correct.

9    Q.  For the Recio phone, is it possible that there were also

10   text messages exchanged between these phone numbers that are

11   not reflected in the summary table?

12   A.  Yes.

13   Q.  And do either of these columns from the data review, did

14   any of that include WhatsApp or Telegram messages?

15   A.  No.

16   Q.  So for both of these phones it is possible that there were

17   also additional WhatsApp and Telegram messages that are not

18   reflected here?

19   A.  Correct.

20   Q.  Just looking at this chart, how many times did Costanzo —

21   using the first Costanzo phone — and Recio call or text each

22   other between October 1st, 2018 and November 30th, 2019?

23   A.  Around 452 times.

24   Q.  And how about between the first Costanzo phone and David

25   Macey?

1   A.  1,215 times.

2   Q.  How many times did the first Costanzo phone and the first

3   number listed for Eddie Pagan ending in 1251, how many times

4   were those phones in contact by call or text between October

5   1st, 2018 and November 30th, 2019?

6   A.  Around 642 times.

7   Q.  Looking over at the second column, how many times was the

8   Recio phone in touch with that same -- with any of the phone

9   numbers for Eddie Pagan in this time period?

10  A.  None.

11  Q.  And how about -- how many times was the Recio phone and the

12  second Costanzo phone, which is the number ending in 0085, in

13  contact -- how many calls were made between those two phone

14  numbers between October 1st, 2018 and November 30th, 2019?

15  A.  Around 46 calls.

16  Q.  When you were reviewing records, did you also review call

17  detail records for the second Costanzo phone?

18  A.  Yes.

19  Q.  For what period of time?

20  A.  From May 30th, 2019, to July 1st, 2019.

21  Q.  Okay.  So that's a shorter time frame within what's

22  reflected in the summary chart; is that correct?

23  A.  Yes.

24  Q.  And how many total calls did the second Costanzo phone make

25  or receive during that time period?

1    A.   For the entire time period, 29 calls.

2    Q.   Out of those 29 calls, how many were made to or received

3    from the Recio phone?

4    A.   28.

5    Q.   There's only one call between May and July 2019 where the

6    second Costanzo phone was used to talk to someone other than

7    Recio?

8    A.   Yes.

9            MS. DEININGER:  I'd like to now pull up what's in

10   evidence as Government Exhibit 318.

11   Q.   And if you look at the top, who are the participants on

12   this WhatsApp chat thread?

13   A.   Manny Recio, with the phone number ending in 7463; and JC,

14   with a phone number ending in 0085.

15   Q.   And that phone number ending in 0085, that's what we've

16   been referring to as the second Costanzo phone; is that

17   correct?

18   A.   Correct.

19   Q.   What are the date of these text messages on this first

20   page?

21   A.   May 31st, 2019.

22   Q.   We're going to read certain portions of this exhibit.  I'm

23   going to ask you to read the Recio messages in gray, and I'm

24   going to read the Costanzo messages in green.

25            Up and running.

NARVCOS5                         Maj - Direct

1    A.  Nice.  Telegram.

2              Can you look at Gilberto Hernandez.  Cedula 71988463.

3    DOB 11 Febrero 1979.

4    Q.  Turn to the second page now please.  And we'll read this

5    first excerpt down to the ellipses -- or actually we'll just

6    read this whole page, sorry.

7              If you can start with the gray.

8    A.  Diego Fernando Coca.  DOB Junio 6/77, a/k/a Platino.

9    Q.  Okay.  Let me see if anyone is in.  If not, it will be

10   mañana.  Luz should be in.

11   A.  Okay.  This guy wants to hire me.

12   Q.  On it.  Paul Cohen.

13   A.  Can you run Jorge Arrango a/k/a Pelusa.

14             MS. DEININGER:  If we can turn to page 4.

15   Q.  And I just want to read the excerpt that starts after the

16   ellipses.  If you can read the Recio messages in gray.

17   A.  Diego Fernando Coca, DOB Junio 6/77, a/k/a Platino.  Can

18   you look into case file and tell me about this guy.  Paul C has

19   the case.

20   Q.  And what follows those messages?

21   A.  A missed voice call.

22             MS. DEININGER:  Can we turn to page 8.

23   Q.  Okay.  And if we can read the excerpt starting with the

24   green, okay.  And again, I'll read the Costanzo messages in

25   green, and you can read the Recio messages in gray.

1          Okay.

2   A.   Attachment sent.  Can you see if this guy is or was an

3   informant.  John, anything on this?  John, if you can get me

4   this quick, it would be great.

5   Q.   And what are the dates of these text messages?

6   A.   July 12th, 2019.

7          MS. DEININGER:  If we can turn to page 13.  Sorry,

8   page 12.  Can we go one back.  Okay.  Thank you.  Sorry.  One

9   before this, page 10.  Okay.

10  Q.   If we can start reading on this page and go on to the next

11  page, the end of this section.  I will read -- again, I'll read

12  the green from Costanzo; you can read the gray from Recio.

13         Going to see Dave now.  Push that pickup.  I have

14  everything lined up.

15         Costanzo sends an attachment, and sends another

16  attachment.

17  A.   Who you said that to, Dave?

18  Q.   Costanzo sends an attachment.

19  A.   Hey, can you get me a phone number in Holland.  We have to

20  provide the number.

21  Q.   Pinga.  Okay, I will call now.

22  A.   Sorry.

23  Q.   Is it an encrypted number that they are requesting?

24  A.   No.  They also want a token.

25  Q.   Those messages are from what date?

1    A.   July 13, 2019.

2    Q.   And then if we look at the excerpt on the next day, what

3    date are those text messages?

4    A.   July 14th, 2019.

5    Q.   Again, I'll read the green from Costanzo.

6            Hey, I can't give you that info, not ethical.  But if

7    your client wants to talk, I will put them with the right

8    people.

9    A.   Okay.

10   Q.   Now let's go to the next page.  If you can start at the top

11   here and read the gray from Recio, and I will read the green

12   from Costanzo.

13   A.   Attachment sent.

14   Q.   Is that a new client?

15   A.   Call me.

16           Another attachment sent.

17           Anything?

18   Q.   Let's read -- and what date were those text messages?

19   A.   August 11th, 2019, and one from August 12th, 2019.

20   Q.   Look at this last set.  What date is this set of text

21   messages sent?

22   A.   August 28th.

23   Q.   And I'm going to read the messages in gray -- sorry.  If

24   you can read the messages in gray from Recio, I'll read the

25   messages in green from Costanzo.

NARVCOS5                           Maj – Direct

1    A.   Attachment sent.

2    Q.   Question mark.

3    A.   Call me today.  Tonight.  Missed voice call.

4    Q.   K.

5             (Counsel conferred)

6    Q.   Okay.  And all of these text messages, these were all

7    exchanged between the Recio phone and the second Costanzo

8    phone; is that correct?

9    A.   Correct.

10             MS. DEININGER:  Let's go back to Government Exhibit

11   708.  And we're going to turn now to page 4.

12   Q.   This table titled "Deleted Messages," what does this show

13   us?

14   A.   This shows us three different platforms and messages that

15   were not able -- that I was not able to locate on the Costanzo

16   phone or Recio phone.

17   Q.   And if you can walk me through that a little bit more.  How

18   did you determine whether or not you were able to find text

19   messages on one phone?

20   A.   I pulled each thread, so from iMessage, Telegram, WhatsApp,

21   from John Costanzo's phone and Recio's phone.  Within those

22   threads, I calculated how many times I was not able to locate a

23   message within each thread.  You'll also see the time frames of

24   each thread.

25             So for example, John Costanzo's iMessage was only from

NARVCOS5                      Maj - Direct

1   May 12, 2019 to October 28th, 2019.

2   Q.  And the threads, the chat threads you compared, those were

3   the conversations between the first Costanzo phone and the

4   Recio phone in each case?

5   A.  Yes.

6   Q.  So the conversation between the first Costanzo phone and

7   the Recio phone from iMessage on the Costanzo phone as compared

8   to the Recio phone?

9   A.  Yes.

10  Q.  Okay.  And so when you say "deleted messages," are those

11  messages the number of messages that you were -- found on one

12  phone, but were not able to find on the other?

13  A.  Yes, I was unable to locate.

14  Q.  And the left side says -- the first column is labeled

15  "Platform."  Can you just briefly explain what that refers to?

16  A.  Of course.  There's three separate messaging platforms.

17  One is iMessage, which is by Apple.  There was another one,

18  Telegram, which is also a messaging platform.  And WhatsApp is

19  a messaging platform, so just text-to-text exchanges.

20  Q.  And the time frames that are in this chart, what do those

21  refer to?

22  A.  The time frames refer to each person's platform.  So if --

23  for example, John Costanzo's iMessage, the thread was only from

24  May 12, 2019 to October 28, 2019.  His Telegram was only from

25  February 19 to June 3rd, 2019, and so on.

1    Q.   Okay.  Approximately how many iMessages between the Recio

2    phone and the first Costanzo phone did you identify as being on

3    the Recio phone but not on the first Costanzo phone?

4    A.   Approximately 422 messages were found on the Recio phone

5    that were not seen in Costanzo's phone from the time period of

6    10/9/2018 to 10/28/2019.

7             MS. DEININGER:  Can we show just for the witness and

8    counsel Government Exhibit 361A.

9    Q.   Ms. Maj, can you see that?

10   A.   Yes.

11   Q.   What is this?

12   A.   An iMessage chat between Johnny Costanzo and Manuel Recio.

13   Q.   Does this accurately reflect messages that you found on the

14   Recio phone but not on the first Costanzo phone?

15   A.   Yes.

16            MS. DEININGER:  Government offers Government Exhibit

17   361A into evidence.

18            MS. YOUNG:  Objection.

19            THE COURT:  Overruled.  361A is admitted.

20            (Government's Exhibit 361A received in evidence)

21            MS. DEININGER:  You can publish for the jury.

22   BY MS. DEININGER:

23   Q.   So again, if we can look at the top, who are the

24   participants in this iMessage chat thread?

25   A.   Johnny Costanzo with the phone number ending in 2480, and

NARVCOS5                        Maj - Direct

1    Manuel Recio with the phone number ending in 7463.

2    Q.  And what is the date of these messages?

3    A.  November 7th, 2018.

4    Q.  I want to -- and again, these are messages that you were

5    not able to find on the Costanzo phone, but did find on the

6    Recio phone; is that correct?

7    A.  Correct.

8    Q.  I want to read through these.  If you can be Recio, who is

9    in the green messages here; I will read the Costanzo messages

10   in gray.

11   A.  Httpsgloballegalconsulting.net/contact.  Tell me what you

12   think.

13   Q.  Bro, that is bad ass.  Good stuff.

14   A.  It's vague enough, but gives us credibility.

15   Q.  For sure.  I really like it.

16   A.  Thanks.  I am an expert at web design now, LOL.

17   Q.  I need Gordon's DOB too.  Too many in NADDIS.  Get it from

18   Dave mañana FYI.

19           MS. DEININGER:  If we can now publish just for the

20   witness what is in -- just for the witness and counsel,

21   Government Exhibit 361C.

22   Q.  Ms. Maj, what is this?

23   A.  An iMessage chat thread between Johnny Costanzo with the

24   phone number ending in 2480, and Manuel Recio with the phone

25   number ending in 7463.

NARVCOS5                        Maj - Direct

1    Q.  And is this a chat thread that you were able to find on the

2    Recio phone but not the Costanzo phone?

3    A.  Yes.

4    Q.  Does this accurately reflect messages that you found on the

5    Recio phone but not the first Costanzo phone?

6    A.  Yes.

7              MS. DEININGER:  The government offers 361C into

8    evidence.

9              MS. YOUNG:  Same objection.

10             THE COURT:  Noted and overruled.  361C is admitted.

11             (Government's Exhibit 361C received in evidence)

12             MS. DEININGER:  Publish.

13   Q.  And again, what are the date of these messages?

14   A.  April 12, 2019.

15   Q.  And I will read the Costanzo messages which are in gray

16   here; if you can read the Recio messages that are in green.

17             FYI, Humberto has an IRS case, needs you ASA big

18   money.  Gonna call you mañana.  It's May.  Drop an indictment

19   as soon as June.  Client is loaded.

20   A.  OMG.  Nice.

21   Q.  Call me in the a.m. so I can brief.

22             MS. DEININGER:  Let's go back to Government Exhibit

23   708, page 4.

24   Q.  What was the time range again for the iMessages that you

25   found on the first Costanzo phone?

A.   The first Costanzo phone time frame was May 12, 2019 to

October 28th, 2019.

Q.   And what was the time range for the iMessages on the

Costanzo -- sorry, on the Recio phone?

A.   October 9th, 2018 to October 20th, 2019.

Q.   And how many of the approximately 422 missing iMessages in

the time range for which messages were found on the Recio phone

but not on the first Costanzo phone?

A.   They were missing from the time frame of October 9th, 2018

to May 12, 2019.

Q.   I'm sorry, I'm not sure I understood that answer.

A.   Would you repeat the question.

Q.   How many of the 422 messages, missing iMessages that you

were not able to locate on the first Costanzo phone, were

within the time range for which messages were on the Recio

phone but not on the first Costanzo phone?

A.   All of them.

Q.   Looking at this chart, approximately how many Telegram

messages between the Recio phone and the first Costanzo phone

did you identify as being on the Recio phone but not on the

first Costanzo phone?

A.   Approximately 278.

Q.   Did you also identify Telegram messages that were on the

first Costanzo phone but not Recio's phone?

A.   Yes.

1    Q.   How many?

2    A.   Approximately 26.

3    Q.   And how did the time ranges for the Telegram messages on

4    the two phones compare?

5    A.   There's a two-day difference in the start date.

6    Q.   But otherwise, the time ranges are the same -- the time

7    ranges covered by these -- the messages on these phones are the

8    same?

9    A.   Yes.

10   Q.   Does the two-day difference in the time ranges account for

11   the messages that are missing from the first Costanzo phone?

12   A.   It accounts for the messages -- the 26 messages.

13   Q.   But it doesn't account for any of the approximately -- or

14   it does not -- strike that.  Let me restart.

15           It does not account for all of the approximately 278

16   messages that were not located on the first Costanzo phone?

17   A.   No.

18           MS. DEININGER:  I want to look at some of those.

19           If we can pull up just for the witness and counsel

20   what's marked as Government Exhibit 362C.

21   Q.   Ms. Maj, what is this?

22   A.   A Telegram chat thread between Johnny Costanzo and Manuel

23   Recio.

24   Q.   And does this accurately reflect messages that you found on

25   the Recio phone on the Telegram chain but not on the first

1   Costanzo phone?

2   A.  Yes.

3          MS. DEININGER:  Government offers Government Exhibit

4   362C into evidence.

5          MS. YOUNG:  Objection.

6          THE COURT:  Admitted, 362C.

7          (Government's Exhibit 362C received in evidence)

8          MS. DEININGER:  Publish.

9   Q.  Ms. Maj, what is the date of this Telegram chat thread?

10  A.  April 4th, 2019.

11  Q.  And I'd like to read through it again.  I will -- again,

12  I'll read the messages from Costanzo which are in gray; if you

13  can read the messages from Recio which are in green.

14         JEM Solutions, Inc. is the company.

15  A.  Okay.  BTW, here is JM's cut on a Mexican case.

16         Attachment sent.  So it's significant.

17         MS. DEININGER:  Now I'd like to publish just for

18  witness and counsel what's marked as Government Exhibit 362D.

19  Q.  Ms. Maj, what is this?

20  A.  Also a Telegram chat thread between Johnny Costanzo and

21  Manuel Recio.

22  Q.  Is this also a chat thread that you found on the Recio

23  phone but not on the first Costanzo phone?

24  A.  Yes.

25  Q.  Does this accurately reflect the messages that you found on

1    the Recio phone but not on the first Costanzo phone?

2    A.  Yes.

3              MS. DEININGER:  Government offers Government Exhibit

4    362D into evidence.

5              MS. YOUNG:  Objection.

6              THE COURT:  Admitted.

7              (Government's Exhibit 362D received in evidence)

8              MS. DEININGER:  Publish.

9    Q.  And Ms. Maj, what are the dates -- what's the date of this

10   Telegram chat thread?

11   A.  April 26, 2019.

12   Q.  Again, if we can read through it.  I will read the Costanzo

13   messages which are in gray; if you can read the Recio messages

14   which are in green.

15   A.  Can you look up Perlaza.

16   Q.  I did.  Hold on.  Hold on.  Gonna be Courtney and Jeff.  No

17   one really owns him.  Colombia is going to be Nate and Randy.

18   A.  Okay.  He wants to turn himself in.  Why wouldn't Lui know

19   that Castro is involved.  Is there an indictment?

20             MS. DEININGER:  If we can go back to Government

21   Exhibit 708, page 4.

22   Q.  The last category here listed is WhatsApp -- last platform

23   listed is WhatsApp.  Approximately how many WhatsApp messages

24   between the Recio phone and the first Costanzo phone did you

25   identify as being on the Recio phone but not on the first

1    Costanzo phone?

2    A.   222 messages.

3    Q.   And did you also identify WhatsApp messages that were on

4    the first Costanzo phone but not on the Recio phone?

5    A.   Approximately 542.

6    Q.   Approximately how many?

7    A.   Approximately 542.

8    Q.   Thank you.

9    A.   Sorry.

10   Q.   And how did the time ranges for the WhatsApp messages on

11   the two phones compare?

12   A.   The Costanzo WhatsApp was from November 27, 2018 to

13   November 27, 2019; and Recio WhatsApp was from May 31st, 2019

14   to August 28, 2019.

15   Q.   So the WhatsApp messages on the Recio phone only covered a

16   span of approximately three months?

17   A.   Yes.

18   Q.   And does that three months fall within the time frame of

19   the WhatsApp messages contained on the first Costanzo phone?

20   A.   Yes.

21   Q.   So can the difference in the time ranges account for why

22   approximately 222 WhatsApp messages that were on the Recio

23   phone were not found on the first Costanzo phone?

24   A.   No.

25              MS. DEININGER:   I want to take a look at one WhatsApp

NARVCOS5                          Maj - Direct

1    thread that was found on the Recio phone, but not on the first

2    Costanzo phone.  If we can show just for the witness and

3    counsel what's marked as Government Exhibit 363B.

4    Q.  Ms. Maj, what is this?

5    A.  WhatsApp chat thread between Johnny Costanzo and Manuel

6    Recio.

7    Q.  And is this a chat thread that you found on the Recio phone

8    but not on the first Costanzo phone?

9    A.  Yes.

10   Q.  Does this accurately reflect the messages you found on the

11   Recio phone but not the first Costanzo phone?

12   A.  Yes.

13            MS. DEININGER:  Government offers Government Exhibit

14   363B into evidence.

15            MS. YOUNG:  Objection.

16            THE COURT:  363B is admitted.

17            (Government's Exhibit 363B received in evidence)

18            MS. DEININGER:  We can publish.

19   Q.  All right.  Ms. Maj, what is the date of this chat thread?

20   A.  June 20th, 2019.

21   Q.  And can I just ask you to read these messages which are

22   from Manuel Recio in green.

23   A.  Diego Fernando Coca, DOB Junio 6/77, a/k/a Platino.  Can

24   you look into case file and tell me about this guy.

25            MS. DEININGER:  Go back to Government Exhibit 708 and

1    turn to page 5.

2    Q.  Okay.  Looking at page 5, what is this?

3    A.  These are incoming and outgoing phone calls for all the

4    target phone numbers that were in that table that we saw

5    earlier on a specific date.

6    Q.  And when you refer to that table, was that the table on

7    page 2 of this exhibit, Government Exhibit 708?

8    A.  Yes.

9    Q.  And what records did you use to create this chart?

10   A.  The call detail records from AT&T which belong to John

11   Costanzo with the phone number ending in 2480.

12   Q.  And how did you select this date range to use, November 11

13   to 14, 2018?

14   A.  I was provided the dates by the prosecutors.

15                  (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1    Q.  Does this chart reflect all of the calls that the first

2    Costanzo phone made on those dates?

3    A.  No.

4    Q.  How did you determine what calls to include?

5    A.  The calls were only included for the specific target phone

6    numbers, so outgoing/incoming for all of the calls that we saw

7    on page 2.

8    Q.  This chart just reflects calls between the first Costanzo

9    phone and any other phone numbers that were on that attribution

10   chart we looked at on page 2, is that correct?

11   A.  Correct.

12   Q.  Okay.  And can you just walk us through the columns quickly

13   and tell us what information is included here.

14   A.  Starting on the far left will be the date and time; the

15   duration of the call; and then all the way to the right are the

16   calling person and called party, which are going to be the

17   outgoing and incoming calls.

18   Q.  And if we look at the remaining pages of this exhibit,

19   pages 6 through 13, are those similar charts of phone calls?

20   A.  Yes.

21   Q.  Do those contain the same type of information but for

22   different date ranges?

23   A.  Yes.

24   Q.  And again, do those charts reflect all of the calls the

25   first Costanzo phone made or received on those dates or only

1    some calls?

2    A.   Some.  Only to the target numbers that were on page 2.

3    Q.   Okay.  So only calls between the first Costanzo phone and

4    phone numbers listed on the chart on page 2 of this exhibit?

5    A.   Yes.

6    Q.   Okay. let's actually switch gears for a minute.  You said

7    earlier that you also reviewed records from the DEA.  Is that

8    correct?

9    A.   Correct.

10           MS. DEININGER:  I would like to show just for the

11   witness and counsel what is marked for identification as

12   Government Exhibit 704B.

13           Can we take this down real quick?

14           (Counsel confer)

15           MS. DEININGER:  Okay.  So pulling up -- we can pull

16   back up for the witness what's marked as Government Exhibit --

17   witness and counsel what's marked as Government Exhibit 704B.

18   BY MS. DEININGER:

19   Q.   Okay.  Do you recognize this?

20   A.   Yes.

21   Q.   And what is it?

22   A.   A chart basically summarizing when John Costanzo ran names

23   in NADDIS and who the requester was and additionally with a

24   phone call right after.

25   Q.   And what did you use to prepare this chart?

Nar2Cos6                          Maj – Direct

1   A.  I used DEA records, along with call detail records and call
2   logs from the phone itself.
3   Q.  And does the information in government -- well, one minute.
4           Does the information in Government Exhibit 704B fairly
5   and accurately reflect the information in those underlying
6   records?
7   A.  Yes.
8           MS. DEININGER:  The government offers Government
9   Exhibit 704B in evidence.
10          MS. YOUNG:  Objection.
11          THE COURT:  704B is admitted.
12          (Government's Exhibit 704B received in evidence)
13  BY MS. DEININGER:
14  Q.  I want to focus now primarily on the column to the far
15  right.  What does that column show us?
16  A.  This shows the date and time of the next phone call after a
17  search was made, and the phone call would be between Costanzo
18  and Recio unless otherwise noticed.
19  Q.  What do you mean by the next phone call?  What did you
20  review?
21  A.  I reviewed call detail records for the 2480 number, but
22  along with that I also reviewed call logs from the phone
23  itself.
24  Q.  Did you review call logs from both the Recio phone and the
25  Costanzo phone?

1    A.  Yes, also the 7463.

2    Q.  And did you look for just traditional host calls or any

3    contact, including contact over Telegram or What's App, to the

4    extent you were able to determine it?

5    A.  Any contact that was a phone call between all data sources,

6    such as, Telegram, What's App, and even regular phone calls.

7    Q.  And the column where it says "next phone call," does that

8    include text messages?

9    A.  No.

10   Q.  Just the next phone call, not whether there was a text

11   message?

12   A.  Yes.

13   Q.  And there is one line here in blue where it says that the

14   requester before the NADDIS search was David Macey.  In that

15   case, what was the next phone call that you identified?

16   A.  The next phone call is between Macey to Costanzo on August

17   7, 2019.

18   Q.  And otherwise all of these phone calls that you identified,

19   those were calls between Recio and Costanzo?

20   A.  Yes.

21   Q.  And when you looked -- we can zoom -- we don't have to be

22   zoomed into that anymore.

23        And when you looked for the next phone call after

24   these NADDIS searches were run, what did you generally find?

25   A.  I generally found that the phone calls would be hours or

1    minutes, and I think in one case a day after the search was

2    run.

3    Q.   Okay.  So they were relatively close in time?

4    A.   Yes.

5    Q.   Let's just look at some examples.

6         If we look at the very first line, when does it say --

7    what is the request date and time listed?

8    A.   The request date and time is November 13, 2018, at 11:51

9    a.m.

10   Q.   Okay.  And when does it say that the NADDIS search for this

11   name Marco Antonio Flores Moreno was run?

12   A.   It was run two days after November 15, 2018, at 10:48 a.m.

13   Q.   And when was the next phone call that you identified

14   between Recio and Costanzo?

15   A.   A couple minutes after it was run at 10:49 a.m.

16   Q.   Okay.  Let's just look at one other example on the fourth

17   line that's from November 27, 2018.  When does it show that

18   there was a NADDIS search for Esteban Samayoa?

19   A.   On November 29, 2018, at 10:38 a.m.

20   Q.   And when had the text message request been received from

21   Manuel Recio?

22   A.   Around two days before that.

23   Q.   And when was the next phone call that you identified?

24   A.   11/29/2018 at 10:38 a.m.

25   Q.   And how does that compare to the time of when the NADDIS

1    search was run?

2    A.   It was a minute after the run.

3    Q.   There are -- we can -- there are a couple of entries in

4    this far right column where there is a duration listed for the

5    call.  I see that in the fifth and the seventh lines, I

6    believe.  Can you explain what that means?

7    A.   I would notice in those two cases that the next phone call

8    would be around that time where the NADDIS search was run, but

9    it would be before.  When I would look at the duration, it

10   would reflect that the search was being made while they were on

11   the phone.  For example, on the fifth line --

12   Q.   Let's highlight the fifth line.

13   A.   The search was being run at 10:47 a.m., but you could see

14   that the start of the call was 10:39 and it didn't end until

15   10:49.

16   Q.   Okay.  So let's -- just walk me through this line.

17           What date was the text message request received that

18   you reviewed?

19   A.   On 11/29/2018 at 9:35 a.m.

20   Q.   And, again, that was a request sent by Manuel Recio to John

21   Costanzo?

22   A.   Yes.

23   Q.   And that related to Victor Eduardo Lopez Cuellar?

24   A.   Yes.

25   Q.   And what time did the phone call between Recio and Costanzo

1    start?

2    A.  The phone call started at 10:39 a.m.

3    Q.  On that same day?

4    A.  Yes, on that same day.

5    Q.  And what time was the NADDIS search run?

6    A.  At 10:47 a.m. on that same day.

7    Q.  So 10:47 a.m., that was when the ten-minute phone call that

8    began at 10:39 a.m. was still ongoing, is that correct?

9    A.  Correct.

10   Q.  All right.  We can drop out of that.

11         So you mentioned before that this column for the next

12   phone call, that does not reflect text messages, is that right?

13   A.  It does not.

14   Q.  Is it possible that Recio and Costanzo also exchanged text

15   messages between a NADDIS search being run and the next phone

16   call identified in this summary chart?

17         MS. YOUNG:  Objection.  Speculative.

18         THE COURT:  Sustained.

19   Q.  All right.  Do you know whether Recio and Costanzo

20   exchanged text messages between a NADDIS search and the summary

21   chart being run and the next phone call?

22   A.  Yes.  Sorry.  Can you rephrase the question?

23   Q.  Do you know whether Recio and Costanzo exchanged text

24   messages between the NADDIS searches that are listed in this

25   chart being run and the next phone call that's also identified

Nar2Cos6                        Maj - Direct

1    in the chart?

2    A.  Oh, no.  No.  Sorry.

3    Q.  I would like to pull up -- if we can look in the middle of

4    the chart, on May 7, 2019, what time did that request come in?

5    A.  The request came in May 7, 2019, at 4:59 p.m.

6    Q.  From who?

7    A.  From Manuel Recio.

8    Q.  And what name was searched?

9    A.  The name Alirio Frujillo was searched.

10   Q.  And when was that run?

11   A.  It was run at 5/8/2019 at 10:42.

12   Q.  When was the next call?

13   A.  5/10/2019 at 4:36 p.m.

14   Q.  Okay.  So about three days later?

15   A.  Around two days later.

16   Q.  Two days later.  Thank you.

17        Can we publish Government Exhibit 344, which is in

18   evidence, side by side with Government Exhibit 704B?

19   Q.  And looking at Government Exhibit 344, who are the

20   participants in this Telegram chat?

21   A.  Manny Recio and JC.

22   Q.  And what is the date of these messages?

23   A.  May 7 and May 8, 2019.

24   Q.  May 7, 2019, that was the date that you said that the

25   request came in from the summary chart, is that correct?

1    A.  Correct.

2    Q.  All right.  If we can just read these from the top.  You

3    can read the Recio chats in gray.  I'll read the JC chats in

4    green.

5    A.  "Alirio Trujillo.  Can you quickly run this name?

6    Potential new client for David."

7    Q.  "Okay."

8    A.  "Can you also run this guy?  Carlos Arturo Salazar

9    Benavides CC 79.720.594.  Let me know what you find."

10   Q.  "Trujillo is Colombian case Nate Clement son and Randy

11   Ballman Guillermo Fuentes was the former agent.  May want to

12   talk to him first.  Stand by.  Salazar case agent is Sam Bonner

13   507 317 5104.  The guy was picked up on a paw in Panama."

14   A.  "Bonner is where?"

15   Q.  "Dallas."

16   A.  "Is there anything in the system about the cases?"

17   Q.  "Both Colombian move a lot of weight very limited."

18   A.  "Bonner works in Columbia."

19   Q.  "No ballad.  Dallas."

20   A.  "Okay.  Awesome."

21   Q.  This message says, "Both Columbian move a lot of weight

22   very limited."  What date was that sent?

23   A.  May 8, 2019, at 10:58 a.m.

24   Q.  And how does that compare to the time on Government Exhibit

25   704B that the NADDIS search was conducted for Alirio Trujillo?

Nar2Cos6

1   A.   The text messages was a couple of minutes after the search.

2   Q.   And that text message is sent, if we can turn back to the

3   page before this, right after Recio says is there anything in

4   the system about the cases, correct?

5   A.   Correct.

6           MS. DEININGER:   Your Honor, one minute.

7           (Counsel confer)

8           MS. DEININGER:   Your Honor, I was going to read a set

9   of text messages, that I believe the limiting instruction

10  applied to now, 2015 text messages.

11          THE COURT:   Oh, okay.

12          MS. DEININGER:   We had agreed on proposed language.

13  Maybe it hadn't been handed up.

14          THE COURT:   It has not.

15          MS. DEININGER:   Apologies.

16          THE COURT:   All right.   Any objection to my reading

17  this now?

18          MS. DEININGER:   I might like to take a quick look to

19  be sure.

20          THE COURT:   I didn't know if you wanted it before or

21  when they were offered or when.   We could also break and resume

22  on Monday.   It is ten minutes --

23          MS. DEININGER:   I think it would make more sense just

24  to break now if that's okay with your Honor.

25          THE COURT:   It's always nice to beat the 5:00 rush, so

Nar2Cos6

1    why don't I let you all go for the weekend.  It's going to be a

2    lovely weekend, at least part of it.  So I'm going to release

3    you for the weekend.

4              We will resume Monday at 9:30.

5              I just want to remind you not to do any research or

6    looking into anything relating to the case.

7              Have a good weekend, everybody.  Leave your notepads

8    on your chairs.

9              And we will have coffee for you again 9, 9:15 on

10   Monday, and we will resume at 9:30.

11             Have a good weekend, everybody.

12             JUROR:  You, too.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Jury not present)

 2              THE COURT:  Thanks.  You may step down.

 3              (Witness not present)

 4              THE COURT:  And you all may be seated.

 5         Before we break, I wanted to put on the record

 6   something relating to the DEA memo that's been referred to as

 7   the deactivation memo.  So following up on Mr. Swett's e-mail

 8   which copied DEA division counsel Kerry Fleck, K-E-R-R-Y

 9   F-L-E-C-K, I followed up directly by e-mail with her.  I think

10   it's a her.

11              MR. SWETT:  It is.

12              THE COURT:  And I said:  We are in the middle of

13   trial.  This is important.  I want to be able to review the

14   unredacted version of the document, which is the DEA

15   deactivation memo in camera.  I didn't go into any more detail

16   than that.  And I initially asked her, did not order her, but I

17   asked her to send a copy, if possible, by e-mail as soon as

18   possible.  This was this morning.

19         She responded:  As I'm sure you know, DEA has very

20   strict policies regarding the protection of the materials

21   contained in our CS files.  Therefore, I'm respectfully

22   requesting that an agent from our New York office be allowed to

23   deliver these materials to your chambers in person in

24   accordance with our policy.

25         I then responded:  That's fine.  I'll be in my office
```

Nar2Cos6

during the lunch hour.

Two individuals from New York office of DEA came over and brought a physical copy of the unredacted version of 3535-294, which is the DEA memo, and also the form 512D.  They wouldn't -- per their policy, they didn't give me a copy of it.  They said we will wait outside in the vestibule while I read it.  And I said, okay, I'm going to need five or ten minutes to read it.  Before they came, I had read pretty carefully, reread, the F.B.I. memo which was produced as 3535-290.  And just to confirm, that was produced as 3500 material, is that right?

MR. SWETT:  Yes, your Honor.

THE COURT:  Okay.  So I then read through the two documents they gave me, the unredacted DEA memo, didn't make a copy of it, but read it, with an eye toward comparing it to what was in the F.B.I. memo essentially.

And having done so, I confirm that there is nothing in the DEA memo that is material that's not in the F.B.I. memo, 3535-290.  Indeed, as I recall, there are a couple of things that are more detailed in the F.B.I. memo.  The one example I remember is the F.B.I. memo refers by name to a Colombian naval officer, whereas the DEA memo simply says Colombian naval officer without a name.  The only other substantive additional thing in the F.B.I. memo was -- I believe it was three sentences about steps being taken by DEA to ensure the safety

Nar2Cos6

1    of the source identified as SOI in the F.B.I. memo, the

2    compromised source.

3            So having done that, I didn't think I needed to follow

4    up with an order.  I don't think there is any additional

5    material there, and there was really nothing in the 512D that

6    was material.

7            Anything else you all wanted to address?

8            MR. ANDREWS:  Nothing from the government.

9            MR. MUKASEY:  No, thank you.

10           MR. GAINOR:  No, your Honor.

11           THE COURT:  Who is next after this witness?

12           MR. SWETT:  It will be Mr. Hernandez.

13           THE COURT:  Okay.  And should I read this Monday

14   morning?

15           MS. DEININGER:  Yes.

16           THE COURT:  All right.  Have a good weekend,

17   everybody.

18           MR. SWETT:  Thank you.

19           (Adjourned to Monday, October 30, 2023, at 9:30 a.m.)

20

21

22

23

24

25

```
 1                          INDEX OF EXAMINATION

 2   Examination of:                              Page

 3    STEVEN MILLER

 4   Direct By Ms. Deininger  . . . . . . . . . . 289

 5   Cross By Mr. Mukasey . . . . . . . . . . . . 325

 6   Redirect By Ms. Deininger  . . . . . . . . . 343

 7   Recross By Mr. Mukasey . . . . . . . . . . . 348

 8    BRANDON CURTIS JAYCOX

 9   Direct By Mr. Swett  . . . . . . . . . . . . 357

10   Cross By Ms. Guaba . . . . . . . . . . . . . 416

11   Cross By Mr. Gainor  . . . . . . . . . . . . 436

12   Redirect By Mr. Swett  . . . . . . . . . . . 446

13   Recross By Ms. Guaba . . . . . . . . . . . . 452

14   Recross By Mr. Gainor  . . . . . . . . . . . 453

15    SUSANNA MAJ

16   Direct By Ms. Deininger  . . . . . . . . . . 457

17                          GOVERNMENT EXHIBITS

18   Exhibit No.                              Received

19    704A-2  . . . . . . . . . . . . . . . . . . 290

20    105  . . . . . . . . . . . . . . . . . . . 301

21    S6  . . . . . . . . . . . . . . . . . . . . 356

22    201, 201T, 205, 205T, 210, 210T, 212, . . . 356

23          212T

24    7  . . . . . . . . . . . . . . . . . . . . 360

25    S9, 510 through 510G, 526  . . . . . . . . 374
```

380    . . . . . . . . . . . . . . . . . . . 376

329, 381, 388   . . . . . . . . . . . . . 376

S5   . . . . . . . . . . . . . . . . . . . 385

703   . . . . . . . . . . . . . . . . . . . 413

116   . . . . . . . . . . . . . . . . . . . 459

208, 208T, 209, 209T  . . . . . . . . . . . 459

318, 318A through 318F, 320, 324A, 337, . . . 460

         343, 360

421   . . . . . . . . . . . . . . . . . . . 460

901, 904   . . . . . . . . . . . . . . . . . 461

927, 928   . . . . . . . . . . . . . . . . . 461

708   . . . . . . . . . . . . . . . . . . . 462

361A   . . . . . . . . . . . . . . . . . . . 478

361C   . . . . . . . . . . . . . . . . . . . 480

362C   . . . . . . . . . . . . . . . . . . . 483

362D   . . . . . . . . . . . . . . . . . . . 484

363B   . . . . . . . . . . . . . . . . . . . 486

704B   . . . . . . . . . . . . . . . . . . . 490

DEFENDANT EXHIBITS

Exhibit No.                              Received

JC 1008A and JC 1009A   . . . . . . . . . . 357

MR 141, 141T, 143, 143T   . . . . . . . . . 384

JC 9703   . . . . . . . . . . . . . . . . . 420