NB7KCOS1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                           22 Cr. 281 (JPO)

JOHN COSTANZO, JR.,
MANUEL RECIO,

             Defendants.

------------------------------x          Trial

                                  New York, N.Y.
                                  November 7, 2023
                                  9:15 a.m.

Before:

                  HON. J. PAUL OETKEN,

                                District Judge
                                -and a Jury-

                     APPEARANCES

DAMIAN WILLIAMS,
     United States Attorney for the
     Southern District of New York
SEBASTIAN A. SWETT
EMILY S. DEININGER
MATHEW ANDREWS
     Assistant United States Attorneys

MUKASEY FRENCHMAN LLP
     Attorneys for Defendant Costanzo
MARC L. MUKASEY
MICHAEL F. WESTFAL
STEPHANIE GUABA
TORREY K. YOUNG

GAINOR & DONNER
     Attorneys for Defendant Recio
RONALD GAINOR
AMBER E. DONNER

NB7KCOS1

APPEARANCES (continued)


Also Present:    Dean Iannuzzelli, Paralegal Specialist (USAO)
                 Nerlande Pierre, Paralegal Specialist (USAO)
                 Marie-Lou Serna, Paralegal (Gainor & Donner)
                 Sal Chan, Paralegal (Mukasey Frenchman)
                 Delise Jeffrey, Special Agent, F.B.I.

NB7KCOS1

1              (Trial resumed; jury not present)

2              THE COURT:  Good morning.  Please be seated.

3              Let's finalize the jury instructions.

4              Anything we need to discuss before that?

5              MR. SWETT:  Your Honor, the only thing we want to let

6    the Court know is we're not going to put on a rebuttal case.

7    We notified defense last night.  So, as soon as they rest,

8    we're ready to go to closing.

9              THE COURT:  Okay.

10             By the way, the other thing I wanted to raise:  You

11   should have seen on the docket that there was another letter

12   from the Associated Press.  The journalist who's been in the

13   courtroom isn't here now, I don't think, but has been in the

14   courtroom during parts of the trial, who objected to three

15   things:  The prospect of closing the courtroom during

16   summations; also wanted a redacted transcript of the portion

17   that was closed; and wanted the government to put up all the

18   exhibits that had been admitted, in whatever file-sharing

19   system you have.

20             MR. SWETT:  I can answer those in turn.

21             So, first, we're not seeking closure of the courtroom.

22   We don't think we're going to be discussing any sealed exhibits

23   at the level of detail that would require that.

24             Second, we have given the transcript to the components

25   of the Department of Justice that really have equities in it.

NB7KCOS1

1    We were told that we would get their redactions last night.

2    They didn't come through.  I can send an email this morning,

3    but we know that we need to get that to the Court as soon as

4    possible.

5         And, third, obviously, we want to make sure that

6    before we upload things to the portal, that they are correct,

7    that we've redacted out any PII, so we're taking extra

8    precautions.  We understand there are some sensitivities around

9    materials in this case.  So it's fully our intention to make

10   those exhibits available.  We just don't want to do it at the

11   expense of uploading something that shouldn't have been

12   uploaded.

13        THE COURT:  Okay.  Fair enough.

14        The only proposed changes I have in paper are from

15   Mr. Westfal, for Mr. Costanzo, which I'm prepared to discuss.

16   I just want to make sure I haven't missed any other

17   submissions.

18        You all haven't submitted anything?

19        MS. DONNER:  Yes, we did, your Honor.  We filed it

20   last night.  It's DE 169.  I can hand up a copy.

21        THE COURT:  Okay.  Was it filed on the docket?

22        MS. DONNER:  Yes.

23        THE COURT:  Oh, I didn't get an email.

24        (Pause)

25        THE COURT:  Counsel, you've seen this, right?

NB7KCOS1

1          MR. SWETT:  Yes, your Honor.

2          MS. DEININGER:  Yes.

3          THE COURT:  I guess, unlike me, you check the docket.

4          (Pause)

5          THE COURT:  Should we just go through and talk about

6     things as they come up in order?

7          MR. SWETT:  That works for the government, your Honor.

8     Just to be clear, we had no proposed edits to the Court's

9     charge.

10         THE COURT:  Okay.  The first thing is, I'm looking at

11    Mr. Westfal's draft, page 15, which is O, defendants' testimony

12    or defendants' right not to testify.  So we'll just take out

13    the yellow, obviously, and we'll put in the second paragraph,

14    "Defendants did not testify in this case.  Under our

15    Constitution, a defendant has no obligation to testify,"

16    et cetera.  All right?

17         MS. DEININGER:  Yes, that works.

18         THE COURT:  And then the next is under Q, "Government

19    Cooperating Witness"?

20         MR. SWETT:  Your Honor, we don't think that their

21    edition is necessary and even necessarily consistent with the

22    testimony because the cooperation agreement speaks for itself.

23    That said, if the Court is inclined to include this language,

24    we think it should say that a witness cooperating with the

25    government may have a motive to testify falsely as opposed to

NB7KCOS1

1    has a motive to testify falsely.

2             MR. WESTFAL:  That would be fine.

3             THE COURT:  I also think it should say believes rather

4    than realizes.

5             MR. SWETT:  I think that's more accurate.

6             THE COURT:  Because realizes suggests that it's true

7    that giving favorable testimony gets you a lighter sentence.

8             MR. WESTFAL:  Your Honor, we would be fine with that

9    change as well.

10            THE COURT:  Okay.  So "may have a motive," right?

11            MR. WESTFAL:  Yes.

12            THE COURT:  And then testimony of experts, you all

13   fought so hard to get it in, and now you don't want it?

14            MR. WESTFAL:  With apologies, we would propose to

15   strike the instruction.

16            THE COURT:  You're okay with that?

17            MR. SWETT:  That's fine, your Honor.

18            MR. GAINOR:  That's fine, your Honor.

19            THE COURT:  Okay.  We'll take out "our experts," the

20   old our.

21            And then the next one is "Substantive Instructions."

22            You've Changed "duties" to "duty."  Is that okay with

23   the government?

24            MS. DEININGER:  No objection.

25            THE COURT:  All right.

NB7KCOS1

1          That's on C.  And then we get to --

2          MS. DONNER:  Your Honor, on page 26 and 27 — I don't

3    know if you're quite there yet — but we requested a supplement

4    to the official lawful duty to add the language that we cited

5    on page 1 of the filing at the bottom.

6          MS. DEININGER:  I think, as we said during the last

7    charge conference, we don't believe that language is necessary

8    under these particular facts, but if your Honor is inclined to

9    consider it, we think the first sentence that has been proposed

10   should be edited to more closely follow the case law, to say,

11   "If you find that the duties of a DEA agent were not completely

12   defined by the DEA's written policies and standards of conduct,

13   you may also consider evidence that has been admitted during

14   the trial concerning the established practices of DEA agents";

15   instead of just saying "customs and practices," say

16   "established practices."  We think the rest of it is

17   unnecessary, that that is where the instruction should end, if

18   there is anything that's going to be added.

19         THE COURT:  Okay.  That sounds right.

20         MR. WESTFAL:  Just on official duty, your Honor, we

21   had requested a sentence to make clear that the scope of

22   Special Agent Costanzo's official duty is an issue of fact for

23   the jury.  We think the jury should be instructed so that they

24   understand that's their decision to make.

25         THE COURT:  Are you okay with that?

NB7KCOS1

| | |
|---|---|
| 1 | MS. DEININGER:  I guess we're fine with it.  Again, I |
| 2 | don't think it's necessary, especially if we're adding a |
| 3 | sentence about, "If you find that the duties of a DEA agent |
| 4 | were not completely defined."  I mean, again, everything |
| 5 | they're being instructed on is a question of fact for them, and |
| 6 | they're just being told that they have to find something. |
| 7 | THE COURT:  Right.  I think I'm okay with adding the |
| 8 | sentence. |
| 9 | MS. DEININGER:  Okay. |
| 10 | MR. WESTFAL:  Just, your Honor -- sorry. |
| 11 | THE COURT:  Yes, go ahead. |
| 12 | MR. WESTFAL:  I was going to move on to a different |
| 13 | topic, so I don't -- |
| 14 | THE COURT:  No, I want to go back to -- the next thing |
| 15 | I had for you is you took out "directly or indirectly" on E, |
| 16 | the second element of Count Two.  And I know why, because it's |
| 17 | not in the indictment for Count Two. |
| 18 | What is the government's position? |
| 19 | MS. DEININGER:  We think it's still appropriate to |
| 20 | include it in.  It's not quoted in the indictment, but it's not |
| 21 | an element that has to be charged in the indictment, it's just |
| 22 | part of the statute.  I think everyone acknowledges it's part |
| 23 | of the statute.  And there is no variance from the theory as |
| 24 | charged in the indictment.  The indictment makes very plain, |
| 25 | contains a number of factual allegations, of how these payments |

1   are being passed indirectly through Pagan and Costanzo, Sr. and

2   other conduits.  So, including the "directly or indirectly"

3   just informs the jury of the two options it can consider.

4               THE COURT:  I agree.

5               MR. WESTFAL:  Can we propose one change, your Honor,

6   to it?  If the Court and the government are amenable to it, it

7   would read, "It is sufficient if he did so indirectly, that is,

8   through another person, so long as you find that the thing of

9   value was for his benefit."

10              MR. SWETT:  Your Honor, we're not sure that's actually

11  the law.  It's not in the statute.  I understand what's

12  motivating this, but we're not going to be arguing to the jury

13  that he was accepting gifts for the benefit of other people.

14  That said, I don't think we should be adding language on the

15  fly that is not based in the statute or case law.

16              THE COURT:  I mean, the statute says, "receives or

17  accepts anything of value, personally or for another person."

18              MR. WESTFAL:  I think the genesis of our request is so

19  that the instructions are consistent with the government's

20  theory, as just stated by Mr. Swett, that they won't be arguing

21  that the payments were for the benefit of some other person,

22  but for Special Agent Costanzo.  So that's why we're asking for

23  that instruction.

24              MS. DEININGER:  I think adding the instruction, as a

25  legal matter, would actually run contrary to the statute.  And

NB7KCOS1

1    I think, look, if we end up arguing something at closing which

2    is inconsistent with what we charge, which we have no intention

3    to do, they'll have an appellate issue, they'll have a variance

4    issue.  We have no intention of doing that.

5             THE COURT:  Okay.

6             MS. DONNER:  Your Honor, before we get too far into

7    chronologically, since we're going by pages, we had, in our

8    filing, objected to, and requested a supplement to, the

9    quid pro quo instruction, which is on page 26 to 27.  And it's

10   on page 26 to 27 of your Honor's most recent proposed jury

11   instructions, and it's on page 2 of our supplement and

12   objection.

13            We requested some additional language regarding

14   quid pro quo, and we described the *Silver* case.

15            MS. DEININGER:  I think we're fine with the first

16   sentence of this.  I think the second sentence, it seems

17   unnecessary and just gets confusing.  I think it is important

18   that it has to say that it's not a quid pro quo if it's solely

19   out of friendship or some other motive, which this does

20   include.  So the first sentence, I don't think we would object

21   to.

22            MS. DONNER:  That works for us.

23            THE COURT:  Okay.  We'll add that.  I guess we'll add

24   that after at the end of the second paragraph under F.

25            Does that make sense?

NB7KCOS1

1          MS. DEININGER:  Or --

2          MS. DONNER:  That works for us.

3          MS. DEININGER:  I think we would suggest at the end of

4    the last paragraph, but either will work.

5          THE COURT:  So at the end of that section?

6          MS. DEININGER:  That's right.

7          MS. DONNER:  And then when your Honor is ready, we

8    have an additional objection to the quid pro quo instruction,

9    which is at the last sentence right before G.

10          MR. WESTFAL:  We have a few before that, your Honor.

11          THE COURT:  Right.  So we're on F — this is where it

12    gets really tricky — the second paragraph, "The core of a

13    bribery offense is something called a quid pro quo."  You want

14    to take out "at least in part."

15          Does the government agree to that?

16          MS. DEININGER:  No, we would object to that.  I think

17    there's other language in the instructions that makes clear

18    that they can have dual motives.  It is enough if at least in

19    part, the motive was for the inducement of the performance of

20    an official duty.

21          THE COURT:  Yes.  *Silver* says that.

22          MR. WESTFAL:  We'll maintain our objection, in

23    particular, in light of the language of the statute that

24    doesn't make reference to "at least in part."

25          THE COURT:  Right.  Okay.

NB7KCOS1

1          Also, the second paragraph, "A public official's

2     official duty is not necessarily limited."  I don't think

3     "necessarily" is appropriate.  There's nothing about law and

4     statute here; it's all policies.  That's just confusing.

5     "Official duty can include duties that are composed by written

6     rules or regulations; however, the scope of Costanzo's official

7     duty is ultimately an issue of fact."  I think that's fine;

8     I'll add that.

9          MS. DONNER:  I think it should include "lawful duty,"

10    too, since the statute with respect to Mr. Recio refers to

11    lawful duty.

12          THE COURT:  Maybe when we get to consistent, we just

13    say lawful duty means the same thing as official duty.  It's

14    weird to raise it here, where lawful doesn't even come up.

15          MS. DEININGER:  We would agree.  We would be fine with

16    that proposal, just to reference back when we get to

17    Count Three.

18          THE COURT:  Yes.

19          And I think everyone agrees they mean the same thing,

20    right?

21          MS. DEININGER:  Yes.

22          THE COURT:  So in the next paragraph that starts, "The

23    agreement to perform" --

24          MS. DEININGER:  I'm sorry, your Honor, just to be

25    clear, this is where we're adding in also the sentence -- in

NB7KCOS1

1    the third paragraph, this is where we're adding in the sentence

2    from Recio's proposed supplemental instruction, the second one;

3    is that right?  "If you find that the duties of a DEA agent

4    were not completely defined by the DEA's written policies and

5    standards of conduct, you may" --

6            THE COURT:  Oh, yes.  Right, so that would be at the

7    end of that third paragraph.

8            MS. DEININGER:  Okay.

9            THE COURT:  So the next one is we're on the fourth

10   paragraph that begins, "The agreement to perform."

11           So I think I agree with defendants' proposal to take

12   out, "It is not necessary for the government to show that

13   Costanzo promised," not for the reasons you've done it, but the

14   whole language in these cases about promises and agreements is

15   very confusing.  There are cases involving promises, and there

16   are cases involving exchanges.  This case doesn't involve

17   promises; it involves exchanges.  And so I think talking about

18   promises is very confusing.

19           So I agree to take that out.

20           However, in the next paragraph, I do not agree with

21   this whole "conveyed" thing that you tried to slip in because,

22   having read *Silver* --

23           MS. DEININGER:  Your Honor, if we can just go back.  I

24   don't think we have an objection to tweaking the promise

25   language, but the sentence itself is the sentence that explains

NB7KCOS1

1    the "as opportunities arise" theory, which we do think is

2    appropriate, consistent with what the government's theory has

3    been all along, that there needs to be something describing to

4    the jury that they can find guilt along an "as opportunities

5    arise" theory only if there's a specific exchange, one piece of

6    information for one payment.  I mean, if we say "agreed"

7    instead of "promised," I think we'd be fine with that.  This

8    language is otherwise, I think, almost straight from *Silver* --

9              THE COURT:  The problem is, this whole "with respect

10   to a particular question or matter" is from *McDonnell*, and so

11   what the Court did in *Silver* is say, yeah, as opportunities

12   arise is fine, but it's not as broad as the government thinks

13   because it has to be limited to a particular question or

14   matter.  Whether that applies here is problematic because

15   that's in another subsection.  That's the official acts versus

16   the official duties part of the statute, so it's unclear if a

17   particular matter is even relevant.  I don't think it is

18   because official duties are what they are; they don't relate to

19   particular matters before.  So I think what I'm saying is, I

20   think you're right, except I would take out "with respect to a

21   particular question or matter."

22             MS. DEININGER:  So it would say, "It is not necessary

23   for the government to show that Costanzo agreed to undertake or

24   omit any specific act as part of the exchange, just that

25   Costanzo promised to perform some act in the future, in

NB7KCOS1

1   violation of his official duties"; is that right?

2        THE COURT:  Yes, except it would be agreed in both

3   places, I guess.

4        MS. DONNER:  I would add, your Honor, that it's the

5   "some act" that is confusing and inappropriate.  The act is the

6   violation of official duty, not just some act.  And this is

7   confusing.

8        THE COURT:  I think it's fair to say -- well, we go on

9   to say, "some act in violation of his official duty."

10       So here is the other thing I was thinking of adding

11  above — and maybe this clarifies things or maybe it confuses

12  things — I think after reading *Silver*, all that's required is

13  that the government show that when he received payment, he

14  understood that it was in expectation of him taking an act in

15  violation of his official duty.  That's it.  He didn't have to

16  actually intend it.  To violate his official duty, he didn't

17  have to intend to violate or actually violate, because that's

18  clear from page 552 of *Silver* and *Ford, United States v. Ford*,

19  where the Court explicitly holds, under Section 201(b)(2),

20  "There is no intent to be influenced element.  The overall act

21  must be committed corruptly, but it only requires an awareness

22  of the payment's purpose on the part of the official."

23       MR. WESTFAL:  Your Honor, I think our response would

24  be we don't see sort of any reference to the payment's purpose

25  or the expectations of Mr. Recio, as this instruction is

NB7KCOS1

1   currently drafted.  And so I think it would take some

2   redrafting to get to that place.  I understand where your Honor

3   is coming from.

4          But we would also object — and I know your Honor has

5   stated your position — we would object to sort of taking one

6   part of *Silver*, but not the other, and we do believe *Silver* was

7   quite clear on the requirement of a public official having to

8   convey an intent to the bribe-payor, and so we maintain that.

9          THE COURT:  I understand, but I feel strongly that's a

10  misreading of *Silver*.  The discussion, and I've read it very

11  carefully again and again, and I now realize that what *Silver*

12  was doing in that passage was rejecting the idea that the

13  intent of the official had to be, in fact, to take the action

14  because they might be play acting, and that's no defense, so

15  they said all that matters in a situation where there's

16  promising happening is that they conveyed the intent, but where

17  we're talking about is implicit quid pro quos, where no one is

18  promising anything, they're just doing it.  There's no

19  necessary conveyance at all.  That's *Ford*.  And that's the

20  instruction that they approved, that Judge Caproni gave.

21  There's no conveying that's necessary.  It's not a separate

22  element.  All they're saying is, in a situation where the

23  official is communicating, they don't actually have to have the

24  intent to take the act; they can be pretending.  That's all the

25  court is saying when it says what matters is the conveyance of

NB7KCOS1

1     the intent.

2              MR. WESTFAL:  Right.  I think our read of *Silver* is

3     different, in that a promise is a necessary element combined

4     with the conveyed intent, and so we'll maintain our objection

5     to --

6              THE COURT:  Okay.  I understand the objection, and

7     it's noted, but I am not going to put in the conveyed language.

8              And I agree with you that adding the point that I'm

9     adding from *Ford* and *Silver* may be too complicated, so I'll

10    back off that.

11             However, back to "as opportunities arise," I do think

12    -- "It is not necessary for the government to show" -- I think

13    rather than promised or agreed, it's just undertook.  In our

14    case, we're not talking about promising or agreeing, we're just

15    talking about whether he actually did stuff.  So I think the

16    appropriate language would be, "It is not necessary for the

17    government to show that Costanzo took any specific act as part

18    of the exchange, just that he" -- never mind, that doesn't work

19    either.

20             You know, I'm going to go back to the promised

21    language.  It's too confusing to change it otherwise.

22             So I'm going to put the sentence back in, but take out

23    "with respect to a particular question or matter."  Or do you

24    think "agreed" is better than "promised"?

25             MS. DEININGER:  I don't think it makes -- the

NB7KCOS1

"promised" versus "agreed," I don't think makes a big

difference to the government.  I don't want to speak for

defense here, but my understanding is that they would prefer to

still leave in the language with respect to a particular

question or matter -- all right, I take that back.

THE COURT:  You don't want to keep it in?

MR. WESTFAL:  So the defense's position is that the

particular question or matter is under a different prong.  We

are fine with the agreement language, but we do object to the,

as this reads, "unspecified some act."  We think that would be

inconsistent with *McDonnell* and *Silver*, which requires the

identification of a specific, in that case, question or matter.

In our case right now, as drafted, it would simply be "some act

in violation."  We think it needs to be specified under the

Second Circuit's decision in *Silver*.

MS. DONNER:  We would support that, your Honor.  And

that's what I was referring to earlier when I objected to the

"some act" language.

THE COURT:  Right.

Is there some way to capture the kind of middle line

that *Silver* took?

MR. SWETT:  Your Honor, what if we said that, "just

that Costanzo promised to perform or omit some act in the

future in violation of his official duties with respect to the

promise"?  And, that way, the jury has to tie the violation

NB7KCOS1

1      back to the agreement between the two parties.

2                THE COURT:  Could you repeat that?  Are you keeping

3      the first part of the sentence?

4                MR. SWETT:  Yes.  So the sentence, I think, would be

5      as currently envisioned by the Court, and then you would add at

6      the end, "just that Costanzo promised to perform or omit some

7      act in the future in violation of his official duties, with

8      respect to the promise."

9                MS. DONNER:  Or you could substitute "promise" with

10     undertaking instead of have that "promise" language, which is

11     problematic.  It's the undertaking that's at issue.

12               MR. SWETT:  I think what we're proposing here is some

13     way to cabin what that act could be and tying it back to

14     essentially what the --

15               MS. DEININGER:  Whatever the agreement had been, it

16     has to be -- the violation has to have been part of what they

17     agreed to.

18               THE COURT:  Right.  I don't know if I like "with

19     respect to the promise."  Let's change it to "agreed."  "It is

20     not necessary for the government to show that Costanzo agreed

21     to undertake or omit any specific act as part of the exchange,

22     just that Costanzo agreed to perform or omit some act in the

23     future in return for or as part of the agreement"?

24               MS. DONNER:  "And that such act was in violation of

25     his official duties."

NB7KCOS1

```
1              THE COURT:  Right.  It will say, "in violation of his
2      official duties-duty."  In violation of his official duty --
3      we're trying to get the idea that the "some act in the future"
4      is in exchange for the bribe.
5              MR. SWETT:  And it's tied to the agreement that, I
6      think, was defense counsel's concern.  And we think that's the
7      best way to do it, if we don't want to use the language from a
8      case involving a different subsection.
9              THE COURT:  So what was the language?
10             MR. SWETT:  I think what the Court just said was fine
11     for the government.
12             THE COURT:  What did he say?
13             MR. SWETT:  "Just that Costanzo agreed to perform or
14     omit some act in the future as part of the agreement."
15             THE COURT:  In violation of his official duties.
16             MR. SWETT:  In violation of his official duties,
17     either in relation to the agreement or consistent with the
18     agreement or --
19             THE COURT:  Or as part of the agreement.
20             MR. SWETT:  -- as part of the agreement.
21             MR. WESTFAL:  I think part of the problem, from our
22     perspective, your Honor, is the language in Silver dealt with
23     the identification of a specific official act, which the court
24     said required the identification of a specific question or
25     matter.  The court went on to say, that identification and
```

NB7KCOS1

specificity was required at the time the payment was accepted.
So there's a chronological temporal aspect which currently does
not appear in the instruction.

          MR. SWETT:  I don't think that's true, your Honor.
The whole idea by tying it to the agreement is that comes
first, and then whatever acts are done are tied back to that
agreement.  This isn't a gratuities case.  So I think that
actually is the cleanest way of addressing that particular
concern.

          MS. DONNER:  I think taking out the "some" in the
"some act" would address that concern.  It's not "some act."

          MS. DEININGER:  What about something like, "It is not
necessary for the government to show that Costanzo agreed to
undertake any specific act at the time of the agreement, just
that Costanzo agreed at that time to perform or omit some act
in the future in violation of his official duties"?  My
understanding of *Silver* is that the intent -- when the mental
state is relevant is at the time that they reached the
agreement, and then the payment and the act can follow
thereafter.

          THE COURT:  But what you just read is kind of
confusing because it's such a thin line.  What you said, "It is
not necessary for the government to show that Costanzo agreed
to undertake any specific act at the time of the agreement,
just that Costanzo agreed at that time to perform or omit some

NB7KCOS1

1    act in the future in violation of his official duty" --

2              MR. WESTFAL:  We object to that.

3              THE COURT:  -- that doesn't make sense.  I think this

4    whole "as opportunities arise" to highlight it, I just think is

5    confusing.  Everyone knows what was done here, what the acts

6    were, and we're just highlighting an issue that's not going to

7    be in their minds, in my view.

8              MR. SWETT:  Your Honor, I think maybe it makes

9    sense --

10             MS. DEININGER:  I think --

11             MR. SWETT:  Your Honor, I think it makes sense maybe

12   to move on from this one, because a lot of this is animated by

13   our concerns about what might be said in the closing, and that

14   there are no acts that we can tie to the dates of specific

15   payments, and we don't think that's necessary, and we think

16   that there's language that can address that point.  But, as the

17   Court said, there isn't a lot of mystery as to our theory here.

18   I think once we know if that's a defense that the jury is going

19   to hear, we may need to revisit this, and I think we're very

20   close to language that would work.

21             MS. DEININGER:  And I think what Mr. Swett is getting

22   at here is that, if the defense were to argue at closing that a

23   particular payment has to be paid to a promise to perform a

24   specific act at the time the agreement is made, that would be

25   inconsistent with the case law, and that that would be legally

NB7KCOS1

1 wrong, and it might require some sort of corrective

2 instruction.

3   I think we're okay not highlighting this particular

4 theory if that's not what the defense is going to be.

5   THE COURT:  Okay.  We'll come back to that.

6   The next paragraph starts "in considering this

7 element."  I would keep the first part.  "What matters is

8 Costanzo's intent to receive a bribe in return for being

9 induced to commit an act in violation of his official duty."

10   Then the next one is, "It is not a defense that

11 Costanzo would have violated his official duties without the

12 inducement of a thing of value."

13   MS. DONNER:  Your Honor, we objected to the next

14 clause, "or that a violation was desirable or beneficial to the

15 DEA or the public."  And we cited to the standards of conduct

16 that the government is relying on and was included in the

17 indictment in the case.  And that standard says, "An employee

18 shall not engage in a financial transaction using nonpublic

19 information, nor allow the improper use of nonpublic

20 information, to further his or her own private interest or that

21 of another."

22   So what this does is write into the standards of

23 conduct something that's not there.  And there is nothing in

24 the standards of conduct that discuss a situation where there

25 was a beneficial aspect to the official act being performed by

NB7KCOS1

1    Special Agent Costanzo.

2              MR. SWETT:  With respect to the first clause that

3    Costanzo's team wants to remove, I think we're okay with that.

4              THE COURT:  With removing it?

5              MR. SWETT:  With removing it.

6              THE COURT:  Okay.

7              MR. SWETT:  We would oppose Ms. Donner's proposal for

8    a couple of reasons.

9              First of all, that's just one standard of conduct that

10   they have cited to.  There are plenty of standards of conduct

11   that don't require some showing of private interest or gain,

12   and that are violations irrespective of whether there is some

13   potential benefit to DEA casework or not.

14             The other reason we oppose it is, that's just not the

15   law.  The law is -- this is an instruction on what the law is;

16   this is not an instruction on what the DEA standards of conduct

17   require.

18             THE COURT:  I think that's right.  There's also

19   language proposed at the end, "If that violation was induced by

20   the acceptance of a thing of value."  Are you okay with that?

21             MS. DEININGER:  "If that violation was induced," we

22   would propose adding in, at least in part by the acceptance of

23   something -- maybe something of value instead of "a thing."  "A

24   thing" just implies property as opposed to money.

25             THE COURT:  Okay.

NB7KCOS1

1          MR. WESTFAL:  We'll maintain our objection to the "at

2     least in part."

3          MS. DONNER:  And we adopted all of Special Agent

4     Costanzo's objections, and maintain our objection.

5          THE COURT:  Okay.

6          We have section G, H, I.  I don't have any changes in

7     the following sections until page 35 of Mr. Westfal's draft.

8          MS. DEININGER:  Your Honor, here, in L, did you want

9     to add a sentence, just referring back, lawful duty to the

10    definition of official duty?

11         THE COURT:  Oh, yes.

12         MS. DEININGER:  I think that's where that would fit

13    in.

14         THE COURT:  So maybe after the first paragraph, just

15    say, "I instruct you that lawful duty has the same meaning as

16    official duty discussed with respect to Count Two"?

17         MS. DEININGER:  We would be fine with that.

18         THE COURT:  Is that okay, Ms. Donner?

19         MS. DONNER:  Yes, your Honor.

20         THE COURT:  All right.

21         Next is in Q, page 35.  Oh, we had referred to --

22    incorrectly, we had referred to three objectives instead of two

23    objectives, so we'll fix that.

24         And then we get to -- I'm on page 41, under U, "Honest

25    Services Wire Fraud."  Mr. Costanzo has proposed, instead of

NB7KCOS1

1    "and others," adding "and defense attorneys David Macey and

2    Luis Guerra."

3              MR. SWETT:  That's fine, your Honor.

4              THE COURT:  Okay.

5              Then next is W on page 42.  Counsel for Mr. Costanzo

6    has proposed putting in the official duty language so that it

7    mirrors Count Two.

8              Is the government okay with that?

9              MS. DEININGER:  I think that the proposed addition of

10   the violation of official duty is fine.  We would, again -- we

11   believe it's appropriate to leave in the language, the "at

12   least in part" language, commits an act.  So it would be

13   "commits an act in violation of his official duty at least in

14   part in return for a concealed bribe."

15             THE COURT:  Got it.  And then you would keep "directly

16   or indirectly"?

17             MR. WESTFAL:  Sorry, your Honor, I just want to make

18   sure, on this charge, we're maintaining our objection to the

19   "at least in part" language, at least as to this count.

20             THE COURT:  Yes.

21             MS. DONNER:  Same objection on behalf of Mr. Recio.

22             THE COURT:  Yes.

23             What about "directly or indirectly"?  I'm not sure I'd

24   include it there because it's not in this statute, unlike 201.

25             MR. SWETT:  We're obviously borrowing heavily from 201

NB7KCOS1

1    here, but that's fine.

2            THE COURT:  All right.  And then the next -- on 45,

3    section Y, we just corrected the title or heading.

4            The next thing was BB on page 48.  Ah, aiding and

5    abetting.  So Mr. Costanzo has proposed taking out the aiding

6    and abetting instruction as to Count Two because Mr. Costanzo

7    couldn't aid and abet himself.

8            MS. DEININGER:  I think we're fine with that.

9            THE COURT:  Okay.  So we'll change that to referring

10   to only Three and Five of the indictment.

11           MS. DEININGER:  Okay.

12           THE COURT:  And then we get to page 52, HH.

13           MS. DEININGER:  Before we get there, your Honor, if we

14   could go back to FF, we did have one proposal.  As your Honor

15   may recall, after the testimony regarding the interviews of

16   Costanzo and Recio, we talked about offering a limiting

17   instruction about how those statements hadn't been introduced

18   for their truth, and we didn't ever get to do that, so we think

19   that would be appropriate to more specifically reference that

20   testimony here.  So what we would propose is after -- instead

21   of the first -- at the very beginning, say, "On Thursday, you

22   heard testimony from Special Agent Joseph LaRocca" --

23           THE COURT:  Hold on a second.

24           MS. DEININGER:  It's a little long.

25           THE COURT:  Mr. Chin has to be writing this.  "On

NB7KCOS1

Thursday, you heard testimony."

MS. DEININGER:  "From Special Agent Joseph LaRocca and Special Agent Delise Jeffrey about" --

THE COURT:  From Special Agent LaRocca?

MS. DEININGER:  Joseph LaRocca, yes, L-a-R-o-c-c-a.

THE COURT:  Joseph LaRocca and?

MS. DEININGER:  Special Agent Delise Jeffrey.

THE COURT:  D-e-l-i-s-e J-e-f-f-r-e-y?

MS. DEININGER:  That's right.

"About their interviews of the defendants in November 2019.  Special Agent LaRocca and Special Agent Jeffrey testified, among other things, that" --

THE COURT:  Hold on.  November 2019.

Okay.  Special Agent LaRocca and Special Agent Jeffrey, or they testified.

MS. DEININGER:  That's fine.  "They testified, among other things, that during those interviews, John Costanzo spoke about Manuel Recio, and Manuel Recio spoke about John Costanzo. I instruct you that the defendants' statements about each other are not being introduced for their truth."

And then, going to the rest of this instruction, we can say, "The government" -- and then instead of saying, "you heard testimony," just say, "The defendants made statements in which they claim that their conduct was consistent with innocence and not guilt," and then leave the rest of the

NB7KCOS1

1   instruction as is.

2          THE COURT:  So you would take out, "you have heard

3   testimony"?

4          MS. DEININGER:  Yes, only because I think you would

5   have just said that in introducing the idea of the testimony

6   from Special Agent LaRocca and Special Agent Jeffrey.

7          THE COURT:  Okay.

8          MR. WESTFAL:  Your Honor, the defense objects to this

9   instruction in its entirety.  To the extent the Court is

10  inclined to give the instruction, we would propose additional

11  language as follows:  "I further instruct you" --

12         THE COURT:  Sorry, are you objecting to what the

13  government just added or to the whole thing?

14         MR. WESTFAL:  We are objecting to the entirety of the

15  government's instruction, proposed instruction.

16         THE COURT:  The thing they just added?

17         MR. WESTFAL:  Yes.

18         MR. GAINOR:  As are we, your Honor, vehemently,

19  actually.

20         THE COURT:  You don't want it to be limited so that

21  it's not for its truth?  That's all it did.

22         MR. WESTFAL:  If the Court is inclined to give the

23  instruction, we just would request additional language as

24  follows, which is:  "I further instruct you that neither

25  defendant is charged with making a false statement to the FBI."

1          THE COURT:  Government okay with that?

2          MR. GAINOR:  Your Honor, just for the record, we think

3     this instruction in its entirety is unnecessary to draw

4     attention to it.  The jury heard the statements; they can be

5     argued in the closing by each side.  But for the Court to

6     highlight these statements again is inappropriate.

7          So you know, we are -- we stand in accord with Special

8     Agent Costanzo's legal team that, No. 1, it should not be read;

9     and No. 2, if the Court is inclined — which we hope the whole

10    instruction is not read — that the modifications consistent

11    with what Mr. Westfal put on the record are done.  But we just

12    think that this instruction from the onset should not be read

13    at all.

14          THE COURT:  Would you like to respond?

15          MS. DEININGER:  I'm a little unclear, I guess.

16          I'm unclear if defendants are objecting to the

17    entirety of FF or they're both just objecting to our proposed

18    addition which, again, we are just trying to make clear that

19    these statements, which our understanding was that everyone had

20    agreed to some sort of limiting instruction.

21          THE COURT:  That's what I thought.

22          MS. DEININGER:  Previously --

23          THE COURT:  I'm confused about why they are objecting

24    to this addition because this is telling them that the

25    testimony that you objected to can be considered only for

NB7VCOS2

1   its -- not for its truth.  So I'm confused.

2          MR. GAINOR:  If I could have a moment, your Honor.

3          THE COURT:  Yes.

4          (Counsel conferred)

5          MS. DONNER:  Your Honor, I'm going to have one more

6   point to raise before we finish.

7          MR. WESTFAL:  Your Honor, the defense is fine with the

8   instruction as proposed by the government with our proposed

9   language on the absence of a false statement charge in this

10  case.  So "I further instruct you that neither defendant is

11  charged with making a false statement to the FBI."

12         MR. SWETT:  Your Honor, we don't object to that in

13  principle.  I think if there are arguments to the jury that

14  "lack of charges" in this case means that they didn't make

15  false statements or they didn't lie to the bank or they didn't

16  lie on their taxes, I think we would have to revisit that.  But

17  in the abstract, simply noting that they haven't been charged

18  with certain crimes is not an issue for us.

19         THE COURT:  Okay.  We'll add that.

20         MR. MUKASEY:  Judge, I'm unfamiliar with this notion

21  of changing the charge after summations and waiting till

22  summations to decide how we're going to structure the charge.

23         The government asked questions yesterday about

24  mortgage fraud, bank fraud, false statements.  They spent the

25  whole day yesterday talking about mortgage fraud and bank

NB7VCOS2

1  statements and tax issues.  I don't think we open up any can of

2  worms by saying, "I want to remind you what the charges are in

3  this case."

4          THE COURT:  I'm fine with it.  I get it.

5          Gift letter.  We'll have to fix the language.

6          We've said "Costanzo" consistently, so we're not going

7  to say "Special Agent Costanzo" here.

8          MR. WESTFAL:  That's fine, your Honor.

9          THE COURT:  But otherwise, you're okay with it?

10          MS. DEININGER:  I'm sorry, I do have one objection to

11  it.  In the second-to-last sentence, it says:  You may not

12  consider the gift letter as a substitute for evidence that he

13  committed the crimes charged in the indictment.  It is,

14  however, evidence of the charged crimes in the indictment.

15          THE COURT:  I agree.

16          MS. DEININGER:  It cannot be the sole evidence.

17          THE COURT:  I think the first two sentences are

18  adequate.  Or is there some other language you could propose,

19  you may not consider it as proof -- well --

20          MS. DEININGER:  I think we think the two --

21          THE COURT:  Yeah, so bad character is fine; propensity

22  is fine.

23          MS. DEININGER:  I think we would just end the sentence

24  there, after "has a propensity to commit a crime."

25          THE COURT:  Right.  However, you may consider it in

NB7VCOS2

1    evaluating state of mind or intent or would you leave that out?

2              MS. DEININGER:  We would include that; we think that's

3    balancing language for what it can be considered for.

4              THE COURT:  Okay.  All right.  Fair enough.

5              And then tax evidence.  There's a whole primer here on

6    tax law.  What does the government think about that?

7              MR. SWETT:  We don't think much of it, your Honor.  We

8    think it should stay out.

9              THE COURT:  Do you want to make your pitch?

10             MR. WESTFAL:  Sure.

11             I think just to sort of reiterate Mr. Mukasey's point,

12   the tax evidence, as far as we understand it, shows that our

13   client's tax returns for 2019 were fully accurate.  There were

14   no errors in there.

15             The jury has seen a lot of evidence, heard a lot of

16   testimony about the tax returns of individuals who are not

17   defendants in this case.  And those documents and that

18   testimony is going to be, as far as we understand it, used

19   against our client.

20             We think it's essential — absolutely essential — that

21   this jury understand when someone does or does not have an

22   obligation to disclose income, gross income or not, in order to

23   understand this — at least as our understanding of the

24   government's case — critical evidence for their case.

25             I don't think it's unreasonable to provide what we

NB7VCOS2

think are simple accurate instructions consistent with the

Internal Revenue Code as to when a taxpayer is obligated to

disclose something on their tax returns, given the amount of

evidence, recent evidence, that was presented in this case.

MS. DEININGER:  Obviously we very much dispute the

concept that -- the idea that Costanzo's tax returns were

correct.  But I think the language on what is and is not

taxable income is just unnecessary.  There was a witness who

testified to this.  If they wanted to cross-examine on those

points, they could have done it then.

If this is going to stay in at all, we think something

along the lines of the first paragraph that basically parallels

or to doing on the gift letter could be appropriate; but again,

we would make the same point that this has -- at the end of it,

the paragraph has a sentence about how it cannot be substitute

for evidence he committed the crimes charged in the indictment,

and that that is again inappropriate.  If there were false

statements in the tax returns, that is evidence that he

committed the crimes charged.  It goes to state of mind.

THE COURT:  I think something like the first paragraph

without the "or" as a substitute language at the end is fair.

And I do think it's fair to tell the jury that there are no tax

charges in this case.

However, there was clear evidence that the recipient

of a gift doesn't have to pay taxes; that it's the gifter who

NB7VCOS2

1   pays taxes.  You can quote the transcript for that.

2           MR. WESTFAL:  We could, your Honor.

3           But it's also a legal instruction.  And so yes,

4   there's testimony from a fact witness; but that's an

5   instruction on the law that we think should appropriately come

6   from the Court.

7           And with respect to the evidence in the first

8   paragraph, it's not -- we're not just talking about Special

9   Agent Costanzo's tax returns; we're also talking about tax

10  returns and tax documents of uncharged individuals.  And so in

11  the absence of any tax-related conspiracy, we think it's

12  accurate that that evidence cannot be used as a substitute for

13  evidence that he committed the charged crimes.  There's no

14  tax-related conspiracy.  So that limiting instruction we

15  believe is necessary given the evidence of tax returns and

16  tax-related documents of other individuals.

17          MS. DEININGER:  We believe that evidence is relevant

18  to the state of mind of people that we've demonstrated to be

19  co-conspirators, namely John Costanzo, Sr. and Edwin Pagan.

20  And so it is relevant as to state of mind and relevant to

21  whether the charged conspiracy existed.

22          MR. WESTFAL:  The charged conspiracy is a bribery and

23  honest services fraud conspiracy.  There is no tax-related

24  conspiracy.

25          THE COURT:  But evidence that you -- evidence of

NB7VCOS2

1    hiding something, consciousness of guilt, etc., is evidence of

2    the honest services conspiracy; it's evidence of the scheme.  I

3    mean, why is it not evidence that he committed the crime?

4            MR. WESTFAL:  That Special Agent Costanzo committed

5    the crime because of tax-related issues or potential

6    tax-related issues of Mr. Pagan?

7            MS. DEININGER:  That's not our theory of why -- of why

8    he committed the crime.  It's that -- it's that multiple

9    individuals here appeared to have been hiding money transfers

10   from the IRS because it was illegal bribery payments and they

11   didn't want those disclosed.

12           I think one issue that raises here with the

13   defendant's proposed instruction is that they've proposed to

14   instruct you may consider whether this tax evidence is relevant

15   to Special Agent Costanzo's state of mind.  And we're actually

16   submitting that evidence for a broader purpose, that is, for

17   the state of mind or intent of multiple of the co-conspirators

18   in this conspiracy.

19           THE COURT:  How would you change it.

20           MS. DEININGER:  I would just strike Special Agent

21   Costanzo's and just say it's relevant to state of mind or

22   intent.

23           MR. WESTFAL:  Just to make our objection clear, I

24   believe Ms. Deininger is describing evidence with respect to

25   the state of mind of Mr. Pagan.  And again, there is no

NB7VCOS2

1     tax-related conspiracy here.  And the evidence is that Special

2     Agent Costanzo had no involvement, no awareness of any tax

3     filings, tax obligations or tax disclosures by Special Agent

4     Costanzo.  So to pin the state of mind of Mr. Pagan on Special

5     Agent Costanzo, where there's not a tax-related conspiracy, we

6     think would be inconsistent with the law which is, again, the

7     genesis of this proposed instruction.

8               THE COURT:  So you want to keep in "or as a substitute

9     for evidence that he committed the crimes charged in the

10    indictment"?

11              MS. DEININGER:  Do we?  No.

12              THE COURT:  No, the defendant.

13              MR. WESTFAL:  Yes, we do.

14              MS. DEININGER:  We think that would be absolutely

15    inappropriate.  Again, evidence of Pagan's state of mind and

16    evidence of John Costanzo, Sr.'s state of mind, their evidence

17    of consciousness of guilt is evidence as to whether the two

18    charged conspiracies — the honest services wire fraud

19    conspiracy and the bribery conspiracy — existed; whether they

20    were all acting in agreement together to engage in these

21    payments and to conceal their conduct.

22              THE COURT:  Okay.  What about the next paragraph:

23    "Taxpayers are required to report all sources of taxable

24    income."

25              MS. DEININGER:  I mean, I think, again, we think this

NB7VCOS2

 1    is unnecessary.  There was a witness to testify to this.  We

 2    don't have a tax expert here to confirm.

 3            If your Honor is inclined to leave it in, then we

 4    think it should -- it should include — which Special Agent

 5    Catanzaro testified to — that individuals who give gifts of

 6    more than $15,000 are required to report that on their tax

 7    return.

 8            MR. WESTFAL:  That would not be required on their tax

 9    return, that would be required on form 709, just to be clear.

10            And so this is part of the problem we were trying to

11    avoid with our objection, but the evidence is in.  I don't

12    think any of our instructions are inconsistent with the law or

13    inconsistent with the testimony of IRS Agent Catanzaro.

14            THE COURT:  Okay.  I think I can include it.

15            MR. ANDREWS:  Judge, can we just revisit that point

16    though about including some language then about the IRS

17    requiring that gifts be disclosed?

18            I mean, this is cutting this a little bit too finally

19    to say, Well, we're just talking about tax returns in this

20    instance.  There was very clear testimony on this point.  And

21    the point here is establishing state of mind, that's what this

22    entire paragraph is about.

23            If they are going to say, Well, the IRS doesn't

24    require people who are recipients of gifts to disclose this,

25    our argument is, Well, then, the giver is supposed to disclose

NB7VCOS2

1    it, and it wasn't given.

2            And Mr. Pagan's state of mind in not disclosing it is

3    of course relevant to everybody else in the conspiracy because

4    it goes to whether it was actually a gift.  Mr. Pagan even

5    testified it wasn't a gift; so there's not really much of a

6    dispute on this one.

7            MR. WESTFAL:  Not sure why there would be an

8    instruction on the giver of a gift if the evidence as you

9    understand it is that it was not a gift from Mr. Pagan.

10            MS. DEININGER:  Mr. Pagan also did say that the

11   $20,000 repayment to Rueda was a gift, and that would also

12   would have had to have been declared.

13            MR. WESTFAL:  That was in 2020, I believe.

14            MR. ANDREWS:  We also submitted a form that Pagan did

15   not report any gifts in 2020.

16            THE COURT:  If you want it in, I would have to include

17   the thing about giving a gift.  Do you still want it in?

18            MR. WESTFAL:  We do want it in, your Honor.

19            THE COURT:  Okay.  So we'll add:  An individual who

20   gives a gift, however, is required to report -- who gives a

21   gift of over $15,000 in a given year to a single individual is

22   required to report the gift to the IRS.

23            MR. ANDREWS:  I think that's an accurate statement of

24   law, your Honor.

25            THE COURT:  All right.

NB7VCOS2

1          MS. DONNER:  Your Honor, there was one more point.

2          THE COURT:  Yes.

3          MS. DONNER:  And that is that your Honor noted this

4    morning that this is not a promises case, it's a payment case;

5    yet the substantive counts regarding Mr. Recio continue to

6    include the language that we objected to at the last charge

7    conference regarding Mr. Recio's offer or promise.  And we

8    object to the language in the substantive count and otherwise

9    regarding offer or promise.  And it should say Mr. Recio gave

10   money or something else of value.  And I'm looking specifically

11   at the top of page 29, which is Count Three, payment of a

12   bribe.

13         THE COURT:  Which paragraph?

14         MS. DONNER:  It's the very -- well, it would include

15   the title, which is -- so that would be on page 28; the bottom

16   of the page, J, payment of a bribe; the first element, offering

17   or giving.  So the offering would need to be taken out.

18         Then at the top of page 29, "offered, promised and/or"

19   would be taken out.  And it's "Recio gave money or something

20   else of value."  And again --

21         THE COURT:  You want to just say giving -- you want to

22   take out all the stuff about offering?

23         MS. DONNER:  Offering or promising.

24         THE COURT:  Does the government agree?

25         MS. DEININGER:  I think in this instance it's

NB7VCOS2

1    different circumstances.  "Offering or promising" are straight

2    from the statute, right.  That is the statutory language:

3    Offering, promising or giving the money or something else of

4    value to Costanzo.  And we think -- we just think it's

5    appropriate to leave in here.

6              THE COURT:  And it is clearly within the statute.

7              MS. DONNER:  Yes.  But with respect to Special Agent

8    Costanzo, you took out those verbs that weren't relevant to the

9    case; yet you're not taking out these verbs that may be in the

10   statute, but they are not relevant to this case.

11             THE COURT:  That's because the government agreed that

12   there was no part of their theory of the case that involved

13   Mr. Costanzo demanding or soliciting or whatever the other

14   language was.

15             MS. DONNER:  Well, I think the government just

16   acknowledged with respect to Mr. Recio the same.  And they are

17   just saying it's in the statute and, therefore, it should be in

18   the instruction.

19             THE COURT:  Is it part of the government's theory that

20   he not only gave, but offered?

21             MR. SWETT:  Your Honor, I think the terms "promise,

22   offer, and agree" are sort of so closely related that this is a

23   different situation from seek and demand, which really implies

24   the unilateral action by the agent.  But there's nothing

25   inconsistent with offering, promising, and then following

NB7VCOS2

1    through on that.  It's in the statute.

2              We're in hour six of the charge conference, and they

3    are bringing it up for the first time.  I don't think that we

4    should be tweaking --

5              THE COURT:  Well, I think I agree.  This is a case

6    where it's so circumstantial in terms of the payments were

7    roundabout; there's no direct evidence of an offer or Mr. Recio

8    actually giving anything, as far as I know.  But it's all going

9    to be the jury making inferences.  And they can make an

10   inference that he gave; they can also make an inference that he

11   offered.  So I think it's consistent with -- certainly as a

12   legal matter, it's within the statute.  So I think I'm going to

13   keep that.

14             MS. DONNER:  Your Honor, I just point out that this

15   was discussed at the -- in-depth at the charge conference, and

16   we did raise it at that point.

17             THE COURT:  Okay.

18             All right.  So we're almost through the draft charge

19   and we're about to have closings.

20             Oh, and then we have the theory of defense

21   instruction, which defense, I guess, proposes to put in at the

22   very end of the substantive charges.  Does the government have

23   any issues with their proposal other than making any references

24   consistent with how we've done before?

25             MS. DEININGER:  I don't think we think a theory of the

NB7VCOS2

1   defense instruction should be included when there's, first of

2   all, not a countervailing theory -- government's theory

3   instruction.  And then also there's not even a theory in terms

4   of for the Recio team; it's very unbalanced and I think

5   that's --

6           THE COURT:  I think they proposed one.  Didn't you,

7   Ms. Donner?

8           MS. DONNER:  Yes, in the filing.

9           MR. MUKASEY:  The indictment is explained in detail in

10  the instructions and was explained earlier in the pretrial

11  instructions.  That's the government's theory.  So it is quite

12  balanced.

13          THE COURT:  Actually, no, I didn't get a theory of the

14  defense instruction from Mr. Recio.

15          MS. DEININGER:  I don't think we received one.

16          MS. DONNER:  That's part of the filing, docket 169,

17  the first, titled "Proposed Theory of Defense."  And the first

18  entry is "supplement to good faith" instruction, which is

19  similar to what Special Agent Costanzo's counsel proposed.

20          Your Honor already has referred to good faith and so I

21  added to what you already had on good faith.

22          THE COURT:  Well, if you want a theory of the defense

23  instruction, it should go alongside and be worded consistently

24  with Mr. Costanzo's.  I'm not going to tack it on to the end of

25  good faith and make it look like you don't have a theory of

NB7VCOS2

1    defense when the other defendant does.

2              MS. DONNER:  Agreed with that, your Honor.

3              THE COURT:  I mean, the last sentence -- two sentences

4    seem to be a theory of defense.

5              "Mr. Recio denies participating in an illegal *quid pro*

6    *quo* bribery," etc.  Do you want me to add that as a theory of

7    defense after Mr. Costanzo's?

8              MS. DONNER:  I would ask that you add everything that

9    we included there, so that paragraph.

10             THE COURT:  Well, the first two sentences are not a

11   theory of defense, they are defining good faith.

12             MR. SWETT:  Your Honor, what if you just read the

13   summary of the case that was -- that the Court read during the

14   preliminary instructions.  That includes a brief explanation of

15   the government's theory and it includes the defendants'

16   position with respect to the charges.

17             MR. MUKASEY:  We're entitled to a theory-of-the-case

18   instruction.  I don't know what the government's objection is.

19   And I think Recio's entitled to one, too.

20             The government's theory of the case is going to be

21   read in great detail.  It's the indictment; and it's five

22   counts that are going to be read in, you know, great detail.

23   We're entitled to a theory of defense.

24             THE COURT:  I think it's fine to give the defendants a

25   theory of defense instruction.  I'll include your theory of

NB7VCOS2

1    defense instruction.

2              And then for Mr. Recio, I just don't think we can

3    start the theory of defense with "This is the definition of

4    good faith."  It doesn't -- I mean, if you want me to, I guess

5    I could, but that's not -- it doesn't sound like a theory of

6    defense instruction.

7              MS. DONNER:  I would start at:  Mr. Recio denies

8    participating in an illegal *quid pro quo* bribery or that he

9    ever entered into a criminal conspiracy.  He denies that he

10   gave, offered, or promised anything of value.

11             THE COURT:  Okay.  Okay.  We can add that.

12             And I think that takes us to the end of the

13   instructions.  My law clerk has some work to do.

14             MR. GAINOR:  Yes, your Honor.

15             If we're past the jury instructions, we know that we

16   have not formally rested yet; we have to do that.  And then we

17   know that we just have to reiterate Rule 29 motions.

18             But we have a motion for mistrial, and we need to put

19   that on the record.  So I don't know what the Court's pleasure

20   is as to when we want to do that.  Should we do it now when the

21   jury is out.  It may be more efficient in advance of resting

22   and then taking a break and going to sidebar, but we wanted to

23   alert the Court to that.

24             THE COURT:  Sure.  I think if you're prepared to do

25   it, you can do that now.

NB7VCOS2

1            MR. GAINOR:  And then, your Honor, one other matter

2    before we do that in terms of housekeeping.

3            The government is going to be giving a closing that

4    lasts -- excuse me, a closing that lasts, the first part, an

5    hour and a half.  And I presume and I understand that

6    Mr. Mukasey is going to go for about an hour.  That's going to

7    take us up to our normal 1 o'clock time or beyond.

8            Can I plan on giving my closing after lunch?

9            THE COURT:  Any objection to that?  That seems fine.

10           MR. SWETT:  That's fine, so long as we're not ahead of

11   schedule.  I mean, if it's 12 o'clock, we should go until 1.

12           THE COURT:  Who's going to do your closing?

13           MS. DEININGER:  I am, your Honor.

14           THE COURT:  Ms. Deininger.

15           MS. DEININGER:  Yes.

16           THE COURT:  And who's going to do the rebuttal?

17           MR. SWETT:  I am.

18           THE COURT:  Mr. Swett.

19           All right.  And Mr. Mukasey is going to take his full

20   hour, I assume.

21           MR. MUKASEY:  I'm not so sure about that, honestly.

22   I'm trying to stay, you know, lean, tight, straight to the

23   point.

24           THE COURT:  I think you can count on going after

25   lunch.

NB7VCOS2

1          MR. GAINOR:  Okay, your Honor.

2          THE COURT:  Just given where we are on timing.

3          All right.  So you all made a Rule 29 motion at the

4    close of the government's case.  I reserved on it.  I think

5    you've made your record.  If there's anything you'd like to

6    add, you may.  But then also on the mistrial motion, which

7    you've mentioned, if you want to add anything on that for the

8    record, you can do that.

9          MR. GAINOR:  And your Honor, just briefly, with regard

10   to the Rule 29, we'd reiterate all previously made motions,

11   objections, and motions for mistrial made prior to the case and

12   made at the initial close of the evidence of the government's

13   case.

14         And then I would defer to Ms. Donner with regard to

15   the motion for mistrial that we'd like to make now that's new.

16         THE COURT:  Ms. Donner?

17         MS. DONNER:  Thank you, your Honor.

18         Mr. Recio moves for a mistrial based on the Court's

19   order granting the government's motion to disqualify Mr.

20   Recio's original trial counsel, Phil Reizenstein.  And that was

21   docket entry 39 regarding your order, and then docket entry 45

22   regarding the denial of Mr. Reizenstein's motion for a

23   rehearing.

24         The Court's orders are a denial of Mr. Recio's right

25   to counsel.  It is now apparent that the government's purported

NB7VCOS2

1    reason for calling Mr. Reizenstein was improper and

2    unjustified.  The government did not call Mr. Reizenstein

3    either in its case-in-chief or in rebuttal; yet the government

4    argued in connection with its motion for disqualification that

5    Mr. Reizenstein's testimony was necessary, and that it was

6    necessary to call every member of Greenspoon Marder's defense

7    team, which was the defense team regarding the *Grobman* case,

8    and Mr. Reizenstein to show that none of them knew that

9    Mr. Recio was working with Edwin Pagan.

10         Mr. Reizenstein agreed to stipulate that he would not

11   have known that Mr. Recio hired Edwin Pagan, because he did not

12   hire Mr. Recio, Greenspoon Marder did, and did not review

13   Mr. Recio's Greenspoon Marder bills.  In any event, such fact

14   was clearly not relevant, as the government made no effort to

15   establish these facts it argued was necessary to its case.

16         Your Honor granted the government's motion to

17   disqualify premised on the likelihood that Mr. Reizenstein

18   would be a witness in this case.  He was not.  Mr. Recio was

19   denied his right to counsel.

20         THE COURT:  Would you like to respond briefly?

21         MR. SWETT:  Very briefly, your Honor.

22         I think the record of the government's pretrial

23   preparations and preparations throughout the course of trial

24   make it abundantly clear that Mr. Reizenstein was always

25   considered a potential witness in this case.  He was disclosed

NB7VCOS2

1        on our witness list, we subpoenaed him, we met with him, we

2        produced 3500 related to him.  We did make a decision after the

3        presentation of evidence that his testimony was not necessary.

4        But even as late as last night, we were contemplating a

5        rebuttal case related to the *Johnny Grobman* matters.  And we

6        still would have been left in a situation where you had a trial

7        attorney who had facts -- who knew facts about matters that

8        were in dispute in this case.

9                This was no ploy on the part of the government.  The

10       government had considered calling Mr. Reizenstein from the

11       get-go and brought him to New York, met with him, produced 3500

12       related to him.  The fact that the evidence came in in such a

13       way that the government felt it was not necessary doesn't

14       change the arguments that the government made initially and the

15       Court's reasons for not disqualifying him, but ruling that he

16       could not serve as trial counsel.

17               THE COURT:  Right.  Okay.

18               For the reasons I gave at the time, I believe it was

19       proper, the decision I made obviously.  I don't think that the

20       government acted in any way that was underhanded or

21       inappropriate.  I think the *Johnny Grobman* matter was

22       appropriate because it's one of the relatively small number of

23       invoices in the case, so my ruling on that stands.  And the

24       motion for a mistrial is denied.  But your arguments are noted

25       for the record.

NB7VCOS2

| 1 | And anything else before we bring in the jury? |
|---|---|

2      MR. SWETT:  Your Honor, I think if -- if both

3  defendants plan on resting, it would be appropriate to allocute

4  the defendants on their right to testify.

5      THE COURT:  Yes.

6      Any objection, Mr. Mukasey?

7      MR. MUKASEY:  No.  I would just ask for a three-minute

8  bathroom break before we bring in the jury.

9      MR. GAINOR:  As would I.

10      MR. MUKASEY:  You can go ahead and allocute.

11      THE COURT:  Okay.

12      All right.  I just want to explain, every defendant in

13  a criminal case has an absolute right not to testify; and no

14  inference or suggestion of guilt can be drawn from the fact

15  that a defendant does not testify in a criminal case, which is

16  something I'll explain to the jury.

17      But a defendant also has the right to testify if the

18  defendant chooses to testify.  It's a personal decision you

19  make.  Ultimately, it's your own decision, but in consultation

20  with your counsel.

21      So I just want to ask you, Mr. Costanzo, if you had a

22  chance to discuss that with your lawyer, and do you, in fact,

23  choose not to testify?

24      DEFENDANT COSTANZO:  I discussed it with my attorney

25  and I choose not to testify.

NB7VCOS2

1          THE COURT:  Thank you.

2          And Mr. Recio, same question for you:  Have you

3    discussed that issue with your attorney and chosen not to

4    testify?

5          DEFENDANT RECIO:  Yes, your Honor.  I discussed that

6    with my attorneys and I'm not going to be testifying.

7          THE COURT:  Okay.  Thank you.

8          I find that the defendants have voluntarily and

9    knowingly chosen not to testify after consulting with counsel.

10          We'll take a five-minute break and then we'll have the

11    first closing.

12          (Recess)

13          THE COURT:  You may be seated.

14          So when we bring the jury back, the government rested

15    yesterday, defense hasn't rested.  I'll turn to Mr. Mukasey and

16    Mr. Gainor, and I anticipate each defense will rest, and then

17    we'll go to closings.

18          Anything else?

19          MR. SWETT:  No, your Honor.

20          MR. MUKASEY:  No, your Honor.

21          THE COURT:  And Ms. Deininger, you're first, right?

22          MS. DEININGER:  That's right.

23          THE COURT:  Okay.  All right.

24          Can we bring in the jury.

25          (Jury present)

NB7VCOS2

1                    THE COURT:  Good morning, ladies and gentlemen.

2                    THE JURY:  Good morning.

3                    THE COURT:  Welcome back.

4                    And Mr. Mukasey, anything further?

5                    MR. MUKASEY:  Defendant Costanzo rests, Judge.

6                    THE COURT:  Thank you.

7                    And Mr. Gainor?

8                    MR. GAINOR:  Your Honor, Defendant Recio rests as

9        well.

10                   THE COURT:  Thank you.

11                   Anything further from the government?

12                   MR. SWETT:  No, your Honor.

13                   THE COURT:  All right.  Ladies and gentlemen of the

14       jury, you've heard all the evidence in the case.  As I

15       instructed you at the beginning, the lawyers in the case for

16       each party have a chance to give what's called summations or

17       closing arguments, and that's what's going to happen now:  The

18       government, then each of the defendants, and then rebuttal for

19       the government.

20                   I just want to remind you that what the lawyers say is

21       not evidence.  As I explained, it's the testimony that you

22       heard and the documents that have been received into evidence

23       and the stipulations of the parties, that you will have those

24       with you in the jury room when you deliberate.  So if the

25       lawyers say anything that's inconsistent with your recollection

NB7VCOS2                    Summation - Ms. Deininger

1    or understanding of the evidence, it's your recollection and

2    understanding that will control.

3           Having said that, we are now ready for the closing

4    argument of the government, Ms. Deininger.

5           MS. DEININGER:  Thank you, your Honor.

6           (Audio played)

7           MS. DEININGER:  That — that — is John Costanzo, a DEA

8    supervisor and special agent giving confidential information

9    about an indictment to Manuel Recio, a private investigator who

10   is not part of law enforcement.  Sensitive information about an

11   indictment scheduled for July 25th, just a few weeks after the

12   call.  The indictment of a top DEA target, Alex Saab.

13          And why would Costanzo, a highly decorated and

14   respected DEA agent, do such a thing?  Because he and Recio

15   wanted to make money.

16          (Audio played)

17          MS. DEININGER:  Because they're scheming to make

18   money, money, money, for all of them.  That's Luis Guerra, John

19   Costanzo, and Manny Recio.  So they are all on the same page.

20   That is what bribery sounds like.

21          And how did John Costanzo and Manuel Recio react to

22   rumors getting out about Costanzo having a corrupt relationship

23   with defense lawyer David Macey?

24          (Audio played)

25          MS. DEININGER:  That — that — is what it sounds like

NB7VCOS2                    Summation - Ms. Deininger

1   when two people involved in a bribery scheme are worried about

2   being caught; when they start taking about extreme steps,

3   putting problems on people to hide their scheme.  Because what

4   they were doing was wrong and they knew it.

5           And that is why we're here today.  Because John

6   Costanzo and Manuel Recio engaged in a corrupt scheme to have

7   Costanzo abuse his position at the DEA, a corrupt scheme in

8   which Costanzo secretly slipped Recio confidential information

9   to help Recio's private investigation business and allow them

10  both to line their own pockets.  This for that — or what is

11  sometimes called a *quid pro quo*.

12          And it was caught on tape when they were talking and

13  they didn't know anyone else was listening.  Tapes that tell

14  you everything you need to know; tapes where they talk about

15  the confidential information Costanzo was providing, the money

16  they were both getting, and how they had to keep it secret.

17  Those tapes alone are enough to tell you that John Costanzo and

18  Manuel Recio are both guilty.

19          You don't have to take my word for that.  You heard it

20  from Michael Nadler, a defense lawyer and former prosecutor:

21  "Q.  Now, when a CS, a confidential source --

22  "A.  Yes.

23  "Q.  -- has recordings of a target, does that address

24  credibility issues?

25  "A.  It's almost incontrovertible.

1  "Q.  Just say it one more time.

2  "A.  In the sense of a prosecution, when they have recordings,

3  it's incontrovertible."

4           You heard it.  When there are tapes, when there are

5  recordings, it is incontrovertible.  And you heard those.

6           Of course, that is not all the evidence and that's why

7  I'm here right now.

8           So let's take a step back for a minute.

9           First of all, good morning, ladies and gentlemen.

10  This is the government's summation.  It's our opportunity to

11  walk through the evidence you've seen and heard over the last

12  two weeks.  I'm not going to try and mention it all.  You've

13  patiently sat through the witnesses and heard their testimony,

14  you've seen the exhibits, you've listened to the recordings.

15  You've been very attentive, and thank you for that.

16           But what I hope to do is show you how all of that

17  evidence fits together; how it's all consistent and how it

18  overwhelmingly proves the defendants' guilt beyond a reasonable

19  doubt.  And as I go through, I'll try and tell you the exhibit

20  numbers so that you can review those for yourself during your

21  deliberations if you want.

22           Before we dive into the evidence, let me spend just

23  one minute making clear what is at the heart of the charges in

24  this case and what the government has to prove.

25           The issue here really, the only issue here is a simple

NB7VCOS2                    Summation - Ms. Deininger

1    question:  Was there an illegal *quid pro quo*?  Did Costanzo and

2    Recio agree that Costanzo would accept payments intending, at

3    least in part, for Costanzo to violate his official duties as a

4    DEA agent?  And what that really comes down to is this:  Did

5    Recio pay Costanzo in exchange for Costanzo secretly giving him

6    DEA confidential information to benefit Recio's private

7    investigation business?  That's the question you have to

8    answer.  And as we talk about the evidence, the answer to that

9    question will be clear, clear as day.

10            Of course, Costanzo and Recio knew Costanzo would be

11   violating his official duties when he secretly gave

12   confidential information to Recio.  Of course, Costanzo was

13   motivated to do so, at least in part, by the money.  Their own

14   words and their extensive efforts to conceal their activities

15   tell you that.  That's the heart of this case, and the evidence

16   of it is devastating.

17            So let's talk about the evidence.  And let's start by

18   talking about the *quo*, how Costanzo violated his official

19   duties, which you saw in writing in the DEA standards of

20   conduct, by passing confidential information to Recio, David

21   Macey, and Luis Guerra.  You heard about at least four

22   different types of confidential information that Costanzo

23   agreed to share in exchange for the money, and I'm going to

24   walk through those now.

25            Okay.  No. 1.  NADDIS information.

NB7VCOS2                    Summation - Ms. Deininger

1          Over and over again, Costanzo looked up confidential

2     information about investigations in the DEA's NADDIS database

3     at Recio's request so that he could pass that information back

4     to Recio.  You'll remember that back at the beginning of this

5     trial, DEA Inspector Stephen Miller told you about NADDIS, how

6     it contains information and reports from DEA investigations,

7     including information about criminal targets and from

8     confidential sources, how the information in NADDIS is

9     confidential.  You saw Government Exhibit 118, the screen that

10    any DEA employee accessing NADDIS has to click through an

11    entire page of security warnings, making it crystal clear that

12    this information is sensitive, it's protected, it's

13    confidential; that it's law enforcement-sensitive.

14         Inspector Miller and Special Agent Escobar told you

15    that.  What does law enforcement-sensitive mean?  That only law

16    enforcement personnel or, you as prosecutors that we are

17    dealing with, that we are the only ones that can see that

18    information; that you need to have certain clearances.

19         You heard from Inspector Miller and Susanna Maj how

20    Costanzo ran NADDIS searches at Recio's request dozens of

21    times; how he gave Recio confidential information from the

22    NADDIS database; how this arrangement with Recio started up

23    three — three — days after Recio's retirement from the DEA on

24    November 10th, 2018.

25         And you can see on the screen the chart summarizing

1   all of those requests and all of those NADDIS searches.  That's

2   Government Exhibit 704B-2.  Sorry for the annoying numbers.

3   This chart starts November 13th, 2018, just days after Recio's

4   retirement, and it goes all the way to November 11, 2019, just

5   before Costanzo and Recio were interviewed by law enforcement.

6           You also saw some of the actual information that

7   Costanzo passed back to Recio via text message from his NADDIS

8   searches; little nuggets of confidential information that would

9   be helpful to Recio and to Macey and to Guerra when they tried

10  to recruit these criminal -- their criminal targets as clients.

11          And we'll look at a few examples now.

12          This, this is May 2019, Government Exhibit 347.  Recio

13  asked John to see if you could help me find any of these guys.

14  Because you looked before and you said the names were too

15  vague; that David, who you now know is David Macey, is placing

16  a lot of pressure on me.  And he sends Costanzo five names.

17          Costanzo searches and starts sending back information.

18  For example, for Palacio Gomez, he ran loads to Costa Rica.

19  That's information about Palacio Gomez's criminal narcotics

20  transportation activities, information that the DEA knows from

21  its investigations and from confidential sources.

22          Let's look at another example.  This is Government

23  Exhibit 344.  In May 2019, Recio asked Costanzo about Alirio

24  Trujillo and Carlos Salazar Benavides.

25          He asked:  Is there anything in the system about the

NB7VCOS2                    Summation - Ms. Deininger

1    cases?

2          And what did Costanzo say?  "Both Colombian move a lot

3    of weight."

4          A nugget of information that would be very helpful in

5    trying to recruit them as clients.

6          And you know that Costanzo isn't only sharing

7    information over text message.  That's just a small fraction of

8    it.  He's also telling Recio about what's in NADDIS in their

9    phone calls.  And how do you know that?  Partly because you saw

10   them plan to do that.

11          Let's look at Government Exhibit 339.  Recio asked

12   Costanzo:  Call me and give me a summary on his NADDIS, about

13   Guillermo Fuentes, followed by at least three — three — calls

14   with Costanzo that same day, each lasting several minutes.

15          You also know they talked about these NADDIS searches

16   because you saw Ms. Maj's analysis, and that's what's on the

17   screen in front of you.  Again, this is back to Government

18   Exhibit 704B-2.  And Ms. Maj found that time and time again,

19   Recio and Costanzo spoke on the phone shortly after Costanzo

20   ran the searches, often within minutes, sometimes on calls that

21   were going on while Costanzo was running the NADDIS search.

22          And let me be clear, there is no innocent explanation

23   for this.  That is confidential, sensitive information that

24   Costanzo is sharing with someone outside of law enforcement, in

25   violation of clear warnings for cases he is not even involved

NB7VCOS2                    Summation – Ms. Deininger

1    in.

2          Let's now talk about the second type of confidential

3    information Costanzo agreed to share, information about

4    upcoming indictments.  And let's go back to the first recorded

5    call we listened to a little bit of today.  That was part of

6    Government Exhibit 202A.

7          Recio:  Right.  Right.  So John, who got indicted this

8    past week or two?

9          Costanzo:  We did Motta Dominguez and Lugo.  That

10   should excite a little bit.

11         Gutierrez:  But the next indictment, which is now

12   scheduled for the 25th, will really -- so I don't know if you

13   want to make your move now or wait.

14         Recio:  Yeah, I think I'll make it now.

15         Michael Nadler gave you the background for this call.

16   As he told you, he was the prosecutor for a large

17   investigation, Operation Honey Badger, that resulted in

18   multiple indictments, including the indictments of Motta

19   Dominguez and Lugo Gomez, who you heard mentioned in this call.

20         Nadler told you that he and -- that he and the DEA

21   case agent had tried to meet with another target, Alex Saab, to

22   talk about cooperation, about how they'd ultimately decided to

23   indict Saab instead after Saab refused to cooperate.

24         At this point, Nadler explained to you the process was

25   secret.  And here's exactly what he said:

1  "Q.  Did you tell Alex Saab's attorney the specific day you

2  were going to the grand jury to seek an indictment against Alex

3  Saab?

4  "A.  No.

5  "Q.  Why not?

6  "A.  Grand juries are, by law, secret.  We are, by law,

7  prohibited from talking about the content and the evidence

8  presented.  Even after a true bill is brought, we are not

9  allowed to talk about anything, 'we' being the prosecution

10  team, anything that is not already made public.

11      "There are also investigative issues why I would not

12  preview a specific date.  It raises questions that if somebody

13  knows and they are -- in this case, especially Alex Saab, they

14  are not complying with their original deals, destruction of

15  evidence, potential witness tampering.  And I think we were

16  still hoping we could catch Alex Saab because he was traveling.

17  So you preview that you are going to file charges, that would

18  potentially advise them that they should stay home and not

19  travel, which is eventually how we did get Alex Saab."

20      So that's a bit of a mouthful, but it's clear no one

21  was supposed to know about the date of the indictment that

22  would be presented to the grand jury because grand juries are,

23  by law, secret.  That's what he told you.  And as he explained,

24  because a criminal target knows they are about to be indicted,

25  there can be serious consequences:  Destruction of evidence,

NB7VCOS2                    Summation - Ms. Deininger

1   potential witness tampering, and targets that might stay home

2   and not travel instead of going to a country where the U.S.

3   would be able to arrest them.

4           For those reasons, as Michael Nadler told you,

5   Costanzo had no authority to tell Recio about the date Saab

6   would be indicted.

7   "Q.  And to your knowledge, did John Costanzo have any

8   authority to disclose to Manuel Recio the specific date that

9   you were going to the grand jury to seek an indictment against

10  Alex Saab?

11  "A.  He did not."

12          Costanzo ignored all those reasons for secrecy.  He

13  ignored his duty not to disclose nonpublic information.  And he

14  told Recio exactly when Saab would be indicted:  July 25th,

15  2019.

16          And why was this helpful to Recio?  You should ask

17  that.  Because then, he and Macey and Guerra could make their

18  move.  You heard him talking about making his move in a call a

19  minute ago.  They can make their move to try and get the

20  criminal targets signed as clients before other lawyers knew

21  about the case.  Because this is all about the money; all about

22  the cut that Recio and Costanzo would get.

23          The evidence also showed you that telling Recio about

24  the Saab indictment wasn't some spur-of-the-moment thing.  This

25  wasn't some accidental slip of the tongue by Costanzo.  Not at

NB7VCOS2                    Summation - Ms. Deininger

1    all.  Remember, you saw in Government Exhibit 302 — that's

2    what's up in front of you right now — how Recio forwarded

3    confidential DEA plans for Operation Honey Badger from his DEA

4    email to his personal email account less than two weeks before

5    his retirement; confidential plans that were particularly

6    sensitive because they involved operations in a foreign country

7    where the sources and agents would have no support;

8    confidential plans that, if disclosed, could result in

9    confidential sources being killed.

10          Recio ignored those risks.  He took that confidential

11   DEA information for himself when he retired, because he knew he

12   would be able to take advantage of it once he was in his new

13   role as a private investigator.  Recio sent himself that email,

14   the email you're looking at, as preparation, preparation for

15   the scheme that Costanzo and Recio started running the day that

16   Recio retired.

17          The third type of confidential information Costanzo

18   illegally agreed to share with Recio is closely related to the

19   indictments we just talked about, and that's information about

20   upcoming arrests.  You actually saw David Macey explain exactly

21   why they wanted to know about arrest dates in advance in a chat

22   with Costanzo.  And this is Government Exhibit 329.

23          Costanzo and Macey were discussing Cesar Peralta, who

24   we'll talk about more in a minute.  And Costanzo suggested that

25   Macey wait until after Peralta was arrested to call him.

1            I would wait till he is arrested.  He will call you.

2            Macey responded that he was worried that if he did

3      that, Peralta will also be attacked by everyone else, by which

4      he meant all of the other attorneys that would try to get

5      Peralta as a client once the arrest was public.  And this is

6      the key, because it shows the advantage that Macey, Recio, and

7      Guerra are getting from Costanzo.  Unlike other attorneys and

8      private investigators who had to wait for public information

9      about indictments and arrests, they could reach out to

10     potential clients earlier before they had competition.

11           And you heard about a couple of different times that

12     Costanzo told Recio in advance about when people would be

13     arrested.  For example, you heard a recorded meeting that we're

14     going to look at in a minute between Recio and Jorge Hernandez

15     Villazon from April 11th, 2019, when Recio told Hernandez about

16     how there was going to be an arrest of a bunch of Venezuelans.

17           Now, Hernandez testified here today -- not today.

18     Testified here because he's committed crimes, and he pled

19     guilty pursuant to an agreement where he has to cooperate with

20     the government.  I expect you'll hear from Judge Oetken that

21     the testimony of cooperating witnesses deserves special

22     scrutiny.  We agree with that.  But as Mr. Andrews told you

23     when this case began, we are not asking you to approve of Mr.

24     Hernandez's crimes; we are merely asking you to listen to the

25     recordings he made.  Recio's words on tape capture when he

NB7VCOS2                    Summation - Ms. Deininger

1    thought Hernandez was working with him.  And keep in mind that

2    the only reason Hernandez was in a position to make those tapes

3    was because he had been working with Costanzo as a source of

4    information for years, and because Recio had tried to recruit

5    him to be part of this bribery scheme.

6           Okay.  So with that in mind, let's go back to

7    Government Exhibit 235B.  And this is the April 11, 2019

8    recording I mentioned.

9           Recio:  Well, the thing that we're going to have to do

10   it in -- in a few weeks, it's going to be with two.  I don't --

11   I don't know more or less when, but there's going to be an

12   operation where we're going to involve many Venezuelans and we

13   have to be ready to pick them up.  Do you -- do you understand?

14          Hernandez:  Yes, I do understand.

15          Recio:  And bring them to the table.

16          In other words, be ready to approach the criminal

17   targets when they are arrested, and sign them off as clients.

18          And Hernandez told you that he understood that to mean

19   that the Venezuelans would be arrested.  But you don't have to

20   take his word for that, because Recio says it later in the call

21   which you can go and listen to in its entirety if you want.

22   Recio tells Hernandez they are going to be arrested in about

23   three weeks.

24          Now, there's one more part of this call I want to talk

25   about, because it is important and it shows how Recio was

1   trying to hide the fact that he was getting this inside

2   information from Costanzo:

3           Recio:  I don't want it before, no.

4           Hernandez:  Don't you want to?

5           Recio:  But what we can do is as soon as it happens,

6   you will have things ready in order to call the people that we

7   have to call, and immediately get to -- to the people who are

8   in the indictment or arrested.  You know what I mean?

9           Hernandez:  But if -- there are -- there are going to

10  be people (unintelligible).

11          Recio:  You do your homework, but hush.

12          Hush.

13          Let's walk back through this.

14          Hernandez asked Recio if he could start calling some

15  of the targets, and Recio stops him.  He says:  I don't want it

16  before, meaning before the arrest.  Instead they should get

17  ready.  So as soon as it happens, you will have things ready to

18  call the people that we have to call, and immediately get to

19  the people who are indicted and arrested.  And then he tells

20  Hernandez, You do your homework, but hush.

21          And Hernandez told you what that meant.  But it's also

22  clear, I think it should be clear to you from the context of

23  the call, but here's what Hernandez said:

24  "Q.  Mr. Hernandez, what did you understand Mr. Recio to mean

25  when he said, Do your homework, but hush?

NB7VCOS2                        Summation - Ms. Deininger

1    "A.  Not to say what the source that's giving him the

2    information comes from.

3    "Q.  And did you have an understanding as to where that

4    information came from?

5    "A.  Yes, from John.

6    "Q.  John who?

7    "A.  John Costanzo."

8            Another example of Costanzo leaking arrest information

9    is Government Exhibit 207:

10           Recio:  Oh, yeah, what's up?

11           Costanzo:  What's going on?

12           Recio:  When AAO tried to fly, they pulled his visa.

13           Costanzo:  Oh, they did?

14           Recio:  Yeah.

15           Costanzo:  Yeah, they're coming.

16           Recio:  Yeah.

17           Costanzo:  Right here.  It's HSI.  They're coming.

18           Recio:  Yeah.

19           This, this was a call between Costanzo and Recio in

20   July of 2019, a call where Costanzo is using his second secret

21   phone, the one that ends in the 0085 number.  This is the call

22   where you heard the stipulation that FBI Special Agent Richard

23   Busick would testify that the call was made from Manhattan.

24   That's Government Exhibit S1, if you want to take a look.

25           And what you have here is Recio calling Costanzo while

NB7VCOS2                    Summation - Ms. Deininger

he's in New York to ask about why someone called AAO's visa was

pulled.  And what does Costanzo say?  They are coming.  It's

HSI.  They are coming; HSI, which you heard was Homeland

Security Investigations, another federal agency responsible for

narcotics investigations.

        And I think you've seen enough of the pattern by now

from this case to tell what is going on here.  It's simple:

Costanzo is tipping Recio off to the fact that HSI is coming

for this person AAO to arrest them.

        You heard about another case where Costanzo tipped

Recio off about an arrest, and that was the attempted arrest of

Cesar Peralta.  You heard about this from FBI Special Agent

Brandon Jaycox.  Jaycox told you there were two indictments

against Peralta that remain sealed, meaning they were

confidential, not public, while the DEA and FBI tried to figure

out how to arrest Peralta in the Dominican Republic.  Jaycox

told you about the big international operation that was

planned, about how Peralta slipped through their fingers and

couldn't be found on the arrest date.

        Most importantly, you heard how on July 31st, 2019,

while the indictments were still sealed, and just a few weeks

before that attempted arrest, Costanzo tipped Recio off.  This

is another call where Costanzo used his second secret phone:

        Costanzo:  Dude, that guy in the DR — meaning the

Dominican Republic.

NB7VCOS2                    Summation - Ms. Deininger

1          Recio:  Mm-hmm?

2          Costanzo:  Gone in two weeks.

3          He'll be arrested in two weeks.

4          Now, you may hear from the defense that Peralta or

5   Recio knew the arrest was about to happen from other sources.

6          Let me just pause here for a minute to remind you the

7   burden to prove the defendant is guilty is always on the

8   government.  We embrace that burden.  It is our job.  But if

9   the defendant chooses to make arguments or put on evidence, as

10  the defendants did here, you can and should scrutinize those

11  arguments and that evidence, just like all the other arguments

12  and evidence in the case.  And this argument is just another

13  distraction.

14         They want you to think it is okay that Costanzo

15  provided confidential information about an arrest just because

16  Peralta or Recio might have been getting leaks from someone

17  else as well.  But it's not.  What Costanzo was doing was clear

18  as day, and it was wrong.

19         Special Agent Jaycox told you:

20  "Q.  What role, if any, did John Costanzo have in the Peralta

21  investigation?

22  "A.  None.

23  "Q.  What authorization, if any, did John Costanzo have to

24  share information about the Peralta case?

25  "A.  Absolutely none.

NB7VCOS2                    Summation - Ms. Deininger

1    "Q.  Did that include the timing of the arrest?

2    "A.  It especially included the timing of the arrest."

3              Now, let's talk about the fourth and last type of

4    confidential information that Costanzo was sharing with Recio

5    in violation of his official duties.  I'm going to touch on

6    this one just briefly.  It's information about DEA cooperators

7    and confidential sources.  The type of information, as you

8    heard from multiple witnesses, that could put the lives of

9    those people in jeopardy if it got out or got into the wrong

10   hands.  And yet Recio and Costanzo repeatedly discussed this

11   type of information.  We'll take a quick look at a few

12   examples.

13             First, September 2019.  You heard about how Costanzo

14   helped Recio gather information about Recio's client Shirley

15   Herrera Colorado.  This is Government Exhibit 330.  And that

16   included telling Recio that People Colorado had provided

17   information about had in turn themselves become cooperating

18   witnesses.  That is confidential nonpublic information.  And

19   let me remind you what Recio told Costanzo while Costanzo was

20   editing that document:

21             Recio:  Make it look good, John.

22             Costanzo:  What?

23             Recio:  Make it look good.  It's 30 grand right here.

24             Just one more example of how Costanzo was willing to

25   share DEA secrets when he thought it could help make them a

NB7VCOS2                    Summation - Ms. Deininger

1     buck.

2            Here's another example.  This one is from October

3     2019, and this is Government Exhibit 311.  In it you see -- you

4     saw how Costanzo forwarded Recio a tip that he had received

5     from a concerned citizen; a tip that was meant to help law

6     enforcement with its investigation, not be forwarded to a

7     private investigator; a tip that could put that concerned

8     citizen at risk if the wrong people found out that they had

9     reached out to law enforcement.

10           Before I move on, there's one other point I want to

11    make about what John Costanzo was doing.  As I expect you will

12    hear from Judge Oetken, there's no criminal bribery scheme

13    unless Costanzo violated his official duties by giving this

14    information to Recio.  So that's a question you have to answer:

15    Was there a violation of Costanzo's official duties as a DEA

16    special agent?  But it's an easy question.  Because Costanzo's

17    official duties are clearly set out in the standards of conduct

18    from the DEA's personnel manual.  I am not going to revisit or

19    reread all of the relevant policies now.  You heard about those

20    from Inspector Miller, but I will highlight two that are

21    particularly important.

22           First, the policy about use of nonpublic information.

23    This is in Government Exhibit 113A:

24           An employee shall not allow the improper use of

25    nonpublic information to further his or her own private

NB7VCOS2                    Summation – Ms. Deininger

1   interest or that of another, whether through advice or

2   recommendation or by knowing unauthorized disclosure.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              MS. DEININGER:  (Continuing)  That is exactly what

2     Costanzo was doing — giving Recio nonpublic information to be

3     used to further Recio's private financial interest, the success

4     of his private investigation business.

5              Second, the policy on misuse of official position.

6     This is also in Government Exhibit 113A.  It has three relevant

7     subparts:  First, DEA personnel will not use his/her official

8     position for private gain.  As we just discussed, that is

9     exactly what Costanzo was doing.  It was all about the money.

10             Two, DEA personnel will not glean or garner

11    information not available to the general public and use that

12    information for nonofficial purposes.  That includes conducting

13    a search in a database, like NADDIS, that an employee has

14    access to due to his or her employment with the DEA.

15             So let me be clear:  Costanzo is also plainly

16    violating this rule.

17             And, three, DEA personnel will not distribute or

18    disclose information not available to the general public for

19    nonofficial purposes.

20             Again, exactly what Costanzo was doing, disclosing

21    confidential information, not as part of some authorized

22    investigative work, but to help Recio and Macey and Guerra.

23             And there is no real question that Costanzo and Recio

24    knew and understood these rules because they were trained on

25    them, because every year, year after year, they had to certify

NB7KCOS3                    Summation - Ms. Deininger

1     that they understood them.  Because, in fact, as DEA

2     supervisors, they had a special duty to understand them and to

3     make sure that the special agents in their group were

4     complying.

5              And if there was any thread of doubt left in your mind

6     whether Costanzo was violating his official duties by sharing

7     all this information, there is more.  You know he was violating

8     his official duties because the DEA special agents who

9     testified — Special Agent Escobar, Inspector Miller, and

10    Special Agent Olesky — told you they would never share this

11    type of information, that doing so could be dangerous, and it

12    violated policy.

13             Let's move on now to talking about the quid, the

14    money, how you know Costanzo was receiving benefits from Recio,

15    Macey, and Guerra through multiple different channels,

16    including JEM Solutions, EBCO, and Edwin Pagan.

17             Start by talking about JEM Solutions.

18             In late January 2019, just days before Costanzo's good

19    friend, Pagan, incorporates JEM Solutions, there are chats over

20    text.  And what do they say?

21             Costanzo:  Working on names for our company.  Gonna

22    send you a list.  Tell me which one gives you movement.

23             I like it.

24             JEM Solutions.

25             Pagan:  JEM can be your acronym.  Then whatever word

1    you wanna use, JEM Solutions, JEM Risk Managers, whatever.

2           This is Government Exhibit 507-2.

3           Costanzo tells Pagan that he is working on names for

4    our company.  Our company.  Not Pagan's company, our company.

5    And what do they come up with?  JEM Solutions.  What does that

6    stand for?  Pagan admitted it to you.  It's an acronym for the

7    names of the people who were involved and working together —

8    John, John Costanzo; Eddie, Eddie Pagan; Manny, Manuel Recio —

9    J-E-M.

10          And now let's take a look at the JEM Solutions bank

11   account.  This is Government Exhibit 705.  It's a schedule of

12   the activity in that account.

13          First of all, you see it was opened on February 14,

14   2019.  And you saw that that very same day, Pagan sent the bank

15   account log-in information to Costanzo.  That was also

16   Government Exhibit 507-2.  You can see on the screen, there is

17   not a lot of activity in this account between February 2019 and

18   October 2019.  This is all the activity from an eight-month

19   period, nine-month period.  In fact, the only purchases are the

20   American Airlines first class tickets that Costanzo bought for

21   himself.

22          Remember what Costanzo said about these?  That's

23   Government Exhibit 358.  Costanzo told Pagan:  Just got a

24   ticket with JEM, meaning he had just used JEM's bank account to

25   buy his airplane tickets.

NB7KCOS3                    Summation - Ms. Deininger

1          So what does this all tell you?  The acronym, J-E-M —

2    Pagan sending Costanzo the bank account log in the same day he

3    opens the bank account, the fact that Costanzo is the only one

4    making purchases out of this account, it tells you that

5    Costanzo controlled the JEM bank account.  As Costanzo said,

6    it's our company, meaning partly his.  It tells you that the

7    money in the JEM bank account doesn't belong to Pagan, who

8    never used it; it's really Costanzo's, Costanzo's secret slush

9    fund, because don't forget, and you heard from the witnesses,

10   including Costanzo's former supervisor, David Olesky, Costanzo

11   knew exactly how criminals hide and move their money, like by

12   moving it through accounts, have the names of other people or

13   other companies, because Costanzo had spent years, decades,

14   investigating exactly that.

15         So let's go back to the JEM bank account, and this,

16   again, Government Exhibit 705, keeping in mind that the JEM

17   Solutions bank account is really Costanzo's secret slush fund.

18         Let's take a look at the payments that went into the

19   account, and there are only two significant ones.

20         First, on April 7, 2019, a deposit of $10,000.  And

21   this was Government Exhibit 701.

22         You've heard that $10,000 was a payment, by check,

23   from Global Legal Consulting, from Manuel Recio, to JEM

24   Solutions.  This is Government Exhibit 471A.

25         You've also seen an invoice for this payment, stating

NB7KCOS3                    Summation – Ms. Deininger

1   that it was for investment of risk management company.  That's

2   Government Exhibit 528.

3          But remember what else you heard.  JEM and Global

4   Legal Consulting were served with subpoenas, and they had no

5   other paperwork for this so-called investment — no contracts,

6   no communications, no other documentation.

7          You also saw, there was not a single call between

8   Recio, from Global Solutions, and Pagan, from JEM, in the

9   six months leading up to this $10,000 check.

10         So I want you to use your common sense.  Is this how

11  two companies engage in legitimate business, worth $10,000?

12  Would there be no records, no emails, no contracts?  Would

13  there be no calls between the two people involved?  No, of

14  course not.  There would be something.

15         So what does this tell you?  The JEM invoice is a

16  sham, a fake invoice for a fake investment created in an

17  attempt to hide a $10,000 payoff from Recio to Costanzo's

18  secret slush fund.

19         I think I need to pause here for a minute to talk

20  about Edwin Pagan.

21         You heard his testimony, just yesterday.  Pagan told

22  you these payments were legitimate.  And it's your job to

23  assess his credibility.

24         But you saw for yourself, he got up on the stand,

25  swore an oath to tell the truth, and he lied to you.  His story

1    was incredible for many, many reasons.  He kept changing, he

2    couldn't tell you key details, it didn't match up with the

3    evidence, JEM's own records.  He was lying.  He was lying to

4    try and help his very good friend, John Costanzo.

5           And you saw how, when his story was scrutinized on

6    cross-examination, it fell apart.  He admitted to lying in

7    other serious matters, which, right off the bat, should give

8    you serious concerns about his credibility.  For example, he

9    told you that he and Costanzo arranged to lie to the bank about

10   the $50,000 being a gift, the down deposit for the townhouse,

11   because Pagan, as a third party, couldn't contribute to

12   Costanzo's mortgage down payments.

13   "Q.  Just to be clear, you couldn't give it to him because you

14   know that friends were not allowed to make a down payment,

15   right?

16   "A.  I knew a third party couldn't make a down payment, yeah.

17   "Q.  And you are a third party, correct?

18   "A.  Right.

19   "Q.  And you also know you couldn't give it to him directly

20   because you know that it was an investment, correct?

21   "A.  Right.

22   "Q.  And John Costanzo said it was a gift, correct -- sorry,

23   and you discussed all of this with John Costanzo, Jr., right?

24   "A.  Yes."

25          Pagan also told you about how he lied to the IRS,

NB7KCOS3                    Summation - Ms. Deininger

1   claiming on his taxes that Costanzo's American Airlines tickets
2   were business expenses, even though he says Costanzo had no
3   role in JEM's business.  So you know he lies when it benefits
4   him even if it places him or others in legal jeopardy.  And you
5   know the rest of his testimony was lies because it just doesn't
6   add up.  And probably the most important way you saw his
7   testimony fall to pieces was when he was talking about these
8   payments to JEM.

9           Pagan told you the 10,000 was for an investment.  But
10  he hadn't even talked to Recio about any of the terms, like how
11  or when it would be repaid.

12          Pagan told you he didn't have to have contracts with
13  Recio because they were such good friends, that they didn't
14  need them.  But you saw that there were no phone calls between
15  Recio and Pagan for the entire year, not one, and no text
16  messages in the months of those payments.

17          Ask yourself:  Does that make sense?  Even if they
18  were meeting in person, wouldn't there be some text, some call,
19  to arrange that meeting?  Yes, of course there would be.  Pagan
20  is trying to sell you an unbelievable story, because he wants
21  to help his friend.  And you shouldn't let him swindle you.

22          So, if we go back to the JEM bank account for a
23  minute, there was one other significant payment into the
24  account, a deposit of $10,750 on June 5, 2019.  The facts are
25  strikingly similar to what we just saw with the 10,000 that was

NB7KCOS3                    Summation - Ms. Deininger

supposedly for the risk management company investment.

First, the money came from a check from Global Legal
Consulting, signed by Manuel Recio.  It looks a lot like the
other check we just reviewed.  This one is Government
Exhibit 471B.

Second, JEM had a handwritten invoice, this time
saying that the money was for services for Johnny Grobman case.
And this is Government Exhibit 528.

Again, neither JEM or Global Legal Consulting had any
other paperwork regarding the work that had supposedly been
done — no contracts, no reports, no notes, no emails, nothing,
just the check and the invoice.  And, again, call records
showed you that there had been no calls between Recio and
Pagan, who claimed that he was helping Recio review documents
for this Grobman case.

Pagan supposedly spent 80 hours reviewing terabytes'
worth of documents in a foreign language for a case he didn't
really know anything about, but he never called Recio with a
question or to tell him what he found?  It just doesn't make
sense.

So, again, you can use your common sense and draw what
is really the only natural inference — that the invoice is just
a sham, a sham created by people who knew about money
laundering and how to hide it, hiding payments into Costanzo's
secret slush fund.

NB7KCOS3                     Summation - Ms. Deininger

1          So that was two payments, more than $20,000, that you

2     now know were made to look like they were for JEM and Pagan

3     when, really, the money went to this JEM bank account that

4     Costanzo had access to and controlled.

5          Let's talk about another way that bribery money was

6     funneled through middlemen to Costanzo.  That's through

7     Costanzo's father, John Costanzo, Sr., and his father's

8     company, EBCO.

9          This is Government Exhibit 701 again, the summary

10    chart about some of the payments.

11         In November 2018, just two days after Recio retired,

12    David Macey wrote a $5,000 check to Global Legal Consulting.

13    Recio deposited that check, and then almost immediately turned

14    around and paid half of that out to EBCO, John Costanzo, Sr.'s

15    company, even though EBCO International had been a completely

16    dormant company during the six months prior to this $2,500

17    payment.  The defense's own witness, Elgin Polo, told you that

18    there were no transactions in or out of the EBCO bank account

19    before this, but here we have a nice 50/50 split between Global

20    Legal Consulting and EBCO of that $5,000 from Macey.  And what

21    does Costanzo say to Macey that same day?  LOL, just made

22    $2,500.  Fuck it.  That's Government Exhibit 317, where they're

23    talking about whether Costanzo should spend some money on car

24    repairs.

25         This is not just a coincidence.

1        Do you think that Recio had already done $5,000 worth

2    of private investigation work just three days after retiring?

3    That Costanzo just happened to get $2,500 from some other

4    source that same day?  Remember, he says he has no outside

5    employment, so the only way he should be making money is from

6    his salary as a DEA agent.

7        No, it's not just chance.  That $2,500 payment to

8    EBCO, it is a payment to Costanzo.  EBCO and John Costanzo, Sr.

9    are just conduits, like Pagan and JEM, middlemen used to pass

10   the payment on and add an extra layer to hide the money trail.

11       There was an invoice for this payment, too — that's

12   Government Exhibit 529 — but just like with the JEM invoices,

13   neither EBCO or Global Legal Consulting had any other records

14   about the investigative services that the invoice says were

15   done — no contracts, no records, no notes, no calls between

16   Recio or John Costanzo, Sr. — before or after this $2,500

17   payment.

18       And I strongly encourage you to go look at the charts

19   summarizing the phone communications in this case if you have

20   any questions, because they are devastating, and those were

21   Government Exhibit 706.  This is not how the real world works.

22   It's just another sham invoice.

23       Okay.  So by now, I hope it is pretty clear that Recio

24   and Costanzo are using Pagan and John Costanzo, Sr. as

25   conduits, or middlemen, to conceal payments going to Costanzo.

1    So let's just take a quick look at some of the other money you

2    heard about.

3            This is Government Exhibit 700, another summary chart.

4    This is about the $50,000 that Costanzo received to help him

5    make a down payment on a new townhouse.  You probably remember

6    the testimony about this.  In January 2019, Pagan gave John

7    Costanzo, Sr. a $50,000 cashier's check, and then just a few

8    weeks later, Costanzo, Sr. turned right around and sent that

9    money to the law firm that Costanzo was using to buy the

10   townhouse.

11           Now, we've already talked about how Pagan and

12   Costanzo, Sr. were used as a way to pass bribery payments to

13   Costanzo, but there are a few other reasons why you know that

14   this payment is not on the up and up.

15           First, Costanzo and Costanzo, Sr. both lied to the

16   bank about the source of the money.

17           This is Government Exhibit 434, the gift letter.  You

18   know it wasn't a gift from Costanzo, Sr. because you've seen

19   the bank records showing it was just passed to Costanzo, Sr. by

20   Pagan, who claims it was an investment.

21           But the idea that this was a legitimate investment is

22   also just a distraction.  That doesn't make any sense either.

23           This is Government Exhibit 709, which showed you

24   Pagan's real income for 2019.  Remember, he had only about

25   61,000 available to him that year of net income — $61,000, to

NB7KCOS3                    Summation - Ms. Deininger

1    pay his rent or his mortgage, his car, all his other normal

2    expenses.  Do you really think he was investing almost all of

3    that in John Costanzo's house?  That doesn't make sense,

4    especially when, according to Pagan, they never discussed

5    important things, like when or how he would get paid back, or

6    what his ownership share in the house would be.  Pretty

7    important things for a big investment of $50,000.

8              And the idea that Pagan was investing $50,000 in

9    Costanzo's townhouse makes even less sense when you think about

10   his other finances.  This is Government Exhibit 401B.  It's the

11   receipt from when Pagan got the $50,000 cashier's check that he

12   gave to John Costanzo, Sr., and it shows that before that,

13   before he made the withdrawal, he had about $113,000 in his

14   bank account, money that he told you took him 26 years to save.

15   Again, do you really think Pagan was taking nearly half of his

16   money, half of his savings, almost all of what he was going to

17   make in the next year, and just giving it to Costanzo, when he

18   had already been foreclosed on, when he was already over a

19   million in debt on other mortgages?  Even for best friends,

20   this just doesn't make sense.  You don't hand a friend $50,000,

21   almost all of your income, almost half your savings, without

22   any serious discussions.

23             So you should ask yourself:  Where was this money

24   coming from if it wasn't from Pagan, if it wasn't from John

25   Costanzo, Sr.?  And you know the answer, because you've already

NB7KCOS3                    Summation - Ms. Deininger

1    seen who used Pagan and John Costanzo, Sr. as conduits to give

2    money to Costanzo, and that's Recio and Macey.  This was just

3    another bribe payment.

4              You heard about one other large payment from Pagan

5    made on Costanzo's behalf, and that was the 20,000 that Pagan

6    gave to Susana Rueda, Costanzo's ex-girlfriend, to pay off the

7    loan she made to Costanzo when he needed a lawyer.  That's

8    another 20,000 on top of the 50,000 we just talked about that

9    was already well beyond Pagan's means.

10             And you heard from Rueda that no one explained to her

11   why Pagan was repaying the loan for Costanzo.  She assumed it

12   was because they were such good friends, but, again, do you

13   give your friends $20,000?  You know from your own experience

14   that the answer is no.  And if this money isn't really coming

15   from Pagan, who is it coming from?  You can draw your own

16   conclusions on that from the pattern of what you're seeing in

17   the other payments — that this was money that was actually from

18   Recio, Macey, or Guerra.

19             And, finally, you heard about how Macey directly paid

20   for things for Costanzo.  And you saw text messages and bank

21   records showing how Macey bought Costanzo tickets for a Yankees

22   game that they went to together here in New York City, Yankees

23   Stadium.  That was Government Exhibits 355 and 385.

24             You heard about how Macey and Costanzo entertained a

25   senior DEA agent, Nic Palmeri, at that game and how excited

1   Costanzo and Recio were when Palmeri got promoted because they

2   thought they had an in on a valuable source of information.

3           Costanzo:  We about to own Mexico.  Nic is in.

4           Recio:  Really!!!!!!

5           That's Government Exhibit 386.

6           Lastly, you heard from Juan Victorero about the

7   contracting work that he did at Costanzo's townhouse and how he

8   got his last payment, which he thought was $5,000, from David

9   Macey.

10          Now, Juan Victorero believed that Macey was giving him

11  the money because Costanzo was out of town, but you can look at

12  these text messages on your screen and see immediately that

13  that just wasn't true.  Costanzo was in town.  He and Macey

14  were talking about hanging out at the pool that day.  There was

15  no reason for Macey to pay Victorero, except for the real

16  reason — that the money was actually coming from Macey.  This

17  is Macey paying off Victorero for Costanzo, just like Pagan

18  paid off Rueda.

19          Okay.  So we've been talking about the money, the

20  quid, for a while, and I want to turn now to talk about how you

21  know the quid and the quo go together, how you know there was

22  an agreed-upon exchange, money for information.  But before I

23  do that, I just want to make one final point:  When you add up

24  all the payments we just talked about and all of the money that

25  passed through JEM, EBCO, Pagan, John Costanzo, Sr., and was

1  paid off on Costanzo's behalf, it's almost $100,000, a 100,000

2  over just one year.  That's not a small amount.  This is

3  Government Exhibit 106A, which shows Costanzo's salary from the

4  DEA as of June 2019.  $100,000?  It's more than 70 percent of

5  what Costanzo was making, more than enough to serve as motive

6  to violate his official duties.

7         So, as I said at the beginning, the only question for

8  you to decide, the only real question before you, is why did

9  Costanzo and Recio do it?  Why did Costanzo leak all this

10  confidential information to Recio?  Why did Recio give all this

11  money to Costanzo?  Were these just two upstanding citizens

12  with the DEA's best interests at heart, like the defense would

13  have you believe?  Or were the payments just very large gifts

14  from friends?  You know that makes no sense.  You know the quid

15  and the quo are connected.  It's obvious.  It's common sense.

16         We're going to talk about four reasons you know

17  Costanzo and Recio are guilty of the scheme, that you know the

18  quid and the quo are connected.

19         First, the GLC subpoena returns tell you they were.

20         Second, Costanzo and Recio talked about how they could

21  make money working together.

22         Third, the timing of the payments matches up with the

23  information Costanzo was leaking.

24         And, fourth, because Costanzo and Recio did everything

25  they could to hide what they were doing.

NB7KCOS3                    Summation - Ms. Deininger

1           So the first reason you know the quid and the quo are

2    connected is the records Global Legal Consulting provided in

3    response to a subpoena told you they were.  Let's look at

4    Government Exhibit 530.  Government Exhibit 530 contain Global

5    Legal Consulting's response to the subpoena.  You can go look

6    at the entire thing if you want, records that were pulled

7    together by Manny Recio.

8           The subpoena had asked for any records relating to the

9    three invoices we talked about earlier, the two handwritten JEM

10   invoices and the November 12, 2018 EBCO invoice, that was

11   supposedly for the $2,500 worth of investigative services.

12          Sorry, this invoice, the one you're looking at here.

13   And what did Global Legal Consulting provide as records

14   relating to that EBCO invoice?  Text messages from Recio asking

15   Costanzo to run names in the DEA's law enforcement sensitive

16   NADDIS databases.  Not any communications between Recio and

17   John Costanzo, Sr., who supposedly EBCO was his company, but

18   messages between Recio and Costanzo and messages specifically

19   asking for DEA confidential information, names that Costanzo

20   did run in the NADDIS database, and where he did provide

21   information to Recio.  You saw at least one of those.

22          And this one is Government Exhibit 1001 from

23   November 13th.  Costanzo gave Recio a valuable little nugget of

24   information.  He asked about Marco Antonio Flores Moreno.

25   Flores is a general who was just appointed to some minister of

NB7KCOS3                   Summation - Ms. Deininger

1   some shit.  This is from November 13th, the same day that

2   Costanzo told Macey, in Government Exhibit 317, which we looked

3   at earlier, just made $2,500, fuck it.

4          In other words, you know this $2,500 was money for the

5   information Costanzo was providing because Global Legal

6   Consulting said it was.  The 2500 was related to these text

7   messages, it was in exchange for the confidential information,

8   confidential information Costanzo was sharing in violation of

9   the DEA's standards of conduct against searching NADDIS for

10  unauthorized purposes.  2500 that was Costanzo's half of a

11  50/50 split out of the 50,000 Macey had just paid to Global

12  Legal Consulting.  Costanzo's cut for his partnership with

13  Recio in this bribery scheme.  That's it.  Honestly, that's all

14  you need to know.  That's enough to find both Costanzo and

15  Recio guilty.  You only have to have one bribe payment, and

16  that one, that one is crystal clear.

17          But I'll go on.  Sorry.

18          The second reason you know Recio and Costanzo are

19  guilty of the bribery scheme is because they discussed how

20  they're working together to make money, working together when

21  Costanzo was supposed to be working for the DEA and Recio was a

22  private citizen.

23          Remember that call we listened to at the beginning of

24  today, Government Exhibit 203.  Recio, Costanzo, and

25  Luis Guerra are together on the phone talking using Costanzo's

NB7KCOS3                    Summation - Ms. Deininger

1   second secret phone.

2           Guerra, joking around for a bit, and then he says:

3   I'm like, man, JC doesn't love Lui anymore.  Doesn't love Lui

4   anymore.

5           Costanzo:  Listen, you better love me because I'm

6   going to be rubbing this fucking thing pretty soon.

7           Guerra:  Okay, listen, so we're here scheming about

8   how we're going to make money, money, money, so we're all on

9   the same page.  Hey, man, when are you going to come back into

10  town so we can actually see each other?

11          Scheming to make money, money, money.  That's it.

12  That's the heart of the matter, scheming to have Costanzo

13  provide information that helped Recio, Macey, and Guerra

14  recruit clients so they could all make money, money, money,

15  including Costanzo, who got his cut.

16          And this isn't the only time they talk about working

17  together, even though Costanzo was still a DEA special agent.

18  Remember the evidence.

19          Pagan -- sorry, Costanzo telling Pagan that JEM —

20  John, Eddie, Manny — is our company, Government Exhibit 507-2.

21          Costanzo creating a group chat called work for him,

22  Recio, and Guerra, and then using that thread to send

23  information about a DEA target.  And that's Government

24  Exhibit 1034.

25          Costanzo even went around telling people that Recio

NB7KCOS3                    Summation - Ms. Deininger

1    was his partner.  That's Government Exhibit 1037.

2              The evidence that they were working together is clear,

3    it's simple, and it's really the only explanation for what they

4    were doing that makes sense.

5              The third reason you know that Costanzo and Recio are

6    guilty is that you saw how the bribery scheme developed from

7    the moment Recio retired and how the timing of the payments

8    matched up with the flow of information.  We just talked about

9    the 2500 that came to Costanzo from Macey, through Global Legal

10   Consulting, to EBCO, just three days after Recio's retirement,

11   on the same day that Costanzo starts giving Recio confidential

12   NADDIS information.  Again, that is not just a coincidence.

13   After all, the EBCO bank account had been completely dormant,

14   no activity, for six months before that.  So just days after

15   Recio's retirement, the pattern is well established.  And from

16   there, you saw what happened — the payments continued, Costanzo

17   continued to feed Recio confidential inside nuggets of

18   information when he got the chance to do so.  And it continues

19   right up until law enforcement let Recio and Costanzo know

20   about the investigation by going to their homes to interview

21   them.

22             So there is one more reason that you know Costanzo and

23   Recio are guilty.  This is a big one.  It's that Recio and

24   Costanzo attempted to hide and cover up the scheme.  Over and

25   over, they concealed and lied.  What they were doing was

NB7KCOS3                    Summation - Ms. Deininger

1    illegal, they knew it, and they tried to hide it.

2            They hid it from the DEA.  You heard Costanzo use

3    personal phones for all of these chats and calls you've seen

4    and heard, not his DEA work cell phone.  That was a different

5    number.  As Special Agent David Olesky told you, anything on an

6    agent's DEA cell phone, that's property of the government and

7    accessible by the DEA.  So when Costanzo chose to have all of

8    these conversations on his personal cell phones, it shows you

9    he is trying to hide it from the DEA, hiding it from the DEA

10   because it is not legitimate DEA work, it's not being done for

11   proper investigation purposes.

12           Costanzo also hid his relationship from his colleagues

13   and his supervisors at the DEA.  You heard the testimony.

14           The first quote here is from Daniel Escobar:

15   "Q.  What, if anything, did John Costanzo tell you about his

16   involvement in Manny Recio's private investigative work?

17   "A.  He didn't tell me anything.

18   "Q.  What, if anything, did Special Agent Costanzo tell you

19   about his communications with Manny Recio about DEA cases?

20   "A.  He didn't tell me anything."

21           And then this other quote is from David Olesky:

22   "Q.  Special Agent Olesky, what, if anything, did John Costanzo

23   report to you about communications with private investigators

24   while he was working under your supervision?

25   "A.  Nothing."

1    So Costanzo never told Special Agent Escobar, who

2  supervised him between March 2019 and June 2019 in Miami, or

3  Special Agent Olesky, who supervised him between June 2019 and

4  November 2019 in Washington, D.C., that he was talking to Recio

5  about DEA cases.

6    He also never told Michael Nadler, the prosecutor who

7  was working with the DEA on the Alex Saab case, that he was

8  talking to Recio about the Saab indictment.  Those are the

9  people he should have been talking to if this was legitimate

10  DEA work, and he wasn't.

11    Costanzo also hid from the DEA that he was involved in

12  outside businesses — again, JEM, our company.  He never told

13  anyone at the DEA about our company, JEM.  He never told anyone

14  about the DEA that he was partners with Recio.  He never

15  reported any outside employment on his security form, even

16  though he's starting companies with people and making money.

17  That's what you see on the screen now, Government Exhibit 104,

18  Costanzo's security form, reporting that his only employment

19  from the last ten years leading up to 2020 was at the DEA.

20    Why didn't he disclose it?  Because he knew the DEA

21  would have a problem with what he was doing.  He knew that it

22  violated DEA's policies.  He knew that he was getting illegal

23  bribe money.

24    Costanzo and Recio also hid the money from the scheme

25  from the IRS.  You heard Valerie Catanzaro that the only source

NB7KCOS3                    Summation - Ms. Deininger

1   of income that Costanzo reported for 2019 was his DEA salary.

2          Now, the defendants might try and argue that all of

3   the money we've discussed didn't need to be reported because it

4   was just gifts.  But the IRS records don't match up with that

5   either.  Because Pagan and John Costanzo, Sr., the people who

6   gave Costanzo the 50,000 for his down payment and the 20,000 to

7   repay his loan from Susana Rueda, they didn't report any gifts.

8   And you heard that you have to report gifts to the IRS if

9   they're more than 15,000 in a year.

10         One way or another, the people involved are trying to

11  hide this from the IRS, and you know that is because they

12  didn't want anyone to know about these illegal bribe payments.

13         Recio and Costanzo also did basically everything they

14  could to try and hide the scheme from detection by law

15  enforcement, both while it was going on and afterwards.

16         First, Recio got Costanzo that second secret phone

17  that Recio paid for and was basically used to only talk to each

18  other.  Remember, Susanna Maj told you, out of 29 calls using

19  the second secret phone between May and July of 2019 — 28 — 28

20  out of 29 — were between Recio and Costanzo.  As we've gone

21  through the evidence today, you may have noticed that a lot of

22  the critical calls and texts were made using that secret phone.

23  That was no accident.  They were hiding those communications.

24  And you don't need anything else to know that what they were

25  doing is wrong, that they had corrupt intent, because there was

1    no other reason why Recio would provide Costanzo a secret phone

2    and Costanzo wouldn't tell anyone about it.

3           They also talked on WhatsApp and Telegram,

4    applications that can't be intercepted by law enforcement, even

5    with a wiretap, as you heard from Michael Nadler, applications

6    where messages can only be recovered by law enforcement if they

7    actually have the physical phone that was used.

8           Recio and Costanzo used middlemen, as we've talked

9    about, these conduits to make the bribery payments harder to

10   trace.  Recio never directly paid Costanzo.  He gave the money

11   to JEM or to EBCO, to Pagan, or John Costanzo, Sr., but you

12   know, we've talked about, the fact that the text messages and

13   the bank record account records show that Costanzo ultimately

14   benefited, that Costanzo had access to the JEM bank account,

15   for example, and that the 50,000 was for Costanzo's down

16   deposit on a house.

17          And they didn't just use middlemen to make the money

18   harder to trace.  They also papered up the transactions with

19   the fake invoices that we've looked at, fake invoices for work

20   that never actually happened, for which there was no other

21   evidence in the records of Global Legal Consulting, of EBCO, of

22   JEM.

23          Fourth, Recio and Costanzo deleted information they

24   thought could incriminate them.  You heard from Ms. Maj about

25   how Costanzo deleted hundreds of text messages from his phone,

NB7KCOS3                    Summation - Ms. Deininger

1  and this is Government Exhibit 708, and we looked at certainly

2  examples of that.

3          Examples, for instance, could be — and you can go back

4  and look at these if you want — where they talk about setting

5  up Global Legal Consulting together, where they talk about JEM

6  Solutions and their cut on a Mexican case, where they talk

7  about Recio's business and the clients he is landing with the

8  help Costanzo has provided.  These are Government

9  Exhibits 361A, 362C, and 363A.

10          What else did they delete?  Recio deleted every single

11  call with the second secret Costanzo phone from his phone's

12  call log — every single one.

13          This is Susanna Maj's testimony:

14  "Q.  Do you remember approximately how many calls there were

15  between the Recio phone and the second Costanzo phone?

16  "A.  Around 46 calls.

17  "Q.  Do any of those calls show up in this call log from the

18  Recio phone?"

19          Which is Government Exhibit 360, that's the call log.

20  "A.  No.

21  "Q.  And are you -- are there -- are you aware of any reasons

22  why a call would not show up in a phone's call log?

23  "A.  Potentially deleted."

24          You also heard from Ms. Maj that Recio deleted all

25  evidence of calls on certain critical days, like August 20,

1   2019, the day that Peralta fled and evaded arrest.  Like

2   July 31st, 2019, when Costanzo told Recio that Peralta would be

3   arrested in two weeks.

4          There are no calls from Recio's phone in the call log

5   on those days, even though you know from the wire intercepts,

6   from the transcripts and the recording you listened to, that he

7   did make calls those days.  And what makes this particularly

8   telling is that Recio didn't delete his entire call log or

9   stretch of months or years, he's not just clearing out his

10   phones.  He only deleted specific important days and all

11   evidence of calls with Costanzo's secret phone.

12          Last, but not least, Costanzo and Recio tried to hide

13   the scheme from law enforcement by lying when they were

14   interviewed in November 2019.  Honestly, they lied about too

15   many things in those interviews for me to talk about them all,

16   so I'll just mention a few.

17          They both initially denied that Costanzo had a second

18   phone, the secret one, that they used to talk to each other.

19   Recio denied that he ever asked Costanzo to conduct searches in

20   NADDIS or that he ever asked Costanzo about who was going to be

21   indicted.

22          Costanzo claimed he never gave Recio any sealed

23   information.

24          Both claimed that Recio had never given Costanzo any

25   money.

1          And there's really no question of what they said on
2    those matters because most of that was recorded in Costanzo's
3    interview.  You heard the recording, and you saw the notes that
4    were taken during the Recio's interview, as the interview was
5    going on.  And it was all lies.  You know these are lies
6    because of the simple, clear incontrovertible evidence that
7    you've seen from the recordings and the text messages.

8          As you deliberate, I strongly encourage you, review
9    the testimony of Special Agent Delise Jeffrey and Special Agent
10   Joseph LaRocca.  They told you about those interviews.  They
11   told you about those lies, lies caught on tape and recorded in
12   LaRocca's notes.

13         All these steps that Costanzo and Recio took to cover
14   their bribery are the last, but one of the most important
15   things that tell you everything you need to know about this
16   case — that they knew what they were doing was wrong, and they
17   wanted to hide it, that they were acting with corrupt intent,
18   that Recio was paying Costanzo for the confidential information
19   Costanzo provided, in violation of his official duties as a DEA
20   agent.

21         Now, I want to talk to you about one of the specific
22   arguments that you've already heard from the defense, and I
23   expect you will hear again.  I'm going to try and move through
24   this quickly, so bear with me.  But before I do, I want to
25   emphasize, as I said before, the burden to prove the defendant

NB7KCOS3                    Summation - Ms. Deininger

1  guilty always rests on the government.  But, again, when the

2  defense chooses to make an argument, you can and should hold

3  that argument up, see if it makes sense, ask why they are

4  telling you this.

5          So the argument that you heard from both John Costanzo

6  and Manuel Recio during opening arguments, and I expect you

7  will hear again, is that Costanzo and Recio were doing all of

8  this because they thought it was in the best interests of the

9  DEA mission, because they wanted to bring in cooperators who

10  could help bring great DEA cases.

11          That is just another distraction.  Why?  Because the

12  evidence overwhelmingly shows you they were doing this for the

13  money.  You heard them talking about how they were scheming to

14  make money, money, money, how they wanted the Shirley Herrera

15  document to look good because there was $30,000 on the line,

16  but there were plenty of other examples in the evidence you

17  saw.

18          You saw in Government Exhibit S7, a stipulation

19  between the parties, that Edison Washington Prado Alava had

20  been charged in February 2017 with conspiracy to distribute

21  cocaine.  And, here, in April 2019, and what's on the screen in

22  front of you, you see Costanzo and Recio talking about trying

23  to set Prado up with Guerra, one of the two defense lawyers

24  that they were steering criminal targets to.  And what does

25  Recio suggest?  Maybe we can talk to Luis to go 50/50.  This is

1   Government Exhibit 384.  In other words, maybe Guerra will

2   split his fees with them, maybe they can all make money.

3   You also heard an intercepted call from a few months

4   later, where Recio and Costanzo explicitly talk about how

5   they're steering criminal targets to these lawyers because of

6   the money.  This is Government Exhibit 202B, and it's a call

7   from July 4, 2019.

8   In this call, Costanzo and Recio are talking about

9   referring criminal targets from a new case, a new AGO, and

10  Costanzo complains about Guerra, saying he doesn't bring

11  anything to the table.  That's the first underlined line on

12  this transcript for you.

13  And how does Recio respond?  "No, but Luis actually

14  has.  He's gotten the sixty with Shirley.  He's gotten another

15  fifty that I'm gonna be collecting now with Jonathan.  Those

16  are two good cases.  That's 110 plus the 20, that's 130.  So

17  he's brought shit to the table.  They haven't paid yet, but

18  Shirley is paying me this weekend, half this upcoming weekend,

19  she's giving me 25."

20  In other words, Recio tells Costanzo Guerra does bring

21  something to the table for both of them — he brings the money,

22  and that is why they're doing this.

23  You also heard that Costanzo was leaking information

24  about cases in which he had no role.  These weren't his cases;

25  he wasn't the case agent.  You heard the actual case agents and

NB7KCOS3                    Summation - Ms. Deininger

1    a former prosecutor take the stand, and they told you that when

2    you're considering cooperation, the prosecutor and case agents

3    discuss, and together, they make a decision about how to

4    proceed.

5          Costanzo, a DEA veteran of over 20 years, he knew

6    this.  And he made the deliberate decision not to follow the

7    procedure, not to tell the prosecutors and the case agents that

8    he was leaking information to Recio, because Costanzo wasn't

9    leaking information in hopes of cooperation; he's leaking the

10   information because of the money.

11         And even if Costanzo and Recio might have believed

12   that some of what they were doing would also be good for DEA

13   cases, that doesn't matter.  It's beside the point, because I

14   expect what Judge Oetken will tell you — and, again, you'll

15   listen to what he says on the law — is that the payments don't

16   have to have been Costanzo's only motivation, it just has to be

17   a part.

18         There are other reasons you know that Recio isn't

19   concerned about the DEA mission.  After all, he doesn't even

20   work at the DEA anymore; he works for defense lawyers, he's on

21   the other side.  But you also saw text messages where

22   Cesar Peralta, the defendant that evaded arrest that we talked

23   about a little bit earlier, he tells Recio that he is bribing

24   someone at the DEA.  He says:  We pay 5,000 to a DEA contact,

25   and he tells us who is and who isn't wanted for extradition

NB7KCOS3                    Summation – Ms. Deininger

1    purposes.

2              And Recio doesn't blink.  Does Recio report this or

3    even sound concerned?  No.  He just reminds Peralta that he

4    shouldn't talk about this with anyone:  "Cesar, it's important

5    that you don't talk about this with anyone.  We're going in

6    10 days and let's make a plan."

7              This is MR 141T.

8              Lastly, you may hear Costanzo argue that he was acting

9    in good faith and even sent messages saying that he couldn't

10   share confidential information because that would be unethical.

11   This is Government Exhibit 318.

12             "Is it an encrypted number that they are requesting?

13             "No, they also want a token.

14             "Hey, I can't give you that info, not ethical, but if

15   your client wants to talk, I will put them with the right

16   people.

17             "Okay."

18             This is another distraction.  You know that because

19   you saw that Costanzo did share information.  And you know that

20   because you heard Special Agent McGuire, and he told you how

21   Costanzo told him how Costanzo thought in July of 2019 that

22   things were getting hot for Costanzo in Miami.  And that's

23   about when those text messages were sent.  It's just another

24   attempt to conceal the scheme after Costanzo and Recio started

25   getting worried about being caught.

NB7KCOS3                     Summation - Ms. Deininger

1              All right.  I have been going on for some time, so
2     before I wrap up, I want to take just a couple of minutes to
3     talk about the charges and the indictment.  You know the
4     evidence.  You have been very patient.  I'm not going to walk
5     you through all the charges and all the elements.  Judge Oetken
6     is the ultimate and only authority on the law in this
7     courtroom.  So follow the instructions he gives you.  I just
8     want to talk about a few aspects.
9              There are five counts in the indictment.  They are on
10    your screen.
11             Counts One through Three charge bribery and bribery
12    conspiracy.
13             Bribery requires proof of corrupt intent and that
14    there was a quid pro quo.  I expect that is part of what Judge
15    Oetken will tell you.  I have talked to you about both of those
16    a lot already, so we don't have to go over that again.
17             Another element is that Costanzo, as a DEA special
18    agent, was a public official.  And I don't think that that's
19    going to be seriously disputed here.
20             Counts Four and Five charge honest services wire fraud
21    and honest services wire fraud conspiracy.  Honest services
22    wire fraud requires a scheme to deprive the public and the DEA
23    of their right to Costanzo's honest services through bribery or
24    quid pro quo payments — again, back to the quid pro quo that
25    we've already discussed.

NB7KCOS3                    Summation – Ms. Deininger

1          Another element I anticipate you will be instructed on

2     is that the scheme has to have involved a material

3     misrepresentation, a false statement, or an omission.  And

4     we've covered this as well.  You know that Costanzo concealed

5     everything he was doing from the DEA, including that he was

6     accepting bribe payments from Recio.  And that's sufficient.

7          I expect that you will also be told that each

8     defendant, to be convicted of honest services wire fraud, must

9     have used or caused the use by others of interstate wires.

10     That sounds complicated, but all it really means is that at

11     some point, a defendant made or caused someone else to make a

12     phone call, an email, or a text message, in furtherance of the

13     scheme that went between two states.  And we don't need to go

14     through this in detail because you heard the stipulation — that

15     was S1 — about how Government Exhibit 207 was a phone call made

16     from Manhattan.  And you saw interstate text messages between

17     Recio and Costanzo about that Yankees game, where Macey paid

18     for the tickets, where Macey and Costanzo were at the game and

19     Recio is in Miami.  Again, I don't expect that element to be

20     contested either.

21          So, ladies and gentlemen, we've gone through the

22     evidence, we've talked about the recordings, the texts, the

23     recordings, the testimony, we've talked a little bit about the

24     technical requirements of the law, so I am about to sit down.

25     But before I do, I want to remind you what this case is about.

1    At the end of the day, when you strip away all the lawyers'

2    arguments, the distractions, what is this case about?  It's

3    about two things:  It's about greed and corruption.  It's about

4    how Recio paid Costanzo tens of thousands of dollars for the

5    DEA's secrets.  It's about how Costanzo and Recio cared so much

6    about the money, that they put people and criminal

7    investigations at risk.

8            When you set aside the distractions, that is what this

9    case is about.  And there is incontrovertible, overwhelming

10   evidence proving it.  Costanzo and Recio committed bribery and

11   fraud.  That is what happened.  That is what you learned about

12   in this trial.  And that is why they are guilty.

13           Thank you.

14           MR. MUKASEY:  John Costanzo did not receive a bribe

15   from Manny Recio or anybody else.

16           John Costanzo wasn't in a conspiracy to receive bribes

17   from Manny Recio or anyone else.

18           And John Costanzo didn't act with corrupt intent.

19           Ladies and gentlemen, in a case where the government

20   has the burden of proving bribery beyond a reasonable doubt,

21   don't you think that one — one — of their witnesses would have

22   testified that there was bribery?

23           In a case where the government has the burden of

24   proving a conspiracy beyond a reasonable doubt, don't you think

25   one of their witnesses would have said there was a conspiracy?

1       And in a case where the government has the burden of

2   proving that John Costanzo acted with corrupt intent, don't you

3   think they would have called one witness who testified that

4   John acted with corrupt intent?

5       But not a single government witness testified to any

6   of that.  Not a single document, not a single text message, or

7   tape recording, out of the thousands in this case, showed money

8   going to John Costanzo in return for DEA information.  Not a

9   single witness, not a single document.  That is astonishing.

10  That is a remarkable failure of proof.

11      And that's enough for you to acquit John Costanzo on

12  every count.

13      In a case about bribery and conspiracy, nobody

14  testified there was bribery or conspiracy.  It's simply not

15  there.  And if it's not there, it's not guilty on every charge.

16      Now, the government spent a ton of time talking about

17  DEA policies and secret memos about Venezuela.  They spent even

18  more time talking about a bunch of people who aren't even on

19  trial and their taxes and their mortgages and their subpoenas.

20  But let's remember what the charges actually are in this case.

21  There are no tax charges, there are no mortgage charges,

22  there's no failure to obey subpoena charges in this case.  The

23  only thing that matters in this case is the only thing the

24  government doesn't want to talk about.  The only thing that

25  matters in this case is the only thing the government had no

1   proof of in this case.  The only thing that matters is that

2   there is no proof that John Costanzo gave away DEA information

3   in return for payments.  There was no quid pro quo.  There was

4   no "this for that."

5        Yes, they showed a lot of DEA information.  And, yes,

6   they showed a lot of payments.  But they never connected any of

7   them.  They never showed how they were linked, because they

8   weren't linked.  They never showed they had anything to do with

9   each other.  They never showed they were related.  They never

10  showed that John gave Manny Recio, or anyone else, DEA

11  information in return for payments.  And that's because it

12  never happened.

13       In this case, if you follow the money, you don't get

14  to John Costanzo; you get to nowhere.

15       Now, ladies and gentlemen, to prove their case, the

16  government has to show that John Costanzo, Jr. violated his

17  official duty at DEA in return for something of value, and that

18  he acted with a corrupt, a bad, and evil state of mind.  And

19  when we scrutinize the proof, really scrutinize it — not just

20  read text messages, but when you really scrutinize it — it's

21  not there.

22       And I want to remind you that I expect Judge Oetken to

23  charge you later on today about acting in good faith.  He's

24  going to give you the exact language; I'm going to give you my

25  best effort.  But I believe he is going to charge you that if

NB7KCOS3                         Summation - Mr. Mukasey

1    John was acting in good faith, it's a complete defense to every

2    count.   That means if John was not acting with criminal intent,

3    he's not guilty.

4              So what does the evidence show about John and his

5    official duty as a DEA agent?

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. MUKASEY:  The evidence shows that John was a good

2    agent.  He was a damn good agent.  The DEA had the right to

3    expect John's honest services, that he was acting in their

4    interest, not his own.  That's exactly what the DEA got from

5    John Costanzo.

6          What motivated John?  The evidence showed that he was

7    motivated by mission, not money.

8          In November 2018, when the government claims the

9    scheme began, where was John Costanzo?  Who was John Costanzo?

10   Well, he had been a DEA agent for 20 years.  His dad was a DEA

11   agent.  He has worked his way up from special agent to group

12   supervisor, he is soon going to headquarters as a staff

13   coordinator in Washington, D.C., and he is looking over all

14   sorts of big cases and providing advice and deconflicting when

15   groups run into each other and he is a problem-solver and he is

16   exercising good judgment and he is handling multimillion and

17   multibillion AEGOs.  He is leading the attack on the financial

18   operations of international drug cartels.  He is a loyal agent.

19   He is a dedicated agent.  He is respected in the DEA.  You

20   heard he was respected in the Department of Justice, and you

21   heard he was respected at the F.B.I.

22         And because he is a good agent and because he's worked

23   hard and because he's saved, he's got a retirement fund.  So he

24   doesn't need money and he certainly doesn't need bribe money.

25   So there is no evidence of motive here.  John was doing fine.

1    Now, the government asked you to use your common

2    sense.  This may be the only thing we agree on.  You should use

3    your common sense.  You've got to ask yourselves, does it make

4    any sense to you that a steadfast, committed, respected agent,

5    who served for 20 years with a spotless record, who has a

6    family legacy in DEA to uphold, who has retirement savings and

7    no money problems and who has dedicated his life to DEA, does

8    it make any sense to you that he would all of a sudden,

9    overnight, out of the blue turn into an evil, greedy, corrupt

10   international criminal mastermind whose life is now devoted to

11   working against the DEA?  Because that's what the government

12   wants you to believe.  And that's a crock.  It's even more

13   ridiculous that he would recruit his own father and his two

14   best friends.  That is preposterous.

15       That is why nobody took the witness stand and

16   testified that John was unethical.  Nobody took the witness

17   stand and testified that John was dishonest.  Nobody took the

18   witness stand and testified that John was greedy.  Nobody took

19   the witness stand and testified that John acted with a corrupt

20   purpose.  Nobody took the witness stand and testified that he

21   was even in a scheme.  Nobody testified that he wanted to harm

22   the DEA.  Not a single person.  So right off the bat, you can

23   reject the government's case if you use your common sense,

24   because it makes no sense.

25       Now, you might be asking yourselves, what about all

1  those manuals and policies that guide DEA conduct?  Do they

2  show somehow that John violated his official duty?  Because

3  even though the government hasn't proved bribery or conspiracy,

4  they certainly proved that DEA has a lot, a lot of manuals.

5          And you heard one of the government's witnesses

6  talking about manuals and office policies.  And he doesn't know

7  John.  He doesn't know the case.  But he knows a lot about

8  manuals.  And he told you about 10 or 12 different manuals——a

9  personnel manual, an agent's manual, an administrate manual, a

10  money laundering manual, an international manual.  He told you

11  there are tons of manuals.  That guy they brought in to

12  testify, he was like the professor of policy manuals, and even

13  he doesn't know all the manuals and all the policies.

14          So did John follow every single rule in every single

15  manual every single our of every single day on every single

16  investigation?  I don't think the policy professor guy knows

17  and I don't think anybody knows.  But what we do know is that

18  none of the manuals say that what John did was wrong.

19          Remember the testimony of the government's first

20  witness, Special Agent Escobar.  He was John's boss.  None of

21  the manuals, according to Escobar, say that a DEA agent may

22  never communicate with a private investigator.  None of the

23  manuals say that a DEA agent can never speak to a defense

24  attorney.  None of the manuals say that an active agent can

25  never accept information from a retired agent.  And none of the

 1    manuals say that an agent can never think about what he might

 2    do with his buddies when he retires.  And the evidence showed

 3    that a huge part of being a good agent is collecting

 4    information.  That's how agents build cases.  A bunch of

 5    different witnesses said it.

 6         So when John is out there doing his job, he is

 7    collecting information.  He is collecting information from

 8    anywhere and everywhere.  That's him doing his job, not

 9    violating his duty.

10         You heard from Special Agent Escobar, he said

11    collecting Information is part of the duty.  It's a critical

12    part of the duty.  And information comes from all different

13    places.  It comes domestically.  It comes internationally.  It

14    comes from members of the public.  It comes from private

15    citizens.  It comes from cooperating witnesses.  It comes from

16    confidential informants.  And John was good at cultivating all

17    of it.  I don't think there is any dispute about that.

18         Now, when John encountered a source——whether it was a

19    criminal source, whether it was a citizen source, whether it

20    was a private investigator source——John didn't need permission

21    to work with them.  When John encountered a confidential

22    source, he didn't need permission to try to flip them,

23    according to Escobar, to further the mission.  If your group

24    encounters somebody and they are not charged, they don't have a

25    lawyer, and they think they might be a good source, they don't

Nb72Cos4                    Summation - Mr. Mukasey

1    need to -- you don't need permission to try to flip them.

2    Escobar said no.

3            A couple more points on the manuals.  Section 6322 of

4    the personnel manual says that "routine use disclosures may be

5    made to individuals and organizations in the course of

6    investigations to elicit information."  "Disclosures may be

7    made to individuals and organizations in the course of

8    investigations to elicit"——to get——"information."

9            That's exactly what John was doing.  He was collecting

10   information, information, and more information.  John was not

11   violating his official duty.  He was pursuing his official

12   duty.

13           Now, what does the government hold up as corrupt or

14   bad intent?  Somehow evidence of bribery, of violating official

15   duties in exchange for money?  What do they hold up?  Well,

16   they hold up the NADDIS searches.  They actually held up two

17   different charts of NADDIS searches because one was wrong and

18   then they had to correct it.  They spent about three or four

19   days on NADDIS searches.

20           And you have to ask yourself two questions:

21           First, was John acting in good faith when he ran

22   NADDIS searches?  Well, the personnel manual, the government's

23   exhibit says a special agent of the DEA doesn't need permission

24   from a supervisor to run a NADDIS search in order to further an

25   investigation for an official purpose, and John was running

1    searches to see if Manny's clients, Manny Recio's clients could

2    be helpful with cooperation.  That's an official purpose.  And

3    getting information from a private investigator or a member of

4    the public is routine and running NADDIS searches is similarly

5    routine.  It's part of gathering information.  So of course

6    John was acting in good faith when he ran the NADDIS searches.

7            But the second question, was there a payment in return

8    for NADDIS searches?  There is not a shred of evidence that

9    there was any payment for any NADDIS search.  The government

10   had a wiretap up in this case for months.  They didn't

11   intercept a single call where John and Manny are talking about

12   NADDIS searches at all, let alone talking about money, a single

13   dollar connected to the NADDIS searches.  That tells you loud

14   and clear that as to the NADDIS searches, John Costanzo was

15   about mission, not money.

16           What else do they hold up as evidence of corrupt

17   intent and bribery?  They hold up the case of Shirley Colorado.

18   Now, you will recall, Shirley Colorado was a cooperating

19   witness who helped build big cases for John.  John was her

20   handler and he worked with her for a number of years and he

21   thought she deserved some leniency because of the help she gave

22   to DEA.  It's called Rule 35, and John made some edits to a

23   letter on her behalf.

24           First question:  Was John acting in good faith when he

25   offered to help a cooperating witness?  Well, DEA lives on

1  cooperating witnesses, and Shirley was a terrific cooperating

2  witness.  And remember what Michael Nadler, who was the

3  prosecutor on her case, what Nadler said?  He said it was

4  honorable to stand up for your cooperating witnesses.  And if

5  John doesn't stand up for successful cooperators, do you know

6  what happens to DEA?  They don't get anymore cooperators.  So

7  that's proof positive that he is acting in good faith,

8  honorably.

9         But the second question:  Was there a payment related

10 to this Shirley document?  Nowhere.  Nowhere in the evidence.

11 They want you to think there was a payment because you just saw

12 a text message where Manny Recio said this is 30 grand right

13 here.  But Shirley is Manny's client.  That's not 30 grand for

14 John Costanzo.  Go back and look at the bank records.  John

15 Costanzo doesn't get a piece of that.  He didn't get a nickel.

16 That tells you loud and clear that, with regard to Shirley

17 Colorado, John Costanzo was about doing it right, doing it for

18 the mission, not the money.

19        What else does the government hold up as evidence of

20 corrupt intent and bribery?  Well, they said that John leaked

21 the indictment date, the sealed indictment of Alex Saab.  So

22 again, first question, was John acting in good faith in this

23 episode with Alex Saab?  Let's listen to Government Exhibit

24 202A-T, where they say John leaked this indictment.

25        (Audio played)

1    MR. MUKASEY:  I submit to you that that call is

2    evidence of John's good faith.  The name Alex Saab is not in

3    that call.  John never mentioned his name.  And if you listen

4    carefully—and I encourage you to listen to that call over and

5    over again when you go back to deliberate—John stopped.  Was

6    he excited?  They are bringing big cases.  Probably.  But you

7    can hear John pull up and stop.  He is essentially saying,

8    well, wait until the 25th.  You know what's coming on the 25th?

9    And he never says it.  He never says it.  Because John's

10   ethics, John's morals, John's honesty, John's duty kicked in.

11   The name Alex Saab never came out of his mouth.  That's

12   evidence of good faith.  And by the way, there is zero evidence

13   of payment in return.  Mission, not money.

14        The government also tried to make a big to-do about

15   the César Peralta "gone in two weeks" comment, and they

16   suggested John's comment may have caused Peralta to flee.  But

17   all you really have to do is ask yourself was John acting in

18   good faith?  Well, look at the testimony.  Look at the

19   information flow.  It's Manny.  It's Manny Recio who tells John

20   what's going on before John even says anything.  So the

21   government can say it doesn't matter, it doesn't matter, it

22   doesn't matter, but you need to decide what was in John's head,

23   what was in John's mind, what were his intentions.  He was

24   listening to Manny Recio.  He got information from Manny Recio.

25   He collected the information from Manny Recio.  And just a

1  little footnote, after John said he was gone in two weeks, you

2  can follow the timeline, he wasn't gone in two weeks.  He was

3  still there.  The F.B.I. was on him.

4          Once again, this is becoming a theme.  There is no

5  connection to any payment as a result of this César Peralta

6  episode.  This was John on the mission, not about the money.

7          And what about the call with that guy Rogelio?

8          (Audio played)

9          MR. MUKASEY:  This is the call that the government

10  says is the ugliest call in the case, right?  GX 214, the one

11  where Manny says Rogelio is spreading rumors that David Macey

12  bought you a Mercedes and John gets angry.  John says he is

13  going to fix these people and he loses his temper.

14          I wanted to play that and I wanted to talk about that

15  because I want to take it head on and stop it right in its

16  tracks.  We know full well from the testimony in this courtroom

17  that David Macey never bought John a Mercedes.  You heard

18  yesterday from Edwin Pagan, John's never even had a Mercedes.

19  That's why John is outraged on the call.  He is outraged that

20  this Rogelio, a cartel boss and a mass murderer, was spreading

21  lies about him.  He never acted on that anger, but his level of

22  anger was at the falsity of the accusation and it sure as heck

23  isn't evidence of bribery.  It's evidence of outrage.  It's

24  evidence of honor.  It's evidence of his integrity.  But it is

25  certainly not evidence of bribery.

1    Now, by the way, David Macey, Luis Guerra, and the

2    other people that the government is trying to sweep into this

3    fantasy conspiracy, there is also no dispute that they are

4    cooperating attorneys.  They are not like the attorneys in this

5    courtroom who go to trials and fight for their position.  They

6    are cooperating attorneys.  So why do you think that John wants

7    them representing people?  They are known to bring people, to

8    bring their clients to the DEA.  That helps the mission.  It

9    has nothing to do with money.  And John's good faith and John's

10   commitment to the mission is pretty well summed up here.

11   And to GX 7T, these are the Macey-Guerra cooperation

12   e-mails.  But John's good faith and John's commitment to the

13   mission is summed up in the text message that John sends

14   saying:  If there is anything that benefits the DEA, I would

15   jump on it.  If there is anything that benefits the DEA, I

16   would jump on it.

17   So, members of the jury, even if you don't like what

18   happened in every one of these instances, even if you think

19   there were policies that covered this stuff, the judge is going

20   to instruct you that you can't find John Costanzo guilty just

21   because you think he broke some DEA policies, even if you think

22   he did something unethical.  That's not enough.  Violating

23   office policies is not a crime by itself, even DEA office

24   policies.  You still have to find all the elements of all the

25   crimes charged beyond a reasonable doubt.  So all that stuff

1    about NADDIS and Saab and Peralta and Shirley, it's not a

2    crime.

3            Now, if John was about mission and not about money,

4    how did we end up here?  Well, it's pretty simple.  We ended up

5    here because of a dishonest murderer with two bad choices and a

6    big grudge.  That's where Villazon Hernandez surround himself

7    in the spring of 2019.  It's March of 2019.  He's been nailed

8    by the F.B.I. for money laundering, and he is looking at 20

9    years in prison.  But then it gets worse for him, because the

10   immigration service sends him this, which is DX 1031.  You can

11   ask for it when you go back in the jury room.  Read it.  Now he

12   is in a jam.  Now his back's against the wall.  Now he is going

13   to be deported.  So he is going to prison in America or he is

14   getting deported and killed back in Colombia.  So he needs

15   help, and he needs help fast, and he needs help from the

16   F.B.I., lots of it.  He's got to bring them a bombshell.

17           So what does he do?  Who is the most obvious target?

18   Well, who is better to serve up than the guy who caused you to

19   be investigated and plead guilty and face prison or

20   deportation?  This is what Villazon Hernandez told you:

21   "Q  The two people you were involved with, or two of the people

22   you were involved with, were Alex Saab and Bruce Bagley, yes?

23   They were your coconspirators?

24   "A  Yes.

25   "Q  DEA Group 10, you said yesterday, was investigating Alex

1   Saab, yes?

2   "A.  Yes, that's correct.

3   "Q  John Costanzo was a group supervisor of Group 10?

4   "A  Yes."

5   Q.  That's how we got here.

6           John was investigating the Saab case, Hernandez got

7   arrested on the Saab case, and Hernandez got his revenge here.

8   he planted the seed with the F.B.I. that Costanzo was dirty so

9   he could get help from the F.B.I. to stay in this country, and

10  that's why an innocent man is sitting in the chair back there

11  and Villazon Hernandez is walking the streets of Miami Beach in

12  a $2,000 suit, driving a Mercedes, with $3 million from the

13  cartel in one pocket and about $500,000 from DEA in the other

14  pocket.

15          Now, let's take a minute and think about this guy,

16  because he is the guy who caused this whole thing.  Villazon

17  Hernandez is a man who made millions trafficking cocaine around

18  the world and killing who he needed to when he wanted to.  He

19  is a man who got thrown out of the cocaine cartels because the

20  cocaine cartels didn't trust him.

21          This is a man who ran to the DEA with his hand out for

22  money and swore up, down, and sideways that he cleaned up his

23  act and then got thrown out of the DEA because they didn't

24  trust him.

25          So he went across the street to the F.B.I. and he said

1   I pinky swear cross my heart I've cleaned up my act.  It's all

2   behind me.  He promised he had gone straight again, and then

3   the F.B.I. threw him out because they didn't trust him.

4          He then weasels his way back to the DEA, because this

5   time, he abso-definitely-swear-to-God-this time, he learned his

6   lesson and he really, really needs it.  Even though he is in

7   the middle of laundering millions of dollars stolen from the

8   people of Venezuela right under the DEA's nose.

9          This is the man that these prosecutors promised a free

10  pass on a murder, a free pass, no prosecution, on zillions of

11  dollars of drugs he trafficked if he would just wear a wire and

12  get evidence to back up his bogus accusations against John

13  Costanzo.  And they gave him a wire and they helped him with

14  his immigration problems, and they let him rip with the wire

15  for seven months, and they trusted him.  But look what happened

16  when I asked him about it in court.

17  "Q   You don't have any information that John Costanzo gave

18  David Macey DEA information?

19  "A   No.

20  "Q   You never had a conversation with David Macey where he

21  said he got information from inside the DEA, correct?

22  "A   No.

23  "Q   You recorded people in this case for approximately seven

24  months?

25  "A   It might be.

1   "Q   You wore a recording device during meeting with Mr. Recio?

2   "A   Yes.

3   "Q   You used a recorder during meetings, conversations, with

4   Mr. Guerra?

5   "A   Yes.

6   "Q   You recorded telephone calls?

7   "A   Yes.

8   "Q   You don't have a single recorded meeting with

9   Mr. Costanzo.

10  "A   Correct.

11  Q.   You don't have a single recorded phone call with

12  Mr. Costanzo.

13  "A   Correct.

14  "Q   You don't have any recording of Mr. Recio discussing

15  bribery with Mr. Costanzo.

16  "A   No, I don't have anything.

17  "Q   You don't have any recording of John discussing bribes

18  with someone named Eddie Pagan.

19  "A   I don't know Eddie Pagan.

20  Q.   You don't have any recording of John discussing bribes with

21  anybody.

22  "A   I never recorded John Costanzo.

23  "Q   And so you don't have any recordings of him asking for

24  bribes.

25  "A   No.

1    "Q   And you never saw Mr. Recio pay Mr. Costanzo any bribe.

2    "A   I never saw Recio pay a bribery to Costanzo."

3           He got nothing.  He came up empty.  His accusations

4    were false and his testimony actually destroys the notion that

5    there was even a conspiracy here.

6           At 743 of the transcript:

7    "Q   David Macey is a criminal defense lawyer in Miami.

8    "A   Yes.

9    "Q   Luis Guerra is a criminal defense lawyer in Miami?

10   "A   Yes.

11   "Q   Sometimes they compete for clients, they are competitors.

12   "A   I'd imagine so.

13   "Q   Sometimes they both want the same clients?

14   "A   Yes.

15          David Macey and Luis Guerra are competitors.  They are

16   not partners.  They are rivals.  They are not coconspirators.

17   Villazon Hernandez says it in other tapes and he says it to

18   Luis Guerra himself when Luis Guerra and Villazon Hernandez

19   were talking about their distaste for David Macey.  That puts

20   the lie to the notion that the government wants you to believe

21   that they were all in cahoots together.

22          And by the way, I believe the Judge is also going to

23   instruct you that you can have friends.  You can have friends.

24   Just because you associate with people who might be up to no

25   good or who might be in a conspiracy or who might be doing

1    things that you don't know about, that doesn't mean you are

2    involved in it.  And John had friends.  John knew David Macey,

3    John knew Luis Guerra, and he was comfortable working with

4    those attorneys because they flipped their clients.  Mission

5    not money.

6          So it's kind of rich that the drug cartels trusted

7    Villazon Hernandez and they got burned.  The DEA trusted

8    Hernandez, they got burned.  The F.B.I. trusted Hernandez, they

9    got burned.  Now the U.S. Attorney's office trusted Hernandez,

10   gave him a wire, sent him out there, and they got burned

11   because he basically exonerated John Costanzo.

12         You have to ask yourself:  How can the government

13   prove these charges against John when this guy comes up totally

14   empty?  No evidence of bribes.  The answer is they can't.  They

15   can't prove the case.  There are no bribes.  The case is burned

16   out.  That's the DEA's story.

17         Now let's talk about the money.  Now let's talk about

18   the payments.  That's the thing the government avoided for most

19   of their case.

20         They probably avoided it because they made sort of an

21   outrageous statement when they stood up in front of you during

22   their opening.  They said about two and a half weeks ago that

23   John Costanzo sold confidential inside information, sold it, to

24   Manny Recio, sold it.  Obviously you have seen no evidence of

25   that.

1          And that Manny Recio paid John tens of thousands of

2     dollars for it.  We will go through it.  It's not there.

3          And that the information was then fed to defense

4     attorneys who paid Recio for it.  I didn't hear any of that.  I

5     don't even think Ms. Deininger said that in her summation.

6          In this case, if you follow the money, you get to

7     nowhere.  Even though you saw a hurricane of records, the

8     government is really pinning its hopes on four payments that

9     either don't come from Recio or any defense attorneys or don't

10    go to John Costanzo.

11         So the government has problems coming and going, and

12    none of them are connected in any way to DEA information.

13         So the first payment, $2500 payment, that went from

14    David Macey to Manny Recio at Global Legal Consulting and then

15    to EBCO, John's father's company.  So was this a bribe payment?

16    Of course not.  No money ever went to John Costanzo, Jr. and no

17    DEA and no confidential information was ever sold.  The

18    government is asking you to make a wild leap, to speculate, to

19    assume that some money must have somehow made it back from

20    John's father to John.

21         But go back and look at the bank records.  Go back and

22    look at Mr. Polo's, the forensic accountant's, testimony.  The

23    buck stopped with EBCO, with John, Sr.  John, Jr. got nothing.

24    That can't be a bribe.

25         Now, the second payment was the $50,000 that started

1    with Eddie Pagan, not Manny Recio and not a defense attorney,

2    which is where the government says the bribes start.  It

3    started with Eddie Pagan, and it went to John, Sr. and then Sr.

4    made a gift to Jr. towards the down payment on his townhouse.

5            Now, is this a bribe?  I mean, think about this for a

6    second.  Eddie Pagan is a police officer assigned to the DEA.

7    So why on earth would he need to pay a bribe for DEA

8    information?  That's absurd.  It makes no sense.  And again,

9    the forensic accountant reviewed his personal bank records and

10   found that Pagan hadn't received a penny from Recio or any

11   defense attorney.  So he wasn't acting as a funnel or as some

12   conduit.

13           And the mortgage officer who came in here yesterday,

14   Mr. Ross, he testified that he was a man concerned with ethics

15   and compliance and the whole purchase of the townhouse was done

16   correctly as far as he was concerned.  The gift letter form

17   didn't require anything but truth about the source of the gift

18   and whether the gift giver expected to get paid back by the

19   gift receiver.  And the truth was that the money that went to

20   the home purchase came from the account of John, Sr.——go check

21   the records——with no expectation of payment back from Jr.

22           And last but not least on this one, you have direct

23   sworn testimony from Eddie Pagan under oath that this had

24   nothing to do with bribes for DEA information.  They took a

25   moment on Pagan, now I'm going to take a moment on Pagan.

1    Yesterday Pagan was on the witness stand for, I don't
2  know, two hours, maybe more.  Here's what the government didn't
3  even ask him:  They didn't ask him a single question about
4  bribery.  They didn't ask him a single question about
5  conspiracy.  They didn't ask him a single question about David
6  Macey.  No mention of Luis Guerra.

7    Instead, they spent their time asking questions about
8  mortgages from years ago, nothing to do with this case.  They
9  spent their time asking questions about his tax deductions.  I
10  mean, they had a guy who supposedly is part of this mastermind
11  bribe scheme and they didn't ask him about bribes or a scheme.
12  That ought to tell you there were no bribes and there was no
13  scheme.

14    The government doesn't do any better with the third or
15  fourth payments.  Those are payments from Global Legal
16  Consulting——Manny Recio's company——to JEM Solutions——Eddie
17  Pagan's company.

18    Now, take a moment to think about JEM Solutions,
19  Pagan's company.  We are not talking about Merrill Lynch here,
20  okay?  JEM was started by a cop who wanted to try to do some
21  work with his friends in the future.  It wasn't a slush fund,
22  but it also didn't have the recordkeeping of a Fortune 500
23  company.  It was started out of Eddie Pagan's bedroom, and he
24  was looking for office space and doing some work with Manny.
25  We reviewed documents.  The only reason we are even talking

1    about JEM Solutions in this trial is not because of any

2    connection to DEA information.  It is not there.  It is not

3    because of any bribes, and we are not talking about JEM

4    Solutions because of John Costanzo's official duty.  The only

5    reason we are even talking about JEM Solutions is because Eddie

6    Pagan let John, his best friend in the world, use the JEM bank

7    card to buy about $3500 worth of plane tickets so he could come

8    back to Miami from Washington to hang with his friends.  And

9    you know it wasn't a slush fund because John didn't even use

10   the bank card until Eddie wanted to pay him back for the car

11   insurance and the tires that John had been paying for.

12          So, again, look at the testimony of Mr. Polo, the

13   forensic accountant, Elgin Polo, dates and amounts that match

14   up with Eddie's testimony, no connection to bribes for DEA

15   information.  Go back.  Check the testimony.

16          Oh, and there is also Mr. Victorero.  The government

17   has now moved that into the bribe category.

18          Now, Victorero, who we didn't even cross-examine,

19   Victorero did work on John's townhouse.  He testified that John

20   left the balance of what was due to Victorero with David Macey,

21   who was also using Victorero, because John was headed out of

22   town.  And that text message says John's packing.  None of that

23   had any connection, according to the proof in this case, to

24   bribes or DEA information.  It's just words.  There is no

25   connection.

1          Now, the other two payments you heard a little bit

2     about were Pagan paying back Susana Rueda when she lent money

3     to John to cover legal fees and he was stressed out.  That had

4     nothing to do with Macey, Guerra, or DEA information or Recio,

5     frankly.

6          And a baseball game, a baseball game, that John went

7     to with another well respected DEA agent, no connection shown

8     to DEA information or bribes.  And I don't know if you

9     remember, but one of the supervisors from the financial

10    operations division was testifying about the baseball game, and

11    the government asked him to look at pictures and sort of an

12    interesting moment in the case because he didn't know anything

13    about the baseball game.  He didn't know anything about the

14    pictures.  He didn't seem to understand why they were asking

15    him questions about a baseball game he didn't know anything

16    about.  And they didn't ask him anything about bribery or

17    conspiracy related to this baseball game.  They just told him

18    to read "third base five rows up."  That's what he read.  No

19    evidence of bribery, no evidence of conspiracy.

20         Now, while I'm on the subject of the government's

21    witnesses, think about who they were.  They were mostly just

22    people reading text messages.  About three or four of them were

23    people who actually worked for the prosecutors and just used

24    their laptops to draw diagrams and artwork and charts that the

25    prosecutors told them to make.  They don't know anything about

the DEA, they don't know anything about John, they don't know

anything about Manny, the job, the duties.  And ladies and

gentlemen, there is no room for sloppy work in a criminal

trial.  There can't be messy, incomplete work in a criminal

trial.  There is no do-overs.  You can't trust mistakes because

mistakes bring doubt.

So are you really going to judge somebody's worth by

their income from one year or are you going to look at all of

their assets?  Are you really going to say that John lived in

that building that they kept showing when he really lives on

the other side?  Are you really going to trust a tape recording

that had 25 unintelligible entries, 25 unintelligibles?  Or the

government witness who understood David Macey to be a retired

law enforcement and private investigator, not a defense

attorney?  Or how about the summary chart that they replaced

two times because it had mistakes in it?  Or the summary chart

of financial transactions, which I think is GX 700, which

called the purchase of the condo that John bought and Manny

Recio establishing Global Legal Consulting as a transaction

related to the purchase.

The final mistake that I want to show you I think is

really the most poignant.  The text message that the government

put up from 4/22/2019, at 4:02, on the bottom left.  Remember

that one?  They put it up, they had the witness read, "Done

with the banks 100K Wells, 100K Bank of America.  He only had

1    40K at Citibank," and they thought they had hit the jackpot

2    because this was a bribery scheme.  Turns out, ladies and

3    gentlemen, it had absolutely nothing to do with a bribery

4    scheme.  That was about a money pickup for a DEA operation.  Do

5    you know which one?  Hector Zavala Mora.

6          Now, speaking of innuendo and speculation versus

7    reality, there is a whole bunch of text messages that you have

8    seen over and over again where you hear scheming about money,

9    money, money, and we can talk with Louie about going 50/50,

10   it's 30 grand right here, and Louie doesn't bring anything to

11   the table, and he's got 60 with Shirley and 110.  Manny Recio,

12   my partner, and this is JM's cut on a Mexican case.

13         You should ask the government to show you the money.

14   Because they can't connect any of those words, any of those

15   text messages, any of that language to a single dollar that

16   went to John Costanzo, Jr.  It's a host of sound and fury.  It

17   signifies nothing.

18         Now, what about this evidence of concealment that

19   somehow John was covering up some scheme?  The fact that his

20   colleagues don't know what his retired buddy from outside the

21   office is up to.  Does that mean that you are covering up a

22   scheme?  Of course it doesn't.

23         Does your employer know all your friends?  I doubt it.

24   Does it mean that you are hiding your involvement in a criminal

25   scheme?  It is sort of a ridiculous argument.

1    I've never told my employer that I have a gold fish at

2 home.  Does that mean I'm covering up or concealing the fact

3 that I have a gold fish at home?  I mean, what it really means

4 is I never had a gold fish at home.  That's why I never told

5 them about a gold fish at home.  You are not concealing it.

6 It's just not a fact.

7    John didn't conceal any dirty relationship with Manny.

8 It's just not a fact.

9    In fact, let me talk to you about another factor that

10 goes into whether or not John was up to a nefarious, dirty

11 scheme.  And this is something the government touched on.  I

12 would like you to think about it in a bit of a different way.

13    John was highly skilled.  John knew a lot about money

14 laundering.  John knew a lot about financial transactions for

15 sure.  And the government wants you to believe that since John

16 was an expert in investigating how criminals move their money,

17 he used that expertise to secretly disguise the bribe payments.

18    Well, that's a joke.  A guy who has been a DEA agent

19 for 20 years, who is an expert in the way sophisticated

20 international cartels launder money, who is teaching financial

21 investigation to new agents, if he wanted to use his expertise

22 to carry out a scheme and he didn't want to get caught,

23 wouldn't he use fake names and aliases and offshore bank

24 accounts and secret codes and phony addresses and cash payoffs?

25 I mean, that's how you would hide a criminal enterprise, I

1    would think.  But that's not at all what John did.

2         If you go back and look at all the records, he was

3    totally transparent, totally open, totally traceable, totally

4    out there for anyone and everyone to see:

5         He used his own name.  Nobody would do that if they

6    were running a criminal scheme.

7         He used his own address.  Nobody would do that if he

8    was running a criminal scheme.

9         He used big, well-known banks and mortgage companies.

10   He used checks and wires and ATMs that are all totally

11   traceable.  Nobody would do that if they were running a

12   criminal scheme.

13        He talked and texted openly on the phones that he knew

14   better than anyone could be intercepted.  Nobody would do that

15   if they were running a criminal scheme.

16        He ran NADDIS searches when Special Agent Escobar told

17   you that everyone in DEA knows they keep track of who is

18   searching names in NADDIS.  Nobody would do that if they were

19   running a criminal scheme.

20        He put his best friend's name and his father's name on

21   his national security forms.  Nobody would do that if they were

22   part of a criminal scheme.

23        And the government also suggests that he is a master

24   concealer and deleter of messages and phone calls.  Well, you

25   know that's not true because carrying that second phone, go

1    back and look at Special Agent Escobar's testimony, he said

2    carrying extra phones is completely responsible.  I think he

3    said he had three or four at one time.

4           And as for the deletions, you heard testimony, and I

5    think everybody knows by now, deleting something from the phone

6    doesn't mean it is deleted from the universe, and there were no

7    pattern to the deletions here.  Why would John delete one

8    message and not the other with the exact same information in

9    it?  Why would he delete calls from his urologist?  Why would

10   he delete calls from his mother and father?  The government's

11   own witness, Ms. Maj, she conceded there was no pattern of

12   deletions here.  Somebody running a criminal scheme would have

13   done it a whole lot better.

14          So John didn't use his skills to hide some scheme.  He

15   used his own name, his own address, his own accounts because he

16   wasn't hiding anything, because he was out in the open, because

17   he had nothing to hide, because he did nothing wrong, because

18   there were no bribes.

19          This has been a long trip for John Costanzo, Jr., and

20   it's been our honor, John, to represent you.  It's been our

21   honor to fight for John Costanzo and his good faith and his

22   innocence.  And it's been our honor to stand in front of you,

23   and I think we chose you as jurors because we are confident you

24   will do your duty in accordance with the oath you took at the

25   beginning of the case, to start your deliberations with the

1  presumption that John is innocent, to require, during your

2  deliberations, that the government overcome that presumption,

3  to make them prove their allegations beyond a reasonable doubt.

4        And I can promise you that the decision that you are

5  going to make about John Costanzo is the most important

6  decision that's ever going to happen to him in his life.  His

7  faith, his liberty, his world will soon be right in your hands.

8  Please don't speculate.  The government may want you to imagine

9  that there are other bank accounts out there that he got money

10  in or there are other wire transfers that he got money from or

11  there is a suitcase of cash somewhere.  Well, it's not here.

12  It's not in this courtroom.  It's not in this record.  This

13  record shows no connection between any DEA information in

14  return for any payment to John Costanzo.

15        John was passionate about his job.  You heard it.

16  John was passionate about his friends.  You heard it.  John was

17  passionate about his integrity, and you heard it.  He was about

18  mission, not money.  So just imagine the nightmare it is for

19  John to have his life hang in the balance because of a text

20  message or a phone call or a comment.  Nobody wants to be

21  judged that way because it is so easy for a prosecutor five

22  years later to put a text message or a telephone call under a

23  microscope and distort it and take it out of context.  So you

24  have to judge John not by what flew from his fingerprints in a

25  text message or came out of his mouth in a phone call.  You

Nb72Cos4

1   have to judge him by what he was thinking in his head and what

2   he was feeling in his heart.  And if you want to know what was

3   in John's head and what was in John's heart, there are text

4   messages that you will see.  He knows where to draw the line.

5   Who sends a message like that with corruption in their heart?

6           Ladies and gentlemen, there were no bribes.  There was

7   no *quid pro quo*.  There was no this for that.  There was no

8   conspiracy.  John Costanzo wouldn't be bought, couldn't be

9   bought, and wasn't ever bought.  So you should return a verdict

10  on all counts of not guilty.

11          THE COURT:  Thank you.

12          Members of the jury, it's about 1:30, so I'm going to

13  give you a break for lunch.  We can resume in 45 minutes or do

14  you think you need a full hour?  Can you get by with 45

15  minutes?  All right.  So we will resume at 2:15, and we will

16  complete the summations, and then I will instruct you on the

17  law and you will begin your deliberations.

18          I just want to remind you that you are not yet

19  deliberating.  So please leave your notepads on your chairs.

20  Do not discuss the case with each other or with anyone else.

21  Obviously, until I tell you you are deliberating, you are not

22  deliberating.

23          Have a good lunch, and we will see you at 2:15.

24          (Continued on next page)

25

Nb72Cos4

1              (Jury not present)

2              THE COURT:  You may be seated.

3              Anything anyone wanted to address before we break?

4              MR. SWETT:  Yes, your Honor.

5              We want to circle back to paragraph F on pages 26 and

6    27 of the jury charge, the red line version from Costanzo's

7    counsel.

8              So we had been wordsmithing the paragraph on page 27,

9    discussing the fact that he didn't need to show that the

10   promise or, rather, there was a promise for a specific act as

11   part of the exchange, and we said, well, let's see how they

12   close, and clearly Mr. Mukasey closed on the idea that specific

13   acts were not tied to payments.  So we renew our proposal, our

14   request that this language be included.  We can talk about the

15   specifics, but we think it's absolutely appropriate.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

NB7VCOS5

1          THE COURT:  What is the language you'd propose, the

2    original language that we had?

3          MR. SWETT:  I think where we were -- I mean, the

4    original language is fine.  Maybe we can take out the part

5    about with respect to a particular question or matter.  But

6    otherwise we think that language is fine.  This is to capture

7    the idea of as opportunities arrive -- as opportunities arise,

8    theory of *quid pro quo* of a specific *quo*.

9          THE COURT:  That's the idea.

10         MR. SWETT:  Correct.

11         THE COURT:  Okay.  We'll take a look at that over

12   lunch; and I think I'll incorporate some version of that.  I

13   want to look at the *Silver* decision and make sure that it's the

14   correct statement of the law.

15         MR. WESTFAL:  Your Honor, just from Special Agent

16   Costanzo's side, we object to requests and changes being made

17   to jury instructions after closing arguments.  We don't think

18   that's appropriate.

19         THE COURT:  Anything else?  All right.  We'll see you

20   after lunch.

21             (Luncheon recess)

22             (Continued on next page)

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

| | |
|---|---|
| 1 | A F T E R N O O N   S E S S I O N |
| 2 | 2:25 P.M. |
| 3 | THE COURT:  Please be seated.  Everybody ready? |
| 4 | MR. SWETT:  Your Honor, any clarity on the |
| 5 | instruction? |
| 6 | THE COURT:  Well, I think I'm just going to take it |
| 7 | out.  We took another look at *Silver*, and it's very nuanced, |
| 8 | "as opportunities arise" survives as a theory, but it's not |
| 9 | just -- you know, I think the way the government proposed it is |
| 10 | actually wrong probably under *Silver*. |
| 11 | So I think the easiest thing to do is just to take it |
| 12 | out as the defendant suggests.  I think getting into it -- to |
| 13 | do it correctly, it would have to be something like:  The |
| 14 | government doesn't have to show that at the time of receiving |
| 15 | the payment Mr. Costanzo knew about any -- agreed to give any |
| 16 | specific piece of information, but agreed to provide |
| 17 | information generally in the future is covered.  It would be a |
| 18 | distinction at that level.  I think that is just too late to |
| 19 | make it. |
| 20 | MR. SWETT:  Okay. |
| 21 | THE COURT:  Ready for the jury? |
| 22 | MR. GAINOR:  Yes. |
| 23 | THE COURT:  Okay. |
| 24 | (Jury present) |
| 25 | THE COURT:  Good afternoon, ladies and gentlemen. |

1        Mr. Gainor, your summation.

2        MR. GAINOR:  Yes, your Honor.  Thank you.

3        Good afternoon.

4        THE JURY:  Good afternoon.

5        MR. GAINOR:  When you walk into a courtroom, ladies

6   and gentlemen, the instant you cross the threshold you

7   immediately realize it's unlike any room in any building

8   anywhere.  Why?  First glance, you think it's maybe the size of

9   this huge room, or you think of the wood paneling, or the high

10  ceilings.  But it's none of that really.  A courtroom is

11  special for one reason, and one reason only:  That man sitting

12  up on the bench.  Every courtroom has a judge.  So people who

13  walk through its doors, whether they are rich or poor, young or

14  old, white or black, know that this is the one room where you

15  might be able to — you could — get justice.

16       But the importance of it, the symbol of it, doesn't

17  end there.  Notice how the judge in this courtroom and in every

18  courtroom sits above on an elevated bench.  Do you ever think

19  about what that means?  It doesn't mean that that particular

20  person is better or above; but it's meant to symbolize that the

21  law to function has to be above those considerations that would

22  interfere with justice:  Jumping to conclusions, guessing

23  someone guilty, filling in the gaps, things that interfere with

24  the true intellectual process of justice, because that's what

25  it is.  It's something that makes this room more special than

1  anything, any room anywhere, because it has such a person

2  representing such a symbol.

3          While going on three weeks ago, all of you took an

4  oath.  You don't have the robes; you don't have the high bench.

5  But what you do have is the most significant and important role

6  in this trial:  Judges of the facts.  We're not everyday people

7  walking on the streets of Manhattan anymore.  You're now

8  judges.  Which means that we have to follow certain rules.  We

9  can't judge if we're going to judge like guessing or filling in

10 the gaps or speculating.

11         You'll be given several important tools to decide how

12 to judge.  And the Court will read the law to you.  But one of

13 the most significant — and they are all significant — is the

14 standard of reasonable doubt.

15         What is reasonable doubt?  It's a doubt that arises

16 from the evidence, the conflict in the evidence, and the lack

17 of evidence.  It appeals to your reason, your common sense.

18 Proof beyond a reasonable doubt must therefore be proof of such

19 a convincing character, that you'd be willing as a reasonable

20 person and would not hesitate to rely upon it in the most

21 important of your own affairs.  There's no guessing here.  The

22 most important of your own affairs.

23         Certainly the most important of Manny Recio's affairs,

24 a veteran retired DEA agent of 22 years, highly respected,

25 admired, and someone that the government wants you to believe

NB7VCOS5                    Summation - Mr. Gainor

1   that overnight became rotten; that overnight became corrupt.

2   And when it comes to Mr. Recio and when you're considering this

3   reasonable doubt instruction as judges, your Honors, you have

4   to ask yourself:  Have you heard, have you been presented with

5   proof of such a convincing nature that Manny Recio, this

6   respected and admired former DEA agent, paid bribes, gave

7   compensation in return for the actions of Special Agent

8   Costanzo?

9          Using the standard of proof and the other law that

10  you'll be given by the Court, I'll ask you to follow with me

11  over the next 45 minutes my view of the case, which I hope

12  you'll look at and consider with an open mind.

13         The allegations in this case, all of them, surround

14  the concept of bribery, giving something, giving this for that,

15  this term of *quid pro quo* that you've heard of so often, that

16  you've all become experts in.

17         I'll make a statement that I made in opening

18  statement:  There is no proof, evidence or otherwise, that

19  Manny Recio ever bribed or conspired to bribe Special Agent

20  Costanzo.  The prosecutors put before you witness after witness

21  with absolutely no personal knowledge that Manny ever paid a

22  bribe, and they tried to spin a tale of leaps and bounds and

23  guesswork.  No proof of a $50,000 bribe.  No proof of a $20,000

24  bribe.  And I start with these two because these are the

25  largest.

NB7VCOS5                          Summation - Mr. Gainor

1            The prosecutor said not only in opening, but in

2     closing, that Manny Recio was directly responsible for these

3     bribes.  Where is the evidence?  Even if you look at the

4     $10,000 and the 10,750 that was deposited, that had a

5     justification, a reason, a rationale, an explanation.  There is

6     no explanation for the bulk of what the government is saying

7     Manny Recio was responsible for, $70,000 in additional bribes.

8     Zero.  None.  *Nada*.

9            Let's go through each one.  Let's talk about the money

10    first.

11           First you heard from Eddie Pagan.  You heard something

12    about Mr. Pagan not just from the prosecutors, but from

13    Mr. Mukasey.  I'll try not to be redundant.

14           Eddie Pagan and Elgin Polo talked about what really

15    happened in this case.  Eddie Pagan, an active Coral Gables

16    police officer, who's on the job, who has not been charged with

17    any wrongdoing whatsoever, took the stand, looked everybody in

18    the eye, and told you the truth.  An expert in police

19    procedures, a SWAT member, a certified arms -- firearms

20    instructor, who better to start a security business than Eddie

21    Pagan?

22           You heard about JEM Solutions, a business that Recio

23    and Pagan wanted to form and formed to attract big-name

24    athletes, big-name clients.  It was started legally by Eddie

25    Pagan; it's certainly not a sham or a shell.  The government

NB7VCOS5                         Summation - Mr. Gainor

1    wants you to believe this, but it's their words, and their

2    words alone.

3         Eddie Pagan got the off the ground and was looking for

4    office space.  Eddie Pagan has been and was best friends with

5    John Costanzo, the best man in the wedding.

6         You heard testimony from Eddie Pagan with regard to

7    the $50,000 down payment.  The government wants you to believe

8    that he couldn't afford to make it because he had a million

9    dollars in mortgages that were not paid yet.  But we don't know

10   what the value of the property was, how much equity was in that

11   property.  There was no exposé as to Eddie Pagan's true net

12   worth.  There was no evidence whatsoever that Eddie Pagan could

13   not afford to make the $50,000 payment for his friend.  But

14   most importantly, what evidence do we have whatsoever other

15   than guesswork, speculation, that Manny Recio was somehow

16   connected to a $50,000 payment?  None.  Nothing.

17        You saw the account statements for Eddie Pagan.  This

18   money was in his credit union account for years before any

19   transfer.  He chose to help his friend; he chose to invest.

20        The same with the $20,000.  There is no connection to

21   Manny Recio.  Nothing that would indicate that Manny Recio said

22   ever, communicated ever, nothing to suggest that Manny Recio

23   ever directed a payment of $20,000 through Eddie Pagan, ever

24   directed $50,000 to Eddie Pagan.  Manny Recio was not connected

25   to $70,000 of the government's case, the vast majority.  The

1   government wants you to leap and bound into a guilty verdict.

2         Let's talk about the 10,750 for the *Grobman* matter.

3   Eddie Pagan took the stand, talked about the fact that he met

4   with Manny Recio.  They would meet together, they would have

5   dinner together, they would talk about cases together.  Manny

6   Recio was hired by the law firm of Greenspoon Marder; not by

7   Luis Guerra, not by David Macey, not by any other attorney, but

8   a law firm.

9         Manny Recio is a private investigator.  There is

10  nothing wrong with a former DEA agent retiring and becoming a

11  private investigator.  It happens often.  You heard that from

12  government witnesses.  Eddie Pagan talked about receiving a

13  hard drive that contained documents, a large stack of paper.

14  He talked about 80 hours of work on the *Grobman* matter.  Manny

15  Recio needed the help.  There was no argument, no rebuttal,

16  there was no challenge to the fact that Eddie Pagan could

17  lawfully and did engage in work and helped Manny Recio.

18        The $10,000 investment through JEM was an investment

19  to look for office space.  That money stayed in the account.

20  If this money is going to Special Agent Costanzo, why is the

21  bulk — all of the $10,000, and the great majority of the 10,750

22  — staying in the account?  It doesn't make sense.  A lack of

23  evidence, a conflict in the evidence, is reasonable doubt, your

24  Honors.  That is the law.

25        We could put up GX 604, page 14.

NB7VCOS5                    Summation - Mr. Gainor

1         What I'm about to show you is Eddie Pagan's tax return

2    for 2019.  This tax return lists the monies deposited into JEM

3    as income.  Using the government's logic, if someone is looking

4    to defraud the government, why report this income in a tax

5    return?  That's GX 604, page 14.  If we have a problem, please

6    take a look at this exhibit if we can't get it up for you on

7    the monitor.  Take a look and notice that all of this has been

8    reported as income by Eddie Pagan.  GX 604, page 14.

9         With regard to the $20,000 payment, as we've talked

10   before and as you heard, this was a payment made by Susana

11   Rueda originally for the lawyers of John Costanzo, paid back by

12   Eddie Pagan.  Again, nothing to do with Manny Recio.  You heard

13   this from Pagan; you heard this from Rueda.

14        And then, of course, there's the payment of $2500 from

15   GLC to EBCO.  You heard that John Costanzo, Sr. was and is an

16   investigator.  Manny Recio is an investigator.  You should be

17   looking at GX 530, if we can call that up.  If not, please

18   pardon our ability, unfortunately, to master some of the

19   exhibits on the screen.

20        GX 530 is a -- are documents turned over by Global

21   Legal Consulting that the prosecutor spoke about.  On page 5 of

22   that document is a discussion -- excuse me, John Costanzo texts

23   the address of 2645 South Bay Shore Drive, which is the address

24   of John Costanzo, Sr., the person who runs and owns EBCO.

25        You heard from Elgin Polo an analysis of the $2500

1   that went into the EBCO account.  None of that money went to

2   John Costanzo, Sr., none of it.  It was used by John Costanzo,

3   Jr. for his own expenses.  Leaps, guesswork, and speculation

4   are a sad replacement for proof.

5         Focus on the chart of Elgin Polo, because they support

6   the testimony of Eddie Pagan completely with regard to the

7   disbursement of funds and the lack of connection to Special

8   Agent John Costanzo.  There is a legitimate reason, a

9   legitimate explanation for why one private investigator company

10  might deal with another.  It is endless why that type of

11  conversation and dialogue might occur.  Doubt with regard to

12  50,000, doubt with regard to 20,000, doubt with regard to the

13  10,750, the 10,000, and the $2500 payments.

14        What did the government do to shore up their case for

15  corrupt intent for Manny Recio?  They put on the testimony of

16  Mr. Hernandez Villazon.  Now, you've heard a little bit more

17  about him from the lawyer that went before me.  And you heard

18  how Hernandez Villazon had a motive to set up John Costanzo,

19  Sr.

20        But think about what he said about Manny Recio.  Manny

21  Recio attends a meeting unannounced on October 24th.  Manny

22  Recio surprises Hernandez Villazon.  Manny Recio threatens

23  Hernandez Villazon with a gun.  We all heard that testimony.

24        But then, during cross-examination, Hernandez Villazon

25  begrudgingly — but finally — admitted as to text communications

1   that preceded that meeting by as much as seven days.

2            Can we try it again?  MR 111 up, please.

3            Let's go to page 2, when we get it.  If we're still

4   technologically challenged by the time -- over the next couple

5   of seconds, then I'll read these things to you because this

6   exhibit is already into evidence.

7            So we're on page 2.  The very top of page 2 -- and

8   remember, Mr. Hernandez Villazon goes by the name of Boli, the

9   bowling ball.

10           So what does he say on the very top of page 2?  I want

11  to know if you have time to talk or if you'd rather wait until

12  the 11th.  The date of this communication was November 17th,

13  2018.  He is referring to November 11th, when Manny Recio was

14  set to retire.

15           And what does Manny say?  Let's wait until the 11th.

16           This is corrupt intent.  These are threats and a

17  surprise.  This is Villazon reaching out to Manny Recio to meet

18  and talk.

19           What does he say at the bottom of page 2?  Thanks,

20  boss.  Hopefully Paul Cohen won't harm me.  You were released.

21  Jaime was released.  He's worried because he knows Jaime

22  Camacho no longer works at DEA and Manny Recio is set to

23  retire.

24           What is he worried about?  what is he scared about?

25  Well, let's go to the next several pages.  We know that he

1    wants to send Manny Recio pictures and copies of his son's

2    grades.

3              You've heard and saw his responses to that.  That goes

4    on for seven pages.  And then he explains on page 7 of the

5    document, October 23rd, 2018:  These are the grades of my

6    oldest son and half of my youngest.  He came here when he was

7    seven months old.  I've never even gotten a ticket here nor do

8    I have a criminal record.

9              Wow, that's a joke.  That's the man who took the stand

10   and the quality of the character before you.

11             I do not have a criminal record.  Immigration is

12   opposing my oldest son and my two other children are citizens.

13   The attorney asked me if she can call you to ask you about my

14   conduct and my family.

15             This is a day before the meeting on October 24th, when

16   the meeting occurred at David Macy's office with Manny Recio

17   and Boli.

18             So when Boli tells you that he was surprised by the

19   meeting, he is lying.  But that's not his only lie.

20             Let's go to page 7.  And before we go -- we're on page

21   7.  But before we go to 8, he says:  Thank you, Mr. Manny.  I'm

22   dying over this, when Manny agrees to talk.  Remember, Manny

23   wanted to wait until he retired, but Boli was asking to meet

24   early, almost pleading.

25             He says on page 8 at the top:  I'm scared.  Mr. Manny,

1   David can at 1:30 p.m.  That was the day of the meeting.  Manny

2   says:  Yes, on my way.

3        The reason that Boli was put on the stand was the

4   government was hoping that was the only evidence of corrupt

5   intent to show Manny's intentions, to show that he was a bad

6   guy, to show that he was going to manipulate an informant and

7   do whatever he had to do to earn money.  But the truth of the

8   matter is very, very different.  The reason for that meeting

9   was that Boli was begging for it because he was worried about

10  immigration issues for his son.  And we know that he had a host

11  of his own immigration problems that he had to worry about.

12       Oh, well, a threat occurred.  Manny knows this.  You

13  know it, Manny.  I'll point it to you in open court in front of

14  the jury.  But what did Boli say the next day?  Thank you for

15  meeting.  May God bless you now and always.

16       That is the caliber of the government's case here, of

17  the prosecutors' case here.  If it's not about leaps and bounds

18  and speculations, it's about misfires; it's about putting on a

19  witness to show corrupt intent who is beyond corrupt himself.

20       What was the other purpose for putting on Mr.

21  Hernandez Villazon?  That is to show somehow that the two

22  recorded phone calls that were made were somehow indicative of

23  some illegal conspiracy, some hope or some intent to bribe.

24       What did those phone calls show?

25       If we can put up Government Exhibit 252B-TR.

1          You remember this call, ladies and gentlemen?  This is
2     the call involving Hector Zavala.  The government proffered it
3     to show some illegal conspiracy.  If we notice in this
4     conversation, mid page of page 2, it reads:  Yesterday Group 10
5     arrested a Venezuelan man here in Miami.

6          Yesterday.  This call discusses an arrest that already
7     occurred.  That's what Boli was responsible for recording.
8     That's what was evidence of a bribery conspiracy.  No
9     discussion of bribes.  No discussion of anything other than an
10    arrest that occurred the day before.

11         An April 11th phone call.  That would be GX 253B-TR.
12    A conversation between Manny Recio and Mr. Hernandez.

13         Page 2 of that discussion, very bottom.  What is said
14    by Manny Recio:  I don't know more or less when, there's going
15    to be an operation.

16         What does he say later in the conversation?  This
17    would be page 6 of the document, of the transcript, the first
18    half of it:  They are going to be arrested, some of them.

19         No names, no exact times, but discussions with an
20    informant who said that I'm from the Colombia/Venezuela border,
21    that he knows people.  So do your homework.  That is the
22    example of the supposed incontrovertible phone calls that the
23    government, the prosecutors, tried to get Mike Nadler to
24    conclude.  Incontrovertible?  Discussions of an arrest that
25    occurred the day before, and the discussions of an operation,

1       not talking about specific people, not talking about specific

2       timing.  That is the caliber of the prosecutors' case, relying

3       on an informant.  The only proof of corrupt intent, a lying

4       informant who completely mischaracterized the conversation and

5       then asked the Court for me to show him respect when he was

6       exposed as a liar.

7              A reasonable doubt arises from the evidence, the

8       conflict in the evidence, and the lack of evidence.  Manny

9       Recio's future is on trial here today.  Is this the type of

10      proof, the caliber of proof, that you would need your Honors to

11      arrive at a guilty verdict?  Or do you have to guess?  Do you

12      have to speculate?  Do you have to leap?

13             The phone calls that were presented to you from Mr.

14      Hernandez Villazon, as you heard from other witnesses before,

15      are also incomplete.  25 instances of unintelligible, and we're

16      asked to make leaps; we're asked to conclude that this is proof

17      of some conspiracy to bribe between Manny Recio and Special

18      Agent Costanzo.  This is the quality of proof?  Guesswork.

19      Speculation.  Jumping to conclusions.

20             And certainly not phone calls that are

21      incontrovertible.  You heard two of them from Hernandez

22      Villazon during his testimony.  Incontrovertible?

23             The government discussed Mr. Peralta.  They inferred

24      or suggested that Mr. Peralta was improperly contacted by Manny

25      Recio.  But you heard the evidence.  Manny Recio was in contact

NB7VCOS5                        Summation - Mr. Gainor

1   with DEA agent Lee Lucas.  They were talking together.  And the

2   goal of that conversation was to cooperate.  You saw that

3   evidence in the form of Government Exhibit 363A, if we can

4   publish that.

5           This was a conversation between Special Agent Costanzo

6   and Manny Recio, where Mr. Recio said the person in the DR,

7   somebody huge, he is going to cooperate.  That's what Manny was

8   in business for, continuing what he did in DEA, which is to get

9   witnesses, to get targets, to get defendants to cooperate and

10  assist the government.  When he left the government, that's

11  what he was doing.  This is an example of it.

12          There were also conversations that came into evidence

13  with regard to contact that Mr. Recio had with Mr. Peralta, and

14  that is MR 143T.  These are conversations that occurred in July

15  of 2019.  And let's recall the time frame.  The government

16  tried to arrest Cesar Peralta the 20th of August 2019.  In July

17  of 2019, Manny Recio had contact with Cesar Peralta trying to

18  convince him to cooperate, to surrender.  But what does Cesar

19  Peralta say?

20          If we can go to page 2.

21          I am a businessman with a family.  I will not run from

22  justice.  I will be leading a normal life.  If they arrest me,

23  they must tell you or him the case.  I am sure I have nothing.

24          Manny Recio exerted his best efforts to try to get a

25  drug Narco dealer to surrender.  Nothing to do with John --

1    with Special Agent John Costanzo.  He did not even know about

2    this until Manny shared it with him.  Manny was dealing with

3    another DEA agent, Lee Lucas.  And we know that because there

4    was a conversation with Lee Lucas or a conversation with

5    Special Agent Costanzo about the efforts to arrest Cesar

6    Peralta on the 20th of August.

7         The insinuation, the suggestion that Manny did

8    anything wrong or that his activities led to Cesar Peralta

9    fleeing are not true.  We know that Cesar Peralta was on the

10   island of the Dominican Republic.  We know that a large

11   operation was ongoing involving FBI, DEA, Homeland Security

12   Investigations, U.S. Marshals, and the local and national

13   Dominican Republic police.  We know this is a country,

14   unfortunately, that was fraught with a level of corruption.

15   And we know, most importantly, that Cesar Peralta was

16   surveilled by law enforcement that had set up on the island for

17   days before the attempt to arrest him on the 20th.  He is

18   followed or at least surveilled into his girlfriend's apartment

19   on the evening of the 19th.  We remember that conversation.

20        If we can put up for the jury's consideration the

21   phone call that deals with that.  It's a conversation that

22   Manny is having with Special Agent Costanzo about efforts to

23   arrest Cesar Peralta because Special Agent Lee Lucas is calling

24   him, saying, Can you assist?  Another DEA agent is talking to

25   Manny Recio to help.  That is transcript 212A-T.

1            If we can go to page 2.

2            August 20th, 2019.  Manny Recio says:  What's up,

3    Johnny?

4            Special Agent Costanzo responds:  What's going on?

5            Manny Recio:  Oh, they're out there trying to arrest

6    Cesar in the DR.

7            Manny Recio says:  Yes, yeah, Lee Lucas gives me a

8    call.  That's special agent for the DEA Lee Lucas.  They have —

9    excuse me, I'll cut out an expletive — the house surrounded,

10   but they can't find him.  Well, they had him last night on

11   surveillance and they saw him go into some girl's house.  And

12   when they -- when they hit everything today, they can't find

13   him.  So then they start calling us to see if we can get hold

14   of him and have him turn himself in.  But, of course, you know,

15   we don't know where this guy is.  We lost all contact.  What a

16   fuck up for Dave Macey.

17           Cesar Peralta fled because he either made the combined

18   law enforcement operation or one of his contacts in the DR told

19   him what was going on.  But we know that the last contact with

20   Manny Recio was either in late July -- it was late July, it was

21   before Cesar Peralta took a vacation.  And then there was no

22   contact, no record of contact.  But Manny Recio still tried to

23   assist DEA with the capture of this person.

24           The government, the prosecutors, tried to use what

25   they can to twist and fill gaps.  That's not the way it should

NB7VCOS5                    Summation - Mr. Gainor

1    be done.  It's about cold hard proof.  And because they don't

2    have any, they want you to listen to a tale, accept something

3    that's not the truth, and hold Manny Recio accountable for

4    something that he didn't do.

5            There are other examples that we'll go through, other

6    examples of allegations by the government, ghosts and whispers

7    of a conspiracy that are not proven.  The prosecutors talk

8    about this SARC memorandum, a memorandum that Manny Recio sent

9    himself from his DEA address to his Yahoo address.  There is no

10   pattern of documentation being sent from one address to

11   another; this is an isolated event.

12           But the prosecutors want you to believe that this is

13   somehow connected to a conspiracy.  There is no evidence that

14   this memorandum was ever used to approach, solicit, or attempt

15   to recruit any person mentioned in the memorandum.  There is no

16   indication — no proof — that Mr. Recio ever got paid or ever

17   was hired by anyone connected to this memorandum.  There is no

18   proof that it was ever disseminated.  It was sent to multiple

19   managers in the DEA originally but, most importantly, no

20   evidence ever that Manny Recio and Special Agent Costanzo

21   conspired to use this memorandum to anyone's benefit.  And no

22   evidence that bribery was involved.  And most importantly,

23   Manny Recio was never charged with sending himself some

24   confidential memorandum separately with a separate crime.

25           There was a discussion that was played during another

NB7VCOS5                      Summation - Mr. Gainor

1   closing statement that talked about a discussion of Motta

2   Dominguez and Lugo, people that had been mentioned in that

3   memorandum.  But the discussion was these people are already

4   arrested, they were arrested for over a week.  A press release

5   was even issued.  No use of that information for anyone's

6   benefit; no proof of any compensation or money going to Special

7   Agent Costanzo from Manny Recio or from any other person.

8   Nothing.  A leap.  Just like the leap that Manny Recio has to

9   be responsible — must be responsible — for the 50,000 and the

10  $20,000 payment that he had absolutely no connection to.

11  Drawing parallels and making connections where there is none by

12  witnesses with absolutely no firsthand knowledge of any

13  conspiracy, any bribery, any crime.

14          This Shirley Herrera Colorado instance is another one.

15  Special Agent Costanzo was the handler for this person.

16  Getting the information correct, so Ms. Herrera Colorado, about

17  the appropriate reduction is not a crime.  And most

18  importantly, there was no proof whatsoever that Manny Recio

19  ever paid money, compensation, consideration, or anything in

20  return for this.  He was the one who drafted the memorandum.

21  He was the one who spent the time as a private investigator

22  putting it together, making sure that the client who decided to

23  cooperate got the benefit of her bargain.

24          (Continued on next page)

25

1          MR. GAINOR:  That's the nature of DEA business.

2          There was discussion about deleted messages and that

3    Manny Recio must be hiding a conspiracy, hiding a criminal act.

4    But if you notice, that exhibit, the conclusion was potentially

5    deleted, but not without a doubt, without hesitation,

6    potentially deleted.  What does that tell you?  Even Maj,

7    Susanna Maj could not come to a definitive conclusion.  Plus,

8    there was no pattern of deletions.

9          The discussion of phones, Manny Recio, Special

10   Agent Costanzo, Agent Escobar, all the other agents in DEA had

11   multiple phones.  We have heard that.  That was part of the

12   culture.  And what did Manny Recio do?  Did he try to put this

13   phone, this second phone, in someone else's name?  No.  It was

14   in Global Legal Consulting, open and obvious.

15         You heard evidence of NADDIS searches.  You also heard

16   that the ability to do a NADDIS search, the ability to give

17   information to someone other than someone inside of the agency

18   is permitted by DEA standards of conduct.  But even if there is

19   a question as to giving it to a private investigator, what

20   proof was given, what definitive proof other than shadows and

21   whispers that Manny Recio ever paid anything for it, ever paid

22   a bribe?  Again, look at the numbers.  The vast majority of

23   what is alleged to be a bribe——$70,000——cannot be connected to

24   Manuel Recio.

25         And you heard that from numerous witnesses.  You

1   listened to the testimony of Agent LaRocca.  He told you that

2   he spoke to Manny Recio.  He told you that his standard

3   procedure is to record interviews.  But it wasn't done here.

4   Why?  This is an expert who has been in law enforcement in

5   multiple agencies for years.  Why wasn't this recording made?

6   And why are we forced to rely on the recollection of a law

7   enforcement officer when his standard procedure is to always

8   record.  Why?  Because the best evidence for a jury is to hear

9   the exact words, but not in this case.  I invite you to take a

10  look at what was put in evidence by the prosecutors.  It is

11  document 3548-0002A.  It's the redacted notes of the interview

12  of LaRocca.

13          Remember LaRocca's testimony.  He said, for instance,

14  that Manny Recio was paid a 10 to 15 percent commission.

15  Looking at these notes, on page 15 of the notes --

16          Do we have those available?  If we can get that up,

17  please.

18          Manny Recio was not paid a commission.  He was paid a

19  salary.  How could LaRocca get it so wrong, unless he just

20  didn't remember.  Manny Recio supposedly spoke to LaRocca on

21  that day in November and said that I did not tell any agent, I

22  did not tell John to run NADDIS searches.

23          Let's go to page 12 of that document.  "Never told

24  agents how to run NADDIS so it wouldn't show a red flag."

25  That's why you record a statement, so you don't guess somebody

1  guilty.

2          Question as to knowledge of a phone, page 4 of 16,

3  please, at the very top.  We have to rely on this recollection.

4  "John Costanzo.  No other phone he has" or "use"?  "Would he

5  have a phone?  Yes."

6          We don't know the context.  We don't know what was

7  said.  We have to guess.  And the prosecutors want to use this

8  statement to establish that Manny Recio was trying to hide his

9  involvement in the conspiracy.  Why an agent of 22 years, who

10 had a spotless record, who was respected and admired, suddenly

11 went rotten according to the prosecutors and is now lying on

12 his statement, a statement that has not been recorded, a

13 statement that you have been asked to make leaps and jumps and

14 to speculate on, just like the entirety of the government's

15 case.

16         When you sit as a judge, you agree to follow an oath.

17 You agree to follow the law.  And the law says, before

18 someone's liberty and life is changed, that you better be

19 darned sure, convincingly sure by the evidence beyond a

20 reasonable doubt without leaping, without guessing before you

21 change a man's life forever.  Are you sure?  Are you sure in

22 the face of Edwin Pagan, who took the stand and gave you direct

23 proof of what happened with the money?  Are you guessing

24 someone guilty or believing that someone did something wrong

25 based on the word of an informant that looked into your eyes

1    and lied and then demanded respect when he was caught?  An

2    informant that lied to his friend and handler, Jaime Camacho,

3    and hid a 13-month felony criminal conspiracy, and then, when

4    caught, decided to turn against Manny Recio, who tried to help

5    him with his son's immigration issues and then turned on the

6    special agent whose group was investigating him.  That is the

7    caliber of the prosecutor's case—nothing direct, whispers and

8    ghosts, speculation, leaps, and guesswork.

9             As judges, you are obliged to look for the reasonable,

10   logical explanations, and there are those in the form of the

11   financials through Elgin Polo and Edwin Pagan.

12            A man's life hangs in the balance.  Consider the leaps

13   and the speculation you are asked to engage in.  Because when

14   you do, you will have all the reasonable doubt you need as

15   judges to return the one fair verdict in this case, and that's

16   a verdict of not guilty on all counts when it comes to Manny

17   Recio, because Manny Recio is in reality, in truth, and under

18   the law not guilty.

19            Thank you.

20            THE COURT:  Thank you.

21            Mr. Swett.

22            MR. SWETT:  Thank you, your Honor.

23            Well, I hope you all stretched this morning because,

24   according to the defense, you are going to be leaping and

25   jumping all afternoon.

1          According to the defense, there isn't a single witness

2     who can talk about payments, there isn't a single witness who

3     can talk about leaks, there isn't a single witness who can talk

4     about conspiracy, and there isn't a single witness who can talk

5     about corruption.

6          Ladies and gentlemen, clearly the defense missed the

7     government's star witnesses——Manny Recio and John

8     Costanzo——because you heard them over and over and over

9     throughout this trial, in their text messages, in their

10    recordings, in their phone calls.  You heard them lay it out

11    clear as day what they were about.  You heard it in

12    unambiguous, clear terms.

13         Now, I think the government and the defense have very

14    different ideas about what speculation and innuendo and leaps

15    of logic mean.  Because speculation, speculation is when you

16    look at something and you have to guess at what they are

17    talking about.  Innuendo, that's when people are using codes,

18    that's when they are saying one thing but meaning another.

19         That's not what you have with John Costanzo and Manuel

20    Recio.  You have them saying it explicitly, explicitly.  Every

21    element you need to find, you are going to hear it coming out

22    of their mouths.

23         Was there a conspiracy?  I don't know.  Ask John

24    Costanzo.  Did he tell people that he was a partner with Manuel

25    Recio?  He sure did.  Did he and Pagan talk about how JEM

Nb72Cos6                    Rebuttal - Mr. Swett

1   Solutions was "our company"?  He did.  Where is the speculation

2   there?  What are we missing when John Costanzo tells you

3   himself what he was about?

4           Oh, but what about the leaks?  Again and again and

5   again the two of them talked about what kind of information

6   Costanzo was providing to Recio.  Recio texted him.  Recio

7   said, he said, call me and give me a summary of his NADDIS.

8           Now, we are not asking you to speculate what that

9   means because it is clear as day.  Recio wanted the valuable

10  information inside of those NADDIS databases so that he could

11  go out and he could find clients and he would make lots of

12  money.  Nothing to speculate there.

13          Oh, but of course payments, they didn't talk about

14  payments.  Oh, they didn't?  They didn't?  When John Costanzo

15  said to Manuel Recio, Louie doesn't bring anything to the

16  table, we don't know what that means.  It's unclear.  It's

17  ambiguous.  The government is asking you to make leaps of

18  logic.  Except that Manuel Recio defined it for you in the very

19  next thing, the very next part of that recording.  He said:

20  No, Louie does bring things to the table.  He brings money to

21  the table.  Because that's what this partnership was about,

22  that's what this business was about.  It was about money, and

23  they said it in their own words.

24          And luckily for all of us, when they didn't think

25  anyone was listening, they didn't use code, they didn't use

1    innuendo, they didn't do anything that requires speculation on

2    your part.  You just have to take our star witnesses at their

3    word, and you will have everything you need to convict.

4              But there is one important piece of the evidence you

5    have from these two defendants that defense didn't really want

6    to talk about, and that's what they said when they were

7    approached by the F.B.I. about this.  Now, Mr. Mukasey didn't

8    mention Costanzo's interview at all, not once.  Mr. Gainor

9    brought up Mr. Recio's interview only to say it wasn't

10   recorded, so throw the whole thing out.  But this is telling

11   evidence of their intent and state of mind that when the F.B.I.

12   and the Department of Justice Office of Inspector General

13   knocked on their doors, they lied, they lied, and they lied

14   again.

15             Special Agent Costanzo, he was asked if he was giving

16   information?  He said:  You are talking about, like, sealed

17   information?  No.  Absolutely no.

18             You know that's not true.  You know that is not true.

19             Special Agent Costanzo was asked, straightforward

20   question, money:  Did you ever get any money from them?  No.

21             You know that's not true.  He lied.  He lied because

22   he knew that if he told the truth, the whole web of deception,

23   the whole artifice that they had put up to protect themselves

24   would come unraveling down like that.

25             Recio did the same thing.  And, look, was that

Nb72Cos6                      Rebuttal - Mr. Swett

1   interview recorded?  No.  Did you see the contemporaneous notes

2   from that interview?  Yes.  Did Special Agent LaRocca walk

3   through those notes and explain what he meant?  Yes.

4          So don't buy into this argument that we are relying on

5   someone's memory from five years later.  What Special

6   Agent LaRocca wrote down makes it clear that Manuel Recio lied.

7   He lied about the secret phone.  He lied about the kind of

8   information he was getting.  He lied about not providing

9   anything to Special Agent Costanzo.  He lied, he lied, he lied.

10         So as you evaluate the evidence in this case and you

11  are thinking about the witnesses, please keep in mind the

12  government's two star witnesses.  Keep in mind all the things

13  that these defendants have said in their own words to prove

14  this bribery conspiracy.

15         Now, I would say most of what you heard from the

16  defense boils down to a question of good faith——that John

17  Costanzo and Manuel Recio believed that what they were doing

18  was right this whole time.

19         Now, you know that flies in the face of everything.

20  It flies in the face of the leaks.  It flies in the face of the

21  lies.  It flies in the face of the payments.  There is no

22  reason to conclude that these two men wanted what was best for

23  the DEA.

24         But let's take that argument head on.  Let's take it

25  at face value.  I believe Mr. Mukasey used the term "totally

1    transparent" in describing John Costanzo's attitude in his

2    relationship with Mr. Recio.  Well, there is one massive,

3    glaring problem with that argument.  These two defendants had

4    opportunity after opportunity to tell someone——anyone——about

5    what they were doing and time and time again, it's not just

6    that they kept quiet, it's that they actively concealed what

7    they were up to.

8           Take Special Agent Daniel Escobar.  He was the

9    government's first witness.  I know that was a long time ago.

10   You can go back and review his testimony.  He said that when he

11   learned Manuel Recio was retiring from the DEA, Mr. Recio told

12   him:  I'm going to work for a bank.  Why would he say that?  He

13   said that because he knew that if Special Agent Escobar was

14   aware of the kind of work he was doing, it could lead to

15   questions, the kind of questions that he didn't want to have to

16   answer.

17          Now, that didn't stop Special Agent Escobar from

18   learning eventually that Manuel Recio was engaged in criminal

19   defense work.  So what did he do?  He went and talked to

20   Manny's friend, Special Agent John Costanzo.  He said, hey,

21   what's going on?  What's Manny doing?  I hear he is working for

22   the defense side.  What was Special Agent Costanzo's response?

23   Did he say, oh, yeah, of course, Manny's working for the

24   defense side, he is bringing us great cases.  It is working out

25   very well.  Let me tell you about the ways we are working

1  together to advance the DEA's mission.  Is that what Special

2  Agent Costanzo did?  No.  You will see Special Agent Escobar's

3  testimony that when he asked Costanzo, Costanzo said:  Manny's

4  doing his thing.  Didn't tell Special Agent Escobar.  Is that

5  total transparency?  Is that pure intentions?  Is that good

6  faith?  You know it is not.

7      Fast forward to July 2019.  Special Agent Costanzo has

8  just moved to D.C.  He is taking on a hot, hot role.  He is a

9  financial investigator.  He is at headquarters.  His career is

10 on the move.  He goes out to drinks with Eric McGuire and he

11 lets slip a damning admission.  He tells Special Agent McGuire:

12 I'm feeling a little heat in Miami.

13     Now, if Special Agent Costanzo truly believed that he

14 wasn't doing anything wrong, why wouldn't he clear that up?

15 Why wouldn't he go to his supervisor in Miami or his supervisor

16 in D.C. and say, hey, I think there might be some

17 misunderstanding here.  I think there may be some confusion

18 about what I am doing and I want to clear that up.

19     Of course he doesn't do that.  Of course he doesn't do

20 that.  He locks this in tight.  Because as soon as he lets

21 people in the DEA on to what's going on, the lies and the

22 deceptions will unravel.

23     In fact, in fact, at the end of their closing, defense

24 counsel put up those texts about Special Agent Costanzo saying,

25 Manny, I can't do this for you.  It's not ethical.  It's not

1    ethical.  Look.  Special Agent Costanzo can't have it both

2    ways.  If he is acting in good faith and he thinks someone is

3    asking him for unethical information, he has a duty to report

4    that.  He has a duty to report that, and that is Government

5    Exhibit 107.  I encourage you to go look at it.  But if he is

6    not acting in good faith, if he is just putting up a smoke

7    screen because he is worried that some day -- one day someone

8    will read his text messages, that is just more deception.

9    That's just more lies.

10          I mean, really, the fact that Special Agent Costanzo

11   had to tell Manny that it was unethical to leak NADDIS

12   information?  That doesn't help him.  It buries him.  Because

13   for months and months and months that's exactly what they did.

14          And so when Special Agent Costanzo felt the heat, he

15   didn't tell his supervisors.  He didn't try to clear things up.

16   Instead, he and his partner——and I'm using his word there——he

17   and his partner exchanged text messages that they could one day

18   rely on if this all ever came to light.

19          And then finally, August 2019, Recio and Costanzo have

20   a conversation about explosive rumors, rumors that David Macey

21   has bought a car for Special Agent Costanzo, the kind of rumors

22   that I agree would make you angry if you heard them about you.

23   Did Costanzo immediately run to his supervisors?  Did he

24   immediately run to DEA counsel and say:  I heard the most

25   terrible thing about me, and I want to clear my name, and I

1   want to do it right now.  Of course not.

2            Instead, he and Recio talked on the phone about how

3   they could silence these people who had information about

4   Costanzo's dirty relationship with David Macey, about putting

5   problems on them, saying they were lucky that they were

6   breathing the air.  Special Agent Costanzo never brought any of

7   this to the DEA's attention because he knew that he was

8   betraying the DEA with every piece of information that he

9   leaked to Manuel Recio, and he knew that he was acting

10  corruptly with every dirty dollar that he got in exchange.

11           Look, there is a shred of truth to what you heard from

12  defense counsel, because they said, look, it doesn't matter if

13  he technically violated the standards of conduct because he was

14  trying to do the right thing.  That's essentially their

15  argument.  And they are getting at something very important

16  here, which is that John Costanzo didn't think the rules

17  applied to him.  But it's not just the rules.  He didn't think

18  the laws applied to him, that he could act however he wanted,

19  he could leak whatever information he wanted, he could take

20  whatever payments because he, he was special.  But you know

21  that's not the case.  You know that this isn't some super hero

22  DEA agent doing everything he can to keep us safe.  You know

23  that this is someone who is working for his own benefit and the

24  benefit of these dirty investigators and attorneys.

25           Now, defense counsel, here's what they want you to do,

1    here's what they did in their closing.  They held up each piece

2    of evidence.  They held up a recording or they held up a text

3    message.  They want you to look at it in isolation.  They want

4    you to poke holes in it.  They want you to think of all the

5    ways that you might doubt the meaning of it.  And then, when

6    you are done with that piece of evidence, they want you to say,

7    oh, there is reasonable doubt and put it off to the side.  They

8    want you to look at everything in isolation, and there is a

9    reason they want you to look at things in isolation.  Because

10   when you consider the evidence as a whole in this case, when

11   you consider how the evidence interweaves and builds upon

12   itself, it's overwhelming.

13           It's like a sturdy rope, right?  So a rope is made up

14   of many different strands, and those strands on their own hold

15   a certain amount of weight.  But when you weave those strands

16   together, the rope is so much stronger as a whole.

17           And that's it exactly what you have here.  You have a

18   recording.  And you can ask yourself is that recording

19   consistent with what's in the text messages?  I know you have

20   been paying close attention, and I know that you will find that

21   they are.

22           And are those text messages consistent with what's in

23   the bank records?  I know you will find the answer is yes.

24           And are those bank records consistent with what the

25   witnesses said?

1        Again, it all builds upon each other.  Every piece of

2   evidence builds upon the rest of the evidence in this case.

3   And when you fit it all together, there is no doubt of the

4   defendants' guilt.

5        I think that's especially true when it comes to the

6   witnesses.  This case is unusual because, with one exception

7   that I will get to in a minute, every single witness, when they

8   took the stand, had a raft of exhibits backing up what they

9   said, every single witness.  That includes Hernandez, that

10  especially includes Hernandez.  When a witness took the stand

11  and they testified, there was a document that was immediately

12  put before them and that document will corroborate what they

13  said.

14       So take Hernandez.  Hernandez said Special

15  Agent Costanzo told me that Macey was his particular friend and

16  that he liked doing cases with him.  Well, we showed you

17  Government Exhibit 325 that was a text message chain between

18  Costanzo and Hernandez, where Hernandez said, long before any

19  of this came out, I'm glad that you and Macey are friends.  I'm

20  going to bring you cases.  Corroborates him.

21       Or what about the idea that Recio tried to recruit

22  Hernandez into the scheme?  Well, the F.B.I. said let's wire

23  you up.  Let's see what we get.  If Hernandez was making that

24  up, if he was just blowing smoke, what would have happened when

25  the F.B.I. wired him up?  Nothing.  He would have tried to set

1   up a meeting with Recio, recio would not have returned his call

2   or they would have met and talked about the weather.

3           That's not what happened.  The F.B.I. put a device on

4   Hernandez.  Hernandez went to speak with Recio, and Recio

5   started spilling the beans.  He started talking about arrests.

6   He started talking about indictments.  He said I can't give you

7   the names yet.  Yet.  We've got to be smart about it.

8           Mr. Gainor went on at some length about that

9   recording, picking out sort of specific aspects.  Read the

10  whole thing.  There is a reason why we put a witness on the

11  stand just to read the whole thing because it really speaks for

12  itself.  It absolutely speaks for itself.

13          And on this topic, the idea that the government

14  accurately noted when certain aspects were unintelligible, that

15  that somehow undermines the evidence, that's a desperation

16  ploy.  They've got to say something about this recording.  It

17  is devastating.  It is absolutely fatal to their case.  So what

18  are they going to say?  Well, you can't hear everything, so you

19  should ignore it.  That is a desperation play.

20          Now, I said there was one witness where you don't have

21  corroboration for what that person said.  Edwin Pagan.  For

22  every key piece of Edwin Pagan's testimony, there are either no

23  documents supporting it or there are documents that flatly

24  contradict it.  I don't want to belabor these examples, I'm

25  only going to give you a couple.

Nb72Cos6                        Rebuttal – Mr. Swett

1          Let's look at JEM Solutions, or JEM.  Now, Edwin Pagan

2    told you that Costanzo had nothing to do with JEM.  And we have

3    told you again and again that that just isn't true; that

4    Costanzo received the log-in information for the JEM Solutions

5    bank account right when it was set up; that Costanzo referred

6    to it as "our company."

7          Edwin Pagan told you that the payments that Recio made

8    into JEM Solutions were part of this verbal agreement for which

9    there were no specific details and about which he couldn't give

10   you the basic, basic elements.

11         You know that every payment that Mr. Recio made into

12   JEM Solutions was for and at the direction of John Costanzo.

13   And how do you know that?  I'm going to ask you to write this

14   down, Government Exhibit 358 is a text message conversation

15   between Costanzo and Pagan, where Costanzo asks Pagan:  What's

16   the name of the company?  Pagan responds:  JEM Solutions

17   Solution, Inc.  Sorry.  Fell asleep.  That's April 4, 2019.

18         What does Costanzo do?  He turns around and he texts

19   Manuel Recio, and this is Government Exhibit 362C, and Costanzo

20   says that JEM Solutions Inc. is the company.

21         So Pagan is telling you that Recio and he had some

22   sort of agreement regarding JEM Solutions, but these text

23   messages make it very clear that the only reason Recio is

24   paying money into JEM Solutions is because that's what Costanzo

25   is telling him to do.  He is saying here's the company.  Here's

Nb72Cos6                    Rebuttal - Mr. Swett

1    where you put the money for my slush fund.

2            Pagan said he did 80 hours of work on the Grobman case

3    without a single phone call during that entire time period.  I

4    mean, think about it, think about it really.  This is a guy who

5    couldn't tell you if it was a fraud case or a bribery case, who

6    had apparently terabytes of data, and he is scrutinizing these

7    documents because it's helpful for the defense attorneys, but

8    at no point he has a question?  It just doesn't make any sense.

9            Look, Pagan is Costanzo's best friend, and he said

10   what he needed to say to try to save his best friend.  No

11   question that he is a loyal friend and a good friend, but he

12   wasn't a good witness.  His story fell apart under the

13   slightest scrutiny.  He said things that were completely

14   inconsistent with his own records.  Nothing about his testimony

15   creates reasonable doubt about the defendant's guilt.

16           In fact, the story he gave you, it didn't just fall

17   apart on cross, it blew up.  It demonstrated the way this

18   defense case has played fast and loose with the facts.

19           So you heard the defense argue that the tickets that

20   Costanzo bought out of JEM Solutions, that those tickets were

21   repayment for insurance payments that Pagan made when he bought

22   Costanzo's car.  It was kind of a complicated story, but that

23   was the basic gist I think you will recall.

24           This was -- this was their money chart.  This was the

25   chart that was going to exonerate the defendants because Elgin

1    Polo wanted you to believe that the USAA Insurance payments at

2    the top, about $3200, were offset by the American Air Line

3    tickets.  Costanzo paid for the insurance, Pagan paid for the

4    airline tickets.

5           Now, the reality is that Elgin Polo didn't know a

6    thing about this.  He admitted as much on the stand.  Basically

7    the defense attorneys told him, Make this chart, and he made

8    it.  They were just pulling out whatever they could to try to

9    explain why Costanzo was using JEM Solutions as his own

10   personal piggy bank.

11          But Pagan, they thought, could lock that story in for

12   you.  Pagan can explain this.  And then the jury will see that

13   Costanzo really did pay for $3,000 of the car insurance

14   payments.

15          Now, to be fair, Pagan did follow the script to some

16   extent.  He said Costanzo paid for the car insurance until my

17   loan went through, which I don't recall exactly.  So he kind of

18   stuck with the story on the stand.

19          But then on cross-examination, it fell apart.  He was

20   asked about the date that loan went through, and Pagan said:

21   "5/19, yes.

22   "Q   That was your car loan, right?

23   "A   Yes."

24          On the stand, Pagan admitted that his loan came

25   through in May of 2019, and yet the defense wants you to

1    believe that payments in late May, in June, in July, in August,

2    in September, that Costanzo made those payments for Pagan.  You

3    want to talk about leaps?  You want to talk about logical

4    inconsistencies?  You want to talk about mistakes in the case?

5              So let's take a look at what this chart really should

6    look like.  Even if you credit the Pagan story——I will leave

7    that up to you——all of those payments after the car loan,

8    Costanzo wasn't doing them for Pagan.  At most, he paid $300

9    for Pagan's car insurance, a far cry from the $3200 that they

10   were hoping you would buy.

11             There is a more basic reason that this story doesn't

12   pass the laugh test, and that is what we have been saying all

13   along.  When Pagan set up JEM Solutions, Costanzo had the keys

14   to the kingdom.  He had the debit card.  He had the checks.  He

15   had the bank account information.  Why would Pagan be giving

16   Costanzo all those things back in February if the whole reason

17   was to repay him for insurance payments in September?  It just

18   doesn't make sense.  It's a Hail Mary.  You know that play in

19   football?  It's like three seconds left on the clock, you are

20   down by a touchdown, you've got 80 yards to go, and you chuck

21   it up and see what happens.  That's the defense case.  They are

22   throwing up whatever they can to see what sticks.

23             Let me give you another Hail Mary that the defense is

24   throwing up, that the government's headers on its documents are

25   misleading or that the government used a Google Maps photo and

Nb72Cos6                          Rebuttal - Mr. Swett

1    therefore we have no idea what we are talking about.  Does that

2    really matter?  Is that really what the government's case is

3    about?

4          And on the topic of accuracy, Mr. Mukasey said

5    something in his closing that I think we need to revisit.  He

6    said there is no record of suitcases of cash in this case.

7    Remember that?  He said there is no record of suitcases of

8    cash.  Well, I guess that's technically right.  But I'm sure

9    you will all remember when Special Agent Jeffrey was on the

10   stand.  Ms. Young, defense counsel, asked her all these

11   questions about the search, didn't you find this, didn't you

12   find that and she asked:  You didn't find bags of cash, did

13   you?  Special Agent Jeffrey said:  Well, not bags of cash, but

14   I did find a drawer full of cash.  I couldn't take it.  It

15   wasn't in the search warrant, but it was there.

16         Look.  This has been a long day, I'm sure.  You have

17   heard a lot of things from lawyers.  But you know, and the

18   judge will instruct you, we are not giving you evidence.  We

19   are making arguments.  We are trying our best to portray our

20   theory of the case, and that's true for both sides.  But when

21   you go back there, anything that was said today——the arguments

22   that AUSA Deininger made or Mr. Mukasey or Mr. Gainor——you've

23   got to put that to the side and you've got to focus on the

24   evidence.  If they told you about a document, read the whole

25   document.  If they pointed you to what a witness said, read the

Nb72Cos6                          Rebuttal - Mr. Swett

1   whole transcript.  We embrace our burden of proving this case

2   beyond a reasonable doubt.  We are not giving it to you in bits

3   and pieces.  We are happy for you to look and scrutinize the

4   whole record because we know what that record says.

5          Okay.  I want to touch on two things briefly, two

6   pieces of evidence that essentially resolve this for you.

7          Again, defense counsel said over and over there is

8   nothing direct about this case, there is nothing direct, it is

9   all circumstantial.

10         Well, as an initial matter, I expect Judge Oetken will

11  instruct you that evidence is evidence.  You can rely on

12  circumstantial evidence, you can rely on direct evidence.  In

13  fact, in a case involving conspiracy and in a case involving

14  this kind of criminal conduct, it's not unusual to have some

15  circumstantial evidence.  It's not unusual that the defendants,

16  that the criminal coconspirators won't talk about it in the

17  open.

18         But you have direct evidence.  You have direct

19  evidence in the form of the GLC subpoena returns that AUSA

20  Deininger walked you through.  Global Legal Consulting, Manuel

21  Recio's company, received a subpoena to provide records about

22  the $2500 payment.  Manuel Recio, he was the one who collected

23  those records and he put them together.  And what did he

24  provide?  Text messages between him and Costanzo talking about

25  the NADDIS searches.  Is that not direct evidence?  That is

Nb72Cos6                     Rebuttal - Mr. Swett

1   Recio, that is Global Legal Consulting truthfully admitting

2   that the reason Costanzo got that payment -- the reason EBCO

3   got that payment was because Costanzo was leaking DEA

4   information and NADDIS information.

5          And that does bring me to a point that you have heard

6   from both defense attorneys about how there is a particular

7   act, that you can't prove that there was a payment tied to that

8   act.  I think, to give one example, Mr. Gainor said there is no

9   proof of a payment related to the Peralta leak.  Okay?

10         Well, members of the jury, there is a very clear

11  pattern of what's going on here.  Costanzo gets a payment, he

12  delivers the goods, and then gets more money.  Starts out right

13  at the beginning.  That $2500 payment, that $2500 payment that

14  you know was for the NADDIS searches, that's the upfront

15  payment.  Welcome to the conspiracy, Special Agent Costanzo.

16  Here is your $2500.  And we will take some NADDIS searches in

17  return.  And Costanzo made good on his end of the deal.  He ran

18  the names.  He called Recio with the information.  He held up

19  his end of the bargain.  And so he keeps getting paid.  Sure,

20  it doesn't relate to any specific thing, but Costanzo is out

21  there busting his butt off for Recio and these corrupt

22  attorneys, and they are continuing to pay him because he is

23  delivering the goods.  So when you go back in there, you are

24  going to know this isn't about, well, can we tie a payment to

25  this particular text or can we tie a payment to this particular

1    phone call.  Because you have seen that from November of 2018

2    until the F.B.I. and the Department of Justice put a stop to

3    this, this was continuous.  This was a day-in/day-out thing.

4    This was a partnership.  It was something that was going on

5    again and again and again.

6          You also were asked to speculate or, rather, you were

7    asked why would these two agents turn bad overnight?  Well,

8    look, that's not for you to decide.  What they did, what they

9    decided to do, how they acted, what they thought of all this.

10   Your job is to decide whether the government has satisfied the

11   elements of this charge and not one of those elements is going

12   to ask for a motive.

13         And frankly, those elements don't include whether

14   Special Agent Costanzo got rich off of this.  A single payment

15   is going to be enough here.  And frankly, ladies and gentlemen,

16   of course it doesn't matter if it was a lot of money or a

17   little money because any dirty agent with half a brain would

18   say as long as I take a thousand bucks a pop, they can't

19   prosecute me.  That is still bribery.  That is still

20   corruption.

21         This is not a case about people getting rich.  This is

22   a case about people violating their duties in exchange for

23   benefits.

24         In Mr. Mukasey's closing there was a big to-do about

25   how transparent and open Special Agent Costanzo was about all

1   of this.  But then there was also this big to-do about how none

2   of the money ever touched his accounts.  I'm sorry.  You can't

3   have it both ways.  If the argument is the money never touched

4   his accounts, that's one argument.  If the argument was he was

5   open about everything, that's another.  But he wants to have it

6   both ways.  Again, they are throwing up whatever they can.

7   They want to make as many arguments as they can, they want to

8   confuse the issue, they want to distract you from the very

9   straightforward evidence in this case, the evidence that

10  Costanzo was the direct, intended beneficiary of payments that

11  were routed through Pagan, his father, and that continued

12  throughout this entire bribery scheme.

13          Now, ladies and gentlemen, this is a case about

14  Special Agent Costanzo selling DEA secrets.  But that's not the

15  only thing he sold.  He sold out his colleagues.  He sold out

16  the DEA investigations.  And he sold his oath of office, that

17  promise that he made to all of us when he raised his right hand

18  and he swore to uphold the Constitution and to enforce the

19  narcotics laws of this country.  He put that oath up for sale.

20  And the buyer?  Manuel Recio and the dirty attorneys he worked

21  with.  I'm sure they thought they got a good deal, $20,000 into

22  a slush fund, a little help on a down payment, some first class

23  plane tickets, not a bad deal to buy a special agent.

24          But when they were working out this corrupt deal, John

25  Costanzo and Manuel Recio never counted on all of their

1    business being put before a jury, being put before you.  They

2    didn't count on it because they thought they were smart enough

3    to get away with it.  They took everything they had learned as

4    special agents, and they didn't use it to enforce the laws.

5    They used it to break the laws.  The secret phone.  The lies.

6    The shell companies.  The concealment.  The deleted messages.

7    The sham invoices.

8           But it's all been out there now.  You have heard them

9    in their own words.  You have seen their text messages.  You

10   have looked at the documents.  You followed the money.

11          And now it is time for you to do your duty.  It is

12   time for to you decide the case based solely on the evidence.

13   That was the promise.  That was the oath that you took when you

14   were sworn in as jurors, to deliberate without favor, without

15   prejudice.  It's time for you to hold the defendants

16   accountable for the leaks, for the lies, for the dirty money.

17   It's time for you to hold the defendants accountable for

18   violating the public trust.  Violating the public trust for

19   their own selfish greed.

20          Because when you go back into that jury room and you

21   consider all of the evidence in this case, you will reach the

22   inescapable conclusion that John Costanzo and Manuel Recio are

23   guilty.

24          THE COURT:  Thank you.

25          Members of the jury, you have now heard all of the

Nb72Cos6                          Rebuttal - Mr. Swett

1    testimony in the case, seen the evidence in the case, and you

2    have heard the summations or closing arguments of the parties.

3            The next stage in the case is for me to instruct you

4    on the law, which is detailed, and I am actually having my

5    staff print out copies of the instructions so that you can

6    follow along as I read them to you and then you will have

7    copies of the instructions with you as you begin your

8    deliberations.

9            So I'm going to give you one more quick break to go to

10   the bathroom or whatever, and then we will resume in five or

11   ten minutes.  One more time, I'm going to ask you to leave your

12   notepads on your chairs, and we will come back in five or ten

13   minutes and I will instruct you on the law.

14           (Recess)

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Members of the jury, you've now heard all

3   the evidence in the case, as well as the final arguments of the

4   parties.  You've reached the point where you are about to

5   undertake your final function as jurors.  You've paid careful

6   attention to the evidence, and I am confident that you will act

7   together with fairness and impartiality to reach a just verdict

8   in the case.

9          On your chairs you'll see a copy of the jury

10  instructions that I'm reading.  I just finished the first

11  paragraph.  So if you'd like to follow along, you're welcome

12  to.  You can also just listen.  And I'll let you bring these

13  back to the jury room to deliberate, so you can either listen

14  or follow along, it's up to you.

15         My duty at this point is to instruct you as to the

16  law.  There are three parts to these instructions.  First I'm

17  going to give you some general instructions about your role and

18  about how you are to decide the fact of the case.  These

19  instructions really would apply to just about any trial.

20  Second, I'll give you some specific instructions about the

21  legal rules applicable to this particular case.  Third, I'll

22  give you some final instructions about procedure.

23         It is your duty to accept these instructions of law

24  and to apply them to the facts as you determine them.  With

25  respect to legal matters, you must take the law as I give it to

you.  If any attorney or witness has stated a legal principle

different from any that I state to you in my instructions, it

is my instructions that you must follow.  You must not

substitute your own notions or opinions of what the law is or

ought to be.

        Listening to these instructions may not be easy.  It

is important, however, that you listen carefully and

concentrate.  I ask you for patient cooperation and attention.

You'll notice that I'm reading these instructions from a

prepared text.  It would be more lively no doubt if I just

improvised.  But it's important that I not do that.  The law is

made up of words, and those words are very carefully chosen.

So it's critical that I use exactly the right words.

        You'll have copies of what I'm reading in the jury

room to consult, so don't worry if you miss a word or two.  But

for now, listen carefully and try to concentrate on what I'm

saying.  Remember, you are to consider these instructions

together as a whole; you are not to isolate or give undue

weight to any single instruction.

        Role of the jury.

        As members of the jury, you are the sole and exclusive

judges of the facts.  You pass on the evidence.  You determine

the credibility of the witnesses.  You resolve such conflicts

as there may be in the testimony.  You draw whatever reasonable

inferences you decide to draw from the facts as you have

1    determined them, and you determine the weight of the evidence.

2           Do not conclude from any of my questions or any of my

3    rulings on objections or anything else that I have done during

4    this trial that I have any view as to the credibility of the

5    witnesses or how you should decide the case.  Any opinion I

6    might have regarding the facts is of absolutely no consequence.

7    It is your sworn duty, and you have taken the oath as jurors,

8    to determine the facts.

9           Role of counsel.

10          Just as I have my duties as a judge and you have your

11   duties as jurors, it has been the duty of each attorney in this

12   case to object when the other side offered testimony or other

13   evidence that the attorney believed is not properly admissible.

14   It has been my job to rule on those objections.  Therefore, why

15   an objection was made or how I ruled on it is not your

16   business.  You should draw no inference from the bare fact that

17   an attorney objects to any evidence.  Nor should you draw any

18   inference from the fact that I might have sustained or

19   overruled an objection.

20          From time to time, the lawyers and I had conferences

21   outside of your hearing.  These conferences involved procedural

22   and other matters and none of the events relating to these

23   conferences should enter into your deliberations at all.

24          To be clear, the personalities and the conduct of

25   counsel in the courtroom are not in any way at issue.  If you

1    formed reactions of any kind to any of the lawyers in the case,

2    favorable or unfavorable, whether you approved or disapproved

3    of their behavior as advocates, those reactions should not

4    enter into your deliberations.

5            Consider each defendant separately.

6            Defendants John Costanzo, Jr. and Manuel Recio are on

7    trial together.  In reaching a verdict, however, you must bear

8    in mind that innocence or guilt is individual.  Your verdict

9    must be determined separately with respect to each defendant,

10   solely based on the evidence or lack of evidence presented

11   against him, without regard to the guilt or innocence of the

12   other defendant.

13           You must be careful not to find either defendant

14   guilty merely by reason of relationship or association with

15   other persons.  The fact that one person may be guilty of an

16   offense does not mean that his friends, relatives, or

17   associates were also involved in the crime.  You may, of

18   course, consider those associations as part of the evidence in

19   the case, and may draw whatever inferences are reasonable from

20   the fact of the associations taken together with all of the

21   other evidence in the case.  But you may not draw the inference

22   of guilt merely because of such associations.  In short, for

23   each defendant, the question of guilt or innocence as to each

24   count of the indictment must be individually considered and

25   individually answered, and you may not find an individual

NB7VCOS7                          Charge

1    guilty unless the evidence proves his guilt beyond a reasonable

2    doubt.

3              All persons are equal before the law.

4              In reaching your verdict, you must remember that all

5    parties stand equal before a jury in the courts of the United

6    States.  The fact that the government is a party and the

7    prosecution is brought in the name of the United States does

8    not entitle the government or its witnesses to any greater

9    consideration than that accorded to any other party.  By the

10   same token, you must give it no less deference.  The government

11   and the defendants stand on equal footing before you.  It would

12   be improper for you to consider in reaching your decision as to

13   whether the government sustained its burden of proof, any

14   personal feelings you may have about either defendant's race,

15   religion, national origin, gender, sexual orientation, or age.

16   All persons are entitled to the same presumption of innocence,

17   and the government has the same burden with respect to all

18   persons.

19             Similarly, it would be improper for you to consider

20   any personal feelings you have about the race, religion,

21   national origin, gender, sexual orientation, or age of any

22   other witness or anyone else involved in this case.  The

23   defendants are entitled to a trial free from prejudice, and our

24   judicial system cannot work unless you reach your verdict

25   through a fair and impartial consideration of the evidence.

1          Now I will instruct you on the presumption of

2     innocence.

3          The law presumes the defendants to be innocent of all

4     charges against them.  In this case, each of the defendants

5     before you have has pleaded not guilty.  In so doing, each

6     defendant has denied the charges in the indictment.  Thus, the

7     government has the burden of proving each defendant's guilt

8     beyond a reasonable doubt.

9          This burden never shifts to the defendants.  In other

10    words, neither defendant has to prove his innocence.  They are

11    presumed to be innocent of the charges contained in the

12    indictment.  The defendants thus began the trial here with a

13    clean slate.  The presumption of innocence was in their favor

14    when the trial began, continued in their favor throughout the

15    entire trial, remains with them even as I speak to you now, and

16    persists in their favor during the course of your deliberations

17    in the jury room.

18         This presumption of innocence is removed if — and only

19    if — as members of the jury, you are unanimously convinced that

20    the prosecution has sustained its burden of proving each

21    defendant guilty beyond a reasonable doubt.

22         Now the question naturally arises:  What exactly is a

23    reasonable doubt?  The words almost define themselves.  A

24    reasonable doubt is a doubt that a reasonable person has after

25    carefully weighing all the evidence.  It is a doubt founded in

NB7VCOS7                          Charge

reason and arising out of the evidence in the case, the

conflict in evidence or the lack of evidence.  Reasonable doubt

is a doubt that appeals to your reason, your judgment, your

experience, your common sense.  Proof beyond a reasonable doubt

must, therefore, be proof of such a convincing character that a

reasonable person would not hesitate to rely and act upon it in

the most important of his or her own affairs.

I must emphasize that "beyond a reasonable doubt" does

not mean beyond all possible doubt.  It is practically

impossible for a person to be absolutely and completely

convinced of any disputed fact that, by its very nature, cannot

be proved with mathematical certainty.  In the criminal law,

guilt must be established beyond a reasonable doubt, not all

possible doubt.

Further, the government is not required to prove each

element of the offense by any particular number of witnesses.

The testimony of a single witness may be enough to convince you

beyond a reasonable doubt of the existence of the elements of

the charged offense, if you believe that the witness has

testified truthfully and accurately related what the witness

has told you.

That all said, if, after a fair and impartial

consideration of all the evidence or lack of evidence, you have

an abiding belief of the guilt of the defendant you are

considering beyond a reasonable doubt, a belief that you would

1    be willing to act upon without hesitation in the most important

2    matters of the personal affairs of your own life, then it is

3    your sworn duty to convict that defendant.

4            On the other hand, if, after a fair and impartial

5    consideration of all the evidence and lack of evidence, you are

6    not satisfied of the guilt of a defendant with respect to the

7    charge in the indictment; if you do not have an abiding

8    conviction of the defendant's guilt; in sum, if you have such a

9    doubt as would cause you, as prudent persons, to hesitate

10   before acting in matters of the most important to yourself,

11   then you have a reasonable doubt and, in that circumstance, it

12   is your sworn duty to return a verdict of not guilty as to that

13   defendant.

14           In reaching that determination, your oath as jurors

15   commands that you are not to be swayed by sympathy or

16   prejudice.  You are to be guided solely by the evidence in this

17   case and you are to apply the law as I instruct you.  As you

18   sift through the evidence, you must ask yourselves whether the

19   prosecution has proven the guilt of the defendant you are

20   considering.  Once you let fear or prejudice or bias or

21   sympathy interfere with your thinking, there is a risk that you

22   will not arrive at a true and just verdict.  Thus, if you have

23   a reasonable doubt as to a defendant's guilt, then you must

24   render a verdict of not guilty as to that defendant.  But if

25   you should find that the prosecution has met its burden of

1   proving the defendant's guilt beyond a reasonable doubt, then

2   you should not hesitate because of sympathy or for any other

3   reason to render a verdict of not guilty.

4          The question of possible punishment is of no concern

5   to the jury and should not enter into or influence your

6   deliberations.  The duty of imposing sentence in the event of a

7   conviction rests exclusively upon the Court.  Your function is

8   to weigh the evidence or lack of evidence in the case and to

9   determine whether or not each defendant is guilty beyond a

10  reasonable doubt, solely upon the basis of such evidence.  Upon

11  your oath as jurors, you cannot allow any consideration of the

12  punishment that may be imposed to influence your verdict.

13         Similarly, it would be improper for you to allow any

14  feelings you might have about the nature of the crimes charged

15  to interfere with your decision-making process.  Your verdict

16  must be based exclusively upon the evidence or the lack of

17  evidence in the case.

18         Now, I've repeatedly referred to the evidence in this

19  case.  This raises an important question:  What is evidence?  I

20  instruct you that evidence consists of the sworn testimony of

21  the witnesses, the exhibits received in evidence, and the

22  stipulations of the parties.  In determining the facts, you

23  must rely upon your own recollection of the evidence.

24         What then is not evidence?  I instruct you that the

25  following does not count as evidence:

First, testimony that I have stricken or excluded is not evidence.  You may not use it in rendering your verdict. If certain testimony was received for a limited purpose, you must follow the limiting instructions I have given and use the evidence only for the limited purpose I indicated.

Second, any exhibit that was not received into evidence is not evidence.  Thus, exhibits marked for identification, but not admitted, are not evidence; nor are materials that were used only to refresh a witness's recollection.

Third, among the exhibits received in evidence, there may have been some documents and recordings that are redacted. "Redacted" means that part of the document or recording was taken out.  You are to concern yourself only with the item admitted into evidence.  You should not consider any possible reason why the other part has been redacted.

Fourth, arguments by the lawyers are not evidence. The reason is simple:  Advocates are not witnesses.  The opening and closing arguments of each party explain how that party wants you to analyze the evidence.  What the lawyers have said to you is intended to help you understand the evidence or the lack of evidence as you deliberate to reach your verdict. However, if your recollection of the facts differs from the lawyers' opening statements, questions to witnesses, or summations, it is your recollection that controls, not theirs.

1    For the same reasons, you are not to consider a lawyer's or a

2    party's questions as evidence, only the witnesses' answers are

3    to be considered evidence, not the questions.

4           Finally, any statements that I may have made do not

5    constitute evidence.  It is for you alone to decide the weight,

6    if any, to be given to the testimony you have heard and the

7    exhibits you have seen.

8           I will now discuss at slightly greater length some

9    important matters related to evidence.

10          There are two types of evidence that you may properly

11   consider in reaching your verdict.

12          One type of evidence is direct evidence.  Direct

13   evidence is testimony by a witness about something he knows by

14   virtue of his own senses, something he has seen, felt, touched

15   or heard.  For example, if a witness testified that when he

16   left his house this morning it was raining, that would be

17   direct evidence about the weather.

18          The second type of evidence is circumstantial

19   evidence.  Circumstantial evidence is evidence that tends to

20   prove a disputed fact indirectly, by proof of other facts.

21   There is a simple example of circumstantial evidence that is

22   often used in this courthouse.

23          Assume that when you came into the courthouse this

24   morning the sun was shining and it was a nice day outside,

25   outdoors.  Assume that the courtroom shades were drawn and you

1   could not look outside.  Assume further that as you were

2   sitting here, someone walked in with an umbrella that was

3   dripping wet and then, a few moments later, someone else walked

4   in with a raincoat that was dripping wet.

5         Now, because you could not look outside the courtroom

6   and you could not see whether it was raining, you would have no

7   direct evidence of that fact.  But on the combination of facts

8   that I've asked you to assume, it would be reasonable and

9   logical for you to conclude that it was raining.

10         That is all there is to circumstantial evidence.  You

11   infer on the basis of your reason, experience, and common sense

12   from one fact that's established the existence or nonexistence

13   of some other fact.

14         As you can see, the matter of drawing inferences from

15   facts in evidence is not a matter of guesswork or speculation.

16   An inference is a logical factual conclusion that you might

17   reasonably draw from other facts that have been proven.

18         Many material facts, such as someone's state of mind,

19   are rarely easily proven by direct evidence.  Usually such

20   facts are established by circumstantial evidence and the

21   reasonable inferences that you draw.  Circumstantial evidence

22   may be given as much weight as direct evidence.  The law makes

23   no distinction between direct evidence and circumstantial

24   evidence, but simply requires that before convicting a

25   defendant, the jury must be satisfied that the government has

1   proven a defendant's guilt beyond a reasonable doubt, based on

2   all of the evidence in the case.

3          There are times when different inferences can be drawn

4   from the evidence.  The government asks you to draw one set of

5   inferences.  The defendants ask you to draw another.  It is for

6   you, and you alone, to decide what inferences you will draw.

7          You have heard evidence in the form of stipulations.

8   A stipulation of testimony is an agreement between the parties

9   that, if called, a witness would have given certain testimony.

10  You must accept as true the fact that the witness would have

11  given the testimony.  However, it is for you to decide what

12  effect that testimony should be given.

13         You also heard evidence in the form of stipulations

14  that contain facts that were agreed to be true.  In such cases,

15  you must accept those facts as true.  However, it is for you to

16  decide what weight, if any, to give to those facts.

17         You have seen transcripts of some of the recordings

18  that were admitted into evidence.  Portions of the

19  communications and recordings were in Spanish.  With respect to

20  foreign language conversations, the Court has admitted English

21  language translations of those Spanish communications and

22  recordings into evidence.  The written English translations are

23  evidence.  You must accept the translations contained in the

24  transcript as evidence and that's part of the evidence before

25  you.  You must disregard any different meaning.  If you speak

Spanish, you may not substitute your own translation for that

which has been agreed upon by the parties.  With respect to

English language recordings that were transcribed, the parties

have stipulated that those transcripts are true and accurate

transcripts of the corresponding audio recordings.

During the course of the trial, there were charts and

summaries shown to you in order to make the other evidence more

meaningful and to aid you in considering the evidence.  They

are not direct independent evidence; they are summaries of the

evidence.  They are admitted into evidence as aids to you.

In understanding the evidence you've heard, it is

sometimes easier and more convenient to utilize summary charts

than to place all of the relevant documents in front of you.

It is for you to decide whether the charts and summaries

correctly present information contained in the testimony and in

the exhibits on which they are based.  To the extent that the

charts conform to what you determine the underlying evidence to

be, you may consider them if you find that they are of

assistance to you in analyzing and understanding the evidence.

Witness credibility.

You have had the opportunity to observe the witnesses.

It will now be your job to decide how believable each witness

was in his or her testimony.  You are the sole judges of the

credibility of each witness and of the importance of his or her

testimony.

1          To that end, I am going to give you a few general

2    instructions on how you may determine whether witnesses are

3    credible and reliable, whether witnesses told the truth at this

4    trial, and whether they knew what they were talking about.

5          First, consider how well the witness was able to

6    observe or hear what he or she testified about.  How did the

7    witness's testimony impress you?  Did the witness appear to be

8    testifying honestly and candidly?  Did the witness appear

9    knowledgeable about what he or she was testifying about?  Were

10   the witness's answers direct or were they evasive?  Consider

11   the witness's intelligence, demeanor, manner of testifying, and

12   the strength and accuracy of the witness's recollection.

13   Consider whether any outside factors might have affected a

14   witness's ability to perceive events.

15         Consider the substance of the testimony.  How does the

16   witness's testimony compare with other proof in the case?  Is

17   it corroborated or is it contradicted by other evidence?  If

18   there is a conflict, does any version appear reliable and, if

19   so, which version seems more reliable?

20         In passing upon the credibility of a witness, you may

21   also consider any inconsistencies or contradictions as to

22   material matters in his or her testimony.

23         If you find that a witness has testified falsely as to

24   any material fact or if you find that a witness has been

25   previously untruthful when testifying under oath or otherwise,

NB7VCOS7                        Charge

 1   you may reject that witness's testimony in its entirety or you

 2   may accept only those parts that you believe to be truthful or

 3   that are corroborated by other independent evidence in the

 4   case.

 5          It is for you, the jury, and you alone, to decide the

 6   credibility of witnesses who testified and the weight that

 7   their testimony deserves.

 8          The defendants did not testify in this case.  Under

 9   our Constitution, a defendant has no obligation to testify or

10   present evidence, because it is the government's burden to

11   prove a defendant's guilt beyond a reasonable doubt.  That

12   burden remains with the government throughout the trial and

13   never shifts to the defendant.  A defendant is never required

14   to prove that he or she is innocent.  You may not attach any

15   significance to the fact that the defendants did not testify.

16   You may not draw any inference against the defendants because

17   they did not take the witness stand.  You may not speculate as

18   to why they did not testify, and you may not consider this

19   against either defendant in any way in your deliberations.

20          You've heard testimony from employees of the

21   government.  The fact that a witness may be employed by the

22   federal government as a law enforcement official or employee

23   does not mean that his or her testimony is deserving of more or

24   less consideration or greater or lesser weight than that of an

25   ordinary witness.

1          In this context, defense counsel may attack the

2     credibility of such a witness on the ground that his or her

3     testimony may be colored by a personal or professional interest

4     in the outcome of a case.

5          It is your decision, after reviewing all of the

6     evidence, whether to accept the testimony of a law enforcement

7     or government employee witness and to give that testimony the

8     weight you find it deserves.

9          You have heard testimony from one witness, Jorge Luis

10    Hernandez Villazon, who was cooperating with the government.

11    Hernandez pleaded guilty to certain crimes and entered into a

12    cooperation agreement with the government.  I will refer to

13    this witness as a cooperating witness because he was

14    cooperating with the government.  The law allows the use of his

15    testimony, which is properly considered by the jury.

16         Like the testimony of any other witness, a cooperating

17    witness's testimony should be given such weight as it deserves

18    in light of all the facts and circumstances.  I have given you

19    some general considerations on credibility, and I am not going

20    to repeat those here, nor will I repeat the arguments that have

21    been made by both sides.  However, let me say a few things that

22    you may want to consider during your deliberations on the

23    subject of cooperating witnesses.

24         Cooperating witness testimony is of such a nature that

25    it should be scrutinized with great care and viewed with

NB7VCOS7                         Charge

particular caution when you decide how much of that testimony
to believe.  The fact that a witness is a cooperating witness
should be considered by you in evaluating his testimony.  The
weight to be given to the fact of the witness's cooperation is
up to you.  A witness who believes that he may be able to
obtain his own freedom or receive a lighter sentence by giving
testimony favorable to the prosecution may have a motive to
testify falsely.  However, it does not follow that, simply
because a person has admitted participation in one or more
crimes, that he is incapable of giving a truthful version of
what happened.

You should, of course, consider whether the testimony
was motivated by reward or self-interest or hostility to the
defendants.  You should ask yourself whether the cooperating
witness would benefit more by lying or by telling the truth.
Was his testimony made up in any way based on a belief that
false testimony would somehow result in favorable treatment?
Or did he believe that his interests would best be served by
testifying truthfully?  If you believe a witness was motivated
by personal gain, was the motivation one that would cause him
to lie or was it one that would cause him to tell the truth?
And did this motivation color the witness's testimony?

Obviously, you should reject the testimony if you find
it false.  However, if, after a cautious and careful
examination of the testimony and the witness's demeanor, you

1    are satisfied that the testimony is true, you should accept it

2    as credible and act on it accordingly.  You may also accept

3    parts and reject parts of a cooperating witness's or of any

4    witness's testimony as I have earlier explained.

5            You have heard testimony and arguments regarding an

6    agreement between the government and Hernandez.  It is no

7    concern of yours why the government has made an agreement with

8    a witness.  Your sole concern is to decide whether the witness

9    has given truthful testimony in this Court before you.

10           Further, you are to draw no conclusions or inferences

11   about the defendants from the fact that a witness pleaded

12   guilty and entered into an agreement with the government.  The

13   fact that a witness decided to plead guilty to certain charges

14   arising from his conduct is a personal decision, and you may

15   not consider the fact that a witness decided to plead guilty

16   against either of the defendants.

17           In sum, you should look to all the evidence in

18   deciding what credence and what weight, if any, you will give

19   to the testimony of the cooperating witness.

20           Bias of witnesses.

21           In deciding whether to believe a witness, you should

22   specifically note any evidence of hostility or affection that

23   the witnesses may have toward one of the parties.  Likewise,

24   you should consider evidence of any other interest or motive

25   that the witness may have in cooperating with a particular

NB7VCOS7                              Charge

party.  You should also take into account any evidence of any

benefit that a witness may receive from the outcome of the

case.

          It is your duty to consider whether the witness has

permitted any such bias or interest to color his or her

testimony.  In short, if you find that a witness is biased, you

should view his or her testimony with great caution, weigh it

with care -- sorry, let me read that again.  In short, if you

find that a witness is biased, you should view his or her

testimony with caution, weigh it with care, and subject it to

close and searching scrutiny.

          Of course, the mere fact that a witness is interested

in the outcome of the case does not mean he or she has not told

the truth.  It is for you to decide from your observations and

by applying your common sense and experience and all the other

considerations mentioned whether the possible interest of any

witness has intentionally or otherwise colored or distorted his

or her testimony.  You are not required to disbelieve an

interested witness; you may accept as much of his or her

testimony as you deem reliable and reject as much as you deem

unworthy of acceptance.

          Persons not on trial.

          Some of the people who may have been involved in the

events leading to this trial are not on trial.  This does not

matter.  There is no requirement that all members of a

1    conspiracy be charged and prosecuted or tried together in the

2    same proceeding.

3            You may not draw any inference, favorable or

4    unfavorable, toward the government or the defendants from the

5    fact that certain persons other than the defendants were not

6    named as defendants in the indictment.  Nor may you speculate

7    as to the reasons why other persons are not on trial.  Those

8    matters are wholly outside your concern and have no bearing on

9    your function as jurors.

10           You have heard evidence during the trial that

11   witnesses have discussed the facts of the case and their

12   testimony with the lawyers before the witnesses appeared in

13   court.  Although you may consider that fact when you are

14   evaluating a witness's credibility, I should tell you that

15   there is nothing unusual or improper about a witness meeting

16   with lawyers before testifying so that the witness can be aware

17   of the subjects he or she will be questioned about, focus on

18   those subjects, and have the opportunity to review relevant

19   exhibits before being questioned about them.  Such consultation

20   helps conserve your time and the Court's time.  In fact, it

21   would be unusual for a lawyer to call a witness without such

22   consultation.

23           Again, the weight you give to the fact or the nature

24   of the witness's preparation for his or her testimony and what

25   inferences you draw from such preparation are matters

1    completely within your discretion.

2            Uncalled witnesses.

3            There are several people whose names you have heard

4    during the course of the trial but who did not appear here to

5    testify.  Each party had an opportunity to call witnesses.  You

6    should not speculate as to what these people would have

7    testified to had they been called.  Their absence should not

8    affect your judgment in any way.

9            You should, however, remember my instruction that the

10   law does not impose on a defendant in a criminal case the

11   burden or duty of calling any witness or producing any

12   evidence.  The burden remains with the government to prove the

13   guilt of each defendant beyond a reasonable doubt.

14           You may have heard reference in the arguments and

15   cross-examination of defense counsel in this case to the fact

16   that certain investigative techniques were or were not used by

17   the government.  There is no legal requirement, however, that

18   the government prove its case through any particular means.

19   While you are to carefully consider the evidence adduced by the

20   government, you are not to speculate as to why they used the

21   techniques they did or why they did not use other techniques.

22   The government is not on trial.  Law enforcement techniques are

23   not your concern.  However, you are free to consider a lack of

24   evidence in your determination of whether the government proved

25   the charged crimes beyond a reasonable doubt.  Your concern is

NB7VCOS7                         Charge

to determine whether, on the evidence or lack of evidence, the

government has proven the defendant's guilt beyond a reasonable

doubt.

            Use of evidence obtained pursuant to searches.

            You have heard testimony about certain evidence that

was seized in searches of certain places and electronic

devices.  Evidence obtained from those searches was properly

admitted in this case and may be considered by you.  Whether

you approve or disapprove of how the evidence was obtained

should not enter into your deliberations because I now instruct

you that the government's use of this evidence is lawful.

            You must, therefore, regardless of your personal

opinions, give this evidence full consideration, along with all

the other evidence in the case, in determining whether the

government has proven the guilt of the defendant you are

considering beyond a reasonable doubt.

            Audio recordings of certain meetings and phone

conversations have been admitted into evidence.  Whether you

approve or disapprove of the recording or interception of those

conversations may not enter into your deliberations.  I

instruct you that these recordings were made in a lawful

manner.  You must, therefore, regardless of any personal

opinions, give this evidence full consideration, along with all

the other evidence in the case, in determining whether the

government has proved beyond a reasonable doubt the guilt of

NB7VCOS7                          Charge

1    each defendant.

2              Statements of defendants.

3              There has been evidence that the defendants made

4    certain statements relevant to the charges in the indictment.

5    Evidence of these statements was properly admitted in this case

6    and may be properly considered by you.  You are to give the

7    statements such weight as you find they deserve in light of all

8    the evidence.

9              Whether you approve or disapprove of the use of these

10   statements may not enter into your deliberations.  I instruct

11   you that no one's rights were violated and the government's use

12   of this evidence is lawful.

13             In this case, some of the defendants' statements were

14   audio-recorded and some were not.  To help your listening,

15   transcripts have been prepared.  The parties have stipulated

16   that the transcripts are true and accurate transcripts of the

17   corresponding audio files that you have heard, and that the

18   dates, times, phone numbers, and voice attributions on these

19   recordings are accurate -- on these transcripts are accurate.

20             Some of the exhibits admitted into evidence consist of

21   excerpts of longer documents that were not admitted into

22   evidence in their entirety.  These excerpts are the portions of

23   the underlying documents considered to be the most relevant to

24   the case by the party introducing them.  There is nothing

25   unusual or improper about the use of such excerpts, and you are

1    not to speculate from the use of such excerpts that any

2    relevant portion of a document has been omitted.

3            Now I'm going to turn to the substantive instructions.

4            I will now turn to the charges against the defendants

5    as contained in the indictment.

6            The defendants, John Costanzo, Jr. and Manuel Recio,

7    are formally charged in a five-count indictment.  As I

8    instructed you at the outset of the case, the indictment is a

9    charge or accusation; it is not evidence.  I will not read the

10   entire indictment to you at this time.  Rather, I will first

11   summarize the offense charged in the indictment -- the offenses

12   charged in the indictment, and then explain in detail the

13   elements of that offense.

14           The indictment contains a total of five counts or

15   charges.

16           Count One charges that Costanzo and Recio participated

17   in a conspiracy to bribe a public official from in or about

18   October 2018, up to and including in or about November 2019.

19   As I will explain in more detail later, a conspiracy, such as

20   the one charged in Count One, is an agreement or understanding

21   by two or more people to violate the law.

22           Count Two charges that from in or about October 2018,

23   up to and including in or about October -- November 2019,

24   Costanzo accepted a bribe as a public official.  This is what

25   is called a substantive count.

NB7VCOS7                        Charge

1          Count Three charges that from in or about October

2     2018, up to and including in or about November 2019, Recio paid

3     a bribe to a public official.  This is also a substantive

4     count.

5          Later on, I will explain to you the differences

6     between a conspiracy count and a substantive count.  For now,

7     just keep in mind that a conspiracy count is different from a

8     substantive count.

9          Count One charges the defendants with conspiring or

10    agreeing to bribe a public official, whereas Counts Two and

11    Three charge the defendants with substantive counts of bribery;

12    that is, the actual commission of the substantive crimes of

13    receiving a bribe as a public official and paying a bribe to a

14    public official.

15         Count Four charges that from in or about October 2018,

16    up to and including in or about November 2019, Costanzo and

17    Recio participated in a conspiracy to commit honest services

18    wire fraud.  This is a conspiracy count.

19         Count Five charges that from in or about October 2018,

20    up to and including in or about November 2019, Costanzo and

21    Recio committed honest services wire fraud.  This is a

22    substantive count.

23         In a moment, I will instruct you on each of these

24    charges in more detail.  At the outset, however, let me

25    instruct you that you must consider each individual charge

separately, and each defendant separately, and evaluate each on the proof or lack of proof that relates to that charge with respect to each defendant.

As you have seen, each count charges at least one defendant with a crime, but both defendants are not charged in every count. You must consider each count and each defendant separately, and you must return a separate verdict for each defendant on each count in which he is charged. I also instruct you that the defendants are not charged with committing any crimes other than the offenses contained in the indictment.

The fact that you may think certain conduct is unethical or morally wrong is of no consequence in this case. Laws enacted by Congress define the crimes charged in this case, and I will talk to you about these laws. Conduct is only a crime if it is defined as such by a law.

Now, Count Two: Receipt of a bribe as a public official.

I will now instruct you on the substantive charges of accepting a bribe as a public official and payment of a bribe to a public official. These are listed in the indictment as Counts Two and Three, but it is more convenient to discuss them first.

Count Two charges Costanzo with accepting a bribe as a public official, in violation of Title 18, United States Code,

NB7VCOS7                          Charge

Section 201(b)(2)(C).  Note that Count Two charges only
Costanzo, not Recio.  Count Two alleges that between in or
about October 2018, through at least November 2019, Costanzo, a
DEA employee and supervisor, received benefits from Recio, in
exchange for Costanzo sharing nonpublic DEA information, in
violation of Costanzo's official duty as a DEA agent.

          The law provides:

          Whoever being a public official, directly or
indirectly, corruptly demands, seeks, receives, accepts or
agrees to receive or accept anything of value personally or for
another person or entity, in return for being induced to do or
omit to do any act in violation of the official duty of such
official, is guilty of a crime.

          To find Costanzo guilty of Count Two, you must find
the government has proven each of the following elements beyond
a reasonable doubt:

          First, that on or about the dates set forth in the
indictment, Costanzo was a public official; second, that
Costanzo received, accepted, or agreed to receive or accept a
thing of value; third, that Costanzo did so in return for being
induced to perform an act or not to perform an act in violation
of his official duty; and fourth, that Costanzo did so with
corrupt intent.

          Now I will discuss separately each of the elements of
the bribery charge.

1        As I just mentioned, the first element of accepting a

2    bribe that the government must prove beyond a reasonable doubt

3    is that Costanzo was a public official when he sought or

4    received -- that should just say when he received the thing of

5    value.

6        The term "public official" means an officer or

7    employee or person acting for or on behalf of the United States

8    government or any department, agency, or branch of government

9    thereof, in any official function, under or by the authority of

10    the United States government.

11        The second element of accepting a bribe that the

12    government must prove beyond a reasonable doubt is that

13    Costanzo received, accepted, or agreed to receive or accept, a

14    thing of value, directly or indirectly.

15        The law makes no distinction between agreeing to

16    receive or receiving a bribe.  An agreement to receive a bribe

17    is as much a violation of the law as the actual receiving of

18    one.  Furthermore, under the law, you need not find that

19    Costanzo received or accepted the thing of value directly.  It

20    is sufficient if he did so indirectly, that is, through another

21    person.

22        The third element of accepting a bribe that the

23    government must prove beyond a reasonable doubt is that

24    Costanzo's receipt or acceptance of a thing of value was in

25    return for being induced to perform or not to perform an act in

violation of his official duty.

        The core of a bribery offense is something called a
*quid pro quo*, which is a Latin phrase meaning "this for that."
The government must prove beyond a reasonable doubt that
Costanzo received or accepted something of value, at least in
part of, in return for, and with the intention of, being
induced in the performance of his official duty.

        A public official's official duty is not limited to
those duties imposed by law or statute.  Official duty can
include duties that are imposed by written rules or regulations
of the governmental unit under whose authority the public
official is acting.  However, the scope of Costanzo's official
duty is ultimately an issue of fact for you to determine as a
jury.  If you find that the official duty of a DEA agent was
not completely defined by the DEA's written policies and
standards of conduct, you may also consider evidence that has
been admitted during the trial concerning the established
practices of DEA agents.

        The agreement to perform or not perform an act in
violation of official duty need not be explicit.  Rather, the
*quid pro quo* arrangement can be implied from words and actions,
so long as you find that Costanzo understood that the thing of
value was being provided in exchange for the promise or
performance of an act or nonperformance of an act in violation
of his official duty.

NB7VCOS7                          Charge

In considering this element, what matters is
Costanzo's intent to receive a bribe in return for being
induced to commit an act in violation of his official duty.  It
is not a defense that a violation was desirable or beneficial
to the DEA or the public, if that violation was induced, at
least in part, by the acceptance of something of value.

An alleged *quid pro quo* is not proven if you find that
something of value was given to or accepted by a public
official solely out of friendship or some other motive
unrelated to inducing a violation of the public official's
official duty.

The fourth and final element the government must prove
is that Costanzo had a corrupt intent.  "Corrupt intent" means
acting voluntarily and deliberately with an improper motive or
purpose.  This requires conscious wrongdoing, something
expressed -- sometimes expressed as a bad or evil state of
mind.  Corrupt intent may be established by circumstantial
evidence of a person's state of mind, including proof of a
person's words and conduct and the logical inferences that can
be drawn from that proof.  It is no defense that a defendant
acted with both proper and improper motives.  A defendant may
have a corrupt intent even if he possesses a dual intent, such
as a criminal intent to receive an unlawful bribe and a
noncriminal intent to help out a friend.

Count Three charges payment of a bribe to a public

NB7VCOS7                          Charge

official by Recio, in violation of Title 18, United States

Code, Section 201(b)(1)(C).  Note that Count Three charges only

Recio, not Costanzo.

          Count Three alleges that between in or about October

2018, through at least November 2019, Recio provided benefits

to Costanzo, who was a DEA agent, in exchange for Costanzo

sharing nonpublic DEA information, in violation of Costanzo's

duty as a DEA agent.

          The law provides:

          Whoever, directly or indirectly, corruptly gives,

offers, or promises anything of value to any public official to

induce such a public official to do or omit to do any act in

violation of the lawful duty of such official is guilty of a

crime.

          To establish a violation of Section 201(b)(1)(C), you

must find that the government has proven each of the following

elements beyond a reasonable doubt:

          First, that Recio, on or about the dates set forth in

the indictment, directly or indirectly, offered, promised, or

gave money or something else of value to Costanzo.

          Second, that at the time, Costanzo was a public

official.

          Third, that Recio did so with intent to induce

Costanzo to perform an act or not perform an act, in violation

of Costanzo's lawful duty in return for the thing of value.

1          Fourth, that Recio did so with corrupt intent.

2          Now I will discuss separately each of the elements of

3     the bribery charge.

4          The first element that the government must prove

5     beyond a reasonable doubt is that on or about the dates charged

6     in the indictment, Recio offered, promised, or gave money or

7     something else of value to Costanzo.

8          You need not find that Recio did all of these things.

9     It is sufficient if you find beyond a reasonable doubt that he

10    did any one of them, that he offered promised, or gave money or

11    something else of value to a political official -- to a public

12    official.

13         It is important to note that the bribery law makes no

14    distinction between offering, promising, or giving a bribe.

15    The mere offer or promise of a bribe is as much a violation of

16    the law as the actual giving of one.

17         Furthermore, under the law, you need not find that

18    Recio directly gave or offered money or something else of value

19    to Costanzo.  It is sufficient if he did so indirectly, that

20    is, through another person.

21         The second element that the government must prove

22    beyond a reasonable doubt is that at the time in question,

23    Costanzo was a public official.  I have already instructed you

24    as to the definition of "public official" and you should apply

25    those instructions here as well.

1          The third element that the government must prove

2    beyond a reasonable doubt is that Recio gave, promised, or

3    offered money or something of value with intent to induce

4    Costanzo to perform an act or not to perform an act, in

5    violation of Costanzo's lawful duty, in return for the thing of

6    value.  I instruct you that "lawful duty" has the same meaning

7    as "official duty," discussed in relation to Count Two.

8          In considering whether Recio offered, promised, or was

9    given a thing of value -- that should say "gave."  In

10   considering whether Recio offered, promised, or gave a thing of

11   value to Costanzo with the corrupt intent of inducing Costanzo

12   to act in violation of his lawful duty, remember that it is

13   Recio's intent to influence Costanzo's actions, and not the

14   subsequent actions of Costanzo, that is important.  Thus, the

15   government does not have to prove that Costanzo accepted the

16   bribe or did the act sought.  It also does not matter if

17   Costanzo would have performed the act anyway.

18         The fourth element that the government must prove

19   beyond a reasonable doubt is that Recio acted with corrupt

20   intent.  I have previously instructed you on the concept of

21   corrupt intent, and you should rely on those instructions here

22   as well.

23         Count One:  Conspiracy to bribe a public official.

24         Now I will turn back to Count One, conspiracy to bribe

25   a public official.

NB7VCOS7                         Charge

1            Count One charges Costanzo and Recio with violating

2       Title 18, United States Code, Section 371, by participating in

3       a conspiracy to bribe a public official, from in or about

4       October 2018, up to and including November 2019.  Count One

5       also charges that certain overt acts were committed in

6       furtherance of this conspiracy.  I will discuss the elements of

7       the crime later on.

8            But before I give you more specific instructions about

9       Count One, let me explain generally the crime of conspiracy.  A

10      conspiracy is a criminal partnership, a combination or

11      agreement of two or more persons to join together to accomplish

12      some unlawful purpose.

13           "Conspiracy" simply means agreement.  And the crime of

14      conspiracy to violate a federal law is an independent offense,

15      separate and distinct from the actual violation of any specific

16      federal laws.  Thus, if a conspiracy exists, it is still

17      punishable as a crime, even if it fails to achieve its purpose.

18           Consequently, for a defendant to be guilty of

19      conspiracy, there is no need for the government to prove that

20      he or any other conspirator was actually successful in their

21      criminal goals.  You may thus find a defendant guilty of the

22      crime of conspiracy even if you find that the substantive

23      crimes that were the objects of the conspiracy were never

24      actually committed.

25           Each member of a conspiracy may perform separate and

NB7VCOS7                        Charge

individual acts.  Some conspirators play major roles, while

other play minor roles in the scheme.  An equal role is not

what the law requires.  When people enter into a conspiracy to

accomplish an unlawful end, they become agents and partners of

one another in carrying out the conspiracy.  In fact, even a

single fact may be sufficient to draw a defendant within the

scope of a conspiracy.

         In order to find Costanzo and Recio guilty on Count

One, the government must prove beyond a reasonable doubt the

following three elements:

         First, that the conspiracy charged in Count One

existed.  In other words, that from at least in or about

October 2018, up to and including at least in or about November

2019, or any portion of that time period, there was an

agreement or understanding among two or more persons to violate

one or more of those provisions of the law which make it

illegal to, one, receive a bribe as a public official; or two,

pay a bribe to a public official.

         Therefore, the first question for you on Count One is:

Did the conspiracy alleged in Count One of the indictment

exist?

         Second, that the defendant you are considering

knowingly and willfully became a member of the conspiracy, with

intent to further its illegal purpose, that is, with the intent

to achieve the illegal object of the charged conspiracy.

NB7VCOS7                          Charge

1            And third, that one of the members of the conspiracy

2    knowingly committed at least one overt act in furtherance of

3    the conspiracy.

4            Now let us separately consider the three elements.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Nb72Cos8                         Charge

1              THE COURT:  The first element that the government must

2       prove beyond a reasonable doubt is that the conspiracy existed.

3       What is a conspiracy?  Simply defined, a conspiracy is an

4       agreement by two or more persons to accomplish one or more

5       unlawful objectives by working together.

6              The essence of the crime of conspiracy is the unlawful

7       agreement to violate the law.  It is not necessary that a

8       conspiracy actually succeed in its purpose for you to conclude

9       that it existed.  Indeed, you may find a defendant guilty of

10      conspiracy despite the fact that it was factually impossible

11      for the defendant to commit the substantive crime or goal of

12      the conspiracy.  This is because the success or failure of a

13      conspiracy is not material to the question of guilt or

14      innocence of the conspirator.  The crime of conspiracy is

15      complete once the unlawful agreement is made and an act is

16      taken in furtherance of that agreement.

17             To establish a conspiracy, the government is not

18      required to show that two or more persons sat around a table

19      and entered into a solemn pact, orally or in writing, stating

20      that they have formed a conspiracy to violate the law and

21      setting forth details of the plans and means by which the

22      unlawful project is to be carried out or the part to be played

23      by each conspirator.  Indeed, it would be extraordinary if

24      there were such a formal document or a specific oral agreement.

25             Your common sense will tell you that when people in

Nb72Cos8                         Charge

1    fact undertake to enter into a criminal conspiracy, much is

2    left to unexpressed understanding.  Conspirators do not usually

3    reduce their agreements to writing or acknowledge them before a

4    notary public, nor do they publicly broadcast their plans.

5    From its very nature, a conspiracy is almost invariably secret

6    in its origin and execution.  I remind you that a conspiracy

7    must include two or more persons.

8            It is sufficient if two or more persons in any way,

9    either explicitly or implicitly, come to a common understanding

10   to violate the law.  Express language or specific words are not

11   required to indicate assent or attachment to a conspiracy.  Nor

12   is it required that you find that any particular number of

13   alleged coconspirators joined in the conspiracy in order to

14   find that a conspiracy existed.  You need only find two or more

15   persons entered into the unlawful agreement alleged in the

16   indictment and that an act was committed in furtherance of that

17   agreement in order to find that a conspiracy existed.

18           In determining whether there has been an unlawful

19   agreement, you may judge acts and conduct of the alleged

20   coconspirators that are done to carry out an apparent criminal

21   purpose.  The saying "actions speak louder than words" is

22   applicable here.  In this regard, you may, in determining

23   whether an agreement existed here, consider the acts and

24   statements of all of those you find to be participants as proof

25   that a common design existed on the part of the persons charged

1    to act together to accomplish an unlawful purpose.

2            Often, the only evidence of a conspiracy available is

3    that of disconnected acts that, when taken together and

4    considered as a whole, show a conspiracy or agreement to secure

5    a particular result as satisfactorily and conclusively as more

6    direct proof, such as evidence of an express agreement.

7            Of course, proof concerning the accomplishment of the

8    object or objects of the conspiracy may be the most persuasive

9    evidence of the existence of the conspiracy itself.  But it is

10   not necessary that the conspiracy actually succeed in its

11   purpose in order for you to conclude that the conspiracy

12   existed.

13           In determining whether a conspiracy existed, you

14   should consider all of the evidence that has been admitted with

15   respect to the conduct and statements of each alleged

16   coconspirator and any inference that may reasonably be drawn

17   from that conduct and those statements.

18           It is sufficient to establish the existence of the

19   conspiracy if, after considering all of the relevant evidence,

20   you find beyond a reasonable doubt that the minds of at least

21   two alleged coconspirators agreed, as I have explained, to work

22   together in furtherance of one or more of the objects alleged

23   in Count One of the indictment, and that an act was taken to

24   further that agreement.

25           In this case, Count One of the indictment charges that

Nb72Cos8                        Charge

1    there were two objects of the conspiracy:

2              One, that Costanzo, being a public official, would

3    receive a bribe in return for being induced to perform an act,

4    or not to perform an act, in violation of his official duty.  I

5    have already instructed you on the elements of this substantive

6    crime in connection with Count Two -- in connection with my

7    instructions for Count Two.

8              Two, that Recio and others would give a bribe to a

9    public official with the intent to induce that public official

10   to perform an act, or not to perform an act, in violation of

11   his lawful duty.  I have already instructed you on the elements

12   of this substantive crime in connection with my instructions

13   for Count Three.

14             If you find that the conspirators agreed to accomplish

15   any one or more of these two objectives, then the illegal

16   purpose element will be satisfied.  In other words, you need

17   not find that the conspirators agreed to accomplish all of

18   these -- both of these two objectives.  An agreement to

19   accomplish any one or more of the objectives is sufficient.

20             However, you must be unanimous as to that objective or

21   those objectives.  That is, you must all be in agreement with

22   respect to at least one of the two alleged objectives of the

23   conspiracy.  You all have to be in agreement on the specific

24   object of the conspiracy that you find to exist before you can

25   find the conspiracy charged in the indictment existed.

1          In order to satisfy the second element of Count One,

2    the government must also prove beyond a reasonable doubt that

3    the defendant you are considering unlawfully, willfully, and

4    knowingly entered into the conspiracy, that is, that the

5    defendant agreed to take part in the conspiracy with knowledge

6    of its unlawful purposes and in furtherance of its unlawful

7    objectives.

8          "Unlawful" simply means contrary to law.  A defendant

9    need not have known that he or she was breaking any particular

10   law or any particular rule, but he or she must have been aware

11   of the generally unlawful nature of his acts.

12         An act is done "knowingly" and "willfully" if it is

13   done deliberately and purposefully.  That is, a defendant's

14   acts must have been the product of his or her conscious

15   objective, rather than the product of mistake, accident, mere

16   negligence, or some other innocent reason.

17         Now, knowledge is a matter of inference from the

18   proven facts.  Science has not yet devised a manner of looking

19   into a person's mind and knowing what that person is thinking.

20   However, you do have before you the evidence of certain acts

21   and conversations alleged to have taken place involving the

22   defendants or in their presence.  You may consider this

23   evidence in determining whether the government has proven

24   beyond a reasonable doubt a defendant's knowledge of the

25   unlawful purposes of the conspiracy.

1              It is not necessary for the government to show that a

2       defendant was fully informed as to all the details of the

3       conspiracy in order for you to infer knowledge on his or her

4       part.  To have guilty knowledge, a defendant need not have

5       known the full extent of the conspiracy or all of the

6       activities of all of its participants.  It is not even

7       necessary for a defendant to know every other member of the

8       conspiracy.  I instruct you that to become a member of the

9       conspiracy, a defendant need not have known the identities of

10      each and every other member, nor need he have been apprised of

11      all of their activities.  Furthermore, a defendant need not

12      have joined in all of the conspiracy's unlawful objectives.

13             Nor is it necessary that a defendant received any

14      monetary benefit from their participation in the conspiracy, or

15      had a financial stake in the outcome.  However, although proof

16      of a financial interest in the outcome of a scheme is not

17      essential or determinative, if you find that a defendant had a

18      financial or other interest, that is a factor you may properly

19      consider in determining whether the defendant was a member of

20      the conspiracy.

21             The duration and extent of each defendant's

22      participation has no bearing on the issue of his guilt.  He

23      need not have joined the conspiracy at the outset and need not

24      have received any benefit in return.  A defendant may have

25      joined it for any purpose at any time in its progress, and he

Nb72Cos8                    Charge

will be held responsible for all that was done before he joined

and all that was done during the conspiracy's existence while

he was a member, if those acts were reasonably foreseeable and

within the scope of that defendant's agreement.

Each member of a conspiracy may perform separate and

distinct acts and may perform them at different times.  Some

conspirators may play major roles while others play minor roles

in the scheme.  One participating in a conspiracy is no less

liable because his part is minor and subordinate.  An equal

role or an important role is not what the law requires.  In

fact, even a single act can be sufficient to make a defendant a

participant in an alleged conspiracy.

A person's mere association with a member of the

conspiracy, however, does not make that person a member of the

conspiracy, even when that association is coupled with

knowledge that a conspiracy is taking place.  A person may

know, work with, or enter into business or friendship with an

individual who is committing a crime without being a criminal

himself.  You may not find that the defendant you are

considering is a member of a conspiracy merely because of a

friendship or business association with alleged coconspirators.

Furthermore, mere presence at the scene of a crime, even

coupled with knowledge that a crime is taking place, is not

sufficient to support a conviction.  In other words, knowledge

without agreement and participation is not sufficient.  What is

1    necessary is that a defendant participate in the conspiracy

2    with knowledge of its unlawful purposes, and with an intent to

3    aid in the accomplishment of its unlawful objectives.

4           A conspiracy once formed is presumed to continue until

5    its objective is accomplished or until there is some

6    affirmative act of termination by its members.  So too, once a

7    person is found to be participant in the conspiracy, that

8    person is presumed to continue being a participant in the

9    venture until the venture is terminated, unless it is shown by

10   some affirmative proof that the person withdrew and

11   disassociated himself from it.

12          It is not essential that the government prove that a

13   particular conspiracy alleged in the indictment started or

14   ended on any of the specific dates described for that

15   conspiracy.  It is sufficient if you find that the conspiracy

16   was formed and that it existed for some time around or within

17   the dates set forth in the indictment.

18          In sum, the government must prove beyond a reasonable

19   doubt that a defendant, with an understanding of the unlawful

20   nature of the conspiracy, knowingly and intentionally engaged,

21   advised, or assisted in the conspiracy for the purpose of

22   furthering an illegal undertaking.  Only through that does a

23   defendant become a knowing and willing participant in the

24   unlawful agreement——that is to say, a conspirator.

25          Let me now turn to the third element of the conspiracy

Nb72Cos8                        Charge

alleged in Count One, the requirement of an overt act.

          The last element the government must prove beyond a
reasonable doubt is that at least one overt act was knowingly
committed by at least one of the coconspirators in furtherance
of the conspiracy.  An overt act is an independent act that
tends to carry out the conspiracy but need not necessarily be
the object of the crime.  The function of the overt act
requirement is to ensure that the agreement went beyond the
mere talking or agreeing stage.

          You need not find that either of the defendants in
this case committed the overt act.  It is sufficient if you
find that at least one overt act was in fact performed by at
least one coconspirator, whether a defendant or another
coconspirator, to further the conspiracy within the time frame
of the conspiracy.  Remember that the act of any member of the
conspiracy done in furtherance of the conspiracy becomes the
act of all of the members.  Nor is it necessary for the
defendant you are considering to commit an overt act in order
to be a member of the conspiracy.  An overt act must have been
knowingly and willfully done by at least one coconspirator in
furtherance of the object or purpose of a conspiracy that is
charged in the indictment.

          In this regard, you should bear in mind that the overt
act, standing alone, may be an innocent lawful act.
Frequently, however, an apparently innocent act sheds its

Nb72Cos8                         Charge

harmless character if it is a step in carrying out, promoting,

aiding, or assisting in the conspiratorial scheme.  You are

therefore instructed that the overt act does not have to be an

act which in and of itself is criminal or constitutes an

objective of the conspiracy.  It must be an act that furthers

the object of the conspiracy.  It is an element of the crime

that the government must prove beyond a reasonable doubt.

The government can satisfy this element by proving any

overt act, provided that the overt act is committed by one of

the coconspirators and is done to further the object of the

conspiracy.  It is sufficient if you find beyond a reasonable

doubt that any one overt act occurred while the conspiracy was

still in existence.

Nor is it necessary for you to reach unanimous

agreement on whether a particular overt act was committed in

furtherance of the conspiracy.  You just need to all agree that

at least one overt act was so committed.

I have admitted into evidence the acts and statements

of certain individuals who the government alleges were

coconspirators of the defendants.

You may consider as evidence against a defendant the

acts and statements of those who were coconspirators of that

defendant.  The reason for this rule has to do with the nature

of the crime of conspiracy.  A conspiracy is often referred to

as a partnership in crime.  Thus, as in other types of

Nb72Cos8                         Charge

partnerships, when people enter into a conspiracy to publish an

unlawful end, each member becomes an agent for the other

conspirators in carrying out the conspiracy.  Accordingly, the

reasonably foreseeable acts, declarations, statements, and

omissions of any member of the conspiracy in furtherance of the

common purpose of the conspiracy are deemed, under the law, to

be the acts of all of the members, and all of the members are

responsible for such acts, declarations, statements, and

omissions.

        In determining the factual issues before you, you may

consider against the defendants any acts or statements made by

any of the people who you find, under the standards I have

already described, to have been their coconspirators, even

though such acts or statements were not made in their presence,

or were made without their knowledge.

        I will now turn to Counts Four and Five.  Counts Four

and Five relate to the crime of honest services wire fraud.

Count Four charges the defendants with conspiracy to commit

honest services wire fraud.  Count Five charges the defendants

with the substantive crime of honest services wire fraud.

Because the law relating to the honest services wire fraud that

is charged in Count Five is relevant to my instructions on the

conspiracy that is charged in Count Four, I will first instruct

you on the substantive fraud that is charged in Count Five.

Then I will turn to the law of conspiracy.

Count Five charges that the defendants committed honest services wire fraud between in or about October 2018 up to and including November 2019, in that Costanzo, a DEA agent, shared nonpublic DEA information with Recio in exchange for bribes paid at the direction of Recio and defense attorneys David Macey and Luis Guerra.

The federal wire fraud statute, Title 18, United States Code, Section 1343, provides in pertinent part as follows:  "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communications in interstate or foreign commerce, any writings, signals, pictures, or sounds for the purpose of executing such scheme or artifice shall be guilty of a crime."

The law defines "the term 'scheme or artifice to defraud'" to "include a scheme or artifice to deprive another of the intangible right of honest services."

Honest services wire fraud involves a scheme to defraud the public of its right to a public official's honest services through bribery using wire communications.  To meet its burden of proof of Count Five, the government must prove four elements beyond a reasonable doubt.

First, that during the time alleged in the indictment,

Nb72Cos8                         Charge

there was a scheme or artifice to deprive the public and the

DEA of their right to the honest services of Costanzo through

bribery;

          Second, that the defendant you are considering

knowingly and willfully participating -- participated in the

scheme or artifice, with knowledge of its fraudulent nature and

with specific intent to defraud;

          Third, the scheme or artifice to defraud involved a

material misrepresentation, omission, false statement, false

pretense, or concealment of fact; and

          Fourth, that in execution of that scheme, the

defendant you are considering used, or caused the use by

others, of interstate wires.

          The first element the government must prove beyond a

reasonable doubt is the existence of a scheme or artifice to

deprive the public and the DEA of their right to defendant

Costanzo's honest services through bribery, which, as I

mentioned before, can more generally be described as *quid pro

quo* payment.

          What is the "right to honest services"?  A DEA

employee owes a duty of honest and faithful services to the

public and the U.S. government agency——the DEA——by which he is

employed.  The public and the DEA have the right to expect the

official's "honest services"——that he is acting in their

interest, not his own.  Thus, when a DEA employee commits an

Nb72Cos8                          Charge

act in violation of his official duty, at least in part, in

return for a concealed bribe, he has deprived the public and

the DEA of his honest services.

A "scheme or artifice" is merely a plan for the

accomplishment of an object.

A "scheme to defraud" is any plan, device, or course

of action to deprive another of the right of honest services by

means of false or fraudulent pretenses, representation, or

promises reasonably calculated to deprive persons of average

prudence.

To prove that a defendant committed honest services

fraud through bribery, the government must show a *quid pro quo*,

that is, a defendant received money in exchange for an act

performed or promised to be performed in the course of his

employment DEA.  Here, the *quid pro quo* alleged is the exchange

of payments for Costanzo's act of sharing nonpublic DEA

information.  The payment need not have been provided directly

to Costanzo, but may have been provided to another person at

his request or with his agreement.

Not all bad or undesirable conduct by a public

official, however, violates the duty of honest services in the

context of the criminal charges before you.  For example, it is

not enough that that the government prove that there was merely

some undisclosed self-dealing by a public official or, more

colloquially, that a public official had an undisclosed

Nb72Cos8                          Charge

"conflict of interest" or violated some disclosure obligation.

It is also not enough that the government prove that the defendants understood that the payments were made solely to create generalized good will.  However, the government is not required to show that Costanzo performed, or promised to perform, an act solely because of the payment.  It is no defense that Costanzo acted because of both proper and improper motives.  A defendant may have the requisite intent to defraud even if he possesses a dual intent, such as an unlawful intent to receive bribes and a proper or neutral intent, like trying to further a DEA investigation.

Similarly, it is not a defense that, had there been no bribe, Costanzo might have performed the same act anyway, or that the acts taken were desirable or beneficial to the DEA or the public.

The second element the government must prove beyond a reasonable doubt is that the defendant you are considering devised or participated in the scheme to defraud knowingly, willfully, and with a specific intent to defraud.  The definitions of "knowingly" and "willfully" here are the same definitions that I gave you earlier.  "Intent to defraud" means to act with the specific intent to deceive for the purpose of depriving the public and the DEA of its right to Costanzo's honest services—in other words, of its right to Costanzo's faithful performance of his official duties, including the duty

Nb72Cos8                        Charge

to not accept payments or things of value in exchange for

performing, or promising to perform, an act.

Direct proof of knowledge and fraudulent intent is

almost never available.  Direct proof of knowledge and

fraudulent intent is almost never available.  Nor is direct

proof required.  As I mentioned earlier, facts may be

established by circumstantial evidence, based upon a person's

outward manifestations, his words, conduct, and acts, and all

of the surrounding circumstances disclosed by the evidence and

the logical inferences that may be drawn from them.

Because intent to defraud is an element of honest

services wire fraud, it follows that a good-faith belief on the

part of a defendant that he was acting lawfully is a complete

defense to the charge.  Good faith means having a state of mind

that is honest and absent of criminal intent.  If a defendant

believed in good faith that he was acting lawfully, even if he

was mistaken in that belief, and even if others were harmed by

his conduct, there would be no crime.  A defendant, however,

has no burden to establish a defense of good faith.  The burden

is on the government to prove fraudulent intent and the

consequent lack of good faith beyond a reasonable doubt.

If a defendant participated in the scheme to defraud,

however, then a belief by the defendant, if such a belief

existed, that ultimately everything would inure to the public

good does not mean that the defendant acted in good faith.  If

the defendant you are considering participated in the scheme

with the intent of depriving the victims of their right to an

official's honest services, then no amount of honest belief on

the part of the defendant that the scheme would, for example,

ultimately benefit the public will excuse fraudulent actions or

false representations by him.

The third element that the government must prove

beyond a reasonable doubt is that the scheme or artifice to

defraud involved a material misrepresentation, false statement,

false pretense or omission.

A representation, statement, false pretense, omission,

or concealment of fact is "material" if it would naturally tend

to lead or is capable of leading a reasonable person, in this

case the DEA, to change its conduct.  Put another way, a

material fact is one which would be expected to be of concern

to a reasonable and prudent person in relying upon the

representation or statement in making a decision.

It does not matter whether the DEA might have

discovered the fraud had it probed it further.  If you find

that a scheme or artifice existed, it is irrelevant whether you

believe that the DEA or anyone else involved was careless,

gullible, or even negligent.  Furthermore, it is not necessary

that the government prove that the public or DEA actually

suffered any loss.  It is sufficient for the government to

prove that the public and the DEA did not receive the honest

and faithful services of Costanzo.

          The fourth element that the government must prove
beyond a reasonable doubt is the use of interstate or
international wire communications in furtherance of the scheme
to defraud.  Wire communications include telephone calls,
e-mails, faxes, text messages, chat messages, bank transfers of
money, and uploads via the Internet.  "Interstate" means that
the wire communications must pass between two or more states
as, for example, a telephone call between New York and
New Jersey.

          The use of the wires need not itself be fraudulent.
Stated another way, the material wired need not contain any
fraudulent misrepresentation, or even any request for money.
It must, however, further or assist in the carrying out of the
scheme to defraud.  It is not necessary for the defendant you
are considering to be directly or personally involved in the
wire communication, as long as the communication was reasonably
foreseeable in the execution of the alleged scheme to defraud
in which that defendant is accused of participating.  In this
regard, it is sufficient to establish this element of the crime
if the evidence justifies a finding that the defendant you are
considering caused the wires to be used by others.  When a
defendant does an act with knowledge that the use of the wires
will follow in the ordinary course of business or where such
use of the wires can reasonably be foreseen, even though not

Nb72Cos8                        Charge

1    actually intended, then he causes the wires to be used.

2              With respect to the use of the wires, the government

3    must establish beyond a reasonable doubt the particular use

4    charged in the indictment.  However, the government does not

5    have to prove that the wires were used on the exact date charge

6    in the indictment.  It is sufficient if the evidence

7    establishes beyond a reasonable doubt that the wires were used

8    on a date substantially similar to the dates charged in the

9    indictment.

10             If you find that wire communications were used in

11   furtherance of the scheme to defraud, you must be unanimous as

12   to at least one of the particular interstate or foreign wire

13   communications in furtherance of the scheme that occurred.

14             We have discussed Count Five of the indictment, which

15   charges honest services wire fraud.  Now let us turn back to

16   Count Four, which charges Costanzo and Recio with participating

17   in a conspiracy to violate the honest services wire fraud

18   statute, the crime I just described, in violation of Title 18,

19   United States Code, Section 1349.

20             As I previously discussed, a conspiracy is an

21   agreement, or an understanding, of two or more persons to

22   accomplish by concerted action one or more unlawful objects.

23   To meet its burden of proof on this charge, the government must

24   prove the following two elements beyond a reasonable doubt:

25             First, that a conspiracy existed; and

Second, that the defendant you are considering

knowingly, willfully, and intentionally became a member of the

conspiracy.

I previously instructed you, in connection with

Count One, on the law relevant to determining whether a

conspiracy existed and whether a defendant became a member of

such a conspiracy.  Those instructions apply here as well, with

the difference here being the object or goal of the conspiracy.

The government alleges that the object of the conspiracy in

Count Four was to commit honest services wire fraud.  So in

deciding whether the conspiracy existed, you must determine

whether the conspirators agreed to accomplish that object.

In addition to charging Costanzo in Count Two with

accepting a bribe, charging Recio in Count Three with paying a

bribe to a public official, and charging both Costanzo and

Recio in Count Five with honest services wire fraud, Counts

Three and Five of the indictment also charge the defendants

with what is called aiding and abetting others in the

commission of these crimes.

A person may be guilty of a substantive offense, such

as the ones I just listed if he "aids or abets," which

essentially means if he assists another person in committing

the offense.  Thus, for example, you may find that the

defendant you are considering is guilty of accepting a bribe,

paying a bribe, or honest services wire fraud, if you find

1   beyond a reasonable doubt that the government has proven that

2   another person actually committed the crime, and that the

3   defendant you are considering helped or assisted that person in

4   the commission of the offense.

5          The legal principles that an aider or abettor of a

6   crime is also liable is codified in a statute called Title 18,

7   United States Code, Section 2.  Under this federal statute,

8   whoever "aids, abets, counsels, command, induces or procures"

9   the commission of an offense "is punishable as a principal."

10  You should give those words their ordinary meeting.  A person

11  "aids" or "abets" a crime if he knowingly does some act for the

12  purpose of aiding or encouraging the commission of that crime,

13  with the intention of causing the crime to be committed.  To

14  "counsel" means to give advice or recommend.  To "induce" means

15  to lead or move by persuasion or influence as to some action or

16  state of mind.  To "procure" means to bring about by

17  unscrupulous or indirect means.  To "cause" means to bring

18  something about, to effect something.

19         In other words, you may find the defendant you are

20  considering guilty of the substantive crime if you find beyond

21  a reasonable doubt that the government has proven both that

22  another person actually committed the crime, and that the

23  defendant aided and abetted that person in the commission of

24  the offense.

25         As you can see, the first requirement for aiding and

abetting liability is that the crime charged was committed.
Obviously, no one can be convicted of aiding and abetting a
crime if no crime was committed.  But if you find that a crime
was committed, then you must consider whether the defendant
aided and abetted the commission of the crime.

However, I emphasize, to aid and abet another to
commit a crime, it is necessary that a person willfully and
knowingly associated himself in some way with the crime and
willfully and knowingly sought to help make the crime succeed.
Participation in a crime is willful if action is taken
voluntarily and knowingly.

To determine whether the defendant aided and abetted
the commission of the crime with which he is charged, ask
yourself these questions:

1.  Did he participate in the crime charged as
something he wished to bring about?

2.  Did he associate himself with the criminal venture
knowingly and willfully?

3.  Did he seek by his actions to make the criminal
venture succeed?

If he did, then the defendant is an aider and abettor
and therefore guilty of the offense.  If he did not, then the
defendant is not an aider and abettor and is not guilty as an
aider and abettor.  The mere presence of a person where a crime
is being committed, even coupled with knowledge by that person

Nb72Cos8                    Charge

1    that a crime is being committed, or the mere acquiescence by a

2    person in the criminal conduct of others, even with guilty

3    knowledge, is not sufficient to establish aiding and abetting.

4    An aider and abettor must have some interest in the criminal

5    venture and must take some action to assist or encourage the

6    commission of the crime.

7              Let me just remind you the section I just read was BB

8    and is it applies specifically to Counts Three and Five and

9    only Counts Three and Five.

10             Now, I am on CC, Good Faith.

11             Because the government must prove that the defendants

12   acted willfully or with corrupt intent to establish their guilt

13   on each of the charges, the "good faith" of a defendant is a

14   complete defense to each count.  Good faith means having a

15   state of mind that is honest and absent of criminal intent.  I

16   say it is a "defense," but I want to make it clear a defendant

17   has no burden of establishing his good faith.  The burden

18   remains on the government to prove beyond a reasonable doubt

19   that a defendant acted willfully or with corrupt intent and,

20   consequently, that he lacked good faith.

21             A person who acts or causes another person to act

22   based on a belief that the intended action complies with the

23   law is not punishable under the statutes relevant to this case

24   merely because that belief turns out to be inaccurate,

25   incorrect, or wrong.  If a defendant believed in good faith

Nb72Cos8                        Charge

1  that he was acting lawfully, even if he was mistaken in that

2  belief, and even if others were harmed by his conduct, there

3  would be no crime.  Again, the burden of proving good faith

4  does not rest of the defendants because the defendants did do

5  not have an obligation to prove anything in this case.

6          Whether a person acted in good faith, like whether he

7  acted knowingly, intentionally, willfully, or with corrupt

8  intent, is a question of fact for you to determine like any

9  other question of fact.

10          DEA Policies and Standards of Conduct.

11          As I instructed you during the presentation of the

12  evidence, you have heard evidence regarding certain DEA

13  policies and standards of conduct that the government alleges

14  are relevant to this case.  I remind you, and you are

15  instructed again, that violating DEA policies or standards of

16  conduct is not by itself a federal crime.

17          I have already instructed you on the elements of the

18  federal crimes that have been charged in the indictment.  You

19  may not find either defendant guilty simply because you believe

20  that Costanzo did not comply with any of the DEA policies or

21  standards of conduct introduced into evidence.  You may,

22  however, consider such evidence in evaluating whether Costanzo

23  violated an official duty or a lawful duty, as well as in

24  evaluating Costanzo's and Recio's state of mind with respect to

25  the charged offenses.

Motive.

Proof of motive is not a necessary element of the crimes with which the defendants are charged.  Proof of motive does not establish guilt, nor does a lack of proof of motive establish that the defendants are not guilty.

If the guilt of the defendants is shown beyond a reasonable doubt, it is immaterial what the motive for the crimes may be or whether any motive is shown, but the presence or absence of motive is a circumstance that you may consider as bearing on the intent of the defendants.

False Exculpatory Statements and Consciousness of Guilt Evidence.

On Thursday, you heard from Special Agent Joseph LaRocca and Special Agent Delise Jeffrey about their interviews with the defendants in November 2019.  They testified, among other things, that during those interviews, John Costanzo spoke about Manuel Recio and Manuel Recio spoke about John Costanzo.  I instruct you that the defendants' statements about each other are not being introduced for their truth.  I further instruct you that neither defendant is charged with making a false statement to the F.B.I.

In this testimony, you heard that the defendants made statements in which they claimed that their conduct was consistent with innocence and not with guilt.  The government claims that these statements in which the defendants exculpated

Nb72Cos8                          Charge

themselves are false.  While false exculpatory statements can

be circumstantial evidence of a consciousness of guilt and can

have probative value, such false statements alone are

insufficient proof on which to convict.  In other words, if you

find that a defendant gave a false statement to divert

suspicion from his scheme, you may not infer that the

defendants -- that the defendant believes that he was guilty.

You may not, however, infer -- sorry, let me do that again.  In

other words, if you find that a defendant gave a false

statement to divert suspicion from his scheme, you may infer

that the defendant believes that he was guilty.  You may not,

however, infer on that basis of this -- on the basis of this

alone that a defendant is in fact guilty of the crimes with

which he is charged.

        Whether the evidence as to a defendant's statements

shows that the defendant believed that he was guilty, and the

significance, if any, to be attached to such evidence, are

matters for you, the jury, to decide.

        You heard testimony regarding the Standard Form 86

questionnaire for national security positions, or SF86, that

Costanzo completed in 2020.  Special Agent Costanzo has not

been charged with any crime related to his SF86 questionnaires.

You may not find Special Agent Costanzo guilty on any count

simply because you believe he should have disclosed more or

different information on that questionnaire.  If, however, you

Nb72Cos8                          Charge

1   find that Costanzo knowingly failed to disclose information

2   that was required by the SF86 questionnaire, you may consider

3   that as evidence of Costanzo's state of mind.  On the other

4   hand, if you find that Costanzo properly disclosed the

5   information required by the questionnaire, then you may

6   consider that as evidence of Costanzo's good faith and intent

7   to comply with the law.

8          You have seen evidence and heard testimony regarding a

9   gift letter that Costanzo and his father, John Costanzo, Sr.,

10  submitted in connection with the mortgage application for

11  Costanzo's home.  I instruct you that there are no bank fraud

12  or mortgage fraud charges in this case.  You may not consider

13  the gift letter as proof that Costanzo is of a bad character or

14  has a propensity to commit crime.  However, you may consider it

15  when evaluating Costanzo's state of mind or intent.

16         You have seen evidence and heard testimony about

17  Costanzo's tax returns, as well as certain tax-related

18  documents for John Costanzo, Sr. and Edwin Pagan III.  I

19  instruct you that there are no tax charges in this case and

20  that Costanzo has not been charged with participating in a

21  tax-related conspiracy.  However, you may consider whether this

22  tax evidence is relevant to state of mind or intent.  You may

23  not consider such evidence as proof that Costanzo is of a bad

24  character or has a propensity to commit crime.

25         I also instruct you that taxpayers in the

1    United States are required to report all sources of taxable

2    income on their tax returns.  Under the federal tax code, gifts

3    are not considered taxable income, and so an individual who

4    receives a gift is not required to declare the gift as income

5    on his tax returns.  However, an individual who gives a gift

6    over $15,000 in a given year, to a single individual, is

7    required to report the gift to the IRS.  Furthermore,

8    compensation for services is considered taxable income and must

9    be disclosed on an individual's tax return.

10          Venue.

11          In addition to all the elements I have just described

12   for you, in order to convict the defendants, you must also

13   consider the issue of venue as to each offense.  The government

14   must establish what is called "venue," which means that some

15   act pertaining to the charge occurred in the Southern District

16   of New York.  The Southern District of New York encompasses

17   Manhattan, the Bronx, Westchester, Rockland, Putnam, Dutchess,

18   Orange, and Sullivan Counties.  Anything that occurs in the

19   counties I have listed for you occurs in the Southern District

20   of New York.

21          The government does not need to prove that the

22   complete crime for any count was committed within the Southern

23   District of New York or that the defendants themselves were

24   ever in the Southern District of New York.

25          Venue must be examined separately for each count in

Nb72Cos8                          Charge

1    the indictment.  Venue on one count does not establish venue on

2    another count, although, if applicable, you may rely on the

3    same evidence to establish venue on multiple counts.

4            With respect to Counts One through Four, it is

5    sufficient to establish venue if the government proves that any

6    act in furtherance of the crime charged occurred in the

7    Southern District of New York.  The act itself need not be a

8    criminal act.  It could include, for example, meeting with

9    others involved in the criminal scheme within this district.

10   The act need not be taken by a defendant or a conspirator, as

11   long as the act was caused by the conduct of the defendant or

12   conspirator or was reasonably foreseeable.

13           With respect to honest services wire fraud——Count

14   Five——it is sufficient to establish venue if the government

15   proves that any of the wire communications you found to satisfy

16   the fourth element of the offense were transmitted from or to

17   the Southern District of New York, so long as the defendant

18   reasonably anticipated that a wire communication in furtherance

19   of the scheme would be transmitted from or to the Southern

20   District of New York.

21           I should note that on this issue——and this issue

22   alone——the government need not prove venue beyond a reasonable

23   doubt, but only by a mere preponderance of the evidence.  A

24   "preponderance of the evidence" means that the government must

25   prove that it is more likely than not that any act in

Nb72Cos8                         Charge

furtherance of a given crime occurred in the Southern District
of New York.

        The indictment in this case refers to various dates.
The government is not required to prove that the conduct took
place on the precise dates alleged in the indictment.  The law
only requires a substantial similarity between the dates
alleged in the indictment and the dates established through
evidence at trial.  It is not essential that the government
prove that the conspiracy started and ended within the
specified time period.  The government is also not required to
prove that the defendants participated in the charged
conspiracy for the entire time period alleged in the
indictment.  It is sufficient if you find that a conspiracy was
formed and that it existed for some time within the period set
forth in the indictment.

        Theory of the Defense.

        It is Costanzo's position that he acted at all times
in good faith and always in pursuit of the DEA's law
enforcement mission.  Costanzo contends that at no time did he
ever promise Recio or anyone else that he would take any
action, or fail to take any action, in violation of his
official duty as a DEA agent and that he never did so or agreed
to do so in return for a bribe.  Costanzo denies that he ever
participated in an illegal *quid pro quo* bribery or honest
services fraud scheme, or that he ever entered into a criminal

Nb72Cos8                    Charge

conspiracy.  Costanzo contends that he never intended to

violate any DEA policy or standard of conduct, and that he

never did so as part of a bribery scheme, honest services fraud

scheme, or criminal conspiracy.

Recio also denies participating in an illegal *quid pro

quo* bribery or honest services fraud scheme, or that he ever

entered into a criminal conspiracy.  Recio denies that he gave,

offered, or promised anything of value to Costanzo to induce

Costanzo to violate his official duties.

That completes the substantive instructions.  You are

about to go into the jury room to begin your deliberations.

Your function is to weigh the evidence in this case and

determine the guilt or lack of guilt of each of the defendants

with respect to each of the charges in the indictment.  You

must base your verdict solely on the evidence and these

instructions as to the law, and you are obliged on your oath as

jurors to follow the law as I instruct you, whether you agree

or disagree with the particular law in question.

Your verdict must be unanimous.  This means that each

and every one of you must agree upon your verdict.  Each juror

is entitled to his or her opinion, but you are required to

exchange views with your fellow jurors.  That is the very

essence of jury of deliberation.  It is your duty to consult

with one another and to deliberate with a view to reaching an

agreement.  If you start with one point of view, but after

Nb72Cos8                         Charge

reasoning with other jurors it appears that your own judgment

is open to question, then of course you should not hesitate in

yielding your original point of view if you are convinced that

the opposite point of view is one that truly satisfies your

judgment and conscience.  But you are not to surrender a view

of the case that you conscientiously believe merely because you

are outnumbered or because other jurors appear firmly committed

to their views.  You should vote with the others only if you

are convinced on the evidence, the facts, and the law that it

is the correct way to decide the case.

          In sum, you, the jury, must deliberate as a body, but

each of you, as an individual juror, must discuss and weigh

your opinions dispassionately, and adopt that conclusion which

in your good conscience appears to be in accordance with the

truth.  No juror should surrender his or her conscientious

beliefs solely for the purpose of returning a unanimous

verdict.

          I instruct you that you are not to discuss the case

unless all jurors are present.  Four or five or ten jurors

together are only a gathering of individuals.  Only when all

jurors are present do you constitute a jury and only then may

you deliberate.

          Remember at all times, you are not partisans.  You are

judges—judges of the facts.  Your sole interest is impartially

to assess the evidence to determine whether the government has

Nb72Cos8                              Charge

met its burden of proving guilt beyond a reasonable doubt as to
each of the charges.

        If you are divided, do not report how the vote stands.
Simply state that you are divided.  If you have reached a
verdict, do not report what it is until you are asked in open
court.  Simply inform me that you have reached a verdict.

        The exhibits that were received into evidence will be
provided to you in the jury room.  You will be provided with a
laptop that contains the exhibits.

        If you want any testimony to review, you may also
request that.  Please remember that it is not always easy to
locate what you might want, so be as specific as you possibly
can in requesting portions of the testimony.  If you want any
further explanation of the law as I have explained it to you,
you may also request that.

        Your requests for testimony——in fact any
communications with the Court——should be made to me in writing,
signed by your foreperson, and given to the marshal or the
deputy clerk.  In any event, do not tell me or anyone else how
the jury stands on any issue until there is a unanimous
verdict.

        If you took notes during the trial, those notes are
only an aid to recollection——they are not evidence nor are they
a substitute for your recollection of the evidence in the case.
Your notes are not entitled to any greater weight than your

Nb72Cos8                    Charge

actual recollection or the impression of each juror as to what

the evidence actually is.  I emphasize that if you took notes,

you should not show your notes to any other juror during your

deliberations.  They are only for yourself.

If you did not take notes during the trial, you should

not be influenced by the notes of another juror but, instead,

you should rely upon your own recollection of the evidence.

The fact that a particular juror has taken notes does not

entitle that juror's views to any greater weight.

I have prepared a verdict form for you to use in

recording your decision.  Please use that form to report your

verdict.  The verdict form does not represent either evidence

or instructions on the law.

At the beginning of deliberations, you must choose a

foreperson.  The foreperson does not have any more power or

authority than any other juror, and his or her vote or opinion

does not count for any more than any other juror's vote or

opinion.  The foreperson is merely your spokesperson to the

Court.  He or she will send out any notes.  And when the jury

has reached a verdict, he or she will notify the marshal that

the jury has reached a verdict, and you will come into open

court and give the verdict.

After you have reached a unanimous verdict, your

foreperson will fill in the form that has been given to you,

sign and date it, and advise the marshal outside your door that

Nb72Cos8                    Charge

1    you are ready to return to the courtroom.

2           I will stress that each of you must be in agreement

3    with the verdict that is announced in court.  Once your verdict

4    is announced in open court and officially recorded, it cannot

5    ordinarily be revoked.

6           You are reminded that you took an oath to render

7    judgment impartially and fairly, without prejudice or sympathy,

8    solely upon the evidence in the case and the applicable law.

9           I am sure that if you follow your oath, listen to the

10   views of your fellow jurors, and apply your own common sense,

11   you will reach a fair verdict here.

12          Remember that your verdict must be rendered without

13   fear, without favor, and without prejudice or sympathy.

14          Before you retire into the jury room, I must inform

15   you that the law provides for a jury of 12 people in this case.

16   Therefore, three people—Jurors 13, 14, and 15—are alternates.

17          Jurors 13, 14, and 15 will be allowed to leave the

18   courthouse during deliberations, but you are not yet excused as

19   jurors in the case.  In the event that one of the nonalternate

20   jurors can no longer deliberate, you will be called back to

21   continue your service.

22          So I am going to release you now, the alternates, but

23   I am not excusing you from jury service yet.  For now, though,

24   jurors 13, 14, and 15 may leave.  You have been very attentive

25   and patient.  I'm sorry that you may miss the experience of

Nb72Cos8                         Charge

1    deliberating with the jury, but again the law provides for a

2    jury of 12 people.

3              Before the rest of the jury retires to the jury room,

4    if you have any clothing or objects there, you are asked to

5    pick them up and to withdraw before the deliberations start.

6              And to the alternates, I just want to say please do

7    not discuss the case with anyone over the next few days.  If

8    you would like to be advised of the outcome of the trial,

9    please let Mr. Hampton know and make sure he has a phone number

10   for you where you can be reached.

11             So I will now ask the alternates 13, 14, and 15, to go

12   back to the jury room.  Again, you are being released for

13   today, and we will let you know when you are officially

14   excused.  Thank you for being here.

15             (Alternates not present)

16             THE COURT:  Now, I have kept you here later than

17   usual.  You can -- in general, if anybody needs to leave at

18   5:00 or 5:30 or whatever, you leave whenever the earliest

19   person has to leave, and that's fine.  So going forward that's

20   how it will work, and I apologize for keeping you a little

21   later, but I wanted to finish everything so that you could

22   start first thing tomorrow.  If you wanted to stay for a half

23   hour and deliberate tonight, you are welcome, but I assume at

24   least some of you are ready to go.  So after swearing in the

25   marshal, sending you back to the jury room so you know where to

Nb72Cos8                    Charge

1    go, you will be able to take your notepads now back to the jury

2    room.  You will not be able to take the notepads home or the

3    instructions home, but you will have the instructions and your

4    notebooks in the jury room with you.  Leave them in the jury.

5    They will never be going home.  We will be destroying them at

6    the end of the case, so you will not be keeping them.  So I'm

7    going to release you to the jury room and then let you go for

8    the evening.

9         Now, tomorrow morning, again, come back at 9:30 and

10   you can begin your deliberations as soon as all 12 of you are

11   present.

12        The first note that you should send out should just

13   say we have chosen a foreperson and it is Juror No. whatever,

14   and then anything else you need during the day, just send out a

15   note, signed by the foreperson.  You know, if it's the end of

16   the day and you want to say, We are going to go until 5:30

17   today or we have to leave at 5:00, you can send out a note

18   saying that or anything else, just send out a note.

19        I'm now going to ask Mr. Hampton to swear in the

20   marshal.

21        (Marshal sworn)

22        THE COURT:  Thank you.

23        Members of the jury, you may go back to the jury room

24   and you can take your notebooks and jury instructions with you.

25   Again, don't take them home.  And I assume I will see you all

1    tomorrow morning.  Have a good night.

2                  (Jury retires to deliberate; 6:05 p.m.)

3                  THE COURT:  See you all in the morning.

4                  MR. SWETT:  Your Honor, just one quick question

5    because I think this was raised but never resolved.  Counsel

6    for Costanzo had requested a special verdict form --

7                  THE COURT:  Oh.

8                  MR. SWETT:  -- as to transactions.  Our view is that

9    is actually not an element of any of the offenses here, and the

10   only element that requires unanimity is the honest services

11   substantive, and that's unanimity as to a particular wire.  The

12   jury has been instructed on that, and there are Second Circuit

13   cases saying that that is sufficient, there is no need to give

14   a special verdict, and certainly not one that encompasses

15   something that's not an element of the crime.

16                  MR. MUKASEY:  We are not seeking a special verdict

17   form.

18                  THE COURT:  You are not.

19                  MR. MUKASEY:  No.

20                  THE COURT:  Okay.  Okay.  With a general verdict form?

21                  (Counsel confer)

22                  MR. GAINOR:  We are fine with it, Judge.

23                  THE COURT:  Okay.  We will send in a general verdict

24   form.  It will just have the counts and the individuals, guilty

25   and not guilty, with a check mark with the box for each.

Nb72Cos8                        Charge

1          MS. DEININGER:  Your Honor, do you want us to provide

2     you with a proposed one or were you planning to come up with

3     one?

4          THE COURT:  I think we can just make one.

5          MS. DEININGER:  Okay.

6          THE COURT:  I mean, there is really nothing -- are

7     there any judgment calls or anything?

8          MS. DEININGER:  No, I don't think so.  I just wanted

9     to make sure you wouldn't be waiting on something from us.

10          THE COURT:  No.  We can do it.  It will literally say

11     Count One and then each defendant's name with a line for not

12     guilty and a line for guilty.  I put not guilty first.  Then

13     Count Two will be just the one defendant and Count Three the

14     other defendant and then four and five both defendants in the

15     same way.

16          MR. MUKASEY:  Do you want us in the courtroom while

17     they are deliberating, just floating around, do you want cell

18     phone numbers or anything?

19          THE COURT:  I think if Mr. Hampton has cell phone

20     numbers and you can sort of let him know that you are on the

21     floor, at least near or at the courthouse, so we can contact

22     you, so you can be back within a few minutes, that would be

23     great.

24          MS. DEININGER:  Okay.

25          THE COURT:  Okay.  Have a good night.

Nb72Cos8                          Charge

1              (Adjourned to Wednesday, November 8, 2023, at 9:30
   a.m.)
2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25