UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

JOHN COSTANZO JR. and
MANUEL RECIO,

Defendants.

Case No. 22 Cr. 281 (JPO)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT JOHN COSTANZO, JR.'S POST-TRIAL MOTIONS FOR JUDGMENT OF ACQUITTAL OR IN THE ALTERNATIVE FOR A NEW TRIAL**

MUKASEY YOUNG LLP
570 Lexington Avenue, Suite 3500
New York, New York 10022
Tel: (212) 466-6400

*Counsel for John Costanzo, Jr.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS ...................................................................................................1

    A.     Procedural History ...........................................................................................1

    B.     The Proof At Trial............................................................................................2

          1.     The JEM Solutions Payments .............................................................3

          2.     The Townhouse Down Payment ..........................................................6

          3.     The Law Firm Retainer .......................................................................9

          4.     The David Macey Payments ................................................................9

               a.     Yankees Tickets .....................................................................10

              b.     Contract Payment ..................................................................10

          5.     The $2,500 Payment ..........................................................................11

ARGUMENT ....................................................................................................................12

POINT I     THE COURT SHOULD ENTER A JUDGMENT OF
          ACQUITTAL ON EACH COUNT .....................................................................12

Counts of Conviction ......................................................................................................12

    A.     Legal Standard ...............................................................................................12

          1.     Rule 29 ..............................................................................................12

    B.     Discussion .......................................................................................................16

          1.     Townhouse and Law Firm Payments ..................................................17

          2.     David Macey Payments ......................................................................19

          3.     $2,500 Payment..................................................................................20

Venue ..............................................................................................................................21

    A.     Relevant Facts ................................................................................................21

    B.     Legal Standard ...............................................................................................23

    C.     Discussion .......................................................................................................25

          1.     Count Two and Count Five – Accepting a Bribe and Honest Services
              Fraud ..................................................................................................25

          2.     Count One and Count Four – Bribery and Honest Services Fraud
              Conspiracy .........................................................................................28

POINT II    THE COURT SHOULD GRANT A NEW TRIAL IN THE INTEREST OF
          JUSTICE ........................................................................................................29

    A.     Relevant Facts................................................................................................29

          1.     Pre-Trial Production of Proposed Trial Exhibits ................................29

          2.     Direct Examination of Rachel Danko ...............................................29

          3.     Government Summations.....................................................................31

    B.     Legal Standard ...............................................................................................32

    C.     Discussion .......................................................................................................33

          1.     The Government's Use of Testimonial Evidence from GLC and
              Recio Violated Costanzo's Sixth Amendment Rights
              Under *Bruton* and *Crawford* ..........................................................33

i

　　　　　2.　　GLC and Recio's Act of Production and Alleged Confession Are
　　　　　　　　Testimonial And Therefore Could Not Be Offered Against Costanzo
　　　　　　　　Absent Cross-Examination ........................................................34

　　D.　　The Error Was Plain........................................................................36

POINT III　　THE COURT SHOULD ONLY ENTER JUDGMENT ON ONE SET OF
　　　　　MULTIPLICITOUS COUNTS ..............................................................38

　　A.　　Legal Standard .................................................................................39
　　B.　　Discussion ........................................................................................40

CONCLUSION..........................................................................................................41

# TABLE OF AUTHORITIES

## CASES

*Ball v. United States*,
470 U.S. 856 (1985)........................................................................................ 39, 40

*Blockburger v. United States*,
284 U.S. 299 (1932)............................................................................................ 39

*Brown v. Ohio*,
432 U.S. 161 (1977)............................................................................................ 38

Bruton v. United States,
391 U.S. 123 (1968)........................................................... 33, 35, 36, 37, 38

Crawford v. Washington,
541 U.S. 36 (2004)........................................................................... 33, 34, 35

*Galloway v. United States*,
319 U.S. 372 (1943)............................................................................................ 14

*Illinois v. Vitale*,
447 U.S. 410 (1980)............................................................................................ 39

*In re Winship*,
397 U.S. 358 (1970)............................................................................................ 12

*Melendez-Diaz v. Massachusetts*,
557 U.S. 305 (2009)............................................................................................ 34

*North Carolina v. Pearce*,
395 U.S. 711 (1969),
*overruled on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989)............... 39

*Rutledge v. United States*,
517 U.S. 292 (1996)............................................................................................ 39

*Samia v. United States*,
599 U.S. 635 (2023)........................................................................... 33, 34, 38

*Smith v. United States*,
599 U.S. 236 (2023)............................................................................................ 24

*United States v. Alfisi*,
308 F.3d 14 (2d Cir. 2002).................................................................................. 15

*United States v. Avenatti*,
81 F.4th 171 (2d Cir. 2023) ................................................................................ 15

*United States v. Beech–Nut Nutrition Corp.*,
871 F.2d 1181 (2d Cir.1989)............................................................................... 23

*United States v. Bonito*,
57 F.3d 167 (2d Cir. 1995).................................................................................. 15

*United States v. Bruno,*
  383 F.3d 65 (2d Cir. 2004)............................................................................... 36

*United States v. Bruno,*
  661 F.3d 733 (2d Cir. 2011)............................................................................. 15

*United States v. Bufalino,*
  285 F.2d 408 (2d Cir. 1960)............................................................................. 13

*United States v. Cassese,*
  290 F. Supp. 2d 443 (S.D.N.Y. 2003), *aff'd,* 428 F.3d 92 (2d Cir. 2005) .............................. 16

*United States v. Chacko,*
  169 F.3d 140 (2d Cir. 1999)............................................................................. 39

*United States v. Chestnut,*
  533 F.2d 40 (2d Cir. 1976)............................................................................. 26

*United States v. Clark,*
  740 F.3d 808 (2d Cir.2014)............................................................................. 12

*United States v. D'Amato,*
  39 F.3d 1249 (2d Cir. 1994)....................................................................... 13, 16

*United States v. Davis,*
  689 F.3d 179 (2d Cir. 2012)............................................................................. 24

*United States v. Feliz,*
  467 F.3d 227 (2d Cir. 2006)............................................................................. 34

*United States v. Ferguson,*
  246 F.3d 129 (2d Cir. 2001)....................................................................... 32, 38

*United States v. Fortenberry,*
  No. 22-50144, 2023 WL 8885105 (9th Cir. Dec. 26, 2023)................................................. 24

*United States v. Glenn,*
  312 F.3d 58 (2d Cir. 2002)......................................................................... 17, 21

*United States v. Gross,*
  No. 15-CR-769 (AJN), 2017 WL 4685111 (S.D.N.Y. Oct. 18, 2017),
  *aff'd sub nom. United States v. Lebedev,* 932 F.3d 40 (2d Cir. 2019) ............................. passim

*United States v. Hardwick,*
  523 F.3d 94 (2d Cir. 2008)....................................................................... 33, 36, 37

*United States v. Hubbell,*
  530 U.S. 27 (2000)..................................................................................... 34

*United States v. Jennings,*
  160 F.3d 1006 (4th Cir. 1998) .......................................................................... 15

*United States v. Jones,*
  393 F.3d 107 (2d Cir. 2004)............................................................................. 13

*United States v. Jones,*
  482 F.3d 60 (2d Cir. 2006)............................................................................. 39

*United States v. Josephberg,*
 459 F.3d 350 (2d Cir. 2006)........................................................................... 38

*United States v. Kirk Tang Yuk,*
 885 F.3d 57 (2d Cir. 2018)............................................................................. 24

*United States v. Lauria,*
 541 F. Supp. 2d 311 (S.D.N.Y. 2021)........................................................... 38

*United States v. Martinez,*
 54 F.3d 1040 (2d Cir. 1995)........................................................................... 18

*United States v. McLain,*
 377 F.3d 219 (2d Cir. 2004)........................................................................... 35

*United States v. Mehta,*
 919 F.3d 175 (2d Cir. 2019)........................................................................... 36

*United States v. Mulheren,*
 938 F.2d 364 (2d Cir. 1991)........................................................................... 13

*United States v. Nakashian,*
 820 F.2d 549 (2d Cir. 1987)........................................................................... 39

*United States v. Olazabal,*
 610 F. App'x 34 (2d Cir. 2015) ..................................................................... 32

*United States v. Pauling,*
 256 F. Supp. 3d 329 (S.D.N.Y. 2017,
 *aff'd and remanded,* 924 F.3d 649, 656 (2d Cir. 2019) ........................... 14, 17

*United States v. Purcell,*
 967 F.3d 159 (2d Cir. 2020)........................................................................... 36

*United States v. Quinn,*
 359 F.3d 666 (4th Cir. 2004) ......................................................................... 15

*United States v. Ramirez-Amaya,*
 812 F. 2d 813 (2d Cir. 1987)......................................................................... 24

*United States v. Ramirez,*
 420 F.3d 134 (2d Cir. 2005)...................................................................... 24, 28

*United States v. Riggi,*
 541 F.3d 94 (2d Cir. 2008)................................................................... 33, 36, 37

*United States v. Rodriguez-Moreno,*
 526 U.S. 275 (1999)....................................................................................... 24

*United States v. Roshko,*
 969 F.2d 9 (2d Cir. 1992) ............................................................................. 39

*United States v. Sanchez,*
 969 F.2d 1409 (2d Cir. 1992)......................................................................... 32

*United States v. Silver,*
 948 F.3d 538 (2d Cir. 2020)...................................................................... 26, 27

*United States v. Stephenson*,
    895 F.2d 867 (2d Cir. 1990) ................................................................... 26, 27

*United States v. Tomasetta*,
    No. 10 CR. 1205 PAC, 2012 WL 2064978 (S.D.N.Y. June 6, 2012) ...................................... 23

*United States v. Triumph Cap. Grp., Inc.*,
    544 F.3d 149 (2d Cir. 2008) ........................................................................ 14

*United States v. Tsolov*,
    642 F.3d 314 (2d Cir. 2011) ........................................................................ 23

*United States v. Valle*,
    807 F.3d 508 (2d Cir. 2015) ................................................................... 13, 14

*United States v. Vernace*,
    811 F.3d 609 (2d Cir. 2016) ........................................................................ 13

## OTHER AUTHORITIES

U.S. Const. art. III, § 2, cl. 3 ............................................................................ 23

U.S. Const. Amend. VI ................................................................................. 24

## RULES

Fed. R. Crim. P. Rule 18 ............................................................................ 1, 23

Fed. R. Crim. P. Rule 33 ........................................................................ 1, 29, 32

## PRELIMINARY STATEMENT

Defendant John A. Costanzo, Jr. respectfully submits this Memorandum of Law in support of his motion for a judgment of acquittal on all counts, pursuant to Fed. R. Cr. P. 29; or in the alternative, for a new trial pursuant to Fed. R. Cr. P. 33; and for dismissal of the multiplicitous counts of conviction.

## STATEMENT OF FACTS

### A.    Procedural History

On or about May 18, 2022, a grand jury in the Southern District of New York returned a five-count Indictment that charged Special Agent John A. Costanzo and former agent Manuel Recio with participating in a bribery scheme between October 2018 and November 2019. Dkt. 1 at ¶ 7. Count One charged Costanzo and Recio with conspiracy to bribe a public official, in violation of Title 18 U.S.C. § 371. Count Two charged Costanzo with accepting a bribe as a public official, in violation of Title 18 U.S.C. §§ 201(b)(2)(C) and 2. Count Three charged Recio with bribery of a public official, in violation of Title 18 U.S.C. §§ 201(b)(1)(C) and 2. Count Four charged Costanzo and Recio with conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. § 1349. Count Five charged Costanzo and Recio with honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346 and 2.

The Indictment broadly alleged that Costanzo and Recio, together with others, engaged in a bribery scheme in which Recio and others provided Costanzo with "various benefits" in exchange for which Costanzo used his position within DEA to provide "nonpublic DEA information, including information about forthcoming, sealed indictments and nonpublic investigations" to Recio. At the time of the charged scheme, Recio worked as a private

investigator for defense attorneys in Miami and allegedly sought the information to recruit new clients for defense attorneys on an "as-needed basis." Dkt. 1 at ¶ 7.

The Indictment alleged three categories of actions that Costanzo supposedly took to assist Recio. The first concerned the disclosure of "nonpublic information about sealed Indictments and ongoing DEA investigations so that RECIO could use this information to recruit indicted defendants and DEA targets as clients for defense attorneys." *Id.* at ¶ 21(a). The second involved Costanzo conducting searches in DEA's NADDIS database to obtain information for Recio and others. *Id.* at ¶ 21(d). The third category alleged that Costanzo provided Recio with assistance in his work for defense attorneys. *Id.* at ¶ 21(e).

The Indictment asserted that Costanzo, in exchange for the information, benefitted from four payments: (1) one $2,500 payment from a bank account in the name of Global Legal Consulting, a company associated with Recio, to a company co-owned by a family member of Special Agent Costanzo, later revealed to be his father; (2) one $50,000 payment from another law enforcement officer, "TFO-1," later revealed to be Coral Gables Police Officer Edwin Pagan ("Pagan"), to Costanzo's father; and (3) two payments, $10,000 and $10,750, from the Global Legal Consulting account to a bank account associated with a company incorporated by Pagan. *Id.* at ¶¶ 16-19.

Trial commenced on October 26, 2023, and concluded on November 8, 2023.

The defendants were convicted on all counts. Dkt. 176.

## B.     The Proof At Trial

The government's theory at trial was that Special Agent Costanzo, in the midst of a decorated and spotless DEA career, earning a lucrative salary and with plenty in savings, went rogue for no reason at all. According to this common sense-defying theory, Costanzo gave

confidential DEA information to Recio, who, in exchange, funneled to Costanzo a handful of small payments using two conduits: Costanzo's father, John Costanzo, Sr., himself a former DEA agent, and Costanzo's best friend, Task Force Officer Pagan. The government offered no proof as to how any DEA information was connected to any payment made to Costanzo, and no evidence whatsoever as to why Costanzo, Sr. and Pagan became involved or what they stood to gain in exchange for their supposed participation. The government's case called for the jury to speculate about the sources, amounts, and reasons for the alleged bribe payments to Costanzo.

The government's case was further undercut by the fact that most of its witnesses had no personal knowledge of the events, communications or financial transactions that they testified about. The government's witnesses were little more than narrators who fashioned an illogical narrative out of cherry-picked electronic communications, phone calls, financial records, and subpoena returns. Much of the government's case consisted of U.S. Attorney's Office employees reading from charts they created – some accurate, some not.

During its case, the defense called Task Force Officer Pagan to testify about his long-term friendship with Costanzo and to explain that the funds exchanged between them were the result of friendly business dealings between and among them that were wholly unrelated to their law enforcement work or confidential DEA information. Pagan was unequivocal: there were no bribes, no fraud and no conspiracy. Tr. 1724:7 – 1725:5.

### 1.     The JEM Solutions Payments

To demonstrate a supposed bribery scheme, the government introduced evidence of two payments from an entity belonging to Recio, Global Legal Consulting ("GLC"), to an entity belonging to Pagan, JEM Solutions ("JEM"). The evidence showed as follows:

On January 31, 2019, Pagan incorporated JEM Solutions, a company that was intended to be a consulting firm to provide security services for athletes. Tr. 1739:21 – 1740:2; Tr. 1062:8-10; GX 701 at 3, GX 502. Pagan was the entity's sole owner and its only registered agent. He properly disclosed JEM Solutions to his employer, the Coral Gables Police Department. Tr. 1121:5-8; 1747:8-21; JC 1040. At the time, Pagan, Recio, and Costanzo had had several conversations about going into business together when they retired. Tr. 1740:3-6. Pagan explained that in early 2019, Costanzo knew he was about to be transferred to DEA headquarters in D.C. and was not sure if he wanted to go and was contemplating retirement. Tr. 1740:9-13. Pagan anticipated that Costanzo would join JEM Solutions upon retirement, but Costanzo had no role in the company while he remained a DEA employee. Tr. 1740:14-18.

Pagan described that in early 2019, the operations of JEM Solutions were very informal because he had just started the company, and he was a full-time police officer. Tr. 1742:7-11.

On or about April 17, 2019, Recio's company, GLC, wrote a check to JEM Solutions for $10,000. Tr. 1063:12-21. GX 440D,701 at 3. Pagan testified that the payment was set aside for office space. Tr. 1748:6-9. A corresponding invoice produced by JEM Solutions provided a record of the payment. Tr. 1063:18-23; GX 503. The invoice stated that the payment was for "Investment of a Risk Management Company." Tr. 1063:18-23; GX 503. The $10,000 check was deposited into a JEM Solutions bank account. Tr. 1125:12-19, and there was no subsequent disbursement of those funds to Costanzo. Tr. 1125:17-22. Pagan testified definitively that the $10,000 was not a bribe payment to Costanzo. Tr. 1749:14-15.

On June 3, 2019, GLC wrote another check to Pagan, this time for $10,750. Tr. 1081: 6-8; GX 440E. A corresponding invoice stated that the payment was for "services on the Johnny Grobman case," a litigation that was then pending in the Southern District of Florida. Tr.

4

1081:14-23; GX 504, S7 at 1. Pagan explained that the $10,750 was for a document review project on the Grobman litigation that GLC and Recio had subcontracted out to Pagan to perform. Tr. 1750:3 – 1752:2. The $10,750 came from a bank account belonging to GLC and was deposited into a JEM bank account. Tr. 1128:1-11. Again, there was no proof that the $10,750 was transferred to Costanzo. Tr. 1128:12-14. Pagan's tax returns showed that he disclosed to the government both payments from GLC on his tax return. GX 604.

On July 12, 2019, Pagan made a $1,600 deposit into the JEM Solutions bank account. GX 705. There was no evidence connecting that deposit to a scheme or to Costanzo.

Notwithstanding that none of the deposits into JEM's Solutions account went to Costanzo, the government invited the jury to speculate that the JEM account must have been a "slush fund" for him. Tr. 1901:6-9. The "evidence" that the government presented to support that inference was that in July, August, and October of 2019, Costanzo used the JEM account to purchase three round-trip plane tickets from Washington D.C. to Miami, respectively. Tr.1089:13 – 1091:8.; GX 701; GX 510A-C; GX 481. But Costanzo did not just purchase the tickets on his own accord; the evidence showed that he informed Pagan before doing so. Tr.1089:13-17.

In any event, the plane tickets were unrelated to any DEA work and not part of any scheme. Indeed, for months, in the spring and summer of 2019, when Costanzo was transitioning to his new life at DEA Headquarters in Washington, D.C., he made insurance payments on a car that he had recently sold to Pagan, still in Miami, at a loss. Tr. 1648:16 – 1652:24; Tr. 1752:9 – 1755:5; JC 1317; JC 2623. Costanzo also paid to have new tires installed on the car after Pagan agreed to purchase it. Tr. 1754:17-23. Pagan sought to repay Costanzo for the car, insurance, and the tires, by allowing Costanzo to use the JEM Solutions account to purchase plane tickets when

Costanzo decided to come back home to Miami. Tr. 1752:9 – 1755:9; Tr.1755:17 – 1756:2. In

other words, the items being exchanged between Costanzo and Pagan–in both directions–were

completely unrelated to DEA business. There was no bribery "slush fund."

In a particularly desperate effort to persuade the jury to see a conspiracy involving

Costanzo and Pagan where none existed, the government presented in yet another summary chart

the following text message exchange:

| | |
|---|---|
| Pagan: | Deposit made |
| Pagan: | Done with banks. 100k Wells , 100k boa, he only had 40k at Citibank |
| Costanzo: | Nice |

GX 701; GX 358. The government argued that the text message suggested that JEM Solutions

was somehow concealing "slush fund" money that was destined for Costanzo even beyond the

two GLC checks. Tr. 1688:24 – 1689:12. But the government was dead wrong.  On cross-

examination, Ms. Danko acknowledged that there were no transactions in the JEM Solutions

bank records that matched the transactions mentioned in the text message. Tr. 1125:23 –

1127:15. Of course, there were no transactions because the misleading text message thread was

not related to "a slush fund" or to bribery at all. The text messages concerned funds that were the

subject of a DEA money laundering investigation that Costanzo and Pagan were working on. Tr.

1756:10-1758:8; JC 9358.

### 2.      The Townhouse Down Payment

At trial, the government introduced evidence of a $50,000 payment that Pagan gave to

Costanzo's father, Costanzo Sr., towards a down-payment on Costanzo's townhouse.

The evidence showed that in late 2018, Costanzo was looking to purchase a townhouse in

the City of Coral Gables. Tr: 1735:12-17. The home was about a block away from the police

station where Pagan worked. Tr. 1731:17-23. Pagan, who was interested in another townhouse in

the same development, missed out on the opportunity after the townhouse he was looking at went into contract. Tr. 1738:4-9. Pagan thus decided that he wanted to invest in the property that Costanzo was purchasing. Tr. 1771:5-1772:4. Pagan's interest was consistent with his history as a real estate investor. Tr. 1726:12-20.

On January 10, 2019, Costanzo executed a contract to purchase the Coral Gables townhouse. Tr. 1018:24-25. He engaged the Robert Allen Law firm to represent him in the transaction and serve as the escrow agent, and he was assisted in the transaction by Neil Ross, a veteran mortgage broker in Miami. Tr. 1020:3-4; 17-19; 1596:15-1597:7; GX 462. The purchase price of the home was $470,000, Tr. 1019:23-24, and Costanzo put down a twenty percent down-payment of $94,000. Tr. 1602:3-8; GX 434 at 75.

On January 17, 2019, Pagan, for his part, issued a cashiers check to John Costanzo, Sr. for $50,000, which came from Pagan's personal bank account at Dade County Federal Credit Union. Tr. 1020:22 – 1021:2; 1107:4-25. GX 401B. Nothing in the evidence suggested that Pagan obtained any of the $50,000, or any of the money in his bank account, from any illicit source, and certainly not from any of the alleged bribe payors, namely, Recio, or attorneys Luis Guerra or David Macey. Tr. 1106:16 – 1107:6. Pagan testified that he did not funnel any bribe payments to Costanzo. Tr. 1724:22 –1725:5. Nor did Recio, Guerra, or Macey ever reimburse Pagan for the $50,000. Tr. 1738:19 – 1739:5.

On February 1, 2029, John Costanzo, Sr. signed a gift letter that was submitted with the townhouse mortgage application. Tr. 1603:11-24; GX 434; 434A. The gift letter stated that $50,000 towards the purchase of the property would come from Costanzo, Sr. as gift to Costanzo, Jr. Tr. 1603:11-24; 434A. Indeed, $50,000 was ultimately paid, from an account belonging to Costanzo, Sr., to the law firm representing Costanzo in the transaction. Tr. 1107:23

– 1108:21; GX 700. Pagan acknowledged that he knew that the money for the down-payment could not come from a third-party, so he gave the money to Costanzo, Sr. Tr. 1778:3-8. But Pagan testified that the money to Costanzo, Sr. came from his personal account at the Dade Federal Credit Union, which contained funds that he had accumulated over the years from various streams of income. Tr. 1814:13-24.

In this regard, Certified Public Accountant Elgin Polo testified about a financial analysis he conducted to summarize Pagan's bank account dating back to 2018. Tr. 1635:18-25; 1636:19-21. That analysis did not identify any deposits with funds originating from any of the alleged bribe payors or any entities associated with them. Tr. 1643:3 – 1646:2; JC 2622. In fact, the evidence showed that Pagan's personal bank account consistently had funds exceeding $80,000 dating back to 2018 and the source of the funds in the account consisted of steady deposits from Pagan's income and rental properties. Tr. 1643:24 – 1645:17. Furthermore, nothing in the record suggested that Pagan or Costanzo, Sr. received funds from Recio, Macey or Guerra, or that any payment related to the townhouse purchase was a *quid pro quo* related to Costanzo's official duty.

### 3.    The Law Firm Retainer[1]

At trial, the government introduced two new categories of bribe payments to Costanzo that were not identified in the indictment. The first of these, a $20,000 payment towards a retainer at a law firm, was introduced during the testimony of Costanzo's former girlfriend, Susana Rueda.

In and around December 2019, after the FBI executed a search warrant at his home in Arlington, Virginia, Tr. 1225:5-1225:7; 1231:18-1232:4, Costanzo asked Rueda to loan him $20,000 so he could retain a defense lawyer. Tr. 1224:17-1225:4. Rueda wired the money to the Marcus Moss law firm on Costanzo's behalf. Tr. 1225:8-24; GX 453A. A month later, Pagan repaid the debt for Costanzo after Rueda pressured Costanzo to pay her back. Tr. 1226:12-1227:10; 1232:22-1233:12.

### 4.    The David Macey Payments

The second new category of alleged bribe payments that was not charged in the indictment involved Miami defense lawyer David Macey. At trial, the government argued that Costanzo accepted bribes from Macey in the form of tickets to a Yankees game, a dinner, and payment to a home contractor.

---

[1] Special Agent Costanzo moved *in limine* to preclude the introduction of (1) the payment from Pagan to Special Agent Costanzo's former girlfriend for Costanzo's retention of a defense lawyer in this case; (2) an alleged payment from Macey for renovations on Special Agent Costanzo's home; . . . and (5) a Yankees game and dinner in New York City. Dkt. 118 at 23 – 27. During the final pre-trial conference held on October 11, 2023, the Court initially concluded that "the $20,000 for retention of a lawyer is not properly admissible under Rule 403. I think it actually prejudicial, the amount of money. I think it's confusing for the jury, and I don't think that that is proper." Tr. 66:25 – 67:4. After the Court's provisional ruling, on October 17, 2023, the government submitted a letter to the Court as a "supplemental motion *in limine*." Dkt. 140. The government re-argued that evidence regarding the $20,000 payment to the law-firm should be admitted. *Id.* at 4. The defendants submitted a response arguing the Court's provisional ruling was correct. Dkt. 145 at 3 – 4.

### a.       Yankees Tickets

On April 14, 2019, Costanzo and attorney Macey exchanged messages regarding going to a Yankees game. Tr. 977:10-20; GX 355. Macey purchased tickets to the game on Stubhub for $1,136.60, Tr. 979:6 – 980:6; GX 525, and Costanzo went to the game with Macey and two other DEA agents, including Nic Palmeri, the Assistant Special Agent in Charge of the DEA's New York office at the time. Tr. 978:4-9. During the game, Costanzo texted pictures of the stadium to Recio. Tr. 981:5-25; GX 385. The government also highlighted two restaurant transactions in New York on the night of the game, but could not show that Costanzo was present. Tr. 982:20 – 983:6; GX 525.

The government then introduced an unrelated phone call between Costanzo and Recio that took place months later, on July 4, 2019. Tr. 983:7-19. On the call, Costanzo and Recio discussed the possibility of meeting with attorney Luis Guerra and Palmeri when they would all be in New York. Tr. 983:7-19; GX 202-C. Neither bribes nor confidential information were mentioned on the call and the government did not introduce any evidence that such a meeting ever took place. The government rounded out this hollow, drifting vignette with a random text message exchange between Costanzo and Recio on October 15, 2019. Tr. 983:21 – 984:13. In the messages, Costanzo and Recio appear to be celebrating the promotion of their DEA colleague Nic Palmeri as the Regional Director of Mexico, excited that a respected and effective DEA Agent would soon "take over" DEA's Mexican operations. Tr. 983:21 – 984:13. The message made no mention of bribes or confidential information.

### b.       Contractor Payment

Another anecdote that was neither mentioned in the indictment nor fit into the scheme described therein, was evidence of a payment to a home contractor, Juan Victorero. In February

2019, Macey referred Victorero to Costanzo when the latter needed construction work done on his new townhouse. Tr. 1246:15 – 1247:4; GX 333. Costanzo eventually hired Victorero to perform about $10,000 of work on the townhouse. Tr. 1248:1 – 1249:5. Victorero received an initial payment from Costanzo of about $4,000. Tr. 1251:21 – 1252:2. Victorero received the second, and final, payment of about $5,000 from Macey, which the government styled as a bribe payment for Costanzo's benefit. Tr. 1253:2-14. Costanzo informed Victorero that he left the balance with Macey because he would be out of town and would not be able to hand Victorero the payment himself. Tr. 1253:15-21; 1258: 7-9. By way of corroboration, Costanzo noted in a text message that same day that he was busy packing and would try to meet up with Macey if he could. Tr. 1254:2-17; GX 336.

Victorero testified that Costanzo "always paid me with a check," so it was likely that Costanzo left a check for him with Macey, but it was possible that "[i]t could have been cash." Tr. 1258: 2-6. This vignette failed to establish any bribe payment to Costanzo. Nothing connected this payment to a violation of Costanzo's official duty, and the evidence showed that Costanzo's funds paid Victorero, not Macey's.

### 5.    The $2,500 Payment

The payment most heavily relied upon by the government as a basis for conviction was also the smallest: a $2,500 payment from GLC to an entity belonging to Costanzo's father, EBCO International ("EBCO"). Thus:

On November 10, 2018, Recio retired from the DEA. Tr. 1027:17-21; GX 701. Two days later, on November 12, 2018, David Macey's law firm wrote a $5,000 check to GLC, Recio's company. Tr. 1031:23-25. GLC also received from EBCO an invoice dated November 12, 2018, billing GLC for $2,500 for "investigative services." Tr. 1028:4-8; GX 367; GX 701.

11

On November 13, 2018, Recio deposited the $5,000 check from Macey into the GLC bank account. Tr. 1032:5-10. That same day, Costanzo searched names in NADDIS that were connected to communications he had with Recio. GX 704A; GX 704B.  He also told Macey in a series of text messages that his car needed repair work done. Tr. 1032:17 – 1033:11; GX 317; 701. Lamenting in jest that he would have to pay for the costly repairs, Costanzo texted Macey "Lol. I just made 2500 fuck it[.]" *Id.* The next day, November 14, 2018, GLC, Recio's company, wrote a check to EBCO, John Costanzo, Sr.'s company, for $2,500. Tr. 1033:14-17. The money never went to Costanzo.

Days later, on November 20, 2018, Costanzo deposited $1,500 in cash into his personal bank account. GX 412A; 701. The government did not present any evidence that linked that isolated deposit with the $2,500 payment.

## ARGUMENT

## POINT I

## THE COURT SHOULD ENTER A JUDGMENT OF ACQUITTAL ON EACH COUNT

**Counts of Conviction**

### A.      **Legal Standard**

#### 1.      **Rule 29**

A defendant may not constitutionally be convicted of a criminal offense except by proof that establishes guilt beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 368 (1970); *United States v. Clark*, 740 F.3d 808, 811 (2d Cir.2014). On a motion for a judgment of acquittal under Fed. R. Crim. P. 29(a), the Court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." The court must evaluate "the evidence in the light most favorable to the Government with all reasonable inferences resolved in the

Government's favor." *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015). "Moreover, pieces of evidence must be viewed not in isolation but in conjunction, and the jury's verdict may be based on circumstantial evidence." *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994) (citation and quotation marks omitted).

"Applying this standard does not, however, mean that a reviewing court must affirm all jury verdicts." *Valle*, 807 F.3d at 515. "A criminal defendant who challenges the sufficiency of evidence shoulders a heavy burden, but not an impossible one." *United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004). Indeed, "[t]his standard does not mean that if there is any evidence that arguably could support a verdict, we must affirm. In any criminal trial there is always some evidence of guilt, otherwise there could not have been a prosecution." *Valle*, 807 F.3d at 515.

On Rule 29 motions, courts are reminded that "in America we still respect the dignity of the individual, and [a defendant] . . . is not to be imprisoned except on definite proof of a specific crime." *United States v. Mulheren*, 938 F.2d 364, 368 (2d Cir. 1991) (quoting *United States v. Bufalino,* 285 F.2d 408, 420 (2d Cir. 1960) (Clark, J., concurring)). "[A] conviction based on speculation and surmise alone cannot stand. In particular, the government must introduce sufficient evidence to allow the jury to reasonably infer that each essential element of the crime charged has been proven beyond a reasonable doubt." *D'Amato*, 39 F.3d at 1256. "Where the Government asks the jury to find an element of the crime through inference," however, "the jury may not be permitted to conjecture or to conclude upon pure speculation or from passion, prejudice or sympathy." *United States v. Vernace*, 811 F.3d 609, 615 (2d Cir. 2016) (cleaned up). "An inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist. Impermissible speculation, on the other hand, is "a complete absence of probative facts to support the conclusion reached."

*United States v. Pauling*, 256 F. Supp. 3d 329 (S.D.N.Y. 2017, *aff'd and remanded,* 924 F.3d

649, 656 (2d Cir. 2019) (internal citations omitted).

"If the evidence viewed in the light most favorable to the prosecution gives equal or

nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a

reasonable jury must necessarily entertain a reasonable doubt." *Valle*, 807 F.3d at 515 (citing

*United States v. Triumph Cap. Grp., Inc.*, 544 F.3d 149, 159 (2d Cir. 2008)) (internal quotation

marks omitted). As the Supreme Court has instructed, "the essential requirement is that mere

speculation be not allowed to do duty for probative facts, after making due allowance for all

reasonably possible inferences favoring the party whose case is attacked." *Galloway v. United

States*, 319 U.S. 372, 395 (1943).

In *United States v. Pauling*, this Court granted a Rule 29 motion where the government

failed to prove beyond a reasonable doubt an essential element of the offense. *Pauling*, 256 F.

Supp. 3d 329 (S.D.N.Y. 2017). In *Pauling*, the Court entered a judgment that found the

defendant guilty of a lesser included offense, where the evidence was insufficient to prove

beyond a reasonable doubt that an additional amount of drugs was involved in the more serious

offense. *Id.* at 652. The government argued that "the evidence permitted the jury to infer that an

additional 14 grams of heroin was attributable to the [charged] conspiracy by virtue of [a] phone

call, in which the buyer mentioned that he wanted the 'same thing as last time' while placing an

order for 14 grams of heroin." *Id*. at 659. In affirming the district court's decision, the Second

Circuit reasoned that a single call, where a customer stated that he wanted the "same thing as last

time" was not enough for a jury to infer that the customer was ordering an additional 14 grams

where the evidence showed that the defendant had multiple suppliers and there was no reason to

believe that the prior purchase had anything to do with the charged conspiracy. *Id.* The Second

Circuit also cautioned that while a court is "obliged to view the evidence with all reasonable inferences drawn in the Government's favor, [it] may not permit that rule to displace the even more important rule that all elements of an offense must be proven beyond a reasonable doubt." *Id.* at 662.

### 2.      Bribery Law

The key issue in a bribery case is whether there was a *quid pro quo*. *See United States v. Alfisi*, 308 F.3d 144, 149 (2d Cir. 2002) ("The 'corrupt' intent necessary to a bribery conviction is in the nature of a *quid pro quo* requirement"); *United States v. Avenatti*, 81 F.4th 171, 194 (2d Cir. 2023) ("[B]ribery is generally understood to mean the corrupt payment or offering of something of value to a person in a position of trust with the intent to influence his judgment or actions."). The necessary fact in establishing a *quid pro quo* in a bribery case is often that the bribe payor provided a benefit to the public official. *See United States v. Quinn*, 359 F.3d 666, 672 (4th Cir. 2004) (quoting *United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998)) ("[t]he quid pro quo requirement is satisfied so long as the evidence shows a course of conduct of favors and gifts flowing to a public official in exchange for a pattern of official actions favorable to the donor."). In this district, courts will often point to the benefit or payment that was received by the public official as key evidence in denying Rule 29 motions. *See United States v. Bruno*, 661 F.3d 733, 744 (2d Cir. 2011) (finding sufficient evidence to sustain a bribery conviction where the defendant received $200,000 from the bribe payors companies); *Alfisi*, 308 F.3d at 148 (sustaining a bribery conviction when public official testified that he received payments from the bribe payor); *United States v. Bonito*, 57 F.3d 167, 174 (2d Cir. 1995) (denying a sufficiency challenge where the defendant gave the public official a car).

### B.      Discussion

The critical element running through all the charged counts was whether "Costanzo received or accepted something of value, at least in part, in return for – and with the intention of – being induced in the performance of his official duty." Dkt. 170 at 25. The Court instructed the jury that bribery required a showing that "Costanzo received or accepted something of value, at least in part, in return for – and with the intention of – being induced in the performance of his official duty." Dkt. 170 at 25.

None of the seven payment vignettes that the government introduced at trial can sustain a conviction on any of the charged counts because the government failed to prove that Costanzo received or accepted something of value in exchange for violating his official duty. For all seven of the payments that the government claimed to be the *quid*, the government failed to prove either (1) that Costanzo received the payment, or (2) that money he did receive or benefit from (for example, from his father and Pagan) had any connection to any of the bribe payors or a scheme. As the Court observed during the charge conference, "[t]his is a case where it's so circumstantial in terms of payments were roundabout; there's no direct evidence of an offer or Mr. Recio actually giving anything, as far as I know. But it's all going to be the jury making inferences." Tr. 1867:5-9.

The Court was correct; but the inferences the government ultimately asked the jury to draw were spurious and impermissible. Instead of proving an essential element, here, *i.e.*, that Costanzo got paid, the government asked the jury to speculate and draw inferences that were inconsistent with the totality of the evidence. *See United States v. Cassese*, 290 F. Supp. 2d 443, 456 (S.D.N.Y. 2003), *aff'd,* 428 F.3d 92 (2d Cir. 2005). Courts in this district have declined to sustain convictions founded upon similar "speculation and surmise." *D'Amato*, 39 F.3d at 1256.

16

With regard to the two JEM Solutions payments, the government's "slush fund" theory failed miserably. Not a penny of the money that GLC sent to JEM Solutions ever made it into Costanzo's hands or bank accounts. There was no proof that the funds were even destined for him; legitimate reasons independent of Costanzo were provided for both payments. And the government certainly did not present any evidence or argument connecting the payments from GLC to any actions Costanzo took in his official duty. As to the plane tickets, the government did not present a shred of evidence that Recio or any defense attorney "bribe payor" had any knowledge of those purchases, let alone that they were part of a bribery scheme and Costanzo's violation of his official duty. The specious inferences the government asked the jury to draw should not be indulged. *See Pauling*, 256 F. Supp. 3d at 334 (internal citations omitted).

The broader evidence of Costanzo and Pagan's friendship paints a different and innocuous picture. The evidence showed that items and funds exchanged between Costanzo and Pagan occurred in the context of a normal friendship and that JEM Solutions was not a "slush fund." Indeed, if it were, it would be the first "slush fund" whose principal disclosed its existence to his law enforcement employer and reported it on his tax-return. The argument defies logic and flies in the face of the "slush fund" theory; the evidence of Pagan's relationship with Costanzo is at least as consistent with innocuous behavior as with misconduct, if not more so. If the evidence gives "nearly equal circumstantial support" to the competing explanations of the payments, reasonable doubt exists. *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002).

### 1.     Townhouse and Law Firm Payments

Neither the townhouse payment nor the law firm retainer re-payment could sustain the convictions because the government failed to prove that any alleged bribe payors had even the slightest connection to these normal, run-of-the-mill, cost-sharing payments among friends and

family. The inferences that the government asked the jury to draw were paper thin – *i.e.,* that Costanzo's father and best friend (both of whom spent decades in law enforcement) agreed (for no reason) to act as (criminal) conduits for "bribery" payments (that lacked any connection to the bribe payors). The evidence with regard to these payments does not even come close to meeting the evidentiary standard. *See e.g., United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995) ("where a fact to be proved is also an element of the offense . . . which is usually established only by inference - it is not enough that the inferences in the government's favor are permissible. We must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt."). No juror could have found that either of these payments was a bribe absent speculation and fantasy.

As to the townhouse down payment, the evidence showed that the money came from Pagan's personal account and nowhere else. Nothing in the evidence suggested that Pagan obtained any of the $50,000, or any money in his bank account, from anyone, and certainly not from any of the alleged bribe payors, namely, Recio, or attorneys Luis Guerra or David Macey. Tr. 1106:16 – 1107:6. Pagan testified that he did not funnel any bribe payments to Costanzo, Jr. Tr. 1724:22 – 1725:5. Nor did Recio, Guerra, or Macey ever reimburse Pagan for the $50,000. Tr. 1738:19 – 1739:5.

The government's theory of this payment also introduced a new and outlandish aspect of the "scheme," that is, that Pagan, a conduit, paid Costanzo, Sr., another supposed conduit, without any explanation at all. The government offered that Pagan must have gotten the funds from someone else because of the supposed "debt" he had accumulated on other properties that he owned, but Pagan dispensed with that supposition with a simple explanation—they are rental

properties. Tr. 1780:18 – 1786:8. Pagan pays the mortgages from the rent that he receives from tenants.

The evidence was even more feeble as to the law firm retainer re-payment being part of a scheme. The government failed to offer anything other than the circular argument that Pagan's very involvement (reimbursing Rueda) was a basis to conclude that the $20,000 payment was actually a bribe.  The government did not even attempt to show that Recio or any alleged defense attorney "bribe-payor" was either the source of the payment or influenced Pagan to act as a "conduit" to re-pay Rueda. Indeed, Pagan's bank records demonstrated that Pagan used funds from his personal bank account. Tr. 1647:12-25. The account did not reflect any transactions with Recio, Macey, or Guerra. *Id*. And there was not even a hint of evidence that the payment was made in exchange for Costanzo's violation of duty.  Pagan also testified that he did not discuss repayment with Costanzo; instead, Pagan understood that Costanzo will "pay[] me back when he pays me back." Tr. 1760:3-6.

In sum, absent impermissible speculation, no reasonable juror could have found that the townhouse payment or the law firm retainer re-payment was a part of a *quid pro quo.*

### 2.    David Macey Payments

As noted above, the government's ever-changing theory of the bribery scheme grew to include a Yankees game outing and payments to Victorero, the contractor.  Here, the government abandoned its theory that the scheme used "conduits" to pay Costanzo bribes, and instead that attorney David Macey himself made payments that benefitted Costanzo. But no juror could reasonably have found that these payments were a part of a scheme.

The baseball game was nothing more than an outing among friends including Macey and Costanzo. No evidence was presented that the baseball game in April, a call about a *possible*

meeting in July, or a text message in October acknowledging Palmeri's promotion, were evidence of a bribery scheme because there was nothing that connected these occurrences to any of Costanzo's supposed official duty violations, confidential DEA information, or bribe payments. While the government suggested that the baseball game was part of some nefarious plot to "take over" Mexico, no juror could have found that the game was part of a *quid pro quo*.

The payment to Victorero did not establish a *quid*, let alone a *quid pro quo*. All it established is that Costanzo left money with Macey to give to Victorero as Costanzo was preparing to go out of town, and that Macey passed the payment to Victorero as a favor to a friend.  There was no proof that Macey did it as part of any *quid pro quo*.

### 3.       $2,500 Payment

Finally, as to the $2,500 that GLC sent to EBCO (Costanzo Sr.'s company), the government was clear: it wanted the jury to suppose that Costanzo received the payment in exchange for running NADDIS searches for Recio. But considering the totality of the evidence, no juror could have reasonably inferred as much. Costanzo's quip about paying for his car repairs because he "made $2500" was of no moment; *there was no evidence in the record that EBCO ever transferred the $2,500 to him.* Tr. 1116:18 – 1117:14. And the government presented no evidence that Costanzo stood to benefit from any interest in his father's company, EBCO. Tr. 1117:20 – 1118:1. Indeed, there was no evidence that any part of the $2500 ever made it to Costanzo.

In a feeble effort to tie Costanzo in some way to the $2,500, the government introduced evidence that days later, on November 20, 2018, Costanzo deposited $1,500 in cash into his personal bank account. GX 412A; 701. But again, there was no evidence that linked the isolated deposit with the $2,500 payment.

In its closing argument, the government suggested that the temporal link between the $2,500 payment to EBCO, the text message from Costanzo to Macey acknowledging making $2,500, and the start of Costanzo running NADDIS searches based on names provided by Recio was enough to show a *quid pro quo*.  But the government is wrong; the link was too weak.  The *Glenn* court put it succinctly: "as the inferential leap between the fact and the proposition to be derived grows, the probative value of the evidence diminishes." *Glenn*, 312 F.3d at 70. Here, it diminished to nil.

In sum, to sustain a conviction, the jury "must have been presented with a sufficient evidentiary predicate to support the conclusion that, beyond a reasonable doubt" the defendant received the benefit of a bribe payment. *Id.* At bottom, however, this is a bribery case where the government never proved beyond a reasonable doubt that the defendant ever actually received the benefit of any bribes from any of the alleged "bribe payors."  No juror could have found beyond a reasonable doubt that any payment was a bribe to Costanzo. Therefore, judgments of acquittal should be entered.

## Venue

In addition to failing to prove the counts of conviction beyond a reasonable doubt, the government also failed to establish venue by a preponderance of the evidence.

### A.      Relevant Facts

At trial the government introduced a phone call and an accompanying stipulation directed at establishing venue in the Southern District of New York. *See* GX 207; GX-S1. According to the stipulation: "An analysis of cell site data and call detail records for phone number (305) 796-7463 (the "7463 Phone")[belonging to Recio], show that the use of the 7463 Phone placed the outgoing call that is reflected in GX 207, which lasted approximately three minutes and twenty-

four seconds, to phone (786) 566-0085 [belonging to Costanzo] at approximately 4:27 pm ET on

July 16, 2019, from Manhattan, New York."  GX-S1.

On that brief phone call, Recio described the hot weather in New York and Costanzo

responded regarding the heatwave. *See* GX 207. Recio also discussed information about an

individual called "AAO," whose visa had been pulled when he tried to fly. Costanzo responded

to the information that AAO could not fly by stating "Ohh they did…Yeah they're coming." *Id.*

Recio acknowledged, "yeah," to which Costanzo added "right here. It's HSI they're coming." *Id.*

Recio again responded with "yeah." Costanzo then elicited information from Recio regarding

AAO's whereabouts: "So where is he in the DR?" Recio described how AAO "wants to know

how he can fix it now you know but uh I told him look I just got to New York I can't figure it out

right now you know" to which Costanzo offered, "[y]eah well first he needs to like hire you." *Id.*

Costanzo also indicated that "[u]m but if there's anything that benefits the DEA I would jump on

it.  I don't think I know it's not us I'm pretty sure." *Id.* Recio responded, "But you know um

maybe if he's willing to cooperate you know what I'm saying."  Costanzo acknowledged, "No

yeah I mean that's number one why did that and number two they're probably going to sanction

him." *Id.*

The government also introduced evidence that on or about April 16, 2019, Costanzo, his

friend David Macey, and two other DEA agents attended a Yankees game in The Bronx, New

York. Macey purchased the tickets using his American Express card. *See* Tr. 979:6 – 980:6; GX

525.

The government argued that venue in the Southern District of New York was established

on all counts through the phone call and the outing to Yankee Stadium. *See* Tr. 1594:5 – 1595:5.

The government is wrong.

### B.    Legal Standard

The Sixth Amendment provides that trials must be held in "the State and district wherein the crime shall have been committed." U.S. Const. art. III, § 2, cl. 3. Further, Federal Rule of Criminal Procedure 18 provides that "[u]nless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed." Fed. R. Crim. P. 18.

"When a defendant is charged in more than one count, . . .  venue must be proper with respect to each count. 'Because venue is not an element of a crime, the government need establish it only by a preponderance of the evidence.'" *United States v. Tomasetta*, No. 10 CR. 1205 PAC, 2012 WL 2064978, at *2 (S.D.N.Y. June 6, 2012) (citing *United States v. Beech–Nut Nutrition Corp.,* 871 F.2d 1181, 1188 (2d Cir.1989)). Venue on one count does not establish venue on another count, although the same evidence may be relied on to establish venue on multiple counts.

"Venue may lie in more than one place if the acts constituting the crime and the nature of the crime charged implicate more than one location." *United States v. Gross*, No. 15-CR-769 (AJN), 2017 WL 4685111, at *36 (S.D.N.Y. Oct. 18, 2017), *aff'd sub nom. United States v. Lebedev*, 932 F.3d 40 (2d Cir. 2019) (quotations omitted). When a federal statute does not specify how to determine where the crime occurred, "[t]he *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *Id.* (quoting *United States v. Tsolov*, 642 F.3d 314, 318 (2d Cir. 2011)).

For continuing offenses, venue is proper in any district in which an offense was "begun, continued or completed." *Id.* For conspiracy, the government must establish two factors for venue by a preponderance of evidence.  *See Tsolov*, 642 F.3d at 318. First, the government must

establish that the "essential conduct" occurred in the district of prosecution. *See United States v. Ramirez*, 420 F.3d 134, 138 (2d Cir. 2005) (quoting *United States v. Rodriguez-Moreno*, 526 U.S. 275, 280 (1999)). Second, if the overt act was committed by someone other than the defendant, the government must prove that it was "reasonably foreseeable" to the defendant that the act would take place in the district. *See United States v. Kirk Tang Yuk*, 885 F.3d 57, 69 (2d Cir. 2018). For a conspiracy charge, the "essential conduct" is either where the agreement was formed or where an overt act was committed to further the conspiracy's objective. *See United States v. Ramirez-Amaya*, 812 F. 2d 813, 816 (2d Cir. 1987).

Ultimately, "there must be some 'sense of [venue] having been freely chosen' by the defendant." *Gross*, 2017 WL 4685111, at *36 (quoting *United States v. Davis*, 689 F.3d 179, 185 (2d Cir. 2012)). The Ninth Circuit recently overturned a conviction on corruption charges, finding that:

> Questions of venue in criminal cases . . . are not merely matters of formal legal procedure. They present policy concerns deeply rooted in the Constitution. Aware of the unfairness and hardship to which trial in an environment alien to the accused exposes him, the Framers drafted the Venue Clause, which "mandates that the 'Trial of all Crimes . . . shall be held in the State where the . . . Crimes shall have been committed.'" This command is reinforced by the Vicinage Clause of the Sixth Amendment, which "guarantees 'the right to . . . an impartial jury of the State and district wherein the crime shall have been committed.'"

*United States v. Fortenberry*, No. 22-50144, 2023 WL 8885105, at *6 (9th Cir. Dec. 26, 2023) (cleaned up; citations omitted). A conviction by a jury from outside "the State and district wherein the crime shall have been committed"—is thus invalid. *See* U.S. Const. Amend. VI; *Smith v. United States*, 599 U.S. 236, 245 (2023) (holding that retrial is the proper post-conviction remedy for improper venue).

### C.     Discussion

For each count the government had to establish venue in the Southern District of New York by a preponderance of the evidence. This did not happen. The Court instructed the jury that it must examine venue separately for each count, and that "it is sufficient to establish venue if the government proves that any act in furtherance of the crime charged occurred in the Southern District of New York." Tr. at 2074-75. The Court instructed the jury that the act establishing venue need not itself be criminal, nor taken by a defendant or a conspirator, "as long as the act was caused by the conduct of the defendant or conspirator or was reasonably foreseeable." Tr. at 2075.

As discussed above, the only conduct that the jury could have possibly considered criminal was a single alleged payment of $2,500 in November 2018. In summation, the government argued to the jury that the evidence proved a *quid pro quo* of $2,500 for NADDIS searches. Tr. at 1914:4-16. Accordingly, the most that the government proved was a bribery, honest services fraud, and conspiracy scheme consisting of a single payment of $2,500 in November 2018, for a series of NADDIS searches. However, the government introduced no evidence that any portion of the alleged $2,500 payment had any connection to the Southern District of New York, nor that any of the alleged NADDIS searches occurred while either Recio or Costanzo was in New York.

The government's alleged contacts with this district failed to establish venue because the government failed to prove by a preponderance of the evidence that either the Yankees game or the July 16 call was in furtherance of the charged crimes.

### 1.     Count Two and Count Five – Accepting a Bribe and Honest Services Fraud

For Count Two (Accepting a Bribe) and Count Five (Honest Services Fraud), the Second Circuit has instructed that an honest services fraud offense is "completed at the time when the public official receives a payment in return for his agreement to perform specific official acts[.]" *United States v. Silver*, 948 F.3d 538, 556 (2d Cir. 2020). That is, bribery is not a continuing offense.

The Second Circuit established the venue analysis for Section 201 charges in *United States v. Stephenson*, 895 F.2d 867 (2d Cir. 1990).  In *Stephenson*, the court reviewed bribery charges against an Export Licensing Officer at the Department of Commerce in Washington, D.C. and explained that venue is analyzed "by examining the 'key verbs' that 'define the criminal statute offense in the statute.'" *Id.* at 869, 874 (quoting *United States v. Chestnut*, 533 F.2d 40, 46-47 (2d Cir. 1976)). The court held that the defendant's phone calls with the corporate victim located in New York "were crucial components of, not merely preparatory to, the bribery scheme that culminated in the November 19 meeting in Washington, D.C." *Id.* at 874. At the November 19 meeting, representatives of the corporate victim offered a $35,000 bribe and the defendant agreed to meet the next day to receive it. *Id.* at 870. The court explained that the defendant "could have done none of these things [the offending bribery verbs under Section 201] without entering, by telephone, the Southern District, where his bribery targets conducted business." *Id.* at 874. On the phone calls to this district, the court found that the defendant's exaggeration of the seriousness of deficiencies in the victim's license applications and his threats that company's representatives would be criminally prosecuted were "designed" by the defendant to make the company "willing to pay him a bribe." *Id.* at 875. As a result, the court found that the phone calls were "part and parcel of the offense of 'demand[ing],' 'seek[ing],' and 'agree[ing] to receive' a bribe" from the victim company located in New York.  *Id.*

Similarly, in *Gross*, Judge Nathan found venue in a bribery and conspiracy case based on a series of emails sent by the defendant from this district. 2017 WL 4685111, at *38. The defendant was the head of a federal credit union convicted of accepting bribes in exchange for relinquishing control of the credit union's board to an illegal bitcoin exchange operator. *Id.* at *6. The government alleged that venue was proper based on a series of emails sent by the defendant to facilitate a board meeting where control of the credit union would be transferred to the bribe payor. *Id.* at *38. Judge Nathan found the emails sufficient to establish venue because they were "essential to ensuring the success of the *key* event in the central quid pro quo arrangement." *Id.* The court also noted that the bribe that the defendant stood to receive was in fact contingent on the success of the transfer of power to the bribe payor. *Id.* at *39. Critically, the test applied by Judge Nathan was whether the venue-establishing emails were "essential" to the charged crimes. *Id.* at *38.

This case bears no resemblance to *Stephenson* or *Gross*. Even assuming that the government proved an alleged bribery scheme of $2,500 for NADDIS searches, that crime was completed at the time Costanzo allegedly accepted the payment in November 2018. *See Silver*, 948 F.3d at 556. As a result, neither the Yankees game five months later nor the July 16 phone call eight months later can be considered "crucial components," "part and parcel," or "essential" to that alleged scheme. *Stephenson*, 895 F.2d at 874-75; *Gross*, 2017 WL 4685111, at *38. Nor did either event "facilitate" the key aspects of the alleged quid pro quo arrangement. *Gross*, 2017 WL 4685111, at *38. One was a Yankees game among friends and work colleagues; the other was a phone call with no relationship to the alleged bribe of $2,500 eight months earlier.

Accordingly, the Court should vacate the convictions on Counts Two and Five for lack of venue.

### 2.    Count One and Count Four – Bribery and Honest Services Fraud Conspiracy

Although conspiracy is a continuing offense, the government nevertheless failed to introduce any evidence to prove that the Yankees game or the July 16 phone call was "essential conduct" in furtherance of the alleged conspiracies. *See Gross,* 2017 WL 4685111, at \*37; *Ramirez*, 420 F.3d at 138. Even assuming there was an ongoing conspiracy regarding NADDIS searches for the alleged $2,500 payment, neither contact with this district approaches the conduct that Judge Nathan deemed "essential" to the conspiracy in *Gross*. As for the Yankees game, the government failed to establish *any* connection between that game and a bribery conspiracy, let alone how the game was "in furtherance" of such a conspiracy. Not one payment, NADDIS search, or shred of DEA information was proven to be connected to Costanzo's attendance at the game. The record reflects a social outing to a Yankees game among friends, and nothing more.

Nor was there any mention of payments, NADDIS searches, or leaking of DEA information on the July 16 phone call. The phone call is also insufficient to establish venue for an additional reason. The government introduced no evidence that it was foreseeable to Costanzo that Recio was located in New York at the time of that call. This is not a case like *Gross* where the defendant knew that his co-conspirator traveled to New Jersey with some frequency and to Manhattan at various times. *Gross*, 2017 WL 4685111, at \*40. The government's evidence instead showed that Recio lived and worked in Miami and frequently traveled outside the United States throughout the entirety of the alleged conspiracy. The government introduced no evidence that would have allowed the jury to infer that it was foreseeable to Costanzo that Recio would have called him from New York on July 16, 2019. *Id.*

Accordingly, the Court should vacate the convictions on Counts One and Four for lack of venue.

## POINT II

## THE COURT SHOULD GRANT A NEW TRIAL IN THE INTEREST OF JUSTICE

Pursuant to Fed. R. Crim. P. 33, Costanzo moves for a new trial based on a violation of his Confrontation Clause rights. During its main and rebuttal summations, the government argued that it had presented direct evidence of *both* defendants' guilt in the form of an alleged admission from Recio in which he supposedly confessed to the charged crimes in a document production that he made related to the $2,500 payment from GLC to EBCO in November 2018. By presenting evidence of an alleged confession from *Recio*, and then arguing that the jury could convict *Costanzo* based on that confession, the government violated Costanzo's Sixth Amendment rights under the Confrontation Clause. Accordingly, he is entitled to a new trial.

### A.    Relevant Facts

#### 1.    Pre-Trial Production of Proposed Trial Exhibits

Before trial, the government produced to the defense more than 300 proposed exhibits. The documents produced pursuant to a subpoena to Recio's company, GLC, were not identified as a proposed trial exhibit until the night before the trial. The government never informed the defense or the Court that it intended to present GLC's production of documents in response to the subpoena as an alleged confession by Recio.

#### 2.    Direct Examination of Rachel Danko

During the direct examination of Investigative Analyst Danko, the government posed questions about the subpoena it served on GLC.  The subpoena requested documents relating to any payment from GLC to EBCO.  The set of documents produced by GLC in response to the subpoena included text messages between Recio and Costanzo relating to NADDIS searches (the "NADDIS text messages"). The questioning of Danko left the jury with the misimpression that Recio paid $2,500 to EBCO in exchange for NADDIS information:

Q. So what we are about to see are what Global Legal Consulting says are all the documents, communications, or other records relating to this $2500 payment from Global Legal Consulting to EBCO, is that correct?

A. Correct.

. . .

Q. All right. So let's read these text messages between Manuel Recio and John Costanzo, Jr. that Global Legal Consulting is saying relate to the $2500 payment. Can you please read the second and third messages, noting the date and the sender?

A. "11/15/2018, 3:29:29 p.m. John, can you run Moreno and USA D&D?" John Costanzo responds, "Yeah."

Tr. at 1046:3-1049:21.

The defense objected to the questioning and asked for a sidebar.[2] During the sidebar, Recio's counsel argued that the government was misleading the jury about the significance of documents included in GLC's subpoena production. Costanzo's counsel joined in that objection, highlighting the government's improper characterization of the evidence in its questioning. *See* Tr.at 1050:2-15.  That is, counsel argued that the government was improperly ascribing significance to GLC's inclusion of the NADDIS text messages in its document production.  The government responded, acknowledging that intent associated with the productions would require the defense calling a witness. *See* Tr. at 1050:16-1050:23 ("If they want to put up a witness as to their intention upon producing the documents, they are welcome to do so[.]"). The government never disclosed that it intended to go even further by characterizing GLC's production of the NADDIS text messages as an *admission* by Recio – through a document production – that $2,500 was paid in exchange for NADDIS information.

---

[2] Prior to the start of the trial, with all parties' consent, the Court ordered that an objection from one defendant constituted an objection from both defendants.  Tr. at 97:17-98:5.

### 3.   Government Summations

A significant portion of the government's main summation focused on the alleged $2,500 payment.  The government used GLC's subpoena production, GX 530, to argue that GLC had admitted that the NADDIS text messages were "related to the November 12, 2018 invoice" [i.e., for the payment from EBCO to GLC].  However, the language from the GLC subpoena production quoted by the government was simply a header or label placed in front of documents apparently to organize the production. *See* GX 530, at 2.  Nevertheless, the government then showed the jury two NADDIS text messages between Costanzo and Recio (GX 530 and GX 1001) and argued that GLC had admitted that those text messages related to the $2,500 payment:

> So the first reason you know the quid and the quo are connected is the records Global Legal Consulting provided in response to a subpoena told you they were. Let's look at Government Exhibit 530. Government Exhibit 530 contain Global Legal Consulting's response to the subpoena. You can go look at the entire thing if you want, ***records that were pulled together by Manny Recio***. The subpoena had asked for any records relating to the three invoices we talked about earlier, the two handwritten JEM invoices and the November 12, 2018 EBCO invoice, that was supposedly for the $2,500 worth of investigative services. Sorry, this invoice, the one you're looking at here. ***And what did Global Legal Consulting provide as records relating to that EBCO invoice?*** Text messages from Recio asking Costanzo to run names in the DEA's law enforcement sensitive NADDIS databases. Not any communications between Recio and John Costanzo, Sr., who supposedly EBCO was his company, but messages between Recio and Costanzo and messages specifically asking for DEA confidential information, names that Costanzo did run in the NADDIS database, and where he did provide information to Recio. You saw at least one of those. And this one is Government Exhibit 1001 from November 13th. Costanzo gave Recio a valuable little nugget of information. He asked about Marco Antonio Flores Moreno. Flores is a general who was just appointed to some minister of some shit. This is from November 13th, the same day that Costanzo told Macey, in Government Exhibit 317, which we looked at earlier, just made $2,500, fuck it. ***In other words, you know this $2,500 was money for the information Costanzo was providing because Global Legal Consulting said it was***. The 2500 was related to these text messages, it was in exchange for the confidential information, confidential information Costanzo was sharing in violation of the DEA's standards of conduct against searching NADDIS for unauthorized purposes. 2500 that was Costanzo's half of a 50/50 split out of the 50,000 Macey had just paid to Global Legal Consulting. Costanzo's cut for his partnership with Recio in this bribery scheme. ***That's it. Honestly, that's all you***

***need to know. That's enough to find both Costanzo and Recio guilty.*** You only have to have one bribe payment, and that one, that one is crystal clear.

Tr. 1913:1 – 1914:2 (emphases added).

The government repeated its argument that Recio had confessed to the charged crimes through the GLC document production in its rebuttal and again included Costanzo in that argument:

> Okay.  I want to touch on two things briefly, ***two pieces of evidence that essentially resolve this for you***.  Again, defense counsel said over and over there is nothing direct about this case, there is nothing direct, it is all circumstantial . . . But you have direct evidence. You have direct evidence in the form of the GLC subpoena returns that AUSA Deininger walked you through. Global Legal Consulting, Manuel Recio's company, received a subpoena to provide records about the $2500 payment. ***Manuel Recio, he was the one who collected those records and he put them together***. And what did he provide? Text messages between him and Costanzo talking about the NADDIS searches. Is that not direct evidence? ***That is Recio, that is Global Legal Consulting truthfully admitting that the reason Costanzo got that payment – the reason EBCO got that payment was because Costanzo was leaking DEA information and NADDIS information***.

Tr. 2004:5 – 2005:4 (emphases added).

## B.    Legal Standard

Rule 33(a), Fed. R. Crim. P., provides in pertinent part, that "[u]pon [a] defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "[A] trial court has broader discretion to grant a new trial pursuant to Rule 33 than to grant a motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29[.]" *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992).  On a Rule 33 motion, furthermore, "a court is permitted to "weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." *United States v. Olazabal*, 610 F. App'x 34, 37 (2d Cir. 2015). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (internal citations omitted).

C.      Discussion

1.      The Government's Use of Testimonial Evidence from GLC and Recio Violated Costanzo's Sixth Amendment Rights Under *Bruton* and *Crawford*

Criminal defendants have an unassailable right under the Confrontation Clause of the Sixth Amendment to confront the witnesses against them at trial. *Samia v. United States*, 599 U.S. 635, 643 (2023). The Second Circuit has reversed convictions and ordered new trials where the government improperly used a non-testifying co-defendant's confession against another defendant, finding that such use violates a defendant's constitutional rights under the Confrontation Clause. *See, e.g., United States v. Hardwick*, 523 F.3d 94 (2d Cir. 2008); *United States v. Riggi*, 541 F.3d 94 (2d Cir. 2008). That is precisely what happened here.

The seminal case regarding the use of a non-testifying co-defendant's confession in a joint trial is *Bruton v. United States*. In *Bruton*, the Supreme Court held that it was a violation of the defendant's constitutional rights for the conviction to stand despite "concededly clear instructions to the jury to disregard [the co-defendant's] inadmissible hearsay evidence inculpating petitioner." 391 U.S. 123, 137 (1968). The Court found that the government's use of the co-defendant's confession "posed a substantial threat to petitioner's right to confront the witnesses against him, and this is a hazard we cannot ignore." *Id.* The court ruled that "we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination. The effect is the same as if there had been no instruction at all." *Id.*

The Supreme Court has evaluated alleged violations of a defendant's Confrontation Clause rights several times since *Bruton*. In *Crawford v. Washington*, the Court limited the scope of a defendant's Confrontation Clause rights to out-of-court statements that are "testimonial" in nature. 541 U.S. 36, 53-54 (2004). And, just a few months before the trial in this matter, the court clarified in *Samia v. United States* that the key distinction for a Confrontation Clause

33

analysis is between "confessions that directly implicate a defendant and those that do so indirectly." 599 U.S. 635, 648, 651 (2023). The court held that *Bruton* only applied to the use of a confession that "directly" implicated the defendant, but not to confessions that "bec[o]me incriminating only when linked with other evidence."  *Id.* at 652-53.  *Samia* is also noteworthy because of the procedure that the government followed in this district, filing a motion *in limine* that sought to admit the confession with proper redactions and other protections for the defendant's constitutional rights.  *Id.* at 641.

> **2.**    **GLC and Recio's Act of Production and Alleged Confession Are Testimonial And Therefore Could Not Be Offered Against Costanzo Absent Cross-Examination**

*Crawford* is of no assistance to the government here.  The government did not argue that the jury could infer that business records produced by GLC established a connection between the defendants' text messages and the alleged $2,500 payment. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009) ("Business and public records are generally admissible absent confrontation because . . . they are not testimonial."); *see also United States v. Feliz*, 467 F.3d 227, 236 (2d Cir. 2006) ("In sum, therefore, we hold that where a statement is properly determined to be a business record as defined by Fed. R. Evid. 803(6), it is not testimonial within the meaning of Crawford[.]").  Instead, the government argued that GLC's act of production constituted a testimonial admission by Recio that the $2,500 payment amounted to a *quid pro quo*.  *See* Tr. at 1913:13-14; 1914:4-6; 2004:25-2005:4.

This violated *Crawford*.  *See United States v. Greenfield*, 831 F.3d 106, 115 (2d Cir. 2016) (recognizing that "the act of production itself could communicate incriminatory statements of facts"); *United States v. Hubbell*, 530 U.S. 27, 45 (2000) (concluding that the "act of production had a testimonial aspect, at least with respect to the existence and location of the

documents sought by the Government's subpoena"). By arguing that the NADDIS-related text messages were included in a production in which GLC allegedly "said" and "truthfully admitt[ed]" that they were relevant to the alleged $2,500 payment, the government presented testimonial hearsay without making Recio or a witness from GLC available for cross-examination.  *See Crawford*, 541 U.S. at 68-69.

This was not just a single verbal slip in summation. The government also excerpted a testimonial statement from the GLC document production and highlighted that statement in the slides that it presented to the jury in summation. The government deemed that statement an admission from Recio that the NADDIS text messages were "related to the November 12, 2018 invoice." *See* GX 530, at 2.  Such an alleged confession is also testimonial under *Crawford*. *See United States v. McLain*, 377 F.3d 219, 221 (2d Cir. 2004) (noting that the Supreme Court in *Crawford* "provided examples of those statements at the core of the definition, including . . . confessions and responses during police interrogations.") (citing *Crawford*, 541 U.S. at 68).

The government then used Recio's alleged testimonial confession directly against Costanzo:

> In other words, you know this $2,500 was money for the information Costanzo was providing because Global Legal Consulting said it was . . . That's it.  Honestly, that's all you need to know. ***That's enough to find both Costanzo and Recio guilty***. You only have to have one bribe payment, and that one, that one is crystal clear.

Tr. 1914:4-16.  In a case such as this, where Recio's supposed confession (*i.e.*, that the NADDIS texts between he and Costanzo were responsive to the subpoena's request for materials related to the $2500 invoice) was used directly against Costanzo, *Bruton* holds that there is a Confrontation Clause violation that no limiting instruction could have saved.  391 U.S. at 137 ("[W]e cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-

examination.  *The effect is the same as if there had been no instructions at all*.") (emphasis added).  Accordingly, Costanzo is entitled to a new trial.  *Id.*

### D.      The Error Was Plain

Special Agent Costanzo is entitled to a new trial even under the plain error doctrine, which requires the Court to consider whether the error: (1) was "clear and obvious"; (2) affected the defendant's substantial rights; and (3) "seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Purcell*, 967 F.3d 159, 194 (2d Cir. 2020) (quoting *United States v. Mehta*, 919 F.3d 175, 180 (2d Cir. 2019)).

The Second Circuit has reversed several convictions tainted by Confrontation Clause violations under the plain error doctrine. *See Hardwick*, 593 F.3d at 97-98; *Riggi*, 541 F.3d at 102-108 (2d Cir. 2008); *United States v. Bruno*, 383 F.3d 65, 77-81 (2d Cir. 2004). In *Hardwick*, the government conceded a Confrontation Clause violation based on the admission of a non-testifying co-defendant's plea allocution, but argued that the Second Circuit was limited to plain error review. 593 F.3d at 97-98. The appellate court applied a plain error analysis, reversed the conviction, and ordered a new trial. The Second Circuit found the error plain under Second Circuit precedent, and also found that the error affected the defendant's substantial rights because it "almost surely influenced the jury's verdict." *Id.* at 98-99 (citing *Bruno*, 383 F.3d at 79 ("[A]n error affects a defendant's substantial rights if it is prejudicial and it affected the outcome of the district court proceedings.")). On the latter point, the court highlighted that the sufficiency-of-the-evidence analysis in *Hardwick* largely relied on inferences to be drawn by the jury. *Id.* The court concluded without analysis that an under such circumstances, "the fairness and integrity of the proceedings in this case were seriously affected by the unconstitutional admissions of the hearsay statements in Stacey's plea allocution." *Id.*

Here, there can be no dispute that the admission of Recio's supposed testimonial confession constituted clear and obvious error. It has been plain since *Bruton* that it is error for an unredacted co-defendant's confession to be used directly against a criminal defendant, irrespective of any limiting instructions. *See Bruton*, 391 U.S. at 137. It has also been clear since *Bruton* that such an error "pose[s] 'substantial threats to a defendant's constitutional rights . . . hazards we cannot ignore.'" *Id*. (internal citation omitted).

As in *Hardwick*, the government's *Bruton* violation especially affected Costanzo's substantial rights given the weakness of the government's evidence on all alleged payments, and the entirely circumstantial nature of the evidence on the alleged $2,500 payment.  *See supra* at 19-25.  The government had to resort to inference upon inference to even be able to argue that Costanzo received that alleged payment. The government also used Recio's alleged confession to prove the essential element in a bribery case—*quid pro quo*—the same element that was tainted by the government's use of the plea allocution in *Hardwick*.  523 F.3d at 99.

Fundamentally, the *Bruton* violation affected Costanzo's substantial rights because the government placed far more emphasis on the alleged confession in this case compared to its closing argument in *Hardwick*. In *Hardwick*, the government stated once that the co-defendant's plea allocution meant there was "no dispute that a conspiracy existed." 593 F.3d at 99. Here, the government similarly stated that Recio's confession was "direct evidence" of the charged crimes, Tr. 204:18-25, but also told the jury multiple times that both GLC and Recio admitted that the $2,500 payment was for NADDIS searches, Tr. 1914:1-16; 2004:25-2005:4, that a single payment alone was sufficient for all the charged crimes, Tr. at 1914:4-16; 2006:13-23, that Recio's confession was enough to find both defendants guilty, Tr. 1914:13-16, and that the confession should "essentially resolve this for you." Tr. 2004:5-6; *See Riggi*, 541 F.3d at 108.

Finally, *Hardwick* holds that the improper use of a co-defendant's confession in a less direct manner than this case seriously affected the fairness and integrity of the proceedings. *Id.* The same is true here in light of the government's decision not to follow the pre-trial procedures outlined in *Samia*, *see* 599 U.S. at 641, despite following such procedures in this district for many years now. *See, e.g., United States v. Lauria*, 541 F. Supp. 2d 311, 315 (S.D.N.Y. 2021) (noting government's motion *in limine* to admit recorded law enforcement interview against one co-defendant but not the other); *see also United States v. Sezanayev*, Case No. 17 Cr. 262 (LGS), 2018 WL 2324077, at *5 (S.D.N.Y. May 22, 2018) (denying *Bruton* motion as premature and noting government's agreement to identify co-defendant statements it intends to use at trial). The government should not get the benefit of such a strategic choice in a criminal case.

This amounts to plain error. Accordingly, the Court should order a new trial because it would be a manifest injustice to let the convictions stand. *See Ferguson*, 246 F.3d at 134; *Bruton*, 391 U.S. at 137.

## POINT III

### THE COURT SHOULD ONLY ENTER JUDGMENT ON ONE SET OF MULTIPLICITOUS COUNTS

Pursuant to Rule 12(b)(3)(B)(ii), Mr. Costanzo moved pre-trial to dismiss the bribery counts as multiplicitous. *See* Dkt. 63, 76. Second Circuit precedent required that the Court defer decision until after the verdict. Dkt. 180 at 11-12, citing *United States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006). Costanzo's motion to dismiss Counts One and Two (the "Bribery Counts") as multiplicitous with Counts Four and Five (the "Honest Services Counts") is now ripe.

A.      **Legal Standard**

The Double Jeopardy Clause of the Fifth Amendment provides that "no person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const., amend. V. The Clause "serves principally as a restraint on courts and prosecutors." *Brown v. Ohio*, 432 U.S. 161, 165 (1977). As relevant here, the Clause "protects against multiple punishments for the same offense." *Illinois v. Vitale*, 447 U.S. 410, 415 (1980) (quoting *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794, 802–03 (1989)).

"The multiplicity doctrine is based upon the double jeopardy clause . . . which assur[es] that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense." *United States v. Nakashian*, 820 F.2d 549, 552 (2d Cir. 1987) (internal quotation marks omitted). An indictment is multiplicitous and implicates double jeopardy, "when a single offense is alleged in more than one count." *United States v. Jones*, 482 F.3d 60, 72 (2d Cir. 2006) (quoting *United States v. Roshko*, 969 F.2d 9, 12 (2d Cir. 1992)).

"To assess whether the two offenses charged separately in the indictment are really one offense charged twice, the . . . 'Blockburger' test is applied." *United States v. Chacko*, 169 F.3d 140, 146 (2d Cir. 1999) (citing *Blockburger v. United States*, 284 U.S. 299 (1932)). The *Blockburger* test provides:

> If "the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." [] In subsequent applications of the test, we have often concluded that two different statutes define the "same offense," typically because one is a lesser included offense of the other.

*Rutledge v. United States*, 517 U.S. 292, 297 (1996) (quoting *Blockburger v. United States*, 284 U.S. 299, 304 (1932)).

Rutledge also prescribes the test for determining whether one offense is a lesser included offense of another. The question is whether proof of the greater offense "necessarily" includes proof of the lesser offense. 517 U.S. at 306. *See also id*. at 297 & n.6 (citing *Ball v. United States*, 470 U.S. 856, 861-64 (1985), and summarizing *Ball* as holding: "proof of receipt [of a firearm] 'necessarily' included proof of possession" of a firearm).

If the Court determines that the Bribery Counts and the Honest Services Counts are multiplicitous, the proper remedy post-conviction is for the Court to enter judgment on only one of the multiplicitous counts. *See Josephburg*, 459 F.3d at 355 (citing *Ball v. United States*, 470 U.S. 856, 865 (1985)).

### B.    Discussion

Consistent with Costanzo's pre-trial motion arguments and as demonstrated at trial, the government had to prove the Bribery Counts to prove the Honest Services Counts.

As to the Honest Services Counts, the Court instructed the jury, "[T]he first element that the government must prove beyond a reasonable doubt is the existence of a scheme or artifice to deprive the public and the DEA of their right to defendant Costanzo's honest services through bribery, which, as I mentioned before, can more generally be described as *quid pro quo* payments." Dkt. 170 at 40. The Court further instructed, "[t]o prove that a defendant committed honest services fraud through bribery, the government must show a *quid pro quo*, that is, a defendant received money in exchange for an act performed or promised to be performed, in the course of his employment at the DEA." *Id.* at 41

As to the Bribery Counts, the Court instructed the Jury on the following four elements:

> *First*, that on or about the dates set forth in the Indictment, Costanzo was a public official;
> *Second*, that Costanzo received, accepted, or agreed to receive or accept, a thing of value;
> *Third*, that Costanzo did so in return for being induced to perform an act, or not to perform an act, in violation of his official duty; and
> *Fourth*, that Costanzo did so with corrupt intent.

*Id.* at 24. The Court explained that as to the third element of the Bribery Counts, "[t]he core of a bribery offense is something called a *quid pro quo*, which is a Latin phrase meaning 'this for that.' The government must prove beyond a reasonable doubt that Costanzo received or accepted something of value, at least in part, in return for—and with the intention of—being induced in the performance of his official duty." *Id.* at 25.

The jury instructions elucidate that all the elements of the Bribery Counts were absorbed by the Honest Services Counts. Moreover, here the multiplicitous counts are based on a *single* criminal scheme founded upon the *same* facts.

Accordingly, for the foregoing reasons and those set forth in Costanzo's pre-trial motions, Costanzo respectfully requests that the Court enter judgment on the non-multiplicitous counts.

## CONCLUSION

For the foregoing reasons, the Court should enter a judgement of acquittal or grant a new trial.

Dated: New York, New York
      January 16, 2024

                                        Respectfully submitted,

                                         /s/ Stephanie Guaba
                                        Stephanie Guaba
                                        Marc L. Mukasey
                                        Torrey K. Young
                                        Michael F. Westfal

                                        MUKASEY YOUNG LLP
                                        570 Lexington Avenue, Suite 3500
                                        New York, New York 10022
                                        Tel: (212) 466-6400
                                        Email: stephanie.guaba@mukaseylaw.com

                                        *Counsel for John Costanzo, Jr.*