UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

JOHN COSTANZO, JR.

Defendant.

Case No. 22 Cr. 281 (JPO)

**SENTENCING MEMORANDUM OF JOHN COSTANZO, JR.**

MUKASEY YOUNG LLP
570 Lexington Avenue, Suite 3500
New York, New York 10022
Tel: (212) 466-6400

*Attorneys for John Costanzo, Jr.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................1

PROCEDURAL HISTORY....................................................................................................4

THE OFFENSE CONDUCT ..................................................................................................5

I.     THE ADVISORY GUIDELINES ANALYSIS....................................................................6
       A.     The Guidelines Calculation Set Forth In The PSR ...................................6
       B.     The PSR's Guidelines Calculation Is Incorrect ........................................7
              1.     Objection: The Value of the Payment/Benefit is Not Based on a
                     Sufficiently Reliable Number ........................................................7
              2.     Objection: Enhancement for More than One Bribe ................................8
              3.     Objection: Adjustment for Manager or Supervisor ................................10
                     a.     The PSR's Guidelines Calculation Substantially Overstates the
                            Seriousness of the Offense..............................................................12
                     b.     The Correct Advisory Guidelines Range ......................................15

II.    TITLE 18 U.S.C. SECTION 3553(a) FACTORS COUNSEL A SENTENCE OF
       PROBATION.........................................................................................................16
       A.     Title 18, Section 3553, Subsection (a)(1) .................................................18
       Special Agent Costanzo's History and Characteristics......................................21
              1.     Early Life and Background.................................................................21
              2.     John Costanzo, Jr.'s Distinguished Career in Law Enforcement..............22
              3.     Extraordinary Dedication to Family .................................................31
              4.     Unswerving Dedication to Friends ....................................................32
              5.     ███████████████████.............................................................34
       B.  Title 18, Section 3553, Subsection (a)(2)(A)..................................................36
       C.  Title 18, Section 3553, Subsection (a)(2)(B)..................................................39
       D.  Title 18, Section 3553, Subsection (a)(2)(C)..................................................41
       E.  Title 18, Section 3553, Subsection (a)(2)(D)..................................................42
       F.  Title 18, Section 3553, Subsection (a)(3)......................................................42
       G.  Title 18, Section 3553, Subsection (a)(4)(A)................................................42
       H.  Title 18, Section 3553, Subsection (a)(5)......................................................42
       I.   Title 18, Section 3553, Subsection (a)(6)......................................................43
       J.   Title 18, Section 3553, Subsection (a)(7)......................................................52

FORFEITURE ...................................................................................................................52

CONCLUSION....................................................................................................................54

# TABLE OF AUTHORITIES

## CASES

*Austin v. United States*,
    509 U.S. 602 (1993)......................................................................................... 52

*Ellerby v. United States*,
    187 F.3d 257 (2d Cir. 1998) ......................................................................... 10

*Gall v. United States*,
    552 U.S. 38 (2007).................................................................................... 16, 18

*Kaley v. United States*,
    571 U.S. 320 (2014)....................................................................................... 41

*Kimbrough v. United States*,
    552 U.S. 85 (2007).................................................................................... 16, 17

*Libretti v. United States*,
    516 U.S. 29 (1995)......................................................................................... 53

*Pepper v. United States*,
    562 U.S. 476 (2011)....................................................................................... 18

*Southern Union Co. v. United States*,
    567 U.S. 343 (2012)....................................................................................... 53

*United States v. Adelson*,
    441 F.Supp.2d 506 (S.D.N.Y. 2006) ................................................ 14, 15, 44

*United States v. Algahaim*,
    842 F.3d 796 (2d Cir. 2016) ......................................................................... 13

*United States v. Altman*,
    48 F.3d 96 (2d Cir.1995) .............................................................................. 43

*United States v. Anderson*,
    267 F. App'x 847 (11th Cir. 2008) ............................................................... 37

*United States v. Anderson*,
    533 F.3d 623 (8th Cir. 2008) ....................................................................... 37

*United States v. Bajakajian*,
    524 U.S. 321 (1998)....................................................................................... 52

*United States v. Barnes*,
    158 F.3d 662 (2d Cir. 1998) ..................................................................... 9, 10

*United States v. Betts*,
    886 F.3d 198 (2d Cir. 2018) ......................................................................... 12

*United States v. Blarek*,
    7 F.Supp.2d 192 (E.D.N.Y. 1998) ................................................................. 3

*United States v. Blount*,
    291 F.3d 201 (2d Cir. 2002) ......................................................................... 10

*United States v. Booker,*
   543 U.S. 220 (2005) .......................................................................................... 43

*United States v. Cavera,*
   550 F.3d 180 (2d Cir. 2008) ............................................................................. 17

*United States v. Contorinis,*
   692 F.3d 136 (2d Cir. 2012) ............................................................................. 52

*United States v. Corsey,*
   723 F.3d 366 (2d Cir. 2013) ............................................................................. 14

*United States v. Emmenegger,*
   329 F.Supp.2d 416 (S.D.N.Y. 2004) ................................................................ 14

*United States v. Greenfield,*
   44 F.3d 1141 (2d Cir. 1995) ............................................................................. 12

*United States v. Gupta,*
   904 F.Supp.2d 349 (S.D.N.Y. 2012) ............................................................ 7, 14

*United States v. Haverkamp,*
   958 F.3d 145 (2d Cir. 2020) ............................................................................. 12

*United States v. Johnson,*
   16-CR-457-1 (NGG), 2018 WL 1997975 (E.D.N.Y. April 27, 2018) .............. 14, 44

*United States v. Johnson,*
   446 F.3d 272 (2d Cir. 2006) ............................................................................. 12

*United States v. Johnson,*
   529 U.S. 53 (2000) ........................................................................................... 12

*United States v. Johnson,*
   964 F.2d 124 (2d Cir. 1992) .......................................................................... 3, 17

*United States v. Laws,*
   819 F.3d 388 (8th Cir. 2016) ............................................................................ 11

*United States v. Leonard,*
   37 F.3d 32 (2d Cir. 1994) ................................................................................. 12

*United States v. Malik,*
   424 F. App'x 122 (3d Cir. 2011) ...................................................................... 37

*United States v. Milikowsky,*
   65 F.3d 4 (2d Cir. 1995) ................................................................................... 17

*United States v. Milton,*
   21 Cr. 478 (ER), 2024 WL 779210 (S.D.N.Y. Feb. 26, 2024) .......................... 52

*United States v. Musgrave,*
   647 F. App'x 529 (6th Cir. 2016) .................................................................. 40, 44

*United States v. Olis,*
   Crim. No. H-02-217-01, 2006 WL 2716048 (S.D. Tex. Sept. 22, 2006) ........... 37

*United States v. Orozco-Prada*,
    732 F.2d 1076 (2d Cir. 1984) .................................................................................... 9

*United States v. Percoco*,
    No. 16 Cr. 776 (VEC), 2019 WL 1593882 (S.D.N.Y. Apr. 15, 2019) .................................... 52

*United States v. Pristell*,
    941 F.3d 44 (2d Cir. 2019) .................................................................................... 10

*United States v. Redemann*,
    295 F.Supp.2d 887 (E.D. Wis. 2003) .......................................................................... 37

*United States v. Samaras*,
    390 F.Supp.2d 805 (E.D. Wis. 2005) .......................................................................... 37

*United States v. Sampel*,
    860 F. App'x 789 (2d Cir. 2021) ............................................................................. 10

*United States v. Seabrook*,
    814 F. App'x. 661 (2d Cir. 2020) ............................................................................ 49

*United States v. Skys*,
    637 F.3d 146 (2d Cir. 2011) .................................................................................. 10

*United States v. Sponaugle*,
    Crim. No. 19-103-LPS, 2022 WL 4079197 (D. Del. Sept. 6, 2022) ........................................ 37

*United States v. Stevenson*,
    834 F.3d 80 (2d Cir. 2016) .................................................................................... 53

*United States v. Vigil*,
    476 F.Supp.2d 1231 (D.N.M. 2007) ............................................................................ 37

*United States v. Viloski*,
    814 F.3d 104 (2d Cir. 2016) ............................................................................. 52, 53

*Wasman v. United States*,
    468 U.S. 559 (1984) .......................................................................................... 18

## STATUTES

18 U.S.C. § 3553(a) .......................................................................................... passim

## OTHER AUTHORITIES

Boss & Kapp, *How the Economic Loss Guideline Lost its Way, and How to Save It*,
    18 Ohio St. J. Crim. L. 605 (2021) .......................................................................... 45

Friedman, Nawaday, & Gitner, *Challenging the Guidelines' Loss Table*,
    Federal Sentencing Reporter, Volume 20, Number 3, February 1, 2008,
    2008 WL 2201041 ............................................................................................. 40

U.S.S.G. Ch. 1 ............................................................................................... 43

U.S.S.G. § 2B1.1 ............................................................................................ 13

U.S.S.G. § 3B1.1 ............................................................................................ 10

U.S.S.G. § 5C1.1 ................................................................................................................... 45

This Sentencing Memorandum is respectfully submitted on behalf of defendant John Costanzo, Jr., who is scheduled to be sentenced on April 24, 2024. For the reasons set forth below, **the Court should impose a sentence of probation.**

## PRELIMINARY STATEMENT

Two things have been constant in John Costanzo, Jr.'s life: his family and the Drug Enforcement Administration ("DEA"). In many ways, they have always been one and the same. "The Costanzos are a Department of Justice family" that takes "immense pride in being part of the DOJ and DEA." (Ex. A-001). John is the son of a former DEA Special Agent who served for 29 years, and John's life goal was always to follow in his father's footsteps and make both his dad and the law enforcement community proud. He accomplished exactly that. John began his career in the Secret Service and then spent over two decades dedicated to the DEA mission of enforcing the drug laws of the United States. His service with honor on dangerous missions, complex investigations and in unglamorous but critical roles, earned him respect throughout the law enforcement world, which was all he ever cared about. **Money was never, ever John's concern.** Outside of work, John leads a simple life as the "rock" for his family, the "glue" that holds it together. (Ex. A-006). These days, that means taking his grievously ill father to chemotherapy appointments as the elder Costanzo battles Stage 4 pancreatic cancer.

This case has destroyed John professionally. He will never work for the DEA again. His legacy is in tatters. **He agrees that the public deserves the utmost integrity from law enforcement officers** and he takes some solace from the fact that this was not a case about an agent who helped drug traffickers evade prosecution, or sold information that compromised the DEA's mission, or who endangered public safety. **The integrity of the cases that John Costanzo investigated at DEA and his commitment to the work have never been in dispute.**

1

Nonetheless, he recognizes the trust that was placed in him as a special agent and he is profoundly remorseful for the circumstances that have brought him before this Court.

The personal damage has been equally severe. A man who has been a giver all his life, is now being portrayed as a taker. His employment prospects are dim, his modest savings are depleting, and his family's name is tarnished. His longtime personal friends and family members have been drawn into this matter, which crushes him. Because of his strength of character, John could live with the pain from those consequences if he had to. What John could not endure – and should not have to endure – is the demise of his father if John were not able to care for him. **Not being present for his hero's waning days and final moments would break John forever. That is a punishment he does not deserve.**

It is hard to imagine a case in which the prosecution's portrayal of the defendant is more at odds with reality than this one. At trial, the government took a baseball game outing, casual meals, money borrowed for a lawyer, and other routine occurrences and communications between and among a tight-knit group of friends and family and depicted all of it as corrupt. This made for a simple, seductive narrative. It was also a false one. Among the great tragedies of this case is that the man presented in the courtroom as a greedy and dishonest agent is anything but.

Letter after heartfelt letter from a diverse array of people who know **the real John Costanzo** reveals a man who is nothing like the "rogue agent" conjured up at trial using cherrypicked communications, musings from an immunized murderer, and innocuous everyday banter among colleagues. To be clear: **there is not a shred of evidence from trial or from John's personal life that he was ever motivated by avarice or greed. There is not a scintilla of proof that he ever acted with the slightest degree of selfishness, ill will, or cruelty. And there is nothing to suggest that he ever intended to compromise or undermine the DEA**

2

**mission.** To the contrary, as set forth below, John is a gentle, decent, guileless, humble, hard-working, kind-hearted, generous, and caring public servant and person.

The PSR recommends that the Court sentence John to **six years** in prison. That recommendation is ghastly out of touch. The three Minneapolis police officers who stood by and watched another officer take the life of George Floyd, willfully violating his civil rights, received federal prison sentences of 42, 36, and 30 months, respectively.[1] The PSR recommends that the Court sentence John to approximately **double the length** of each of those sentences. That is not justice. That is perverted.

John accepts the jury's verdict, though he respectfully disagrees with it. Nonetheless, his remarkable life and career should earn him a great measure of mercy at sentencing. "Mercy is seldom included on the list of 'traditional' rationales for sentencing. It is, however, evinced by the federal sentencing statute, 18 U.S.C. § 3553(a), which provides . . . that the lowest possible penalty consistent with the goals of sentencing be imposed. *See also United States v. Johnson,* 964 F.2d 124, 125 (2d Cir. 1992) ("the United States Sentencing Guidelines do not require a judge to leave compassion and common sense at the door to the courtroom"). "The notion that undue harshness should be avoided by those sitting in judgment has long been a part of the human fabric and spirit. Lenity is often the desirable route." *United States v. Blarek*, 7 F.Supp.2d 192, 210 (E.D.N.Y. 1998).

For these reasons, and for the reasons set forth below, **we respectfully ask the Court to impose a sentence of probation**, which will allow this extraordinary, selfless person, who has already lost most, if not everything, to continue caring for his father, assisting his family, and

---

[1] Press Release, Dep't of Justice, Former Minneapolis Police Officers Tou Thao and J. Alexander Kueng Sentenced to Prison for Depriving George Floyd of His Constitutional Rights (July 27, 2022), https://www.justice.gov/opa/pr/former-minneapolis-police-officers-tou-thao-and-j-alexander-kueng-sentenced-prison-depriving.

serving his community. Such a sentence, we submit, is consistent with applicable law and does justice to the facts of the case and the characteristics of this very atypical defendant.

## PROCEDURAL HISTORY

On or about May 18, 2022, a grand jury in the Southern District of New York returned a five-count Indictment that charged Special Agent John Costanzo, Jr. and former agent Manuel Recio with participating in a bribery scheme between October 2018 and November 2019. Dkt. No. 1. Count One charged Special Agent Costanzo and Recio with conspiracy to bribe a public official, in violation of Title 18 U.S.C. § 371. Count Two charged Special Agent Costanzo with accepting a bribe as a public official, in violation of Title 18 U.S.C. §§ 201(b)(2)(C) and 2. Count Three charged Recio with bribery of a public official, in violation of Title 18 U.S.C. §§ 201(b)(1)(C) and 2. Count Four charged Special Agent Costanzo and Recio with conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. § 1349. Count Five charged Special Agent Costanzo and Recio with honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346 and 2.

Trial commenced on October 26, 2023, and concluded on November 8, 2023, when the jury returned guilty verdicts against Special Agent Costanzo on Counts One, Two, Four, and Five. Dkt. No. 176.

On January 16, 2024, Special Agent Costanzo moved, pursuant to Fed. R. Crim. P. 29 and 33, for a judgment of acquittal on all Counts or, in the alternative, a new trial. Dkt. Nos. 210, 232. The motions, which are *sub judice*, contend that (1) the evidence was insufficient to prove a *quid pro quo*; (2) the government violated Special Agent Costanzo's Confrontation Clause rights; and (3) the Court should enter judgment on the non-multiplicitous counts.

## THE OFFENSE CONDUCT

The Indictment and the government's case at trial broadly alleged that Special Agent Costanzo and Recio, together with others, engaged in a bribery scheme in which Recio and others provided Special Agent Costanzo with "various benefits" in exchange for which Special Agent Costanzo used his position within DEA to provide "nonpublic DEA information, including information about forthcoming, sealed indictments and nonpublic investigations" to Recio. At the time of the charged scheme, Recio worked as a private investigator for defense attorneys in Miami and allegedly sought the information to recruit new clients for those attorneys. Dkt. No. 1 at ¶ 7.

The Indictment alleged three categories of actions that Special Agent Costanzo took to assist Recio. The first concerned the disclosure of "nonpublic information about sealed Indictments and ongoing DEA investigations so that RECIO could use this information to recruit indicted defendants and DEA targets as clients for defense attorneys." *Id.* at ¶ 21(a). The second involved Special Agent Costanzo conducting searches in DEA's NADDIS database to obtain information for Recio and others. *Id.* at ¶ 21(d). The third category alleged that Special Agent Costanzo provided Recio with assistance in his work for defense attorneys. *Id.* at ¶ 21(e).

The Indictment alleged that Special Agent Costanzo, in exchange for the information, benefitted from four payments: (1) one $2,500 payment from a bank account in the name of Global Legal Consulting, a company associated with Recio, to a company co-owned by a family member of Special Agent Costanzo's, later revealed to be his father; (2) one $50,000 payment from another law enforcement officer, "TFO-1," later revealed to be Coral Gables Police Officer Edwin Pagan ("Pagan"), to Special Agent Costanzo's father; and (3) two payments, $10,000 and

$10,750, from the Global Legal Consulting account to a bank account associated with a company incorporated by Pagan. *Id.* at ¶¶ 16-19.

At trial, the government asserted that Special Agent Costanzo benefitted from four additional payments as a part of the scheme: (1) three payments from a Miami defense attorney, David Macey, in the form of a ticket to a Yankees game, a dinner, and a $5,000 payment to a home contractor, and (2) one $20,000 payment from Pagan to Special Agent Costanzo's former girlfriend, who assisted Special Agent Costanzo with the retainer for his prior legal counsel in this case.

## I.      THE ADVISORY GUIDELINES ANALYSIS

**The Presentence Investigation Report's ("PSR") recommendation of six years in prison is incorrect on the facts and the law.** It is also unreasonable on its face as a sentence for a **first-time, non-violent offender**, in a **completely circumstantial case**, who will **never again be in a position to commit the same crime** and is **extremely unlikely to ever offend again**. This Court should reject the PSR's recommendation.

### A.      The Guidelines Calculation Set Forth In The PSR

The PSR, applying the November 1, 2023 Guidelines Manual and incorporating all guideline amendments, calculated a total offense level of 31, a Criminal History Category of I, and a range of 108 – 135 months' imprisonment. PSR ¶¶ 49-61.

The PSR grouped Counts One, Two, Four, and Five into one group pursuant to U.S.S.G. § 3D1.2(d). PSR ¶ 50.

Using U.S.S.G. § 2C1.1, the PSR calculates the Guidelines range as follows:

| | |
|---|---|
| Base Offense Level (2C1.1(a)(1)) | 14 |
| Enhancement for more than one bribe (2C1.1(b)(1)) | +2 |

| | |
|---|---|
| Value of Payment/Benefit Enhancement (2C1.1(b)(2)(E)) & (2B1.1(b)(1)(E)) | +8 |
| Public Official in a Sensitive Position Enhancement (2C1.1(b)(3)) | 4 |
| Manager or Supervisor Adjustment (2B1.1(b)(3)) | 3 |
| Total Offense Level | 31 |

PSR ¶¶ 51-61.

The PSR's advisory Guidelines range reveals the fundamental flaws that lie at the heart of the entire Guidelines regime. "The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense." *United States v. Gupta*, 904 F.Supp.2d 349, 350 (S.D.N.Y. 2012) (Rakoff, J.). Here, as shown below: (1) there are several enhancements in the PSR which should not be applied to Special Agent Costanzo; and (2) in any event, the offense level substantially overstates the seriousness of Special Agent Costanzo's offense, which warrants a downward departure.[2]

**B.      The PSR's Guidelines Calculation Is Incorrect**

**1.      Objection: The Value of the Payment/Benefit is Not Based on a Sufficiently Reliable Number**

John Costanzo, Jr. objects to the PSR's eight-level enhancement based on the theory that he "received monetary payments of approximately $98,750." PSR at ¶ 53. He directs the Court to his below objection to the PSR's enhancement for more than one bribe, which he incorporates into this objection. Because of the government's flawed legal theory and its effect on the evidence introduced at trial, *see* Dkt. No. 232 at 4-16, the Court should find that, at most, Special

---

[2] Counsel submitted lengthy objections to the PSR. We rely on the previously submitted objections and will limit revisiting these objections herein. *See* PSR at 28-42.

Agent Costanzo received no more than a single bribe of $2,500 and apply no loss enhancement pursuant to U.S.S.G. §§ 2C1.1(b)(2) and 2B1.1(b)(1)(A).

**2.     Objection: Enhancement for More than One Bribe**

John Costanzo, Jr. further objects to the PSR's two-level enhancement for more than one bribe pursuant to U.S.S.G. § 2C1.1(b)(1). PSR ¶ 52. In rejecting the defense's objection, the PSR noted that the jury found Special Agent Costanzo guilty of "Public Official Accepting a Bribe" (singular), but then concluded: "*therefore*, the evidence produced at trial established that the defendant received bribes" (plural). *Id.* at 40 (emphasis added). It is unreasonable and unfair to extrapolate from charges that **required the jury to find a single bribe,** to a Guidelines calculation based on a finding of **multiple bribes**. The only evidentiary support provided by Probation is that "trial testimony reveals that the defendant received more than one payment during his involvement in the conspiracy." *Id.* But the issue is not how many *payments* Special Agent Costanzo received; the issue is how many *bribes* he received. It is true that the grand jury charged multiple bribes in the Indictment, but that is not what the government proved at trial. Special Agent Costanzo directs the Court to his discussion of the bribery evidence set forth in his Rule 29 briefing, which he incorporates into this objection. *See* Dkt. No. 210 at 2-12, 16-21; Dkt. No. 232 at 2-16.[3]

Special Agent Costanzo's position is further supported by: **(i)** the Court's jury charge, which did not require the jury to find multiple bribes, Dkt. No. 170 at 23-27 ("Receipt of *a Bribe*

---

[3] Rather than repeat his Rule 29 arguments, one example is sufficient to demonstrate how the PSR is distorted. With respect to the payment for Juan Victorero's renovation of John's condo, the PSR asserts that, "COSTANZO JR. told Contractor-1 to collect the money from Attorney-1 because COSTANZO JR. was out of town[.]" PSR ¶ 38. But Victorero did not testify that John told him to collect the money from David Macey. He testified that John told him "that *he had left . . . the balance* with Dave Macey" (emphasis added) and that John did so because he was out of town, a fact corroborated by John's text to Macey hours before the payment that he was "packing." Tr. 1253:17-19, 1258:7-9; GX 336. And as is the case with other alleged payments, there is no evidence tying this fact pattern to any alleged violation of Special Agent Costanzo's official duty.

as a Public Official") (emphasis added) and 40-41 ("Thus, when a DEA employee commits an

act in violation of his duty, at least in part, in return for *a concealed bribe*, he has deprived the

public and the DEA of his honest services . . . *The payment* need not have been provided directly

to Costanzo[.]") (emphases added); **(ii)** the government's repeated arguments to the jury that it

only had to find a single bribe of $2,500, Tr. 1914:13-16 ("Honestly, that's all you need to know.

That's enough to find both Costanzo and Recio guilty. You only have to have one bribe payment,

and that one, that one is crystal clear.") and 2006:13-23 ("A single payment is going to be

enough here."); and **(iii)** the government's post-trial briefing, in which it took the position that it

only had to prove a single *quid pro quo* of $2,500 for NADDIS searches. Dkt. No. 220 at 24.

Indeed, because of the government's flawed legal theory, *see* Dkt. No. 232 at 4-6, even the

government argues that was the lone exchange of a bribe for a violation of duty that it proved at

trial. Dkt. No. 220 at 24. The government does not even attempt to connect payments other than

the $2,500 to any violations of duty and the evidence showed no such connection. Thus, there is

no non-speculative basis to conclude that Special Agent Costanzo received more than one bribe.

   In addition, under Second Circuit law, it is the government's burden to seek a special

verdict form where its charges rely on more than one potential basis for conviction. *See United

States v. Barnes*, 158 F.3d 662, 672 (2d Cir. 1998) (reversing sentence for conspiracy to possess

four different controlled substances and noting that it is "'the government's responsibility to seek

special verdicts'") (quoting *United States v. Orozco-Prada*, 732 F.2d 1076, 1084 (2d Cir. 1984)).

If the government wanted the jury to find more than a single bribe, it could have asked for a

special verdict form, but it chose not to do so.

   *Barnes* also counsels that, under these circumstances, the Court should sentence Special

Agent Costanzo based on "the most lenient statutorily prescribed sentence":

Under these circumstances, the general guilty verdict here provides no guidance in determining which statutorily mandated sentence is applicable. Indeed, because the summation of the Assistant United States Attorney and the judge's charge suggested that a finding that the defendant conspired to possess either of the four controlled substances would suffice to warrant a guilty verdict, it was entirely possible for the jurors to have concluded their deliberations after finding the defendant guilty of only one of the conspiracies underlying Count Twenty–Seven.

158 F.3d at 668, 671. That analysis is on all fours with this record. Accordingly, the Court should reject the PSR's eight-level enhancement based on an alleged benefit of "approximately $98,750," and the PSR's two-level enhancement for more than one bribe.

### 3.    Objection: Adjustment for Manager or Supervisor

The PSR applies a three-level adjustment because "the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive" pursuant to U.S.S.G. § 3B1.1(b). PSR ¶ 56. The PSR is wrong.

"'To qualify for th[is] enhancement, a defendant need only manage or supervise one other participant and may properly be considered a manager or supervisor if he exercised some degree of control over others involved in the commission of the offense.'" *United States v. Sampel*, 860 F. App'x 789, 791 (2d Cir. 2021) (citing *United States v. Pristell*, 941 F.3d 44, 50 (2d Cir. 2019)); *see also United States v. Skys*, 637 F.3d 146, 156-7 (2d Cir. 2011). A defendant could also be considered a manager or supervisor if he "play[ed] a significant role in the decision to recruit or to supervise lower-level participants." *United States v. Blount*, 291 F.3d 201, 217 (2d Cir. 2002) (quoting *Ellerby v. United States*, 187 F.3d 257, 259 (2d Cir. 1998) (internal quotation marks omitted.)); *see also* Guidelines § 3B1.1 Application Note 4.

The record does not support a finding that Special Agent Costanzo acted as a manager or supervisor. The government claims that "there was extensive evidence that [PAGAN], one of

Costanzo, Jr.'s closest friends, and [COSTANZO SR.] served as conduits to accept bribes paid to the defendant by Recio and others." PSR at 40. But then it makes a flying leap to the conclusion that "in light of their relationships with the defendant, *the only reasonable inference is that Costanzo Jr. recruited them into these roles*." *Id.* (emphasis added). That leap falls well short of the proof necessary to justify the enhancement.

In *United States v. Laws*, 819 F.3d 388, 394 (8th Cir. 2016), the Eighth Circuit rejected an adjustment under § 3B1.1 that relied on nothing more than the general nature of the relationship between the alleged co-conspirators to support the manager/supervisor enhancement. The court reasoned that:

> The facts that Laws' co-conspirators were her adult children and that the offense was apparently committed in her home may give rise to a general suspicion that she was likely in control of the family's conspiracy—but this gut feeling is insufficient to support a conclusion, by a preponderance of the evidence, that Laws was an organizer or leader of the offense for purposes of this enhancement. While the district court found that Laws "exercised decision-making authority over other participants," neither the court nor the government identified any specific evidence to support this conclusion.

*Id.* at 394.

Beyond pointing to their pre-existing relationships, the government in this case did not provide any evidence that Special Agent Costanzo recruited or conscripted or enrolled his father or Pagan into a bribery conspiracy. There was no evidence of meetings, communications, inducements, requests, or any other means of "recruitment." To the contrary, these so-called "co-conspirators" or "bribe conduits" were, in fact, regular people who were part of his immediate and extended family, and with whom he spoke every day about work, health care issues, food, sports, and myriad other life happenings. **The nature of the relationship between Special Agent Costanzo, his own father, and his best friend is simply not enough by itself to**

**support the conclusion that Special Agent Costanzo recruited them into a scheme.** The government's "general suspicion" or "gut feeling" cannot support the enhancement. *Id.*

Nor is there evidence that John "exercised some control over others involved in the commission of the offense or [was] responsible for organizing others for the purpose of carrying out the crime." *United States v. Greenfield*, 44 F.3d 1141, 1146 (2d Cir. 1995) (citing *United States v. Leonard*, 37 F.3d 32 (2d Cir. 1994)). Even if one believes the government's theory of the conspiracy, there is no factual basis to support Special Agent Costanzo's managerial or supervisory role over any of the alleged participants. Indeed, it borders on the absurd to suggest that a DEA agent "organized" or exercised any "control" over four independent actors including *his own former supervisor* (Recio); his own father; his best friend (Pagan); and two private criminal defense attorneys (Macey and Guerra). This enhancement should be rejected.

### a.   The PSR's Guidelines Calculation Substantially Overstates the Seriousness of the Offense[4]

The PSR calculates an eight-level enhancement on the theory that Special Agent Costanzo received approximately $98,750 in "monetary payments." PSR at 41. As explained above, it was unlawful for Special Agent Costanzo to receive bribes, not routine monetary payments. The PSR repeats this erroneous view of the law and the record by adding a two-level enhancement for more than one bribe. PSR ¶ 52. These combined enhancements increase the

---

[4] The PSR recommends a third-party risk notification as a special condition of supervised release, based on the defendant's reported intention of obtaining employment as a private investigator in the future. PSR at 45. John Costanzo, Jr. objects to this unwarranted recommendation. "A district court is required to make an individualized assessment when determining whether to impose a special condition of supervised release, and to state on the record the reason for imposing it." *United States v. Betts*, 886 F.3d 198, 202 (2d Cir. 2018). Mr. Costanzo is unsure of what he intends to do for employment following this case. Furthermore, supervised release serves as a means of rehabilitation. *See United States v. Johnson*, 529 U.S. 53, 59 (2000). For this individual and offense, this condition is not necessary for specific deterrence, public protection, or rehabilitation. *See United States v. Haverkamp*, 958 F.3d 145, 151 (2d Cir. 2020) (citing *United States v. Johnson*, 446 F.3d 272, 277 (2d Cir. 2006)) (district court is to avoid inflicting any "greater restraint on liberty than is reasonably necessary.").

Guidelines calculation from a Total Offense Level of 21 to a Total Offense Level of 31. **That, in turn, nearly *triples* the Guidelines range from 37-46 months to 108-135 months.**

That aggravation alone is enough to justify a downward departure under Application Note 21(C) to § 2B1.1, which provides, in pertinent part: "There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted." Recognizing the harm to public trust caused by public corruption cases, a downward departure is nevertheless warranted in a case such as this one where the public official was not convicted of stealing public funds or accepting kickbacks from the beneficiaries of government contracts. This may be what led Judge Caproni to comment during her sentencing of former Assembly Speaker Sheldon Silver that despite his decade-long bribery and money laundering scheme involving millions of dollars, "[i]mposing a guidelines sentence would be Draconian, as it is far longer than is necessary to achieve the goals of sentencing." August 20, 2018, Sentencing Transcript, Dkt. No. 460, *United States v. Silver*, 15-cr-93 (VEC) (S.D.N.Y.). Application of the one-size-fits-all approach of § 2B1.1's table would make John's alleged crimes equal in seriousness to, and deserving of punishment as harshly as, a public official who outright stole $98,750 in public funds, or who received $98,750 in kickbacks from government contracts. That is a ludicrous result on the facts of this case.

Even if the § 2B1.1 table were a suitable fit for a case such as this one, the Second Circuit and scores of district court judges have recognized the absence of any empirical evidence supporting the loss amounts or corresponding enhancement levels set forth in the loss table. In fraud cases, "the amount of loss . . . [has] become the principal determinant of the adjusted offense level and hence the corresponding sentencing range." *United States v. Algahaim*, 842

13

F.3d 796, 800 (2d Cir. 2016). "This approach, unknown to other sentencing systems, was one the Commission was entitled to take, but its unusualness is a circumstance that a sentencing court is entitled to consider." *Id.* Many cases, furthermore, recognize that the Guidelines go too far in fraud cases: the Guidelines place "inordinate emphasis . . . on the amount of actual or intended financial loss." *United States v. Adelson*, 441 F.Supp.2d 506, 509 (S.D.N.Y. 2006); *United States v. Emmenegger*, 329 F.Supp.2d 416, 427 (S.D.N.Y. 2004) (Lynch, J.) ("The Guidelines place undue weight on the amount of loss involved in the fraud.").

The Guidelines do not "explain[] why it is appropriate to accord such huge weight to such factors." *Adelson*, 441 F.Supp.2d at 509. Certainly, "the Sentencing Commission's loss enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime." *United States v. Johnson*, 16-CR-457-1 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. April 27, 2018). Rather, "the numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology—thus maximizing the risk of injustice." *Gupta*, 904 F.Supp.2d at 351; *see also Johnson*, 2018 WL 1997975, at *4 (describing the loss enhancement as a "grievous wrong" and noting "the rigidity of the loss amount overriding the diverse reality of complex financial crimes [and] the lack of any consideration of danger to society[]").

For such reasons, one District Judge summarized—accurately, we submit—as follows: "The loss guideline . . . was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices." *United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013) (Underhill, J., concurring). This failure to apply an empirical, reasonable approach yields "[t]he widespread perception that the loss guideline is broken[,]" *id*. at 378, and

14

"fundamentally flawed, especially as loss amounts climb. The higher the loss amount, the more distorted is the guideline's advice to sentencing judges." *Id*. at 380. Therefore, "district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides." *Id.* at 379.

In short, "the guidelines' fetish with abstract arithmetic" can result in a "travesty of justice" and in "harm . . . visit[ed] on human beings[,] if not cabined by common sense." *Adelson*, 441 F.Supp.2d at 512. Accordingly, even if this Court were to adopt the PSR's insistence that Special Agent Costanzo received $98,750 in "monetary payments" despite overwhelming evidence that they were not bribes, Special Agent Costanzo should still receive a significant downward departure and a well-below Guidelines sentence.

*       *       *       *

The whole point of the Guidelines is to approximate the relative seriousness of the crime and culpability of the defendant, for the purpose of determining an appropriate range for the specific crime that was actually committed. The government instead asks the Court to imagine that Special Agent Costanzo committed a far more serious crime than the jury found, and then apply enhancements even though they clearly do not apply to the facts of this case. Such an approach turns the Guidelines regime on its head and should not be countenanced.

### b.       The Correct Advisory Guidelines Range

**Using U.S.S.G. § 2C1.1, the correct Guidelines range should be as follows:**

| | |
|---|---|
| Base Offense Level (2C1.1(a)(1)) | 14 |
| Value of Payment/Benefit Enhancement (2C1.1(b)(2)(E)) & (2B1.1.(b)(1)(E)) | +0 |
| Public Official in a Sensitive Position Enhancement (2C1.1(b)(3)) | +4 |
| Zero-Point Offender Adjustment (4C1.1(a) & (b)) | -2 |

Total Offense Level                                                                      16

**With a total offense level of 16, and a Criminal History Category of I, the**
**Sentencing Table yields a range of 21-27 months**.

*       *       *       *

The Honorable John S. Martin, a former Southern District Judge and United States
Attorney, recently addressed "the overly long sentences that are being imposed every day in our
federal courts on nonviolent offenders."[5] He wrote that "[w]e have lost all sense of how horrible
it is to spend even one year in prison, far away from family and friends, where every moment of
existence must be lived under prescribed rules enforced by people who do not respect you and
whom you do not respect and under constant fear of an unprovoked attack by another inmate."
*Id.*

The PSR's **six-year** recommendation lacks any appreciation of Judge Martin's point, that
is, every **day** in prison is brutal. Moreover, the recommendation fails to take into account the
daisy chain of innuendos that led to this conviction and the weakness of the evidence on the
payment/benefit amount. Anything approaching six years in prison is inappropriate for this crime
and this man.

**II.      TITLE 18 U.S.C. SECTION 3553(a) FACTORS COUNSEL A SENTENCE OF**
**PROBATION**

The Sentencing Guidelines mark only the "starting point and initial benchmark at
sentencing." *Kimbrough v. United States*, 552 U.S. 85, 108-109 (2007), citing *Gall v. United
States*, 552 U.S. 38, 39 (2007). Ultimately, sentencing is governed by 18 U.S.C. § 3553(a),
which provides, in pertinent part: "The court shall impose a sentence **sufficient, but not greater**

---

[5] John S. Martin, *Cruel But Not Unusual: The Sentence Recommended for Sam Bankman-Fried*, New York Law
Journal (March 12, 2024), https://www.law.com/newyorklawjournal/2024/03/12/cruel-but-not-unusual-the-
sentencerecommended-for-sam-bankman-fried/.

**than necessary**, to comply with the purposes set forth in" § 3553(a)(2), discussed below.

Accordingly, after the Court considers the advisory Guidelines calculation, the Court must

proceed to an individualized assessment of the case-specific factors, set forth in section 3553(a),

to determine whether, "in [this] particular case, a within-Guidelines sentence is 'greater than

necessary' to accomplish the goals of sentencing." *Kimbrough*, 552 U.S. at 101, quoting 18

U.S.C. § 3553(a). In making this determination, the Court may consider the applicable

Sentencing Guidelines range but must not presume that the sentencing range is reasonable or

proper in every case. The Court must "conduct its own independent review of the [§3553(a)]

factors, aided by the arguments of the prosecution and defense." *United States v. Cavera*, 550

F.3d 180, 189 (2d Cir. 2008) (en banc). Furthermore, "the Sentencing Guidelines 'do not require

a judge to leave compassion and common sense at the door to the courtroom.'" *United States v.

Milikowsky*, 65 F.3d 4, 9 (2d Cir. 1995) (quoting *United States v. Johnson*, 964 F.2d 124, 125 (2d

Cir. 1992)).

> Title 18 U.S.C. § 3553(a) provides:
>
> The court, in determining the particular sentence to be imposed, shall consider—
> (1) the nature and circumstances of the offense and the history and characteristics
> of the defendant;
> (2) the need for the sentence imposed—
>> (A) to reflect the seriousness of the offense, to promote respect for the law,
>> and to provide just punishment for the offense;
>> (B) afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed education or vocational training,
>> medical care, or other correctional treatment in the most effective manner.
> (3) the kinds of sentences available;
> (4) the kinds of sentences and the sentencing range established [under the
> Sentencing Guidelines] subject to any amendments made to such guidelines by act
> of Congress…;
> (5) any pertinent policy statement . . . issued by the Sentencing Commission . . .
> subject to any amendments made to such policy statement by an act of Congress…;
> (6) the need to avoid unwarranted sentencing disparities among defendants with
> similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to the victims of the offense.

### A.      Title 18, Section 3553, Subsection (a)(1)

Title 18 U.S.C. § 3553(a)(1) requires the court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant[.]" As part of this analysis, a sentencing court must consider any and all information relating to the background, character and conduct of the defendant, in order to "make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50 (2007). "Permitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'" *Pepper v. United States*, 562 U.S. 476, 488 (2011) (citing *Wasman v. United States*, 468 U.S. 559, 564 (1984)).

#### Nature and Circumstances of the Offense

John Costanzo, Jr. acknowledges that he exhibited poor judgment in his position as a public official. He does not seek to minimize that. It should be noted, however, that in considering the nature and circumstances of the offense, this case stands in stark contrast to the majority of prosecutions of law enforcement officers accused of taking bribes, *see infra* pages 46-51, because John never intended to jeopardize the DEA's mission or assist criminals or investigative targets. To the contrary, the evidence showed that even John's alleged violations of duty were, in his mind, at all times intended to further the DEA's work. To wit:

None of the information allegedly disclosed from NADDIS was ever intended or used to assist drug traffickers with evading law enforcement. In most instances, Special Agent Costanzo simply provided Recio with the name and contact information of a DEA case agent so Recio could initiate his client's cooperation through that agent. GX 339; GX 344; GX 347. While the government repeatedly suggested to the jury that Recio and David Macey made no effort to get

Cesar Peralta to cooperate, Tr. 392:15-20; 395:18-22; 396:16-18, **that is exactly what Special Agent Costanzo told Recio to do.** SDNY_0059161,[6] July 3, 2019 call (Session 33) ("Yeah, but it doesn't work for us. It doesn't work for DEA . . . it needs to work for the Agency . . . get it into the hands of the agents. You've got to have faith and trust them that they're going to do the right thing.").[7]

The same is true of Special Agent Costanzo's supposed "leak" of the Alex Saab indictment. As Special Agent Costanzo stated in a recorded call, "[t]hat should excite a little bit, Gutierrez, but the next indictment which is now scheduled for the 25th will really . . . so I don't know if you want to make your move now or wait . . . If you get a meeting, let me know and then I'll tell you what to say." GX 202A-T. In other words, Special Agent Costanzo thought that news of the various indictments **would have a domino effect and hopefully incentivize Saab's associates, like Carlos Gutierrez, to cooperate** with the U.S. government. **And, if Recio secured a meeting with a putative cooperator, John was in a position to be able to help Recio convince that person to cooperate** – "I'll tell you what to say" – not for financial reasons, but for pure law enforcement reasons. That inference is further supported by a recorded call two days later that was not admitted in evidence:

---

[6] SDNY bates numbers from the government's productions are used to indicate recorded calls that were not introduced into evidence. The defense can submit audio files or transcripts for any such calls upon request from the Court.

[7] The government seems to have abandoned its theory that Special Agent Costanzo's "gone in two weeks" disclosure caused Peralta to flee, deeming any causal connection "irrelevant." PSR at 33. In addition, while the government contends "there is no indication that Recio got that information [about Peralta's arrest] from anyone other than the defendant," *id.*, that is exactly what happened. GX 201-T (July 3, 2019 call in which Recio recounts telling Macey, "[w]e got everybody fucking telling us that this guy is fucking about to get captured."); DX JC-1009-A (July 29, 2019 call in which Recio recounts telling Macey, "he's gonna get arrested within the next few weeks."). And while the PSR now says that Special Agent Costanzo "never shared" with the case agents that Recio and Macey had been in contact with Peralta, *see* ¶ 30, Special Agent Costanzo knew full well that Recio was in close contact with Special Agent Lee Lucas both before and after the attempted arrest. SDNY_0059161 (Costanzo to Recio: "Have the conversation with Lee."); GX 212-T ("Yea, Lee Lucas gives me a call. They have the fucking house surrounded but they can't find him . . . So, then they start calling us to see if we can get a hold of him and have him turn himself in. But of course, you know, we don't know where this guy is we lost all contact.").

RECIO: . . . the umm hammer falling on the guy SAAB, you know. I know there was an initial but I'm trying to see how we can do this. Because you know the other guys would be, they looked to switch from MARIA.

COSTANZO: Oh they are? . . . Yeah. I mean CARLOS is in a good place, **he just needs to cooperate.**

(SDNY_0059196, July 6, 2019 call (Session 185)).

As set forth more fully below, the same holds true for Shirley Herrera Colorado – Special Agent Costanzo wanted her to cooperate and make sure she received proper credit for doing so. It would further the mission. The government now asserts that the revised (Rule 35) document that Special Agent Costanzo provided to Recio was improper because it "included names of other individuals who were potentially cooperating." Dkt. No. 234, at 34. But the government is wrong. As to a list of twenty individuals already identified in the Rule 35 document, Special Agent Costanzo merely clarified that all were "either indicted, incarcerated or cooperating with the US government." DX JC-2001. That is, Shirley's cooperation furthered the DEA's mission. Michael Nadler, a former federal prosecutor in the Southern District of Florida, testified that it was honorable to stand up for a cooperator. Tr. 896:1-14. That's exactly what Special Agent Costanzo believed he was doing.

In sum, Special Agent Costanzo prioritized one thing above all else – "further[ing] the goals and objectives of the DEA." (Ex. A-044). *See also, e.g.*, GX 207-T at 3 ("but if there's anything that benefits the DEA I would jump on it"). Even in the recorded call when Luis Guerra stated, "we're going to make money, money, money," Special Agent Costanzo provided Recio with a case update so that DEA agents could coordinate the continued cooperation of one of Recio's clients in preparation for trial. SDNY_0059197, July 5, 2019 call (Session 160). No money changed hands. The complete absence of evidence that Special Agent Costanzo ever intended to jeopardize the DEA's mission, and the abundance of evidence that he sought to

20

advance it (albeit in ways he now regrets), makes this case very different from other bribery cases and weighs heavily in favor of a non-custodial sentence.

Finally, the Court should consider that this is Special Agent Costanzo's first and only offense in his long and otherwise distinguished career. Although we should hold all public officials to the highest standard in our society, no one is infallible. A just sentence should recognize the humanity of our public servants.

### Special Agent Costanzo's History and Characteristics

### 1. Early Life And Background

John Costanzo, Jr. was born in Greenwich, Connecticut on August 22, 1974. At the time, the family was living in Port Chester, New York. His mother, Elaine Costanzo, was a teacher. His father, John Costanzo, Sr., was a Special Agent with the DEA who retired after almost 30 years of decorated, and many would say legendary, service. Later, John Sr. started an investigations company, EBCO International, which was based in Miami, Florida and Rome, Italy. John has one sibling, an older sister, Danielle Costanzo Bonavita.

John grew up shuttling between the eastern part of the U.S. and Europe due to John Sr.'s DEA service. The family moved around the country and the world several times during John's childhood due to his father's career. When John was about 18 months old, his father was transferred to Milan, Italy where the family stayed until he was about 8 years old. The family then relocated to Andover, Massachusetts. When John was about 12 years old, the family moved to Burke, Virgina, where they remained until John was about 16. Around that time, John Sr. was transferred back to Europe but John Jr. remained in the U.S. to complete high school.

John attended boarding school in Florida where he played on his high school's lacrosse and football teams. He then went on to Elon University in North Carolina to play football.

Participating in team sports led John to value the importance of loyalty, teamwork, and physical health from an early age. He has maintained these values ever since.

John's sister Danielle says that writing a letter to a judge about her brother "is the most surreal, terrifying and unexpected" task of her life. She recounts their childhood:

> As little kids our Dad was transferred to the U.S. Consulate in Milan. It was there that John-o got his nickname, "John-o from Milano". Growing up, John-o and I never fully understood what my Dad's job really entailed, we just knew that he was fighting the "bad guys" and that it was dangerous. We could sense my mother's fear and stress as my father would go for weeks long "business trips", or as we later discovered undercover operations and we knew that we would not hear from him until he returned. When my Dad retired in 1995, I felt a weight lifted off of my shoulders and a huge sense of relief.

(Ex. A-001).

As fate would have it, Danielle's brother would choose the same career and she would constantly worry about him too.

### 2.    John Costanzo, Jr.'s Distinguished Career in Law Enforcement

After graduating from college, John started on the path to becoming a Special Agent with the DEA, something he knew he wanted to do since he was 12 years old. John grew up admiring his Special Agent father and yearned to follow in his footsteps. A close family friend and former DEA agent Richie Fiano explained:

> After graduating college, John Jr's sole ambition was to join the DEA. However, at the time DEA was not accepting recently graduated applicants without any police or military experience. So, in 1994, John Jr. applied for, was accepted and graduated the academy for the Indian Creek Police Department in South Florida. In 1997, he applied for, was accepted and graduated from the United States Secret Service Academy ("USSS"). Spending the next 7 years with the USSS and undeterred from his lifelong dream of becoming a DEA Special Agent, he applied for and was accepted and successfully graduated the DEA Academy in 2004.

(Ex. A-014).

Following his training at the Secret Service Academy, from about 1998 to 2004, John

worked as a Secret Service Agent based in Miami, Florida. As one of the few agents in the

service at the time who was fluent in Italian, he was frequently placed on former President Bill

Clinton's detail whenever he traveled to Europe. When he was not assigned to protection, John

worked as a Secret Service criminal investigator specializing in counterfeit money investigations.

From about 2002 to 2004, he was assigned to a DEA Task Force, finally able to work for his

beloved dad's agency. In 2004, John was dispatched back to the Secret Service where he began

training for placement at the White House. Despite the potential honor of being assigned to a

Presidential detail in Washington, D.C., John's ambition was always to be a DEA agent. In 2004,

he finally made the move after successfully completing the DEA academy.

John's father, John Costanzo, Sr. wrote about that proud moment:

> John has provided me many proud moments. One that is high on my list of his
> accomplishments is the day I presented him his badge and credentials when
> entering the Drug Enforcement Administration as a Special Agent.

(Ex. A-004).

Once on the job at DEA, John "was a quick study and excelled as both an undercover

officer and a money laundering expert." (Ex. A-041). For the first ten years of his career, he

served as an agent in the Miami Field Division's Group 3, where he developed a reputation as a

"trustworthy, reliable and dedicated public servant…" (Ex. A-014). His personable demeanor

and ability to cultivate sources made him a natural. He was particularly talented at getting

individuals to cooperate with law enforcement. *See* Tr. 992:12-17 (Testimony of Special Agent

David Olesky). His hard work and dedication enabled him to become a subject matter expert on

Drug Trafficking Organizations operating out of Colombia and Venezuela. *See* Tr. 172:5-25.

(Testimony of Special Agent Daniel Escobar) (testifying that Special Agent Costanzo worked on

large cases in Colombia and Venezuela and that he did that well.). Since Miami was the "gateway to Colombia," his work also required a significant amount of street work in an effort to dismantle distribution networks impacting local communities. In short, John was "an energetic, smart, and resourceful Special Agent, highly thought of by his peers and supervisors." (Ex. A-029).

Eventually, John's primary investigative focus became money laundering investigations and he led some of the largest Attorney General Exempt Operations ("AGEOs"). DEA employs these operations to degrade and dismantle transnational organized crime networks. *See generally* Tr. 132:22-133:23 (Testimony of Special Agent Daniel Escobar). They may involve the establishment of income-generating businesses and participation in undercover financial transactions to target, infiltrate, and investigate drug trafficking and money laundering organizations. AGEOs typically take a long time to investigate. They often produce sophisticated international cases that require an immense amount of information gathering. For many years, John's role required significant travel abroad to meet with sources, informants, foreign agencies, and partners. Because John mostly worked on sensitive AGEOs, his work was subject to the highest level of scrutiny and supervision by the agency.

One of John's most important cases involved the aforementioned Shirley Herrera Colorado, a notorious cocaine trafficker who was originally indicted in the Southern District of Florida in or around December 2012. *See United States v. Colorado*, 12-cr-20931 (KMW) (S.D. Fla.), Dkt. No. 3. Due to John's exhaustive efforts and under his DEA guidance, Ms. Colorado ended up cooperating with U.S. authorities at great personal risk to her life and that of her family. **As the case agent, John appreciated her cooperation, and he believed she should be treated with gratitude and compassion and receive sentencing credit despite her horrible**

**crimes**. His assistance in compiling a Rule 35 letter on her behalf was described at trial. John's methods in this instance may have been unorthodox, but his heart was certainly in the right place.

The Colorado case was the product of years of painstaking work. At its conclusion, John sought out a new professional challenge: he became a Group Supervisor around July 2014. As a "GS," John still worked on the same types of cases and did much of what he did as a field agent, with the added responsibility of overseeing a team. A natural team player, he excelled in the role. He encouraged collaboration not only within his own team but also with all the teams that he worked with. Jesus Hernandez, a former DEA colleague described:

> Throughout the years, we would work together in joint investigations that would allow us to realize our professional side of our relationship. Those were years between 2000 through 2017. John was assigned in the Miami Field Division and I was in Panama and/or Miami FD, but I had always noticed John's diligent work and leadership methods so that all parties would participate in order to accomplish the investigations goals of arresting the parties involved with the case. John had always displayed responsible work behavior and lead by example by utilizing all the methods available to the DEA in initiating and following up on the cases that he worked on. Many successful cases occurred.

(Ex. A-030-31).

*　　*　　*　　*

For years, John never sought a promotion out of Miami because he wanted to stay close to family. He hoped that if he remained a highly productive agent on a Miami team, it was unlikely that the agency would transfer him to another district. But the agency eventually required that he transfer to DEA Headquarters in Washington, D.C. after completing five years as a Group Supervisor. Initially, John did not want to complete a rotation in Washington, D.C. He was content with life near his family. As the time for his transfer grew near, he contemplated retirement and a move to the private sector. After seeking counsel from many agents, including

25

former colleagues who had also completed a stint in D.C., he figured he should give Headquarters a try.

Around July 2019, John began his role as a staff coordinator at DEA Headquarters. His responsibilities required him to oversee the AGEO program at a high level and coordinate operations between DEA divisions. He also managed overlap between the divisions and deconflicted investigations. *See* Tr. 989:2-3; 990:15-991:5 (Testimony of Special Agent David Olesky). John's new role also required working with foreign partners to understand their goals and educate them on the goals of the agency and the United States. As an agent knowledgeable about conducting investigations "on the ground," it was also his job to advocate for resources for the different DEA divisions and programs.

Despite his initial reluctance, John enjoyed his new role and building on his prior experience. David Olesky, John's supervisor at Headquarters, testified that he wanted to have John in his section because of his significant background in undercover financial investigations and expertise in Colombia and Venezuela. Tr. 988:13-22. Special Agent Guillermo Alleman attests: "John was an excellent agent, but he was even better as a Staff Coordinator…" (Ex. A-024). Ironically, at the very time the government alleges John was violating his duties, he was performing spectacularly and getting rave reviews: **"[t]he work product that John provided to DEA while he was assigned to Headquarters was second to none."** (Ex. A-034).

About five months into his tenure at headquarters, the FBI executed a search warrant on John's Virginia apartment in connection with this case. He dutifully notified his supervisors and he was permitted to stay in his role without any modifications. Indeed, in the years following the execution of the search warrant, **John maintained his security clearance and still was trusted with access to confidential law enforcement databases, including NADDIS.** He was also put

in charge of his Headquarters section on numerous occasions in his supervisor's absence. *See* Tr. 992:1-6. (Testimony of Special Agent David Olesky). **And he was still called upon to brief the DEA Administrator and Congressional Committees on matters relating to the AGEO program and drug trafficking in South America.** He remained in his position for over two years until his indictment in 2022 without incident.

John's personnel records reflect his sterling performance as an agent. He received a raise and bonus every year and consistently positive performance evaluations. (Ex. B). His most recent evaluation speaks to John's unwavering dedication to the DEA's mission, his consistent performance at the highest possible standard, but perhaps more than anything else, his true passion for the work. (Ex. B). John received the highest rating of "Outstanding" on three of the five critical job elements, and a rating of "Excellent" on the two remaining elements. His overall rating of "Outstanding" required his supervisors to make the following finding:

> Consistently exceeded the performance standard: Quality was outstanding; **overall contribution was of maximum benefit to the organization** and stood out from that of most employees.

(Ex. B-005). That assessment is bolstered by the narratives used to justify his performance ratings:

> Staff Coordinator ("SC") John Costanzo is extremely knowledgeable on money laundering operations and is a subject matter expert on money laundering activity involving Venezuela. SC Costanzo has been a "go to" agent for guidance, not just for investigators in the field; but also other staff coordinators within the section. He is always willing to assist and provide input on operations. As for his AGEO area of responsibility (Mid-West Region), the field relies heavily upon SC Costanzo's experience and guidance when developing their investigative blue print for operations. (Ex. B-002).

> During this reporting period, SC Costanzo participated as a speaker in virtual AGEO Administrative Conferences and related AGEO trainings. He is always knowledgeable about the relative subject matter . . . SC Costanzo is always professional and has an outgoing personality. He excels in public speaking and doesn't shy away from speaking engagements (*Id.*).

> All of SC Costanzo's written communications are done so with a lot of thought, complete, and with little to no required corrections . . . [his review of AGEO submissions] allowed for field submissions to easily pass through the HQ approval process without delays (*Id.*).

> SC Costanzo is heavily relied upon for investigative support, guidance, and public speaking engagements relative to money laundering. SC Costanzo is a "go to" member of the section and can always be counted on assist anyone. He has an outgoing personality and gets along great with all co-workers and those outside of DEA. For the reasons outlined above, SC Costanzo has earned an Outstanding rating this evaluation period (*Id.* at 006).

John's prior performance evaluations reached the same conclusion:

> GS Costanzo shows a sincere interest in his employees and the solutions to their problems. GS Costanzo has excelled at building and maintaining coalitions within and outside the agency. He is able to work with other DEA Offices and Groups to expand his group's investigations. GS Costanzo has fostered, developed, and maintained an outstanding relationship with co-workers within DEA, as well as with counterparts from local, state, and other federal law enforcement agencies. GS Costanzo works closely with the U.S. Attorney's Office and has strengthened relations between DEA and state and local law enforcement entities.

(Ex. B-022).

Eric V. Liniero eloquently summarizes John's contributions as follows:

> John has dedicated most of his entire life in service to our country as a decorated agent … Throughout his tenure, he consistently exhibited qualities of integrity, diligence and skillful commitment to enforcing the law in an effort to keep our nation and communities safe. His contributions to combating drug trafficking and organized crime, many of which are historic at the DEA, have earned him numerous awards and commendations for his service. . . .

(Ex. A-051).

*       *       *       *

Amidst all his important contributions to DEA investigative work, John's most meaningful impact as an agent may have been his mentorship and encouragement of other agents – a quality that he had observed in his father and sought to emulate. John had a desire to lift up other agents and build a better workforce from within. Special Agent Daniel Aleman described:

28

. . . I was disillusioned with the prospect of becoming a DEA supervisor. As a newly promoted supervisor, John quickly realized his group was lacking the drive and teamwork mentally necessary to achieve great success. John brought to the group, the teamwork mentality reminiscing of the comradery I experienced in the military. It was then that his leadership and mentorship inspired me to become a DEA supervisor.

(Ex. A-027).

Luis Infante, another DEA colleague explained:

Although John was very busy running one of the most active and successful DEA Groups in the Miami FD, John always took the time to call me and give me advice on my career goal of being promoted as a supervisor. John played an important role with me eventually being promoted.

(Ex. A-025-26).

Guillermo Aleman, an agent who began working with John in 2008, wrote:

As one of the few Spanish speaking agents, up to the point that I began working with John, my experience had been mainly as an undercover agent who communicated with drug traffickers. I was not a case agent, and I did not have experience managing a complex investigation. John Costanzo provided me the opportunities to grow in my career and gain the experience to take the lead on cases and to become a supervisor in the agency.

(Ex. A-023).

There are simply too many reports to recount here about "the positive impact [John] has had on the lives and careers of so many people." *Id.* But there is **one truly remarkable story** from John's days at the Secret Service that must be told.

In 1999, Special Agent Michael Townsend was a young, Black agent in a Miami Secret Service office that had very few Black agents. He was "nervous, and financially destitute . . . did not know anyone, . . . had no family, no friends . . . and no guidance nor support" at the Secret Service. (Ex. A-021-22). Special Agent Townsend "just didn't fit in to the good old boy network that was alive and prevalent in those days." *Id.* As he puts it: "I was just in a lot of people's eyes

a 'quota' that the USSS had to meet…I was constantly ridiculed and ostracized." *Id.* He was

prepared to resign and move home. *Id.*

Enter John Costanzo, then a Secret Service Agent in Miami. John befriended the young

Agent Townsend, took him on surveillance, bantered with him, befriended him, and helped him

furnish an apartment. It was the beginning of a 25-year Secret Service career for Agent

Townsend and an equally long friendship – **a "brotherhood"** – between the two men. *Id.*

> . . . I have now been with the USSS for 25 years due to that first interaction with
> John . . . because of him and his acknowledgement of me, his positive attitude for
> me, his kindness towards me, his frankness, his trust in me, his confidence in me,
> and his un-biased attitude toward me, changed my entire outlook, trajectory on my
> career and my future (*Id.*).

> John would lay down his life for me and go before me, he would go before any of
> us to make sure we got home safe (*Id.*).

Twenty-five years later, John remains someone who mentors and encourages others to

pursue their dreams of a career in public service. The daughter of a friend, Madysen Hawkins

writes:

> Because of John, I am proud to say that I am halfway through the hiring process to
> become a Special Agent with the Secret Service. Who he is as a person and what
> he has accomplished as an agent finally gave me the courage to take the leap on my
> passion of becoming a public servant. However, he has not only inspired me but
> has been by my side the whole time. Regardless of what he has going on in his life,
> he continues to be my cheerleader and support system throughout this process. John
> Costanzo is more than just a mentor or a DEA agent I look up to; he has become
> part of my family and I wouldn't want it any other way.

(Ex. A-045).

*       *       *       *

Special Agent Costanzo is filled with remorse and shame for the actions that led to the

end of his law enforcement service. His conduct was completely contrary to the integrity with

which he conducted himself as an agent throughout his long career. Despite his good intentions,

his bad judgment destroyed his life and career. One of his closest friends, Paul Pugliese, observed:

> These last two years have been probably the most challenging time in John's, as well as his loved ones, lives. I know his sense of pride and satisfaction in all the good and important work he has done for so long has been wounded, and though it has been draining, emotionally and financially, he has been determined to clear his good name. He has become more introspective, and though one might expect for someone faced with these challenges to become self absorbed, his generosity has soared. His willingness to do and help others has been further amplified. It's been pretty amazing to witness.

(Ex. A-017).

John remains hopeful that the Court, in accordance with section 3553(a), will review and consider how he has lived his entire professional life, *writ large*, and not just the conduct in this case.

### 3.    Extraordinary Dedication to Family

To John Costanzo, Jr., family is not just an important thing. **It is everything.** John has an "unbelievably strong connection to his family." (Ex. A-016). Susana Rueda, his former girlfriend and a government witness, observes that John's "respect for his family is something out of a fairytale." (Ex. A-019). Longtime friend William Silvestri writes that "the love and respect [John] has for his family are truly heartwarming." (Ex. A-037). "His love and respect for his parents, his constant involvement in the lives of his nieces and nephew [are] so impressive." (Ex. A-016).

John lives two miles away from his parents in Miami and three miles away from his sister. "Not only is John-o an involved and caring uncle and brother, he is also a dedicated, patient and loyal son." (Ex. A-002). He sees his parents every day and his sister, nieces and nephew as often as possible. "John has never prioritized his personal interests over his family commitments. He has never missed a family function, dinner, or outing, always ensuring that he

was present to support and celebrate with his loved ones." (Ex. A-013). This explains how he

"rushe[s] to his nieces soccer game… ██████████████████████████████

██████████." (Ex. A-016).

His father writes:

[John's] most important priority is family. John is not married and has no children
however his sister has four children, all Generation "Z", two in college[] and two
about to enter. He is a constant force in their lives where he mentors them as well
as physically trains them and keeps them on the "straight and narrow" especially in
today's culture of social media.

(Ex. A-004).

His niece describes John as the ultimate uncle.  He taught her how to drive, ███████

████████████, and drove 10 hours round-trip to help her when she was homesick. He also

imparted lasting life lessons. In the words of his niece, "Uncle John-o taught me the values of

mental and physical toughness, and the importance of believing in myself." (Ex. A-008).

Quietly, John takes his nieces and nephew "to volunteer in inner city neighborhoods and

exposes them to the importance of helping those who are suffering from illness or are less

fortunate than them." (Ex. A-002). John's sister notes the "deep sense of pride he took in

carrying on my father's legacy and in his words, 'making the world a little safer for his nieces,'"

(Ex. A-001). That is likely why John's niece, Juliana, compares him to a "real-life superhero."

(Ex. A-007).

### 4.       Unswerving Dedication to Friends

To John, the concept of friendship, like family, means **no one gets left behind or**

**forgotten.** "John's second life priority (after his immediate family) is his friends, of which he

has many." (Ex. A-004). He treats all his friends like family and he is "loyal to a fault." (Ex. A-

006). And John's family and friends are unanimous that he is "the type of man who goes beyond

the extra mile for anyone in need." (Ex. A-032). He is the type of person that shows up for others no matter the life challenge that they may face.

In its closing argument, the government expressed great skepticism about John's friendships, seemingly incredulous that people would do kind things for each other out of pure friendship. **But they don't know John Costanzo**. Take the words of the loved ones who feel his warmth directly:

- ➢ "John spends much of his time helping others, always trying to do what's necessary to make their lives easier." (Ex. A-016)

- ➢ "When I got covid last year, without hesitation, he arrived at my house with bags of groceries, including homemade lentil soup…" *Id.*

- ➢ John "has been the most selfless and supportive friend a man could hope for. Through this impossibly difficult time for John, he hasn't relied upon me once, but has selflessly offered all the support I've needed." (Ex. A-040).

- ➢ "his heart for 'loving his neighbor' is exactly where it is supposed to be." (Ex. A-033).

- ➢ "My family and I will never forget his kindness and friendship that he extended to us in our time of need and sorrow." (Ex. A-037).

- ➢ "█████████████████████████████████████████████ . . . These are just a couple of the many, many, many times John selflessly extended himself to help others." (Ex. A-046).

- ➢ "A minute does not go by without John thinking about everyone else except himself." (Ex. A-050).

- ➢ "He makes me a better Man, Husband and Father." *Id.*

- ➢ "[H]e has always been there for me when I have most needed a friend." (Ex. A-024).

- ➢ "Upon suddenly losing my own father…John made me feel that my pain and grief w[]ere also his.  John helped me more than I can explain or he would ever know. That was just John being his caring, sincere self." (Ex. A-034).

➤ "██████████████████████████████████
  ████████████████████████ (Ex. A-026).

➤ "If one is so lucky to enter John's orbit, he never let's [sic] go." (Ex. A-018).

The Zampogna family letter puts it beautifully:

"He is the finest example of a family member and friend that exists." (Ex. A-052).

**5.** ██████████████





### B.  Title 18, Section 3553, Subsection (a)(2)(A)

Subsection (a)(2)(A) provides that the court shall consider "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."

John's punishment will not begin when the Court imposes its sentence. On the contrary, it began a long time ago. The prosecution itself has already resulted in significant punishment of John and reverberated upon those he loves.

John has been living with this case and its aftermath since the FBI executed a search warrant on his home on November 18, 2019. To make matters worse, in early 2020, two years before he was indicted, news of the wiretap of Recio's phone and the execution of the search warrant on his home was published in the Associated Press and Miami Herald.[9] He was permitted to remain in his role although it was not easy as much of the agency quickly learned of the investigation. Following the indictment, he was placed on unpaid administrative leave where he remains today.

News of John's arrest and conviction spread nationwide and internationally. It appeared throughout the mainstream media, including, but not limited to the Associated Press, Bloomberg, NBC, CBS, PBS, *The Daily News*, *The Orlando Sentinel*, The LA Times, Law.com, and Mexico Today. In addition, on the eve of his already unimaginably stressful criminal trial, an article entitled "Shadowy snitch takes starring role in bribery trial of veteran DEA agents" was released

---

[9] *See* Joshua Goodman & Jim Mustian, *AP sources: Feds wiretap former DEA supervisor in leak probe*, Associated Press (Mar. 11, 2020), https://apnews.com/article/6b2787ff1ccb15aefb57f01024821d52.

by the Associated Press.[10] These and other sensationalized portrayals of John have caused him and his family enormous pain and will live on the internet, punishing John for the rest of his life.

Perhaps most devastating is that the case ensnared almost everyone that is close to him including his father, best friend, former girlfriend, and many of his former colleagues. This reality weighs heavily on John, whose natural inclination is to put others before himself. As a result, John has also lost touch with some of his closest friends and colleagues. These are people with whom he worked and many of whom he mentored. DEA was their common bond and John's life's work. Not only has he been cast aside at the agency he gave his own sweat and blood to, but many of his old colleagues are prohibited from, or reluctant to, speak with him. He has been ousted from the very community he loved. The result has been depression and loss for John. Many courts take factors like these into account at sentencing.[11]

---

[10] *See* Joshua Goodman & Jim Mustian, *Shadowy Snitch Takes Starring Role in Bribery Trial of Veteran DEA Agents*, Associated Press (Oct. 11, 2023), https://apnews.com/article/dea-cocaine-corruption-bribery-misconduct-miami-4a0f0bdc3abbe7218c648731292bcacc

[11] *See, e.g.*, *United States v. Sponaugle*, Crim. No. 19-103-LPS, 2022 WL 4079197, at \*6-7 (D. Del. Sept. 6, 2022) (identifying "significant punitive components" of non-custodial sentence, including financial punishment, collateral consequences of "greatly reduced job prospects" and impact on the defendant's reputation); *United States v. Anderson*, 533 F.3d 623, 633 (8th Cir. 2008) (upholding below-Guidelines sentence in part because district court found that "defendant had suffered atypical punishment such as the loss of his reputation and his company"); *United States v. Anderson*, 267 F. App'x 847, 850 (11th Cir. 2008) (affirming a below-Guidelines sentence in part because defendant lost his job and income); *United States v. Jasen*, 15-CR-00214 (M.D. Fla. Jan. 28, 2016), Dkt. No. 86 at 53-54 (imposing probation because, in part, "one who makes a mistake in judgment...should be, in my judgment, absent other aggravating circumstances, be able to go on with their life and suffer the humiliating and devastating effects of being prosecuted...which will... harm your reputation, your social status..."); *United States v. Malik*, 424 F. App'x 122, 127 (3d Cir. 2011) (affirming a below-Guidelines sentence in part because the defendant "was punished by the reputational harm he suffered as a result of the criminal action"); *United States v. Redemann*, 295 F.Supp.2d 887, 894–97 (E.D. Wis. 2003) (downward departure warranted where defendant suffered serious collateral consequences from conviction); *United States v. Samaras*, 390 F.Supp.2d 805, 809 (E.D. Wis. 2005) (imposing below-Guideline sentence in part because, "as a consequence of his conviction and sentence, defendant lost a good public-sector job, a factor not considered by the Guidelines."); *United States v. Anghaie*, 09-CR-0037 (N.D. Fla. Nov. 29, 2011), Dkt. No. 238 (imposing below-Guidelines sentence and noting that defendants "received significant punishment through financial loss, loss to reputation and career opportunities."); *United States v. Vigil*, 476 F.Supp.2d 1231, 1315 (D.N.M. 2007) (observing that, in considering justness of sentence, "it is important to consider all other forms of punishment [defendant] has already suffered," including loss of job and damage to his personal and professional reputation); *United States v. Olis*, Crim. No. H-02-217-01, 2006 WL 2716048, at \*13 (S.D. Tex. Sept. 22, 2006) (finding a substantial variance warranted in part because "the attendant negative publicity, the loss of his job and accounting and law licenses, and the need to provide support for his family will provide adequate deterrence against any potential future criminal conduct").

For John, furthermore, a conviction by itself imposes very serious punishment. He has no prior criminal history. The very status of "convicted felon" therefore delivers a significant blow, and inflicts a major punishment in this case—more than sufficient to satisfy the statutory requirements. John will also suffer the harsh "collateral consequences" of a felony conviction, under both state and federal law. He will likely lose the right to own a firearm—a serious deprivation for a lifelong lawful weapons owner—to vote, to hold office, to sit on a jury and perhaps to obtain professional licenses. The csgjusticecenter.org puts it as follows:

> Collateral consequences remain obscure and are increasingly complex. Because collateral consequences are civil in nature—and not part of a person's criminal punishment—they are generally imposed without the involvement of sentencing courts and are not referenced alongside the state and federal laws that govern criminal offenses or procedure. Instead, they are scattered throughout various portions of state statutory and regulatory codes, making it difficult for a person to identify all of the consequences that may stem from a conviction for a particular crime in a particular jurisdiction. In a single state, employment barriers may be embedded in a state's civil service code, trade and occupations code, and any other place that regulates business practices. And because collateral consequences are not criminal, they are generally implemented by state agencies through obscure and often complex administrative policies and internal practices that may drastically alter their operation and impact.[12]

Furthermore, "[i]n many states, a criminal record is a stain you can't wash off."[13]

John is poised to lose his job and the only livelihood he has ever known. This will be a financial hit to him that far exceeds any of the alleged benefits he received as the result of the supposed scheme. The emotional toll of losing his career and the embarrassment he has caused DEA is exponentially more painful.

---

[12] Chidi Umez & Joshua Gaines, After the Sentence, More Consequences: A National Report of Barriers to Work, Council of State Governments Justice Center (Jan. 2021), https://csgjusticecenter.org/wp-content/uploads/2021/02/collateral-consequences-national-report.pdf.
[13] Stephen Slivinski, Economist, Center for the Study of Economic Liberty at Arizona State University, Council of State Governments Justice Center, https://csgjusticecenter.org/publications/the-national-inventory-of-collateral-consequences-of-conviction/#:~:text=In%20many%20states%2C%20a%20criminal,to%20use%20it%20against%20you.

Put simply, a host of sanctions and disqualifications will be an albatross John must carry for the rest of his life.

### C.      Title 18, Section 3553, Subsection (a)(2)(B)

According to 18 U.S.C. § 3553(a)(2)(B), an appropriate sentence should "afford adequate deterrence to criminal conduct[.]"

Here, the government, through its investigation and highly publicized prosecution, has surely achieved adequate general deterrence of the conduct of conviction. In the wake of John's arrest, trial, and conviction, the Court can reasonably conclude that John's downfall is known to all – and certainly to the law enforcement community – and all are aware of the offending conduct and potential punishment. The collapse of much of John's life is complete and clear: a term of incarceration is unnecessary to send any further message.

Moreover, in a publication by the National Institute of Justice ("NIJ")—the research, development, and evaluation agency of the U.S. Department of Justice—the NIJ summarized that "increasing the severity of punishment does little to deter crime." [14] Certainty has a greater impact on deterrence than severity of punishment. *Severity* refers to the length of a sentence. Studies show that for most individuals convicted of a crime, short to moderate prison sentences may be a deterrent but longer prison terms produce only a limited deterrent effect. In addition, the crime prevention benefit of long sentences falls far short of the social and economic costs.

*Certainty* refers to the likelihood of being caught and punished for the commission of a crime. Research underscores the more significant role that certainty plays in deterrence than severity—it is the certainty of being caught that deters a person from committing crime, not the fear of being punished or the severity of the punishment. Effective policing that leads to swift

---

[14] National Institute of Justice, *Five Things About Deterrence* (June 5, 2016), https://www.ojp.gov/pdffiles1/nij/247350.pdf.

and certain (but not necessarily severe) sanctions is a better deterrent than the threat of incarceration. In other words, the message of certainty has been made loud and clear.

The United States Attorney's Office issued press releases on the date of the arrest and the date of conviction using pointed, sharp rhetoric warning the public against these types of crimes: (U.S. Attorney Damian Williams: "Recio and Costanzo were convicted by a unanimous jury for their brazen violation of the public's trust and for providing information that could have put their former colleagues and others in harm's way. This case underscores that corruption in the ranks of any law enforcement agency will be met with zero tolerance.").[15]

In sum, the public is undoubtedly aware, warned, reacting, and more than adequately deterred. Incarceration is not necessary. *See e.g., United States v. Musgrave,* 647 F. App'x 529, 534 (6th Cir. 2016) (sentence of supervised release joined with home confinement and a severe financial penalty, though not imprisonment, afforded adequate general deterrence where defendant was convicted of bank fraud and wire fraud).

This prosecution has also already undoubtedly achieved specific deterrence. On this score, it must be noted that John spent over 20 years *as a law enforcement agent*. His heart and his soul are in upholding the law, not breaking it. He did not go from Dr. Jekyll to Mr. Hyde overnight – or ever. It bears repeating that he never thought he was harming the mission, and has learned a significant lesson as result of this case.

---

[15] Press Release, Dep't of Justice, Former High-Ranking DEA Special Agent and Current DEA Agent Convicted for Bribery Scheme (Nov. 9, 2023), https://www.justice.gov/usao-sdny/pr/former-high-ranking-dea-special-agent-and-current-dea-agent-convicted-bribery-scheme; *see also* Press Release, Dep't of Justice, Current and Former DEA Agents Indicted for Bribery Scheme (May 20, 2022), https://www.justice.gov/usao-sdny/pr/current-and-former-dea-agents-indicted-bribery-scheme.

Offenders with no criminal history, like John, are the least likely to re-offend. And offenders with a college education are less likely to recidivate.[16] In the words of Daniel Gitner, now Chief of the S.D.N.Y.'s Criminal Division:

> [L]ong sentences often are not required to deter recidivism among business fraud offenders. White-collar offenders ... often become involved in illegal conduct as a result of their position within a legitimate enterprise or in the context of a legitimate financial relationship with others. That position or relationship is often destroyed, as is the ability to forge new ones, through the felony conviction alone. Similarly, research shows that the threat of short prison terms has a significant deterrent effect on the typical white-collar would be criminal.[17]

There are many other reasons why John would not re-offend, including that he would sooner suffer than bring any more disrepute to his family and the DEA. Even the merciless PSR does not suggest that John is likely to commit further crimes.

Furthermore, to the extent there is any criminal forfeiture ordered, criminal forfeiture is a punitive measure and serves as a specific deterrent. *Kaley v. United States*, 571 U.S. 320, 323 (2014) ("Forfeitures… at once punish wrongdoing, deter future illegality, and 'lessen the economic power' of criminal enterprises") (citations omitted).

### D.      Title 18, Section 3553, Subsection (a)(2)(C)

Section 3553(a)(2)(C) sets forth that an appropriate sentence shall "protect the public from further crimes of the defendant." Neither the PSR nor the government suggests that John will commit further crimes or that the public needs protection from him. He will never again be in a law enforcement position, and likely never in a position of public trust.

---

[16] *See* U.S. Sent. Comm'n, *Recidivism Among Federal Offenders: A Comprehensive Overview* 18-24 (March 2016), https://www.ussc.gov/research/research-reports/recidivism-among-federal-offenders-comprehensive-overview.
[17] Gabrielle S. Friedman, Kan M. Nawaday, & Daniel M. Gitner, *Challenging the Guidelines' Loss Table*, Federal Sentencing Reporter, Volume 20, Number 3, February 1, 2008, 2008 WL 2201041, at *178 (internal citations omitted).

### E.      Title 18, Section 3553, Subsection (a)(2)(D)

Section 3553(a)(2)(D) provides that courts shall consider "the need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]" John needs no further education or training. He has no history of mental health issues or substance abuse. He does not need any rehabilitation or correctional treatment.

### F.      Title 18, Section 3553, Subsection (a)(3)

Subsection 3553(a)(3) provides that courts shall consider "the kinds of sentences available." Here, the PSR sets forth in detail the kinds of sentences available in this case. *See* PSR ¶¶ 96-115. As urged elsewhere in this memorandum, the Court should impose a sentence of probation.

### G.      Title 18, Section 3553, Subsection (a)(4)(A)

Section 3553(a)(4)(A) provides that courts shall consider "the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[.]" This memorandum discusses the issues arising under the advisory Guidelines in section I *supra*. John respectfully directs the Court's attention to that discussion.

### H.      Title 18, Section 3553, Subsection (a)(5)

Section 3353(a)(5) provides that courts shall consider any "pertinent policy statements" of the Sentencing Commission. The Court should therefore consider the "pertinent policy statements" cited in the discussion of the sentencing guidelines in this memorandum.

Additionally, the applicable guidelines calculation applies the so-called zero-point offender adjustment. The Sentencing Commission's data shows that zero-point offenders "have

considerably lower recidivism rates than other offenders, including lower recidivism rates than the offenders in Criminal History Category I with one criminal history point." U.S.S.G. Manual, Amendment 821 (eff. 11/1/2023), at "Reason for Amendment" (*available at* https://www.ussc.gov/guidelines/amendment/821) (citation omitted). In short, the criminal justice system generally has no need or reason to imprison the zero-point offender because he or she—like John—is so unlikely to reoffend. A term of incarceration is therefore unnecessary to achieve specific deterrence.

Proposed amended Commentary—specifically, a new Application Note 10(A) to § 5C1.1—drives home the Commission's view that zero-point offenders, who would qualify for an adjustment under § 4C1.1(a), generally should not go to prison. That new Application Note provides: "If the defendant received an adjustment under § 4C1.1 . . . and the defendant's applicable guideline range is in Zone A or B . . . a sentence other than a sentence of imprisonment, in accordance with subsection . . . (c)(3), is generally appropriate." Furthermore, Application Note 10(B) to § 5C1.1 provides: "A departure, including a departure to a sentence other than a sentence of imprisonment, may be appropriate if the defendant received an adjustment under § 4C1.1 . . . and the defendant's applicable guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense."

## I.     Title 18, Section 3553, Subsection (a)(6)

Section 3553(a)(6) requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]" Because fraud is a crime of infinite variety, *see generally United States v. Altman,* 48 F.3d 96, 101 (2d Cir.1995), it presents particular challenges for sentencing courts

striving to achieve proportionality in sentencing while reducing unwarranted disparity, *see generally* U.S.S.G. Ch. 1, pt. A.3 (identifying reduced disparity and proportionality based on the severity of the offense as two key goals of the Sentencing Reform Act of 1984, 18 U.S.C. § 3551 *et seq.*); *United States v. Booker,* 543 U.S. 220, 264 (2005) (explaining that post-*Booker* sentencing contemplates consideration of Guidelines to serve goals of "avoiding unwarranted sentencing disparities" and "proportionality").

On this issue, the PSR sets forth information from the U.S. Sentencing Commissions Judiciary Sentencing Information ("JSIN") database. Specifically, the PSR – using its Total Offense Level of 31 – provides as follows:

> During the last five fiscal years (FY2019-2023), there were 15 defendants whose primary guideline was §2C1.1, with a Final Offense Level of 31 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 12 defendants (80%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 45 month(s) and the median length of imprisonment imposed was 48 month(s). For all 15 defendants in the cell, the average sentence imposed was 38 month(s) and the median sentence imposed was 44 month(s).

(PSR at 26-27).

John's inflated guideline calculation is, in part, the result of the economic loss Guideline § 2B1.1. Based on the disproportionately severe sentences that result from the economic loss Guidelines, courts routinely conclude that these Guidelines do not serve as a reliable benchmark for culpability, and issue sentences well below the Guidelines range. *See, e.g.*, *Musgrave*, 647 F. App'x at 530, 538 (6th Cir. 2016) (affirming downward variance for defendant with offense level of 25 and a $1.7 million loss to a sentence of one day of imprisonment, reasoning that "because the loss Guidelines were not developed using an empirical approach based on data about past sentencing practices, it is particularly appropriate for variances."); *Johnson*, 2018 WL 1997975, at *3-4 (criticizing loss enhancement as a "grievous wrong" and imposing 24-month sentence

following downward variance from Guidelines range of 87-108 months); *United States v. Milton*, Case No. 21-cr-478-ER, Dkt. No. 327 (Judgment) (S.D.N.Y. Jan 17, 2024) and Sentencing Tr. at 25:16-26:3 (Dkt. No. 322) (S.D.N.Y. Dec. 18, 2023) (48-month sentence for defendant with offense level of 41 and Guidelines range of 324 to 405 months); *United States v. Scott*, Case No. 17-cr-630-ER, Dkt. Nos. 607 (Govt. Sentencing Memorandum) and 611 (Judgment) (S.D.N.Y. 2024) (120-month sentence for lawyer who laundered $400 million in fraud proceeds and received $50 million in payments despite Guidelines range of 600 months); *Adelson*, 441 F.Supp.2d at 512 (imposing 42-month sentence for defendant with offense level of 46 and describing "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense").

The Interactive Data Analyzer shows that judges are more likely to vary below the Guideline range in § 2B1.1 cases than the average federal criminal case. *Interactive Data Analyzer*, U.S. SENT'G COMM'N, https://ida.ussc.gov.

Indeed, courts appear to depart or vary below the Guidelines in the majority of cases applying a § 2B1.1 loss enhancement. For example, from 2015 through 2019, more than 50 percent of sentences issued to fraud offenders were below the Guideline range. *See* Barry Boss & Kara Kapp, *How the Economic Loss Guideline Lost its Way, and How to Save It*, 18 Ohio St. J. Crim. L. 605, 622 (2021).

The same holds true for bribery offenses. The JSIN data from fiscal years 2019 through 2023 for bribery offense under § 2C1.1 with a Total Offense Level of 31 reflects that 82 percent of sentences imposed, relative to the guideline range, received a downward departure or variance. PSR at 27.

\*       \*       \*       \*

Several federal law enforcement agents have been charged with corruption in recent years in cases that merit comparison.

➢ In *United States v. Broumand*, 20-cr-224 (RGK) (C.D. Cal.), the defendant FBI agent was found guilty of conspiracy to commit bribery of a public official; two counts of bribery; and one count of monetary transaction in property derived from specified unlawful activity. Dkt. No. 275 at 1. Broumand conspired with an attorney, who was connected to organized crime, and was richly rewarded with cash, a $30,000 check, escorts, a Ducati motorcycle, private jet flights, meals, hotel stays and other items of value in exchange for querying sensitive law enforcement databases and sharing the results with the lawyer, **in order to help the lawyer and his criminal associates avoid prosecution and law enforcement monitoring.** *Id.* at 1-2. He also drafted and submitted FBI reports that contained false or misleading information; lied to other FBI agents; falsely represented to an off-duty Beverly Hills Police Department Officer that the FBI needed a private investigator to assist in an FBI investigation; made contact with individuals he knew to be subjects of ongoing criminal investigations without notifying the FBI; and engaged in criminal activity with the attorney, including accepting and having sex with paid escorts, furnished by the attorney. *Id.* at 3. In total, the defendant received over $150,000 in illegal benefits. Dkt. No. 190 at 12. Broumand's PSR yielded a total offense level of 29, with an applicable guidelines range of 87-108 months. Dkt. No. 275 at 14. At sentencing, the government sought a two-level enhancement for obstruction of justice, and argued that the applicable total offense level was 31. *Id.* Broumand was

ultimately sentenced to a term of 72 months imprisonment followed by a term of supervised release for 3 years. Dkt. No. 294.

➢ In *United States v. Collare*, 20-cr-17 (M.D. Pa.), the defendant was a member of the Cumberland County Drug Task Force who preyed on vulnerable persons he had sworn to protect over a six-year period. Dkt. No. 135 at 2-6. Among other heinous acts, he **used his official position to obtain sex from two women in exchange for agreeing to take official actions in relation to certain cases.** *Id.* He distributed heroin, lied on federal forms, and made multiple false statements when interviewed by federal agents. *Id.* He was charged with various counts of honest services fraud and bribery, distribution of heroin, and false statements. Collare was ultimately sentenced to a term of imprisonment of 75 months. Dkt. No. 139.

➢ In *United States v. Robert Lustyik*, 13-cr-616 (VB) (S.D.N.Y.), the defendant was charged with conspiracy to solicit bribes by a public official; soliciting bribes by a public official; conspiracy to commit honest services fraud; theft of government property and unlawful disclosure of a suspicious activity report. Dkt. No. 197 at 9. Lustyik was an FBI agent who worked on the counterintelligence squad in the White Plains Resident Agency. *Id.* at 3. Together with two colleagues, Lustyik engaged in a bribery scheme involving an agreement to exchange money for confidential documents and information to which Lustyik had access by virtue of his position as an FBI agent that **could be used against** a rival of one of the men. *Id.* at 3-8. The PSR calculated the offense level at 31, yielding the applicable Guidelines range as 108 to 135 months' imprisonment. *Id.* at 10. The Court sentenced the defendant to 60 months' imprisonment. Dkt. No. 198.

These three examples are noteworthy for several reasons. First, each of these **substantially more culpable defendants** received a lower sentence than the applicable Guidelines range here of 108 to 135 months' imprisonment, despite engaging in **exponentially more harmful conduct**. Second, in those three cases, **the agents provided confidential information to individuals who sought to use it for nefarious purposes**, namely, to help others evade the law or use the information against those who were the subject of confidential information. In this case, John provided limited information concerning case agent identities to a trusted former colleague who had only recently retired, in the hopes of encouraging cooperation. The nature of the information that John provided to Recio was administrative and something Recio himself had previously had access to. Finally, in at least two of the above examples, the defendant either received or sought to receive *considerably more* in bribe payments or benefits than the government submits John received. **These cases are indicative of the PSR's overreach in recommending a six year sentence for John.**

By contrast, in *United States v. Perry*, 09-cr-00090 (DKC) (D. Md.), the defendant was charged with conspiracy to commit unlawful activity in connection with computers, in violation of Title 18 U.S.C. § 371. Perry worked as a data entry clerk for various contractors providing services for NADDIS in Arlington, Virgina. Dkt. No. 19-1 at 1. According to the Indictment, Perry compromised an ongoing investigation when she searched for and **shared with her associates confidential information from the NADDIS database** and thus **furthered their illegal activities.** Perry accepted a plea agreement and was sentenced to **two years' probation**. Dkt. No. 19, 27.

It also bears noting that in the last few years the Second Circuit has been no stranger to public corruption and bribery cases. This district has seen a considerable amount of wrongdoing

by high-level government and public officials who wielded exorbitant amounts of power and influence yet received considerably lower sentences than that proposed by the PSR and the government here, despite schemes involving hundreds of thousands, and sometimes millions, of dollars. **These cases exemplify how the Guidelines in this case grossly overstate the seriousness of the offense.** For example:

> ➢ In *United States v. Edward Mullins*, 22-cr-120 (JGK) (S.D.N.Y.), the President of the Sergeants Benevolent Association ("SBA"), was alleged to have stolen almost **$600,000** from the pockets of NYPD sergeants to in part, pay for meals at high-end restaurants and to purchase luxury personal items. Mullins' alleged scheme lasted approximately five years. He was sentenced to **24 months' imprisonment.**[18]

> ➢ In *United States v. Norman Seabrook*, 16-cr-467 (ALC) (S.D.N.Y.), the former president of the Correction Officers' Benevolent Association ("COBA"), allegedly accepted a $60,000 bribe payment in a Ferragamo bag in exchange for his investment of millions of dollars of COBA money in a high-risk hedge fund. Seabrook also agreed to receive future bribes in the form of kickbacks from the profits from COBA's investment that were estimated to total between $100,000 and $150,000 per year, and he lied under oath to cover up the scheme.[19] Soon after the COBA investment, the hedge fund went bankrupt, resulting in a loss of $19 million in retirement benefits for union members.

---

[18] Press Release, Dep't of Justice, Edward Mullins, Former President of NYPD Sergeants' Union, Sentenced to Two Years in Prison for Stealing Union Funds (Aug. 3, 2023), https://www.justice.gov/usao-sdny/pr/edward-mullins-former-president-nypd-sergeants-union-sentenced-two-years-prison.

[19] Press Release, Dep't of Justice, Norman Seabrook, President of Correction Officers Benevolent Association, Sentenced to 58 Months in Prison for Accepting Bribes in Exchange for Investing Union Money in New York-based Hedge Fund (Feb. 8, 2019), https://www.justice.gov/usao-sdny/pr/norman-seabrook-president-correction-officers-benevolent-association-sentenced-58.

*United States v. Seabrook*, 814 F. App'x. 661, 661-62 (2d Cir. 2020). Seabrook eventually served **21 months** after having his sentence reduced due to the resentencing of his co-defendant. Dkt. No. 459.

➢ In *United States v. Dean Skelos*, 15-cr-317 (KMW) (S.D.N.Y.), the former New York State Senate Majority Leader, was alleged to have repeatedly used his significant power to pressure companies with business before the State to obtain **over $300,000** in bribe and extortion payments to him and his son over a period of nearly five years. Skelos was able to secure these illegal payments through "persistent and repeated pressure" and implicit and explicit representations that he would use his official position to benefit those who made the payments, and punish those who did not. Skelos was found to have committed perjury at trial and was ultimately sentenced to **51 months' imprisonment.**[20]

➢ In *United States v. Sheldon Silver*, 15-cr-00093 (VEC) (S.D.N.Y.), the former New York State Assembly Speaker, was alleged to have used his power over the real estate industry and his control over state health care funding to enrich himself. In all he was alleged to have obtained **nearly $4 million in bribes** in exchange for his official acts and another $1 million through laundering the proceeds of his crimes, in two separate bribery schemes spanning more than a decade.[21] Silver was sentenced to **78 months' imprisonment.** Dkt. No. 527.

---

[20] Press Release, Dep't of Justice, Dean Skelos, Former New York State Senate Leader, Sentenced to 51 Months (Oct. 4, 2018), https://www.justice.gov/usao-sdny/pr/dean-skelos-former-new-york-state-senate-leader-sentenced-51-months-son-adam-skelos.
[21] Press Release, Dep't of Justice, Former New York State Assembly Speaker Sheldon Silver Sentenced to 7 Years in Prison (July 27, 2018), https://www.justice.gov/usao-sdny/pr/former-new-york-state-assembly-speaker-sheldon-silver-sentenced-7-years-prison.

> ➢ In 1986, **a federal prosecutor** was sentenced to a **three-year prison term for
> stealing drugs and cash** from the United States Attorney's Office where he
> worked.[22] The sentence was imposed after the defendant pleaded guilty to
> taking **$41,800 and five pounds of drugs** from the office while working there
> as a prosecutor. The defendant was released after serving **16 months** of his
> sentence.[23]

This case pales in comparison to the corruption described above. In the wide range of
public corruption cases, this case falls on the lowest end.

Finally, in fashioning a just sentence the Court should consider that the **government did
not indict** John's alleged co-conspirators, **David Macey and Luis Guerra**. Judge Gardephe did
exactly that in *United States v. Michael Avenatti*, 19-cr-00373 (PGG) (S.D.N.Y.). Judge
Gardephe considered the government's decision not to indict a lawyer who was alleged to have
participated with Avenatti in a scheme to extort Nike, Inc. Dkt. No. 341 at 17:25-18:18. In
formulating a sentence, Judge Gardephe explained that the unindicted lawyer was someone who
the government referenced as an unindicted co-conspirator in the complaint and indictment and
was ultimately not charged even though he was supposedly involved in the criminal conduct and
stood to benefit enormously from Avenatti's scheme. Dkt. No. 341. In sentencing Avenatti to 30
months, the Court reasoned that it would not be justice for Mr. Avenatti to be sentenced to a
nine- to eleven-year term of imprisonment when the other lawyer was not even charged. *See* Dkt.
No. 341 at 44:20-23. Here, the government maintains that John Costanzo received bribe

---

[22] *See* Howard Kurtz, *3-Year Prison Term Completes Collapse of Attorney's Career*, Washington Post (Jan. 10, 1986), https://www.washingtonpost.com/archive/politics/1986/01/11/3-year-prison-term-completes-collapse-of-attorneys-career/ce4884c1-b38c-4e6f-8ae7-449c342b6e9e/.
[23] Arnold H. Lubasch, *Ex-Prosecutor, Jailed As Thief, Wins Early Release*, NYTimes (July 16, 1987), https://www.nytimes.com/1987/07/16/nyregion/ex-prosecutor-jailed-as-thief-wins-early-release.html.

payments from two criminal defense lawyers in exchange for confidential information to help recruit new clients for those lawyers. Dkt. No. 1 at 2-3. The government calls them co-conspirators. In theory, they stood to benefit most from the "scheme." **Yet, the government did not indict either alleged co-conspirator. Sending John Costanzo to prison under these circumstances would be a twisted result.**

> **J.      Title 18, Section 3553, Subsection (a)(7)**

Section 3553(a)(7) provides that the court shall consider "the need to provide restitution to any victims of the offense."

The PSR provides that there is no identifiable victim, PSR ¶ 46, and restitution is not applicable in this case. PSR ¶¶ 109-110.

## FORFEITURE

To the extent the Court weighs imposing forfeiture, 18 U.S.C. § 981(a)(2)(a)'s definition of "proceeds" does not apply. There is nothing "inherently unlawful" about a mortgage downpayment, a retainer payment to engage legal counsel, payment for home renovations, or a ticket to a baseball game. *See United States v. Contorinis*, 692 F.3d 136, 145 n.3 (2d Cir. 2012). As such, direct costs should be deducted from any forfeiture order.

In a bribery case, one court in this District explained that "[w]hether § 981(a)(2)(A) or (a)(2)(B) applies to this case is a difficult question of statutory interpretation." *United States v. Percoco*, No. 16 Cr. 776 (VEC), 2019 WL 1593882, at *4 (S.D.N.Y. Apr. 15, 2019). Judge Ramos has noted "the difficulty of determining whether § 981(a)(2)(A) or (a)(2)(B) applies to a particular defendant's conduct" and observed that "[t]he case law provides no clear way to delineate" as to which definition of "proceeds" applies. *United States v. Milton*, 21 Cr. 478 (ER),

2024 WL 779210, at *6-7 (S.D.N.Y. Feb. 26, 2024). In light of these "difficult questions," Judge Ramos stayed the forfeiture order pending Milton's appeal, which remains pending.

In consideration of forfeiture, the amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish. *United States v. Bajakajian*, 524 U.S. 321 (1998) (citing *Austin v. United States*, 509 U.S. 602, 622-623 (1993) (noting Court of Appeals' statement that "the government is exacting too high a penalty in relation to the offense committed")). If a forfeiture can be characterized as punitive, a court must consider "whether the forfeiture is unconstitutionally excessive." *United States v. Viloski*, 814 F.3d 104, 110 (2d Cir. 2016). In *Bajakajian*, the Supreme Court "emphasize[d] that the Excessive Fines Clause grew out of the English constitutional tradition, including Magna Carta, which required that a fine 'should not deprive a wrongdoer of his livelihood.'" *Viloski*, 814 F.3d at 111. In appropriate cases, courts should consider "[w]hether a forfeiture would destroy a defendant's *future* livelihood" in addition to the non-exhaustive *Bajakajian* factors, because "hostility to livelihood-destroying fines is deeply rooted in our constitutional tradition." *Id.* at 111-12. (emphasis in original).

Finally, in *Libretti v. United States*, 516 U.S. 29, 48-49 (1995), the Supreme Court held that criminal defendants have no constitutional right to a jury determination on forfeiture. The Second Circuit has held that criminal forfeiture is not subject to the *Apprendi* doctrine. *United States v. Stevenson*, 834 F.3d 80, 85 (2d Cir. 2016). But *Southern Union Co. v. United States,* 567 U.S. 343 (2012), which held that *Apprendi* applies to certain criminal fine provisions, *undermines Stevenson*. In light of *Southern Union Co.*, John Costanzo, Jr. preserves for further review on appeal the argument that any forthcoming proposed forfeiture order would violate his

Fifth and Sixth Amendment rights because it was not based on facts found by a jury beyond a reasonable doubt.

## CONCLUSION

For the foregoing reasons, John Costanzo, Jr. respectfully submits that the sentence which is sufficient, but not greater than necessary, to comply with the purposes set forth in § 3553, is **a term of probation**.

Dated: New York, New York
         April 15, 2024

                                         Respectfully submitted,

                                          /s/ Marc L. Mukasey
                                         Marc L. Mukasey
                                         Torrey K. Young
                                         Stephanie Guaba
                                         Michael F. Westfal

                                         MUKASEY YOUNG LLP
                                         570 Lexington Avenue, Suite 3500
                                         New York, New York 10022
                                         Tel: (212) 466-6400
                                         Email: marc.mukasey@mukaseylaw.com

                                         *Attorneys for John Costanzo, Jr.*