

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 19, 2024

**BY ECF**

The Honorable J. Paul Oetken
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    *United States v. John Costanzo*, 22 Cr. 281 (JPO)

Dear Judge Oetken:

      The Government respectfully submits this letter in connection with the sentencing of defendant John Costanzo, scheduled for Wednesday, April 24, 2024, at 10:30 a.m.  As set forth below, Costanzo abused the skills and influence his country entrusted him with by secretly accepting bribes in exchange for sharing confidential law enforcement information about the targets of DEA criminal investigations.  His conduct was not only an egregious breach of the public trust that undermined the public's faith in the integrity of law enforcement and the fairness of the criminal justice system, but also directly placed the physical safety and lives of agents, cooperating witnesses, and others at risk.  In light of the seriousness of the defendant's crimes, and for all of the reasons set forth below, the Government respectfully submits that a substantial term of imprisonment of at least 84 months, which is below the Guidelines range, would be sufficient but not greater than necessary, to serve the legitimate purposes of sentencing.

      In his filing, Costanzo continues to minimize his conduct by ignoring much of the trial evidence and, indeed, the jury's verdict. He seeks an extreme downward variance, from a Guidelines range of 108 to 135 months down to a sentence of probation.  Such a sentence would be entirely inadequate to vindicate the Section 3553(a) factors and would, among other things, lead to unwarranted sentencing disparities among similarly situated defendants, fail to fully reflect the seriousness of the defendant's offense conduct, and would inadequately promote deterrence. Imposing a sentence of probation as suggested by the defendant would, in short, represent a grave injustice given the extent of the defendant's betrayal of the public trust that placed the safety and lives of others at risk.

**Background**

**I.    Offense Conduct**

   A.    Overview of the Bribery Scheme

John Costanzo has been a special agent with the DEA since approximately 2004.[1] (PSR ¶ 13). During his employment with the DEA—and during the entirety of the relevant period for the offense—Costanzo served in DEA supervisory roles, first as a group supervisor for Group 10 of the Miami Field Division and then as staff coordinator in the Financial Investigations Section at DEA headquarters in Washington DC. (*Id.*). During the course of his employment, Costanzo worked with, and was supervised by, Manuel Recio, who was a DEA special agent from 1997 until his retirement in November 2018. (PSR ¶ 12). Recio served, among other things, as an Assistant Special Agent in Charge for the Miami Field Division where Group 10 was located. (*Id.*).

After his retirement, Recio founded Global Legal Consulting LLC ("GLC"), a private investigative firm, and began working with defense attorneys, including David Macey and Louis Guerra. (PSR ¶ 12). Within days of retiring, Recio began paying bribes to Costanzo in exchange for confidential, sensitive information about DEA cases. He continued to do so through at least November 2019. Costanzo leaked confidential information about grand jury investigations and law enforcement actions, including anticipated indictment and arrest dates, and confidential information about DEA targets from the DEA's Narcotics and Dangerous Drugs Indexing System ("NADDIS"). Recio paid Costanzo bribes through parties trusted by Costanzo, including Costanzo's father and Costanzo's best friend, former DEA Task Force Office Edwin Pagan.

   B.    The Leaked Information

The evidence at trial showed that Costanzo provided Recio with information regarding indictment dates, arrest dates, cooperating witnesses, and confidential details gleaned from DEA investigations, all to benefit Recio's private investigation business and enrich them both—through fees from private attorneys to Recio, and bribe payments to Costanzo. First, there was overwhelming evidence that Costanzo regularly queried the DEA's confidential NADDIS database upon Recio's request. (PSR ¶¶ 20-21). Indeed, Costanzo and Recio were open with each other about the fact that Costanzo was leaking NADDIS information to Recio. For example, on one occasion Recio sent Costanzo a name and asked him to "call me and give me a summary of his NADDIS". (*Id.* ¶ 22).

Costanzo provided this information to Recio despite clear warnings in the NADDIS system that he could not share this information with those outside of law enforcement. Agents logging into NADDIS, including Costanzo, had to view repeated warnings that the information was "DEA/Law Enforcement Sensitive" and "for Official Use only."

In an attempt to support his argument that his true intent was to further the DEA's mission, Costanzo suggests that he used NADDIS only to provide Recio with contact information for case agents so that Recio could attempt to cooperate clients. (Def. Mem. At 18). His position, however,

---

[1] He is currently on unpaid leave, and has had his clearances suspended since July 2022.

is directly undercut by the trial evidence. As already noted, what Recio sought was a "summary" of whatever information might be useful, not mere contact information. This is clear from Recio and Costanzo's text message exchanges, in which Costanzo regularly provided confidential information regarding the targets in questions. (*See, e.g.*, PSR ¶ 20 ("Individual-1 is a general was just appointed to some minister of some shit"); GX 344 ("Both Columbian move a lot of weight"); GX 347 ("Palacio Gomez ran loads to Costa Rica")). Costanzo and Recio likewise had numerous calls shortly after Costanzo conducted these NADDIS searches, many of which were intercepted by wiretap and played for the jury.

On July 4, 2019, for example, Costanzo told Recio that the indictment of a high-level individual under investigation for money laundering and foreign corrupt practices in Venezuela was scheduled for July 25, 2019. (PSR ¶ 24). Costanzo suggested Recio use that information to "get a meeting" where Costanzo could "tell you what to say." (*Id.*). This information regarding a planned grand jury presentation and plans to seek an indictment plainly constituted grand jury secrets that Costanzo was not authorized to disclose. (*Id.*). That individual, moreover, was not yet in custody and very well could have led to this individual fleeing from arrest or the destruction of evidence. Costanzo fully understood the unlawful implications of leaking this information, which led him to lie when confronted by the FBI in November 2019 by adamantly denying having ever shared information regarding sealed investigations. (*Id.*).

During the bribery scheme, Costanzo provided Recio with other highly sensitive information regarding DEA targets and law enforcement actions. In April 2019, Recio told CW-1 that the DEA would be conducting an operation involving many Venezuelans, and CW-1 understood that Recio had obtained that information from Costanzo. (PSR ¶ 26). In another notable example, in July 31, 2019, Costanzo warned Recio that a DEA target who was residing in the Dominican Republic would be "gone"—i.e., arrested—"in two weeks." (*Id.* ¶ 29). As the Court heard at trial, that individual ultimately did flee; law enforcement was unable to find him on the day of the arrest and Costanzo's leaking of this information could very well have contributed to that failure. Costanzo then failed to inform anyone at the DEA that Recio and Macey had been in touch with that target, despite knowing that law enforcement was actively searching for him and that Recio and Macey might have relevant information as to his location. (*Id.*). And of course Costanzo had no control whatsoever as to how the information he leaked would be used either by defense attorneys or by their clients, leaving aside his purportedly "pure" motives that led him to take nearly $100,000 in bribes.

Costanzo also shared extraordinarily sensitive information about cooperating witnesses and informants with Recio. In September 2019, Costanzo edited a document that Recio was preparing on behalf of a defendant client who had cooperated with law enforcement. Among other things, Costanzo added a note that all the individuals she had provided information about had been "indicted, incarcerated, or cooperated." (GX 303A). While the information about indictments may have been publicly available, the information regarding cooperators was not. Costanzo also knew the value of the information: while discussing the edits Costanzo was making, Recio told him to "[m]ake it look good, it's 30 grand right here." (PSR ¶ 31). On another occasion, a civilian witness contacted Costanzo with a tip about criminal activity, which Costanzo immediately shared with Recio with the instruction to "not show anyone." (*Id.*)

In sum, the information that Costanzo leaked was plainly of a highly sensitive nature. This

3

information risked jeopardizing investigations and arrests, and it risked jeopardizing the safety and lives of others.  As is discussed further below, Costanzo knew better as a DEA supervisor.  He placed his own greed above the interests of the United States when he accepted bribes to leak law enforcement sensitive information.  Costanzo's claim in his sentencing submission that he was leaking information to assist DEA investigations and that these leaks were "at all times intended to further the DEA's work," (Def. Mem. at 18), is at odds with the evidence and the jury's verdict and represents a pitiful attempt to rationalize his betrayal of the United States to line his own pockets.

    C.  <u>Bribery Payments</u>

In exchange for improperly sharing DEA confidential information, Costanzo received nearly $100,000 in bribes during a period spanning approximately one year that were funneled to him via at least four methods: (1) a company owned by Costanzo's father, EBCO International of Miami ("EBCO"); (2) a company nominally owned by Costanzo's best friend, Edwin Pagan, JEM Solutions; (3) Pagan, and (4) Macey.

At trial, the evidence showed that Costanzo received at least the following bribery payments:

- $2,500 received from Recio, via GLC to EBCO, on November 13, 2018, just three days after Recio retired from the DEA.  (PSR ¶ 33).  The evidence at trial overwhelmingly showed that this was money Costanzo made for leaking information to Recio.  Among other things, this payment was made at the same time that Costanzo began conducting NADDIS searches for Recio, and Recio's company, GLC, produced text messages regarding those NADDIS searches in response to a subpoena request for any records related to GLC's transfer of $2,500 to EBCO.

- $10,000 received from Recio, via GLC to JEM Solutions, on January 31, 2019.  (PSR ¶ 34).  Notably, Pagan provided Costanzo with access to the JEM Solutions bank account right after it was established and testified that the company was an acronym for "John, Edwin, and Manuel"—in other words, it was a company that they operated together. JEM's records included a handwritten invoice falsely suggesting that the payment was for the "investment of risk management company," but neither JEM nor GLC had any other records or communications relating to such an investment.  Indeed, phone records showed that Recio and Pagan had never called each other and exchanged no relevant text messages. (*Id.*)

- $10,750 received from Recio, via GLC to JEM Solutions, on June 3, 2019.  (PSR ¶ 35). As with the prior payment, there was a handwritten invoice falsely suggesting that the payment was for "services for Johnny Grobman case," but Pagan could not answer basic questions about that case and neither JEM nor GLC had any other records regarding those purported services.  (*Id.*).

- $50,000 received from Pagan via Costanzo, Sr. in 2019 as a payment that was made towards Costanzo's purchase of a townhouse.  (PSR ¶ 37).  While Pagan claimed that this payment was an investment that he made in the townhouse, Pagan could not articulate any

4

of the terms of that purported investment and a letter was submitted to the mortgage company falsely claiming that this money was a gift from Costanzo, Sr.. (*Id.*).

- $20,000 received from Pagan to pay off a loan that Costanzo, in January 2020, had received from a former girlfriend. (PSR ¶ 37). Pagan could provide no credible explanation as to why he paid this loan for Costanzo and, notably, the combined value of this payment and the investment in the townhouse exceeded his entire available net income in 2019, the relevant year. (PSR ¶ 37).

- Approximately $5,000 paid by Macey, in 2019, to a contractor that was working on renovations at Costanzo's home. (PSR ¶ 38). Macey also paid more than $1,700 for Yankees tickets and a dinner attended by himself, Costanzo, and another high-ranking DEA supervisor. (*Id.*)

The evidence that those payments were bribes, was supported by, among other things, the steps Costanzo and his co-conspirators took to conceal the payments and recorded calls in which Costanzo and Recio discussed the money they were making from Macey and Recio. For example, in July 4, 2019, when Costanzo complained that Guerra did not "bring anything to the table," Recio responded by describing how Guerra had brought approximately $130,000 to the scheme. (PSR ¶ 39). In another call, Guerra remarked to Costanzo and Recio, in response to Costanzo's statement about how he would be "running this fucking thing [the DEA] pretty soon," that "we're here scheming about how we're going to make money, money, money, so we're all on the same page." (*Id.*).

D. Costanzo Violated His Official Duties

When Costanzo accepted money in exchange for leaking confidential information to Recio, he blatantly violated his official duties as a DEA Special Agent. Among other things, the DEA Standards of Conducts lists, as conduct constituting "Misuse of Official Position," the following:

- "Us[ing] his/her official position for private gain;"

- "Glean[ing] or garner[ing] information not generally available to the general public and us[ing] that information for nonofficial purposes. This includes conducting a search in a database that an employee has access to due to his/her employment with DEA;"

- "Distribut[ing] or disclos[ing] information not available to the general public for nonofficial purposes." (PSR ¶ 16).

DEA employees are required to receive annual training on the Standards of Conduct and certify their understanding of those rules, which Costanzo did in 2018 and 2019. (PSR ¶ 17). As a DEA supervisor, moreover, Costanzo was responsible for making sure that DEA Special Agents under his supervision also understood and followed the Standards of Conduct.

E. Costanzo and Recio Attempted to Conceal the Scheme

Costanzo and Recio took numerous steps to hide their bribery scheme, which further demonstrated their consciousness of guilt and that the payments received were bribes rather than

5

having been provided for any purported legitimate purpose. Most significantly, Costanzo and Recio hid many of their communications by having Costanzo use a secret phone that Recio paid for, using encrypted applications, and deleting chat communications, including communications where they discussed the bribery scheme. When confronted about the secret phone during interviews, both Costanzo and Recio initially denied it, and then downplayed its significance. But Costanzo used the secret phone for many of the recorded calls where Costanzo leaked sensitive information to Recio. (PSR ¶ 40).

In addition to hiding their communications, Costanzo concealed the nature of his ongoing relationship with Recio. Most notably, Costanzo never disclosed to his supervisors at the DEA that he was discussing DEA cases with Recio. (PSR ¶ 41). Nor did he disclose those communications to the relevant case agents, even though he now claims that the purpose of his leaks was to encourage cooperation in those cases. When a DEA colleague asked Costanzo what Recio was doing after his retirement, Costanzo answered that "Manny is doing his thing" without disclosing Recio's work as a private investigator or his own involvement in that work. (*Id.* ¶ 41).

Finally, Costanzo failed to disclose the work he was doing with Recio on his SF-86 form in 2020, which required a disclose of "all employment activities," nor did he disclose the payments he had received on his IRS forms.

Costanzo also threatened to take more aggressive steps to limit the flow of information after rumors started to circulate about his relationships with Macey. In particular, during a discussion regarding those rumors, Costanzo told Recio to "[g]et those guys in line" and threatened to "find people to put problems on them." (PSR ¶ 42; GX 214-T)

## II.     The Charges and Trial

Indictment 22 Cr. 281 (JPO) (the "Indictment"), which was filed on May 18, 2022, charged John Costanzo with one count of conspiracy to bribe a public official, in violation of 18 U.S.C. § 371 (Count One); accepting a bribe as a public official, in violation of 18 U.S.C. § 201(b) (Count Two); conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. § 1349 (Count Four); and honest services wire fraud, in violation of 18 U.SC. §§ 1343 & 1346 (Count Five), all from at least in or about October 2018 up to and including November 2019.

On November 8, 2023, Costanzo was convicted on all four counts following a three-week jury trial.

## III.    The Presentence Report

The U.S. Probation Office determined that the total offense level for Counts One, Two, Four, and Five, which are all grouped for guideline calculation purposes, is 31. The offense calculation for Costanzo is as follows:

**Base Offense Level:** Pursuant to U.S.S.G. § 2C1.1(a)(1), because Costanzo was a public official, the base offense level is 14. (PSR ¶ 51).

**More Than One Bribe:** Pursuant to U.S.S.G. § 2C1.1(b)(1), 2 levels are added because Costanzo received more than one bribe. (PSR ¶ 52).

**Value of the Bribes:** Pursuant to U.S.S.G. § 2C1.1(b)(2)(E) and 2B1.1(b)(1)(E), 8 levels are added because the value of the payments was approximately $98,750. (PSR ¶ 53)

Costanzo objects to both of the above-enhancements. As Costanzo acknowledges, many of his arguments mirror those he made in his Rule 29 Motion, to which the Government previously responded. (*See* Gov't Opp'n to Def. Post-Trial Mots., Dkt. No. 220, at 17-24). In his sentencing submission, however, Costanzo raises a new, irrelevant argument: that the Court should not find multiple bribes because the Government did not request a special verdict form. (Def. Mem. 8-10). The case Costanzo cites in support for his argument, *United States v. Barnes*, 158 F.3d 662 (2d Cir. 1998), dealt with the fact that *statutory enhancements* to sentences can only be based on conduct resulting in a conviction. *Id.* at 668-71. When it comes to determining the appropriate Guidelines range, however, *Barnes* stated that a jury's verdict was not dispositive. *Id.* at 668. The Government was under no obligation to seek a special verdict for the Court to determine there were multiple bribe payments; this Court may apply the sentencing enhancement if it finds the relevant facts established by a preponderance of the evidence. And the evidence at trial clearly showed that there were multiple bribe payments.

In addition, the Guidelines commentary makes clear that "[t]he court need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1, Application Note 3. Here, the fact that there were multiple bribes totaling approximately $98,750 is amply supported by the record. In particular, the evidence demonstrates beyond a preponderance that two payments made by Recio to Pagan's company JEM, totaling approximately $20,000, and the two payments totaling approximately $70,000 that Costanzo received from Pagan, were all part of the bribery scheme. In the final pretrial conference, the Court already recognized that there was a reasonable inference the $70,000 was part of the scheme: "When someone gets $70,000, they can infer that they had some really nice wealthy friends who just love to shower them with $70,000, or they can infer that there was some illegitimate income from employment or from somewhere." (Final PTC at 29:16-20). The evidence at trial proved the latter of these inferences. First, the trial demonstrated that Pagan was a conduit for bribe payments through JEM Solutions. Recio sent over $20,000 to JEM Solutions, despite no communications between Reico and Pagan, and Costanzo had access to that money, including using the JEM Solutions account to pay for first-class flights. That Pagan separately sent Costanzo $70,000 around the same time is not merely coincidence; the reasonable inference is that this was also part of the bribery scheme. Additionally, the trial evidence clearly showed that Pagan was not a "nice wealthy friend." Rather, Pagan's payments to Costanzo exceeded his entire post-tax income for 2019 and reduced his lifelong savings by nearly half. (GX 401B, GX 709). Finally, any lingering doubts about the $70,000 payments were resolved when Pagan took the stand. Although he denied any bribery scheme on direct examination, the significant gaps and inconsistencies in his testimony completely undermined his narrative. The Court can and should reasonably infer that Pagan's unbelievable testimony was meant to hide the truth—that Pagan participated in the bribery scheme by funneling money to Costanzo, including the $70,000.

**Public Official in a High Level / Sensitive Position:** Pursuant to U.S.S.G. § 2C1.1(b)(3), 4 levels are added because Costanzo was a public official in a high-level decision-making or sensitive position. (PSR ¶ 54). Costanzo does not dispute this enhancement.

**Manager / Supervisor of Criminal Activity:** Pursuant to U.S.S.G. § 3B1.1(b), a three-level increase is warranted because Costanzo was a manager or supervisor and the criminal activity involved five or more participants or was otherwise extensive. (PSR ¶ 56).

Costanzo objects to this leadership enhancement. The Probation Department, however, properly applied an enhancement based on Costanzo's role as a manager or supervisor of the criminal offense. (PSR ¶ 44). In opposing this enhancement, Costanzo claims that there is no evidence other than "the nature of the relationship[s]" to support a finding that Costanzo recruited his father and Pagan into the scheme. Additionally, Costanzo rejects the notion that he exercised control over any of the other participants, including Recio, Pagan, Macey, or Guerra. (Def. Mem. at 11-12). The evidence, however, more than supports a finding that Costanzo was a manager or supervisor of the conspiracy.[2] Application Note 4 to Section 3B1.1 provides that the relevant factors include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." All of these factors weigh in favor of applying the three-level enhancement here.

First, there is ample basis to conclude that Costanzo managed and supervised Pagan and Costanzo, Sr. during the offense. Costanzo, Sr. and Pagan served as conduits through which bribe payments flowed, but the evidence plainly showed that Costanzo directed the flow of funds and managed Pagan and Costanzo, Sr. For instance, from October 1, 2018 through November 30, 2019, Pagan and Costanzo, Sr. exchanged no calls with Recio, despite the fact that Recio sent both of them tens of thousands of dollars connected to the bribery scheme. (GX 708). During that same period, however, Pagan and Costanzo, Sr. exchanged over 600 phone calls *each* with Costanzo, Sr. (*Id.*) A more detailed analysis of Costanzo's phone calls around key dates further demonstrates his central role in the conspiracy's operations. For example, between November 11, 2018 and November 14, 2018—a period of time in which Macey paid GLC $5,000, half of which Recio then sent to Costanzo, Sr.'s company—Costanzo Jr. was the hub of communications, making and receiving numerous calls to Macey, Recio, and Costanzo, Sr. (*Id.* at 5).

Similarly, when Recio was getting ready to deposit a $10,000 bribe into the JEM Solutions bank account, he did not ask Pagan for the account information. Rather, Costanzo collected the information from Pagan, which he then shared with Recio. (GX 358, GX 362C). There was nothing stopping Recio from reaching out directly to Pagan for that information, but the text records make it clear that Costanzo was coordinating the payment between his fellow co-conspirators. And after Susana Rueda had loaned Costanzo $20,000 to pay for his lawyer, Pagan paid that money back through a cashier's check. But even though Rueda and Pagan knew each other, (Trial Tr. 1224), they did not coordinate the repayment between themselves. Rather, Costanzo picked up Rueda, then picked up Pagan, who handed Rueda the check without any further explanation. (Trial Tr. 1226-1227). This evidence not only shows that Costanzo managed Pagan and Costanzo, Sr., it also provides a basis to conclude that he recruited them into the scheme. As conduits for the bribes, Costanzo, Sr. and Pagan clearly had subordinate roles in the conspiracy,

---

[2] Costanzo does not contest that the conspiracy "involved five or more participants." U.S.S.G. § 3B1.1(b).

8

as demonstrated by the lack of evidence that either profited from the scheme. Pagan, for example, did not utilize any of the funds in the JEM Solutions bank account, and the bank records showed that the $50,000 given by Pagan to Costanzo, Sr. almost immediately got passed in full to the lawyer's handling Costanzo's real estate closing. Moreover, as noted above, there is no evidence that either of them acted without Costanzo's knowledge. Costanzo's close relationship with his father and friend is relevant, but it is not the only evidence to show, by a preponderance, that Costanzo brought his father and Pagan into the scheme.

Second, the evidence at trial established that Costanzo exercised significant supervision over the entire conspiracy. Costanzo exclusively controlled the inside DEA information—the most valuable part of the conspiracy. He recognized the power that gave him over his co-conspirators and exercised it to his advantage, playing Macey and Guerra off each other to further enrich himself. In one case, Recio told Costanzo he would recommend a client to Guerra, suggesting they could talk Guerra into a "50/50" split. Costanzo replied that he was meeting with Guerra the next day. (GX 384). Similarly, on a phone call where Recio complained about Macey's attitude, Costanzo directed Recio to "get through this," meaning continue working with Macey, because Guerra "doesn't bring anything to the table." (GX 202B-T). Despite Recio's evident dislike of Macey, Costanzo, who controlled the information, told Recio to keep working with Macey because of the money Macey could provide them. Costanzo even told this to the attorneys directly. On one occasion, when Macey complained that a client had chosen Guerra over him, Costanzo told Macey there were cases "we have been working on for u and him. It necessary to share." (SDNY_0002552-53). And, to drive home the control Costanzo exercised over the attorneys, he told Guerra in a recorded conversation that Guerra "better love me, because I'm going to be running this fucking thing pretty soon." (GX 203-T).

The defendant is assigned to Criminal History Category I and has zero criminal history points.[3] (PSR ¶ 65). Accordingly, the applicable Guidelines range is 108 to 135 months' imprisonment. (*Id.* ¶ 97).

Noting, among other things, that Costanzo's involvement in the instant offense was "in direct contrast to his decades of work in law enforcement" and that Costanzo's "greed outweighed the endangerment of the DEA's investigations and criminal cases" that "could have seriously endangered . . . lives," the Probation Department recommends a sentence of 72 months. (PSR at 43, 45).

---

[3] U.S.S.G. § 4C1.1's two-level adjustment for certain offenders with zero criminal history points is inapplicable here because Costanzo received an aggravating role adjustment under Section 3B1.1.

**Discussion**

I. **Applicable Law**

As the Court knows, the Sentencing Guidelines, while no longer mandatory, still provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), courts must treat them as the "starting point and the initial benchmark" for sentencing proceedings, *id.* at 49.

After calculating the Guidelines range, the Court must consider the factors outlined in Title 18, United States Code, Section 3553(a), which include: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7). *See Gall v. United States*, 552 U.S. 32, 50 & n.6 (2007).

In determining the appropriate sentence, the statute directs the Court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

II. **A Substantial Term of Imprisonment of At Least 84 Months is Warranted**

John Costanzo rose through the ranks of the DEA to become a group supervisor and hold a prestigious title at DEA headquarters. He supervised countless investigations and arrests—including for cases involving sophisticated money laundering and with significant international and diplomatic implications. At the same time, Costanzo was taking advantage of his position to sell his access to information. Although the FBI unraveled the bribery scheme after only approximately one year, when Costanzo had just started reaping significant profits, real damage was already done: investigations had been undermined, at least one criminal target had fled, and Costanzo had corrupted the law enforcement system he had sworn to honorably serve. The sentencing factors in 18 U.S.C. § 3553(a) support a substantial sentence of at least 84 months' imprisonment, consistent with the Probation Office's recommendation.

      A.      <u>Seriousness of the Offense and Need for Just Punishment</u>

A substantial sentence of imprisonment is necessary primarily to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. 18 U.S.C. § 3553(a)(2)(A). There is no question that the defendant's crimes were serious, spanned more than a year, and undermined public confidence in law enforcement and government institutions. While working as a trusted federal law enforcement officer with tremendous power, including supervisory power over numerous criminal investigations, the defendant sold his access to confidential law enforcement information.

Costanzo did not simply accept bribes in exchange for confidential information. He did so after having been placed in a senior position of trust to protect the public. And he did so using the specialized knowledge regarding money laundering and techniques to conceal illicit conduct—techniques like the use of shell companies, the layering of payments through multiple bank accounts, and the use of encrypted communication applications—that he obtained from his long experience with the DEA for purposes of *preventing* criminal conduct. In other words, he corrupted his many years of experience and casework by using it to enable his criminal activity. Simply put, the defendant was entrusted by the public with highly sensitive law enforcement information. Rather than protecting that information, the defendant sold it in return for bribes. By doing so, the defendant jeopardized investigations and safety. The defendant knew better, but chose greed over duty. This corrupt conduct speaks for itself and warrants a significant sentence.

Promoting respect for the law and providing just punishment thus demands a substantial incarceratory sentence, so that the American public knows that its government will not allow its officials to exploit their position and power in service of self. *See, e.g.*, *United States v. Sampson*, 898 F.3d 287, 314 (2d Cir. 2018) (finding above-Guidelines sentence justified by district court's reasoning that "there has to be a sense that we give to the public that we are going to safeguard the integrity of our system . . . . That we will hold our public officials to a higher standard . . . .").

      B.      <u>The Need to Afford Adequate Deterrence to Criminal Conduct</u>

Deterring former government officials—particularly those responsible for significant criminal investigations—from abusing their positions also requires a significant term of imprisonment. *See* 18 U.S.C. § 3553(a)(2)(B). Crimes such as Costanzo's "are hard to detect and prosecute, and so the sentence imposed must be sufficient to deter conduct of this sort." *United States v. Burman*, 16 Cr. 190 (PGG), 2020 WL 3182766, at *5 (S.D.N.Y. June 13, 2020) (internal quotation marks omitted); *see also United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it."); *see also United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018) (citing *Heffernan*). As noted above, Costanzo used multiple sophisticated techniques that he learned from his years of experience in investigating crimes to attempt to conceal his conduct. Preventing other law enforcement officers from following in Costanzo's footsteps supports a significant term of imprisonment. Indeed, imposing a non-incarceratory sentence, as Costanzo suggests, would have detrimental result, sending a message that public servants will suffer no serious consequences even

11

if they abandon their oaths and begin selling their access to valuable, sensitive information in exchange for bribes.

The need for general deterrence is particularly acute in this case, which involved the interplay between defense attorneys, their private investigators, and special agents. *See, e.g.*, "The FBI Flipped DEA Snitch 'Bowling Ball,' and He's Blowing the Lid Open on Miami's 'White Powder Bar' of Cocaine Lawyers," *Fortune*, October 11, 2023 (available at https://fortune.com/2023/10/11/fbi-investigation-dea-snitch-miami-white-powder-bar-drugs-cocaine). While agents can and should seek out information from all lawful sources, the high-level cases Costanzo handled presented a temptation to blur the lines between defense attorney, investigator, and agent—a temptation Costanzo was unable to resist. Further evidence of the blurring of these lines, incredibly, comes from one of Costanzo's own letters of support. Michael P. McManus, the former DEA Chief of Operations for Mexico and Central America and a private investigator, in his letter supporting Costanzo, describes "the area in question associated with this case" as a "gray area." (Def. Mem., Ex. A). To be clear, this is a former high-ranking DEA official describing the leaking of NADDIS information, cooperator details, and arrest dates—all in exchange for payments—as a "gray area." McManus goes on to describe the role of a private investigator as "assist[ing] the U.S. Government (USG) in their fight in the drug war." (*Id.*). This attitude obviously contradicts the notion of an adversarial system, in which private investigators working for defense attorneys should be representing their clients' interests, not "fight[ing] the drug war" on behalf of the DEA.

Costanzo embraced this culture. As his attorneys repeatedly told the jury, he *thrived* in this culture. (Trial Tr. 116-17). But this culture, taken too far, can lead to a perversion of justice and a corruption of the system, as seen in this case. The Court must send a clear message through its sentence in this case that leaking confidential law enforcement investigation is a serious crime that will bear heavy costs to any member of law enforcement who dares to do so, particularly those who leak information in exchange for bribes.

C.   The Need to Avoid Unwarranted Sentencing Disparities

The requested sentence of 84 months' imprisonment will also prevent unwarranted sentencing disparities between this defendant and similarly situated defendants. In his submission, Costanzo identifies numerous bribery cases resulting in sentences of substantial terms of imprisonment. Incredibly, however, Costanzo argues that these cases support his request for a non-incarceratory conduct because they demonstrate "*exponentially more serious conduct*." (Def. Mem. at 48 (emphasis in original)). Costanzo is wrong. His conduct is similar to, and in many instances far more serious, than the conduct in these other bribery cases. And even if in some respects Costanzo's conduct was less culpable, it in no way justifies the extreme variance he seeks.

The most direct analogue to this case is *United States v. Broumand*, 20 Cr. 224 (RGK) (C.D. Cal.), in which an FBI agent who accessed sensitive information to share with an attorney was sentenced to 72 months' imprisonment. Broumand received bribes in the form of a motorcycle, flights, hotels, and meals. To cover up the conduct, Broumand lied to other agents and filed false forms. The similarities to the present case are striking. Yet Costanzo relies on a specious distinction to claim Broumand's conduct was worse. Costanzo claims that Broumand's actions were undertaken "to help the lawyer and his criminal associates avoid prosecution and law

12

enforcement monitoring." (Def. Mem. at 46). Costanzo contrasts that with his allegedly pure motives for leaking information. Costanzo's account of his own motives is, at best, highly selective and misleading. There is no evidence that Recio, Macey, or Guerra ever advanced the DEA's mission after receiving information from Costanzo, and considerable evidence that Costanzo's actions were motivated by his own greed and his desire to protect himself from prosecution, not from a desire to build cases. More importantly, Costanzo's distinction between his actions and Broumand's actions falls apart under closer scrutiny. Broumand, like Costanzo, offered self-serving and overwhelmingly innocuous explanations for his conduct. *See Broumand*, 20 Cr. 224 (RGK) (C.D. Cal.) (Dkt. No. 283). In other words, Costanzo is asking the Court to assess Broumand's conduct based on the jury's verdict, while assessing his own conduct based on a rejected theory that he presented to the jury. The Court should not credit this false distinction.

Costanzo ignores perhaps the most important difference between this case and *Broumand*: unlike Broumand, Costanzo was a DEA supervisor at the time of the offense. As a supervisor, Costanzo was responsible for ensuring that the people under his supervision followed the "policies and procedures" of the DEA. (Trial Tr. at 131:14-18). To that end, Costanzo received additional training when he became a supervisor, including ethical training. (*Id.* at 131:21-132:10). This is a significant aggravating factor Costanzo fails to address. Costanzo, more than a line agent, should have understood the ethical boundaries of his job. And yet he flouted the DEA's standards of conduct. One of his responsibilities as a supervisor was to set an example for his agents, yet for years Costanzo showed his agents that cultivating improper relationships with defense attorneys was the way to succeed. Additionally, the fact that he committed these crimes while holding positions of management within the DEA undermines confidence in the DEA more than if he had simply been a line agent.[4]

The other cases Costanzo cites similarly weigh in favor of the Government's recommended sentence.[5] In *United States v. Collare*, 20 Cr. 17 (M.D. Pa.), the defendant was sentenced to an above-guidelines sentence of 75 months for various bribery and fraud offenses. While Collare's sentence was driven, in part, by his unique misconduct, it bears noting that the sentencing judge was particularly persuaded by the fact that a defendant charged with similar crimes received a 72-month sentence. (*Id.*, Dkt. No. 144 at 22:-2-7) ("I did review the docket for that case, and I conclude that there are significant similarities between the offense conduct in these cases. And while there were differences in the individual characteristics of the defendants, the sentence imposed here, I think importantly, is commensurate with the 72-month sentence imposed on Defendant McDonald."). The Government believes that the same rationale applies here—the similarity between this case and *Broumand* compels the Court to impose a commensurate, if not higher, sentence on Costanzo.

---

[4] Moreover, for much of the scheme, Costanzo served in a coordinating role at DEA HQ, from which he had visibility into sensitive investigations all around the country. (Tr. at 956-57). This gave Costanzo both a means to commit the offense and a plausible explanation for gathering information about cases handled by other DEA agents.

[5] As with *Broumand*, it does not appear that any of these defendants were supervisors within their law enforcement agencies.

Finally, in *United States v. Lustyik*, 13 Cr. 616 (VB) (S.D.N.Y.), the defendant received a 60-month sentence despite the fact that he only received $1,000 in bribes, and no harms resulted from the offense. Yet Costanzo somehow claims that this conduct was "exponentially" more serious than his own.

Even in cases involving bribery of a less serious nature, courts in this District have repeatedly stressed the harm caused by the offenses and the need for imprisonment. For example, in a pair of cases involving bribes of less than $10,000 to NYCHA employees, Judge McMahon and Judge Cote powerfully described the harms caused when public officials betray the trust inherent in their offices. Judge McMahon stated, "[T]he corruption of a public agency, to me, that's at the top of the list. . . . It's the worst of the worst. . . . This is exactly the type of crime that cries out for a message to be sent that if you engage in this kind of behavior, if you betray the public trust . . . that there are serious consequences to be paid." *United States v. Gibbs*, 22 Cr. 534 (CM) (Dkt. No. 30, 14-15). Gibbs was sentenced to thirty-three months' imprisonment. (*Id.*). In *United States v. Figueroa*, 22 Cr. 605 (DLC), Judge Cote similarly called the offense "a real betrayal. You may have been a good family member, but you were not a good employee. You betrayed your employer, you betrayed the city, you betrayed the residents of the houses at which you worked. This was a corruption of your job and your duties. You were given responsibility and authority, and instead, you used that to get money you had no right to. And corruption is a corrosive, destructive issue. People need to have faith in their government. . . . So, you did something that undermined any other good work that you did as a NYCHA employee." (*Id.* (Dkt. No. 27 at 17)). And in *United States v. Figueroa*, 23 Cr. 161 (MAD), a former court employee for the Southern District of New York was sentenced to two years' imprisonment for encouraging criminal defendants to retain a private attorney in exchange for payments from the attorney.[6]

All these cases share two things in common: first, they recognize that bribery by public officials is a serious offense that has negative impacts far beyond the offense misconduct itself; and second, none of them remotely support Costanzo's request for a non-incarceratory sentence.

    D.    <u>History and Characteristics of the Defendant</u>

Defendant's history and characteristics further support the requested sentence. Unlike many of the defendants who appear before this Court, the defendant came from a stable, loving, supportive family home. Rather than build upon this strong family foundation and honorably build on his father's legacy of service at the DEA, the defendant abused his position in a manner that violates the public trust in law enforcement.

Moreover, Costanzo acted purely out of greed: the bribery payments were used solely to pay for his owner personal expenses, such as the downpayment on his home, first class airline tickets, and renovation expenses. There is no contention that Costanzo engaged in the offense out of need, necessity, or lack of other options. Costanzo could have easily chosen a path in which he continued to do valuable work for the DEA and the public. Instead, he used his network, connections, and skills to hold himself above the law and make money for leaking law enforcement

---

[6] https://www.justice.gov/usao-sdny/pr/southern-district-new-york-court-employee-and-criminal-defense-attorney-sentenced

14

secrets, undermining everything he purported to stand for. Costanzo's background thus provides no mitigation or excuse for his conduct.

### E. Costanzo's Section 3553(a) Arguments Are Unpersuasive

The Court should also reject the defense's remaining arguments for a non-incarceratory sentence under the § 3553(a) factors. Costanzo asks for a sentence of probation, meaning that he would not serve any term of imprisonment whatsoever for his offense. Such meager punishment would hardly comport with society's understanding of just punishment, and would undermine respect for the law.

According to Costanzo, it is enough that his conviction has cost him his job, his reputation, and his social standing with friends and family. But as the Court of Appeals has explained, that does not constitute just punishment because "[t]hose are consequences generally suffered by anyone accused and convicted of a crime," especially a serious one. *United States v. Cutler*, 520 F.3d 136, 170-71 (2d Cir. 2008) (holding district court erred as a matter of law in imposing non-incarceratory sentence on grounds that humiliation and loss of law license adequately punished convicted attorney). To suggest that Costanzo has been adequately punished by these highly foreseeable collateral consequences is to reward him for the very privileges he abused, by suggesting that only less fortunate defendants, who lack equivalent jobs and support systems to lose, need to be jailed. *See id.* ("[T]he imposition of a non-incarceratory sentence on the basis that a defendant has suffered sufficiently simply because he was prosecuted and convicted would create unwarranted disparities among similarly situated defendants."). In short, collateral consequences of the sort cited by Costanzo should not be given undue weight and should not ultimately dictate a lenient sentence. Courts in this District and elsewhere appropriately disfavor placing undue weight on the collateral consequences that a defendant in a white-collar job suffers as a result of a conviction. *See, e.g., United States v. D'Amico*, 496 F.3d 95, 107 (1st Cir. 2007) (vacating former city councilor's four-month sentence for Hobbs Act extortion and false statements offenses, which sentence varied downwardly 88% from a Guidelines range of 31 to 44 months, where the variance was premised significantly on the collateral consequences of conviction faced by the defendant), *vacated on other grounds by* 552 U.S. 1173 (2008); *id.* at 106-07 (noting that giving substantial variances in sentencing to white collar defendants who "often have achieved more tangible successes than other defendants . . . will inevitably lead to sentencing courts treating white collar defendants more leniently (in the relative sense) simply because of their societal status—a result that would be contrary to one of Congress' primary objectives in enacting the current federal sentencing scheme"); *see also United States v. Rattoballi*, 452 F.3d 127, 135 (2d Cir. 2006) (noting that "[e]very convicted felon suffers from the indignity and ill-repute associated with a criminal conviction," and that reliance on such so-called "collateral consequences is contrary to 18 U.S.C. § 3553(a)(6), which calls for a reduction in unwarranted disparities among similarly situated defendants").

Costanzo also erroneously argues that this was a victimless crime, with no impact on law enforcement. This contention flies in the face of the actual trial evidence, which showed that at least one defendant fled and evaded arrest after Costanzo tipped Recio as to his anticipated arrest date. Multiple law enforcement agents also testified that leaks of the type of information Costanzo provided could endanger the safety of agents, cooperating witnesses, and sources. (Trial Tr. 319

("you could compromise an ongoing DEA investigation and thereby compromise the safety of individual DEA personnel and any individual involved in the investigation"); *see also* Trial Tr. 296, 321, 986, 1307). It may be impossible to fully quantify the harm Costanzo caused, especially given that no one but Recio and Costanzo know what information Costanzo shared in his numerous calls with Recio about NADDIS searches and other matters prior to the Government obtaining a judicially authorized wiretap; the failure to be able to quantify it, however, does not mean that the harm was not real and did not occur. To the contrary, at a minimum, Costanzo's crimes undermined the legitimacy of the work done by other federal law enforcement agents.

Further, all criminal defendants have an interest in retaining counsel based on reliable, neutral information. Costanzo undermined that interest by providing information that was used to steer criminal targets, defendants, and their families towards the attorneys of *Costanzo*'s choice—Macey and Guerra—regardless of whether that was in their best interests, based on Costanzo's own personal financial stake in their decision. Being deprived of access to counsel of their own choosing based on unbiased information undoubtedly harmed defendants and undermined the integrity of the criminal justice system.

Costanzo's argument that the purpose of his efforts was always to encourage cooperation with DEA investigations is similarly specious. As an initial matter, this argument was presented to, and rejected by, the jury, which necessarily found that he leaked the information at least in part because of the bribe payments. It is also absurd. If Costanzo's true goal had been to further the interests of ongoing DEA investigations, he would have communicated with, and coordinated with, the relevant case agents and his supervisors. He did no such thing. To the contrary, he took affirmative steps to hide his ongoing relationship with Recio and their exchanges. Costanzo was motivated by greed, not altruism.

As another mitigation argument, Costanzo points to his long service with the DEA in the period before he began committing crimes. There is no dispute that Costanzo had a successful career in the DEA. But when he embarked on the bribery scheme, he chose to throw away those years of lawful service. Having sold his service cheaply, he cannot credibly claim leniency based on that same service, especially because, as already noted above, Costanzo was able to commit the instant crimes, and those crimes were so damaging, precisely because of the senior position he occupied at the DEA. *See United States v. Fishman*, 631 F. Supp. 2d 399, 403 (S.D.N.Y. 2009). It is perverse for Costanzo to seek leniency based on the same achievements that laid the foundation for his crimes.

Costanzo also touts his devotion to family and friends, and includes letters from a handful of former supervisees proclaiming him to be a great boss. The Court should not give these letters great weight for two reasons. First, one should expect a senior leader in the DEA to have at least some agents with whom he shared a good working relationship, and so it is of limited import that certain agents have written that Costanzo competently performed the job which he also used to commit his crimes. *See United States v. Serafini*, 233 F.3d 758, 773 (3d Cir. 2000) (good works as a legislator "reflect[] merely the political duties ordinarily performed by public servants" and "if a public servant performs civic and charitable work as part of his daily functions, these should not be considered in his sentencing because we expect such work from our public servants"). Second, and perhaps more importantly, anyone who speaks of Costanzo's devotion to family and friends is likely not fully aware of the facts of the instant prosecution. The measure of Costanzo's devotion

16

to his family must include the fact that he exposed both his father and best friend to criminal exposure and imprisonment by using them as conduits to accept bribe payments. He also angrily threatened violence against those who spoke of his corrupt relationships, stating that "they should be lucky that they're breathing the air." (GX 214-T). Those are not the actions of a devoted friend and family man; they are the words and actions of a selfish, greedy one.

Costanzo also argues that the Guidelines range is overly inflated because of 8-level enhancement for the loss amount. This is, however, not a case where the offense level is driven primarily by the loss enhancement. It is driven just as much—in fact, more so—by other relevant considerations, like the fact that Costanzo took more than one bribe, that he was in a sensitive position when he did so, and that he played a leadership role in the offense. Nor was this a case where there was a single event with a large loss amount that might overstate Costanzo's culpability, or where the overall loss was particularly high compared to other economic offenses. To the contrary, Costanzo leaked information to Costanzo for a full year, receiving periodic payments that reflected the value of that information. Regardless, the Government does not dispute that some downward variance from the Guidelines range would be appropriate here; the downward variance of 100% that Costanzo seeks, however, is completely unwarranted.[7]

For all these reasons, the Government respectfully submits that a substantial period of at least 84 months' imprisonment should be imposed in this case.

## III. Forfeiture

The applicable forfeiture statutes provide for the forfeiture of "[a]ny and all property, real and personal, that constitutes or is derived from proceeds traceable to [the offense of conviction]. 18 U.S.C. § 981(a)(1)(C). In cases involving "illegal services [and] unlawful activities," proceeds is defined to include "property of any kind obtained directly or indirectly, as the result of the commission of the offense . . . , and any property traceable thereto, and is not limited to the net gain or profit realized from the offense." 18 U.S.C. § 981(a)(2)(A).[8] In addition to seeking forfeiture of specific property that was derived from or used to facilitate a crime, the Government

---

[7] Costanzo argues that he shouldn't serve a prison term because the Government didn't indict two of his co-conspirators, Macey and Guerra. He entirely ignores that the Government *did* indict his most similarly situated co-conspirator, Recio, a former DEA officer who well knew the sensitivities of the information Costanzo was leaking. This Court and Costanzo, moreover, are well aware that the Government's investigation into this matter is ongoing, and that there is a crime-fraud motion pending before the Court to obtain access to additional communications regarding the scheme involving Macey and Guerra.

[8] Costanzo suggests that the definition of proceeds in Section 982(a)(2)(B) may apply. The difference in the definitions is irrelevant here, as Costanzo incurred no direct costs or expenses that could be offset against the amount of proceeds. Regardless, the cases he cites do not support the point he makes. In *United States v. Percoco*, 16 Cr. 776 (VEC), 2019 1593882 (S.D.N.Y. Apr. 15, 2019), the court stated that "bribery is an inherently unlawful activity: it simply cannot be done legally. That would suggest that § 981(a)(2)(A) should apply." And *United States v. Milton*, 21 Cr. 478 (ER), 2024 WL 779210 (S.D.N.Y. Feb. 26, 2024), was a case involving securities fraud and wire fraud, not bribery.

may also obtain a money judgment against the defendant to recover the amount of the defendant's criminal proceeds. *See* Fed. R. Crim. P. 32.2; *United States v. Awad*, 598 F.3d 76, 78 (2d Cir. 2010).

During his involvement in the charged conspiracy, Costanzo obtained approximately $98,750 in bribery payments, as discussed above. Accordingly, the Government requests that the Court enter an order of forfeiture in the amount of $98,750.[9] The Government has submitted a proposed forfeiture order together with this sentencing submission.

## **Conclusion**

For the foregoing reasons, the Court should impose a substantial term of imprisonment of at least 84 months' imprisonment and order forfeiture in the amount of $98,750.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____/s/_____
Mat Andrews
Emily Deininger
Sheb Swett
Assistant United States Attorney
(212) 637-6526 / 2472 / 6522

cc:    Defense counsel (by ECF)

---

[9] Costanzo also suggests that imposition of such a forfeiture order might be unconstitutionally excessive. Second Circuit precedent, however, strongly suggest that "a forfeiture amount is not . . . greatly disproportionate where it equals the proceeds of the illegal scheme." *United States v. Patterson*, No. 21 Cr. 1678, 2022 WL 1825627, at *6 (2d Cir. 2022); *United States v. Bonventre*, 646 F. App'x 73, 91-92 (2d Cir. 2016) ("Where . . . forfeiture ordered is in an amount equivalent to the undisputed, actual proceeds of the fraud, . . . we cannot conclude that the order was grossly disproportional to the gravity of the offense."). This is particularly true here, where the amount of forfeiture to be imposed falls well within potentially statutory fine and the Guidelines fine range of $30,000 to $300,000. *See id.* (noting that one factor for consideration is how the forfeiture amount compares to "the maximum sentence and fine that could have been imposed").